# EXHIBIT B

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - -x

BURTON T. FRIED,

     Plaintiff,

   -against-

      10 Civ. 9308 (JSR)(JCF)

LVI SERVICES, INC.; LVI PARENT CORP.;
CODE HENNESSY SIMMONS LLC d/b/a CHS
PRIVATE EQUITY V LP; APOLLO
INVESTMENT CORP.; SCOTT E. STATE, in
his official and individual capacities;
BRIAN SIMMONS, in his official and
individual capacities; RAJAY BAGARIA,
in his official and individual
capacities; GERALD J. GIRARDI, in his
official and individual capacities,

     Defendants.

- - - - - - - - - - - - - - - - - - -x

     May 20, 2011
     9:56 a.m.

    Videotaped deposition of

BURTON T. FRIED, taken by attorneys for

Defendants, pursuant to notice, held at the

offices of Sidley Austin LLP, 787 Seventh

Avenue, New York, New York, before Nicole

Cannistraci, a Shorthand Reporter and Notary

Public within and for the State of New York.

 Pages 293 - 297 were marked "Highly Confidential".

**Elisa Dreier Reporting Corp.  (212) 557-5558**
**950 Third Avenue, New York, NY 10022**

1                    Burton T. Fried

2    employment because of your age?

3         A.    Yes.

4         Q.    What facts do you have that the

5    actions happened because of your age?

6         A.    At a meeting with Scott State, on

7    November 4th, to -- at my request, to review the

8    responsibilities that I would have going forward

9    as chairman, I delivered a list of

10   responsibilities that I had been performing

11   as -- historically, as chairman, for many years.

12              And at that meeting he advised me

13   that he was going to take away my responsibility

14   for strategic growth, which was the first item

15   and something that was contained in my

16   employment agreement.  And that he would

17   specifically replace me in the development of a

18   relationship with a New England -- with a Great

19   Britain-based company called Squibb Demolition,

20   a company that I met in London, and as a result

21   of meetings, entered into -- drafted, entered

22   into a teaming agreement, with the help of

23   counsel I engaged in Great Britain, and was

24   planning to meet with the principals and the

25   owners in New York for them to reciprocate for

Burton T. Fried

1  my meeting them in Great Britain, and in order

2  to explore the actual development of a business

3  relationship, including a project in the United

4  States at an airport -- airplane facility of

5  Boeing.

6  Q.    Okay.

7  A.    He told me it was unnecessary for

8  me to attend, notwithstanding my historical

9  frame of reference in the development of this

10 relationship and my meeting and knowing the

11 people, and he would take it from that point.

12         He then said that with respect to

13 the -- all of my other duties and

14 responsibilities, he would assign that -- those

15 responsibilities to others, other managers, and

16 transition those duties to others.  He would

17 transition those duties to others and that

18 within the next 60 or 90 days, when I had

19 nothing further to do, he would then determine

20 my fate at LVI, which to me meant that he was

21 going to terminate my employment.

22         I asked him, "Scott, why would you

23 do this?"  His reply was, "Burt, you're 71 years

24 of age.  How long do you expect to work?"

1              Burton T. Fried

2       Q.    Is there --

3             MR. WIGDOR:  I don't think he's

4       done.

5             MS. SELTZER:  I'm sorry.

6             MR. WIGDOR:  Yeah.

7       A.    He then went on to say that "What

8       if you're hit by a bus," and that the company

9       has to plan for the future.

10            Clearly, I was in shock and I left

11      the meeting not knowing really what to do but

12      knowing full well that this was wrong, it had to

13      be an illegal act to say that he was taking away

14      my duties and ultimately going to terminate me

15      because of my age.  And returned to my office.

16            Q.    We'll talk more about that meeting

17      a little later in the deposition.

18            Any other facts that you have that

19      lead you to believe that your being stripped of

20      your duties and your being terminated had

21      something to do with your age, other than this

22      meeting with Mr. State?

23            MR. WIGDOR:  Does that question

24            include documents that he was unaware of

25            at the time but that he's now become

```
 1                    Burton T. Fried
 2    in-person conversation or over the phone?
 3            A.    All telephone conversations.
 4            Q.    And approximately how much after
 5    your conversation with Mr. State did that
 6    happen?
 7            A.    He was the first person I was able
 8    to reach, shortly afterwards.
 9            Q.    Was it the same day?
10            A.    All occurred between October 20th
11    and the beginning of November, but certainly by
12    the end -- I think by the end of October, within
13    a week period or so.
14            Q.    Do you remember anything else
15    Mr. Bagaria said to you during the course of
16    that telephone conversation?
17            A.    No, other than he made his point
18    quite clear as to his support of Mr. State in
19    his actions.
20            Q.    How about Mr. Simmons, was that a
21    telephone conversation as well?
22            A.    He was the second person I
23    reached, and Mr. Simmons in that conversation
24    sort of waffled and said something about "We
25    have to plan for the future and we have to
```

```
 1                    Burton T. Fried

 2   support Scott State as new CEO, but I'll get

 3   back to you after I talk to the other

 4   directors."

 5          Q.    Did he get back to you?

 6          A.    He did, with an e-mail on

 7   November 2nd.

 8          Q.    We'll look at that e-mail together

 9   in a little bit.

10                Anything else that you remember

11   Mr. Simmons saying in that telephone

12   conversation that you had shortly after your

13   meeting with Mr. State?

14          A.    I was left with the impression and

15   belief, based upon his statements, that he

16   supported these discriminatory acts that were

17   being perpetuated by Mr. State against me.

18          Q.    Did Mr. State make any kind of

19   statements to you about your age during the

20   course of that telephone conversation?

21                I'm sorry, Mr. Simmons, my

22   apologies.

23          A.    I repeated to him the comments

24   that were made by Mr. State.  And

25   notwithstanding that, he said that he has to
```

1                      Burton T. Fried

2    support -- I repeated the comments as well as

3    indicating that it was, in my mind,

4    inappropriate and probably illegal and certainly

5    discriminatory because of my age.

6              Q.    Just going back a second, did

7    Mr. Bagaria say anything that was age-related

8    during the course of that telephone

9    conversation?

10             A.    He supported the actions of

11   Mr. State after I described to him that it was

12   discriminatory and it seemed to be

13   discriminatory and illegal.

14             Q.    You said you had also a

15   conversation with Mr. Schnabel?

16             A.    Yes.

17             Q.    Am I pronouncing that correctly?

18             A.    Schnabel.

19             Q.    Why don't you tell me what you

20   remember about that telephone conversation?

21             A.    I related the same conversation to

22   him, and he was shocked.

23             Q.    What did he say that led you to

24   think that?

