# EXHIBIT CC

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X

BURTON T. FRIED,                          :

              Plaintiff,        :   No. 10 Civ. 9308 (JSR)

              :

          v.                :   **AMENDED COMPLAINT**

              :

LVI SERVICES, INC.; LVI PARENT CORP.,     :   **JURY TRIAL DEMANDED**
CODE HENNESSY SIMMONS LLC d/b/a CHS       :
PRIVATE EQUITY V LP; APOLLO               :
INVESTMENT CORP.; SCOTT E. STATE, in his  :
official and individual capacities; BRIAN :
SIMMONS, in his official and individual capacities; :
RAJAY BAGARIA, in his official and individual :
capacities; GERALD J. GIRARDI, in his official :
and individual capacities,                :

            Defendants.        :

------------------------------------------------------------X



RECEIVED
FEB 03 2011
U.S.D.C. S.D.N.Y.
CASHIERS

## AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Burton T. Fried ("Plaintiff" or "Mr. Fried"), by and through his

undersigned counsel, Thompson Wigdor & Gilly LLP, as and for his Amended

Complaint in this action against Defendants LVI Services, Inc. (the "Company" or

"LVI"), LVI Parent Corp., Inc. (the "Parent") (together "LVI Defendants"), Code

Hennessy Simmons LLC d/b/a CHS Private Equity V LP ("CHS"), Apollo Investment

Corp. ("Apollo") (collectively with the LVI Defendants, the "Corporate Defendants"),

Scott E. State ("State"), Brian Simmons ("Simmons"), Rajay Bagaria ("Bagaria"), and

Gerald J. Girardi ("Girardi"), all in their official and individual capacities (collectively,

the "Individual Defendants") (all together, "Defendants"), hereby alleges as follows:

## NATURE OF THE CLAIMS

1.      This is an action for declaratory, injunctive and equitable relief, as well as monetary damages, to redress Defendants' unlawful employment practices and retaliation against Plaintiff, including discriminatory treatment of Plaintiff due to his Age, in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621 *et seq.* ("ADEA") and New York City Human Rights Law, New York Administrative Code §§ 8-101 *et seq.* ("NYCHRL").

2.      In addition, this action seeks relief for Corporate Defendants' common law breach of contract and breach of the implied covenant of good faith and fair dealing, as well as tortious interference with Plaintiff's employment relationship by Defendants Parent, CHS, Apollo, and the Individual Defendants.

## PRELIMINARY STATEMENT

3.      At the age of 70 years old, Plaintiff Burton T. Fried fully expected to be working at LVI into his ninth decade of life.  Tireless and dedicated to the Company even after 24 years of service, Mr. Fried worked rigorously to ensure that the Company continued down the trail of success he blazed as a pioneer in his field.  It was this work ethic that allowed Mr. Fried, through his leadership as Company President and Chief Executive Officer ("CEO"), to transform the Company from a solely regional entity into the country's largest, and only, fully integrated national provider of self-performed diverse environmental remediation, demolition, and other facility management services.

4.      Throughout his tenure, Mr. Fried garnered the respect of clients and competitors alike, investors, lenders, sureties, vendors, and all who worked with him,

2

including Company managers, many of whom had long worked side-by-side with him to build the Company into what it is today.

     5.     In October 2010, a new President and CEO, Defendant Scott E. State, began his employment at the Company. This regime change ushered in a new era at the Company, in which Mr. Fried was viewed as "dead wood" and someone who, despite his history and commitment to the Company, should retire.

     6.     On October 19, 2010, Defendant State told Mr. Fried that his duties would be transitioned to other Company managers because of his age and in breach of his employment contract. From that day forward, Defendants worked to isolate Mr. Fried from any substantive involvement in the Company, all while endeavoring to retain Mr. Fried as titular Chairman of the LVI Defendants to exploit long-standing business relationships that he had developed and cultivated, as well as to utilize Mr. Fried's knowledge of historical business matters being litigated with third parties.

     7.     As Mr. Fried was reduced to the status of a mere figurehead on account of his age, he became increasingly disheartened by Defendants' discriminatory conduct that served only to demean and debase his years of valuable service to the Company.

     8.     On November 16, 2010, the Company callously dealt its final blow by sending a letter informing Mr. Fried that, effective November 30, 2010, his almost quarter century of service to the Company would be coming abruptly to an end.

     9.     Defendants' conduct was knowing, malicious, willful and wanton and/or showed a reckless disregard for Plaintiff's rights, warranting an award of punitive damages. Such conduct has caused, and continues to cause, Plaintiff to suffer substantial

monetary damages, permanent harm to his professional and personal reputation, and severe mental anguish and emotional distress.

## JURISDICTION AND VENUE

10.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, as there is complete diversity of citizenship between Plaintiff, a resident of Connecticut, and all Defendants, and this action involves an amount in controversy in excess of $75,000, exclusive of interest and costs.  Additionally, the Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiff's rights under the ADEA. The Court has subject matter jurisdiction over Plaintiff's related claims arising under state and local law pursuant to 28 U.S.C. § 1367(a).

