# EXHIBIT FF

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
BURTON T. FRIED,                    :

              Plaintiff,            :

       -v-                          :

LVI SERVICES, INC.; LVI PARENT CORP.,:
CODE HENNESSEY SIMMONS LLC d/b/a CHS :
PRIVATE EQUITY V LP; APOLLO         :
INVESTMENT CORP.; SCOTT E. STATE, in :
his official and individual         :
capacities; BRIAN SIMMONS, in his   :
official and individual capacities; :
RAJAY BAGARIA, in his official and  :
individual capacities; GERALD J.    :
GIRARDI, in his official and        :
individual capacities,              :

              Defendants.           :
------------------------------------x
```

```
┌─────────────────────────────┐
│ USDC SDNY                    │
│ DOCUMENT                     │
│ ELECTRONICALLY FILED         │
│ DOC #: _____      │
│ DATE FILED: ___10/4/11___    │
└─────────────────────────────┘
```

10 Civ. 9308 (JSR)

OPINION AND ORDER

JED S. RAKOFF, U.S.D.J.

On February 3, 2011, plaintiff Burton T. Fried filed an Amended Complaint in this age discrimination action against the following defendants: LVI Services, Inc. ("LVI"); LVI Parent Corp. ("LVI Parent"); Code Hennessy Simmons LLC d/b/a CHS Private Equity V LP ("CHS"); Apollo Investment Corp. ("Apollo"); Scott E. State, in his official and individual capacities; Brian Simmons, in his official and individual capacities; Rajay Bagaria, in his official and individual capacities; and Gerald J. Girardi, in his official and individual capacities. On February 14, 2011, Apollo moved to dismiss the entire Amended Complaint with respect to Apollo, and the remaining defendants moved to dismiss certain common law claims with respect to all defendants and to dismiss the entire Amended Complaint with respect to CHS. Following full

briefing and oral argument, the Court granted both motions in their entirety.  See 04/01/11 Order; 05/23/11 Memorandum. Accordingly, only the following causes of action remained: (1) Discrimination in Violation of the Age Discrimination in Employment Act ("ADEA") (against LVI and LVI Parent); (2) Retaliation in Violation of the ADEA (against LVI and LVI Parent); (3) Discrimination in Violation of New York City Human Rights Law ("NYCHRL") (against LVI, LVI Parent, State, Simmons, Bagaria, and Girardi); (4) Retaliation in Violation of NYCHRL (against LVI, LVI Parent, State, Simmons, Bagaria, and Girardi); and (5) Aiding and Abetting Violations of NYCHRL (against LVI Parent, State, Simmons, Bagaria, and Girardi).

On June 10, 2011, all remaining defendants -- i.e., LVI, LVI Parent, State, Simmons, Bagaria, and Girardi (collectively, "defendants") -- moved for summary judgment with respect to all remaining claims.  Plaintiff filed papers in opposition to the motion on June 20, 2011; defendants filed reply papers on June 27, 2011; and the Court heard oral argument on July 6, 2011.[1] After careful consideration and for the reasons explained in this Opinion, the Court hereby grants defendants' motion in all

---

[1] Following oral argument, the Court granted plaintiff leave to file a short supplemental submission addressing two issues discussed during oral argument.  This submission was filed on July 8, 2011.

respects except as to one prong of plaintiff's claim of retaliation under the ADEA.

The relevant facts, either undisputed or, where disputed, taken most favorably to the plaintiff, are as follows.  LVI Services, Inc. is an environmental remediation company with its principal place of business in New York.  See Defendants' Rule 56.1 Statement of Material Facts ("Defs.' 56.1) ¶ 1.  LVI Parent is the sole shareholder of LVI.  Id. ¶ 2.  LVI Parent is incorporated in Delaware and maintains its principal place of business in New York.  Id.  At the relevant times, the following individuals comprised the board of directors (the "Board") of LVI Parent: Rajay Bagaria, Gerald Girardi, Robert Hogan, Brian Simmons, John Schnabel, Scott State, Richard Ferruci, Robert Buck, and Burton Fried.  See Declaration of Shaffin A. Datoo, dated June 20, 2011 ("Datoo Decl.), Ex. 4 at 18-19 (Deposition of Paul Cutrone, dated June 1, 2011 ("Cutrone Dep.")).

Fried, who has been referred to as the "founder" of LVI, was born on February 26, 1940 and is currently 71 years old.  See, e.g., Defs.' 56.1 ¶ 7; Datoo Decl. Ex. 9.  Fried was employed by LVI from 1986 through November 30, 2010.  Defs.' 56.1 ¶ 8.  Fried served as General Counsel of LVI from 1986 to 1989, at which point he became its President and Chief Executive Officer.  See Datoo Decl. Ex. 12 at 63-64 (Deposition of Burton T. Fried, dated

May 20, 2011 ("Fried Dep.")).  Fried worked exclusively out of
LVI's New York City office until 2003, when LVI opened a
satellite office in Westport, Connecticut (the "Westport
Office"), whereupon Fried began to work out of the Westport
Office two to three days a week.  See Fried Dep. at p. 45, 64-67;
Cutrone Dep. at 45-46.  It is undisputed that Fried lived in
Westport, Connecticut at all relevant times.  Id.

On November 16, 2005, CHS purchased a majority equity stake
in LVI.  See Am. Compl. ¶ 30.  Fried had been actively seeking a
successor as President and CEO prior to the equity stake purchase
by CHS and, upon purchase by CHS, Brian Simmons, a managing
partner of CHS, asked Fried to continue the search.  Id.[2]

Plaintiff's agreement to remain as President and CEO was
memorialized in a November 16, 2005 contract between LVI and
Fried (the "Employment Contract").  Id. ¶ 31. The Employment
Contract contains, among other terms, the following provisions:

---

[2] See also Fried Dep. at 75-76:

Q. Was that your decision to transition into a chairman role
or was it the decision of CHS or any entity involved in the
purchase of the company?

A. It was my decision. . . . I believed the company needed the
management skill sets to take us to a billion and I didn't know
that I had that capability. . . . I felt there had to be a
manager out there that could contribute the skill sets to take
us, you know, to triple our earnings and to manage the company
effectively.

Id.

