# Exhibit 3

1

1

2 UNITED STATES DISTRICT COURT

3 SOUTHERN DISTRICT OF NEW YORK

4 No. 10 Civ. 9308(JSR)

5 -------------------------------------------x

6 BURTON T. FRIED,

7                         Plaintiff,

8          - against -

9 LVI SERVICES, INC., LVI PARENT CORP., CODE

10 HENNESSY SIMMONS, LLC d/b/a CHS PRIVATE

11 EQUITY V LP; APOLLO INVESTMENT CORP.,

12 SCOTT E. STATE, in his official and

13 individual capacities; BRIAN SIMMONS, in

14 his official and individual capacities;

15 RAJAY BAGARIA, in his official and

16 individual capacities; GERALD J. GIRARDI,

17 in his official and individual capacities,

18                         Defendants.

19 -------------------------------------------x

20                         May 23, 2011

                          11:06  a.m.

21

22

23

24

25

**2**

4          VIDEOTAPE DEPOSITION of RAJAY
5  BAGARIA, taken by the Plaintiff, pursuant
6  to Notice, held at the offices of Thompson
7  Wigdor & Gilly, LLP, 85 Fifth Avenue, New
8  York, New York, before Debbie Zaromatidis,
9  a Shorthand Reporter and Notary Public of
10  the State of New York.

**4**

2          S T I P U L A T I O N S
4          IT IS HEREBY STIPULATED AND
5  AGREED by and between the Attorneys for
6  the respective parties hereto that filing
7  and sealing be and the same are hereby
8  waived.
9          IT IS FURTHER STIPULATED AND
10  AGREED that all objections except as to
11  the form of the question, shall be
12  reserved to the time of the trial.
13          IT IS FURTHER STIPULATED AND
14  AGREED that the within examination may be
15  signed and sworn to before any notary
16  public with the same force and effect as
17  though signed and sworn to before this
18  Court.

**3**

2  A P P E A R A N C E S :
4  THOMPSON WIGDOR & GILLY, LLP
5  Attorneys for Plaintiff
6       85 Fifth Avenue
7       New York, New York 10003
8  BY:  SHAFFIN A. DATOO, ESQ.
9       MATTHEW GORMAN, ESQ.

11  SIDLEY AUSTIN, LLP
12  Attorneys for Defendants
13       787 Seventh Avenue
14       New York, New York 10019
15  BY:  JOANNE SELTZER, ESQ.

18  ALSO PRESENT:
19     BURTON FRIED
20     J.D. MARTINEZ, Videographer

**5**

2          THE VIDEOGRAPHER:  We are on   11:06:13
3  the record.  My name is JD Martinez of   11:06:13
4  Veritext New York.  The date today is May   11:06:17
5  23, 2011.  The time on the video monitor   11:06:20
6  is 11:06 a.m.  This deposition being held   11:06:24
7  in the office of Thompson Widgor & Gilly   11:06:27
8  LLP, located at 85, Fifth Avenue, New   11:06:31
9  York, New York.  The caption of this case   11:06:34
10  is Burton T. Fried versus LVI Services,   11:06:36
11  Inc., et al., filed in the United States   11:06:41
12  District Court, Southern District of New   11:06:43
13  York.  The name of the witness is Rajay   11:06:46
14  Bagaria.                                 11:06:48
15          At this time the attorneys will   11:06:50
16  identify themselves and the parties they   11:06:50
17  represent after which our court reporter,   11:06:53
18  Debbie, will swear in the witness, and we   11:06:55
19  can proceed.                             11:06:57
20          MS. SELTZER:  Joanne Seltzer   11:07:00
21  with Sidley Austin, LLP representing   11:07:02
22  defendants.                              11:07:03
23          MR. DATOO:  Shaffin Datoo with   11:07:05
24  Thompson Widgor & Gilly representing the   11:07:08
25  plaintiff Burt Fried.                    11:07:08

2  (Pages 2 to 5)

14

```
1              BAGARIA
2      Q.   What are your job duties at      11:13:33
3   Apollo?                          11:13:36
4      A.   My focus is on investment       11:13:36
5   underwriting.                     11:13:39
6      Q.   For any particular type of      11:13:40
7   companies or investments?         11:13:44
8      A.   All types.                      11:13:45
9      Q.   Okay.  Now, are you familiar    11:13:46
10  with a company called LVI Parent Corp.?  11:13:49
11     A.   Yes.                            11:13:51
12     Q.   How so?                         11:13:52
13     A.   It is the parent of LVI         11:13:53
14  Services.                         11:13:56
15     Q.   Okay.  What does LVI Parent do?  11:13:56
16     A.   If it is -- if my               11:13:59
17  understanding -- I am -- my            11:14:04
18  understanding -- the corporate structure  11:14:07
19  is -- I am not entirely clear as to what  11:14:08
20  the holding company's different names are,  11:14:14
21  but if Parent is directly above Services  11:14:17
22  its sole purpose would be to own the      11:14:20
23  equity of Services.               11:14:23
24     Q.   Okay.  And who owns LVI Parent?  11:14:24
25     A.   If parent is the ultimate       11:14:27
```

15

```
1              BAGARIA
2   holding company, then it is owned by      11:14:31
3   Apollo, Code Hennessy, Falcon, and       11:14:34
4   potentially some others.          11:14:40
5      Q.   Is there a majority owner?      11:14:41
6      A.   Majority being defined as over   11:14:44
7   50 percent?                       11:14:46
8      Q.   Yes.                            11:14:47
9      A.   No.                             11:14:48
10     Q.   Is there any owner that owns     11:14:48
11  more stock than others?           11:14:52
12     A.   Yes.                            11:14:53
13     Q.   And which owner would that be?   11:14:53
14     A.   Apollo has slightly more shares  11:14:56
15  than Code Hennessy.               11:14:58
16     Q.   Was that true in 2010?          11:15:00
17     A.   At the conclusion of the        11:15:03
18  restructuring, yes.               11:15:06
19     Q.   Okay.  And what percentage does  11:15:06
20  Apollo own of LVI Parent?         11:15:11
21     A.   Approximately 34.               11:15:13
22     Q.   When did Apollo finalize its    11:15:15
23  investment in LVI Parent?         11:15:20
24         MS. SELTZER:   I object to the    11:15:23
25  form.  You can answer.            11:15:25
```

