# Exhibit 4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
No. 10 Civ. 9308(JSR)

-----------------------------------------x

BURTON T. FRIED,

Plaintiff,

- against -

LVI SERVICES, INC., LVI PARENT CORP., CODE HENNESSY SIMMONS, LLC d/b/a CHS PRIVATE EQUITY V LP; APOLLO INVESTMENT CORP., SCOTT E. STATE, in his official and individual capacities; BRIAN SIMMONS, in his official and individual capacities; RAJAY BAGARIA, in his official and individual capacities; GERALD J. GIRARDI, in his official and individual capacities,

Defendants.

-----------------------------------------x

June 1, 2011
9:38 a.m.

VIDEOTAPE DEPOSITION of PAUL CUTRONE, taken by the Plaintiff, pursuant to Notice, held at the offices of Thompson Wigdor & Gilly, LLP, 85 Fifth Avenue, New York, New York, before Debbie Zaromatidis, a Shorthand Reporter and Notary Public of the State of New York.

A P P E A R A N C E S:

THOMPSON WIGDOR & GILLY, LLP
Attorneys for Plaintiff
85 Fifth Avenue
New York, New York 10003
BY: SHAFFIN A. DATOO, ESQ.

SIDLEY AUSTIN, LLP
Attorneys for Defendants
787 Seventh Avenue
New York, New York 10019
BY: JOANNE SELTZER, ESQ.

ALSO PRESENT:
BURTON FRIED
J.D. MARTINEZ, Videographer

S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between the Attorneys for the respective parties hereto that filing and sealing be and the same are hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections except as to the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within examination may be signed and sworn to before any notary public with the same force and effect as though signed and sworn to before this Court.

THE VIDEOGRAPHER: My name is J.D. Martinez of Veritext New York. The date today is June 1, 2011. The time is approximately 9:38 a.m. This deposition is being held in the officeS of Thompson Wigdor & Gilly, LLP, located at 85 Fifth Avenue, New York, New York. The caption of the case is Burton T. Fried versus LVI Services, Inc. et al. filed in the United States District Court, Southern District of New York. The name of the witness is Paul Cutrone. 09:37:53 09:37:54 09:37:57 09:38:01 09:38:03 09:38:05 09:38:11 09:38:13 09:38:16 09:38:20 09:38:21 09:38:23

At the time -- at this time the attorneys will identify themselves and the parties they represent, after which our court reporter Debbie Zaromatdis, will swear in the witness, and we can proceed. 09:38:25 09:38:27 09:38:29 09:38:31 09:38:33

MS. SELTZER: Joanne Seltzer, Sidley Austin, LLP representing all defendants. 09:38:35 09:38:37 09:38:39

MR. DATOO: Shaffin Datoo, Thompson Wigdor & gilly representing the plaintiff, Burton Fried. 09:38:40 09:38:43

6

PAUL CUTRONE,
having first been duly sworn by a Notary Public of the State of New York, was examined and testified as follows:
EXAMINATION BY MR. DATOO: 09:38:53
Q. Good morning, Mr. Cutrone. 09:38:53
A. Good morning. As you know, my name is Shaffin Datoo, and I represent Mr. Fried in this matter. I am going to ask you some questions today. I hope you can answer all of them unless you are directed not to answer by your attorney. 09:38:55 09:38:56 09:39:00 09:39:01 09:39:08 09:39:08
I am just going to start off with some preliminary questions. Is your ability to tell the truth in any way impaired today? 09:39:08 09:39:09 09:39:11 09:39:12
A. No. 09:39:13
Q. Do you understand that the answers you are about to give are under oath, and that you are subject to penalties of perjury if you give an untruthful answer? 09:39:14 09:39:16 09:39:17 09:39:20 09:39:23
A. Yes. 09:39:24
Q. I am going to assume that if you 09:39:24

7

CUTRONE
answer a question that you understood it. If you don't understand a question, let me know, and I will ask it a different way. 09:39:26 09:39:27 09:39:29
Please give verbal answers to my questions. Don't nod your head or shake it; otherwise, the court reporter won't be able to take it down. 09:39:31 09:39:34 09:39:36 09:39:39
A. Uh-huh. 09:39:40
Q. And please don't answer my question before I am finished asking it; otherwise, the court reporter won't be able to take both of us talking at the same time. 09:39:40 09:39:43 09:39:46 09:39:48 09:39:50
If you need a break, just let me know. The only condition I have is that you answer the last question asked. 09:39:51 09:39:53 09:39:55
Do you understand? 09:39:59
A. Yes. 09:40:00
MS. SELTZER: Could I add one thing? 09:40:01 09:40:02
MR. DATOO: Sure. 09:40:04
MS. SELTZER: Paul, play to the camera. 09:40:05 09:40:06
THE WITNESS: Okay. 09:40:08

8

CUTRONE
MS. SELTZER: I am saying just turn, so they could get a good shot of you. 09:40:09 09:40:10 09:40:13
THE WITNESS: This is my good side. 09:40:13 09:40:15
MS. SELTZER: I know. I know Shaffin is very attractive, but you have to -- go ahead. 09:40:15 09:40:16 09:40:18
Q. Mr. Cutrone, in connection with this lawsuit, did you provide your attorney with all responsive documents? 09:40:19 09:40:21 09:40:23
A. Yes. 09:40:24
Q. Where did you look to find any documents? 09:40:25 09:40:27
A. Whatever documents I would have been asked for, I would have had in my office. 09:40:29 09:40:31 09:40:33
Q. Does that include on your computer? 09:40:33 09:40:36
A. Yes. 09:40:37
Q. Do you have a personal e-mail account? 09:40:37 09:40:39
A. At work? 09:40:40
Q. Just a personal e-mail account. 09:40:42

9

CUTRONE
A. Yes. 09:40:45
Q. Did you check your personal e-mail account for any responsive documents? 09:40:45 09:40:48 09:40:49
A. I did not. 09:40:50
Q. Okay. Would there be any work-related documents stored in your personal e-mail? 09:40:50 09:40:52 09:40:54
A. No. 09:40:55
Q. Okay. Do you keep any work-related documents at home? 09:40:55 09:40:57
A. No. 09:40:59
Q. Okay. Have you ever been sued before? 09:41:01 09:41:05
A. Me personally? 09:41:05
Q. Yes. 09:41:08
A. No. 09:41:08
Q. Have you ever -- has anyone ever accused you of discrimination? 09:41:09 09:41:12
A. No. 09:41:14
Q. Have you ever given any sworn testimony before? 09:41:15 09:41:16
A. Yes. 09:41:17
Q. How many times? 09:41:19

14

CUTRONE

A. Yes. 09:44:48

Q. Who? 09:44:48

A. The president and CEO, Scott State. 09:44:49 09:44:51

Q. And is he president and CEO of LVI Services, Inc.? 09:44:51 09:44:54

A. Yes. 09:44:56

Q. Okay. Since you've been employed by LVI Services, have you received any anti-discrimination training? 09:44:56 09:45:10 09:45:12

A. No. 09:45:14

Q. Have you -- do you know if LVI Services, Inc. has a handbook? 09:45:18 09:45:24

A. Yes. 09:45:25

Q. And do you know if that handbook contains an equal employment opportunity policy? 09:45:26 09:45:30 09:45:32

A. I haven't looked at that in a while. So offhand I don't know, but I believe it does. 09:45:33 09:45:35 09:45:38

Q. Okay. Do you know if it contains an anti-discrimination policy? 09:45:39 09:45:41

A. It may. 09:45:43

Q. And do you know if it contains 09:45:44

15

CUTRONE

an anti-retaliation policy? 09:45:45

A. I don't know. It may. 09:45:47

Q. Do you know if any of these policies that I just mentioned exist outside the handbook? 09:45:49 09:45:50 09:45:52

MS. SELTZER: I object to the form. 09:45:54 09:45:56

Q. Let me rephrase it. 09:45:56

Do you know if any of these policies that I just mentioned exist? 09:45:58 09:45:59

MS. SELTZER: Same objection. Are you talking about -- 09:46:06 09:46:08

MR. DATOO: Apart from the handbook. 09:46:10 09:46:11

MS. SELTZER: So like online or -- 09:46:12 09:46:13

MR. DATOO: Yes. 09:46:14

Q. Are there -- do you know if these policies -- does LVI Services, Inc. have these policies? 09:46:14 09:46:16 09:46:18

A. I'll say this: We have a code of ethics policy, and we have an employee handbook. I can't tell you chapter and verse what is in each of those documents, 09:46:20 09:46:23 09:46:27 09:46:31

16

CUTRONE

but if we -- whatever policies we have relative to things you mentioned would be in one or both of those documents if they are. 09:46:33 09:46:36 09:46:38 09:46:41

Q. And was Mr. Fried employed by LVI Services, Inc.? 09:46:41 09:46:43

A. Yes. 09:46:44

Q. Do you know for how long? 09:46:46

A. Offhand, no. I mean the entire time that I was -- when I was hired in February of '89 Mr. Fried I believe was employed by LVI Services, Inc. at the time although he might have been employed by the then former parent. So I really don't know, but he was with the company all those years that I was with the company when I was with the company. 09:46:48 09:46:57 09:46:59 09:47:03 09:47:07 09:47:07 09:47:10 09:47:12 09:47:19

Q. Okay. Do you know what Mr. Fried's last job title was? 09:47:20 09:47:22

MS. SELTZER: Objection. At the time of termination? 09:47:24 09:47:25

MR. DATOO: Yes, his last job title. 09:47:27 09:47:29

MS. SELTZER: Okay. 09:47:29

17

CUTRONE

A. I don't know. 09:47:30

Q. Okay. And do you know who -- if he last worked for LVI Services, Inc.? 09:47:31 09:47:35

A. I'll say that his pay check came from LVI Services, Inc. Yes. He was an employee of LVI Services, Inc. 09:47:39 09:47:43 09:47:46

Q. Okay. And what is LVI Parent? 09:47:47

A. LVI Parent Corp. is a holding company. 09:47:55 09:48:01

Q. Does it engage in any business? 09:48:03

A. No, not the business that -- no business at all actually. It is just a holding company. 09:48:05 09:48:10 09:48:12

Q. And who owns LVI Parent? 09:48:13

A. Currently? 09:48:15

Q. Yes. 09:48:17

A. LVI Parent is owned by -- there are several investors, several stockholders. You want me to name them? 09:48:18 09:48:24 09:48:26

Q. Yes, if you can. 09:48:28

A. And I -- I don't know if they have a specific name, you know. There might be a different fund name, but Code Hennessy Simmons, CHS if you will, Apollo, 09:48:29 09:48:32 09:48:33 09:48:37

CUTRONE
and I think it is Apollo Investments, and 09:48:40
Falcon investments are the three primary 09:48:43
shareholders. Together they own 95 to 97 09:48:48
percent of the company. 09:48:54
Q. Do you know when LVI Parent was 09:48:58
formed? 09:49:00
A. 2002 I believe. 09:49:01
Q. Does LVI Parent have a board of 09:49:04
directors? 09:49:09
A. Yes. 09:49:09
Q. And how many people are 09:49:10
currently on the board? 09:49:11
A. I believe there are currently 09:49:12
eight members on the board. 09:49:14
Q. Can you give me their names? 09:49:15
A. From Code Hennessy you have 09:49:17
Brian Simmons and Rob Hogan. From Apollo 09:49:21
you have Rajay Bagaria and Gerald Girardi. 09:49:28
From Falcon you have John Schnabel. You 09:49:37
have two outside directors Robert Buck, 09:49:41
Bob Buck, and Richard Fiorucci, and Scott 09:49:44
State. So two, four, five, six -- eight. 09:49:48
Q. Okay. And were all of these 09:49:53
people on the board in the first half of 09:49:54