25             A.    He said that "I can't believe that

```
 1                    Burton T. Fried
 2   Scott State is taking that action and -- nor
 3   that he's relating it to your age, and I oppose
 4   that action under any grounds.  That Falcon made
 5   the investment, recent investment into LVI based
 6   upon your continuous employment and
 7   participation in the business of LVI, and I will
 8   contact the other parties and -- in an effort to
 9   straighten this thing out."
10        Q.    Anything else that you remember
11   Mr. Schnabel saying to you?
12        A.    That was about it.
13        Q.    Did Mr. Schnabel make any comments
14   relating to your age during the course of that
15   telephone conversation?
16        A.    Other than finding the act of
17   discrimination because I was 71 years of age to
18   be repugnant and objectionable, no.
19        Q.    So we've spoken about your meeting
20   with Mr. State and then the subsequent -- any
21   other people, by the way, that you spoke to over
22   the telephone subsequent to the -- or in person,
23   subsequent to the meeting with Mr. State?
24        A.    Yes.
25        Q.    Who is that?
```

```
 1                    Burton T. Fried

 2         A.    Doug Wigdor.

 3         Q.    Okay.  Anybody else other than

 4    your counsel?

 5         A.    Other than family, no.

 6         Q.    Other than the meeting with

 7    Mr. State and your conversation with these three

 8    individuals after the meeting with Mr. State,

 9    any other facts that lead you to think that what

10    happened to you at LVI was as a result of your

11    age?

12              MR. WIGDOR:  Well, I think that

13         question doesn't accurately portray

14         his -- his testimony, because he also

15         said based on his prior performance.

16         Q.    Okay.  Anything -- any other facts

17    that you can remember?

18         A.    Yes.  I -- no mention was made of

19    any lack of performance, no criticism by anyone,

20    including those I spoke to by phone, related any

21    reason for the removal of responsibilities or

22    the planned termination by Mr. State.

23              On the contrary, I had been

24    congratulated that very same month, earlier in

25    the month, by Mr. Simmons, as performing in an
```

1                        Burton T. Fried

2    exemplary manner during the company's most

3    difficult times, which was in the period of a

4    year that it took to restructure the equity and

5    debt of the company.

6                    And when the CEO left in May,

7    during this most critical time, he asked me and

8    I accepted the position of interim CEO, and he

9    related that the entire recapitalization and

10   restructuring and the survival of LVI could not

11   have taken place without my personal leadership.

12         Q.    I'm confused.  How is Mr. Simmons'

13   asking you to be an interim CEO and

14   congratulating you with respect to your

15   accomplishment an indication that anything

16   happened as a result of your age?

17         A.    I'm explaining to you there was no

18   reason given by anyone at any time, be it

19   Mr. State or each of the directors who invested

20   the company while I was interim CEO, and made

21   the commitment before even knowing Mr. State

22   existed, it was based upon my being CEO and I

23   was seeking a candidate and being more than

24   pleased with respect to my performance.

25                    After October 19th, I told you I

1                      Burton T. Fried

2       contacted Mr. Wigdor.  But I also received a

3       written communication from Mr. Simmons in the

4       beginning -- dated the beginning of November, in

5       which he related that he had discussed my

6       complaint with other members of the board.  He

7       didn't delineate, I don't think, who, but he

8       said "other members of the board," to my best

9       recollection.  And that they -- they supported

10      the termination of my employment from LVI

11      Services and suggested that I become a

12      consultant to LVI Parent Company and perform

13      matters selected by them of a legacy nature.

14                  That was followed by a board

15      meeting on November 4th in which Mr. Simmons

16      suggested that I express my opposition to the

17      treatment that I was being received.  And that

18      took place on November 4th at a meeting of the

19      board.

20            Q.     And we'll talk more about that as

21      we get further in terms of the details of that

22      meeting, but let me just step back a second.

23                  I understand that there was a

24      written communication from Mr. Simmons in which

25      he described a consultancy agreement that --

Burton T. Fried

1    that would be offered to you.  How is that an

2    action that you believe was based on age?

3

4         A.    He knew the facts, that Mr. State

5    indicated that I was 71 years of age and how

6    long did I expect to work and "What if you get

7    hit by a bus," to me equating to "how long do

8    you expect to live."  And notwithstanding that

9    and that there was no other reason for taking

10   away my responsibilities that was given other

11   than my age, he still pursued and supported

12   Mr. State in that act of discrimination by

13   saying in his e-mail that he supported the

14   termination of my employment and the removal of

15   my health insurance and other benefits.

16        Q.    Any other facts that you can think

17   of at this point that lead you to believe that

18   the decisions that were taken by LVI had

19   something to do with your age?

20        A.    Any other facts that I was aware

21   of at that time?

22        Q.    That's correct?

23        A.    Not with respect to other e-mails

24   that I saw?

25        Q.    That's correct.

**Elisa Dreier Reporting Corp.   (212) 557-5558**
**950 Third Avenue, New York, NY 10022**

1                         Burton T. Fried

2              A.    My best recollection at the moment

3       is those were the factors.

4              Q.    Now, shifting a second to the

5       individual defendants, you brought a number of

6       claims against them that they participated in

7       this discriminatory treatment, and we spoke

8       about Mr. State briefly in terms of the comment

9       that he made to you during the course of that

10      meeting.  Any other comments or actions by

11      Mr. State that you believe reflect age

12      discrimination against you?

13             A.    Yes.  He reaffirmed his ageist

14      remark to me at the board meeting on

15      November 4th.

16             I began my presentation by saying

17      to him specifically that I would be making

18      statements about remarks he made to me during an

19      October 19th meeting and that if he felt that

20      any of those statements were untrue, to please

21      stop me, interrupt me, and either deny or

22      correct them or say what you want if in fact

23      they are untrue.  And this was a statement that

24      I made before all of the members of the board,

25      that were 100 percent attendance, and Jeffrey

```
 1                    Burton T. Fried
 2   Smith, who was counsel to LVI Parent and a
 3   partner in Sidley firm.
 4              Mr. State looked at me and nodded
 5   his head, and I went into a presentation
 6   concerning my service to LVI over a period of 24
 7   years in its leadership and the most recent
 8   events of the most difficult times of LVI in the
 9   past year, which involved keeping thousands
10   employed without any credit line, which the bank
11   shut down, negotiating -- doing negotiations
12   with the lender, that was CIBC in New York,
13   keeping management intact, especially the
14   corporate staff in New York during this period
15   of time, notwithstanding rumors of the ultimate
16   demise of LVI because of its being in default of
17   indebtedness in an attempt to restructure.  And
18   described major projects that I was either
19   directly or indirectly involved of in New York,
20   that was the most premier projects, certainly in
21   New York City, if not the United States, during
22   the past year, which included the Deutsche Bank
23   building and being deeply involved daily, if not
24   weekly, in the progress of that project, the
25   most regulated project ever in the United States
```

```
1                    Burton T. Fried
2    because of its unfortunate history with the
3    death of a few firemen.
4                    Yankee Stadium project being
5    performed in a densely populated area, as well
6    as Deutsche Bank, and yet having -- getting the
7    community to support our actions and regulatory
8    authorities to support our -- and with an
9    incredible safety record as well as LMBC in the
10   Deutsche Bank project.
11                   And then ultimately, the most
12   recent project which I negotiated for LVI, which
13   was the remediation and selective structural
14   demolition project, the Deutsche Bank project,
15   which I negotiated a price with the help of
16   management, provided me the numbers, but the
17   actual contract I negotiated and the award I
18   negotiated with representatives of Cable Vision,
19   Madison Square Garden and Turner Corporation.
20   This was a $27 million contract to be performed
21   over a four-year period, which I'm sure is
22   currently being performed.
23                   And I described to them all these
24   events, including stepping in for Bob McNamara,
25   who left in May, and during these difficult
```

```
 1                      Burton T. Fried
 2    times holding 200 million in bonding and keeping
 3    it effective notwithstanding the rumors going
 4    around, as well as received by the surety about
 5    our ultimate demise, which were rumors, but
 6    certainly made everybody nervous, including
 7    suppliers.  Having to keep the financial
 8    stability of the company going, notwithstanding
 9    not having resource to a credit line, and
10    therefore millions in payroll going out and
11    relying upon collection of receivables and
12    able -- before the closing able to amass
13    $17 million in cash in the bank.
14                  Performing these human tasks and
15    then to be told that because of my age and
16    related -- looking at Scott, the comment he
17    made, that within two weeks or three weeks of
18    his employment, that I was dead wood, that I was
19    useless, that I was old, that I was 71 years of
20    age and have no value to LVI, and that how long
21    did I expect to work, and by relating about
22    being hit by a bus, meaning -- "and we have to
23    plan for the future" -- that my longevity was of
24    short term.
25                  Scott State did not say a word
```

1                     Burton T. Fried

2     and -- to object to the credibility or the

3     candor or the accuracy of my remarks.