11.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) because the LVI Defendants are corporations doing business in the State of New York and are subject to personal jurisdiction in this district, and a substantial portion of the unlawful conduct alleged herein occurred in this district.

## PROCEDURAL REQUIREMENTS

12.     On or about December 13, 2010, Plaintiff filed a charge of discrimination against the Corporate Defendants with the Equal Employment Opportunity Commission ("EEOC"), alleging violations of the Age Discrimination in Employment Act ("ADEA").

13.     Prior to the commencement of this action, a copy of the Complaint was served on the New York City Commission on Human Rights and the Office of the Corporation Counsel of the City of New York, thereby satisfying the notice requirements of § 8-502 of the New York City Administrative Code.

14.     Any and all other prerequisites to the filing of this suit have been met.

**PARTIES**

15.     Plaintiff Burton T. Fried, a former employee of the Company, was born on February 26, 1940, and is a resident of the State of Connecticut, Fairfield County.  At all relevant times, Mr. Fried met the definition of an "employee" under all applicable statutes throughout his employment with the Company.

16.     LVI Services, Inc. is an environmental remediation company that offers a variety of services, such as asbestos abatement and complete demolition, to clients primarily in the continental United States, its territories and Hawaii, including in the City of New York.  At all relevant times, the Company met the definition of an "employer" under all applicable statutes, and has maintained a principal place of business located at 80 Broad Street, New York, New York 10004.

17.     Defendant Parent is a Delaware corporation and the sole shareholder of the Company.  Defendant Parent is a corporate entity with no active business operations or officers, existing only to sign documents.   At all relevant times, Defendant Parent met the definition of an "employer" and/or "agent thereof" under all applicable statutes, and has maintained a principal place of business located at 80 Broad Street, New York, New York 10004.

18.     Defendant CHS is a private equity firm headquartered in Illinois.  Defendant CHS owns a minority equity interest in Parent and has two seats on the Board of Directors of Parent (the "Board"). At all relevant times, CHS met the definition of an "employer" and/or "agent thereof" under all applicable statutes, and has maintained a

principal place of business located at 10 South Wacker Drive, Suite 3175, Chicago, Illinois, 60606.

19.     Defendant Apollo is a publicly traded investment management company that specializes in providing subordinated debt and equity capital to middle-market companies. Defendant Apollo is incorporated in Maryland and also owns a minority equity interest in Parent with two seats on the Board. At all relevant times, Apollo met the definition of an "employer" and/or "agent thereof" under all applicable statutes, and has maintained a principal place of business located at 9 West 57th Street, New York, New York 10019.

20.     Upon information and belief, Defendant State is a resident of the State of Colorado. At all relevant times, he is and has been a member of the Board, as well as employed as President and CEO for Defendant LVI, in which capacity he participated directly, and/or aided and abetted, in the unlawful discrimination against Plaintiff as alleged herein. Defendant State is approximately 47 years of age.

21.     Upon information and belief, Defendant Simmons is a resident of the State of Illinois. At all relevant times, he is and has been a member of the Board, as well as a managing partner of CHS, in which capacity he participated directly, and/or aided and abetted, in the unlawful discrimination against Plaintiff as alleged herein. Defendant Simmons is approximately 47 years of age.

22.     Upon information and belief, Defendant Bagaria is a resident of the State of New York. At all relevant times, he is and has been a member of the Board, in which capacity he participated directly, and/or aided and abetted, in the unlawful discrimination against Plaintiff as alleged herein. Defendant Bagaria is approximately 33 years of age.

6

23.     Upon information and belief, Defendant Girardi is a resident of the State of New York.  At all relevant times, he is and has been a member of the Board, in which capacity he participated directly, and/or aided and abetted, in the unlawful discrimination against Plaintiff as alleged herein.  Defendant Girardi is approximately 51 years of age.

## FACTUAL ALLEGATIONS

**Mr. Fried's Employment at LVI**

25.     Mr. Fried, who is currently 70 years old, was the long tenured and highly respected Chairman of the LVI Defendants and former President and CEO of the Company.

26.     Mr. Fried had been employed by the Company for over 24 years.  He spent his first three years as an officer and General Counsel, the next 17 years as the Company's President and CEO, and his last four years as the Company's Chairman.

27.     Until his last seven years of employment with the Company, Mr. Fried performed his services while working out of the Company's New York City corporate office.  After that time, Mr. Fried worked from the Company's corporate Connecticut satellite office in Westport.

28.     During his period of employment, Mr. Fried grew the Company into the only national provider of self performed environmental remediation, structural demolition and other facility services, and established LVI Services as a respected brand name for performance, honesty and integrity in its industry.  At present, the Company employs the greatest number of both union and non-union employees in its specialty field and generates more revenue than any other firm in its field throughout the country.

29.      Under Mr. Fried's tireless leadership, the Company expanded to over 25 offices throughout the United States and has been relied on to do everything from accomplishing the safe environmental remediation and structural demolition of buildings nationwide to assisting in the emergency disaster response clean up after catastrophic events, such as Hurricane Katrina.