4

Job Title/Responsibilities:

You will continue to serve as President and Chief Executive
Officer of the Company and Buyer until a replacement President
and Chief Executive Officer is hired to oversee and conduct
the day to day business of the Company and Buyer. You will be
expected to perform such services as are customary for such
positions, including such duties and responsibilities as are
assigned from time to time by the board of directors (the
"Board") of the Company and Buyer. After a new President and
Chief Executive Officer is hired, you will serve as the
Chairman of the Company and Buyer with primary responsibility
for strategic growth.

. . .

Office:

You will work in the Company's New York city office two days a
week and three days a week in an office maintained by the
Company in Westport, Connecticut.

After your transition from President and Chief Executive
Officer to Chairman, you will work five days a week in
Westport, Connecticut.  The Company will maintain the current
office in Westport, Connecticut or an office with similar
facilities at substantially the same rent reasonably
acceptable to you in Westport, Connecticut.

See Employment Contract, Affirmation of Joanne Seltzer, dated

June 8, 2011 ("Seltzer Affirm") Ex. D at 1-2.

In July 2006, LVI hired Robert McNamara as its President and

CEO.  See Cutrone Dep. at 38-39, 41; Datoo Decl. Ex. 14.  As

contemplated by the Employment Contract, Fried thereupon resigned

from his position as President and CEO and assumed the position

of Chairman.  See, e.g., Am. Compl. ¶¶ 31-32.  In his position as

Chairman under McNamara, Fried was responsible for, among other

things, strategic growth, legal matters and sales.  See Datoo

5

Decl. Ex. 7 at 35-36 (Deposition of John Leonard, dated June 3,
2011 ("Leonard Dep.")).

McNamara resigned in April 2010, and Simmons asked Fried to
serve as interim President and CEO of LVI until McNamara's
replacement could be found.  See, e.g., Am. Compl. ¶ 37; Fried
Dep. at 108-109.  Fried accepted this responsibility.  See Fried
Dep. at 108-109.  In August 2010, Scott E. State, who was then 47
years old, was introduced to Fried as a candidate for President
and CEO of LVI.  See Fried Dep. at 110.  Fried supported State's
candidacy "upon the recommendation of the senior managers."  Id.
at 121.  On September 8, 2010, the position was offered to State,
and employment negotiations thereafter ensued.[3]

---

[3] During this same period, the ownership of LVI was also in flux.
The Court summarized this period of transition in its May 23,
2011 Memorandum as follows:

Plaintiff "introduced . . . State to Russell Reynolds, the
executive search firm hired by the Company, and Russell
Reynolds introduced Defendant State to CHS and two investment
firms that were poised to become new equity partners of the
Company, Apollo and Falcon Strategic Partners III, LP
('Falcon')." [Am. Compl. ¶ 39.]  State was hired as President
and CEO on October 1, 2010, and Apollo and Falcon became
minority stakeholders in LVI Parent on October 8, 2010. Id. ¶¶
39, 41, 43. As a minority shareholder, Apollo gained two seats
on the nine-member Board of Directors of LVI Parent, which
were filled by Rajay Bagaria and Gerald J. Girardi, two
employees of Apollo's investment manager, Apollo Investment
Management, L.P.  Id. ¶ 41. CHS was given a minority equity
stake in LVI Parent, as well as two seats on its Board of
Directors, one of which is held by Simmons, the managing
partner of CHS.

05/23/11 Memorandum at 5 (footnote omitted).

These negotiations included discussions regarding Fried's
continuing role at LVI following the contemplated hire of State.
The parties highlight in particular the following email exchanges
as relevant to this discussion:

> (1) Email from Scott State to Robert Hogan[4] and Brian Simmons,
> dated September 14, 2010 (Datoo Decl. Ex. 18):

>> In the Covenants section 5.1(a)(v), I think it requires
>> unanimous consent of the investors to remove [Burton
>> Fried] as Chairman of the Board.

> (2) Email from Scott State to Robert Hogan, September 19,
> 2010 (Datoo Decl. Ex. 19):

>> To be successful and move beyond what "has been" to what
>> "can be" starts with leadership and a single vision. I
>> have expressed my concern about having that singular
>> focus and avoiding confusion within the team about who is
>> in charge. I need to get to a meeting of the minds with
>> Burt before making the leap on this opportunity. Burt
>> has told me he plans to continue part-time with LVI
>> pursuing opportunities in Dubai on over-water oil
>> platform remediation. He is also actively pursuing
>> hiring a CIO for the Company. These are two plans I
>> would not anticipate pursuing upon joining the team as
>> being unrealistic and unnecessary respectively. I would
>> like Burt's commitment not to challenge those decisions
>> if they are made as this would likely result in an
>> immediate division in the management team.

>> In the best-case scenario Burt will decide to retire at
>> some date certain from LVI upon a new CEO being named and
>> offer to support the business under a consulting
>> agreement in any way the new CEO sees fit. Several
>> members of the senior team have told me that Burt will
>> never retire because he has no other interests and

---

[4] It appears from plaintiff's opposition papers that Robert Hogan
was an employee of CHS. See Plaintiff's Memorandum of Law in
Opposition to Defendants' Motion for Summary Judgment ("Pl.'s
Opp.") at 1.

nothing else to do.  This is not a healthy situation for Burt or LVI.

. . .

I prefer to enter into this commitment with a clear vision of goals and leadership. Upon agreement on the business terms of the offer I would like to have a meeting with Burt to establish our working relationship and then move to a conclusion.

(3) Email from Robert Hogan to Burton Fried, September 21, 2010 (Seltzer Affirm Ex. E):

Burt - Scott wants to discuss your ongoing role at LVI. I suspect he wants to be assured that he will have authority as CEO to align his team, manage the business, etc.  Obviously he will be accountable to the Board for a budget, performance, and various other corporate action. I think it will be very important for him to hear unambiguously from you that he is in charge and you will give him the room he needs.

(4) Email from Burton Fried to Robert Hogan, dated September 21, 2010 (Seltzer Affirm E):

Brian:

If your e mail to me accurately reflects Scott's concern then he is evidencing early insecurity… Before Bob McNamara accepted the LVI CEO position his only question of me was how long I would continue at LVI.  My answer was "a day up to a year subject to your pleasure". He then said he would only accept the position at LVI if I agreed to stay as long as he wanted.  I asked how long that would be and he said "until I (Bob) leave".