16

```
1              BAGARIA
2      A.   In I believe it was October     11:15:26
3   2010.                             11:15:31
4      Q.   Is that when the transaction    11:15:31
5   closed?                           11:15:33
6      A.   Yes.  We finalized our          11:15:33
7   investment when the transaction closed.   11:15:36
8      Q.   Okay.  And that was in October   11:15:37
9   2010?                             11:15:40
10     A.   I believe so.  I can't recall    11:15:40
11  the exact date.                   11:15:42
12     Q.   Okay.  And why did Apollo invest  11:15:43
13  in LVI Parent?                    11:15:46
14     A.   To obtain a recovery on our     11:15:47
15  existing investment.              11:15:51
16     Q.   What do you mean by that?       11:15:51
17     A.   Apollo had an investment in LVI  11:15:55
18  that it made in 2005.  Due to the        11:15:59
19  underperformance of the company, that     11:16:03
20  investment no longer had value, so Apollo  11:16:06
21  invested new money in order to obtain    11:16:09
22  ownership, so that it might obtain a      11:16:12
23  recovery at some point in the future.     11:16:15
24     Q.   Does LVI have a board of        11:16:17
25  directors, LVI Parent have a board of    11:16:21
```

17

```
1              BAGARIA
2   directors?                        11:16:23
3      A.   LVI has a board of directors.  I  11:16:24
4   can't recall the specific entity,        11:16:26
5   whichever the board sits at.      11:16:28
6      Q.   So when you mean LVI, do you     11:16:33
7   mean Parent, do you mean Services, do you  11:16:35
8   mean another LVI entity?          11:16:37
9      A.   When I mean LVI I refer to the   11:16:39
10  operating company of LVI that generates   11:16:41
11  all the income.  There is a holding       11:16:43
12  company that has -- that is where the     11:16:45
13  equity and the board sits, and I don't    11:16:47
14  recall the specific name of that entity.  11:16:49
15     Q.   Do you sit on the board of LVI?  11:16:51
16     A.   I sit on the board of directors  11:16:55
17  of the company, and again I am not clear   11:16:58
18  as to whether that is LVI Holdings or     11:17:02
19  Services or Parent, but at whatever entity  11:17:04
20  the board of directors is comprised at    11:17:07
21  that is where I have a board seat.        11:17:10
22     Q.   So you sit on the board of       11:17:11
23  directors, but you don't know for what    11:17:13
24  company you sit on?               11:17:14
25         MS. SELTZER:   Objection.         11:17:15
```

**22**

```
 1            BAGARIA
 2    Q.   You can answer.           11:21:01
 3    A.   That is how our charter is   11:21:02
 4 established.                       11:21:04
 5    Q.   What is LVI Acquisition Corp?  11:21:05
 6    A.   It was an entity I believe    11:21:16
 7 formed to consummate the acquisition, and  11:21:19
 8 I am not clear whether that related to   11:21:26
 9 this transaction in 2010 or the 2005   11:21:28
10 buyout.                            11:21:34
11    Q.   Do you know the relationship    11:21:34
12 between LVI Acquisition and LVI Parent?  11:21:36
13    A.   I don't.                   11:21:39
14    Q.   Does LVI Parent have any    11:21:40
15 employees?                          11:21:44
16    A.   I do not believe so.        11:21:45
17    Q.   And does LVI Parent have any   11:21:51
18 officers?                          11:21:53
19    A.   I don't know the answer to that  11:21:54
20 question.                          11:21:57
21    Q.   Well, you said Jeffrey Smith is  11:21:57
22 an officer of LVI Parent, correct?   11:21:59
23       MS. SELTZER:   Objection.    11:22:02
24    A.   I said that Jeffrey Smith is an  11:22:02
25 officer of the board, and I was unclear as  11:22:04
```

**23**

```
 1            BAGARIA
 2 to what level the board he sat at.    11:22:07
 3    Q.   What do you mean that Jeffrey   11:22:09
 4 Smith is an officer of the board?    11:22:12
 5    A.   His title is secretary to my   11:22:14
 6 knowledge.                          11:22:20
 7    Q.   Is -- but he is not on the board  11:22:20
 8 of directors, correct?             11:22:24
 9    A.   He is not a board member.     11:22:25
10    Q.   Okay.  And is he an officer of   11:22:26
11 LVI Parent?                         11:22:29
12       MS. SELTZER:   Objection.  Asked  11:22:31
13 and answered.                       11:22:33
14    A.   I don't know the answer to that  11:22:33
15 question.                          11:22:35
16    Q.   Okay.  Does LVI Parent own any  11:22:35
17 assets?                            11:22:37
18    A.   I can't -- I don't know.     11:22:38
19    Q.   Does it own -- you said it is a  11:22:46
20 holding company, correct?          11:22:48
21    A.   If it is a holding company that  11:22:49
22 sits directly above Services, then it   11:22:51
23 would own a hundred percent of the equity,  11:22:54
24 as I mentioned.                     11:22:56
25    Q.   Does LVI Parent have its own   11:22:56
```

**24**

```
 1            BAGARIA
 2 bank account?                      11:22:59
 3    A.   I don't know the answer.     11:22:59
 4    Q.   Does LVI Parent have any    11:23:00
 5 offices?                           11:23:02
 6    A.   I don't know.               11:23:02
 7    Q.   You don't know if it has an   11:23:08
 8 office?                            11:23:10
 9       MS. SELTZER:   Asked and      11:23:11
10 answered.                          11:23:12
11    A.   That is what I said.        11:23:12
12    Q.   Do you know where LVI Parent is  11:23:13
13 headquartered?                      11:23:17
14    A.   I don't know.               11:23:17
15    Q.   Does LVI Parent have any    11:23:18
16 subsidiaries?                       11:23:21
17    A.   I would think LVI Services at  11:23:22
18 some point in the chain would be a sub.  11:23:32
19    Q.   Any other subs?             11:23:33
20    A.   Not -- I don't know the answer   11:23:34
21 to that question.                  11:23:36
22    Q.   Is LVI Services a wholly-owned   11:23:36
23 subsidiary of LVI Parent?          11:23:39
24    A.   I don't know.               11:23:41
25    Q.   Do you know what the         11:23:42
```

**25**

```
 1            BAGARIA
 2 relationship is between LVI Acquisition   11:23:46
 3 and LVI Services?                   11:23:49
 4    A.   I don't know.               11:23:50
 5    Q.   What does LVI Services do?    11:23:51
 6    A.   It is engaged in the remediation  11:23:54
 7 of asbestos and mold and also in    11:24:01
 8 structural demolition.             11:24:06
 9    Q.   And do you have any background   11:24:07
10 in that area?                      11:24:09
11       MS. SELTZER:   Objection to the   11:24:12
12 form.                              11:24:13
13    A.   Can you be more specific?     11:24:13
14    Q.   Do you know anything about the   11:24:15
15 business that LVI Services engages in?  11:24:16
16    A.   I invested in the company.  So  11:24:19
17 from that standpoint, yes.         11:24:21
18    Q.   From a financial standpoint?   11:24:23
19    A.   Well, a financial investment   11:24:25
20 which entails 34 percent ownership    11:24:28
21 connotes some knowledge of the underlying  11:24:31
22 business.                          11:24:37
23    Q.   Okay.  Have you ever worked in   11:24:37
24 that business?                      11:24:38
25    A.   As an employee of a services   11:24:39
```