CUTRONE
November of 2010? 09:49:59
A. Yes. 09:50:01
Q. Okay. Was anyone else on the 09:50:03
board in the first half of November of 09:50:06
2010? 09:50:09
A. In the first half. I don't 09:50:10
know. I don't think so. 09:50:12
Q. Okay. When Mr. Fried was 09:50:13
employed by LVI Services, was he on the 09:50:15
board of directors of LVI Parent? 09:50:18
A. Yes. 09:50:20
Q. And do you know if Mr. Fried and 09:50:26
Scott State served on the board of LVI 09:50:30
Parent at the same time? 09:50:33
A. I don't know. 09:50:33
Q. Okay. Now, did you attend any 09:50:36
board meetings of LVI Parent? 09:50:39
A. Yes. 09:50:42
Q. Did you regularly attend board 09:50:44
meetings of LVI Parent? 09:50:46
A. To the extent there were because 09:50:49
prior to October of '10 the ultimate 09:50:52
parent was a different corporation, which 09:50:58
was LVI Acquisition. So LVI Acquisition 09:51:01

CUTRONE
had quarterly board meetings, which I 09:51:05
attended. 09:51:08
Q. Okay. And in what capacity did 09:51:09
you attend? 09:51:11
A. As CFO. 09:51:12
Q. Okay. Okay. What is LVI 09:51:13
Acquisition Corp.? 09:51:19
A. Like LVI Parent, it was a 09:51:19
holding company as well. 09:51:21
Q. Okay. What is the relationship 09:51:22
between LVI Acquisition and LVI Parent? 09:51:26
A. Currently, LVI Invest -- first 09:51:28
of all LVI Acquisition changed its name to 09:51:33
LVI Invest and is now a minority owner of 09:51:38
LVI Parent. 09:51:41
Q. Do you know what percentage LVI 09:51:42
Invest owns of LVI Parent? 09:51:45
A. Roughly 2 or 3 percent. 09:51:46
Q. Okay. And -- and who owns LVI 09:51:48
Invest? 09:51:53
A. LVI Invest is owned by -- 09:51:53
primarily by Code Hennessy Simmons and 09:51:56
others. They own roughly 85 percent of 09:51:59
LVI Invest. 09:52:02

CUTRONE
Q. Sorry. What was the -- 09:52:04
A. They own roughly 85 percent of 09:52:05
LVI Invest. 09:52:08
Q. No. The name of the second -- 09:52:09
A. Others. 09:52:10
Q. Others. Okay? 09:52:12
A. Primarily individuals. 09:52:13
Q. Okay. Does LVI Parent have any 09:52:14
employees? 09:52:17
A. No. 09:52:17
Q. Does LVI Parent have any 09:52:17
officers? 09:52:21
A. Yes. 09:52:22
Q. How many? 09:52:24
A. I don't know offhand. 09:52:25
Q. Do you know their -- their 09:52:29
positions? 09:52:32
A. I know I am vice president of 09:52:33
LVI Parent. Sitting here today, I 09:52:36
just -- I don't want to guess at the other 09:52:41
officers. 09:52:44
Q. Okay. And you're also a vice 09:52:44
president of LVI Services? 09:52:47
A. Yes, sir. 09:52:48

22

CUTRONE

Q. Okay. Do you know anyone else who is an officer of LVI Parent other than yourself? 09:52:49 09:52:51 09:52:54
A. Scott State, Joseph Annarumma, and I am -- I would be guessing after that. I'm not sure. 09:52:55 09:53:06 09:53:09
Q. Okay. And do you know what Scott State's job title is as an officer of LVI Parent? 09:53:10 09:53:12 09:53:14
A. President I believe. 09:53:15
Q. And he is also the president of LVI Services? 09:53:19 09:53:23
A. Correct. 09:53:24
Q. And do you know what Mr. Annarumma's job title is as an officer of LVI Parent? 09:53:25 09:53:26 09:53:29
A. Vice president and treasurer and secretary. 09:53:30 09:53:33
Q. And does he hold the same titles with LVI Services, Inc.? 09:53:33 09:53:39
A. Yes. 09:53:41
Q. Is Jeffrey Smith an officer of LVI Parent? 09:53:42 09:53:46
A. No. 09:53:47

23

CUTRONE

Q. Who is Jeffrey Smith? 09:53:56
A. Jeffrey Smith is an attorney for Sidley Austin, and Sidley Austin is the company's general counsel -- outside counsel. Excuse me. 09:53:58 09:53:59 09:54:01 09:54:03
Q. Does Mr. Smith serve as secretary to LVI Parent? 09:54:04 09:54:05
A. He attends board meetings and acts as secretary, so he takes the minutes. 09:54:07 09:54:10 09:54:12
Q. Why doesn't Mr. -- do you know why Mr. Annarumma doesn't take the minutes as secretary? 09:54:12 09:54:17 09:54:20
A. It's just not been our practice. 09:54:21
Q. Okay. How long has Mr. Smith been taking minutes at LVI Parent board meetings? 09:54:24 09:54:27 09:54:29
A. The last several years. It could be as far back as 2005 but certainly over the last couple of years. 09:54:30 09:54:33 09:54:36
Q. Okay. And does LVI Parent own any assets? 09:54:38 09:54:40
A. Its only asset is its investments in LVI Services, Inc. 09:54:41 09:54:46

24

CUTRONE

Q. Does LVI Parent have its own bank account? 09:54:48 09:54:51
A. I am not sure. 09:54:51
Q. Does LVI Parent have any offices? 09:54:54 09:54:57
A. None outside of 80 Broad Street. In other words, 80 Broad is our -- the office of LVI Services, Inc. That is also the mailing address for LVI Parent Corp. as well. 09:54:57 09:55:04 09:55:06 09:55:09 09:55:11
Q. And is that where LVI Parent is headquartered? 09:55:12 09:55:14
A. Again, that is -- yes, that is the corporate office if you will. 09:55:15 09:55:17
Q. Okay. Now, other than LVI Services, Inc., does LVI Parent have any subsidiaries? 09:55:18 09:55:22 09:55:24
A. Not directly. 09:55:25
Q. Okay. How about indirectly? 09:55:27
A. Well, LVI Services, Inc. has several wholly-owned subsidiaries. 09:55:29 09:55:33
Q. And is LVI Services a wholly-owned subsidiary of LVI Parent? 09:55:35 09:55:38
A. Yes. 09:55:40

25

CUTRONE

Q. Now, what is the relationship, if any, between LVI Acquisition and LVI Services? 09:55:40 09:55:44 09:55:48
A. Currently none other than LVI Invest is indirectly a minority owner of LVI Services, Inc. through its investment -- their ownership interest in LVI Parent. 09:55:49 09:55:56 09:55:59 09:56:02 09:56:04
Q. Okay. Now, does LVI Services have a board of directors? 09:56:05 09:56:08
A. Yes. 09:56:09
Q. And how many people are currently on that board? 09:56:11 09:56:13
A. I believe Services, Inc. is just Scott and I. 09:56:14 09:56:22
Q. And was Mr. Fried on the board at any time of LVI Services? 09:56:23 09:56:24
A. Yes. 09:56:28
Q. And did there come a time when he was no longer on the board? 09:56:28 09:56:36
A. Yes. 09:56:37
Q. And when was this? 09:56:38
A. I don't recall. 09:56:39
Q. Do you know why he was -- was he 09:56:40

30

CUTRONE

decisions or resolutions should be made by the board of directors of LVI Parent? 10:00:38 10:00:40

A. It depends on the situation and circumstances I guess. I'm not sure I understand the question. 10:00:43 10:00:46 10:00:50

Q. Well, how do you know if a resolution should be made by the board of directors of LVI Services or whether it should be made by the board of LVI Parent? 10:00:51 10:00:53 10:00:56 10:00:58

A. Offhand I don't know. 10:01:01

Q. So has there ever been a time where the board of LVI Services decided that LVI -- the board of LVI Parent should make a resolution? 10:01:03 10:01:07 10:01:10 10:01:13

A. Again, there was no formal meetings of LVI Services, Inc.'s board. It -- there was a board consisting of two, and it would always -- and I say always because I do not recall ever having a formal meeting where there was minutes of the board of LVI Services, Inc. The only time the board took action was to execute resolutions in lieu of a meeting. 10:01:15 10:01:17 10:01:20 10:01:24 10:01:29 10:01:31 10:01:32 10:01:35 10:01:39

Q. Okay. So it wasn't -- was 10:01:41

31

CUTRONE

it -- when you discussed with the other board members of LVI Services whether to sign a resolution or make a resolution, did there ever come a time where the board decided that perhaps the parent -- the board of directors of the parent should make the resolution? 10:01:45 10:01:56 10:01:59 10:02:02 10:02:06 10:02:08 10:02:10

A. A, I don't recall there ever being any discussions of the board of LVI Services formally or informally. Although I mentioned before we might get together by conversation or what have you, but it might be something as simple as, oh, we need to sign a resolution to elect so and so as officer of the company. Okay. Send me the resolution, and I'll sign it. That is the conversation, but I don't recall there ever being a time where there was a discussion where well who should sign that resolution, should it be Services, should it be Parent, no. 10:02:12 10:02:14 10:02:18 10:02:20 10:02:22 10:02:24 10:02:27 10:02:29 10:02:31 10:02:33 10:02:35 10:02:37 10:02:39 10:02:42

Q. Okay. Now, does LVI Services have any offices? 10:02:43 10:02:49

A. Offices or officers? 10:02:50

32

CUTRONE

Q. Offices. 10:02:52

A. Yes. 10:02:53

Q. How many approximately? 10:02:54

A. We have 80 Broad Street for one. We have an office in Westport that is effectively LVI Services, Inc./LVI Parent, LVI Acquisition just like 80 Broad Street, and we have an office in Orange, Texas, which houses our national director of health and safety. It is considered a corporate office, if you will, and those employees work for LVI Services, Inc. We have an office in Colorado where our CEO and COO call their primary place of business. I don't know exactly where in Colorado offhand, and I believe that constitutes all the offices of the company. 10:02:56 10:03:05 10:03:07 10:03:11 10:03:14 10:03:16 10:03:20 10:03:22 10:03:24 10:03:26 10:03:32 10:03:36 10:03:39 10:03:45 10:03:48

Q. So about five? 10:03:48

A. Four. 10:03:49

Q. Four offices. 10:03:49

And where is LVI Services headquartered? 10:03:52 10:03:55

A. It is always been 80 Broad 10:03:56

33

CUTRONE

Street. 10:04:01

Q. And is that where you maintain an office? 10:04:01 10:04:03

A. Yes. 10:04:03

Q. Do you work at any other offices regularly? 10:04:04 10:04:05

A. No. 10:04:06

Q. Just the one at 80 Broad Street? 10:04:07

A. Yes. 10:04:11

Q. And does LVI Services have any employees? 10:04:11 10:04:14

A. Yes. 10:04:14

Q. Approximately how many? 10:04:15

A. Thirty. 10:04:16

Q. And does LVI Services have any officers? 10:04:19 10:04:23

A. Yes. 10:04:24

Q. About how many? 10:04:25

A. Six to ten. 10:04:27

Q. Now, prior to 2006, do you recall what Mr. Fried's job title as LVI Services was? 10:04:30 10:04:45 10:04:48

MS. SELTZER: Prior to January of '06? When do you want? 10:04:50 10:04:52

CUTRONE

MR. DATOO: Yes, prior to 2006. 10:04:54
So -- 10:04:56

A. Burt was always president and 10:04:57
CEO. 10:04:59

Q. Okay. And do you know how long 10:04:59
he was president and CEO? 10:05:03

A. Probably as long as I was vice 10:05:05
president and CFO. 10:05:08

Q. Okay. Do you know what his job 10:05:09
duties were as CEO? 10:05:12

MS. SELTZER: Objection. At 10:05:15
any particular point in time? 10:05:16

MR. DATOO: This is all prior 10:05:18
to 2006. 10:05:19

A. As president and CEO, you know, 10:05:22
Burt was the leader of the business, the 10:05:25
strategic leader, and handled the overall 10:05:29
direction of the company. 10:05:37