4                 Subsequently, when the meeting

5     proceeded after my remarks, none of the board

6     members who spoke objected to the remarks,

7     criticized the remarks.  They completely ignored

8     the remarks and rather told me that I had no

9     right to complain, I had no right to object, I

10    had no right to even discuss this matter, and

11    that it was the absolute unalterable right of

12    the corporation, the board of directors,

13    according to Bagaria and Scott State, to do

14    whatever he wished insofar as my continuity in

15    the corporation.

16                Q.    Are you done with your answer?

17                A.    For the moment.  There were

18    further discussions but that's all -- that's all

19    that I think relates to your question.

20                Q.    Before I get to these comments

21    that I want to talk a little more about, but

22    during the course of this meeting did Scott

23    State say or do anything that evidenced to you

24    age discrimination, or was it his not saying

25    something that you believe was discriminatory?

**Elisa Dreier Reporting Corp.   (212) 557-5558**
**950 Third Avenue, New York, NY 10022**

```
 1                    Burton T. Fried

 2   you believed to have been a comment with respect

 3   to your age?

 4               MR. WIGDOR:  And I object to the

 5          form of the question.

 6          A.    Not that I can recall.

 7          Q.    Let's turn our attention to

 8   Mr. Simmons.

 9               During the course of your

10   employment with LVI, did Mr. Simmons ever make a

11   comment to you that you believed to have been a

12   reflection of his discriminating against you on

13   account of your age?

14               MR. WIGDOR:  Objection to the form

15          of the question.

16          A.    Not until after my conversation

17   with Mr. Simmons concerning the age remark and

18   cause of action because of my age being made by

19   Mr. State.

20          Q.    What did Mr. Simmons say to you

21   that --

22          A.    He had to support the actions

23   of -- of Mr. State and did not attempt to -- and

24   in effect supported -- by his statements to me,

25   supported the position of Mr. State that I was
```

```
1                    Burton T. Fried
2    too old and how long would I continue to work,
3    and by saying to me, "We have to plan for the
4    future."
5              I had grown the company for 24
6    years to be the most successful company in its
7    field of specialty and the largest in my last
8    year of CEO.  I achieved the highest earnings,
9    more than $60 million, and the highest revenue.
10   I created a brand name, LVI.  And I was
11   congratulated by Mr. Simmons on not only I --
12   permitting him to achieve a restructuring of the
13   company and the survival of LVI and his
14   investment just weeks before, as well as telling
15   me that the closing could never have taken place
16   without me, as well as telling me that the hire
17   of Mr. State could not have taken, and
18   congratulating me, and could not have taken
19   place without me, and now was telling me that he
20   supported the comments of Mr. State that I was
21   too old.
22        Q.    Did he say that?
23        A.    Yes.
24        Q.    Did Mr. Simmons state that he
25   supported the statement -- the ageist statement
```

1                   Burton T. Fried

2    that Scott State made to you?

3          A.    Yes.

4          Q.    When did he say that?

5          A.    In the conversation he said, "We

6    have to plan for the future."

7          Q.    How is that supporting the

8    statement?

9          A.    After repeating to him the comment

10   that I was too old to continue, and he was

11   taking away -- my responsibilities would

12   terminate, he gave a reason, an explanation for

13   that comment by saying that the company has to

14   plan for the future, notwithstanding my efforts

15   and notwithstanding his comments of my successes

16   with the company in the previous year.

17         Q.    Is it possible that Mr. Simmons

18   was giving an explanation, perhaps, for the

19   things that were happening to you, like the

20   giving away of your responsibilities to

21   management, as opposed to the comment that

22   Mr. State made?

23               MR. WIGDOR:  Objection.

24         A.    I don't understand the question.

25         Q.    Well, you just stated that

1                    Burton T. Fried

2      Mr. Simmons saying, "We have to move on" or "we

3      have to plan for the future" was his support of

4      the ageist statement that Scott State made; is

5      that correct?

6           A.    Yes.

7           Q.    Couldn't it be that Mr. Simmons

8      was actually saying that he was supporting

9      Mr. State's actions in moving some of your

10     responsibilities to management as opposed to the

11     statement?

12                    MR. WIGDOR:   Objection.

13                    Go ahead.

14          A.    He was supporting the ageist

15     remark and the actions he was taking because of

16     the ageist remark by saying, "We have to plan

17     for the future."  Planning for the future,

18     because of the ageist remark, is inalterably

19     connected and merged.

20                    In my statement to him, it wasn't

21     two separate conversations.  It was one complete

22     dialogue in which he supported by saying, "We

23     have to plan for the future."  He didn't say, "I

24     don't consider you too old but we have to assign

25     duties for other reasons."  His simple comment

**Elisa Dreier Reporting Corp.   (212) 557-5558**
**950 Third Avenue, New York, NY 10022**

1                    Burton T. Fried

2    was, after I made that one statement about age

3    and assignment of duties, "We have to plan for

4    the future."

5            Q.    Okay.  Other than Mr. Simmons,

6    according to you, supporting Mr. State's

7    statements to you, did Mr. Simmons take any

8    other action against you that you believe was

9    based on your age?

10           A.    Yes.

11           Q.    What is that?

12           A.    At the board meeting he was very

13   vocal in supporting the position of Mr. State

14   and the actions Mr. State was taking, and at no

15   time did he recant or -- or deny or say that he

16   disagreed with the reasons for Mr. State's

17   actions.  And his concluding remarks in which I

18   were present, because there was a part that I

19   wasn't present, in which I was present, was that

20   he would discuss it with the board but as far as

21   he was concerned, whatever Scott State wanted,

22   he supported for the reasons that Scott State

23   gave.

24           Q.    So I'll ask you my question one

25   more time.