30.      Throughout his tenure at the Company, Mr. Fried presided over the sale of the Company on multiple occasions – one taking place effective November 16, 2005, when CHS purchased a majority equity stake in the Company.  Mr. Fried had been actively seeking a successor as President and CEO prior to the equity stake purchase by CHS and, upon purchase by CHS, Defendant Simmons asked Mr. Fried to continue the search.  Mr. Fried agreed to remain as President and CEO and continue the search for a replacement until a suitable one could be found.

31.      Mr. Fried's agreement to remain as President and CEO was memorialized, along with other terms of employment, in a November 16, 2005 contract from the Company to Mr. Fried (the "Employment Contract").  Among the terms of Mr. Fried's Employment Contract was a promise that after he found a replacement President and CEO, Mr. Fried would serve as Chairman of the Company "with primary responsibility for strategic growth."

32.      In June 2006, Robert McNamara succeeded Mr. Fried as President and CEO of the Company.  In recognition of Mr. Fried's indispensability and tremendous worth to the Company, Mr. McNamara conditioned his acceptance of the position of President and CEO on Mr. Fried remaining as Chairman of the Company.  As provided

8

by Mr. Fried's Employment Contract, he indeed remained at the Company as its Chairman.

33.    After assuming the position of Chairman, Mr. Fried agreed to reduce his compensation by 20% and begin working four days per week.   This reduced work schedule did not suit Mr. Fried's assiduous nature as only a week later he returned to working full-time, albeit while continuing to honor his agreement to accept reduced compensation.

34.    As Chairman under Mr. McNamara, Mr. Fried continued to play a large and vital role in the Company's operation and development.   Indeed, although no longer involved in all of the day-to-day duties required of a President and CEO, Mr. Fried remained engaged in myriad different areas of the Company's operation, including:

     a.     Developing and implementing new business initiatives;

     b.     Overseeing all Company litigation and legal matters;

     c.     Participating in the negotiation of Company acquisitions;

     d.     Performing risk assessments of large Company projects which did not require surety bonds, as well as large projects requiring bid and/or payment and performance bonds; and

     e.     Preparing, reviewing, and/or approving from a legal perspective all Company contracts and/or terms of agreement not in the ordinary course of business.

35.    Additionally, Mr. Fried cultivated a relationship with Arch Surety (the "Surety") that resulted in a $200 million surety line being available to the Company.   The

relationship with the Surety was built on Mr. Fried's integrity, honesty, knowledge, experience and hard-work, and is an immensely valuable resource to the Company.

36.   As part of his duties as Chairman, Mr. Fried had been responsible for daily management of the relationship with the Surety, ensuring that the $200 million line remained available to the Company and all bond requests, no matter the size of the bond, were accepted and approved by the Surety.

## Mr. Fried's Unlawful Termination Based on His Age and in Breach of His Contract

37.   Mr. McNamara resigned from his position as President and CEO effective in April 2010.  Once again, CHS sought Mr. Fried's experience and expertise to guide the Company through a period of transition, and asked him to step in as interim President and CEO and again conduct the search for his replacement.

38.   As he re-assumed the position, Mr. Fried's compensation returned to its previous level, and Defendant Simmons complimented Mr. Fried that he "was earning every penny of it."  As interim President and CEO, Mr. Fried again spearheaded efforts to find a permanent replacement, interviewing approximately ten different candidates for the position.

39.   During Mr. Fried's search for a permanent replacement, Defendant State asked Mr. Fried to have him considered for the position and provided Mr. Fried with his resume.  After a perfect candidate withdrew, Mr. Fried introduced Defendant State to Russell Reynolds, the executive search firm hired by the Company, and Russell Reynolds introduced Defendant State to CHS and two investment firms that were poised to become new equity partners of the Company, Apollo and Falcon Strategic Partners III, LP ("Falcon").

10

40.     While Mr. Fried was engaged in the search for a permanent replacement, he was simultaneously leading LVI as the Company was actively engaged in the renegotiation of the terms of its major loans and the infusion of new capital during the worst economic business climate in decades.  During Mr. Fried's leadership, the Company was able to eliminate approximately $100 million in debt, recapitalize and put itself on firm financial ground.  At a Board meeting held just prior to the closing of the transaction, Defendant Simmons expressed to the Board that the restructuring of the Company loan and recapitalization could not have taken place without Mr. Fried's efforts.

41.     When the recapitalization and restructuring closed on or about October 8, 2010, Falcon and Apollo became minority equity shareholders in the Parent and gained, respectively, one and two seats on the Parent's Board.  Apollo's seats on the Board were subsequently filled by Defendants Bagaria and Girardi.

42.     After his introduction, Mr. Fried arranged for Defendant State to be interviewed by the Company's most senior managers and Defendant State became their top choice to fill the position of President and CEO.  Mr. Fried continued vouching for Defendant State and recommended to CHS, Apollo and Falcon (together, the "Equity Partners") that Defendant State indeed take on the role of President and CEO of the Company.  Thanks to the support of Mr. Fried, the Equity Partners agreed.

43.     On or about October 1, 2010, Defendant State commenced employment with the Company as President and CEO.  At that time, Mr. Fried returned to his role as Chairman of the Company.