I will repeat my offer to Scott.  I am prepared to remain at LVI until he, the Board or I decide its time for me to leave…an offer he can't refuse.  Ask you to recall that one of the purposes of my working in Westport was to get out of the way of the new CEO at the NY Corporate office.

Trust you have no problem with my planned rely…He will be in charge and get all the room he wants from me.

8

    (5) Email from Burton Fried to Brian Simmons and Robert Hogan, dated September 22, 2010 (Seltzer Affirm Ex. F):

> Brian: Spoke with Scott.  He now has no concern about my support in his role as CEO.

In addition to these emails, Fried highlights the testimony of John Leonard, the Chief Operating Officer of LVI.  According to Leonard, State asked him if Fried, who was then 70 years old, was going to retire; Leonard responded "no."  See Datoo Decl. Ex. 7 at 59-60, 64-65 (Deposition of John Leonard, dated May 26, 2011 ("Leonard Dep.")).  Leonard further testified that Fried had told him that Fried intended to die in his chair.  Id. at 49.

On September 23, 2010, State accepted the offer of employment with LVI as President and CEO, and Fried returned to the Chairman role.  Defs.' 56.1 ¶ 24.  State assumed the role of President and CEO on October 1, 2010.  Id. ¶ 25.

The parties give divergent accounts of subsequent events. Defendants claim that tensions arose concerning Fried's role in the company almost immediately upon State's hire; that on October 5, 2010, State and Fried agreed to meet on October 19, 2010 to discuss transition issues; and that on October 14, 2010, Fried sent State an "unsolicited" email listing responsibilities he purportedly had handled as Chairman under McNamara.  See Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Defs.' Mem.") at 5; Defs.' 56.1 ¶¶ 26-27.  Fried

9

responds that he "met with State for the first time since State
was hired in New York City to discuss Mr. Fried's job duties" on
October 19, 2010, and that "[t]he evidence cited by Defendants
does not support the contention that Plaintiff sent Mr. State 'an
unsolicited email' or that the email listed Plaintiff's
'purported' responsibilities as Chairman under Mr. McNamara."
Plaintiff's Response to Defendants' Rule 56.1 Statement of
Material Facts ("Pl. 56.1") ¶ 27.  It is clear from the record,
however, that Fried sent an email to State on October 14, 2010
"attch[ing] for [his] review and discussion on Tues 10/19" a
document with the heading: "Chairman – Areas of Responsibility."
See Seltzer Affirm Ex. O.[5]  This document lists the
responsibilities of the "Chairman" in fifteen bullet-points and
includes, among other things, the following items: "Development
and implementation of new business initiatives;" "Major
Client/Major Project/Competitor Relationships;" "Manage at senior
level all LV litigation and legal matters;" "Review and approve
of all LVI Offers of Employment;" "Negotiate all company
acquisitions"; "Monitor all employee air travel;" and "Coordinate
all corporate public relations communications and website updates
with LVI public relations firm."  Id.

---

[5] Plaintiff has not disputed the authenticity of this email.

10

On October 19, 2010, Fried met with State in LVI's New York

City office.   See Fried Dep. at 176.   In his deposition

testimony, Fried describes the meeting with State as follows:

> And [State] said - looked at the list and he said "I'm going
> to be reassigning all your responsibilities to other managers
> and I'm going to do that in the next 60 to 90 days, and when
> that's completed, I can let you know if there is anything
> else for you to do."
>
> I didn't immediately respond because I was in a state of
> shock. And my only response was, "Scott, why would you do
> that?"
>
> His response was, "Burt, you're 71 years of age, how long do
> you expect to work.   And what if you get hit by a truck" - a
> bus, rather - "what if you get hit by a bus, and we have to
> plan for the future."

Fried Dep. at 182.   Fried responded that he didn't plan on being

hit by a bus, that he was in good health, and that he "expect[ed]

to work for a long period of time."   Id. at 183.   Following this

meeting, State wrote the following email to Simmons and Hogan:

> Spent 3 hours with Burt today.   He came to me with an
> expanded list of duties and proceeded to explain how he is
> uniquely qualified to do each task.   He told me that he would
> like to work for LVI as long as he is able, paid
> $600,000K/year to work 4 days a week, and that it would be a
> great loss to the Company if he were not involved.   I was
> clear with him that it was my objective to have him truly
> retire and be just an on call resource.   He countered that
> that would be a huge mistake, the business would suffer, and
> he would apply his skills elsewhere (not sure if he was
> suggesting he would compete). . . .
>
> It is clear that Burt believes that he is irreplaceable and
> he would like to be involved forever.   The management team is
> growing weary of his constant meddling in every aspect of the
> business and continued interference. . . . He and I are
> already diverging on long term strategy and opportunities for

11

growth as well as how to run marketing HR, accounting, and
IT.

We should probably talk about how to handle this.  His
involvement is technically as a Board member so I am not sure
what my say is in terms of his continued role at LVI.  If he
is asked by me to depart he will not go without a fight and
some broken glass although he did say at one point that if I
were so short sighted to request that he would comply.

Datoo Decl. Ex. 21 (email from Scott State to Brian Simmons and

Robert Hogan, dated October 19, 2010).

Fried discussed the October 19, 2010 meeting with Bagaria,

Simmons and Schnabel, telling them that State wanted to reassign

all of his duties and had made an age-related comment.  See,

e.g., Fried Dep. at 194-200.  On October 28, 2010, at Simmons's

request, Fried sent Simmons the list of responsibilities prepared

for Fried's meeting with State to distribute to the Board of

Directors.  Seltzer Affirm Exs. R, S.  On November 2, 2010,

Simmons, on behalf of the Board, responded to Fried's list of

responsibilities, telling Fried that the list was "much more

expansive that [sic] what [he] had envisioned" and "[not]

consistent with the sentiments [Fried] had expressed to [him]"

when State was hired.  See Am. Compl. ¶ 49; Seltzer Aff. Ex. S

(email from Brian P. Simmons to Burton Fried, Rajay Bagaria, John

Schnabel, Robert Hogan, Daniel Hennessy, Laura Lester, and Scott

State).  Simmons wrote: "I am of the opinion that we need to

transition all of your day-to-day activities to Scott and other

12

members of the management team.  It is my hope that you continue
as Chairman of the board in a non-executive capacity and act as
on call resource for Scott."  Id.  He further indicated that he
"would like to replace [Fried's] existing employment arrangement
with a consulting agreement that compensates you for the services
you will continue to provide and also as Chairman of the Board."