**46**

```
                 BAGARIA
1
2   document is forwarded to anyone outside of  11:44:38
3   Apollo?                          11:44:41
4       A.   Outside of our attorneys, not to  11:44:42
5   my knowledge.                    11:44:46
6       Q.   Okay.  Now, did there come a       11:44:46
7   time when Scott State was hired as    11:44:50
8   president and CEO of LVI Services?    11:44:53
9       A.   Yes, he was hired as CEO.     11:44:55
10      Q.   And do you know when that was?  11:44:58
11      A.   I believe it was in October or   11:45:00
12  around October.                  11:45:04
13      Q.   Of what year?            11:45:05
14      A.   2010.                    11:45:06
15      Q.   And who made the decision to    11:45:08
16  hire Mr. State?                  11:45:11
17      A.   The board of directors.     11:45:11
18      Q.   And were you involved in the    11:45:18
19  decision to hire him?            11:45:19
20      A.   I had no authority to make the  11:45:24
21  decision.  However, I was offered the   11:45:26
22  opportunity to meet with Scott.     11:45:28
23      Q.   And did you take that       11:45:29
24  opportunity?                     11:45:31
25      A.   Yes.                     11:45:31
```

**47**

```
                 BAGARIA
1
2       Q.   And what did you think?     11:45:32
3            MS. SELTZER:  Objection to the  11:45:34
4   form.                            11:45:35
5       A.   I thought --             11:45:35
6       Q.   What did you think of Mr. State?  11:45:37
7       A.   I thought he was a very well   11:45:39
8   qualified candidate.             11:45:41
9       Q.   Okay.  And did the board vote on  11:45:43
10  hiring Mr. State?                11:45:47
11      A.   I was not part of that board.  I  11:45:48
12  had no knowledge of it.          11:45:50
13      Q.   Do you know when Mr. State's    11:45:51
14  first day of work was?           11:45:53
15           MS. SELTZER:  Objection.    11:45:55
16      A.   I can't recall.          11:45:56
17      Q.   Now, after Mr. State was hired,  11:45:57
18  did Mr. Fried's job title change?   11:45:59
19      A.   I believe Burt gave up the    11:46:02
20  interim CEO title and kept his title as  11:46:09
21  chairman.                        11:46:12
22      Q.   Okay.  And what were his job    11:46:13
23  duties as chairman?              11:46:15
24      A.   There was no specific document  11:46:19
25  that outlined his job duties as chairman  11:46:25
```

**48**

```
                 BAGARIA
1
2   to my knowledge.                 11:46:27
3       Q.   All right.  Do you know what his  11:46:29
4   job duties were as chairman?     11:46:32
5       A.   What they were?          11:46:33
6       Q.   Yes.                     11:46:35
7       A.   I do not.                11:46:36
8       Q.   Did there come a time when you  11:46:37
9   learned what his job duties were as   11:46:43
10  chairman?                        11:46:46
11      A.   I learned anecdotally from Burt  11:46:46
12  about some of the things he claimed to   11:46:54
13  have done with the previous CEO, but I   11:46:56
14  have not come across any document produced  11:47:02
15  by the board which outlined those    11:47:06
16  responsibilities that Burt should hold as  11:47:08
17  chairman.                        11:47:12
18      Q.   When did you have this       11:47:12
19  conversation -- was it a conversation with  11:47:14
20  Mr. Fried that you had where he told you  11:47:16
21  about his duties under Mr. McNamara?   11:47:19
22      A.   Yes.                     11:47:21
23      Q.   And when was that conversation?  11:47:22
24      A.   They were in late October I    11:47:23
25  believe.                         11:47:26
```

**49**

```
                 BAGARIA
1
2       Q.   And how many conversations were  11:47:27
3   there?                           11:47:31
4       A.   At least one, maybe two.    11:47:31
5       Q.   Do you recall what you said in   11:47:37
6   the first conversation?          11:47:40
7       A.   Well, this was in the context of  11:47:41
8   what his role as chairman should be going  11:47:46
9   forward, which obviously was a matter of  11:47:48
10  debate, and I do recall expressing my   11:47:54
11  point of view on what his role should be  11:47:59
12  under the new ownership.         11:48:02
13      Q.   And what was your point of view?  11:48:04
14      A.   That he would have a more     11:48:05
15  diminished role as chairman if what he   11:48:09
16  claimed to have done under Bob McNamara's  11:48:12
17  leadership as chairman was in fact true.  11:48:16
18      Q.   Why?                     11:48:19
19           MS. SELTZER:  Objection.    11:48:20
20      A.   Because the new CEO did not need  11:48:21
21  Burt to act in that capacity.    11:48:26
22      Q.   Is that because Burt was 70    11:48:28
23  years old?                       11:48:34
24           MS. SELTZER:  Objection.    11:48:35
25      A.   No, it was not.          11:48:35
```

**50**

BAGARIA

```
1              BAGARIA
2    Q.  Now, while Mr. Fried was      11:48:37
3  chairman under Scott State, do you have  11:48:40
4  any reason to believe that his work   11:48:45
5  performance was less than excellent?   11:48:47
6      MS. SELTZER:  I object to the   11:48:50
7  form.                     11:48:52
8    A.  His work performance in what   11:48:52
9  capacity?                  11:48:54
10   Q.  Whatever the job duties he was  11:48:55
11 performing at LVI under Scott State.  11:48:58
12   A.  Under his employment agreement?  11:49:01
13   Q.  No, the job duties he was    11:49:02
14 performing while Scott State was CEO.  11:49:04
15   A.  But are you referring to his job 11:49:06
16 duties as the chairman or as an employee?  11:49:08
17   Q.  His job -- well,        11:49:10
18 chairman -- what do you mean by -- when  11:49:16
19 you say his job duties as chairman?  11:49:17
20   A.  Burt had a consulting      11:49:19
21 arrangement in which he was receiving  11:49:21
22 compensation.             11:49:23
23   Q.  When did he enter into this   11:49:24
24 arrangement?              11:49:28
25   A.  I don't know.          11:49:29
```