Q. And during the time he was CEO 10:05:38
prior to 2006, how was LVI Services doing 10:05:42
financially? 10:05:47

A. Prior to -- the whole 20 10:05:48
years -- 10:05:53

Q. Yes, prior to January 1, 2006 10:05:54

CUTRONE

during the entire time that he was CEO 10:05:57
that you know of. 10:06:00

MS. SELTZER: So over a 20-year 10:06:01
period? 10:06:02

MR. DATOO: Yes. 10:06:03

Q. Generally speaking how was LVI 10:06:04
Services doing financially? 10:06:06

A. We had our good years, and we 10:06:07
had our bad years. 10:06:09

Q. Okay. How about in '04, 2004, 10:06:10
how was LVI Services doing financially? 10:06:12

A. '04 was a very good year. We 10:06:15
had four hurricanes in Florida, which 10:06:18
contributed a significant amount of 10:06:21
revenue to the bottom line of the company, 10:06:23
stress and aggravation to go with it. 10:06:26

Q. And how about in 2005? 10:06:28

A. Similar. 10:06:30

Q. Okay. Now, did there -- do you 10:06:31
have personal knowledge of how Mr. Fried's 10:06:35
work performance was as CEO prior to 2006? 10:06:37

MS. SELTZER: Over the entire 10:06:44
twenty-year period? 10:06:45

MR. DATOO: Yes, in general. 10:06:47

CUTRONE

A. How his work performance was? 10:06:47
Well, we were a successful contracting 10:06:49
organization that continued to grow in its 10:06:53
space and become the dominant leader in 10:06:58
the industry. So I would say that is 10:07:01
fairly good marks -- 10:07:02

Q. Okay. 10:07:04

A. -- for a CEO. 10:07:04

Q. Did you work closely with Mr. 10:07:06
Fried when he was CEO prior to 2006? 10:07:08

A. Sure. 10:07:11

Q. Now, did there come a time in 10:07:11
2005 or 2006 when LVI Services began to 10:07:17
look for a new CEO? 10:07:22

A. Yes. 10:07:24

Q. Do you know why that is? Why 10:07:25
that was? Sorry. 10:07:32

A. Yes, I have heard -- you know, 10:07:33
Burt expressed back at the time that he 10:07:35
wanted to find his successor, somebody to 10:07:38
lead the company through its next 20 10:07:42
years. So it was -- it was primarily, you 10:07:44
know, Burt's desire to make sure he had a 10:07:50
good succession plan. 10:07:52

CUTRONE

Q. Do you know why he wanted a 10:07:55
successor? 10:07:56

A. Meaning? 10:07:57

Q. Do you know why he was looking 10:07:58
for someone to succeed him? 10:07:59

A. Because he couldn't do it 10:08:01
forever. Right? You know, he was -- it 10:08:03
is the old proverbial what if I get hit by 10:08:06
a bus, and at some point I am going to 10:08:10
retire, you know, and doing something 10:08:13
else. He was deciding, you know, I am 10:08:15
doing this for a period of time, and 10:08:17
logically the company needs a successor to 10:08:19
bring it to the next X of amount of years. 10:08:22

Q. Do you know if he was looking to 10:08:27
retire from LVI Services at that point? 10:08:28

A. I know he was looking for his 10:08:30
replacement, and I think you would always 10:08:32
expect -- I don't know whether he expected 10:08:35
to stay on as chairman or not, what his 10:08:38
personal goals and aspirations were. I 10:08:41
just know that he was looking for a 10:08:44
replacement to take on the day-to-day 10:08:46
responsibilities that he was then 10:08:47

CUTRONE

responsible for. 10:08:48
Q. Did you ever have a conversation 10:08:49 with him about what his role was going to 10:08:50 be once his successor was named? 10:08:53
A. Not specifically. 10:08:54
Q. Okay. Did he ever tell you he 10:08:56 wanted to retire prior to 2006? 10:08:58
A. You know, not that I recall any 10:09:02 specific conversations. 10:09:04
Q. Do you know when 10:09:05 approximately -- 10:09:16
MR. DATOO: Strike that. 10:09:17
Q. Do you know who Robert McNamara 10:09:18 is? 10:09:20
A. Yes. 10:09:20
Q. Who is he? 10:09:20
A. The former president and CEO of 10:09:21 LVI Services, Inc. 10:09:25
Q. And was he -- was Mr. McNamara 10:09:27 the one who was hired to succeed Mr. Fried 10:09:33 as CEO of LVI Services? 10:09:35
A. At the time, yes. 10:09:38
Q. Okay. And while Mr. McNamara 10:09:39 was the CEO of LVI Services, what was Mr. 10:09:42

CUTRONE

Fried's job title? 10:09:46
A. He was chairman. 10:09:47
Q. Chairman of LVI Services? 10:09:48
A. Chairman of the ultimate parent 10:09:51 corp. I don't know that there was a 10:09:56 formal distinction as chairman of LVI 10:09:58 Service, Inc. and its subsidiaries. We 10:10:01 were directors of LVI Services. Actually 10:10:05 at that time, when Bob came on, Bob then 10:10:07 became director with me of the 10:10:10 subsidiaries. So Burt was on the board of 10:10:15 the ultimate parent. I don't recall if he 10:10:19 was on the board of the intermediary 10:10:21 parent. It might have been Bob and I the 10:10:24 rest of the way down like it used to be 10:10:27 Burt and I the rest of the way down. So 10:10:30 it was very much an order of things, if 10:10:33 you will. 10:10:36
Q. When you say "ultimate parent," 10:10:36 what company are you referring to? 10:10:38
A. In '05, in November of '05, LVI 10:10:40 Acquisition now known as LVI Invest 10:10:43 acquired an ownership of LVI Parent Corp. 10:10:47 So -- I am sorry? What was the question? 10:11:00

CUTRONE

Q. When you refer to ultimate 10:11:03 parent -- 10:11:05
A. Right. 10:11:06
Q. -- what company are you 10:11:07 referring to? 10:11:08
A. So LVI Acquisition became the 10:11:08 ultimate parent in November of '05 when it 10:11:10 acquired LVI Parent. 10:11:13
Q. And when you refer to the 10:11:14 intermediate -- 10:11:17
A. You have -- the company has done 10:11:19 four leveraged buyouts. Each time a new 10:11:22 investment was going to come in to acquire 10:11:28 the company, the business, it would form a 10:11:31 Newco, invest its equity into that Newco 10:11:35 and then Newco would acquire Old Co. So 10:11:39 '97, 2002 -- well, '93, '97, 2002, 2005, 10:11:44 there was always a Newco formed above the 10:11:54 Old Co. at the time. 10:11:57
Q. Okay. 10:11:57
A. So LVI Services, Inc. was the 10:11:58 company that first existed, the public 10:12:00 parent in '93, and there was a Newco, and 10:12:02 there was another Newco in '02, a Newco 10:12:06

CUTRONE

in '05, and then we collapsed -- we merged 10:12:09 out of existence a couple of those 10:12:12 intermediary Newcos. So because we 10:12:16 basically just had four Old Cos., so we 10:12:18 basically merged them, and what you had 10:12:22 was LVI Acquisition, LVI Parent, LVI 10:12:24 Services, Inc. in late '05. 10:12:27
Q. Okay. And while Mr. McNamara 10:12:29 was the CEO of LVI Services, was Mr. Fried 10:12:34 an employee of LVI Services, Inc. as well? 10:12:37
A. Yes. 10:12:40
Q. Okay. And do you know what his 10:12:41 job title was as an employee of LVI 10:12:42 Services, Inc.? 10:12:45
A. His role was chairman. 10:12:45
Q. Chairman. So he had the title 10:12:47 chairman with LVI services, Inc. and with 10:12:50 either of the ultimate parent or the 10:12:53 intermediate parent? 10:12:57
A. Again, what I had said is the 10:12:58 ultimate parent Burt was chairman of. I 10:13:02 don't know if there was a formal 10:13:05 distinction of chairman of any of the 10:13:07 board members of any parent below the 10:13:09

42

CUTRONE

ultimate parent. 10:13:12

Q. But he held the title of chairman as an employee with LVI Services while Mr. McNamara was CEO? 10:13:13 10:13:14 10:13:17

A. So there by that distinction, it would clearly be as two-member boards Burt and I, and Burt was the chairman. Let's say it that way. So I just don't know if there was a formal distinction as a board member, even though his position as employee of Services was chairman. That is what we referred to him as, was chairman. 10:13:19 10:13:21 10:13:24 10:13:26 10:13:28 10:13:31 10:13:32 10:13:34 10:13:36

Q. And while Mr. McNamara was CEO, what were Mr. Fried's job duties? 10:13:36 10:13:39

A. Primarily, you know, as I understand it, Burt still maintained -- was in-house general counsel. So from -- primarily, you know, legal matters would run through Burt, and primarily it was strategic in nature. His position was more strategic. If we had any mergers or acquisition we were looking at, you know, he was chairman, and Bob 10:13:43 10:13:47 10:13:51 10:13:52 10:13:56 10:14:05 10:14:07 10:14:12 10:14:15

43

CUTRONE

McNamara was president and CEO and ran the day-to-day operations. I reported to Bob, and Burt handled the legal and overall strategic role for the company and then certainly had other responsibilities that he and Bob agreed would be his responsibilities I guess. 10:14:17 10:14:21 10:14:22 10:14:25 10:14:27 10:14:29 10:14:32

Q. Do you know what those were? 10:14:33

A. Burt had involvement with our bonding line. So, you know, contract reviews and requests for bonds would come -- again would come through But. He would sign off on what bond requests we were making. So legal and contractual matters were primarily in Burt's wheelhouse. He also had -- again, when -- when we looked at different companies for acquisitions like we acquired a business in '07; we acquired a business in '09, he would play an active role in that and, you know, evaluating whether the company was for us and then in participating and negotiating the deal. 10:14:34 10:14:39 10:14:44 10:14:47 10:14:50 10:14:52 10:14:54 10:14:56 10:15:01 10:15:04 10:15:05 10:15:08 10:15:11 10:15:13 10:15:15

There was other items that ran 10:15:19

44

CUTRONE

through the corporate office in Westport. There was business development efforts that went on out of that office, and I don't know if he had a personal relationship, working relationship with the woman that handled that, but clearly he had an involvement when it came to overseeing, you know, what -- marketing materials, things of that nature. He -- I believe he had involvement in that respect because it was out of his office. Travel and -- travel went through the Westport office. So people who were going to travel for the company would -- would make their reservations through our reserve systems. And those would go through either Burt or -- or Shari for approval and processing. Those are some of the primary items -- 10:15:23 10:15:25 10:15:26 10:15:29 10:15:32 10:15:34 10:15:37 10:15:39 10:15:41 10:15:44 10:15:47 10:15:49 10:15:53 10:15:56 10:15:58 10:16:01 10:16:02 10:16:05 10:16:10

Q. Okay. 10:16:11

A. -- that I recall. 10:16:12

Q. Those all that you know of? 10:16:13

A. That I recall. 10:16:14

Q. Okay. Now, while -- going back 10:16:15

45

CUTRONE

a bit prior to 2006. 10:16:23

A. Okay. 10:16:29

Q. When Mr. Fried was CE -- president and CEO of LVI Services, where did he maintain an office? 10:16:29 10:16:32 10:16:35

A. Early on we were together either at 80 Broad Street or prior to that it was 470 Park Avenue South, and prior to that was 345 Hudson Street. 10:16:37 10:16:42 10:16:47 10:16:50

Q. All in New York City? 10:16:52

A. Yes. 10:16:54

Q. And then did there come a time when an office in Westport opened? 10:16:54 10:16:56

A. Yes. 10:16:58

Q. And what -- do you recall when that was? 10:16:59 10:17:00

A. Sometime prior. We could check the lease. I don't recall how far back we opened the office, but clearly it was before '05, and it was sometime after Blue Point's investment in '02. So somewhere between 2002, 2005 we opened up Westport. 10:17:01 10:17:09 10:17:13 10:17:14 10:17:21 10:17:23