**Elisa Dreier Reporting Corp.   (212) 557-5558**
**950 Third Avenue, New York, NY 10022**

```
 1                    Burton T. Fried
 2                    Other than his support of Scott
 3    State and the statement and these actions that
 4    Mr. State wanted to take against you, is there
 5    anything else that Mr. Simmons did to you that
 6    you believe to be discrimination on the basis of
 7    age?
 8                    MR. WIGDOR:  Objection.
 9         A.    Yes.
10         Q.    What is that?
11         A.    On November 16th, I think it was,
12    I could be off a day, but November 16th he sent
13    me a letter.
14         Q.    I think I know the letter, the
15    consultancy letter we spoke about a second ago?
16         A.    No, a letter in which he
17    terminated my employment on behalf of the board.
18         Q.    Okay.
19         A.    My employment with LVI Services, I
20    think, and wrote the letter on Code Hennessy
21    stationery and -- and then offered, after
22    termination of my employment, for me to become
23    employed as a consultant for another company,
24    LVI Acquisition, as a consultant.
25                    MR. WIGDOR:  Are you done with the
```

```
 1                    Burton T. Fried
 2          answer?
 3                    THE WITNESS:  Yes.
 4                    MR. WIGDOR:  I would like to take
 5          a break.  We have been going for about
 6          an hour, so --
 7                    MS. SELTZER:  Fine.
 8                    THE VIDEOGRAPHER:  The time is
 9          10:55 a.m.  We're going off the record.
10                    (An off-the-record discussion took
11          place.)
12                    (A recess was taken.)
13                    THE VIDEOGRAPHER:  The time is
14          11:01 a.m. and we're back on the record.
15    BY MS. SELTZER:
16          Q.    Before the break we were talking
17    about Mr. Simmons and the actions that you
18    believe that he took against you as a result of
19    your age, and you talked about his support of
20    Mr. State's decisions with respect to you, and
21    you spoke about this November 16th letter which
22    he sent to you indicating your termination of
23    your employment and the consultancy agreement.
24                    Is that an accurate representation
25    so far?
```

<pre>
 1                    Burton T. Fried

 2          A.    Yes.

 3          Q.    Anything else Mr. Simmons did that

 4    you believe were based on age discrimination?

 5          A.    Yes.

 6          Q.    Okay.

 7          A.    He sent me a letter, as a member

 8    of the board of LVI Parent, terminating my

 9    employment of LVI Services, Inc.  It was not the

10    board of LVI Services, Inc. that terminated my

11    employment but the board of LVI Parent.  I did

12    not have any employment relationship for the

13    services that I was performing for LVI Services

14    with LVI Parent.  I thought that was a -- an

15    illegal act in furtherance of their

16    discriminatory conduct and to take that -- those

17    actions without even caring about the corporate

18    protocol and requirements of law and exceeding

19    the authority that he had.

20                    So individually and as a member of

21    LVI Parent, with the other board members, they

22    were terminating my employment that I had the

23    agreement with another corporation.

24                    Further, he then attached to his

25    letter of termination an offer of employment as
</pre>

1                        Burton T. Fried

2     a consultant, terminable at 30 days' notice.

3     And yet requiring me, in order to become a

4     consultant, to waive my age discrimination

5     claims.  And I thought this was an act of

6     discrimination.

7            Q.    Waiving the claims, asking you to

8     waive the claims?

9            A.    Asking me to waive the claim.   I

10    also considered that to be an acknowledgment

11    that I had an age discrimination claim.

12           Q.    You had raised a claim by that

13    point, had you not?

14           A.    Yes.  And now he was asking me to

15    waive it.

16                 I felt that if there was -- he

17    certainly gave merit to my claim, that's why he

18    was asking for a waiver, or else he wouldn't ask

19    for a waiver.  He was acknowledging the claim

20    and in my mind the authenticity of the claim.

21           Q.    In your mind?

22           A.    Yeah, in my -- it was in my mind

23    as a lawyer for 46 years that you don't ask

24    somebody to waive something if there is no merit

25    to it.  And it was condition of my employment as

**Elisa Dreier Reporting Corp.   (212) 557-5558**
**950 Third Avenue, New York, NY 10022**

```
 1                    Burton T. Fried
 2    a consultant to LVI Parent.
 3            Q.    Anything else that Mr. Simmons
 4    did, other than this letter and his support of
 5    Mr. State?
 6                  MR. WIGDOR:  I'm just going to
 7                  keep on objecting.  Why don't you just
 8                  ask anything else, because his prior
 9                  testimony speaks for itself.
10                  MS. SELTZER:  Okay, that's fine.
11                  MR. WIGDOR:  You keep on trying to
12                  recharacterize his testimony.
13            Q.    Anything else that Mr. Simmons did
14    with respect to your employment that you believe
15    to be based in age discrimination?
16            A.    Yes.  I subsequently discovered
17    that he was planning --
18            Q.    Did you discover that as a course
19    of your discovery in this case?
20            A.    Yes.
21                  Can I finish my answer?
22            Q.    Sure, go ahead.
23            A.    I discovered that he was planning
24    to -- and conspiring with Mr. State to cause my
25    retirement prior to the time that Mr. State was
```

```
 1                    Burton T. Fried
 2    even hired and while he was being considered for
 3    hire.  And that other correspondence indicated
 4    that that plan of Mr. Simmons and Mr. Hogan and
 5    the other board members was being effectuated
 6    with the ultimate meeting that took place with
 7    Mr. State on October 19th.  And in furtherance
 8    of their ends, they -- he gave me the impression
 9    that this complaint was being considered and he
10    was going to discuss it with the board, when I'm
11    certain that he had already planned to terminate
12    me, force me into retirement or whatever you
13    want to call it.  And that's why he included in
14    the offer of consultancy that -- not only asking
15    me or requiring me to waive my claim but
16    required me to agree not to compete with the
17    company for a period of 12 months without
18    compensation, when the current agreement in
19    effect that I had with the company required me
20    to be paid for noncompetition.  And that also
21    was another act of discrimination in furtherance
22    of his purposes to terminate my employment
23    unlawfully.
24              Q.   What document did you see that led
25    you to believe that there was a plan to retire
```

1                   Burton T. Fried

2      document.  I don't remember the exact words.

3             Q.    Okay.

4             A.    But the whole effect of the

5      document is how do we get rid of Fried, how do

6      we retire him.

7             Q.    Is the word "retirement" used in

8      the document?

9             A.    Yes.

10            Q.    Okay.  Anything else that

11     Mr. Simmons did that made you name him in this

12     lawsuit?

13            A.    Not that I can recall at the

14     moment.

15            Q.    Let's turn to Mr. Bagaria.

16                  In addition to his support of

17     Mr. State's decisions with respect to your

18     employment and his participation in that board

19     meeting, is there anything else that Mr. Bagaria

20     did that you believe to be an action against you

21     because of your age?

22            A.    Yes.

23                  MR. WIGDOR:  Objection.  Again,

24            I'm going to just object and just -- the

25            record speaks for itself as to what this

1                    Burton T. Fried

2          witness has testified with respect to

3          Mr. Bagaria, not the way this -- the way

4          counsel is phrasing the question.

5              MS. SELTZER:  Objection taken.  He

6          can answer the question.

7              MR. WIGDOR:  I just want to make

8          sure the question is clear, because I

9          know the question is going to appear in

10         some motion down the line.  I just want

11         to make sure when the judge reads the

12         motion he understands that there is

13         prior testimony before this question,

14         which mischaracterizes the evidence.

15         Q.    You can answer the question if you

16    remember what it is.

17         A.    I -- I remember -- I related to

18    you the conversation that I had with Mr. Bagaria

19    after October 19th.

20         Q.    Okay.

21         A.    In his support for the actions of

22    Mr. State.  I hope I don't have to repeat this.

23         Q.    No, anything more.  You don't need

24    to repeat anything that you've said already.

25         A.    He was very vocal at the board of

1                    Burton T. Fried

2    director closed session.  And unlike

3    Mr. State -- sorry, unlike Mr. Simmons in saying

4    that it was the authority of Mr. State to

5    determine what my duties were or were not and

6    how long I would be with the company, it was

7    Mr. Bagaria's position that -- he vocalized in

8    front of that entire room that it wasn't any CEO

9    that had the authority to change my duties or to

10   terminate me, it was the authority of the board,

11   LVI Parent.

12               And I found that to be

13   discriminatory in that LVI Parent was not my

14   employer but was acting as my employer.  And he

15   was so anxious to terminate me because of my

16   age, and notwithstanding counsel being in the

17   room, was now voicing the fact that it was LVI

18   Parent that would take that action.  And in

19   fact, it did.  With the letter of Mr. Simmons,

20   on behalf of the board of LVI Parent, they were

21   terminating my employment with LVI Services.