11

44.     Although Mr. Fried previously had informed Defendant State of the continuing role he would play as Chairman, he met with Defendant State on or about October 19, 2010, at the Company's corporate office in New York City, to discuss the duties that he had been performing in his previous service to the Company as Chairman.

45.     During this meeting, Mr. Fried presented Defendant State with a list of the duties that Mr. Fried had been performing for almost four years under Mr. McNamara. Defendant State ignored Mr. Fried's attempt to discuss his responsibilities and instead informed Mr. Fried that all his responsibilities would be transitioned to the Company's managers. Further, Defendant State ordered Mr. Fried to cease working on numerous projects that he had been managing effectively prior to Defendant State's arrival.

46.     When prompted to explain the reason for stripping Mr. Fried of all his responsibilities, in a blatant ageist remark, Defendant State ridiculed Mr. Fried by asking him, "You are 71 years old. How long do you expect to continue working?"

47.     Mr. Fried left the meeting shocked by the discriminatory animus harbored by Defendant State and the blatant manner in which Defendant State effectuated a breach in Mr. Fried's Employment Contract.

48.     Defendant State was not the only member of the Board who harbored such discriminatory beliefs about Mr. Fried due to his age.

49.     On or about November 2, 2010, Defendant Simmons informed Mr. Fried that, after consulting with other Board members, including those from Apollo, he would like to replace Mr. Fried's Employment Contract with a consulting agreement and transition all of Mr. Fried's day-to-day responsibilities to Defendant State and other members of the Company's management team.

12

50.     Both Defendants Simmons and State clearly expressed their desire to strip Mr. Fried of his substantive and executive responsibilities on account of his age and in violation of his Employment Contract.

51.     On or about November 4, 2010, the entire Board met in a closed session at Apollo's New York City offices to discuss Mr. Fried's employment status with the Company. At this meeting, Mr. Fried expressed his opposition to the discriminatory treatment at the hands of Defendant State and even offered Defendant State a chance to repudiate his ageist comments in front of the Board. Instead of accepting this olive branch, Defendant State affirmed his comments and, ratifying this clear discriminatory intent, the Board members from CHS and Apollo informed Mr. Fried that they were stripping him of his duties.

52.     Prior to this Board meeting, Mr. Fried had reached out to the Board members from CHS and Apollo to tell them of Defendant State's discriminatory treatment, all of whom told Mr. Fried in no uncertain terms that they supported Defendant State and whatever decision he made regarding Mr. Fried's employment status.

53.     During the November 4 Board meeting, the Board members from Apollo, Defendants Girardi, Bagaria, as well as Board members from CHS, including Defendant Simmons, were especially vocal about the right of the Board to eliminate all of Plaintiff's responsibilities as Chairman that Mr. Fried had previously performed when Mr. McNamara was CEO. In particular, Defendant Bagaria emphasized that Plaintiff would no longer be performing his substantive job duties and that the Board had sole discretion to determine Mr. Fried's responsibilities.

13

54.    Defendant Bagaria conferred with the President of Defendant Apollo before the November 4 Board meeting and was directed to strip Mr. Fried of his substantive responsibilities.

**Mr. Fried's Isolation and Termination**

55.    From the time Mr. Fried left his meeting with Defendant State on or about October 19, 2010, he was isolated at the Company.

56.    In fact, after he met with Defendant State, Company managers told Mr. Fried that they had been instructed by Defendant State not to contact Mr. Fried, or to speak with him about new Company matters, and that all their needs which were previously directed to Plaintiff should be conveyed to Defendant State.

57.    Defendant State actively worked to exclude Mr. Fried from multiple facets of the Company's operation, including:

    a.    Ordering Mr. Fried to turn over responsibility for securing new corporate office space, a project Mr. Fried had initially been working on for Defendant State;

    b.    Taking over responsibility for expanding the Company's business into the United Kingdom and banning Mr. Fried from future meetings that Mr. Fried was arranging;

    c.    Preventing Mr. Fried from working on a demolition project that was being bid that Mr. Fried had been informed of and was attempting to secure on behalf of the Company, even though Mr. Fried had routinely performed such work under Mr. McNamara; and

14

        d.     Causing LVI personnel to cease all communications and day-to-day involvement with Mr. Fried on business matters.

58.    On or about November 10, 2010, Mr. Fried was notified that it was the wishes of the Board, including Defendants Simmons, Bagaria and Girardi, that he have no day-to-day involvement in the Company and that Defendant State should have sole discretion to determine the level of Mr. Fried's involvement in the operation of the Company.

59.    On or about November 15, 2010, Mr. Fried sent, through his counsel by hand delivery, a letter to Defendant State opposing the discriminatory conduct to which he was being subjected.

60.    The following day, on November 16, 2010, Defendant Simmons, on behalf of the Board, notified Mr. Fried in a written letter that effective November 30, 2010, his employment with the Company would terminate.  After more than 24 years of service, Mr. Fried was given two weeks of notice that his employment would terminate.

61.    Although Mr. Fried was notified of his termination, Defendants endeavored to exploit Mr. Fried's years of valuable experience and relationship with the Surety by keeping him as a consultant in a "non-executive" capacity.  In exchange for this "new position," Mr. Fried would be required to release Defendants from his age discrimination, as well as other, claims.