Id.

On November 4, 2010, Fried attended the quarterly Board
meeting in New York City.  See Datoo Decl. Ex. 22 ("Minutes of a
Meeting of the Boards of Directors of LVI Parent Corp.").  At the
end of the meeting, the Board discussed Fried's future role at
LVI.  Id.  During this meeting, Fried told the Board about
State's comment and State's decision to reassign his duties.
See, e.g., Datoo Decl. Ex. 3 at 90-93 (Deposition of Rajay
Bagari, dated May 23, 2011 ("Bagaria Dep.")); Datoo Decl. Ex. 5
at 43-44 (Deposition of Gerald Girardi, dated May 23, 2011
"Girardi Dep.")); Datoo Decl. Ex. 6 at 51-52 (Deposition of
Gregory DiCarlo, dated June 2, 2011 ("DiCarlo Dep.")).  He also
told the Board that State's actions constituted age
discrimination.  See, e.g., Bagaria Dep. at 91.  At the
conclusion of the meeting, no decision regarding Mr. Fried's
continued employment was made.  Id. at 93, 95.  Instead, the

Board decided to have Schnabel reach out to Fried and State and attempt to broker a resolution. Id. at 92-93.

On November 5, 2010, State emailed his personal friend and wrote the following sentence in reference to Fried: "In a battle with founder about his need to retire but Board gets it and is working to exit him with some respect." See Datoo Decl. Ex. 9 (email from Scott State to David S. Hicks, dated November 5, 2010).

On November 15, 2010, Fried's attorneys hand delivered a letter to State's attention at LVI's New York City Office. See Datoo Decl. Ex. 24 (letter from Douglas H. Wigdor to Scott E. State, dated November 15, 2010). The letter states, inter alia, that "[b]ased on our knowledge of LVI's callous and discriminatory conduct to date, it is abundantly clear that the Company is pursuing a course of conduct which constitutes unlawful age discrimination and violates Mr. Fried's employment contract. Although Mr. Fried's devotion to the Company is unwavering and he would prefer to remain with LVI in his present, undiminished capacity, he remains committed to pursuing any and all legal remedies in order to ensure that he is fully made whole as a result of the Company's illegal and discriminatory action." Id. at 4.

14

On November 16, 2010, Girardi, Simmons, Hogan, Schnabel and

State participated in a conference call.  See, e.g., Girardi Dep.

at 82-84; 87-89.  Girardi's handwritten notes of that conference

call state, among other things:

> Burt sent preemption letter; ignore + send good faith letter
> offer to Burt Fried.  Next steps[:] 1. send out letter to
> Burt[;] 2. Treatment for Burt[:] [a] e-mail acct [b] Westport
> office [c] compensation [d] treat his daughter as we would any
> other employee.  Maintain status quo until 11/30.

Datoo Decl. Ex. 25.  On November 16, 2010, Brian P. Simmons sent

a letter to Fried on behalf of the Board.  The letter states,

inter alia:

> Following our meeting November 4, and our subsequent
> discussions with you, management and among board members, I
> have been asked to finalize the scope of your
> responsibilities, compensation and benefits as you transition
> to non-executive chairman and consultant.
>
> Effective 11/30/10 your employment with LVI Services Inc. will
> terminate.  You will continue your relationship with LVI as
> non-executive Chairman of the Board of LVI Parent Corp.  In
> addition, we are offering you the position of consultant to
> LVI Services on the terms set forth in the attached letter
> agreement.

Datoo Decl. Ex. 26 (letter from Brian P. Simmons on behalf of the

Board of Directors of LVI Parent Corp. to Burton Fried, dated

November 16, 2010).  As set forth in the attached letter

referenced above, the proposed consulting arrangement was

contingent on Fried agreeing to "release and forever discharge

LVI Parent Corp., LVI and its affiliiates . . . of and from any

and all claims," and to waive "any and all rights that [he] may

15

have arising under the Age Discrimination in Employment Act

('ADEA'), as amended by the Older Workers Benefit Protection Act

of 1990, which have arisen on or before the date of the execution

of this agreement." Id.

Fried declined the Board's officer and resigned as Chairman

of the Board on November 30, 2010; he did not resign from his

position as Chairman of LVI. See, e.g., Datoo Decl. Ex. 33 at

12, 133 (Deposition of Brian Simmons, dated May 25, 2011

("Simmons Dep.")). After his employment was terminated, Fried's

job duties were mostly reassigned to Tom Cullen, age 35; Gregory

DiCarlo, age 44; David Pearson, age 44; Frank Aiello, age 45;

John Leonard, age 46; State, age 47; Mark Canessa, age 48; Kamal

Sookram, age 53; Joseph Annarumma, age 57. See Plaintiff's

Memorandum of Law in Opposition to Defendants' Motion for Summary

Judgment ("Pl.'s Opp'n") at 8.

At the time of Fried's termination, eight employees,

including Fried's daughter, Shari Dembin, worked in the Westport

Office. See DiCarlo Dep. at 79-80, 88. Although the facts are

somewhat in dispute, it is uncontested that Shari Dembin's

employment was terminated in January 2011. See, e.g., Bagaria

Dep. at 124; Cutrone Dep. at 161-165, 169-170; Girardi Dep. at

118; Leonard Dep. at 150-151, 155, 172-173; Datoo Decl. Ex. 32

(email from John Leonard to All Regional Mangers, et al. dated

16

December 21, 2010). At least ten other employees were also
terminated, five of whom worked at the Westport Office. Id. As
of June 1, 2011, the Westport Office remained open. See Cutrone
Dep. at 166-167, 171.

With this lengthy background in mind, the Court turns to
defendants' motion for summary judgment. Summary judgment is
appropriate only "if the movant shows that there is no genuine
dispute as to any material fact and the movant is entitled to
judgment as a matter of law." Fed. R. Civ. P. 56(c); see also
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). "In
deciding whether there is a genuine issue of material fact as to
an element essential to a party's case, the court must examine
the evidence in the light most favorable to the party opposing
the motion, and resolve ambiguities and draw reasonable
inferences against the moving party." Abramson v. Pataki, 278
F.3d 93, 101 (2d Cir. 2002) (internal quotation marks omitted).