**51**

BAGARIA

```
1              BAGARIA
2    Q.  So when Scott State was CEO, was  11:49:29
3  Burt under this consulting arrangement?  11:49:34
4    A.  I believe Burt was still    11:49:37
5  on -- on the payroll.        11:49:39
6    Q.  As an employee or as a     11:49:42
7  consultant?               11:49:44
8    A.  I am not sure which one.   11:49:45
9    Q.  Was Mr. Fried ever an employee  11:49:47
10 of LVI Services under Scott State?  11:49:56
11   A.  I can't recall whether he was an  11:49:59
12 employee or a consultant, but he was  11:50:04
13 receiving some remuneration from the  11:50:07
14 company.                  11:50:11
15   Q.  In whatever capacity Mr. Fried  11:50:11
16 was in, do you have any reason to believe  11:50:19
17 that his job performance was less than  11:50:22
18 excellent?                11:50:24
19      MS. SELTZER:  Objection to   11:50:25
20 form.                     11:50:26
21   A.  Yes, I do.            11:50:26
22   Q.  Why?                 11:50:28
23   A.  As I stated previously, the   11:50:29
24 business materially underperformed his  11:50:33
25 expectations, and as a result I questioned  11:50:36
```

**52**

BAGARIA

```
1              BAGARIA
2  his ability to lead in a -- in a capacity  11:50:41
3  that had significant responsibility.   11:50:49
4    Q.  At that time, Scott State was  11:50:51
5  the new CEO, correct?        11:50:54
6    A.  He had joined I believe in   11:50:55
7  October, yes.             11:50:58
8    Q.  And the job duties that Mr.   11:50:58
9  Fried was performing either as an employee  11:51:02
10 or as a consultant of LVI services, was he  11:51:04
11 performing those duties in a satisfactory  11:51:08
12 manner?                   11:51:11
13      MS. SELTZER:  Objection.  Can  11:51:12
14 you -- which period?  After Mr. State came  11:51:13
15 on as --                  11:51:16
16      MR. DATOO:  Yes.         11:51:17
17   A.  So the period between Mr. State  11:51:18
18 joining and Burt resigning is a very  11:51:20
19 narrow period of time, and I can't really  11:51:27
20 comment on his performance within that  11:51:31
21 small window.             11:51:34
22   Q.  Now, prior to hiring Mr. State,  11:51:35
23 did you ever think about firing Mr. Fried?  11:51:41
24   A.  I was unaware that Burt had a  11:51:44
25 consulting or employment arrangement with  11:51:54
```

**53**

BAGARIA

```
1              BAGARIA
2  the company and was receiving the amount  11:51:56
3  of compensation that he was getting.  When  11:51:58
4  that came to my attention, it was very  11:52:01
5  clear to me that that needed to either  11:52:04
6  discontinue or be set at a level that was  11:52:08
7  materially lower than what we had been  11:52:11
8  paying Burt.              11:52:14
9      As it relates to his role as  11:52:16
10 chairman, we fully envisioned him   11:52:19
11 maintaining a role on the board of   11:52:21
12 directors but in a capacity that the board  11:52:23
13 agreed and the CEO could work with.  11:52:28
14   Q.  Okay.  My question was prior to  11:52:34
15 Mr. State's hire did you ever think about  11:52:36
16 firing Mr. Fried?            11:52:39
17   A.  Prior to Mr. State joining the  11:52:40
18 company, we felt no need to terminate Burt  11:52:45
19 Fried in his capacity as interim CEO  11:52:50
20 because the restructuring was coming close  11:52:52
21 to a resolution, and we would -- at that  11:52:55
22 point in time we would find a permanent  11:52:58
23 CEO.                      11:53:00
24   Q.  Now, you said we twice.  Who do  11:53:01
25 you mean by "we"?            11:53:04
```

14 (Pages 50 to 53)

VERITEXT REPORTING COMPANY

212-267-6868                                        516-608-2400

**54**

BAGARIA

```
1          BAGARIA
2      A.  When I said we, I meant the    11:53:05
3   board.                   11:53:06
4      Q.  Everyone on the board?         11:53:07
5      A.  I don't know if all members of  11:53:08
6   the board shared this view.      11:53:10
7      Q.  Who shared that view?          11:53:11
8      A.  Certainly Jerry Girardi from   11:53:13
9   Apollo.                  11:53:15
10     Q.  Is that the only person that   11:53:16
11  shared the view?             11:53:17
12      MS. SELTZER:  Objection. To     11:53:19
13  your knowledge.              11:53:20
14     Q.  That view.                   11:53:21
15     A.  To my knowledge.              11:53:21
16     Q.  Now, after Mr. State was hired, 11:53:22
17  did there come a time when Mr. State began  11:53:27
18  taking away Mr. Fried's job duties and   11:53:29
19  giving them to other employees?     11:53:32
20      MS. SELTZER:  Objection to the   11:53:33
21  form.                    11:53:34
22     A.  I don't have direct knowledge of  11:53:35
23  it.                      11:53:39
24     Q.  Do you have indirect knowledge   11:53:40
25  of it?                   11:53:45
```

**55**

BAGARIA

```
1          BAGARIA
2      A.  I heard from Burt about things  11:53:46
3   Scott was doing to take away        11:53:53
4   responsibilities, and I heard from Scott,  11:53:55
5   you know, a different side of the story.  11:54:00
6      Q.  And what did you hear from Mr.  11:54:03
7   Fried?                   11:54:05
8      A.  That Scott was taking actions to  11:54:05
9   marginalize Burt within the organization.  11:54:11
10     Q.  And did he list any specific    11:54:14
11  examples?                11:54:16
12     A.  I can't recall the details.     11:54:17
13     Q.  And what did you say in        11:54:20
14  response?                11:54:21
15     A.  I told Burt that he needed to   11:54:21
16  defer to Scott and Scott's decisions on  11:54:30
17  what role Burt would have in the ongoing  11:54:35
18  operations of the business.      11:54:39
19     Q.  And what did Mr. Fried say in   11:54:40
20  response to that?            11:54:42
21     A.  Mr. Fried wanted to discuss that  11:54:43
22  more extensively.            11:54:46
23     Q.  So he didn't refuse to defer to  11:54:47
24  Mr. State, did he?           11:54:52
25      MS. SELTZER:  I object to the    11:54:55
```