Q. And when that Westport office opened up and while Mr. Fried was CEO, did 10:17:28 10:17:30

46

CUTRONE

he spend any time in the Westport office? 10:17:32
A. Yes. 10:17:34
Q. Do you know approximately -- and 10:17:35 did he also spend any time in the New York 10:17:36 office during that same time period? 10:17:38
A. Early on, the first year or two, 10:17:41 he would split time. He would spend a 10:17:43 couple of days in New York and a couple of 10:17:45 days in Westport. Usually two in New York 10:17:47 and three in Westport. It was 10:17:49 about -- but it was whatever he decided. 10:17:51 It wasn't strict. But generally he was in 10:17:53 the office a couple of days a week in the 10:17:55 New York office, and then at some point I 10:17:57 want to say it clearly went -- then Burt 10:18:01 was exclusively in Westport. 10:18:05
Q. Did he ever come to the New York 10:18:08 office when Mr. McNamara was CEO? 10:18:09
A. Yes. If there was a meeting or 10:18:13 whatever the case may be, but it wasn't a 10:18:14 set diet. It was on an as-needed basis. 10:18:18 He would come down with Bob to -- to meet 10:18:22 with Bob for things. 10:18:26
Q. When you say he came down with 10:18:27

47

CUTRONE

Bob -- 10:18:30
A. To meet with Bob. 10:18:30
Q. Can you tell me how many times a 10:18:31 week Mr. Fried would work out of the New 10:18:33 York office while Mr. McNamara was CEO? 10:18:35
A. I wouldn't say -- it is 10:18:37 sometimes per week. It would -- he never 10:18:39 really worked out of the 80 Broad Street 10:18:40 office. He would come down for meetings. 10:18:43 So how many times I don't know. It would 10:18:44 depend on whether there was a -- it would 10:18:46 just depend on the nature of the meeting. 10:18:48 If it required Burt's presence physically, 10:18:50 he would be at 80 Broad Street, and then 10:18:52 he might stay there for a couple of hours 10:18:55 and go back to Westport. So generally 10:18:57 never -- he didn't maintain an office at 10:18:59 30 Broad Street. He would be there for 10:19:01 meetings, and when he needed to work he 10:19:03 would work out of a guest office, so his 10:19:06 primary location was Westport. 10:19:08
Q. Okay. So can you give me an 10:19:10 approximate number of how many times a 10:19:11 month he worked out of -- Mr. Fried worked 10:19:13

48

CUTRONE

out of the New York office? 10:19:16
A. Really -- I really can't. I 10:19:16 would say almost never that he worked out 10:19:18 of the New York office. 10:19:20
Q. Can you tell me approximately 10:19:24 how many times per month Mr. Fried had a 10:19:28 meeting at the New York office? 10:19:29
A. I don't know. You know -- you 10:19:30 know, a couple of times a year maybe. 10:19:31 Maybe more but not frequent. 10:19:34
Q. Okay. And while Mr. McNamara 10:19:35 was CEO, did Mr. Fried ever come to New 10:19:38 York to meet with clients or have any 10:19:41 client meetings? 10:19:43
A. He may have. I don't know. I 10:19:43 didn't keep his calendar, so I don't know. 10:19:54
Q. Now, while Mr. McNamara was CEO, 10:19:57 how was LVI Services doing financially 10:20:01 during that period of time? 10:20:03
A. We had our good years, and we 10:20:05 had our bad years. 10:20:07
Q. Okay. How about in 2008? 10:20:08
A. 2008 was a fairly good year in 10:20:13 both revenue and operating income. 10:20:20

49

CUTRONE

Q. And how about in 2009? 10:20:22
A. Much softer volume. You know, 10:20:24 the economic downturn took its toll. 10:20:30 The -- we kind of stayed afloat in '08 10:20:34 because we had a couple of big contracts 10:20:37 and backlog that helped us maintain a 10:20:39 level of business through 2007, 2008, but 10:20:42 we weren't able to replenish that business 10:20:46 sufficient enough to maintain that level 10:20:50 of business. So in '09 and then in 2010 10:20:51 the volumes were significantly less than 10:20:55 what they were in 2007, 2008. 10:20:58
Q. In your opinion, would '09 be 10:21:00 considered a bad year? 10:21:03
A. You know, I wouldn't say a bad 10:21:04 year because the one thing I'll say that 10:21:07 -- what the company was able to do is 10:21:09 maintain fairly strong gross margins on 10:21:17 the work that it did perform, and it was 10:21:17 able to manage its overhead, spend 10:21:17 reasonably well to maintain an operating 10:21:20 profit, but to the extent that it was 10:21:23 still saddled with the same debit load 10:21:27 that you had for a company, you know, that 10:21:32

CUTRONE

MS. SELTZER: I object to the form. You can answer. 10:43:23 10:43:24

A. Again, I don't evaluate the chairman's performance. It is not for me to evaluate. 10:43:25 10:43:27 10:43:32

Q. Okay. Now, did there come a time when Mr. Fried became the interim CEO of LVI Services? 10:43:33 10:43:38 10:43:41

A. Yes. 10:43:43

Q. Do you know when that was? 10:43:44

A. Shortly after Mr. Freed's requests McNamara left. 10:43:45 10:43:48

Q. And do you know when that was? 10:43:49

A. He resigned, advised us of his resignation, you know, a couple of days or a day after we executed the change order for 130 Liberty Street, so early March is when he resigned. I want to say he stayed on for the better part of March, and then at that point Burt came on as interim chairman -- interim -- interim president and CEO. 10:43:51 10:43:55 10:43:57 10:44:00 10:44:03 10:44:05 10:44:09 10:44:12 10:44:15

Q. Do you know why Burt came on as interim president and CEO? 10:44:17 10:44:19

CUTRONE

A. That was the decision of the board. 10:44:21 10:44:22

Q. Do you know if Burt was asked to be president and interim CEO? 10:44:25 10:44:34

A. What I recall is that shortly after McNamara resigned, the board retained a consultant or had a consultant come in to meet with the team to meet with myself and others I believe to assess, you know, what does the company need now that its CEO has abruptly left. It didn't take long to convince that consultant that the business didn't need any outside help, that, you know, Burt was -- and Burt and the team were more than capable of handling its affairs while a search went on for a replacement, and that is what we did, and I supported that. 10:44:35 10:44:37 10:44:40 10:44:42 10:44:47 10:44:51 10:44:53 10:44:57 10:45:00 10:45:04 10:45:07 10:45:09 10:45:12 10:45:14

Q. Okay. Do you -- in your opinion, was Burt a good choice? 10:45:15 10:45:17

A. Absolutely. 10:45:20

Q. Why? 10:45:20

A. Why not? I mean it was the role he held for some fifteen plus years prior 10:45:21 10:45:23

CUTRONE

to Bob coming aboard. You know, he -- it is in his blood. It is like, you know, falling off a bike. So for Burt to -- and he was always active during the time that Bob was there. So for Burt to step back in and perform the role of president and CEO, contract reviews, bid reviews, engaging with me on financial affairs, whatever the case may be, you know, it was an old hat for him. Why not? I think there was no better choice on an interim basis than Burt if he was willing to do it. 10:45:27 10:45:31 10:45:34 10:45:37 10:45:39 10:45:41 10:45:43 10:45:48 10:45:50 10:45:53 10:45:55 10:45:59

Q. Okay. And do you know if Mr. Fried continued to perform his prior job duties as chairman while he was president -- interim president and CEO? 10:46:01 10:46:05 10:46:07 10:46:09

A. Yes. I don't -- I don't believe anybody stepped in to -- as active chairman or acting chairman while Burt was acting president and CEO. The team rallied around him, and we got the job done. We did what we had to do. 10:46:11 10:46:15 10:46:18 10:46:20 10:46:25 10:46:28

Q. And in your opinion how was Mr. Fried's work performance as interim 10:46:30 10:46:32

CUTRONE

president and CEO? 10:46:34

A. Well, again it -- in my area, you know, it was fine. There is no -- just like before, just like then, you know, I would engage him on things that he needed to be engaged on but otherwise went about doing the role that I have been doing for the last 20 years and didn't need to bother him with a lot actually. You know, let's just go forward, keep doing what we are doing, take care of -- take care of your end of the business and, you know, go out and find a replacement. 10:46:35 10:46:37 10:46:40 10:46:43 10:46:46 10:46:49 10:46:51 10:46:54 10:46:56 10:46:58 10:47:00 10:47:04 10:47:06

Q. And why were you trying to find a -- why wasn't Mr. Fried chosen as the permanent CEO and president, if you know? 10:47:07 10:47:09 10:47:15

MS. SELTZER: I object to the form. Can you phrase it again? 10:47:19 10:47:20

MR. DATOO: Sure. 10:47:21

Q. Was Mr. Fried considered to be the permanent president and CEO of LVI Services? 10:47:21 10:47:23 10:47:26

A. When the search went on for the 10:47:26

CUTRONE
replacement for Bob you mean? 10:47:28
Q. Yes. 10:47:30
A. I don't know. I don't -- I 10:47:31
don't think Burt -- well, I know Burt 10:47:32
didn't want it. Burt didn't want to be a 10:47:36
permanent replacement. Burt wanted to 10:47:39
find another president and CEO. 10:47:41
Q. Do you know if that is because 10:47:43
he wanted to keep his chairman role? 10:47:44
MS. SELTZER: Objection. 10:47:47
A. You'll have to ask Burt. 10:47:48
Q. Okay. Now, while Mr. Fried was 10:47:50
the interim president and CEO, did he work 10:47:52
out of the New York office? 10:47:55
A. No. 10:47:56
Q. Was he still based in -- 10:47:57
A. Westport. 10:48:00
Q. The Westport office? 10:48:01
A. Yes. 10:48:02
Q. Did he travel to New York more 10:48:03
often to work out of the New York office 10:48:04
while he was president -- interim 10:48:06
president and CEO? 10:48:09
A. No, not that I recall. There 10:48:10

CUTRONE
was no real need. Not really. He could 10:48:12
do everything by phone and e-mail. So 10:48:15
there was no need for him to be physically 10:48:17
at 80 Broad Street. 10:48:19
Q. Do you know if he was in New 10:48:20
York meeting with clients while he was 10:48:22
president and interim CEO? 10:48:24
A. I don't know. 10:48:26
Q. Okay. Now, while Mr. Fried was 10:48:26
interim president and CEO, was LVI 10:48:35
services going through a restructuring? 10:48:38
A. Yes. 10:48:40
Q. Okay. Why is that? 10:48:41
A. In late 2009, probably mid 2009, 10:48:43
the company's financial performance -- 10:48:57
based on the company's financial 10:48:59
performance it was evident that its 10:49:01
business size and resulting profit was not 10:49:04
going to be sufficient to maintain the 10:49:09
covenant levels required under the 10:49:11
existing debt agreements. So, as I said 10:49:14
earlier, while we were still quote, 10:49:17
unquote successful in that we were still 10:49:19
maintaining our presence in the industry, 10:49:21

CUTRONE
the management team was intact; the gross 10:49:23
margins are intact; SGA, you know, 10:49:26
somewhat rationalized given the lower 10:49:29
volume, we just weren't -- simply weren't 10:49:33
making enough money to support the debt 10:49:35
load, and, therefore, it was evident we 10:49:37
were going to be in default of our 10:49:40
covenants. 10:49:42
So the board understood that, 10:49:42
and the lender group was approached. We 10:49:44
retained a firm to assist in the 10:49:49
restructuring of its debt instruments and 10:49:55
equity investments, and that took 10:49:59
basically a year because we started 10:50:03
somewhere around September of '09 and 10:50:05
completed October 8th, the final close, of 10:50:07
'10. 10:50:11
Q. And what was Mr. Fried's role in 10:50:11
the restructuring? 10:50:13
A. Like myself, you know, we -- we 10:50:14
were there to, A, run the company and keep 10:50:22
the wheels moving, B, provide information 10:50:26
necessary to assist really the -- it was 10:50:30
more the ownership group that was leading 10:50:35