22               So this was a group who in concert

23   determined one way or the other, and without

24   apology, were going to terminate my employment

25   because of age, notwithstanding my comments and

1                    Burton T. Fried

2    objections, and then were going to retaliate

3    against me and -- by termination, and then

4    retaliate against my daughter by terminating her

5    employment within weeks thereafter.

6              Q.    Okay.  We'll get to that.

7                    Anything else Mr. Bagaria did,

8    other than what happened at that meeting on

9    November 4th and anything else that you

10   testified to, anything more that you want to add

11   in terms of what Mr. Bagaria might have done to

12   you with respect to your age?

13             A.    There are -- there is

14   correspondence, e-mails that I have not yet

15   reviewed, that were being produced as of

16   yesterday by your office.  I have not had a

17   chance to review it and I don't know if

18   everything has been produced that was requested,

19   so that there may be other actions in writing

20   that I'm not aware of.

21             Q.    Anything that you remember now?

22             A.    As I know now, based on what I've

23   seen, I don't recall anything else.

24             Q.    And with Mr. Girardi, what actions

25   do you believe he took that were based on your

**Elisa Dreier Reporting Corp.   (212) 557-5558**
**950 Third Avenue, New York, NY 10022**

```
 1                    Burton T. Fried

 2    age?

 3            A.    He was the other person at the

 4    board meeting of February 4th --

 5            Q.    November 4th?

 6            A.    I'm sorry, I'm sorry,

 7    November 4th.

 8                  -- that became very vocal in

 9    supporting the comments made by his colleague,

10    Mr. Bagaria, on behalf of Apollo and as a board

11    member of LVI Parent, in supporting the

12    discrimination that was being brought upon me,

13    by saying that he as a board member supports the

14    actions of Mr. State and I had no say, and was

15    particularly offensive in his remarks.  Because

16    I remember saying to him, probably too politely,

17    "Please don't talk to me that way."  At which

18    point he didn't say anything further and moved

19    to the other side of the room, away from me.

20            Q.    What had Mr. Girardi said to you

21    that prompted that comment from you?

22            A.    It was offensive remarks

23    concerning the fact that I had no rights and it

24    was -- it was like Mr. Bagaria said, the rights

25    of the board to determine, and Mr. State was a
```

64

1                          Burton T. Fried

2      time?

3               A.      General counsel.  And I have --

4      maybe I've been called president, but I didn't

5      perform as such.

6               Q.      Okay.  So your first position with

7      LVI was as general counsel?

8               A.      Yes.

9               Q.      And what was your position

10     subsequent to that title?

11              A.      A few years later I became

12     president and CEO.

13              Q.      So that would have been around

14     1988, '89?

15              A.      Yes.  '89, I believe.

16              Q.      And -- go ahead.

17              A.      Yeah, correct.

18              Q.      And how long did you hold that

19     position?

20              A.      I held that position for 17 years.

21              Q.      When did you start working out of

22     the Westport office?

23              A.      September of 2003.

24              Q.      And what was the reason for your

25     moving to the Westport office?

**Elisa Dreier Reporting Corp.   (212) 557-5558**
**950 Third Avenue, New York, NY 10022**

1                    Burton T. Fried

2          A.    I could be more effective in the

3    management of the company through less travel

4    and more effective in the development of and

5    oversight, really, of the New York corporate

6    office and the development of the business in

7    New York and making plans for the fact that at

8    my request we were about to be engaged in the

9    recruitment of the CEO, new CEO, at which point

10   I would become chairman.

11         Q.    Why did you think that being in

12   Connecticut would make you more effective with

13   respect to oversight of what was happening in

14   New York?

15         A.    I no longer had to travel three

16   hours a day, and I showed up for work usually

17   around seven o'clock in the morning, and rather

18   than traveling and first arriving at the office

19   sometime later.

20         Q.    Do you live in Westport?

21         A.    Yes.

22         Q.    Was a consideration for your

23   moving to a Westport office convenience to you

24   with respect to your commute to work?

25         A.    Yes.

66

Burton T. Fried

2      Q.     Did you have an office in
3   New York?

4      A.     Yes.

5      Q.     Where was that located?

6      A.     Eighty Broad Street.

7      Q.     And with respect to a normal week,
8   how many days did you work in New York as
9   opposed to the days that you worked in Westport,
10  Connecticut?

11          MR. WIGDOR:  You're talking about
12          physically or what he was doing?

13          MS. SELTZER:  No, physically.

14      A.     I worked in the New York office
15  maybe two, three days a week and Connecticut
16  two, three days a week.  It depended upon
17  business matters as to where I worked, but I
18  also, in addition -- even if I wasn't physically
19  in the New York office, I was having meetings in
20  New York City on securing work and other legal
21  matters and business matters.  So I wasn't
22  limiting it -- if I worked in Connecticut three
23  days, it wouldn't necessarily mean I was only
24  two days in New York.  I could have been there
25  longer than that.

**Elisa Dreier Reporting Corp.  (212) 557-5558**
**950 Third Avenue, New York, NY 10022**

```
 1                    Burton T. Fried
 2        A.      President and CEO.
 3                MS. SELTZER:  Could you mark this
 4        as Exhibit 2, please.
 5                (Investment memo marked Fried
 6        Exhibit 2 for identification.)
 7        Q.      Exhibit 2 is a document entitled
 8   "Investment Memo," Bates stamped number CHS1 to
 9   11.
10                Have you ever seen this document
11   before, Mr. Fried?
12        A.      I don't recall seeing it, no.
13        Q.      If you turn to page number 3 of
14   this document, it's also called CHS3 on the
15   lower right-hand corner, if you look at the
16   second bullet point from the bottom that begins
17   with "Enhance the strong management team," could
18   you just read that paragraph to yourself?
19        A.      Yes.
20        Q.      This paragraph talks about "The
21   current CEO, Burton Fried, will then transition
22   into an active chairman role focusing on growth
23   initiatives."
24                Do you see that?
25        A.      Yes.
```

1                    Burton T. Fried

2          Q.    Was that your decision to

3    transition into a chairman role or was it the

4    decision of CHS or any entity involved in the

5    purchase of the company?

6          A.    It was my decision.

7          Q.    Why did you decide that you wanted

8    transitioning to an active chairman role?

9          A.    We had achieved revenues

10   approaching 300 million.  I felt that the

11   company had the capability of continuing its

12   profitable growth and achieving revenues with

13   profits of a billion.

14              At that point in time we were

15   dominating -- the dominant force in the nation

16   in the performance of our services.  We had a

17   brand name.  We had 25-plus offices.  We were

18   probably the largest of our kind in the planet.

19   And I believed the company needed the management

20   skill sets to take us to a billion and I didn't

21   know that I had that capability.  And I then

22   recommended to Blue Point that we conduct a

23   search.  And they asked me to retain a

24   recruiter.  They supported the effort to retain

25   a recruiter.