62.    Mr. Fried's termination by the Company, including his positions as a director and officer of the LVI Defendants and all subsidiaries and affiliated companies, was effected on November 30, 2010.

15

63.    Defendants have expressed clearly that Mr. Fried's isolation at the Company, and his termination, related solely to his age. It is equally clear that his termination was in retaliation for Mr. Fried's protected opposition to Defendants' discrimination toward him.

**Retaliatory Conduct Following Mr. Fried's Termination**

64.    Even after termination of Plaintiff's employment, the LVI Defendants continued their retaliatory actions against Mr. Fried by terminating the employment of his daughter, Shari Dembin.

65.    Ms. Dembin began working for LVI in 1996 as an administrative assistant in the Company's New York corporate office. She remained in the New York office until 2003 when LVI opened the office in Westport. At that time, both Plaintiff and Ms. Dembin transferred to the Westport office and remained there until they were both unlawfully terminated.

66.    Throughout her tenure at LVI, Ms. Dembin took on a wide range of responsibilities and eventually came to play a vital role in the insurance and bonding aspects of the Company's operation. Ms. Dembin's responsibilities included reviewing and processing insurance requests from LVI branch offices, as well as reviewing all bid and bond requests before the requests were sent to the Surety.

67.    Ms. Dembin was the only employee in the Company with these responsibilities in the insurance and bonding fields and she was a high performer in these areas, receiving a total of eight pay raises throughout her time at LVI.

68.    On or about January 6, 2011, Ms. Dembin was notified by Paul Cutrone, LVI Chief Financial Officer, that her employment with LVI would be terminated

16

effective January 14, 2011. The decision to terminate Ms. Dembin's employment was made by Defendant State.

69.     Notice of her termination came less than a month after Mr. Fried engaged in protected activity.

70.     All Ms. Dembin's responsibilities were transferred to other LVI employees, each of whom has less experience and skill than Ms. Dembin in the performance of her job duties.

71.     The sole motivation for Ms. Dembin's termination was to retaliate against Plaintiff for engaging in protected activity by filing EEOC charges and this Complaint.

**A Single/Joint Employer Relationship Exists Between the Company and Parent**

72.     At all relevant times, the LVI Defendants operated as a single, integrated enterprise, a single employer, or as joint employers.

73.     Parent operates from the same offices as the Company. All the corporate officers of Parent, except Robert G. Hogan who is Assistant Secretary for the purpose of signing documents, are employed by the Company. Additionally, three of the four officers of Parent maintain offices at the New York corporate office of the LVI Defendants.

74.     Parent is a holding company that maintains no payroll and conducts no business outside of signing documents.

75.     Further, the Board exercises authority over the terms and conditions of employees of the Company. In particular, the Board altered the terms of Mr. Fried's employment with the Company by stripping him of his job duties and unilaterally terminating his employment.

76.     Parent operates with the authority to set the terms and conditions of employment for LVI employees even though it is without the authority to do so.  The Board was the only entity to consider Plaintiff's employment status with LVI.

77.     Additionally, Parent is the sole shareholder and owner of the Company.

78.     The only assets of Parent are the shares it holds of the Company.

79.     Due to the foregoing, the LVI Defendants have an interrelation of operations, centralized control over labor relations, common management and common ownership.  As such, they are jointly and severably liable for the discrimination, retaliation and other unlawful treatment of Plaintiff.

**A Single Employer Relationship Exists Between the Company and Apollo**

80.     At all relevant times, the Company and Apollo operated as a single, integrated enterprise.

81.     Apollo is a minority shareholder of Parent, the sole owner of the Company, and has two seats on the Board.  Through the Board, Parent controls the terms and conditions of employment for individuals employed by LVI.

82.     With its seats on the Board, Apollo participates in the hiring of officers of both the LVI Defendants and operates with the authority to change the terms of employment for employees of the Company, including terminating their employment.

83.     The votes of representatives of two minority shareholders, CHS and Apollo, along with the vote of Defendant State, control the decision-making process of the Board and all of its decisions, including the termination of employment of Mr. Fried.

18

84.     Defendants Apollo and CHS, through their status as controlling shareholders of Parent, controlled the day-to-day operations of the LVI Defendants and the terms and conditions of Plaintiff's employment.

85.     Due to the foregoing, the Company and Apollo have an interrelation of operations, centralized control over labor relations, common management and common ownership.  As such, they are jointly and severably liable for the discrimination, retaliation and other unlawful treatment of Plaintiff.

**A Joint Employer Relationship Exists Between the Company and Apollo**

86.     In the alternative that LVI and Apollo are not a single, integrated enterprise, at all relevant times the two entities acted as joint employers of Plaintiff.

87.     Defendant Apollo, through its seats on the Board, along with LVI, jointly controlled the terms and conditions of Mr. Fried's employment with the Company.

88.     The Board operated as though it had the authority to determine the terms and conditions of Mr. Fried's employment with LVI, even though Mr. Fried was employed by LVI and not Parent.  Defendant Apollo acted through its two representatives on the Board to participate in the decisions to strip Plaintiff of his job duties and terminate his employment.