The moving party must demonstrate that no genuine issue exists as
to any material fact, see Celotex Corp. v. Catrett, 477 U.S. 317,
323-25 (1986); however, as to an issue on which the non-moving
party bears the burden of proof, "the burden on the moving party
may be discharged by 'showing'-that is, pointing out to the
district court-that there is an absence of evidence to support
the nonmoving party's case." Id. at 325. If the moving party

17

makes such a showing, the "non-movant may defeat summary judgment
only by producing specific facts showing that there is a genuine
issue of material fact for trial." Samuels v. Mockry, 77 F.3d
34, 36 (2d Cir. 1996).

The Court first considers plaintiff's federal claims for
discrimination and retaliation in violation of the ADEA.  With
respect to plaintiff's claim of discrimination, the Supreme Court
recently held that "a plaintiff bringing a disparate-treatment
claim pursuant to the ADEA must prove, by a preponderance of the
evidence, that age was the 'but-for' cause of the challenged
adverse employment action.  The burden of persuasion does not
shift to the employer to show that it would have taken the action
regardless of age, even when a plaintiff has produced some
evidence that age was one motivating factor in that decision."
Gross v. FBL Fin. Serv. Inc., 129 S. Ct. 2343, 2352 (2009).
Although the Supreme Court noted in Gross that it "has not
definitively decided whether the evidentiary framework of
McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817,
36 L. Ed. 2d 668 (1973), utilized in Title VII cases is
appropriate in the ADEA context," id. at 2349 n.2, the Second
Circuit has continued to apply the familiar McDonnell Douglas
burden-shifting framework to ADEA cases even after Gross.[6]

---

[6] See Gorzynski v. JetBlue Airways Corp., 596 F.3d 93 (2d Cir.
2010).

18

Accordingly, "to establish a prima facie case of age discrimination, [the plaintiff] must show (1) that she was within the protected age group, (2) that she was qualified for the position, (3) that she experienced adverse employment action, and (4) that such action occurred under circumstances giving rise to an inference of discrimination." Id. at 107. If the plaintiff establishes a prima facie case, the burden shifts to the defendant to "articulate some legitimate nondiscriminatory reason for [the adverse act]." Id. at 106. If the defendant satisfies this requirement, the burden then shifts to the plaintiff to demonstrate that age was the "but for" cause of the challenged

---

Gross did not . . . reject the McDonnell Douglas burden-shifting framework for ADEA cases altogether. Instead, it left that issue open, noting only that the Supreme Court "has not definitively decided whether the evidentiary framework of McDonnell Douglas . . . is appropriate in the ADEA context." Id. at 2349 n.2. Its decision explicitly focused on "the textual differences between Title VII and the ADEA that prevent . . . applying Price Waterhouse and Desert Palace [mixed-motive analysis] to federal age discrimination claims." Id.

Accordingly, we remain bound by, and indeed see no reason to jettison, the burden-shifting framework for ADEA cases that has been consistently employed in our Circuit. See D'Cunha v. Genovese/Eckerd Corp., 479 F.3d 193, 195 (2d Cir. 2007) (applying the McDonnell Douglas framework in an ADEA case); see also United States v. Wilkerson, 361 F.3d 717, 732 (2d Cir. 2004) ("[W]e . . . are bound by the decisions of prior panels until such time as they are overruled either by an en banc panel of our Court or by the Supreme Court.").

Id. at 106.

19

adverse employment action.  <u>Id.</u> at 106; <u>Holowecki v. Federal</u>

<u>Express Corp.</u>, No. 09-3477, 2010 WL 2573864, at *1 (2d Cir. June

24, 2010).

In this case, defendants do not contest that plaintiff has

satisfied his burden of establishing a *prima facie* case.  <u>See,</u>

<u>e.g.</u>, Memorandum of Law in Support of Defendants' Motion for

Summary Judgment ("Defs.' Mem.") at 12.  The Court need only

decide, therefore, whether the defendants have articulated some

legitimate nondiscriminatory reason for the adverse employment

action at issue -- <u>i.e.</u>, the termination of plaintiff's

employment with LVI -- and if so, whether Fried has demonstrated

that age was the "but for" cause of the adverse action.

The Court finds that defendants have clearly articulated a

legitimate, nondiscriminatory reason for terminating Fried's

employment with LVI: the need to ensure that the new CEO and

President, defendant Scott E. State, would have the freedom to

manage the Company as he saw fit.  Def. Mem. at 12.  It cannot be

gainsaid that companies may legitimately terminate personnel in

order to promote effective management and leadership; it is not

the Court's role to second-guess such decisions.  <u>See Sellick v.</u>

<u>Agency-Castle Point</u>, No. 09 Civ. 6616, 2010 WL 2813431, at *10

(S.D.N.Y. July 16, 2010) (Cote, J.) ("It is not the role of

federal courts to review the correctness of employment decisions

20

or the processes by which those decisions are made . . . .")
(citations and brackets omitted).  Moreover, the abundant,
undisputed evidence in the record, which has been recounted at
length above, amply supports defendants' contention that Fried
was fired because of conflicting visions concerning the proper
role of LVI's chairman.  For example, it is uncontested that
Fried's continuing role in the company was the subject of debate
before State was ever hired,[7] and that disagreements arose
between Fried and the Board concerning the scope of Fried's
responsibilities shortly after State became LVI's President and
CEO.

Accordingly, the burden now shifts to the plaintiff to
demonstrate that defendants' proffered reason is pretextual.
Smith v. N.Y. City Dep't of Educ., 2011 U.S. Dist. LEXIS 77547,
at *20 (S.D.N.Y. July 18, 2011).  To meet this burden, the
plaintiff must demonstrate that: (1) the proferred reason[] [is]
false; and (2) the real reason was unlawful discrimination.  Id.

---

[7] Indeed, Fried goes to great lengths in his opposition papers to
emphasize that discussions concerning Fried's role in the company
had been ongoing before State was hired.  See, e.g., Pl.s' Opp'n
at 4 ("On September 14, 2010, before State was even hired, he
inquired about how Mr. Fried could be removed as Chairman of the
Board."); Id. at 5 (Again, before he was hired, State asked John
Leonard ('Leonard'), the Chief Operating Officer of LVI, if Mr.
Fried, who was 70 years old at the time, was going to retire.").