**56**

BAGARIA

```
1   form.                    11:54:56
2      A.  I can't recall.              11:54:56
3      Q.  And what did you hear from Mr.  11:54:57
4   State?                   11:54:59
5      A.  Mr. State had a vision for how  11:54:59
6   to fix the business and grow it, and that  11:55:05
7   entailed making certain changes and he   11:55:09
8   needed more autonomy to execute his plan  11:55:13
9   and less involvement from Burt in order to  11:55:21
10  do that, and Apollo was supportive of that  11:55:23
11  decision.                11:55:26
12     Q.  Now, did you attend a meeting on  11:55:26
13  October 19 between Mr. State and Mr.    11:55:29
14  Fried?                   11:55:31
15     A.  I can't recall.              11:55:32
16     Q.  Okay.  Do you know if they met  11:55:34
17  on or about that day?            11:55:36
18     A.  I don't know.               11:55:38
19     Q.  Did you hear if Mr. State made  11:55:39
20  any comments about Mr. Fried's age?    11:55:47
21      MS. SELTZER:  I object to the    11:55:52
22  form.                    11:55:53
23     Q.  At a meeting?               11:55:53
24     A.  Can you repeat the question?    11:55:54
```

**57**

BAGARIA

```
1          BAGARIA
2      Q.  Sure.                    11:55:55
3          Do you know if Mr. State or did  11:55:56
4   you --                   11:55:58
5      MR. DATOO:  Sorry. Strike that.    11:55:58
6      Q.  Did you hear if Mr. State made  11:56:00
7   any comments about Mr. Fried's age at a  11:56:02
8   meeting the two of them were at?     11:56:04
9      MS. SELTZER:  Same objection.     11:56:07
10     A.  I know that Burt and Scott had a  11:56:12
11  meeting where the relationship and Burt's  11:56:14
12  involvement in the business was discussed  11:56:18
13  and that there was a comment made around  11:56:20
14  Burt's age.  I heard that from both Scott  11:56:24
15  and Burt prior to the Burt -- the board  11:56:28
16  meeting in November 4 where we discussed  11:56:33
17  the issue more broadly.         11:56:36
18     Q.  And what was the comment that   11:56:38
19  was made about Mr. Fried's age?     11:56:41
20     A.  The comment was along the lines  11:56:44
21  of Burt you're 70 or 71 years old.  How  11:56:47
22  long do you plan to continue doing this?  11:56:53
23     Q.  Do you know if Mr. State made  11:56:55
24  any comments about planning for the future  11:57:01
25  at that meeting?             11:57:04
```

15  (Pages 54 to 57)

VERITEXT REPORTING COMPANY

212-267-6868                                                         516-608-2400

90

```
              BAGARIA
1
2       Q.   Now, after -- who argued first   12:44:04
3  in this board meeting, Mr. Fried or Mr.     12:44:09
4  State?                        12:44:13
5       A.   I believe Scott State spoke      12:44:14
6  first.                        12:44:21
7       Q.   Okay.  And then did he speak or  12:44:22
8  did he argue?                  12:44:25
9          MS. SELTZER:  Objection.       12:44:26
10      A.   Again, I don't know the        12:44:27
11 difference.  If you want to explain it,     12:44:28
12 I'll be happy to address it.             12:44:30
13      Q.   I am just trying to use -- I am  12:44:31
14 just trying to use -- to understand your    12:44:34
15 meaning of the words.                12:44:38
16      A.   Okay.                    12:44:38
17      Q.   And did Mr. Fried state I guess  12:44:39
18 anything second after Mr. State?         12:44:42
19         MR. DATOO:  That was a horrible  12:44:45
20 question.  Strike that.               12:44:46
21      Q.   Did Mr. Fried then present his   12:44:47
22 point of view after Mr. State?          12:44:49
23      A.   Yes.                     12:44:51
24      Q.   And then while Mr. Fried was    12:44:51
25 presenting his point of view, did he        12:44:53
```

91

```
              BAGARIA
1
2  mention that Mr. State made a comment       12:44:58
3  about his age?                   12:45:05
4       A.   Yes.                     12:45:05
5       Q.   And did you notice any reaction  12:45:06
6  by the other board members?            12:45:08
7       A.   The reaction to              12:45:14
8  Scott's -- Burt's speech was more of        12:45:20
9  surprise because I believe that most felt   12:45:22
10 that the statement was taken out of         12:45:27
11 context, and some of the threats that       12:45:29
12 followed by Burt was -- was entirely new   12:45:33
13 to all of us, and -- and that is why we     12:45:38
14 had a surprise reaction.               12:45:43
15      Q.   What threats did Mr. Fried make? 12:45:45
16      A.   Burt threatened to take up an   12:45:48
17 age based discrimination case.  He also    12:45:54
18 threatened to disrupt our relationship      12:45:57
19 with the company's sureties, which is a     12:45:59
20 lifeline to the business, so actions that   12:46:03
21 would potentially cause real harm to the    12:46:06
22 company outside of his issues with the      12:46:09
23 comment that Scott had made.            12:46:13
24      Q.   And how did he threaten to break 12:46:15
25 up the relationship with the sureties?     12:46:21
```

92

```
              BAGARIA
1
2       A.   Burt claimed that he had        12:46:24
3  substantial influence over the           12:46:26
4  relationship and the decision for Arch to   12:46:27
5  extend surety financing to the company,    12:46:31
6  and that him announcing his uninvolvement   12:46:39
7  with LVI would disrupt and cause          12:46:42
8  significant harm to the company.          12:46:44
9       Q.   Now, did Mr. Fried --          12:46:46
10         MR. DATOO:  Strike that.        12:46:52
11      Q.   After Mr. Fried presented his   12:46:53
12 point of view, what happened next?        12:46:56
13      A.   We asked Burt and Scott to step 12:46:58
14 outside, and the board had a discussion    12:47:03
15 around what had transpired.             12:47:05
16      Q.   And how long was that          12:47:07
17 discussion?                   12:47:08
18      A.   I can't recall exactly but      12:47:08
19 approximately fifteen minutes.           12:47:12
20      Q.   And what was discussed outside  12:47:14
21 the presence of Mr. Fried and Mr. State?   12:47:17
22      A.   We discussed how to resolve the 12:47:21
23 situation.                    12:47:25
24      Q.   And what resolution was reached? 12:47:26
25 Was a resolution reached?               12:47:33
```