CUTRONE
the efforts around the restructuring, you 10:50:41
know, Code Hennessy as owner, Apollo as 10:50:46
subordinate lender at that time and 10:50:52
partial owner, minority owner, and the 10:50:54
lender group. It was Code and Apollo 10:50:57
really strategically working with each 10:51:02
other and the lender group, but certainly 10:51:05
Bob when he was there and then Burt were 10:51:12
involved and understanding and helping the 10:51:15
team, you know -- you know, navigate kind 10:51:19
of the process. 10:51:24
We had the consultants in from 10:51:25
the bank gathering all kinds of 10:51:29
information on forecasting and what have 10:51:31
you. We had the investor group from the 10:51:33
company that was hired by the company -- 10:51:35
really Code Hennessy picked them and 10:51:37
then -- engaged them to be the company 10:51:40
through the company. It was really kind 10:51:42
of Code/Apollo driving the bus as far 10:51:44
where we would go with this. 10:51:47
Now, that is my impression. 10:51:49
Quite frankly Burt and Bob certainly had 10:51:51
input, involvement and I did and others, 10:51:53

CUTRONE

handling whatever he was handling. I anticipated a transition period to Scott, and I didn't know what Scott, Burt and the board had agreed would be Burt's responsibilities going forward, and it was not necessarily relevant to me. 11:21:32 11:21:34 11:21:37 11:21:40 11:21:42 11:21:44

Q. Do you know if Mr. Fried had any direct reports while Mr. State was CEO? 11:21:47 11:21:53

A. I don't know. 11:21:55

Q. Do you know if he delegated work to anybody? 11:22:03 11:22:06

MS. SELTZER: Objection. 11:22:08

Q. I am sorry. Do you know if Mr. Fried delegated work to anybody while Mr. State was CEO? 11:22:09 11:22:11 11:22:13

MS. SELTZER: I object to the form, but you can answer. 11:22:15 11:22:16

A. I don't know. 11:22:17

Q. Now, after Mr. State started working at LVI Services, do you have any personal knowledge of Mr. Fried's work performance? 11:22:18 11:22:30 11:22:34 11:22:37

A. No. 11:22:37

MR. DATOO: 46. 11:23:13

CUTRONE

(Plaintiff's Exhibit 46 marked for identification.) 11:23:16 11:23:16

(Document handed to witness.) 11:23:18

Q. Mr. Cutrone, you have in front of a document that has been marked Plaintiff's Exhibit 46. 11:23:18 11:23:20 11:23:22

Can you take a look at the document and let me know if you've seen it before? 11:23:24 11:23:24 11:23:26

A. Yes. Okay. 11:23:27

MS. SELTZER: This is 46. 11:24:04

Q. 46. Do you see on the first page an e-mail written by John Leonard to yourself with a copy to Mr. Fried and Mr. Leonard dated September 21, 210? 11:24:06 11:24:07 11:24:12 11:24:15

A. Uh-huh. 11:24:18

Q. Do you agree with Mr. Leonard's comments in which he wrote: "You are infamous in the little 13 billion dollar market"? 11:24:19 11:24:27 11:24:28 11:24:32

A. Well, I responded by saying very well said and completely true, so that is a good indication that I agreed. Although I think he used the term infamous, but he 11:24:36 11:24:37 11:24:39 11:24:42

CUTRONE

means famous. Infamous has actually a negative connotation which -- if I know the English language, which I have been accused of not knowing. 11:24:45 11:24:48 11:24:52 11:24:54

Q. Well, would you -- well, did you agree with the term infamous or would you agree with the term famous? 11:24:55 11:24:57 11:24:59

A. I would -- famous. Infamous -- somebody is infamous for a bad reason. If you are known in this industry, you're well known in a good way, not in a bad way. 11:25:01 11:25:03 11:25:07 11:25:10 11:25:13

Q. Okay. Did you believe that Mr. Fried would be a supportive chairman? 11:25:13 11:25:19

A. Yeah. Yes. 11:25:21

Q. Okay. Is that because he was supportive of Mr. McNamara? 11:25:27 11:25:31

MS. SELTZER: Objection. 11:25:33

A. Just my evaluation of Burt like, you know, he was -- he wanted what was best for the company. So if he was involved with the company, you know, he would always be having -- in my mind have the objective of doing something that is 11:25:34 11:25:39 11:25:43 11:25:46 11:25:48 11:25:52

CUTRONE

good for the company. 11:25:53

Q. Now, after Mr. State started working at LVI Services, did there come a time when Mr. State began transitioning Mr. Fried's job duties to other employees? 11:25:54 11:25:59 11:26:02 11:26:04

A. Yes, obviously. Yes. 11:26:06

Q. And how do you know that? 11:26:14

A. By what was occurring. There was the appointment of Greg DiCarlo as general counsel. There was nothing more formal than that. You know my role was still my role. I reported to him, and -- but at some point I was aware that there was a set of responsibilities that Burt had outlined and then Scott looked to delegate to others in the organization as opposed to them being performed by the chairman. 11:26:16 11:26:29 11:26:31 11:26:35 11:26:38 11:26:41 11:26:44 11:26:46 11:26:50 11:26:52 11:26:55

Q. Okay. And do you know what duties Mr. State wanted to delegate to others? 11:26:55 11:26:57 11:27:00

A. Of what -- of that list? 11:27:00

Q. Yes -- 11:27:04

A. That I referred to? 11:27:04

CUTRONE

tell you what happened and, you know, let's just let it play out, but let's focus on what we have to do. 11:54:26 11:54:28 11:54:30

Q. Now, did you ever have a conversation with Mr. State about Mr. Fried's job duties or his role at LVI other than what you just testified to? 11:54:31 11:54:45 11:54:47 11:54:49

A. Not that I recall. 11:54:51

Q. Did you ever have a conversation with anybody about Mr. Fried's job duties or his role at LVI other than what you just testified to? 11:54:54 11:54:55 11:54:58 11:55:00

MS. SELTZER: I object to the form. The meeting in LVI, outside LVI? 11:55:03 11:55:03

MR. DATOO: Anybody. 11:55:06

MS. SELTZER: His wife, his -- 11:55:07

MR. DATOO: Anybody. 11:55:09

A. Well, certain things I share with my wife. Now, kind of the ongoing things, really the only other person that I have in any way been conversant at all with would be John, John Leonard, and to a lesser extent Kamal and Joseph. You know, the three of us worked -- the four of us 11:55:10 11:55:12 11:55:16 11:55:18 11:55:21 11:55:24 11:55:27

CUTRONE

have been working together for 20 years. It has come up in conversation what is going on shoulder to shoulder huddled up with each other, and, you know, we are a little befuddled by it too, but we try not to let it be a distraction. 11:55:30 11:55:32 11:55:36 11:55:36 11:55:39 11:55:43

Q. So what did you discuss with Mr. Leonard about Mr. Fried's job duties or his role at LVI? 11:55:45 11:55:46 11:55:48

A. I -- I didn't really. My point is usually we talk about the fact that we have this ongoing battle, but I didn't talk about the job duties per se. I think he was probably aware like I was aware that there was a list, and there was a list of duties, and Scott wanted to assign them out, and Burt didn't want to, and that started their friction, and he wondered about how much longer are we going to do this. That is the extent of it. After that it was just more of, you know, when are you being deposed, that kind of thing, not -- there has not really been a lot of dialogue about it because 11:55:52 11:55:54 11:55:57 11:55:59 11:56:02 11:56:04 11:56:06 11:56:08 11:56:09 11:56:11 11:56:14 11:56:15 11:56:18 11:56:20 11:56:22

CUTRONE

there is nothing for us to do. It is of no relevance to us other than the company has to defend a very significant lawsuit, and we have got jobs to do. Se we just go back to work. 11:56:25 11:56:29 11:56:31 11:56:34 11:56:36

Q. And does the same thing apply for conversations with Mr. Annarumma or Mr. Sookram? 11:56:36 11:56:38 11:56:41

A. Yes. 11:56:42

Q. Did you ever take any notes of your conversations with these three individuals? 11:56:42 11:56:43 11:56:45

A. No. 11:56:45

Q. Did you take any notes regarding a conversation you had about Mr. Fried during your Denver meeting? 11:56:45 11:56:47 11:56:49

A. No. 11:56:51

Q. Did you ever have a conversation with Mr. State about whether there was uncertainty concerning employees -- who employees should be reporting to between Mr. State and Mr. Fried? 11:56:51 11:57:01 11:57:04 11:57:06 11:57:08

A. Say -- rephrase -- say that again, please. 11:57:10 11:57:13

CUTRONE

Q. Did you ever have a conversation with Mr. State about any uncertainty with LVI employees as to who they should be reporting to between state and Mr. Fried? 11:57:14 11:57:15 11:57:19 11:57:22

MS. SELTZER: I object to the form, but you can answer. 11:57:27 11:57:28

A. I would say no because I am not aware that there was any uncertainty of what it is Scott wanted. Obviously there must be have been uncertainty between him and Burt, but I am not aware of any -- there was never any discussion with me about that uncertainty. 11:57:29 11:57:30 11:57:33 11:57:37 11:57:39 11:57:41 11:57:42

Q. Do you know if there was any uncertainty amongst the employees as to who they should be reporting to for certain things? 11:57:44 11:57:45 11:57:48 11:57:50

A. No. Like post -- like when Scott came aboard? 11:57:51 11:57:53

Q. Yes. 11:57:54

A. No, I think Scott made it pretty clear very candidly, very directly, very logically, and we subscribed to it and went forward day one. 11:57:55 11:57:56 11:57:59 11:58:02

138

CUTRONE

didn't have an opinion or anything on it 12:13:34
because we didn't -- we didn't know 12:13:37
anything about it. We just found out 12:13:39
secondhand that this is the road it has 12:13:41
taken. 12:13:43
Q. Okay. Did you ever -- 12:13:44
A. Let me just put this on silent. 12:14:35
Q. Did you ever see a letter from 12:14:37
Mr. Fried's attorneys? 12:14:41
A. A letter -- yes. 12:14:44
Q. Do you recall when you first saw 12:14:46
that letter? 12:14:47
A. No. 12:14:48
Q. How did you come to see the 12:14:52
letter? 12:14:53
A. It was e-mailed to me by Scott, 12:14:53
and the original ultimately was with me. 12:15:01
I have -- I have the original letter 12:15:08
because it was addressed to Scott at 80 12:15:10
Broad Street. 12:15:13
Q. How did you -- I'm sorry. 12:15:14
A. I just wanted to say it was 12:15:17
delivered to 80 Broad Street. 12:15:19
Q. So how did you come to be in 12:15:21

139

CUTRONE

possession of that letter? 12:15:22
A. At some point I asked Scott if 12:15:23
he wanted me to open it or send it to him, 12:15:26
and he asked me -- you know, I don't 12:15:29
recall. He might have probably said open 12:15:32
it because I wouldn't have opened it if he 12:15:33
didn't agree to it, but I think I already 12:15:36
knew it was coming because I think, you 12:15:38
know, going back to the conversation I 12:15:40
think at some point Scott said to me, you 12:15:43
know, I think he is going to file suit or 12:15:46
something, you know, that -- so I didn't 12:15:49
think the letter was necessarily an 12:15:52
ultimate surprise because it obviously 12:15:56
wasn't moving forward productively the 12:15:59
other way. I don't know what was going on 12:16:03
between the conversation -- in 12:16:05
conversations between Burt and the board 12:16:06
and Scott. But it -- you know, at some 12:16:08
point I got the letter. 12:16:11
Q. Okay. 12:16:12
MR. DATOO: Can we take a short 12:16:14
break? 12:16:16
MS. SELTZER: Got to find the 12:16:17