**Elisa Dreier Reporting Corp.   (212) 557-5558**
**950 Third Avenue, New York, NY 10022**

```
 1                    Burton T. Fried
 2    Code Hennessy, and retained the recruiter even
 3    before I heard the name Code Hennessey, and
 4    suspended this recruitment process even before I
 5    ever heard the name Code Hennessey, because we
 6    now decided to move forward with a possible sale
 7    of the company and I felt that it would be
 8    useless to identify a candidate and select one
 9    when we couldn't introduce the new owner for
10    whom he would work.  So we suspended that
11    process.
12            Q.    So at the time that Code Hennessey
13    bought LVI, they knew that you had intended to
14    step from the position of CEO to the position of
15    chairman and to hire a CEO to take your place in
16    that position; is that correct?
17            A.    There was no intention.  They knew
18    I would.  And that was the plan before and they
19    bought the company with that understanding.
20            Q.    Was there ever a chairman before
21    you in that position?
22            A.    No.  I was the most senior officer
23    for the period of time from 19 -- certainly
24    performing the function from 1989 through this
25    date, which was 2005.
```

```
 1                    Burton T. Fried

 2    with his consent and clearly with the

 3    understanding and consent of the board of both

 4    LVI Services and LVI Acquisition, the then

 5    parent of LVI Services.

 6                    And was requested by the board,

 7    which included Mr. Simmons, Mr. Hogan,

 8    Mr. Hennessy from CHS, to actively pursue a

 9    variety of matters on behalf of the company,

10    including collection of approximately

11    $10 million of receivables that were owed as a

12    result of Hurricane Katrina.

13         Q.    We'll get to the responsibilities

14    under Mr. McNamara in a second.  I just want to

15    focus back to your understanding of the role of

16    active chairman at the time that this company

17    was sold to CHS.

18         A.    Okay.

19         Q.    And you mentioned a second ago

20    that you believed -- was it your understanding

21    that the strategic initiatives that you were

22    going to be asked to do were determined by the

23    board of directors and the CEO that would be

24    taking your position?

25         A.    I don't think the board of
```

1                    Burton T. Fried

2    directors ever got involved in the operations of

3    the business.  They were there simply to listen

4    quarterly, if that frequent, to results of

5    operations and the plans for the future and to

6    make recommendations to management of what steps

7    to take and who to use and how to get there.

8           Q.     So who would you believe would

9    have been responsible for determining the types

10   of growth initiatives that you would be focused

11   on as chairman of LVI?

12          A.     That would be the CEO, and that

13   would be with the support of the board.

14          Q.     Did you view the chairman role as

15   an opportunity to remove yourself from the

16   day-to-day management of the firm?

17          A.     Yes.

18          Q.     Why did you want to remove

19   yourself from the day-to-day management?

20          A.     Simply because the CEO role, by

21   its title, as chief executive officer, should

22   have the day-to-day and final decision in the

23   operations of the business.  And the chairman

24   should be a person who supports the actions of

25   the CEO and in any way that the CEO seeks that

```
 1                    Burton T. Fried
 2   advice and counsel.
 3            Q.    Did you play a role in recruiting
 4   the new CEO, the very first CEO after you --
 5   after the sale or during the sale of CHS -- of
 6   LVI to CHS?
 7            A.    We commenced -- we started up
 8   again the recruitment process under the original
 9   retainer agreement that we had signed with
10   Heidrick & Struggles, and only this time it was
11   like Blue Point.  Mr. Simmons, on behalf of Code
12   Hennessy, asked that I select the candidate,
13   find the candidate, select the candidate and
14   present the candidate for the approval of Code
15   Hennessey.
16            Q.    So am I to understand that you
17   were in charge of the recruiting process for the
18   CEO position?
19            A.    I was the sole person who -- who
20   was engaged to -- with that task and worked with
21   Hunter --
22            Q.    Was Mr. McNamara the only person
23   that presented as a CEO candidate?
24            A.    No.  There were others, but for --
25   for consideration and review, but it was
```

```
 1                    Burton T. Fried

 2         BF03.

 3         Q.    Do you recognize this document,

 4    Mr. Fried?

 5         A.    I don't have it.

 6         Q.    Oh, I'm sorry.

 7               Now do you recognize it?

 8         A.    Yes.

 9         Q.    Was this the agreement that you

10    were referring to before?

11         A.    Yes.

12         Q.    And on page BF03, is that your

13    signature on the bottom?

14         A.    It is.

15         Q.    Was it your understanding that

16    this contract -- let me strike that.

17               Do you know the concept of at will

18    employment, Mr. Fried?

19         A.    Yes.

20         Q.    Was this contract -- did this

21    contract leave you the freedom to leave whenever

22    you wanted and give LVI the ability to terminate

23    you whenever they wanted?

24         A.    It gave me the freedom of not

25    having a specific term of employment, and that
```

1                    Burton T. Fried

2    went both ways with respect to both of us.

3    There was no specific term.  There's no

4    termination provision.  So it would appear that

5    we each had a right to terminate the agreement.

6         Q.    And could you have had -- could

7    you have negotiated a term employment agreement

8    if you wanted to?

9         A.    I don't know, I don't remember.

10        Q.    Did you ask for one?

11        A.    I don't recall.

12        Q.    Did you feel that you needed some

13   kind of guarantee to stay with the company?

14        A.    There is no term agreement, so it

15   appears that I didn't need any, feel I needed

16   any guarantees.

17              This is -- in a way, this was

18   similar to the terms of employment that I held

19   every other employee and officer and senior

20   manager accountable to, that as long as you

21   perform, you have no worry about being

22   terminated.  That resulted in all of my senior

23   managers with a longevity of 20 to 24 years in

24   the employment of LVI without a term agreement.

25   So I held myself to the same standard as

```
 1                      Burton T. Fried

 2    do?

 3             A.      I've served LVI and I -- they had

 4    a need, and it wasn't a position that I wanted,

 5    but was by necessity.   There was no one else

 6    that could handle the position, especially in

 7    the trying times of restructuring and the

 8    economy.

 9             Q.      When you were working as chairman,

10    were you working full-time?

11             A.      Yes.

12             Q.      Was there ever an agreement that

13    you would be working part-time while you were

14    working as chairman?

15             A.      No.   After Mr. McNamara took over,

16    he discussed with me a reduction in my

17    compensation in connection with now that I was

18    no longer CEO but chairman.   And I agreed to a

19    reduction of 20 percent, down to 600,000,

20    provided that the amount of time that I had to

21    devote was no more than 20 percent less than a

22    full week, which was four days.

23             Q.      I don't mean to interrupt you, but

24    is it your testimony then that you did go to a

25    more part-time schedule, less than a full-time
```

                          Burton T. Fried

1

2    schedule?

3             A.     For one week.

4             Q.     For one week?

5             A.     And then I went back to a

6    full-time schedule at the same compensation that

7    I agreed to, which was the reduced amount.

8             Q.     Why did you go back to full-time?

9             A.     My services were necessary.

10            Q.     Did Mr. McNamara ask you to go

11   back full-time?

12            A.     No.

13            Q.     Did the board?

14            A.     No.  The demands of the business

15   required it, and as everyone in the company

16   knew, including people at the Westport office, I

17   worked from 7 in the morning straight until 5 or

18   5:30, sometimes 6.

19            Q.     When Mr. McNamara resigned, did

20   you ever think about taking over the role of CEO

21   again?

22            A.     No.

23            Q.     Why?

24            A.     I felt the company had the need to

25   have somebody in there that could grow the

1                    Burton T. Fried

2     company.