89.     At the November 4, 2010 Board meeting, Defendant Bagaria expressed clearly to Plaintiff that the Board would operate with the authority to decide Mr. Fried's employment relationship with LVI going forward.  Further, Defendants Bagaria and Girardi told Mr. Fried that they supported Defendant State in whatever decision he made concerning Plaintiff's job responsibilities with LVI.

90.     High-ranking executives with Defendant Apollo, including the President, supported the efforts of Defendants Bagaria and Girardi to alter, and eventually terminate, Mr. Fried's employment with LVI.

91.     Defendant Apollo, through Defendants Bagaria and Girardi, used the Board as an instrumentality to effectuate Plaintiff's unlawful termination from LVI based on his age.

92.     Defendants Apollo and CHS, through their status as controlling shareholders of Parent, controlled the day-to-day operations of the LVI Defendants and the terms and conditions of Plaintiff's employment.

93.     Defendant Apollo's actions on the Board demonstrate joint control, along with LVI, of the terms and conditions of Plaintiff's employment with the Company.

**A Single Employer Relationship Exists Between the Company and CHS**

94.     At all relevant times, the Company and CHS operated as a single, integrated enterprise.

95.     CHS is a minority shareholder of Parent, the sole owner of the Company, and has two seats on the Board of Directors of Parent.  Through the Board, Parent controls the terms and conditions of employment for individuals employed by LVI.

96.     With its seats on the Board, CHS participates in the hiring of officers of both the LVI Defendants and operates with the authority to change the terms of employment for employees of the Company, including terminating their employment.

97.     The votes of representatives of two minority shareholders, CHS and Apollo, along with the vote of Defendant State, control the decision-making process of the Board and all of its decisions, including the termination of employment of Mr. Fried.

98.     Defendants Apollo and CHS, through their status as controlling shareholders of Parent, controlled the day-to-day operations of the LVI Defendants and the terms and conditions of Plaintiff's employment.

99.     Due to the foregoing, the Company and CHS have an interrelation of operations, centralized control over labor relations, common management and common ownership. As such, they are jointly and severably liable for the discrimination, retaliation and other unlawful treatment of Plaintiff.

**A Joint Employer Relationship Exists Between the Company and CHS**

100.     In the alternative that LVI and CHS are not a single, integrated enterprise, at all relevant times the two entities acted as joint employers of Plaintiff.

101.     Defendant CHS, through its seats on the Board, along with LVI, jointly controlled the terms and conditions of Mr. Fried's employment with the Company.

102.     The Board operated as though it had the authority to determine the terms and conditions of Mr. Fried's employment with LVI, even though Mr. Fried was employed by LVI and not Parent. Defendant CHS acted through its two representatives on the Board to participate in the decisions to strip Plaintiff of his job duties and terminate his employment.

103.     Defendant Simmons, managing partner of CHS, was primarily involved with negotiating the terms of employment and hiring of Defendant State, the change in Mr. Fried's terms of employment with the Company, and finally, the termination of Mr. Fried's employment. Defendant Simmons communicated to Mr. Fried how his employment relationship with the Company would be altered, spoke on behalf of the

21

Board at a meeting of the Board, and ultimately wrote Mr. Fried's letter of termination, speaking on behalf of the Board.

104.   Defendant CHS, through Defendant Simmons, used the Board as an instrumentality to effectuate Plaintiff's unlawful termination based on his age.

105.   Defendants Apollo and CHS, through their status as controlling shareholders of Parent, controlled the day-to-day operations of the LVI Defendants and the terms and conditions of Plaintiff's employment.

106.   The votes of representatives of two minority shareholders, CHS and Apollo, along with the vote of Defendant State, control the decision-making process of the Board and all of its decisions, including the termination of employment of Mr. Fried.

**Damages as a Result of Defendants' Age Discrimination, Retaliation and Breach of Contract**

107.   As a direct and proximate result of Defendants' unlawful conduct, Mr. Fried is left feeling humiliated, demoralized and demeaned at this complete disregard for his years of exemplary service and continued contribution to the Company resulting from Defendants' discriminatory and retaliatory motivations for terminating him.

108.   As a direct and proximate result of Defendants' unlawful conduct, Mr. Fried has suffered, and will continue to suffer, substantial monetary and/or economic damages, including, but not limited to, the loss of past and future income, compensation, health insurance, and other benefits to which he would otherwise be entitled.

109.   As a further direct and proximate result of Defendants' unlawful conduct, Mr. Fried has suffered, and will continue to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, demoralization, embarrassment, and emotional pain and suffering.

110.   As a direct and proximate result of Defendants' unlawful conduct, Mr. Fried has suffered damage to his reputation and his career.

111.   Defendants' discriminatory, retaliatory, and otherwise unlawful conduct against Mr. Fried was intentional and malicious and/or showed a deliberate, willful, wanton and reckless disregard for Mr. Fried's rights, including his rights under New York City Human Rights Laws.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Discrimination in Violation of the Age Discrimination in Employment Act)

112.   Plaintiff hereby repeats and realleges each and every allegation in paragraphs 1 through 111, inclusive, as if fully set forth herein.