Moreover, Fried himself assured Hogan that State "[would] be in
charge and get all the room he wants from me."  Email from Burton
Fried to Robert Hogan, dated September 21, 2010 (Seltzer Affirm
E).

(citing Kerzer v. Kingly Mfg., 156 F.3d 396, 401 (2d Cir. 1998)).

As explained above, because the Supreme Court recently eliminated

the mixed-motive analysis for ADEA claims, see Gross v. FBL Fin.

Servs., 129 S. Ct. 2343, 2351 (2009), Fried must prove not merely

that age was one of the factors motivating defendants' decision,

but rather that age was the "but-for" cause of that decision.

Aiello v. Stamford Hosp., 2011 U.S. Dist. LEXIS 87121, at *54 (D.

Conn. Aug. 8, 2011).  Fried must therefore "raise[] sufficient

evidence upon which a reasonable jury could conclude by a

preponderance of the evidence that [his] age was a 'but for'

cause of [defendants'] decision to fire [him]."  Gorzynski v.

JetBlue Airways Corp., 596 F.3d 93, 107 (2d Cir. 2010).

The Court concludes that Fried has failed to sustain this

burden as a matter of law.  Indeed, Fried's case hinges almost

exclusively on the October 19, 2010 conversation between Fried

and State, when State purportedly indicated that he would be

reassigning Fried's duties and stated: "Burt, you're 71 years of

age, how long do you expect to work. . . . [W]hat if you get hit

by a bus . . . we have to plan for the future."  Fried Dep. at

182.  However, "[s]tray remarks, even if they occurred as

plaintiff claims, are not enough to satisfy the plaintiff's

burden of proving pretext. Stray remarks alone do not create an

issue of material fact to defeat summary judgment."  Bunk v.

22

General Services Admin., 408 F. Supp. 2d 153, 158 (W.D.N.Y.

2006).  See also Shapiro v. N.Y. City Dep't of Educ., 561 F.

Supp. 2d 413, 424 (S.D.N.Y. 2008) ("[t]he stray remarks of a

decision-maker, without more, cannot prove a claim of employment

discrimination").  In this case, the single, isolated mention of

Fried's age, the only such mention in the entire record, cannot,

standing alone, create an issue of material fact sufficient to

defeat summary judgment.  This is especially true given that

State, by Fried's own admission, qualified his remark by asking

"what if you get hit by a bus."  Accordingly, unless other

indicia of discrimination are properly presented, see Shapiro v.

N.Y. City Dep't of Educ., 561 F. Supp. 2d 413, 424 (S.D.N.Y.

2008), this comment alone is insufficient to sustain plaintiff's

burden of proving pretext as a matter of law.

     Fried's purported indicia of discrimination also fall short.

Although Fried highlights several emails in which State used the

word "retire,"[8] courts have consistently held that remarks

relating to retirement or transition planning are insufficient to

---

[8] See, e.g., Datoo Decl. Ex. 19 (email from Scott State to Robert
Hogan, September 19, 2010) ("In the best-case scenario Burt will
decide to retire at some date certain from LVI upon a new CEO
being named and and offer to support the business under a consulting
agreement in any way the new CEO sees fit.") (emphasis added);
Datoo Decl. Ex. 9 (email from Scott State to David S. Hicks,
dated November 5, 2010) ("In a battle with founder about his need
to retire but Board gets it and is working to exit him with some
respect.") (emphasis added).

defeat a motion for summary judgment in an ADEA case.  See, e.g.,
Boston v. McFadden Pub., Inc., No. 09 Civ. 457, 2010 WL 3785541,
at *11 (S.D.N.Y. Sept. 29, 2010) ("even if plaintiff was asked
about his retirement plans, inquiries about retirement plans do
[] not necessarily show animosity toward age"); Vesprini v. Shaw
Contract Flooring Servs., Inc., 315 F.3d 37, 42 (1st Cir. 2002)
(comment that the time had come for the plaintiff to "step back
and let the young stallions run the [day-to-day] business" not
sufficient to constitute direct evidence of age-based animus),
abrogated in part as stated in Drumm v. CVS Pharm., Inc., 701 F.
Supp. 2d 200, 2010 U.S. Dist. LEXIS 33464, 108 Fair Empl. Prac.
Cas. (BNA) 1819 (D.R.I. 2010); Mereish v. Walker, 359 F.3d 330,
337 (4th Cir. 2004) ("ambiguous remarks referring to the process
of generational change create no triable issue of age
discrimination") (citing cases); Getler v. Cornell Weill Univ.
Med. College Dept. of Surgery, No. 05 Civ. 8550, 2007 WL 38276,
at *11 (S.D.N.Y. Jan. 3, 2007) ("inquiries about retirement plans
do not necessarily show animosity toward age").  As defendants
point out, this is particularly true where, as in this case,
plaintiff was the first to raise the topic of retirement.  See
Boston, 2010 WL 3785541, at *11; Spahr v. Am. Dental Ctrs. No. 03
Civ. 4954, 2006 U.S. Dist. LEXIS 14581, at *12 (E.D.N.Y. Mar. 14,
2006) ("Given the circumstances, with Plaintiff repeatedly

24

raising the topic of retirement, letting everyone in the office know that she planned to leave the office in 2003, it is natural, and hardly creates an inference of discrimination, for [her supervisor] to inquire about her future plans.").

Indeed, the facts presented here are quite similar to those in Raskin v. The Wyatt Co., 125 F.3d 55 (2d Cir. 1997), a case in which the evidence plaintiff proffered to support his age discrimination claim included a statement by his supervisor that plaintiff might not be interested in a manager position because of his age and a reference to his eligibility for early retirement. Id. at 63. Even under the pre-Gross standard, the Second Circuit found that Raskin's supervisor had a legitimate reason to confirm Raskin's interest in a career change, and that the inquiry, which arose in a conversation about Raskin's application for a manager position, failed to support an inference that age played a role in the defendant's decision not to offer Raskin the position at issue. Id. The Court concluded: "[t]he ADEA does not make all discussions of age taboo." Id. So too in this case, where Fried had previously given assurances that State "[would] be in charge and get all the room he want[ed]" from Fried, see Seltzer Affirm E, it was natural, and hardly demonstrates pretext, for Fried's colleagues to inquire as

to his future plans when disagreements arose concerning the scope
of Fried's responsibilities.