93

```
              BAGARIA
1
2       A.   A course of action was          12:47:36
3  determined, and that was to have John      12:47:38
4  Schnabel from Falcon engage Burt in        12:47:41
5  discussions around an arrangement that     12:47:45
6  could work for all sides.               12:47:50
7       Q.   Was a vote taken at this board  12:47:52
8  meeting as to Mr. Fried's employment?     12:47:56
9       A.   Not that I can recall.         12:47:58
10      Q.   And what did -- what did you say 12:48:00
11 at this meeting, this meeting just among   12:48:05
12 the board members?                12:48:08
13      A.   To be clear, we had not made a  12:48:09
14 decision at that board meeting to          12:48:11
15 terminate Burt.  We simply wanted to find  12:48:13
16 an arrangement that could work for all     12:48:20
17 sides.  We wanted to find an opportunity    12:48:22
18 for Burt to stay involved with the company 12:48:24
19 as chairman.  What I specifically said was 12:48:26
20 my views surrounding Burt's list and the   12:48:30
21 autonomy that I felt we should provide a    12:48:34
22 new CEO to the company, which I've stated  12:48:37
23 previously, but I will be happy to say it   12:48:40
24 again.                       12:48:42
25      Q.   And what did Mr. Girardi say at 12:48:42
```

24 (Pages 90 to 93)

94

```
1              BAGARIA
2   this meeting?                  12:48:45
3       A.  I can't recall exactly what he   12:48:45
4   said.                          12:48:48
5       Q.  What did Mr. Schnabel say at    12:48:48
6   this meeting?                  12:48:51
7       I can't recall exactly what John   12:48:51
8   said.                          12:48:54
9       Q.  What did Mr. Simmons say at this  12:48:54
10  meeting?                       12:48:56
11      A.  Again, I can't recall exactly   12:48:56
12  what you said.                 12:48:58
13      Q.  What did Mr. Buck say at this   12:48:59
14  meeting?                       12:49:02
15      A.  No recollection.           12:49:02
16      Q.  How about Mr. Fiorucci?       12:49:04
17      A.  The same.                 12:49:06
18      Q.  Was there ever a vote taken to  12:49:07
19  terminate Mr. Fried?           12:49:16
20          MS. SELTZER:  I object to the  12:49:18
21  form.                          12:49:19
22      A.  We -- there was consensus     12:49:20
23  amongst the board.  Everyone had an  12:49:23
24  opportunity to voice their concern, but  12:49:27
25  everyone was in agreement to my   12:49:31
```

95

```
1   understanding.                 12:49:33
2       Q.  During that meeting?         12:49:34
3       A.  No.  Again, we did not make a  12:49:35
4   decision to terminate Burt at that   12:49:37
5   meeting.                       12:49:39
6       Q.  All right.  When did the     12:49:41
7   board -- did the board come to a consensus  12:49:43
8   to terminate Mr. Fried at that meeting if  12:49:45
9   Mr. Schnabel's conversation with Mr. Fried  12:49:49
10  didn't go well?                12:49:52
11          MS. SELTZER:  Objection.  Asked  12:49:53
12  and answered.                  12:49:54
13      A.  Again, we did not make a      12:49:55
14  decision to terminate.         12:49:57
15      Q.  Did there come a time when the  12:49:59
16  board made a decision to terminate?  12:50:00
17      A.  Yes.                      12:50:02
18      Q.  When?                     12:50:03
19      A.  When we determined that we could  12:50:03
20  not reach a suitable arrangement with  12:50:07
21  Burt.                          12:50:09
22      Q.  What was the date?          12:50:10
23      A.  I don't recall.            12:50:11
24      Q.  And did the board hold a     12:50:12
```

96

```
1              BAGARIA
2   meeting?                       12:50:14
3       A.  I can't recall.            12:50:16
4       Q.  And how did the board come to  12:50:21
5   this consensus?                12:50:23
6       A.  The board had -- was involved  12:50:24
7   with the decision making around resolving  12:50:29
8   the tensions between Burt and Scott.  We  12:50:33
9   attempted to find a resolution, which was  12:50:36
10  a path all board members were supportive  12:50:40
11  of, and when we determined we couldn't it  12:50:42
12  was clear and conversations were held as  12:50:47
13  to what -- what needed to happen around  12:50:51
14  Burt's employment, but the decision for,  12:50:55
15  you know, termination related more towards  12:51:00
16  Burt -- Burt's consulting or employment  12:51:03
17  arrangement.  The decision for his   12:51:05
18  chairmanship was not something that the  12:51:09
19  board terminated.  That was done by Burt.  12:51:11
20      Q.  But as an employee or as a    12:51:15
21  contractor --                  12:51:19
22      A.  Yes.                      12:51:20
23      Q.  -- he was terminated from LVI  12:51:20
24  Services, correct?             12:51:23
25      A.  Yes.                      12:51:24
```

97

```
1              BAGARIA
2       Q.  And was the vote -- was there a  12:51:25
3   vote taken to terminate Mr. Fried?  12:51:28
4       A.  I can't recall if there was a  12:51:31
5   specific vote whether that decision was  12:51:35
6   unanimous or majority, but there were a  12:51:37
7   large number of board members who were  12:51:41
8   supportive and voiced their support over  12:51:44
9   taking that course of action, so it was  12:51:47
10  a -- it was a company approved   12:51:51
11  termination.                   12:51:54
12      Q.  Was -- how did the board come to  12:51:55
13  this consensus?  Was it through   12:52:01
14  conversations, through e-mail exchanges?  12:52:03
15      A.  Yes, all of the above.       12:52:05
16      Q.  And you testified that you don't  12:52:10
17  know if it was a unanimous vote?  12:52:12
18      A.  I can't recall whether our    12:52:15
19  charter stipulates that that would need  12:52:17
20  unanimous approval or majority, but I do  12:52:19
21  know that it was in compliance with our  12:52:23
22  corporate organization documents.  12:52:26
23      Q.  But there was no meeting held?  12:52:29
24          MS. SELTZER:  Objection.  Asked  12:52:33
25  and answered.                  12:52:34
```

25  (Pages 94 to 97)

**118**

```
BAGARIA
 1            BAGARIA
 2   in front you marked Plaintiff's 11,        01:14:27
 3   Exhibit 11.                                01:14:30
 4          Please take a look at it and let    01:14:31
 5   me know if you have ever seen it before.   01:14:33
 6      A.   I don't recall looking at this.    01:14:39
 7          (Plaintiff's Exhibit 12 marked      01:15:12
 8   for identification.)                       01:15:15
 9          (Document handed to witness.)       01:15:16
10      Q.   Mr. Bagaria, you have in front     01:15:17
11   of a document marked Plaintiff's Exhibit   01:15:18
12   12.                                        01:15:21
13          Could you take a look at that       01:15:21
14   document and let me know if you have ever  01:15:22
15   seen it before?                            01:15:24
16      A.   I can't recall reviewing this.     01:15:27
17      Q.   Okay. Now, you mentioned           01:15:29
18   earlier that Mr. Fried resigned; is that   01:15:33
19   correct?                                   01:15:39
20      A.   I believe Burt resigned as         01:15:39
21   chairman of the board. Correct.            01:15:44
22      Q.   But he was terminated --           01:15:47
23      A.   As an employee.                    01:15:50
24      Q.   Of LVI Services?                   01:15:51
25      A.   Again, I don't recall which        01:15:52
```