140

CUTRONE

letter? 12:16:18
THE VIDEOGRAPHER: We're going 12:16:19
off the record, 12:16 p.m. 12:16:20
(Recess taken.) 12:16:22
THE VIDEOGRAPHER: We're 12:23:28
returning to the record, 12:23 p.m. 12:23:28
Q. Mr. Cutrone, you have in front 12:23:31
of you a document that has been previously 12:23:32
marked as Plaintiff's Exhibit 8. It is a 12:23:34
document Bates stamped B Simmons 44 12:23:37
through B Simmons 49. 12:23:45
Can you please take a look at 12:23:54
this document and let me know if you have 12:23:55
seen it before? 12:23:58
A. Yes, I have. 12:23:59
Q. Is this the letter from Mr. 12:24:00
Fried -- Fried's attorneys that you 12:24:06
mentioned earlier? 12:24:10
MS. SELTZER: Do you mean the 12:24:14
attachment? 12:24:15
Q. Yes, the attachment. Not the 12:24:15
cover. 12:24:17
A. Yes, this is the letter I 12:24:17
recall. Yes. 12:24:19

141

CUTRONE

Q. Okay. Now, if you look at 12:24:19
the -- did you read -- did you receive 12:24:29
this letter on November 15, 2010? 12:24:32
A. I don't know. I think it was 12:24:35
received at the office because it 12:24:40
was -- it says via hand delivery addressed 12:24:44
to Scott State. And so if that is true, 12:24:46
it probably hit our office on November 15. 12:24:49
Q. Okay. Do you -- 12:24:52
A. I -- 12:24:54
Q. Go ahead. 12:24:55
A. I sent the e-mail to Scott on 12:24:56
the 16th. 12:24:58
Q. And do you recall when this 12:25:03
letter was delivered to you? 12:25:04
A. No. 12:25:05
Q. Okay. 12:25:05
MS. SELTZER: I object to the 12:25:06
form. He didn't testify it was delivered 12:25:07
to him specifically. 12:25:10
MR. DATOO: I'm sorry? 12:25:11
MS. SELTZER: I said he didn't 12:25:12
testify it was delivered to him. 12:25:13
Q. Well, at some point -- at some 12:25:15

146

CUTRONE

board meeting, did you have any discussions -- other than what -- sorry. Let me back up. 12:28:31 12:28:32 12:28:36

Other than what you have testified to after the November 4 board meeting, did you have any discussions with anyone about Mr. Fried's job duties or his role at LVI? 12:28:37 12:28:38 12:28:41 12:28:42 12:28:45

MS. SELTZER: Objection. Asked and answered. You can answer again. 12:28:47 12:28:48

A. No. 12:28:50

Q. Okay. Do you know why Mr. Fried was terminated? 12:28:51 12:28:56

A. Specifically, no. 12:28:57

Q. How about generally? 12:29:01

A. My understanding is that the -- they could not come to terms on the offer of compensation and responsibilities going forward. There was an offer. He didn't accept, and therefore his termination -- his employment ceases. 12:29:02 12:29:08 12:29:12 12:29:15 12:29:19 12:29:23

Q. And how did you come to learn that? 12:29:25 12:29:26

A. I couldn't recall. It was 12:29:26

147

CUTRONE

either through conversation with Scott or -- it probably would have been talking with Scott. 12:29:27 12:29:30 12:29:32

Q. Do you recall when that conversation took place? 12:29:33 12:29:33

A. No. 12:29:34

Q. Was it before or after Mr. Fried was terminated? 12:29:35 12:29:36

A. I don't know. Assuming there was a conversation, I am just saying who else would I have heard from. Either Scott or Kamal are the only two people I would have -- that would shared that fact with me. It might have -- you know, I recall an e-mail from Burt about a severance package -- a severance package or a termination package, and I want to say he wrote to me -- I don't think that was the first time I heard. It could have been. It could have been from Burt himself. 12:29:37 12:29:40 12:29:42 12:29:44 12:29:47 12:29:49 12:29:54 12:29:59 12:30:03 12:30:06 12:30:08 12:30:10 12:30:12

Q. Do you recall when that was? 12:30:12

A. Offhand, no. 12:30:13

Q. Do you recall what the substance 12:30:14

148

CUTRONE

of the e-mail was? 12:30:16

A. Something about I understand I am going to get a package, and I think I referred him to Kamal because I wouldn't normally deliver that. 12:30:17 12:30:19 12:30:21 12:30:23

Q. Do you know if that was before or after Mr. Fried was terminated? 12:30:24 12:30:26

A. I don't know. 12:30:28

Q. Okay. 12:30:29

A. But there is an e-mail to that effect, so -- 12:30:30 12:30:32

Q. Okay. Are you familiar with Shari Dembin? 12:30:33 12:30:35

A. Yes. 12:30:36

Q. How so? 12:30:36

A. She -- I've known Shari since she was sixteen years old. 12:30:37 12:30:43

Q. And was she employed by LVI Services? 12:30:45 12:30:51

A. Yes. 12:30:51

Q. Do you know how long? 12:30:51

A. At least ten years, probably fifteen. 12:30:52 12:30:56

Q. And which office did she work 12:30:57

149

CUTRONE

in? 12:31:00

A. Originally she worked out of the corporate office at 80 Broad Street and/or 470 Park when it was there, where ever the corporate office was. 12:31:00 12:31:03 12:31:08 12:31:12

Q. And how about later on? 12:31:13

A. At some point she relocated to the Westport office. 12:31:14 12:31:17

Q. And did you know if she is related to Mr. Fried? 12:31:18 12:31:20

A. It is his daughter. 12:31:21

Q. And when did you find that out? 12:31:22

A. Probably the day I met her. 12:31:25

Q. And do you know what Ms. Dembin's job title was? 12:31:28 12:31:32

A. In -- I believe it was insurance and bonding administrator. 12:31:34 12:31:36

Q. And do you know what her job duties were? 12:31:38 12:31:40

A. Generally but she didn't report to me. 12:31:40 12:31:46

Q. Can you tell me what her job duties were generally? 12:31:46 12:31:48

A. She administered insurance and 12:31:49

150

CUTRONE

bonding. So all the company's insurance 12:31:50 certs, you know, when we -- when we start 12:31:53 a project we have to provide our client an 12:31:57 insurance certificate to evidence our 12:32:01 insurance. So she was the point person. 12:32:02 So all of the requests for insurance certs 12:32:06 came through to her, and she was the 12:32:09 clearinghouse with our -- to issue those 12:32:10 certs. We could issue a lot of them 12:32:13 in-house, and sometimes we had to go to 12:32:15 the broker for a special cert. So she was 12:32:18 -- everything routed through her in that 12:32:21 respect. She issued certs. 12:32:24

Q. What do you mean by certs? 12:32:26

A. Insurance certificates. 12:32:28 Certificates of insurance evidencing the 12:32:29 company's insurance on behalf of the owner 12:32:31 on a project. So every project you have 12:32:33 to give them a certificate of insurance, 12:32:35 so they could see what our -- A, they are 12:32:37 named as the certificate holder and 12:32:40 we -- it provides notice as to the limits 12:32:43 that the company has, policy limits. 12:32:44

Q. Do you know how much money she 12:32:46

151

CUTRONE

made? 12:32:48

A. Yes. I -- offhand I think it 12:32:48 was 85,000 a year. 12:32:52

Q. Okay. 12:32:54

A. In that range. 12:32:56

Q. Do you know if she was 12:32:56 responsible for reviewing and processing 12:32:59 insurance requests from LVI's other 12:33:01 offices? 12:33:05

A. That is what I just described. 12:33:05

Q. Okay. And was she responsible 12:33:07 for reviewing -- do you know if she was 12:33:09 responsible for reviewing bid and bond 12:33:12 requests before the requests were sent to 12:33:14 a surety? 12:33:16

A. Yes. Again, she had a similar 12:33:18 function in my understanding that all bid 12:33:20 bond requests and all bond requests also 12:33:23 came through Shari. She received them and 12:33:25 any information necessary for the company 12:33:28 to -- to actually then order the bid bonds 12:33:31 or payment performance bonds from the 12:33:35 surety. So, yes, she was the -- the 12:33:38 person that routed them through. 12:33:41

152

CUTRONE

Q. And do you know how long she had 12:33:43 this role for? 12:33:44

A. Several years. 12:33:45

Q. What do you mean by several? 12:33:47

A. Probably at least five. 12:33:49

Q. Okay. And do you know what her 12:33:52 job title was prior or her role was prior? 12:33:56

A. She started off primarily as 12:34:01 Burt's administrative assistant, and then 12:34:05 she took on different roles and 12:34:09 responsibilities over the course of the 12:34:10 years, insurance bonding, administration. 12:34:12 She also was involved with the travel 12:34:17 program and the promotions, if we -- if a 12:34:21 branch office was going to order T-shirts 12:34:27 or hats. So she was -- things like that, 12:34:29 so she was -- she would organize and 12:34:31 receive and place orders for that on 12:34:33 behalf of the branches. So LA would say I 12:34:36 need this, that, the other thing, and she 12:34:39 would secure them. So she was like the 12:34:41 one purchase agent, if you will, for the 12:34:43 company for promotional items, and she 12:34:45 also assisted quite adeptly in organizing 12:34:48

153

CUTRONE

any company functions. So the holiday 12:34:53 party at Rosini's, management meetings off 12:34:56 site, she would be coordinating with 12:34:59 Burt's direction on, you know, sites, 12:35:03 location and making arrangements for the 12:35:06 rooms and et cetera, et cetera for -- for 12:35:08 a management meeting of, you know, 12:35:10 sometimes 20, sometimes 60 people at -- at 12:35:12 an event or at a resort setting or 12:35:15 whatever, you know. 12:35:17

Q. And did she continue to perform 12:35:18 those job duties when she was I guess 12:35:20 responsible for insurance and bonding? 12:35:25

A. Yeah. There were much fewer and 12:35:26 far in between in the last five years, but 12:35:31 to the extent we had them, you know, she 12:35:34 would. Yes. 12:35:36

Q. And would you consider when she 12:35:36 became responsible for insurance and 12:35:39 bonding a promotion? 12:35:42

MS. SELTZER: I object to form, 12:35:45 but you can answer if you know. 12:35:46

A. You know, not formally. I mean 12:35:48 she was given salary increases over time 12:35:50

154

CUTRONE

and -- but I wouldn't say it was promotion. You know, administrative -- it is an administrative position either way. So administrating bonding insurance or administrating for an executive. So -- 12:35:53 12:35:57 12:35:59 12:36:01 12:36:04

Q. Do you know who gave her or assigned her those responsibilities? 12:36:09 12:36:13

A. With regards to bonding and insurance, let me step back. Five plus years ago, Joseph Annarumma took over as primary manager over insurance bonding on the administration of insurance and bonding. Joseph was procuring and negotiating -- procuring quotes for insurance for annual renewals and things of that nature and Shari administered the certificate program, you know, issuance of certificates. Bonding administration was really kind of always with Burt, you know, that -- all bid bonds, the review of that, it is all about contractual review because you are going to give the bonding company -- you want to make sure it's got good scope and terms and conditions that were 12:36:14 12:36:17 12:36:22 12:36:25 12:36:29 12:36:32 12:36:36 12:36:38 12:36:40 12:36:42 12:36:47 12:36:50 12:36:52 12:36:55 12:36:57 12:36:58 12:37:02

155

CUTRONE

acceptable, and Burt would review those provisions prior to ordering it. So Shari wouldn't -- Shari might tab the page here is the different provisions, but Burt was I believe -- because Burt was the one that would review that specifically and say, yes, go ahead and send it. 12:37:04 12:37:07 12:37:09 12:37:12 12:37:13 12:37:16 12:37:17

So Shari administered the bonding program through -- you know, with Burt because she received in the bid bonds, logged them, tabbed them, gave them to Burt. He would clear them. She would send them to the bonding company to get bid bonds. She would get the bid bonds, log them in, and get them to the branch, and she would administer that function under Burt's direction on the bonding side. On the insurance side also under Joseph's direction but she had it down. She didn't -- it was a very straightforward process, but if there was a unique insurance requirement, then she would go to Joseph if something was unique or different because Joseph knew our 12:37:19 12:37:21 12:37:23 12:37:28 12:37:30 12:37:33 12:37:35 12:37:42 12:37:42 12:37:42 12:37:43 12:37:46 12:37:47 12:37:49 12:37:50 12:37:52 12:37:56