3            Q.    So is the reasoning that you

4     decided not to step back in full time is the

5     same reasoning which you originally thought a

6     CEO was needed; is that correct?

7            A.    I was working full time.  I didn't

8     want to take over the CEO role for the same

9     reason we searched and found Mr. McNamara.  And

10    that was for the growth of the company to be far

11    larger and a more dominant force in the

12    marketplace.

13           Q.    Did the board have to approve your

14    assuming the interim role of CEO?

15           A.    The board did.

16           Q.    The board did?

17           A.    Yes.

18           Q.    And did the board agree to giving

19    you an increase in your salary when you became

20    the interim head and the CEO?

21           A.    Yes.  I asked that of Mr. Simmons,

22    who then confirmed it to me in writing.

23           Q.    Did Mr. Simmons discuss with you

24    his reasoning for wanting you to become interim

25    president and CEO?

1                      Burton T. Fried

2          A.     Yes.

3          Q.     What did he say that you remember?

4          A.     I was the only qualified person to

5    continue the stable path of the company, retain

6    management, motivate management, continue

7    profitable operations, and as the face of the

8    company with respect to the surety relationships

9    and other relationships, and understanding that

10   as part of my duties I would conduct a search

11   for a permanent CEO.

12         Q.     Did Mr. Simmons say that he felt

13   that you were the only person who would be able

14   to function in this interim capacity until a new

15   CEO was found?

16         A.     Yes.

17         Q.     How old were you at the time,

18   Mr. Fried?

19         A.     That occurred in May of '10.  I

20   was 70 years old.

21         Q.     At that time did Mr. Simmons

22   express any kind of reservation of you assuming

23   that role because of your age?

24         A.     Not on an interim basis.  He was

25   without options at the time.  A search would

```
 1                    Burton T. Fried

 2   take, you know, a considerable period of time

 3   and the ship would be rudderless, so it was a

 4   matter of necessity.

 5          Q.     Did you take control of searching

 6   for a new CEO?

 7          A.     Yes.

 8          Q.     Did anybody else take control with

 9   you or was it solely you?

10          A.     Solely me.

11          Q.     Did Mr. Simmons participate at all

12   in the recruitment?

13          A.     No.

14          Q.     Did you retain a search firm?

15          A.     Mr. Simmons recommended one, which

16   was Russell Reynolds.

17          Q.     Did you agree with that

18   recommendation?

19          A.     No.

20          Q.     Why?

21          A.     I felt they didn't have the

22   specialist that was necessary to produce a

23   candidate or candidates with the proper

24   qualifications.

25          Q.     Did you then move forward with
```

```
 1                    Burton T. Fried
 2    was earlier -- it was the only one I presented,
 3    frankly, to Mr. Simmons.  And Mr. Hopkins then
 4    did some research and withdrew.
 5            Q.    Why did he withdraw?
 6            A.    I can only tell you what I
 7    believe, not what the fact is, so I prefer not
 8    to say.
 9            Q.    Did Mr. Hopkins have any
10    conversations with you about why he was
11    withdrawing from the position?
12            A.    No.
13            Q.    Did he have any conversations with
14    Mr. Simmons about it?
15            A.    I don't know.
16            Q.    Did Mr. Simmons ever speak to you
17    about it, about any conversations with Mr.
18    Hopkins?
19            A.    I don't recall.
20            Q.    Was Mr. State also being
21    interviewed at the same time Mr. Hopkins was?
22            A.    No.  He was not a candidate for
23    this position, nor was he an individual that was
24    discovered by Russell Reynolds, nor was he a
25    person with whom Code Hennessy, Apollo or Falcon
```

1                        Burton T. Fried

2      ever heard of before.

3             Q.    In fact, you knew Mr. State, is

4      that correct, prior to this search?

5             A.    I had known Mr. State and he was

6      sort of introduced to be considered for the

7      position by one or more managers of LVI.

8             Q.    When did you meet Mr. State?

9             A.    I met him in around '99 or 2000.

10            Q.    And what was the circumstances

11     around which you met Mr. State?

12            A.    We were in bankruptcy court for a

13     competitor of LVI.

14            Q.    What was your understanding of

15     Mr. State's reputation at the time that you met

16     him and subsequent to that?

17            A.    I didn't really know Mr. State

18     prior to my first meeting with him.

19            Q.    Did you recommend to Mr. State

20     that he should apply for the position of CEO at

21     LVI?

22            A.    I suggested that after being

23     requested to do that by other managers.

24            Q.    What other managers?

25            A.    I don't -- I believe it was

1                     Burton T. Fried

2       Falcon and Apollo and then the senior managers

3       of the company.

4              Q.    Did you have some reservations

5       with respect to Mr. State's management

6       experience?

7              A.    He wasn't in the profile that I

8       was hoping to secure, but clearly it appeared

9       that he had certainly the same or similar

10      experience or as much experience as the other

11      two candidates.  So I had no objection and in

12      fact supported his hiring upon the

13      recommendation of the senior managers.

14             Q.    So would you say that Mr. State

15      was your and the management's choice for the

16      position?

17             A.    He was as a result of my adopting

18      the recommendation of the senior managers.  He

19      wasn't the choice of Mr. Simmons but then he

20      became his choice.

21             Q.    Did you have any conversations

22      with Mr. Simmons or any other CHS person about

23      the possibility of Scott State being hired?

24             A.    It was simply we were proposing --

25      I proposed him as the choice of management and

**Elisa Dreier Reporting Corp.   (212) 557-5558**
**950 Third Avenue, New York, NY 10022**

1                    Burton T. Fried

2    they went through the interview process, as I

3    mentioned, with the three equity owners and then

4    I had the senior managers and they came back and

5    said, "Okay, we'll go along with what senior

6    managers want."

7         Q.    Was there ever consideration given

8    to offering Mr. State the position of chairman

9    and CEO?

10        A.    I think there was one e-mail that

11   Simmons wrote about that and asked me if he

12   should take over as chairman and CEO or

13   something like that.  And I didn't understand

14   where that was coming at, where that was coming

15   from, but I think I indicated, you know, he

16   could do whatever he wants.  He -- he makes the

17   decisions.

18             MS. SELTZER:  Can you mark this,

19             please, as number 8.

20             (E-mail dated September 3, 2010

21             marked Fried Exhibit 8 for

22             identification.)

23             MS. SELTZER:  Let the record show

24             that Exhibit 8 is an e-mail from Burton

25             Fried to John Leonard and Paul Cutrone,

1                    Burton T. Fried

2    e-mail of October 13th, he's with the company

3    two weeks.

4                    MS. SELTZER:  Can you mark this,

5              please.

6                    (E-mail dated October 14, 2010

7              marked Fried Exhibit 13 for

8              identification.)

9                    MS. SELTZER:  Let the record show

10             that Exhibit 13 is an e-mail from Burt

11             Fried to Scott State dated October 14th,

12             2010 and Bates stamped LVI 449 to 450.

13             Q.    Would you familiarize yourself

14   with this document.

15             A.    I'm familiar with it.

16             Q.    What prompted you to send this to

17   Mr. State?

18             A.    Well, I've always believed,

19   especially after working with Bob McNamara, that

20   the best way to have an effective meeting is to

21   outline an agenda and the issues that you'd like

22   to talk about rather than have a loose

23   conversation, and it's more efficient, more

24   effective and a better result.