113.   The Corporate Defendants have discriminated against Plaintiff on the basis of his age in violation of the ADEA by subjecting Plaintiff to disparate treatment based upon his age, including, but not limited to, by stripping Plaintiff of his responsibilities and terminating Plaintiff because of his age.

114.   As a direct and proximate result of the Corporate Defendants' unlawful discriminatory conduct in violation of the ADEA, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which he is entitled to an award of monetary damages and other relief.

115.   As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the ADEA, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, demoralization, embarrassment, and emotional pain and suffering.

116.   The Corporate Defendants' unlawful discriminatory conduct, including retaliation, constitutes a willful and wanton violation of the ADEA, was outrageous and

malicious, was intended to injure Plaintiff, and was done with reckless indifference to Plaintiff's civil rights, entitling Plaintiff to an award of liquidated damages.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Retaliation in Violation of the Age Discrimination in Employment Act)

117.    Plaintiff hereby repeats and realleges each and every allegation in paragraphs 1 through 116, inclusive, as if fully set forth herein.

118.    The Corporate Defendants have retaliated against Plaintiff in violation of the ADEA by terminating his employment with the Company after Plaintiff engaged in protected activity by opposing Defendants' discriminatory conduct.

119.    Additionally, the LVI Defendants have retaliated against Plaintiff in violation of the ADEA by terminating the employment of his daughter, Shari Dembin, after Plaintiff engaged in protected activity by opposing the Defendants' discriminatory conduct.

120.    As a direct and proximate result of the Corporate Defendants' unlawful discriminatory conduct in violation of the ADEA, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which he is entitled to an award of monetary damages and other relief.

121.    As a direct and proximate result of the Corporate Defendants' unlawful retaliatory conduct in violation of the ADEA, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, demoralization, embarrassment, and emotional pain and suffering for which he is entitled to an award of monetary damages and other relief.

122.    The Corporate Defendants' unlawful discriminatory conduct, including retaliation, constitutes a willful and wanton violation of the ADEA, was outrageous and

24

malicious, was intended to injure Plaintiff, and was done with reckless indifference to Plaintiff's civil rights, entitling Plaintiff to an award of liquidated damages.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Discrimination in Violation of New York City Human Rights Law)

123.   Plaintiff hereby repeats and realleges each and every allegation in paragraphs 1 through 122, inclusive, as if fully set forth herein.

124.   Defendants have discriminated against Plaintiff on the basis of his age in violation of the New York City Human Rights Law by subjecting Plaintiff to disparate treatment based upon his age, including, but not limited to, by stripping Plaintiff of his responsibilities and terminating Plaintiff because of his age.

125.   As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the New York City Human Rights Law, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which he is entitled to an award of monetary damages and other relief.

126.   As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the New York City Human Rights Law, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, demoralization, embarrassment, and emotional pain and suffering.

127.   Defendants' unlawful discriminatory conduct, including retaliation, constitutes a willful and wanton violation of the New York City Human Rights Law, was outrageous and malicious, was intended to injure Plaintiff, and was done with reckless indifference to Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**(Retaliation in Violation of New York City Human Rights Law)**

128.    Plaintiff hereby repeats and realleges each and every allegation in paragraphs 1 through 127, inclusive, as if fully set forth herein.

129.    Defendants have retaliated against Plaintiff in violation of the New York City Human Rights Law by terminating his employment with the Company after Plaintiff engaged in protected activity by opposing Defendants' discriminatory conduct.

130.    Additionally, the LVI Defendants and Defendant State have retaliated against Plaintiff in violation of the New York City Human Rights Law by terminating the employment of his daughter, Shari Dembin, after Plaintiff engaged in protected activity by opposing Defendants' discriminatory conduct.

131.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the New York City Human Rights Law, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which he is entitled to an award of monetary damages and other relief.

132.    As a direct and proximate result of the Defendants' unlawful retaliatory conduct in violation of the New York City Human Rights Law, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, demoralization, embarrassment, and emotional pain and suffering for which he is entitled to an award of monetary damages and other relief.

133.    Defendants' unlawful discriminatory conduct, including retaliation, constitutes a willful and wanton violation of the New York City Human Rights Law, was outrageous and malicious, was intended to injure Plaintiff, and was done with reckless indifference to Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

26

## AS AND FOR A FIFTH CAUSE OF ACTION
### (Aiding and Abetting Violations of New York City Human Rights Law)

134.    Plaintiff hereby repeats and realleges each and every allegation in paragraphs 1 through 133, inclusive, as if fully set forth herein.

135.    Defendants Parent, CHS, and Apollo, as well as the Individual Defendants, knowingly or recklessly aided and abetted the unlawful, discriminatory employment practices, including retaliation, against Plaintiff in violation of the New York City Human Rights Law.

136.    Additionally, Defendant State knowingly or recklessly aided and abetted the unlawful, retaliatory termination of Ms. Dembin.

137.    As a direct and proximate result of these aider and abettor Defendants' unlawful and discriminatory conduct, including retaliation, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which he is entitled to an award of monetary damages and other relief.