Fried's other "evidence" of discrimination consists solely
of the Board's decision to distribute Fried's operational
responsibilities to younger workers.  While this decision is
sufficient to establish that the adverse employment action
occurred under circumstances giving rise to an inference of
discrimination for the purpose of establishing a prima facie
case, it is insufficient to show that defendants' legitimate,
non-discriminatory explanation is pretextual and that age
constituted the "but for" cause of the adverse employment action.
See, e.g., Mattera v. JPMorgan Chase Corp., 40 F. Supp. 2d 561,
574 (S.D.N.Y. 2010) ("[T]he mere fact that plaintiff's
replacement was younger, though enough to establish the inference
of discrimination prong of plaintiff's prima facie case, cannot
standing alone establish pretext.").[9]

In sum, even after drawing all reasonable inferences in
favor of the plaintiff, the Court concludes that plaintiff's

---

[9] See also Ashton v. Pall Corp., 32 F. Supp. 2d 82, 90 (E.D.N.Y.
1999) (diminished responsibilities did not create an inference of
discrimination where employer had different expectations of how
the work should be performed); Deebs v. ALSTOM Transp., Inc., 550
F. Supp. 2d 385, 390-91 (W.D.N.Y. 2008) ("reassignment of [the
plaintiffs] duties to other, younger employees does not dictate a
finding that other employees were hired into the [plaintiffs]
position, or that the position was effectively reinstated at any
relevant time following [the plaintiffs] discharge").

discrimination claim under the ADEA must fail as a matter of law.

Accordingly, the Court hereby grants summary judgment to the

defendants on this claim.

Plaintiff's federal claim of retaliation, however, is a

closer question.  To establish a prima facie claim of retaliation

under the ADEA, plaintiff must show that (1) he participated in

protected activity known to defendant; (2) he suffered an adverse

employment action; and (3) a causal connection exists between the

plaintiff's engagement in the protected activity and the adverse

employment action.  Gorzynski, 596 F.3d at 110 (citations

omitted).  Once established, the burden shifts to defendant to

articulate a legitimate nondiscriminatory reason for the adverse

employment action.  Mattera v. JP Morgan Chase Corp., No. 08 Civ.

04040, 2010 WL 3785576, at *14 (S.D.N.Y. Sept. 30, 2010).

Finally, the burden shifts back to the plaintiff to demonstrate

that the reason is pretextual.  Id.

In this case, Fried alleges that defendants retaliated

against him by (1) excluding him from multiple aspects of LVI's

operations and requesting that LVI's manager direct new Company

matters to State rather than to Fried, Am. Compl. ¶¶ 55-58; (2)

terminating his employment and offering him a position as a

consultant, Am. Comp. ¶¶ 60-62; and (3) terminating the

employment of his daughter, Shari Dembin, Am. Compl. ¶¶ 64.71.

It is undisputed that these actions constitute "adverse employment actions" for the purpose of establishing plaintiff's prima facie case.  There is also no question that Fried engaged in protected activity by complaining of age discrimination at the November 4, 2010 Board meeting and in his November 15, 2010 letter addressed to State.  Although defendants argue that plaintiff did not complain of age discrimination prior to November 4, 2010, see Defs.' Mem. at 20, there is at least some evidence in the record to suggest that Fried complained of age discrimination as early as October 19, 2010, see Fried Dep. at 194-200.  Drawing all reasonable inferences in favor of the plaintiff, the Court must conclude for the purposes of this motion that Fried in fact complained of age discrimination on that date.

The fact that Fried complained of age discrimination as early as October 19, 2010 is significant because many of defendants' arguments are based on the premise that Fried's first protected activity occurred at the November 4, 2010 Board meeting.  For example, defendants argue that the decision to close or at least downsize the Westport Office was considered as early as October 29, 2010, and that Simmons proposed the idea of a consulting agreement in an email sent to Fried on November 2, 2010.  See Def. Mem. at 22.  Defendants contend that because it

is axiomatic that no cause-and-effect relationship between a protected activity and an adverse employment action can be found where the alleged adverse employment action occurred prior to the commencement of any protected activity, any inference of retaliation in this case is negated by the timing of events. Id. at 20.[10]  However, because Fried has produced evidence suggesting that he engaged in protected activity before defendants contemplated closing the Westport Office or offering Fried the consulting agreement, defendants' argument in this regard is unpersuasive.  Accordingly, the Court concludes that Fried has established a prima facie case of retaliation.

The Court therefore considers whether defendants have articulated a legitimate nondiscriminatory reason for the adverse employment action and whether plaintiff has demonstrated that the reason was pretextual.  For the reasons already limned above, plaintiff's claim of retaliation fails with respect to the consultancy agreement and with respect to the decision to fire Fried.  However, a separate question is presented with respect to

---

[10] See Kemp v. Metro-North R.R., No. 04 Civ 9926, 2007 U.S. Dist. LEXIS 43568, at *49 (S.D.N.Y. June 12, 2007) (dismissing retaliation claim where a transfer decision was made before the plaintiff's EEOC charge, even though the actual transfer occurred after the charge); Williams v. City of N.Y., No. 04 Civ. 1993, 2005 U.S. Dist. LEXIS 6083, at *42 (S.D.N.Y. Apr. 12, 2005) (finding no viable retaliation claim where the plaintiff filed his complaint with the New York City Commission on Human Rights after his termination).

plaintiff's claim of retaliation based on the termination of
Shari Dembin, Fried's daughter.  Defendants argue that they had a
legitimate business reason for closing the Westport office: to
contain costs at a time when LVI faced a significant financial
shortfall.  Def. Mem. at 22 (citing Seltzer Aff., Exs. AA, BB,
CC; State Dep. at 395-400.)).  They contend that terminating
Dembin was a cost-cutting measure, and point out that all other
employees of the Westport office, with the exception of the
members of the legal team, were terminated.  Id. Defendants have
therefore offered a legitimate, nondiscriminatory reason for
terminating Dembin's employment.

However, the Court finds that there is an issue of fact
concerning whether defendants' proffered reason is pretextual.