**119**

```
BAGARIA
 1            BAGARIA
 2   entity he was employed by.                 01:15:54
 3      Q.   Okay. Now, after the decision      01:15:55
 4   to terminate Mr. Fried was made, did LVI   01:16:00
 5   Services offer to retain him as a          01:16:04
 6   consultant?                                01:16:06
 7      A.   We had discussions around          01:16:07
 8   creating a consulting opportunity for Burt 01:16:16
 9   as an attempt to create a workable         01:16:19
10   solution, which I understand Burt          01:16:24
11   rejected.                                  01:16:28
12      Q.   Okay. And did you ever see --      01:16:28
13   do you know if that offer to retain Mr.    01:16:30
14   Fried as a consultant was reduced to       01:16:36
15   writing?                                   01:16:38
16      A.   I can see that it has been.        01:16:38
17      Q.   Okay. Did you know before I        01:16:40
18   showed you the document?                   01:16:41
19      A.   I -- I recall being told that it   01:16:42
20   had been offered to him.                   01:16:45
21      Q.   And do you recall what the terms   01:16:48
22   were?                                      01:16:50
23      A.   I don't recall the specifics,      01:16:51
24   although I did have conversations with     01:16:55
25   Code Hennessy on the level of              01:16:59
```

**120**

```
BAGARIA
 1            BAGARIA
 2   compensation.                              01:17:01
 3      Q.   Okay. And do you recall what       01:17:05
 4   the level of compensation was?             01:17:06
 5      A.   I don't recall the specifics.      01:17:07
 6      Q.   Do you recall if any               01:17:09
 7   compensation was guaranteed to Mr. Fried?  01:17:10
 8          MS. SELTZER: I object to the        01:17:13
 9   form.                                      01:17:14
10      A.   I recall there was two             01:17:15
11   components. One was a set salary for       01:17:17
12   maintaining the board seat, and then to    01:17:21
13   the extent he worked hours there would be  01:17:25
14   some -- some bill rate established.        01:17:28
15      Q.   And what kind of functions did     01:17:30
16   you envision Mr. Fried performing as a     01:17:36
17   consultant?                                01:17:38
18      A.   Really in whatever capacity the    01:17:39
19   CEO needed it.                             01:17:44
20      Q.   So if Mr. State didn't need him    01:17:46
21   in any capacity he would be performing no  01:17:49
22   functions?                                 01:17:51
23          MS. SELTZER: Objection.             01:17:52
24      A.   As a consultant, correct.          01:17:53
25      Q.   And do you recall if Mr. Fried     01:17:55
```

**121**

```
BAGARIA
 1            BAGARIA
 2   had to waive his right to sue for age      01:17:58
 3   discrimination if he became a consultant?  01:18:02
 4      A.   I don't know the details around    01:18:04
 5   that.                                      01:18:07
 6      Q.   Do you know anything about that?   01:18:07
 7      A.   No.                                01:18:08
 8      Q.   Do you know who drafted the        01:18:09
 9   consulting agreement?                      01:18:20
10      A.   I don't.                           01:18:21
11      Q.   Do you know who came up with the   01:18:25
12   idea of having Mr. Fried work as a         01:18:27
13   consultant?                                01:18:29
14          MS. SELTZER: Objection.             01:18:29
15      A.   I can't recall.                    01:18:31
16      Q.   Do you know who would have         01:18:31
17   reviewed the consulting agreement before   01:18:32
18   it was presented to Mr. Fried?            01:18:34
19      A.   Most likely Sidley.               01:18:36
20      Q.   Okay. Now, does LVI Services       01:18:37
21   currently have a satellite office in       01:18:48
22   Westport, Connecticut?                     01:18:50
23      A.   I believe that office has been     01:18:52
24   closed.                                    01:18:54
25      Q.   Now, did Mr. Fried work out of     01:18:54
```

31  (Pages 118 to 121)

VERITEXT REPORTING COMPANY

212-267-6868                                516-608-2400

**122**

|  | BAGARIA |  |
|---|---|---|
| 1 | BAGARIA |  |
| 2 | that office? | 01:19:01 |
| 3 | A. I believe so. | 01:19:01 |
| 4 | Q. Do you know how often? | 01:19:05 |
| 5 | A. I don't. | 01:19:06 |
| 6 | Q. Did Mr. Fried ever work out of | 01:19:08 |
| 7 | the New York office? | 01:19:10 |
| 8 | A. I don't remember. | 01:19:11 |
| 9 | Q. Do you know what types of | 01:19:12 |
| 10 | projects Mr. Fried was working on while he | 01:19:16 |
| 11 | was chairman? | 01:19:17 |
| 12 | A. I don't. | 01:19:18 |
| 13 | Q. Are you familiar with Sheri | 01:19:20 |
| 14 | Dembin? | 01:19:27 |
| 15 | A. No. | 01:19:27 |
| 16 | Q. You don't know who that is? | 01:19:28 |
| 17 | A. I don't. | 01:19:29 |
| 18 | Q. Are you familiar with Mr. | 01:19:31 |
| 19 | Fried's daughter? | 01:19:32 |
| 20 | A. I know he has -- he had a | 01:19:33 |
| 21 | daughter that worked for the company. | 01:19:35 |
| 22 | Q. Do you know what her name is? | 01:19:37 |
| 23 | A. I can't recall. It might have | 01:19:38 |
| 24 | been Sheri. | 01:19:40 |
| 25 | Q. Okay. And do you know what | 01:19:41 |