156

CUTRONE

policies. Joseph managed our policies for workers comp, general liability, et cetera. So he was the manager on the insurance side, and Burt was the manager on bonding side, and she administered the function necessary for both those managers. That is how I understood it. 12:37:58 12:38:00 12:38:02 12:38:04 12:38:06 12:38:09 12:38:11

Q. Do you know who assigned her those job duties? 12:38:12 12:38:14

A. I think Burt and Joseph -- 12:38:15

Q. Okay. 12:38:21

A. -- you know, going back now five plus years ago. 12:38:22 12:38:24

Q. Right. And do you know what her work performance was like? 12:38:25 12:38:26

A. Not directly but, you know, she didn't report to me. 12:38:28 12:38:33

Q. Okay. How about indirectly? Do you know what her work performance was like? 12:38:34 12:38:37 12:38:39

A. It was fine. 12:38:39

Q. Okay. Now, did you consider her job duties as noncritical administrative duties? 12:38:41 12:38:45 12:38:49

157

CUTRONE

MS. SELTZER: I object to the form. 12:38:50 12:38:51

A. Did I consider them noncritical. What do you mean by critical? I considered them administrative. 12:38:51 12:38:55 12:38:58

Q. Do you -- could her job duties have been performed by a secretary? 12:39:00 12:39:06

A. Her job duties could be performed by any capable person paying attention. 12:39:08 12:39:14 12:39:16

Q. Why do you -- why was she being -- how much do secretaries get paid? 12:39:17 12:39:19

A. First we don't have any secretaries. We have administrative assistants, and there is no defined structure or salary. We pay for performance based upon what the manager's opinion is as to role and responsibility, and we compensate people accordingly. 12:39:22 12:39:25 12:39:30 12:39:31 12:39:33 12:39:37 12:39:40

Q. What is your highest -- your current highest paid administrative assistant? 12:39:42 12:39:45 12:39:47

A. In the corporate office? 12:39:48

Q. Yes. 12:39:51

CUTRONE

A. 60. 12:39:52

Q. Now, did there come a time when 12:39:55 Ms. Dembin was terminated? 12:40:04

A. Yes. 12:40:06

Q. And do you recall when that was? 12:40:06

A. Yes, early January. 12:40:08

Q. Do you know why? 12:40:10

A. Primarily because we were 12:40:11 closing the Westport office. Actually 12:40:13 specifically because we were closing the 12:40:18 Westport office. 12:40:20

Q. And was the closure of that 12:40:21 office a part of a bigger layoff? 12:40:23

A. Yes. 12:40:26

Q. And how many people were laid 12:40:27 off in total? 12:40:30

A. There was a reduction in force 12:40:31 of about at least a dozen people or about 12:40:33 a dozen people. 12:40:39

Q. And who made the decision to lay 12:40:42 off? 12:40:47

MS. SELTZER: Objection. 12:40:49

Q. To lay off the 12 people. 12:40:50

MS. SELTZER: I object to the 12:40:54

CUTRONE

form simply because it may not have been 12:40:55 one person. Do you want for each person 12:40:57 to -- 12:40:59

MR. DATOO: That is why I said 12:41:00 who. 12:41:01

MS. SELTZER: Okay. 12:41:01

A. Well, there was meetings amongst 12:41:02 several senior managers, Scott, myself, 12:41:06 John Leonard, the regional managers, Mark 12:41:09 Canessa, regional managers being Aiello, 12:41:14 Pearson, Anderson. I believe Greg DiCarlo 12:41:18 might have been in those 12:41:22 discussions -- that discussion as well. 12:41:24

MS. SELTZER: Before I let him 12:41:26 answer if there were any discussions with 12:41:27 Greg DiCarlo that had any kind of legal 12:41:29 component, you are not to testify about 12:41:32 those, okay. 12:41:34

A. No, it was -- it was about the 12:41:35 reduction in force. 12:41:37

MS. SELTZER: Okay. 12:41:38

A. About, you know, Scott assessing 12:41:39 the business, assessing the talent that 12:41:42 the business has, the effectiveness of 12:41:46

CUTRONE

that -- of that talent, talent meaning the 12:41:48 personnel, and evaluating where it was 12:41:50 being effective and delivering a return, 12:41:53 and so he evaluated many aspects of the 12:41:58 business to -- collectively as a team. 12:42:01 People were asked for their opinions. 12:42:04 People gave their opinions, and at the end 12:42:06 of the day I would say without any 12:42:09 reservation that all the managers that 12:42:11 participated on those calls were 12:42:13 supporters of the reduction in force to 12:42:16 the individual, and then we acted on it. 12:42:19

Q. Including you? 12:42:23

A. Yes. 12:42:25

Q. And who made the final decision 12:42:25 as to who was going to be laid off? 12:42:30

MS. SELTZER: Objection. 12:42:34

A. I mean -- 12:42:36

MS. SELTZER: I object to the 12:42:36 form. 12:42:39

MR. DATOO: What is -- what is 12:42:39 wrong with the form? 12:42:39

MS. SELTZER: Well, I mean 12:42:40 first of all what do you mean by final 12:42:41

CUTRONE

decision? Secondly, you are assuming that 12:42:43 there was one individual that made the 12:42:45 final decision. 12:42:47

MR. DATOO: I said who. I said 12:42:48 -- I never said it could be one, two, 12:42:50 three people. Who made the final 12:42:52 decision. 12:42:54

MS. SELTZER: You may answer. 12:42:55

A. The way I see it is we agreed as 12:42:56 a group. 12:42:58

Q. Now, you testified that there 12:42:59 was a series of meetings among senior 12:43:04 managers regarding the layoff, correct? 12:43:06

A. Uh-huh. 12:43:09

Q. Do you recall when the meetings 12:43:10 first began? 12:43:10

A. No. 12:43:11

Q. Do you know how long after Mr. 12:43:16 State started working at LVI? 12:43:21

A. Offhand, no. I think it was, 12:43:24 you know, first -- first it was part of 12:43:30 the budgeting process -- you know, the 12:43:33 planning process for '11 was when 12:43:35 the -- the conversations first started 12:43:39

162

CUTRONE
about personnel and -- and roles and responsibilities and effectiveness or lack of effectiveness. So it was all part of that iterative process over those first couple of months. 12:43:40 12:43:45 12:43:48 12:43:51 12:43:54
Q. And that process started in the first couple of months? 12:43:55 12:43:57
A. Yes. 12:43:58
Q. And do you know if it was in October, November? 12:43:59 12:44:03
A. Like I said, Scott started, you know, effective October 1. September 24, we could take. And, you know, it wasn't the first order of business to go into. Okay. Let's go do layoffs. It was understanding the business, talking about who does what, roles or responsibilities, who is this guy, who is that guy, effectiveness. You know, he was counseling with his team as to what constitutes the talents. So that is what I said by iterative process. It started dialogue, dialogue, dialogue planning process, meet in Denver. I think it was 12:44:06 12:44:08 12:44:11 12:44:14 12:44:16 12:44:18 12:44:20 12:44:22 12:44:24 12:44:26 12:44:29 12:44:32 12:44:36 12:44:37

163

CUTRONE
not until after I would say -- when it comes to substantive talks about reduction in force, I believe that was more in earnest in December. 12:44:40 12:44:47 12:44:49 12:44:53
Q. In when? 12:44:55
A. In December. I don't think we got really into it -- maybe in November. Maybe in November. 12:44:56 12:44:57 12:45:00
Q. What part of November? 12:45:01
A. I don't recall. We would have -- we would have had dialogue about it in our Denver meeting, so I think -- I really think it started up in November and then, you know, into December. That is my recollection of the time frame. 12:45:03 12:45:04 12:45:06 12:45:12 12:45:14 12:45:17
Q. And that Denver meeting happened after the November 4 board meeting? 12:45:18 12:45:19
A. I believe so. 12:45:21
Q. Well, Mr. State told you what happened at the board meeting in Denver, correct? 12:45:22 12:45:24 12:45:25
A. Yes. 12:45:26
Q. So obviously it happened afterwards, correct? 12:45:27 12:45:29

164

CUTRONE
A. Correct. 12:45:30
Q. Okay. Now, prior to having the substantive talks, were there preliminary talks? 12:45:31 12:45:41 12:45:43
MS. SELTZER: Objection. About the layoffs. 12:45:44 12:45:45
Q. About the layoffs? 12:45:47
A. There -- there were no preliminary talks about layoffs. There was discussions about people's effectiveness, talents, capabilities, who was responsible for what. It was about the lay of the land. There was no talk about layoffs early on. I think that came more of as we went through the planning process, and we saw, you know, business backlog and contributions for next year and who is going to bring in the work and everything. I think that really started to spur the okay, well, this guy is effective. Who does he report to. Who pays for him, that kind of thing. 12:45:49 12:45:51 12:45:54 12:45:58 12:46:00 12:46:04 12:46:05 12:46:08 12:46:11 12:46:13 12:46:15 12:46:17 12:46:20 12:46:24 12:46:27
So it was very interesting and very -- it was a quality process quite 12:46:28 12:46:30

165

CUTRONE
frankly that I think really got the management team to think through capabilities, put longevity aside. Let's talk about capabilities and responsibilities, and out of that came ultimately the group decision on reduction in force. 12:46:33 12:46:35 12:46:38 12:46:43 12:46:45 12:46:46 12:46:50
Q. At what point did you start discussing names? 12:46:51 12:46:53
A. I don't recall. 12:46:54
Q. Was it -- was that part of the substantive talks you referred to? 12:46:55 12:46:57
A. Yes. 12:46:59
Q. Okay. And that was towards the end of November, early December? 12:47:00 12:47:03
A. I don't know, but it was in that time frame. It was November, December. We did the layoffs on January 7 I want to say. So we concluded on our decision, my recollection is we basically concluded prior to the holidays and then clearly decided to wait until after the holidays to make the announcement. So it -- you know, it could have started in Denver and 12:47:05 12:47:06 12:47:09 12:47:11 12:47:15 12:47:17 12:47:18 12:47:20 12:47:23

166

CUTRONE

ended, you know, sometime in, you know, in Denver like mid-November and ended sometime in December, and I would say that is about -- the 30-day window is my memory for when that would have taken place. 12:47:25 12:47:29 12:47:31 12:47:33 12:47:39

Q. Why was Ms. Dembin included in the layoff? 12:47:41 12:47:43

A. Because we were closing the Westport office. 12:47:44 12:47:46

Q. Could she have worked out of another office? 12:47:47 12:47:48

A. Not effectively. It would have been -- 12:47:49 12:47:52

Q. Why? 12:47:52

A. It was simply -- her functions could be reassigned quite easily to personnel at 80 Broad Street. There was no need to have two corporate offices. Joseph worked out of New York. His staff was more than capable to perform the administrative functions on the insurance side. The general counsel, his paralegal could handle the administrative functions on the bonding side. So there was no need 12:47:53 12:47:56 12:47:58 12:48:00 12:48:03 12:48:05 12:48:08 12:48:11 12:48:13 12:48:16

167

CUTRONE

to retain her. 12:48:18

Q. Did you hire anyone else to assume any of her job duties? 12:48:19 12:48:21

A. No. 12:48:23

Q. Could Ms. Dembin have performed her job duties out of the Milford, Connecticut office? 12:48:23 12:48:27 12:48:29

A. No, because she would have been unsupervised. She would have been there by herself. 12:48:30 12:48:32 12:48:35

Q. Where -- which office did Mr. Annarumma work out of? 12:48:35 12:48:37

A. 80 Broad Street. 12:48:39

Q. Didn't -- wasn't -- didn't Ms. Dembin report to Mr. Annarumma while she was in the Westport office? 12:48:40 12:48:42 12:48:45