25                    So I called him and I asked for a

1                      Burton T. Fried

2      meeting, and he scheduled it for the 19th and I

3      told him that I would be sending him a list of

4      the agenda as well as the responsibilities that

5      I had performed historically so that we have

6      some basis upon which to have a discussion.  And

7      then he could decide what he would like me to do

8      and what not to do.

9              Q.    Was it your initiative to send

10     this or did he actually request you to put

11     together a list of what he thought -- you

12     thought your responsibilities should be under

13     his tenure?

14             A.    My initiative.

15             Q.    Was he responsive to receiving

16     this document?

17             A.    He didn't object.

18             Q.    If you look at the areas of

19     responsibility -- I know we had looked at what

20     you listed in the complaint and there's a few

21     more here than there were there -- were all of

22     these responsibilities responsibilities that you

23     had while you were working with Mr. McNamara or

24     are there some extra ones in here that you threw

25     in?

1                    Burton T. Fried

2          Q.    Okay.  Tell me what you remember

3    about the meeting in as much detail as you

4    remember.  I know we talked a little about it

5    before, but...

6          A.    The first item was the area of

7    responsibility, and so I handed him a copy of

8    the -- of that attached list.

9          Q.    That's the one that's attached

10   here, right?

11         A.    Yes.

12         Q.    So it's a little different from

13   the one that you had sent him; is that correct?

14         A.    Well, the date is different.  I

15   dated it the same day, but other than that, it

16   was pretty much the same.

17         Q.    There is a couple of more

18   responsibilities on it.

19         A.    Okay.  It could have been.

20         Q.    Anyway, go ahead.

21         A.    On reflection, I could have added

22   something and I've forgotten.  But in any event,

23   I handed him the list and I said, "Why don't we

24   go through this, and this is what I performed

25   under Bob McNamara, and why don't we determine

1                     Burton T. Fried

2    what you want me to do in going forward so I

3    have some direction."

4                     And he said, "Well, the first

5    item, I'm going to take that over.  New business

6    initiatives."

7                     I said, "Fine."  I said, "Well,

8    what about the meeting that we're planning to

9    have with Squibb in New York?

10                    "Oh, I'll attend that meeting, you

11   don't have to go there.  But if I change my

12   mind, I'll let you know."

13          Q.     Okay.

14          A.     I said -- and I said, "Well, the

15   owner of Squibb Demolition is going to be there,

16   he couldn't make the meeting in Great Britain

17   because he was ill.  I would think he would

18   expect me to be there, so you might want to

19   consider that."

20                    He said, "No, I could take care of

21   that, but if I change my mind, I'll let you

22   know.  I said, "Fine.  You want to go to the

23   next item?"

24          Q.     Yeah.  Tell me what -- what his

25   response was.  I assume you went one-on-one.

                        Burton T. Fried

1

2          A.      That's what I said.  I was giving

3   you my answer.

4          Q.      Okay.

5          A.      I said, "You want to go to the

6   next item."

7          Q.      Okay.  I thought you were talking

8   to me.  Go ahead.

9          A.      To State?

10         Q.      Yeah.

11         A.      And he said -- looked at the list

12  and he said.  "I'm going to be reassigning all

13  your responsibilities to other managers and I'm

14  going to do that in the next 60 to 90 days, and

15  when that's completed, I can let you know if

16  there is anything else for you to do."

17              I didn't immediately respond

18  because I was in a state of shock.  And my only

19  response was, "Scott, why would you do that?"

20              His response was, "Burt, you're 71

21  years of age, how long do you expect to work.

22  And what if you get hit by a truck" -- a bus,

23  rather -- "what if you get hit by a bus, and we

24  have to plan for the future."

25              My response to that, since this

229

```
 1                    Burton T. Fried
 2   discrimination.
 3            Q.     So he could have been referring to
 4   any one of those things, correct?
 5            A.     He was referring to all of them.
 6            Q.     How do you know that?
 7            A.     Because you had to be there to
 8   understand it.
 9            Q.     And he said "problem," right?
10            A.     Yeah.
11            Q.     Let's talk about the meeting with
12   the board of directors on November 4th.
13            A.     Again?
14            Q.     Yup, again.
15                   Was this a regularly scheduled
16   board meeting?
17            A.     Yes.  It was the first board
18   meeting.
19            Q.     Of the year?
20            A.     No, of LVI Parent.
21            Q.     So this was the first time that
22   Mr. Bagaria and Mr. Girardi were voting members
23   of the board?
24            A.     Yes.
25            Q.     Who attended that meeting, if you
```

**Elisa Dreier Reporting Corp.   (212) 557-5558**
**950 Third Avenue, New York, NY 10022**

```
 1                    Burton T. Fried
 2          Q.     Were -- was the -- when you state
 3     that the -- your statement was during part of
 4     the closed board meeting, what do you mean by
 5     that?
 6          A.     Well, at the end of the agenda of
 7     business items, those that were not board
 8     members were asked to leave, with the exception
 9     of Jeffrey Smith.  Although all board members
10     were asked do leave, Jeffrey Smith remained as
11     secretary because it was still a meeting of the
12     board, and that was at my request because I felt
13     it would be inflammatory to have John Leonard
14     and Cutrone there to listen to this dialogue,
15     when in fact it could have been or I had hoped
16     it would be resolved and there was no reason for
17     that to then be repeated out among the managers
18     and so forth.  And Simmons asked me if I wanted
19     it closed and I said I preferred it because of
20     that reason and he said fine.
21          Q.     What was your purpose in the
22     statement that you made to the board of
23     directors?  What did you intend to do with that
24     statement?
25          A.     If his actions had the approval of
```

1                    Burton T. Fried

2       the board.

3            Q.    So you wanted to find out if his

4       actions had the approval of the board?

5            A.    I wanted to find out if it had the

6       actions, I wanted them to be aware of what was

7       going on and whether they supported it.

8                  They had just invested tens of

9       millions of dollars into the company.  I had

10      been with the company for 24 years, I had been

11      with it in this past year, I had rescued it,

12      helped rescue it in the past six months so they

13      could do a restructuring and make the

14      investment.  It was my obligation to present to

15      them these facts and for them to determine if in

16      fact they supported the actions of Scott State.

17           Q.    Which members of the board of

18      directors were in this closed meeting?

19           A.    All.

20           Q.    So that would have been

21      Mr. Bagaria, Mr. Girardi, Mr. Schnabel,

22      Mr. Simmons?

23           A.    Yes.

24           Q.    You, Mr. State were there?

25           A.    Yes, Mr. Farucci, Mr. Buck.

1                    Burton T. Fried

2          Q.    Did you at some point during the

3    course of the meeting step out of the conference

4    room with Mr. State?

5          A.    Yes.

6          Q.    Was that after your speech?

7          A.    Yes.

8          Q.    Do you remember why you were asked

9    to step outside?

10         A.    Mr. Simmons said that the board

11   wanted to discuss this alone.   In camera?

12         Q.    I don't know if that's used in a

13   board meeting.  Possibly.

14               Tell me, about how long were you

15   and Scott outside of the conference room?

16         A.    10-15 minutes.

17         Q.    Did you speak at all?

18         A.    It seems everything is 10-15

19   minutes.

20               He came over to me and said,

21   "Burt, I just want to tell you that I never told

22   anyone not to speak to you," and because during

23   the presentation I made reference to the fact

24   that I was told by two officers that they were

25   not to speak to me, one at all, the other one