138.    As a direct and proximate result of these aider and abettor Defendants' unlawful discriminatory conduct, including retaliation, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, demoralization, embarrassment, and emotional pain and suffering for which he is entitled to an award of monetary damages and other relief.

139.    The aider and abettor Defendants' unlawful discriminatory conduct, including retaliation, constitutes a willful and wanton violation of the New York City Human Rights Law, was outrageous and malicious, was intended to injure Plaintiff, and was done with reckless indifference to Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

## AS AND FOR A SIXTH CAUSE OF ACTION
### (Breach of Contract)

140.    Plaintiff hereby repeats and realleges each and every allegation in paragraphs 1 through 139, inclusive, as set forth herein.

141.    Plaintiff and the LVI Defendants are parties to an enforceable Employment Contract that includes an obligation by the LVI Defendants to employ Plaintiff as Chairman with "primary responsibility for strategic growth."

142.    The LVI Defendants willfully and wantonly breached the Employment Contract by stripping Plaintiff of his substantive responsibilities and terminating his employment.

143.    As a direct and proximate result of the LVI Defendants' breach of contract, Plaintiff has suffered and continues to suffer, substantial monetary and/or economic damages, including but not limited to, loss of past and future income.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

144.    Plaintiff hereby repeats and realleges each and every allegation in paragraphs 1 through 143, inclusive, as set forth herein.

145.    Plaintiff and the LVI Defendants are parties to an enforceable Employment Contract.

146.    The Employment Contract between Plaintiff and the LVI Defendants contained an implied covenant of good faith and fair dealing.

147.    The LVI Defendants willfully and wantonly breached the implied covenant of good faith and fair dealing by, among other wrongful conduct, stripping Plaintiff of his substantive responsibilities, undermining his authority as Chairman of

LVI, directing LVI employees to cease contacting Plaintiff, endeavoring to exploit Plaintiff's business relationships and industry experience, and terminating Plaintiff's employment in retaliation for engaging in protected activity.

148.   As a direct and proximate result of the LVI Defendants' breach of the implied covenant of good faith and fair dealing, Plaintiff has suffered and continues to suffer, substantial monetary and/or economic damages, including but not limited to, loss of past and future income.

## AS AND FOR A EIGHTH CAUSE OF ACTION
### (Tortious Interference with Employment and/or Contractual Relations)

149.   Plaintiff hereby repeats and realleges each and every allegation in paragraphs 1 though 148, inclusive, as set forth herein.

150.   To the extent that it could be concluded that any of the Corporate Defendants were not single or joint employers with the Company, those entities, and the Individual Defendants acting on their behalf, tortiously interfered with Plaintiff's employment with the Company by conspiring to strip Plaintiff of his job duties, transition his duties to members of the Company management team, and terminate his employment.

151.   The tortiously interfering Defendants acted willfully, wrongfully, maliciously and/or violated a duty owed to Plaintiff by conspiring to strip Plaintiff of his job duties, transition his duties to members of the Company management team, and terminate his employment.

152.   The tortiously interfering Defendants were motivated solely by malice and/or a desire to inflict injury on Plaintiff by unlawful means.

153.   As a direct and proximate result of these tortiously interfering Defendants' tortious interference with Plaintiff's employment and/or contractual relations at the

Company, Plaintiff has suffered and continues to suffer substantial monetary and/or economic damages, including but not limited to, loss of past and future income.

154.    The tortiously interfering Defendants' unlawful conduct, including tortiously interfering with Plaintiff's employment and/or contractual relations, constitutes a willful and wanton violation of the New York common law, was outrageous and malicious, was intended to injure Plaintiff, and was done with reckless indifference to Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in his favor and against Defendants, containing the following relief:

A.    A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the City and State of New York;

B.    An injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

C.    An order directing Defendants to place Plaintiff in the position he would have occupied but for Defendants' discriminatory and/or otherwise unlawful treatment of him, as well as to take such affirmative action, including but not limited to reinstatement, as is necessary to ensure that the effects of these unlawful employment practices and other unlawful conduct are eliminated and do not continue to affect Plaintiff;

D.    An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including, but not limited to, the loss of past and future income, wages, compensation, job security and other benefits of employment;

E.    An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damage, including, but not limited to, compensation for his severe mental anguish and emotional distress, including, but not limited to, humiliation, demoralization, embarrassment, and emotional pain and suffering and any other physical or mental injuries;

F.    An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to his professional and personal reputation and loss of career fulfillment;

G.    An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff in an amount to be determined at trial, plus prejudgment interest;

H.    An award of punitive damages;

I.    An award of costs that Plaintiff has incurred in this action, as well as Plaintiff's reasonable attorneys' fees to the fullest extent permitted by law; and

J.    Such other and further relief as the Court may deem just and proper.

31

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated:  New York, New York
        February 3, 2010              Respectfully submitted,

                                      THOMPSON WIGDOR & GILLY LLP

                                      By: _____
                                                Douglas H. Wigdor

                                      85 Fifth Avenue
                                      New York, New York 10118
                                      Telephone: (212) 257-6800
                                      Facsimile: (212) 257-6845
                                      dwigdor@twglaw.com

                                      *Attorneys for Plaintiff Burton T. Fried*

32