Fried notes that Dembin began working for LVI in 1996 and had
been based out of the Westport Office starting in 2003.  Pl.'s
Opp'n at 23.  She was viewed as a quality performer, and she was
not laid off during any of the multiple rounds of layoffs prior
to her eventual termination in January 2011.  Id.  It is
"undisputed that some time after November 13, 2010, Ms. Dembin's
name came up for the first time during a discussion of a
potential reduction-in-force ('RIF') and the first time her name
appeared on a list of employees who would be affected by the RIF
was on December 21, 2010, less than two months after Mr. Fried's

30

earliest complaints of age discrimination." Id. (citing Cutrone
Dep. at 61-166; DiCarlo Dep. at 150-151; Datoo Decl. Exs. 32 and
35). Pl. Opp. at 23. Moreover, Dembin's inclusion in a general
reduction-in-force does not automatically shield defendants from
liability. See Hird-Moorhouse, No. 03 Civ. 9688, 2010 WL
3910742, at *5 (S.D.N.Y. Oct. 5, 2010); ("reorganization may not
be used as a pretext to remove or demote a particular employee,
particularly where that employee is a member of a protected
class"). Finally, although defendants claim that the decision to
fire Dembin was tied to the decision to close the Westport
Office, Cutrone testified that the Westport Office in fact
remains open. See Cutrone Dep. at 168. Accordingly, the Court
concludes that Fried has introduced just enough evidence for a
reasonable jury to conclude that defendants' decision to
terminate Dembin, following so closely on the heels of
defendants' contentious dispute with Dembin's father after he
complained of age discrimination, constituted retaliation under
the ADEA.

Finally, the Court concludes that Fried's remaining claims,
all of which are brought pursuant to the New York City Human
Rights Law ("NYCHRL"), must be dismissed for the simple reason
that the NYCHRL is inapplicable to the instant dispute. The
NYCHRL expressly limits the applicability of its protections to

acts that occur within the boundaries of New York City.  See

N.Y.C. Admin. Code § 2-201; Casper v. Lew Lieberbaum & Co., Inc.,

No. 97 Civ. 3016, 1998 WL 150993, at *4 (S.D.N.Y. Mar. 31, 1998).

Courts have looked to the location of the impact of the adverse

action on the plaintiff to determine the location of the

discrimination.  See Salvatore v. KLM Dutch Airlines, No. 98 Civ.

2450,1999 WL 796172, at * 16 (S.D.N.Y. Sept. 30, 1999) ("To

determine the location of the discrimination, courts have looked

to the location of the impact of the offensive conduct.");

Casper, 1998 WL 150993, at *4.  Of particular relevance here, the

New York Court of Appeals recently held:

> There is disagreement among state and federal courts
> concerning the territorial reach of the City Human Rights Law
> in circumstances where the alleged discriminatory conduct is
> against a nonresident who does not work in New York City.
> Some courts have concluded that a nonresident plaintiff may
> invoke the protections of the NYCHRL by merely alleging and
> proving that the discriminatory decision to terminate was
> made in the city . . . .
>
> Other courts have taken the view that the nonresident
> plaintiff must demonstrate that the alleged discriminatory
> conduct had an "impact" within the city . . . .  Courts
> adopting the impact requirement have done so out of concern
> that merely focusing the inquiry on where the termination
> decision is made--as opposed to where the impact of that
> decision is felt--results in the expansion of the NYCHRL to
> cover any plaintiff who is terminated pursuant to a decision
> made by an employer from its New York City headquarters
> regardless of where the plaintiff works . . . .
>
> We hold that the impact requirement is appropriate where a
> nonresident plaintiff invokes the protection of the City
> Human Rights Law. Contrary to Hoffman's contention, the
> application of the impact requirement does not exclude all
> nonresidents from its protection; rather, it expands those

protections to nonresidents who work in the city, while
concomitantly narrowing the class of nonresident plaintiffs
who may invoke its protection. . . .

> [T]he impact requirement is relatively simple for courts to
> apply and litigants to follow, leads to predictable results,
> and confines the protections of the NYCHRL to those who are
> meant to be protected--those who work in the city . . . .

Hoffman v. Parade Publ'ns., 15 N.Y.3d 285, 290-91 (2010)

(emphasis added). Accordingly, to state a claim under the

NYCHRL, it is insufficient to show more that LVI's headquarters

are located in New York City and that the decision to terminate

Fried's employment was made in New York City. Id. Rather, Fried

must prove that the decision to terminate his employment impacted

him in New York City.

In this case, it is undisputed that Fried is a resident of

the State of Connecticut, Am. Compl. ¶ 15, and that he worked

exclusively from the Company's Westport Office at the time of the

alleged discrimination, Am. Compl. ¶ 27.[11] Plaintiff's admission

that he worked five days a week out of the Westport Office during

the time of the events in question is dispositive. Fried's

argument to the contrary -- that he attended meetings in New York

City, made regular phone calls to New York City, and secured

contracts for LVI in New York City, see Pl.'s Opp'n at 18-20 --

---

[11] "Until his last seven years of employment with the Company,
Mr. Fried performed his services while working out of the
Company's New York City corporate office. After that time, Mr.
Fried worked from the Company's corporate Connecticut satellite
office in Westport." Am. Compl. 27.

is unavailing.  As recently stated by the New York Court of
Appeals, the impact requirement is meant to be simple to follow
and predictable in its application.  Hoffman v. Parade Publ'ns.,
15 N.Y.3d 285, 291 (2010).  This goal would be completely
undermined if courts were required to conduct a fact-intensive
analysis of the amount of contact a particular individual
maintained with New York City even where it was undisputed that
that individual did not work in New York City.  This is
especially true in today's increasingly globalized society in
which business is often conducted over large distances.
Accordingly, the Court concludes the NYCHRL is inapplicable to
the instant case, and hereby grants defendants' summary judgment
with respect to all of plaintiff's claims brought pursuant to the
NYCHRL.

In sum, the Court hereby grants summary judgment to the
defendants' on all of plaintiff's claims with the exception of
the prong of plaintiff's claim of retaliation under the ADEA
relating to the firing of plaintiff's daughter.  The parties are
instructed to convene a joint conference call with Chambers on
October 11, 2011 at 2:00P.M. to schedule a trial on the remaining
claim.  The Clerk of the Court is directed to close item number
37 on the docket of this case.

SO ORDERED.

                                        _____
                                        JED S. RAKOFF, U.S.D.J.

Dated:      New York, New York
            October 3, 2011

35