**123**

|  | BAGARIA |  |
|---|---|---|
| 1 | BAGARIA |  |
| 2 | office she worked in? | 01:19:43 |
| 3 | A. Yes, the Westport office. | 01:19:44 |
| 4 | Q. Okay. And do you know what her | 01:19:46 |
| 5 | job title was? | 01:19:48 |
| 6 | A. I don't. | 01:19:49 |
| 7 | Q. Do you know what her job duties | 01:19:50 |
| 8 | were? | 01:19:51 |
| 9 | A. No. | 01:19:52 |
| 10 | Q. Do you know how long she was | 01:19:53 |
| 11 | employed by LVI Services? | 01:19:56 |
| 12 | A. I don't. | 01:19:57 |
| 13 | Q. Do you know who she reported to? | 01:19:59 |
| 14 | A. I don't. | 01:20:00 |
| 15 | Q. Do you have any personal | 01:20:10 |
| 16 | knowledge about the quality of her work | 01:20:11 |
| 17 | performance? | 01:20:13 |
| 18 | A. No. | 01:20:14 |
| 19 | Q. Do you know if Mr. Fried's | 01:20:14 |
| 20 | daughter was terminated from LVI Services? | 01:20:18 |
| 21 | A. My understanding is she was | 01:20:21 |
| 22 | terminated along with all of the other | 01:20:24 |
| 23 | employees in that office. | 01:20:26 |
| 24 | Q. And what is your understanding | 01:20:27 |
| 25 | based upon? | 01:20:28 |

**124**

|  | BAGARIA |  |
|---|---|---|
| 1 | BAGARIA |  |
| 2 | A. My communication -- | 01:20:29 |
| 3 | MS. SELTZER: Objection. If | 01:20:31 |
| 4 | his understanding comes through any | 01:20:32 |
| 5 | conversations with counsel, he is not to | 01:20:34 |
| 6 | testify about that. | 01:20:36 |
| 7 | Q. Other than any conversations you | 01:20:38 |
| 8 | may or may not have had with counsel -- | 01:20:39 |
| 9 | A. Yes. My conversations were with | 01:20:42 |
| 10 | Scott State. | 01:20:46 |
| 11 | Q. And what did he tell you? | 01:20:47 |
| 12 | A. That he was closing the Westport | 01:20:48 |
| 13 | office. | 01:20:50 |
| 14 | Q. And did he tell you that Mr. | 01:20:51 |
| 15 | Fried's daughter was being terminated? | 01:20:52 |
| 16 | A. Yes. | 01:20:54 |
| 17 | Q. And who made the decision to | 01:20:55 |
| 18 | terminate -- I mean close the office? | 01:20:57 |
| 19 | A. This was Scott's decision. | 01:20:59 |
| 20 | Q. Did the board have to approve | 01:21:00 |
| 21 | it? | 01:21:02 |
| 22 | A. I don't believe so. | 01:21:03 |
| 23 | Q. Did you vote to close the | 01:21:04 |
| 24 | office? | 01:21:07 |
| 25 | A. I don't recall. | 01:21:07 |

**125**

|  | BAGARIA |  |
|---|---|---|
| 1 | BAGARIA |  |
| 2 | Q. And do you recall when the | 01:21:08 |
| 3 | decision to close the office was made? | 01:21:11 |
| 4 | A. I can't recall the specific | 01:21:13 |
| 5 | date. | 01:21:15 |
| 6 | Q. And was everyone from that | 01:21:16 |
| 7 | office terminated? | 01:21:17 |
| 8 | A. My understanding was a | 01:21:19 |
| 9 | substantial portion of these -- the staff | 01:21:23 |
| 10 | was terminated. I can't -- I don't know | 01:21:28 |
| 11 | exactly whether every single employee was | 01:21:32 |
| 12 | included. | 01:21:36 |
| 13 | Q. And do you recall when the | 01:21:36 |
| 14 | selection of employees that were being | 01:21:37 |
| 15 | terminated was made? | 01:21:42 |
| 16 | A. No. | 01:21:43 |
| 17 | Q. Do you know when the Westport | 01:21:49 |
| 18 | office closed? | 01:21:58 |
| 19 | A. I don't know the exact date. | 01:21:59 |
| 20 | Q. Do you know an approximate date? | 01:22:01 |
| 21 | A. Earlier this year. | 01:22:04 |
| 22 | Q. Now, do you know if Mr. Fried's | 01:22:06 |
| 23 | daughter was offered the opportunity to | 01:22:12 |
| 24 | work in the Milford office? | 01:22:13 |
| 25 | A. I don't know. | 01:22:16 |

32  (Pages 122 to 125)

VERITEXT REPORTING COMPANY

212-267-6868                                         516-608-2400

## 135

```
                BAGARIA
1
2      A.  Not to my knowledge.        01:40:37
3      Q.  Do you know who is paying your   01:40:38
4  attorney's fees?                    01:40:40
5      A.  Well, to be clear, we have had   01:40:41
6  two sets of attorneys, and so Apollo may  01:40:45
7  have been responsible for some of the  01:40:49
8  fees.  I am not -- I am not clear on the  01:40:50
9  details.                            01:40:52
10     Q.  Are you paying any fees     01:40:53
11 personally?                         01:40:54
12     A.  No, I am not.               01:40:55
13     Q.  Do you know if any of your  01:40:56
14 attorneys have been paid on an hourly  01:40:58
15 basis?                              01:41:00
16     A.  I don't know the details.  01:41:01
17     (Continued on next page.)      01:41:01
18
19
20
21
22
23
24
25
```

## 136

```
                BAGARIA
1
2      MR. DATOO:  Okay.  I have no    01:41:03
3  further questions for the witness.  01:41:04
4      MS. SELTZER:  Thank you.        01:41:06
5      THE VIDEOGRAPHER:  We're going  01:41:07
6  off the record.  1:41 p.m., end of today's  01:41:08
7  questioning.                        01:41:12
8      (Time noted: 1:41 p.m.)        01:41:13
9
10
11
12
13
14
15              RAJAY BAGARIA
16
17 Subscribed and sworn to before me
18 this    day of        , 2011
19
20                    .
21
22
23
24
25
```

## 137

```
                BAGARIA
1
2        C E R T I F I C A T I O N
3
4
5
6      I, DEBBIE ZAROMATIDIS, a Shorthand
7  Reporter and a Notary Public, do hereby
8  certify that the foregoing witness, RAJAY
9  BAGARIA, was duly sworn on the date
10 indicated, and that the foregoing is a
11 true and accurate transcription of my
12 stenographic notes.
13     I further certify that I am not
14 employed by nor related to any party to
15 this action.
16
17
18
19
20
21
22
23      DEBBIE ZAROMATIDIS
24
25
```

## 138

```
                BAGARIA
1
2           E X H I B I T S
3
4  PLAINTIFF'S
5  EXHIBIT      DESCRIPTION        PAGE
6   1     Memo                    43
7   2     List of responsibilities   59
8   3     E-mail                  66
9   4     E-mail                  71
10  5     E-mail                  77
11  6     E-mail                  99
12  7     E-mail                  101
13  8     Letter                  104
14  9     Handwritten notes       107
15  10    E-mail                  112
16  11    Document                117
17  12    Document                118
18
19
20
21
22
23
24
25
```

34  (Pages 135 to 138)