A. Partially, you know, on the insurance side, yes. 12:48:46 12:48:48

Q. And then how about the bonding side? 12:48:49 12:48:51

A. She reported to Burt. 12:48:51

Q. Well, when -- after Mr. Fried was terminated, who did she report to on the bonding side? 12:48:53 12:48:55 12:48:58

168

CUTRONE

A. Good question. I don't know. Well, it would have been Gregg. 12:48:59 12:49:03

Q. And where was Greg? Where was Mr. DeCarlo? What office did he work out of? 12:49:07 12:49:10 12:49:12

A. He is out of Westport. 12:49:12

Q. And where is he working now? 12:49:13

A. Still out of the Westport office until that lease expires. 12:49:15 12:49:16

Q. And then where is he going to go to? 12:49:18 12:49:21

A. I don't know. 12:49:21

Q. Where do you think he would go to? 12:49:22 12:49:23

MS. SELTZER: I object to the form. 12:49:24 12:49:25

Q. Which office do you think he would work out of? 12:49:25 12:49:26

A. I don't know. We might rent him a suite out of there. We might have relocate to the Milford office. 12:49:28 12:49:30 12:49:32

Q. So this -- to this date is the Westport office open? 12:49:34 12:49:36

A. Yes. 12:49:37

169

CUTRONE

Q. So if Ms. Dembin -- could Ms. Dembin have continued to work out of the Westport office to this day? 12:49:38 12:49:41 12:49:44

A. Physically if the office is there, yes. 12:49:45 12:49:46

Q. And if -- 12:49:47

MR. DATOO: Strike that. 12:49:51

Q. Now, were there any lists that circulated that had names of employees to be laid off? 12:49:52 12:49:59 12:50:01

A. I don't think so. 12:50:02

Q. Were there -- was there a target number of people to be laid off? 12:50:06 12:50:17

A. No. 12:50:19

Q. Was every employee within LVI evaluated for layoff -- for inclusion in the layoff? 12:50:20 12:50:26 12:50:29

A. In effect, yes. 12:50:30

Q. What do you mean by in effect? 12:50:32

A. Well, we constantly evaluate our people. So the group I am talking about is corporate. All right. So corporate being the Westport office, there is 80 Broad Street, and there is Orange, Texas. 12:50:34 12:50:37 12:50:38 12:50:41 12:50:43

170

CUTRONE

There is the Westport office, and there was a change in focus as to how we are going to approach business development, and there was a reassignment of responsibilities and a -- and a reduction in force. 12:50:45 12:50:47 12:50:49 12:50:51 12:50:55 12:50:57

So we said okay. Let's go through whatever we need and not need we will let go. The woman that worked at 80 Broad Street underneath Joseph that handled insurance claims, and we reassigned that responsibility to Gary Thibodeaux in Orange, Texas. We let go of Shari and reassigned her responsibilities to both Greg and Joseph because they were going to take back those responsibilities -- take those responsibilities. The marketing team in the Westport office was let go because that was being shifted underneath Canessa. So it was a very logical, unemotional approach towards reduction in force, and the fact that it happens to be Burt's daughter is irrelevant. 12:50:57 12:50:59 12:51:02 12:51:05 12:51:07 12:51:09 12:51:11 12:51:14 12:51:15 12:51:17 12:51:18 12:51:19 12:51:22 12:51:24 12:51:26 12:51:30 12:51:34 12:51:37

171

CUTRONE

Q. I am sorry? 12:51:38

A. The fact that it happens to be Burt's daughter is irrelevant. 12:51:39 12:51:41

Q. To you? 12:51:42

A. Yeah. 12:51:42

Q. Okay. Were there any employees that worked in the Westport office retained? 12:51:43 12:51:46 12:51:49

A. Other than general counsel and his staff, no. 12:51:50 12:51:54

Q. And who comprises the general counsel's staff? 12:51:55 12:52:00

A. Greg DiCarlo, Tom Cullen, and Jeannie Naggy. 12:52:01 12:52:04

Q. Are they both attorneys? 12:52:05

A. Greg is an -- Tom is an attorney, and Genie is a paralegal. 12:52:07 12:52:09

Q. So Ms. Dembin wasn't laid off because the Westport office closed, wasn't she? 12:52:12 12:52:18 12:52:20

A. Well, it is part and parcel. It was, you know, we are going to close the Westport office, move it out -- reassign responsibilities. So the physical 12:52:20 12:52:23 12:52:24 12:52:27

172

CUTRONE

location had less to do with it than the reassigning of responsibilities, but without Burt there there was no reason to have a Westport office. 12:52:28 12:52:31 12:52:33 12:52:34

Q. Now, well, what about Mr. DiCarlo and his staff? 12:52:36 12:52:39

A. Well, he can -- he can function from anywhere. We just -- we have a lease, so he is staying in the Westport office for the time being. 12:52:40 12:52:44 12:52:46 12:52:48

Q. Now, you testified that you were -- were you constantly evaluating your staff? 12:52:50 12:52:51 12:52:53

A. Uh-huh. 12:52:54

Q. Why is that that Ms. Dembin was not terminated prior to the layoff? 12:52:54 12:52:57

MS. SELTZER: I object to the form of the question. He never testified that he was her report. 12:53:03 12:53:04 12:53:05

MR. DATOO: Sorry. 12:53:10

MS. SELTZER: He didn't supervise Ms. Dembin, if that is what you are alluding to. You just asked him why he didn't terminate Ms. Dembin. 12:53:11 12:53:12 12:53:14 12:53:16

173

CUTRONE

MR. DATOO: No, why wasn't she terminated. 12:53:18 12:53:19

MS. SELTZER: If you know the answer. 12:53:20 12:53:21

A. I don't know. 12:53:21

Q. You don't know. So you just said you were evaluating -- 12:53:22 12:53:24

A. As a company. 12:53:25

Q. -- as a company. 12:53:26

A. So managers are always assigned the responsibility of evaluating their talents, and when I mentioned earlier when the economic downturn hit in '08 and business came down in '09 and '10 we made reductions in force then of all personnel in all companies. It is what we have done in our history. When you grow you build talent, and when you are contracting you have to let go of talent, and sometimes it is good people. 12:53:27 12:53:29 12:53:31 12:53:34 12:53:37 12:53:40 12:53:43 12:53:45 12:53:49 12:53:52 12:53:56

Q. Do you know why Ms. Dembin wasn't laid off in the prior layoff? 12:53:57 12:53:59

A. No, I don't know. 12:54:00

Q. Well, who -- 12:54:02

174

CUTRONE

A. When you say the prior layoff meaning as part of the overall process the company goes through them, we lay people off all the time. 12:54:04 12:54:06 12:54:08 12:54:10

Q. Were you involved in any decisions to lay off prior to the January lay off, January 2011 layoff? 12:54:11 12:54:12 12:54:15

A. In previous corporate layoffs, sure, I was consulted. 12:54:17 12:54:19

Q. And was everyone evaluated for layoff or continued employment? 12:54:21 12:54:25

MS. SELTZER: I object to the form. You mean for each separate one? 12:54:27 12:54:29

MR. DATOO: Yes. 12:54:33

A. I -- I don't know if I understand your question. The -- the company always looks at -- we don't just decide one day okay today is Tuesday. We are going to do evaluation of personnel and decide whether we need layoffs or not. Every manager is tasked with the responsibility to evaluate his talent and retain them or not retain them. That is just SOP. So all I am saying is no 12:54:34 12:54:36 12:54:37 12:54:43 12:54:45 12:54:47 12:54:49 12:54:52 12:54:54 12:54:57

175

CUTRONE

different than historically if there is a need for retrenching of the business and reduction of force we go through that process. Sometimes it is closing an office. We closed Pittsburgh. We closed Seattle. We closed Orlando. You know, we will -- we will close offices and lay off the whole staff. 12:54:59 12:55:01 12:55:02 12:55:04 12:55:06 12:55:08 12:55:11 12:55:13

Q. When was your last layoff -- other other -- prior to the January 2011 layoff, when was your last layoff? 12:55:14 12:55:16 12:55:18 12:55:21

A. When a layoff -- where it was more kind of company wide reevaluation, I want to say we have done several since, you know, '05 because in '05 we had trouble with the banks. In '06, '7, '8, '9, there was plenty of times where we went through a process of this one goes, this one stays, if you will. 12:55:21 12:55:23 12:55:33 12:55:39 12:55:44 12:55:47 12:55:48 12:55:51

Q. And did the decision making procedure in terms of who to lay off vary in any of these other layoffs as compared to the January 2011 layoff? 12:55:53 12:55:55 12:55:58 12:56:01

176

CUTRONE

A. Did the procedure change? 12:56:04

Q. Well, you testified earlier that there was a group decision to determine who to lay off, correct? 12:56:09 12:56:11 12:56:14

A. In this particular case, there were several managers brought in to the discussion, and I think that was smart of Scott because he is new. So he says let's talk about our people. Let's talk about talent, and he was soliciting input from -- from the management to see let's evaluate. Tell me about this one, that one in going through the -- the process. 12:56:16 12:56:20 12:56:24 12:56:25 12:56:28 12:56:29 12:56:33 12:56:34 12:56:36 12:56:38

So there was very much of a group decision for good reason. Prior to that, you know, much of the management team was together for a long time. It probably took on the same process. You know, when we would talk about layoffs Bob and I would talk about okay let's do corporate. I mean I have had conversations with him back in -- okay. I am trying to think when that was. '6, '7 12:56:39 12:56:41 12:56:45 12:56:48 12:56:49 12:56:52 12:56:55 12:56:57 12:57:00 12:57:01

177

CUTRONE

when we first ran into trouble with the banks, we started talking about layoffs. So it would still be a group decision whether it is several managers or whether it is one or two managers, two managers, three managers. It just depends. It depends on the situation. 12:57:03 12:57:05 12:57:07 12:57:10 12:57:12 12:57:14 12:57:16

Q. So what I am -- what I am trying to get at is you were involved in these prior layoff decisions, correct? 12:57:17 12:57:19 12:57:22

A. On occasion, yes. 12:57:24

Q. Okay. And on the occasions that you were involved with these layoff decisions, did Shari's name ever come up? 12:57:26 12:57:28 12:57:30

A. Not that I recall. 12:57:34

Q. Do you know why not? 12:57:38

A. No. 12:57:40

Q. Was Mr. Annarumma involved in these decisions? 12:57:41 12:57:44

A. Probably not. 12:57:45

Q. Why not? 12:57:47

A. He managed a very small group of people, so the decisions usually are within -- when -- for the corporate office 12:57:50 12:57:55 12:58:01

182

CUTRONE

operating level. The 12 people I referred 01:07:53
to were at the corporate level, and that 01:07:55
would include regional managers. So there 01:07:57
was no prescribed number. It was an 01:08:02
evaluation that was concluded on. 01:08:06

Q. Was there a certain target 01:08:08
savings that LVI was hoping to achieve? 01:08:10

A. No. 01:08:13

Q. Did Mr. State ever suggest that 01:08:14
he wanted to save a million dollars by 01:08:19
closing the Westport office? 01:08:21

A. Not that I recall, no. 01:08:23

Q. Okay. 01:08:26

(Continued on next page.) 01:08:26

183

CUTRONE

MR. DATOO: Thank you very 01:08:30
much. 01:08:31

THE VIDEOGRAPHER: We're going 01:08:32
off the record, 1:08 p.m. End of today's 01:08:33
questioning. 01:08:37

(Time noted: 1:08 p.m.) 01:08:39

PAUL CUTRONE

Subscribed and sworn to before me
this day of , 2011

184

C E R T I F I C A T I O N

I, DEBBIE ZAROMATIDIS, a Shorthand Reporter and a Notary Public, do hereby certify that the foregoing witness, PAUL CUTRONE, was duly sworn on the date indicated, and that the foregoing is a true and accurate transcription of my stenographic notes.

I further certify that I am not employed by nor related to any party to this action.

DEBBIE ZAROMATIDIS

185

E X H I B I T S

PLAINTIFF'S

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 44 | E-mail | 84 |
| 45 | E-mail | 95 |
| 46 | E-mail | 99 |