# Exhibit 5

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

No. 10 Civ. 9308(JSR)

----------------------------------------x

BURTON T. FRIED,

                    Plaintiff,

          - against -

LVI SERVICES, INC., LVI PARENT CORP., CODE

HENNESSY SIMMONS, LLC d/b/a CHS PRIVATE

EQUITY V LP; APOLLO INVESTMENT CORP.,

SCOTT E. STATE, in his official and

individual capacities; BRIAN SIMMONS, in

his official and individual capacities;

RAJAY BAGARIA, in his official and

individual capacities; GERALD J. GIRARDI,

in his official and individual capacities,

                    Defendants.

----------------------------------------x

                    May 23, 2011
                    2:39 p.m.

c9dfbb84-ebd6-4083-b8a8-7b260e306ed0

Page 2

```
 1
 2
 3
 4        VIDEOTAPE DEPOSITION of GERALD
 5   GIRARDI, taken by the Plaintiff, pursuant
 6   to Notice, held at the offices of Thompson
 7   Wigdor & Gilly, LLP, 85 Fifth Avenue, New
 8   York, New York, before Debbie Zaromatidis,
 9   a Shorthand Reporter and Notary Public of
10   the State of New York.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1
 2        S T I P U L A T I O N S
 3
 4        IT IS HEREBY STIPULATED AND
 5   AGREED by and between the Attorneys for
 6   the respective parties hereto that filing
 7   and sealing be and the same are hereby
 8   waived.
 9        IT IS FURTHER STIPULATED AND
10   AGREED that all objections except as to
11   the form of the question, shall be
12   reserved to the time of the trial.
13        IT IS FURTHER STIPULATED AND
14   AGREED that the within examination may be
15   signed and sworn to before any notary
16   public with the same force and effect as
17   though signed and sworn to before this
18   Court.
19
20
21
22
23
24
25
```

Page 3

```
 1
 2   A P P E A R A N C E S :
 3
 4   THOMPSON WIGDOR & GILLY, LLP
 5   Attorneys for Plaintiff
 6        85 Fifth Avenue
 7        New York, New York 10003
 8   BY:  SHAFFIN A. DATOO, ESQ.
 9        MATTHEW GORMAN, ESQ.
10
11   SIDLEY AUSTIN, LLP
12   Attorneys for Defendants
13        787 Seventh Avenue
14        New York, New York 10019
15   BY:  JOANNE SELTZER, ESQ.
16
17
18   ALSO PRESENT:
19   BURTON FRIED
20   J.D. MARTINEZ, Videographer
21
22
23
24
25
```

Page 5

```
 1
 2        THE VIDEOGRAPHER:  We are on      02:39:00
 3   the record.  My name is J.D. Martinez of   02:39:00
 4   Veritext New York.  The date today is May  02:39:04
 5   23, 2011.  The time on the video monitor   02:39:05
 6   is 2:39 p.m.  This deposition is being      02:39:09
 7   held at the offices of Thompson Widjor &    02:39:13
 8   Gilly, LLP located at 85 Fifth Avenue, New  02:39:17
 9   York, New York.                             02:39:20
10        The caption of this case is            02:39:20
11   Burton T. Fried versus LVI Services, Inc.,  02:39:22
12   et al., filed in the United States          02:39:27
13   District Court, Southern District of New    02:39:29
14   York.  The name of the witness is Gerald    02:39:31
15   Girardi.                                    02:39:33
16        At this time the attorneys will        02:39:34
17   identify themselves and the parties they    02:39:35
18   represent after which our court reporter,   02:39:38
19   Debbie, will swear in the witness.          02:39:41
20        MS. SELTZER:  Joanne Seltzer           02:39:41
21   for Sidley Austin, LLP representing the     02:39:42
22   defendants.                                 02:39:45
23        MR. DATOO:  Shaffin Datoo for          02:39:47
24   Thompson Widgor & Gilly representing the    02:39:47
25   plaintiff Burton T. Fried.                  02:39:48
```

                              2 (Pages 2 to 5)

VERITEXT REPORTING COMPANY

212-267-6868                                    516-608-2400

c9dfbb84-ebd6-4083-b8a8-7b260e306ed0

Page 6

| | | |
|---|---|---|
| 1 | GIRARDI | |
| 2 | G E R A L D  J.  G I R A R D I, | 02:39:50 |
| 3 | having first been duly sworn by a Notary | 02:39:50 |
| 4 | Public of the State of New York, was | 02:39:50 |
| 5 | examined and testified as follows: | 02:39:50 |
| 6 | EXAMINATION BY MR. DATOO: | 02:39:58 |
| 7 | Q.  Good afternoon, Mr. Girardi.  As | 02:39:58 |
| 8 | I just mentioned, my name is Shaffin | 02:40:01 |
| 9 | Datoo.  To my left is my colleague Matthew | 02:40:04 |
| 10 | Gorman.  We represent Mr. Fried in this | 02:40:07 |
| 11 | matter. | 02:40:09 |
| 12 | I am going to ask you a bunch of | 02:40:09 |
| 13 | questions today, and if your attorney does | 02:40:12 |
| 14 | not direct you not to answer, hopefully | 02:40:15 |
| 15 | you can answer all of them today. | 02:40:19 |
| 16 | I am going to start off with | 02:40:21 |
| 17 | some preliminary questions.  Is your | 02:40:23 |
| 18 | ability to tell the truth in any way | 02:40:25 |
| 19 | impaired today? | 02:40:26 |
| 20 | A.  No. | 02:40:27 |
| 21 | Q.  Do you understand that the | 02:40:27 |
| 22 | answers you are about to give are under | 02:40:28 |
| 23 | oath? | 02:40:31 |
| 24 | A.  Yes. | 02:40:31 |
| 25 | Q.  And that you are subject to | 02:40:31 |

Page 7

| | | |
|---|---|---|
| 1 | GIRARDI | |
| 2 | penalties of perjury if you give an | 02:40:33 |
| 3 | untruthful answer? | 02:40:36 |
| 4 | A.  Yes. | 02:40:37 |
| 5 | Q.  I am going to assume that if you | 02:40:38 |
| 6 | answer a question that you understood it. | 02:40:39 |
| 7 | If you don't understand a question, let me | 02:40:40 |
| 8 | know, and I will ask the question a | 02:40:42 |
| 9 | different way.  Please give verbal answers | 02:40:44 |
| 10 | to my questions.  If you nod your head or | 02:40:45 |
| 11 | shake it, the video will be able to pick | 02:40:48 |
| 12 | it up, but the court reporter won't. | 02:40:51 |
| 13 | A.  Okay. | 02:40:54 |
| 14 | Q.  If you need a break, let me | 02:40:54 |
| 15 | know.  The only condition I have is that | 02:40:56 |
| 16 | you answer the last question asked. | 02:40:58 |
| 17 | A.  Okay. | 02:40:59 |
| 18 | Q.  Now, in connection with this | 02:41:00 |
| 19 | lawsuit, did you provide your attorneys | 02:41:02 |
| 20 | with all responsive documents? | 02:41:04 |
| 21 | A.  Yes. | 02:41:05 |
| 22 | Q.  And where did you look to find | 02:41:06 |
| 23 | these documents? | 02:41:07 |
| 24 | A.  In Apollo's files electronic and | 02:41:08 |
| 25 | physical. | 02:41:16 |

Page 8

| | | |
|---|---|---|
| 1 | GIRARDI | |
| 2 | Q.  Do you have any -- do you have a | 02:41:16 |
| 3 | personal e-mail account? | 02:41:18 |
| 4 | A.  I do. | 02:41:19 |
| 5 | Q.  Did you look in your personal | 02:41:19 |
| 6 | e-mail account for any documents? | 02:41:21 |
| 7 | A.  There would be no LVI files in | 02:41:22 |
| 8 | my personal e-mail account.  I -- I didn't | 02:41:25 |
| 9 | look in them -- in my personal e-mail | 02:41:29 |
| 10 | account. | 02:41:31 |
| 11 | Q.  Did you review any documents you | 02:41:31 |
| 12 | had at home? | 02:41:34 |
| 13 | A.  No.  I -- LVI documents may have | 02:41:35 |
| 14 | been sent to my personal e-mail account, | 02:41:38 |
| 15 | loan documents, things of that nature, | 02:41:42 |
| 16 | and -- but in terms of this deposition | 02:41:44 |
| 17 | they are all on my work e-mail account | 02:41:47 |
| 18 | because I send it from my Blackberry. | 02:41:50 |
| 19 | Q.  Have you ever been sued before? | 02:41:55 |
| 20 | A.  No. | 02:41:56 |
| 21 | Q.  Other than this lawsuit, has | 02:41:56 |
| 22 | anyone ever accused you of discrimination? | 02:41:57 |
| 23 | A.  No. | 02:41:59 |
| 24 | Q.  Have you ever given any sworn | 02:42:00 |
| 25 | testimony before? | 02:42:03 |

Page 9

| | | |
|---|---|---|
| 1 | GIRARDI | |
| 2 | A.  No. | 02:42:03 |
| 3 | Q.  Did you do anything to prepare | 02:42:05 |
| 4 | for this deposition? | 02:42:10 |
| 5 | A.  I met with my attorney. | 02:42:11 |
| 6 | Q.  How many times? | 02:42:13 |
| 7 | A.  We met once last week. | 02:42:14 |
| 8 | Q.  And for how long? | 02:42:18 |
| 9 | A.  A couple of hours. | 02:42:19 |
| 10 | Q.  And did you review any documents | 02:42:20 |
| 11 | in preparing for this deposition? | 02:42:22 |
| 12 | A.  Yes, we did. | 02:42:23 |
| 13 | Q.  How many approximately? | 02:42:24 |
| 14 | A.  We had a binder full of | 02:42:26 |
| 15 | documents that are probably 40, 50 tabs in | 02:42:29 |
| 16 | it.  40 tabs of information. | 02:42:32 |
| 17 | Q.  And did you read Mr. Fried's | 02:42:35 |
| 18 | deposition transcript prior to testifying | 02:42:37 |
| 19 | today? | 02:42:39 |
| 20 | A.  I did not read his deposition | 02:42:39 |
| 21 | transcript, no. | 02:42:41 |
| 22 | Q.  Did you read any excerpts or | 02:42:42 |
| 23 | summaries from his deposition transcript? | 02:42:44 |
| 24 | A.  No. | 02:42:47 |
| 25 | Q.  Mr. Girardi, how old are you? | 02:42:47 |

3 (Pages 6 to 9)

Page 10

```
 1            GIRARDI
 2    A.  Fifty-one.              02:42:49
 3    Q.  And what is your date of birth?  02:42:50
 4    A.  10/8/59.                02:42:52
 5    Q.  And do you know the plaintiff in  02:42:54
 6  this lawsuit, Mr. Fried?       02:43:02
 7    A.  Yes, I do.              02:43:03
 8    Q.  How so?                 02:43:04
 9    A.  Professionally from our  02:43:05
10  investment in LVI.            02:43:07
11    Q.  When you say our, do you mean  02:43:08
12  Apollo?                       02:43:09
13    A.  Apollo, yes.            02:43:10
14    Q.  And do you know how old Mr.  02:43:11
15  Fried is?                     02:43:13
16    A.  I know from reading his  02:43:13
17  complaint that he is 70.       02:43:15
18    Q.  Okay.  Prior to reading his  02:43:16
19  complaint --                  02:43:18
20    A.  I had no idea how old he was.  02:43:18
21    Q.  How old did you think he was?  02:43:20
22    A.  I figured he was older than me.  02:43:23
23    Q.  How much older?         02:43:24
24        MS. SELTZER:  Objection.  You  02:43:26
25  can answer.                   02:43:27
```

Page 11

```
 1            GIRARDI
 2    A.  I had no idea to be honest with  02:43:27
 3  you.                          02:43:30
 4    Q.  Okay.  In 2010, November of 2010  02:43:30
 5  what company did Mr. Fried work for?  02:43:33
 6    A.  He worked for LVI as far as I  02:43:35
 7  know.                         02:43:39
 8    Q.  LVI Parent or LVI Services?  02:43:39
 9    A.  The distinction isn't that  02:43:45
10  important to me frankly.  We were an  02:43:47
11  investor in LVI Services.  I felt he was  02:43:48
12  an employee of LVI Services.  If he was an  02:43:51
13  employee of the Parent, I honestly don't  02:43:55
14  know.                         02:43:57
15    Q.  Do you know what his job title  02:43:57
16  was?                          02:43:58
17    A.  He was the interim CEO up until  02:43:59
18  the restructuring.  Then he was going to  02:44:02
19  be the chairman of the board of the  02:44:06
20  company.                      02:44:07
21    Q.  Okay.  And are you currently  02:44:07
22  employed?                     02:44:11
23    A.  I am.                   02:44:11
24    Q.  Full time?              02:44:12
25    A.  Yes, I am.              02:44:13
```

Page 12

```
 1            GIRARDI
 2    Q.  And where do you work?   02:44:13
 3    A.  For Apollo Investment Corp.  02:44:15
 4    Q.  And how long have you worked  02:44:17
 5  there?                        02:44:18
 6    A.  I have been there for just over  02:44:18
 7  three years.                  02:44:21
 8    Q.  And where were you prior to  02:44:21
 9  Apollo?                       02:44:23
10    A.  CIBC.                   02:44:23
11    Q.  And do you work in the New York  02:44:26
12  office of Apollo?             02:44:29
13    A.  I work in the New York office,  02:44:30
14  yes.                          02:44:32
15    Q.  And what is your current job  02:44:32
16  title at Apollo?              02:44:34
17    A.  Principal.             02:44:35
18    Q.  And how long have you held that  02:44:41
19  title?                        02:44:42
20    A.  Three years.            02:44:42
21    Q.  And what are your job duties?  02:44:43
22    A.  I work for our mezzanine debt  02:44:45
23  fund.  My primary responsibility is to  02:44:49
24  work on problem credits, workouts, and  02:44:51
25  restructuring.                02:44:53
```

Page 13

```
 1            GIRARDI
 2    Q.  Now, are you familiar with a  02:44:54
 3  company called LVI Parent Corp.?  02:44:55
 4    A.  I -- yes.               02:44:57
 5    Q.  How so?                 02:44:59
 6    A.  It's the parent corp. of LVI  02:44:59
 7  Services.  Again, the distinction is not  02:45:03
 8  that important to me.          02:45:05
 9    Q.  It is to me, so I am --   02:45:07
10    A.  Okay.                   02:45:09
11    Q.  -- asking you questions --  02:45:10
12    A.  Sure.                   02:45:11
13    Q.  -- about specific LVI entities.  02:45:12
14        What does LVI Parent do?  02:45:14
15    A.  Nothing that I am aware of.  02:45:16
16    Q.  Is it a holding company?  02:45:19
17    A.  I believe so, but I am not a  02:45:23
18  hundred percent sure.          02:45:24
19    Q.  Who owns LVI Parent?     02:45:25
20    A.  Today I believe our investment  02:45:27
21  is at the LVI Parent level, although I  02:45:30
22  have to go back and refer to documents to  02:45:34
23  make sure, but I -- I couldn't say for  02:45:35
24  sure.                         02:45:37
25    Q.  Are you saying that Apollo is an  02:45:38
```

4  (Pages 10 to 13)

VERITEXT REPORTING COMPANY

212-267-6868

516-608-2400

c9dfbb84-ebd6-4083-b8a8-7b260e306ed0

Page 18

```
1          GIRARDI
2  new lines of business, and things of that  02:49:24
3  nature primarily.                      02:49:28
4     Q.   How about personnel decisions?  02:49:29
5     A.   At a certain level based on our  02:49:31
6  investment agreement, yes, certain      02:49:34
7  personnel decisions are undertaken by the  02:49:36
8  board.                                 02:49:38
9     Q.   And what level?               02:49:38
10     A.   I believe it is a handful of the  02:49:39
11  executives.                           02:49:41
12     Q.   Is -- would the chairman be one  02:49:42
13  of those executives?                   02:49:44
14     A.   I believe in our investment     02:49:45
15  agreement there is -- the chairman was one  02:49:47
16  of the decisions that was at the board  02:49:51
17  level, yes.                           02:49:53
18     Q.   Okay.  What is LVI Acquisition  02:49:54
19  Corp.?                                02:49:58
20     A.   Again, the distinction isn't    02:49:58
21  that important to me.  It was an       02:50:01
22  intermediate holding company that was  02:50:04
23  formed I believe when the original     02:50:05
24  acquisition from Code was made in 2005.  02:50:08
25     Q.   Does LVI Parent have any        02:50:13
```

Page 19

```
1          GIRARDI
2  employees?                            02:50:15
3     A.   I am not sure.                 02:50:15
4     Q.   Does LVI Parent have any        02:50:18
5  officers?                             02:50:21
6     A.   I am not sure.                 02:50:21
7     Q.   Does LVI Parent own any assets?  02:50:24
8     A.   I don't really know.           02:50:26
9     Q.   Does LVI Parent have any        02:50:29
10  offices?                              02:50:31
11     A.   I don't believe so.  I don't   02:50:32
12  know.                                 02:50:35
13     Q.   Where is LVI Parent            02:50:36
14  headquartered?                        02:50:39
15     A.   LVI is headquartered in New    02:50:40
16  York.  I am not sure if LVI Parent shares  02:50:43
17  the same offices.                     02:50:45
18     Q.   Okay.  Does LVI Parent have any  02:50:46
19  subsidiaries?                         02:50:49
20     A.   I assume that they do,         02:50:50
21  but -- LVI Services being one.  I couldn't  02:50:53
22  tell you the others.                  02:50:55
23     Q.   Do you know if LVI Services is a  02:50:56
24  wholly-owned subsidiary?              02:51:00
25     A.   I believe it is.              02:51:02
```

Page 20

```
1          GIRARDI
2     Q.   Of LVI Parent?                 02:51:03
3     A.   I -- I will assume it is, but I  02:51:04
4  am not a hundred percent sure.         02:51:08
5     Q.   Okay.  And what does LVI        02:51:09
6  Services do?                          02:51:11
7     A.   Remediation and demolition     02:51:12
8  services primarily as well as emergency  02:51:15
9  response business.                    02:51:18
10     Q.   And do you -- do you know the   02:51:19
11  relationship between LVI Parent and LVI  02:51:22
12  Services or whichever company is the   02:51:26
13  parent of LVI Services?               02:51:27
14     A.   I am not sure I understand the  02:51:29
15  question.                             02:51:30
16     Q.   Do you know -- is there a      02:51:31
17  relationship between the parent company of  02:51:32
18  LVI Services and LVI Services?         02:51:35
19     A.   I assume there is, yes.        02:51:37
20     Q.   Do you know what that          02:51:39
21  relationship is?                      02:51:40
22     A.   There is a parent holding      02:51:41
23  company and an operating company.      02:51:43
24     Q.   Okay.  When were you appointed  02:51:45
25  to the board of directors?            02:51:50
```

Page 21

```
1          GIRARDI
2     A.   October 8 when the deal closed.  02:51:51
3  October 8, 2010 when the transaction    02:51:54
4  closed when we became an owner.        02:51:56
5     Q.   Now, prior to your appointment  02:51:58
6  to the board, were you involved in any way  02:52:01
7  with LVI Parent or LVI Services?       02:52:02
8     A.   We were an investor, and so we  02:52:05
9  were involved as an investor.  Yes.    02:52:07
10     Q.   And can you give me examples of  02:52:09
11  how investors would be involved or how you  02:52:11
12  were involved as an investor?          02:52:14
13     A.   As a mezzanine investor we     02:52:15
14  attended board meetings as observers, so  02:52:18
15  we were allowed to sit in on board     02:52:21
16  meetings and listen to what was discussed.  02:52:23
17  We didn't have a vote.  We were there  02:52:26
18  purely to observe, and, you know, as any  02:52:28
19  investor we would follow up with        02:52:31
20  questions.  We would discuss how the   02:52:33
21  business was doing periodically with the  02:52:38
22  management team, mainly the CFO Paul   02:52:41
23  Cutrone.                              02:52:43
24     Q.   And when did you start sitting  02:52:44
25  in on these board meetings?            02:52:45
```

6 (Pages 18 to 21)

c9dfbb84-ebd6-4083-b8a8-7b260e306ed0

Page 26

```
1            GIRARDI
2   that is still -- if that is still the      02:56:00
3   -- the fact, then, yes, they would have a  02:56:04
4   Milford and a Westport office.             02:56:07
5      Q.   And do you know if there are any   02:56:09
6   employees working out of the Westport      02:56:11
7   office currently?                          02:56:13
8      A.   I'm not sure.                       02:56:14
9      Q.   Now, prior to 2006, do you know    02:56:15
10  what Mr. Fried's job title at LVI Services 02:56:17
11  was?                                       02:56:20
12     A.   Prior to 2006?                     02:56:21
13     Q.   Yes.                               02:56:22
14     A.   In 2005 I believe Burt was the    02:56:23
15  CEO.                                       02:56:29
16     Q.   Okay.  And do you know how long    02:56:30
17  he was CEO for?                            02:56:32
18     A.   No.                                02:56:33
19     Q.   And do you know what his job       02:56:34
20  duties were as CEO?                        02:56:35
21     A.   No.                                02:56:37
22     Q.   Do you know what his work          02:56:38
23  performance was like as CEO?               02:56:39
24     A.   No.                                02:56:41
25     Q.   Now, during the time he was CEO,  02:56:42
```

Page 27

```
1            GIRARDI
2   do you know how LVI Services was doing     02:56:48
3   financially?                               02:56:50
4        MS. SELTZER:  I object to the         02:56:52
5   form, but you can answer.                  02:56:52
6      A.   Up until 2005 the company had      02:56:54
7   been performing well.  That is the time    02:56:58
8   that -- that was at the time of the Code   02:57:00
9   Hennessy buyout.  Burt was replaced as CEO 02:57:04
10  in 2006 by Bob McNamara.  In early 2006,   02:57:06
11  up until the time McNamara came on board   02:57:13
12  the company began to underperform, and it  02:57:16
13  has continued to underperform ever since.  02:57:21
14     Q.   To this date?                      02:57:23
15     A.   Yes.                               02:57:23
16     Q.   Now, you testified that Mr.        02:57:24
17  McNamara became CEO in 2006, correct?      02:57:34
18     A.   Sometime in 2006.  Right.          02:57:37
19     Q.   Okay.  Do you know why he became   02:57:39
20  the CEO of LVI Services?                   02:57:42
21        MS. SELTZER:  I object to the        02:57:44
22  form.                                      02:57:45
23     A.   No.                                02:57:46
24     Q.   And do you know when he became     02:57:48
25  CEO?                                       02:57:56
```

Page 28

```
1            GIRARDI
2      A.   When?                              02:57:56
3      Q.   Yes.                               02:57:57
4      A.   I don't remember the exact date,  02:57:57
5   no.                                        02:57:59
6      Q.   Okay.  And do you know how long    02:57:59
7   Mr. McNamara was CEO of LVI Services?      02:58:01
8      A.   From sometime in 2006 until        02:58:04
9   March or April of 2010.                    02:58:07
10     Q.   Okay.  And during the time that    02:58:09
11  Mr. McNamara was CEO, do you know what Mr. 02:58:11
12  Fried's job title was?                     02:58:15
13     A.   I believe he was chairman.         02:58:17
14     Q.   Chairman of the board or           02:58:19
15  chairman at LVI Services?                  02:58:23
16     A.   I believe he was the chairman of  02:58:25
17  the board of LVI.  Again, whether it was   02:58:27
18  LVI Services or Parent, that distinction   02:58:29
19  can't -- I can't testify to that.          02:58:32
20     Q.   Was he also an employee of LVI     02:58:34
21  Services?                                  02:58:37
22     A.   I'm not sure.                       02:58:37
23     Q.   How often did you interact with    02:58:38
24  Mr. Fried while he was chairman?           02:58:43
25     A.   Infrequently.                      02:58:45
```

Page 29

```
1            GIRARDI
2      Q.   How often would that be?           02:58:46
3      A.   At --                              02:58:49
4      Q.   How infrequent --                  02:58:50
5      A.   At the board meetings primarily.   02:58:52
6      Q.   So about four times a year?        02:58:54
7      A.   Probably.                          02:58:56
8      Q.   And do you know what Mr. Fried's   02:58:56
9   job duties were during the time that he    02:58:58
10  was chairman while Mr. McNamara was the    02:58:59
11  CEO?                                       02:59:02
12     A.   No.                                02:59:02
13     Q.   Now, while Mr. Fried was the       02:59:03
14  chairman and Mr. McNamara was the CEO, do  02:59:11
15  you have any knowledge about the quality   02:59:18
16  of his work performance?                   02:59:19
17     A.   As measured by -- in what terms?   02:59:21
18     Q.   Was he doing a good job?           02:59:26
19     A.   The company performed miserably,   02:59:28
20  so I would have to assume that he wasn't   02:59:31
21  doing a good job.                          02:59:34
22     Q.   Why would you say assume that?     02:59:34
23     A.   Because the company performed      02:59:36
24  terribly and we ultimately had to          02:59:38
25  restructure, so I would assume that the    02:59:40
```

8  (Pages 26 to 29)

Page 30

GIRARDI

1
2  entire management team underperformed    02:59:42
3  including Burt during that time.    02:59:44
4      Q.  Well, you just testified that    02:59:45
5  you didn't know what Mr. Fried's job    02:59:47
6  duties were, didn't you?    02:59:49
7      A.  I did.    02:59:50
8      Q.  So how do you --    02:59:50
9      A.  Well, you asked me about his    02:59:52
10  performance.    02:59:54
11      Q.  I didn't ask about the company's  02:59:54
12  performance.  I asked about Mr. Fried's    02:59:56
13  performance.    02:59:58
14          MS. SELTZER:  I object to the    02:59:59
15  form.  Is there a question?    02:59:59
16      Q.  The question -- the question    03:00:01
17  stands.  Do you have any --    03:00:02
18      A.  Read -- please repeat the    03:00:03
19  question.    03:00:05
20      Q.  Do you have any knowledge of --  03:00:06
21  while Mr. McNamara was the CEO, do you    03:00:07
22  have any personal knowledge of Mr. Fried's  03:00:10
23  work performance as chairman?    03:00:12
24      A.  I would measure work performance  03:00:15
25  based on the performance of the company.    03:00:16

Page 31

GIRARDI

1
2  The company performed miserably during    03:00:18
3  that period of time.    03:00:21
4      Q.  Okay.  And while Mr. McNamara    03:00:22
5  was CEO, did you have any conversations or  03:00:29
6  e-mail communications about Mr. Fried's    03:00:31
7  duties or his role at LVI with anyone?    03:00:34
8      A.  While Mr. McNamara was --    03:00:38
9      Q.  Yes.    03:00:40
10      A.  I don't believe so.  Not to my    03:00:41
11  recollection.    03:00:43
12      Q.  Now, did there come a time when  03:00:43
13  Mr. McNamara resigned?    03:00:48
14      A.  Yes.  He resigned in either    03:00:50
15  March or April of 2010.    03:00:53
16      Q.  Do you know why?    03:00:54
17      A.  He got another job.    03:00:55
18      Q.  And after Mr. McNamara resigned,  03:00:57
19  who assumed his job duties?    03:01:01
20      A.  Burt Fried.    03:01:03
21      Q.  Do you know why?    03:01:05
22      A.  Code Hennessy asked him to    03:01:06
23  assume the job duties.  They were the    03:01:10
24  owner of the business at the time.    03:01:12
25      Q.  Do you know why they asked him?  03:01:13

Page 32

GIRARDI

1
2      A.  Not really.    03:01:15
3      Q.  And do you know who from Code    03:01:16
4  Hennessy asked him?    03:01:19
5      A.  I don't know specifically.    03:01:20
6      Q.  And what job duties did Mr.    03:01:22
7  Fried assume?    03:01:27
8      A.  I don't know what his specific    03:01:27
9  job duties were.  He was the interim CEO    03:01:30
10  of the business though.    03:01:32
11      Q.  Do you know if he -- excuse me.    03:01:33
12  Do you know if he kept his job duties as    03:01:35
13  chairman as well?    03:01:37
14      A.  I didn't know what his job    03:01:38
15  duties were as chairman, so I couldn't    03:01:40
16  answer that.    03:01:42
17      Q.  Okay.  Now, while Mr. Fried was  03:01:43
18  the interim CEO, do you have personal    03:01:46
19  knowledge of the quality of his work    03:01:54
20  performance?    03:01:55
21      A.  As measured how?    03:01:56
22      Q.  As measured by his executing his  03:01:57
23  job duties.    03:02:00
24      A.  I wasn't -- I don't have a list  03:02:02
25  of his job duties, so I can't really    03:02:04

Page 33

GIRARDI

1
2  answer that.  But again if you are    03:02:07
3  measured by the performance of the    03:02:09
4  business, the business continued to    03:02:10
5  underperform.    03:02:12
6      Q.  Okay.  So it didn't get any    03:02:12
7  better?    03:02:19
8      A.  It got worse.    03:02:19
9      Q.  And did the economy have    03:02:20
10  anything to do with that?    03:02:22
11      A.  The economy certainly had    03:02:23
12  something to do with it, yes.    03:02:26
13      Q.  Okay.  Do you know how LVI's    03:02:28
14  competitors were doing during that same    03:02:30
15  period of time?    03:02:33
16      A.  I don't have a good sense.    03:02:34
17      Q.  Now, while Mr. Fried was the    03:02:40
18  interim CEO, did you have any    03:02:41
19  conversations or e-mail communications    03:02:43
20  with anyone about Mr. Fried's job duties    03:02:45
21  or his role at LVI?    03:02:47
22          MS. SELTZER:  I am sorry.    03:02:51
23  During what period?    03:02:52
24          MR. DATOO:  While Mr. Fried was  03:02:55
25  the interim CEO.    03:02:56

VERITEXT REPORTING COMPANY

212-267-6868                                                        516-608-2400

c9dfbb84-ebd6-4083-b8a8-7b260e306ed0

Page 38

```
1            GIRARDI
2    2010.                      03:06:42
3      Q.   And do you know who made the    03:06:46
4    decision to hire Mr. State?            03:06:48
5      A.   It was made by the owners at the  03:06:49
6    time, Code Hennessy.          03:06:51
7      Q.   Did you participate in the    03:06:52
8    decision to hire him?          03:06:53
9      A.   We were asked to interview him  03:06:54
10   as prospective owners, and so we      03:06:57
11   interviewed the candidate, and we told  03:06:59
12   Code that we thought he was a good    03:07:01
13   candidate.                03:07:03
14     Q.   And when you say "we," are you  03:07:04
15   referring to --              03:07:06
16     A.   Myself and Rajay Bagaria.    03:07:07
17     Q.   And did you recommend his hire?  03:07:11
18     A.   I don't recall that we      03:07:13
19   recommended or not.  We told them that we  03:07:14
20   thought he was a good candidate.      03:07:16
21     Q.   Did you interview any other    03:07:18
22   candidates?              03:07:20
23     A.   I did not, no.          03:07:20
24     Q.   Do you know if Mr. Bagaria did?  03:07:21
25     A.   I don't believe he did.      03:07:23
```

Page 39

```
1            GIRARDI
2      Q.   Do you know when Mr. State    03:07:25
3    actually started working for LVI?      03:07:26
4      A.   I think it was September of 2010  03:07:28
5    although I can't be sure.          03:07:31
6      Q.   Okay.  Now, after Mr. State was  03:07:32
7    hired, did Mr. Fried's job title change?  03:07:34
8      A.   He became chairman of the board.  03:07:37
9      Q.   And was he still an employee of  03:07:41
10   LVI Services?              03:07:43
11     A.   I don't know what the        03:07:44
12   distinction is, so I can't answer that.  03:07:45
13     Q.   Okay.  Do you know what      03:07:47
14   his -- what his job duties were as    03:07:49
15   chairman of the board?          03:07:51
16     A.   No.                03:07:51
17     Q.   Now, after Mr. Fried became    03:07:52
18   chairman of the board under Scott State,  03:08:02
19   do you have any personal knowledge as to  03:08:05
20   the quality of Mr. Fried's work      03:08:07
21   performance?              03:08:09
22     A.   No.                03:08:10
23     Q.   Okay.  Now, prior to Mr. State's  03:08:10
24   hire, did you ever think about firing Mr.  03:08:15
25   Fried?                  03:08:18
```

Page 40

```
1            GIRARDI
2      A.   No.                03:08:18
3      Q.   Now, after Mr. State was hired,  03:08:20
4    did there come a time when Mr. State began  03:08:28
5    taking away Mr. Fried's job duties?    03:08:31
6      MS. SELTZER:  I object to the    03:08:34
7    form.                  03:08:36
8      A.   I -- yes.  I think -- I don't    03:08:36
9    understand that question.        03:08:40
10     Q.   Did Mr. Fried have any job    03:08:41
11   duties as chairman?          03:08:44
12     A.   I told you I don't -- I don't    03:08:45
13   know what his job duties as chairman were.  03:08:48
14     Q.   Okay.  Do you know if Mr. Fried  03:08:50
15   was performing any work as chairman?    03:08:55
16     A.   I don't really know what he was  03:08:57
17   doing as chairman.            03:09:00
18     Q.   Okay.  Did you attend a meeting  03:09:01
19   on October 19, 2010 between Mr. State and  03:09:08
20   Mr. Fried?                03:09:11
21     A.   I don't recall.          03:09:12
22     Q.   Do you know if they met that    03:09:14
23   day?                  03:09:16
24     A.   I don't recall.  I don't know.  03:09:16
25     Q.   Did Mr. Fried ever tell you that  03:09:20
```

Page 41

```
1            GIRARDI
2    Mr. State made a comment about his age?  03:09:23
3      A.   Mr. State, yes.          03:09:26
4      Q.   And when did Mr. Fried tell you  03:09:34
5    that?                  03:09:36
6      A.   Mr. Fried didn't tell me that.  03:09:36
7    Mr. State mentioned that Burt took      03:09:38
8    exception to something that he said    03:09:40
9    offhand about his age, yes.        03:09:41
10     Q.   And do you recall --        03:09:43
11     A.   I don't remember whether it was  03:09:44
12   the October 19 meeting or not.      03:09:45
13     Q.   And do you recall when Mr. State  03:09:47
14   told you that?              03:09:49
15     A.   No.                03:09:49
16     Q.   And do you know was it before or  03:09:50
17   after the -- the November -- your first    03:09:51
18   board meeting?              03:09:56
19     A.   It was probably just prior to    03:09:57
20   the November board meeting.        03:09:58
21     Q.   And what did Mr. State tell you?  03:09:59
22     A.   He said that Burt is threatening  03:10:01
23   an age discrimination suit if he doesn't  03:10:04
24   have his job duties restored.  I didn't    03:10:07
25   know what his job duties were.      03:10:10
```

11  (Pages 38 to 41)

VERITEXT REPORTING COMPANY

212-267-6868                        516-608-2400

Page 42

```
1              GIRARDI
2   Subsequently an e-mail was produced with a  03:10:12
3   long list of job duties that Mr. Fried    03:10:14
4   suggested were his duties that he would    03:10:17
5   continue to perform.              03:10:22
6      Q.   Did Mr. State tell you what    03:10:23
7   comment he made about Mr. Fried's age?    03:10:24
8      A.   I don't remember exactly what it  03:10:27
9   was.                    03:10:29
10     Q.   Do you know why Mr. State told    03:10:29
11  you he made a comment about Mr. Fried's  03:10:33
12  age?                    03:10:36
13     A.   Because Burt -- Burt was      03:10:36
14  threatening to make it an issue at the    03:10:38
15  board meeting. So we should be aware of  03:10:39
16  it.                      03:10:43
17     Q.   But you don't remember what he    03:10:43
18  said?                    03:10:45
19     A.   I --                03:10:47
20     Q.   The comment.            03:10:48
21     A.   I don't remember exactly what he  03:10:49
22  said.                    03:10:50
23     Q.   Do you remember what your      03:10:51
24  reaction was to that comment?        03:10:52
25     A.   I thought it was overstating the  03:10:53
```

Page 43

```
1              GIRARDI
2   case.                    03:10:55
3      Q.   What was?              03:10:55
4      A.   I thought Burt was out of line    03:10:58
5   and that he was wrong and that Scott meant  03:11:00
6   no malice, and there was nothing to it.    03:11:04
7      Q.   Did you speak to Mr. Fried --    03:11:06
8      A.   I did not.            03:11:07
9      Q.   Okay.              03:11:08
10        -- about that comment?        03:11:13
11     A.   No.                03:11:13
12     Q.   Did you speak to Mr. Fried about  03:11:14
13  the discussion that he had with Mr. State  03:11:16
14  that day in which the comment came out    03:11:17
15  from?                    03:11:19
16     A.   I didn't.            03:11:20
17     Q.   Okay. Did Mr. Fried ever tell    03:11:21
18  you that Mr. State made a comment about    03:11:31
19  him?                    03:11:34
20     A.   Never.              03:11:34
21     Q.   Did he tell you at your first    03:11:35
22  board meeting that Mr. State made a      03:11:37
23  comment about his age?          03:11:38
24     A.   In the session after the formal  03:11:40
25  board meeting, Mr. Fried made a speech,    03:11:42
```

Page 44

```
1              GIRARDI
2   and, yes, that was mentioned.      03:11:45
3      Q.   That was during the board    03:11:47
4   meeting?                03:11:49
5      A.   It was not during a formal board  03:11:49
6   meeting.                03:11:52
7      Q.   Was he given an opportunity to    03:11:59
8   speak about his situation during the    03:12:01
9   formal board meeting?          03:12:03
10     A.   No.                03:12:04
11     Q.   Was it planned that he would    03:12:04
12  discuss this after the formal board      03:12:05
13  meeting?                03:12:07
14     A.   I believe it was part of the    03:12:07
15  agenda, yes.              03:12:09
16     Q.   Mr. Girardi, if you could flip    03:12:10
17  over to the next document in that pile in  03:12:25
18  front of you. That should be marked    03:12:28
19  Plaintiff's Exhibit 2. Have you --    03:12:29
20        MS. SELTZER:  Is it Simmons    03:12:38
21  030?                    03:12:41
22        MR. DATOO:  Yes. I figured it  03:12:42
23  is going to be an issue for you. I will    03:12:44
24  read in the Bates stamp numbers.      03:12:46
25     Q.   Mr. Girardi, if you could just    03:12:48
```

Page 45

```
1              GIRARDI
2   look at this document. Let me know if you  03:12:52
3   have seen it before?            03:12:54
4      A.   Yes, I have.            03:12:55
5      Q.   And when was the first time you  03:12:56
6   saw that document?            03:12:58
7      A.   Probably on the day it was sent  03:12:59
8   on October 28 prior to the board meeting.  03:13:01
9      Q.   Okay. And if I can turn your    03:13:04
10  attention to the second page of the      03:13:06
11  document. You've seen this document    03:13:09
12  before?                  03:13:14
13     A.   Yes.                03:13:14
14     Q.   And what is it?          03:13:15
15     A.   It is Burt's list of what he    03:13:16
16  believes his areas of responsibility    03:13:19
17  should be.                03:13:20
18     Q.   Is it should be or are?      03:13:22
19     A.   I took it to be should be      03:13:24
20  because I didn't know what his areas of    03:13:28
21  responsibility were.            03:13:30
22     Q.   Did you ever speak to Mr. Fried  03:13:30
23  about this list?            03:13:32
24     A.   Never.              03:13:32
25     Q.   And did you ever discuss the    03:13:33
```

                                    12  (Pages 42 to 45)

VERITEXT REPORTING COMPANY

212-267-6868                                    516-608-2400

c9dfbb84-ebd6-4083-b8a8-7b260e306ed0

Page 70

GIRARDI

1
2     Q.   Was Mr. State present when Mr.   03:36:54
3  Fried addressed the board?            03:36:57
4     A.   Yes, he was.                   03:36:58
5     Q.   And what did Mr. Fried say to  03:36:59
6  the board?                            03:37:01
7     A.   Burt discussed his long service 03:37:02
8  with LVI.  He was very emotional.  He was 03:37:08
9  rambling.  He was not making a lot of 03:37:13
10 sense.  He was trying to basically justify 03:37:18
11 the job description that he had laid out 03:37:24
12 previously, and we all listened to him. 03:37:26
13    Q.   Did anyone ask any questions?  03:37:29
14    A.   During his talk I think there  03:37:31
15 was some interaction, yes.            03:37:38
16    Q.   Do you know who interacted with 03:37:39
17 him?                                  03:37:40
18    A.   At one point Burt made a comment 03:37:41
19 about going to our sureties and telling 03:37:44
20 them that LVI was -- with him not on board 03:37:48
21 LVI was going to have no risk management. 03:37:59
22 They were going to be in a difficult 03:38:03
23 condition and that he was going to tell 03:38:04
24 them that with what I thought was the 03:38:06
25 hopes of undermining the business, which I 03:38:07

Page 71

GIRARDI

1
2  felt was inappropriate.  I told him that, 03:38:10
3  and he didn't appreciate it.          03:38:12
4     Q.   When did you tell him that?    03:38:14
5     A.   During his speech.             03:38:16
6     Q.   And did anyone else interact   03:38:17
7  with him other than you?              03:38:22
8     A.   I -- I'm sure people did, but I 03:38:23
9  don't remember exactly.               03:38:26
10    Q.   Do you know how long Mr. Fried  03:38:28
11 spoke for?                            03:38:29
12    A.   Twenty, twenty-five minutes.  I 03:38:29
13 can't recall.                         03:38:33
14    Q.   And did Mr. Fried say anything  03:38:34
15 about a comment that Mr. State made about 03:38:35
16 his age during this meeting?          03:38:38
17    A.   I believe he did make mention of 03:38:39
18 it.  He mentioned that he was considering 03:38:42
19 a suit and that he had an appointment with 03:38:44
20 his counsel after the board meeting.  03:38:47
21    Q.   And did -- do you recall what   03:38:49
22 Mr. State said?                       03:38:57
23    A.   Mr. State -- I don't recall    03:38:58
24 exactly what he said, no.             03:38:59
25    Q.   And what happened after Mr.    03:39:01

Page 72

GIRARDI

1
2  Fried finished his address to the board? 03:39:05
3     A.   I believe Burt and Scott left  03:39:06
4  the room, and the board discussed what we 03:39:09
5  had just heard.                       03:39:12
6     Q.   And what was discussed?        03:39:13
7     A.   Our impression of what Burt had 03:39:15
8  to say.                               03:39:19
9     Q.   And what was everyone's -- let's 03:39:20
10 start with you.  What was your impression 03:39:24
11 of what --                            03:39:25
12    A.   Again, I think Burt was out of  03:39:26
13 line.  I think he was incoherent,     03:39:28
14 emotional.  I thought it was inappropriate 03:39:33
15 the way he was addressing us.  I thought 03:39:37
16 he made threats against the business which 03:39:39
17 I thought was entirely inappropriate, and 03:39:41
18 I made that clear to the board that   03:39:43
19 that -- that was my view.             03:39:47
20    Q.   And what did Mr. -- did         03:39:48
21 Mr. Bagaria say anything?             03:39:50
22    A.   I don't remember exactly what he 03:39:51
23 said.                                 03:39:53
24    Q.   And what about Mr. Schnabel?    03:39:53
25    A.   John Schnabel I don't recall   03:39:55

Page 73

GIRARDI

1
2  exactly what he said.                 03:39:57
3     Q.   And was Mr. State part of this  03:39:58
4  caucus?                               03:40:02
5     A.   I believe he and Burt at that  03:40:03
6  point were out of the room, although I 03:40:05
7  can't remember.                       03:40:06
8     Q.   Do you recall what Mr. Buck     03:40:07
9  said?                                 03:40:08
10    A.   No.                            03:40:08
11    Q.   Do you recall what Mr. Fiorucci 03:40:09
12 said?                                 03:40:10
13    A.   No.                            03:40:11
14    Q.   How about Mr. Simmons?          03:40:11
15    A.   I don't remember exactly what he 03:40:13
16 said, no.                             03:40:16
17    Q.   And did the board vote on Mr.   03:40:16
18 Fried's employment at this session?   03:40:23
19    A.   No.                            03:40:27
20    Q.   Why not?                       03:40:27
21    A.   We didn't think it was          03:40:29
22 appropriate at the time, and we were going 03:40:30
23 to make another offer to Burt and see if 03:40:32
24 we accommodate him.                   03:40:35
25    Q.   So --                          03:40:37

19  (Pages 70 to 73)

VERITEXT REPORTING COMPANY

212-267-6868

516-608-2400

c9dfbb84-ebd6-4083-b8a8-7b260e306ed0

Page 74

```
1        GIRARDI
2    A.  We still wanted to have Burt on  03:40:38
3  as chairman.               03:40:40
4    Q.  Did the board come to some sort  03:40:40
5  of consensus or resolution at the end of  03:40:42
6  this session?               03:40:45
7    A.  The only consensus that we     03:40:45
8  arrived at is that we asked John Schnabel  03:40:47
9  to -- who had a closer relationship with  03:40:49
10  Burt to talk to Burt and see if he could  03:40:52
11  come to some kind of an arrangement or  03:40:54
12  accomodation with him.         03:40:56
13    Q.  And did Mr. Schnabel have that  03:40:57
14  conversation with Mr. Fried?     03:41:00
15    A.  I believe he did, yes.     03:41:01
16    Q.  And do you know what they     03:41:03
17  discussed?                03:41:04
18    A.  Again, it was Burt's job    03:41:05
19  description that he had outlined the  03:41:08
20  responsibilities and whether or not there  03:41:10
21  was some way that we could work with him  03:41:12
22  in coming up with a job description that  03:41:15
23  was satisfactory.            03:41:17
24    Q.  And do you know when Mr.     03:41:18
25  Schnabel spoke to --          03:41:21
```

Page 75

```
1        GIRARDI
2    A.  It was a few days after the -- I  03:41:23
3  can't recall exactly, but it was within a  03:41:25
4  couple of weeks of the board meeting.  03:41:27
5    Q.  Now, did you ever investigate  03:41:29
6  Mr. Fried's allegation that he was -- he  03:41:39
7  felt he was discriminated against because  03:41:43
8  of his age by virtue of Mr. State's  03:41:46
9  statement?                03:41:49
10      MS. SELTZER:  Objection to  03:41:52
11  form.  You can answer.          03:41:53
12    A.  No.                03:41:54
13    Q.  Why not?              03:41:55
14    A.  Because we had the parties in  03:41:56
15  the room, and it was a question of he said  03:41:57
16  she said.                 03:41:59
17    Q.  Did you ask Mr. State if he made  03:42:00
18  that comment?               03:42:02
19    A.  No.                03:42:02
20    Q.  Why not?              03:42:03
21    A.  He is -- he said that it was  03:42:04
22  taken out of context.          03:42:07
23    Q.  So you did make that --     03:42:08
24    A.  I don't -- I don't recall Scott  03:42:11
25  ever saying he made it.  He     03:42:13
```

Page 76

```
1        GIRARDI
2  would -- whatever Scott said is up for  03:42:15
3  debate at this point.          03:42:19
4    Q.  Didn't you testify earlier that  03:42:20
5  he told you he made a comment about Mr.  03:42:22
6  Fried's age?               03:42:24
7    A.  He said that he made a comment  03:42:25
8  that was taken out of context.     03:42:27
9    Q.  So he did make a comment about  03:42:28
10  his age, right?              03:42:31
11    A.  He made a comment that he said  03:42:32
12  Burt took out of the context.     03:42:34
13    Q.  Okay.  So there is no he said  03:42:36
14  she said about Mr. State making an age  03:42:38
15  based comment, correct?         03:42:40
16      MS. SELTZER:  Objection to  03:42:42
17  form.                     03:42:43
18    A.  It wasn't an age-based comment.  03:42:43
19    Q.  What did Mr. State say?     03:42:45
20    A.  I don't know exactly what he  03:42:46
21  said.                     03:42:48
22    Q.  Okay.  Did he -- do you know if  03:42:48
23  he told -- said to Mr. Fried that Mr.  03:42:50
24  Fried was 70 years old, 71 years old?  03:42:53
25    A.  I don't know exactly what he  03:42:56
```

Page 77

```
1        GIRARDI
2  said.  No.                03:43:00
3    Q.  Do you know in he said -- if he  03:43:00
4  asked Mr. Fried how long he expected to  03:43:02
5  work?                     03:43:04
6      MS. SELTZER:  Objection.  Asked  03:43:04
7  and answered.               03:43:05
8    A.  I don't remember exactly what  03:43:06
9  was said, no.               03:43:09
10    Q.  If you could flip the next  03:43:10
11  document over, it should be Plaintiff's  03:43:26
12  Exhibit 6.  It is Bagaria 113.     03:43:32
13      Could you take a look at this  03:43:37
14  document.  Let me know if you've seen it  03:43:38
15  before.                   03:43:40
16    A.  I guess so.           03:43:41
17    Q.  Why do you guess so?       03:43:42
18    A.  I wrote it.           03:43:48
19    Q.  Okay.  So you've seen it before?  03:43:48
20    A.  I have seen it, yes.      03:43:50
21    Q.  Okay.  Now, according to this  03:43:52
22  document it appears that a conference call  03:43:54
23  between you -- actually let --     03:44:00
24      MR. DATOO:  Strike that.     03:44:03
25    Q.  Why don't you review this     03:44:04
```

20   (Pages 74 to 77)

c9dfbb84-ebd6-4083-b8a8-7b260e306ed0

Page 82

```
1           GIRARDI
2    A.  I don't believe so, no.        03:48:19
3    Q.  Do you know if those two spoke   03:48:22
4  that day or on or about that day?      03:48:24
5    A.  I can't remember.  I -- November  03:48:26
6  10 is a specific date.  I can't recall  03:48:29
7  whether they spoke.  I don't believe I was  03:48:31
8  present though to the best of my         03:48:33
9  recollection.                           03:48:35
10   Q.  Now, did there come a time when   03:48:35
11  the board voted to terminate Mr. Fried?  03:48:38
12   A.  We did not have a formal vote to   03:48:40
13  terminate Mr. Fried, no.                03:48:44
14   Q.  Why not?                          03:48:45
15   A.  It never got to the point where   03:48:46
16  we had to vote.                         03:48:50
17   Q.  Why not?                          03:48:51
18   A.  We sent Burt an offer for a       03:48:52
19  consultancy agreement.  He rejected it,  03:48:56
20  and he subsequently resigned.           03:48:58
21   Q.  So when you say we, who do you    03:49:00
22  mean by "we"?                           03:49:07
23   A.  The board.  The board.            03:49:07
24   Q.  So everyone was in agreement      03:49:09
25  with that offer?                        03:49:11
```

Page 83

```
1           GIRARDI
2    A.  Yes.                              03:49:11
3    Q.  Is that memorialized in writing   03:49:12
4  any where?                              03:49:14
5    A.  I don't know.                     03:49:14
6    Q.  Was there one person who was --   03:49:15
7  who acted as a point person to get      03:49:19
8  everyone's take on that letter?         03:49:22
9    A.  I don't recall, no.               03:49:25
10   Q.  Do you know if you are required   03:49:26
11  to have Apollo, CHS, and Falcon approval  03:49:31
12  if Mr. Fried was to be removed?         03:49:36
13   A.  I believe our investment          03:49:38
14  agreement called for                    03:49:40
15  unanimous -- unanimous approval, yes.   03:49:43
16   Q.  But that is not memorialized      03:49:45
17  anywhere in writing, correct?           03:49:47
18   A.  Our investment is in writing,     03:49:49
19  yes.                                    03:49:50
20   Q.  I am sorry.  That you had the     03:49:50
21  sufficient parties' vote?               03:49:52
22   A.  It is not memorialized in         03:49:54
23  writing, no.                            03:49:57
24   Q.  So how do you know everyone was   03:49:58
25  on board?                               03:49:59
```

Page 84

```
1           GIRARDI
2    A.  I believe we had a conference     03:50:00
3  call where everybody agreed to send the  03:50:01
4  letter to Burt.                          03:50:03
5    Q.  Do you recall when that           03:50:05
6  conference call was?                     03:50:05
7    A.  I don't remember the date, no.    03:50:06
8    Q.  Do you recall who participated    03:50:08
9  in that conference call?                 03:50:10
10   A.  I believe it was the full board.  03:50:12
11   Q.  Would that be reflected in any    03:50:13
12  minutes?                                03:50:15
13   A.  It wasn't a board meeting, no.    03:50:15
14  So I don't believe minutes exist.       03:50:17
15   Q.  Did you take any notes of this    03:50:19
16  conversation?                           03:50:20
17   A.  I don't remember whether I took   03:50:21
18  notes or not, no.                       03:50:23
19   Q.  And was this offer to keep Burt   03:50:24
20  on an ultimatum?                        03:50:31
21   A.  No.                               03:50:33
22   Q.  If he rejected the offer, what    03:50:33
23  were the consequences?                  03:50:36
24       MS. SELTZER:  Objection.          03:50:39
25   A.  I believe -- I don't know what    03:50:40
```

Page 85

```
1           GIRARDI
2  the consequences were.  No.              03:50:41
3    Q.  Would he -- if you didn't accept  03:50:43
4  this arrangement --                      03:50:46
5    A.  I don't recall exactly what the   03:50:48
6  date was.  I believe there was a date by  03:50:49
7  which he had to accept the offer.        03:50:51
8    Q.  And if he didn't?                  03:50:53
9    A.  Then, I don't recall exactly      03:50:53
10  what the letter said.                    03:50:56
11   Q.  And did you --                     03:50:57
12       MR. DATOO:  Strike that.          03:51:08
13       MR. DATOO:  We have to switch     03:51:25
14  the tape.                               03:51:26
15       MS. SELTZER:  Okay.               03:51:29
16       MR. DATOO:  Let's go off the      03:51:29
17  record.                                 03:51:31
18       MS. SELTZER:  Sure.               03:51:31
19       THE VIDEOGRAPHER:  We are going   03:51:33
20  off the record.  3:51 p.m., end of tape  03:51:33
21  number 1.                               03:51:37
22       (Recess taken.)                   03:59:34
23       THE VIDEOGRAPHER:  We are         03:59:34
24  returning to the record, 3:59 p.m.      03:59:35
25  beginning of tape number 2.             03:59:38
```

22 (Pages 82 to 85)

c9dfbb84-ebd6-4083-b8a8-7b260e306ed0

Page 86

```
1            GIRARDI
2     Q.  Mr. Girardi, if could you flip   03:59:39
3  over to the next document in your pile.   03:59:41
4  It should be Plaintiff's Exhibit 8. It is   03:59:43
5  B. Simmons 44.                03:59:47
6     A.  Okay.               03:59:49
7     Q.  Is that identified as      03:59:50
8  Plaintiff's Exhibit 8?          03:59:54
9     A.  Yes.                03:59:56
10        MS. SELTZER:  And let the   03:59:57
11 record again show that Mr. Girardi is   03:59:58
12 neither a sender or a receiver of this   04:00:01
13 e-mail, of either.            04:00:03
14    Q.  Mr. Girardi, if could you flip   04:00:04
15 to the second page. Have you ever seen   04:00:06
16 this document before?          04:00:11
17    A.  I believe I have, yes.      04:00:12
18    Q.  Okay. And do you recall when   04:00:14
19 you first saw it?            04:00:15
20    A.  Not exactly, no.        04:00:17
21    Q.  Did you ever discuss the     04:00:19
22 contents of this letter with anybody?   04:00:22
23    A.  I don't remember a specific   04:00:25
24 discussion about this letter, no.     04:00:27
25    Q.  Do you recall a general      04:00:28
```

Page 87

```
1            GIRARDI
2  discussion about this letter?      04:00:32
3     A.  I am sure we had discussions   04:00:33
4  about it. I can't recall anything.    04:00:36
5     Q.  When you say "we," who do you   04:00:38
6  mean?                   04:00:40
7     A.  Myself and Rajay, probably other   04:00:40
8  members of the board of directors.    04:00:44
9     Q.  Okay. Mr. Girardi, if you could   04:00:45
10 flip over the next document in the pile.   04:01:03
11 It should be Plaintiff's Exhibit 9.    04:01:08
12        MR. DATOO:  Joanne, that is   04:01:19
13 236.                   04:01:22
14    Q.  Have you seen this document    04:01:23
15 before?                  04:01:25
16    A.  That is my handwriting, yes.   04:01:25
17    Q.  Okay. In the top left-hand     04:01:27
18 corner it says 11/16. Does that mean you   04:01:39
19 wrote this on November 16?        04:01:42
20    A.  Yes.               04:01:43
21    Q.  Okay. And can you do me a     04:01:44
22 favor? Can you read everything you wrote   04:01:46
23 into the record?            04:01:52
24    A.  This is an LVI board of       04:01:52
25 directors call. Fiorucci, Code Hennessy   04:01:55
```

Page 88

```
1            GIRARDI
2  Simmons, Simmons and Hogan, Falcon   04:01:59
3  (Schnabel) AIC, Girardi and Reynolds, Buck   04:02:05
4  not present, Scott State. "Schnabel:    04:02:10
5  Burt is open to some role with day-to-day   04:02:16
6  responsibilities. Insists this is due to   04:02:21
7  his age," which I assume -- well I am just   04:02:23
8  reading.                04:02:32
9     Q.  I just need you to read.     04:02:32
10    A.  "Burt sent preemption letter.   04:02:32
11 Ignore. Good faith letter offer to Burt   04:02:32
12 Fried. Next step send out letter to Burt.   04:02:36
13 Treatment for Burt e-mail account Westport   04:02:39
14 office, compensation. Treat his daughter   04:02:41
15 as we would any other employee. Maintain   04:02:46
16 status quo until 11:30. General counsel   04:02:49
17 relocate eventually to Milford.  Surety   04:02:53
18 demonstrates strategy ability to de-lever   04:02:58
19 and improve coverage ratios performance.   04:03:01
20 Other senior manager off site in Denver   04:03:07
21 week of 11/15."             04:03:11
22    Q.  Okay. Under the -- I guess at   04:03:12
23 the top half of the document where you   04:03:21
24 write --                04:03:23
25        MR. DATOO:  Strike that.    04:03:27
```

Page 89

```
1            GIRARDI
2     Q.  So this was a -- were these   04:03:28
3  notes memorializing a conference call that   04:03:30
4  you had with board members?       04:03:33
5     A.  These are my notes of a call   04:03:34
6  with the board members noted on      04:03:36
7  the -- in -- on the page.        04:03:39
8     Q.  In addition to some other    04:03:40
9  nonboard members, correct?        04:03:42
10    A.  Teddy Reynolds is not a board   04:03:43
11 member. Correct.             04:03:45
12    Q.  And how about Hogan?        04:03:46
13    A.  Hogan is a board member.      04:03:47
14    Q.  Why is Mr. Bagaria's name not   04:03:49
15 listed on here as either present or not   04:03:53
16 present?                04:03:55
17    A.  He probably wasn't present. I   04:03:55
18 don't remember though, but I -- I don't   04:03:57
19 think he was present at this call.    04:03:59
20    Q.  Was Mr. Buck present?       04:04:01
21    A.  I listed him as not present, so   04:04:03
22 I assume he wasn't.           04:04:05
23    Q.  So do you know why you didn't   04:04:06
24 list Mr. Bagaria as not present?     04:04:08
25    A.  I -- I don't remember, no.    04:04:10
```

c9dfbb84-ebd6-4083-b8a8-7b260e306ed0

Page 90

```
 1           GIRARDI
 2    Q.   Okay.  And it says here on the    04:04:12
 3  top half of the page it says "Burt - sent  04:04:20
 4  preemptive letter.  Ignore and send good   04:04:26
 5  faith letter offer to Burt Fried."         04:04:28
 6        What did you mean by "ignore"?       04:04:31
 7    A.   Burt had sent us I guess this       04:04:33
 8  letter from the previous exhibit.          04:04:35
 9    Q.   So Plaintiff's Exhibit 8.  Is       04:04:37
10  that what you are referring to?            04:04:40
11    A.   I believe that is what it refers    04:04:41
12  to, yes.                                   04:04:43
13    Q.   Can you just flip it over and       04:04:43
14  make sure?                                 04:04:45
15    A.   I -- I am certain that that is      04:04:46
16  what it referred to.                       04:04:50
17    Q.   Okay.  And why did you -- why       04:04:51
18  did the board ignore the letter?           04:04:58
19    A.   We wanted to keep Burt              04:05:02
20  on -- Burt on as chairman, and so we sent  04:05:04
21  him our offer to enter into a consultancy  04:05:06
22  agreement I believe shortly after this     04:05:10
23  call.                                      04:05:12
24    Q.   And that was in response to the     04:05:12
25  letter you received -- Plaintiff's Exhibit 04:05:14
```

Page 91

```
 1           GIRARDI
 2  8?                                         04:05:18
 3    A.   I believe so, yes.                  04:05:18
 4    Q.   And was there only one letter       04:05:20
 5  sent to Burt after you received this       04:05:24
 6  letter or were there two letters sent?     04:05:25
 7    A.   I don't recall.  I know we sent     04:05:27
 8  at least one letter with the offer for a   04:05:29
 9  consultancy agreement.  I don't recall any 04:05:33
10  other letter.                              04:05:34
11    Q.   Do you know if it was coupled       04:05:35
12  with a letter that terminated his          04:05:36
13  employment?                                04:05:38
14    A.   I don't remember that, no.          04:05:38
15    Q.   Did Mr. Simmons say anything        04:05:39
16  during this call about sending a second    04:05:42
17  letter terminating Mr. Fried's employment? 04:05:44
18    A.   I don't recall during this phone    04:05:47
19  call whether he mentioned that, no.        04:05:50
20    Q.   Okay.  Under the heading "next      04:05:52
21  steps," number two, it says "treatment for 04:05:55
22  Burt."  What did you mean by that?         04:05:59
23    A.   If Burt was not going to accept     04:06:01
24  our offer we were going to take him off    04:06:04
25  the e-mail system, and that was what that  04:06:09
```

Page 92

```
 1           GIRARDI
 2  was referring to.                          04:06:12
 3    Q.   Why would you take him off the      04:06:13
 4  e-mail system if he didn't accept your     04:06:14
 5  offer?                                     04:06:17
 6    A.   Because he would no longer be an    04:06:17
 7  employee of the company I believe based on 04:06:19
 8  the terms of that letter.                  04:06:20
 9    Q.   So you would be terminating --      04:06:22
10    A.   Well, he had --                     04:06:24
11  actually -- excuse me.  He had already     04:06:26
12  sent us this letter.                       04:06:27
13    Q.   Are you referring to Plaintiff's    04:06:32
14  Exhibit 8?                                 04:06:33
15    A.   Yes.                                04:06:34
16    Q.   So why would you terminate him      04:06:34
17  if he didn't accept your offer?            04:06:38
18        MS. SELTZER:  Objection.             04:06:41
19    A.   We weren't terminating him.         04:06:42
20    Q.   Why would you take him off the      04:06:43
21  e-mail account?                            04:06:46
22    A.   Because -- I don't recall.          04:06:47
23    Q.   All right.  You also mentioned      04:06:48
24  west -- you wrote Westport office.         04:06:51
25    A.   Right.                              04:06:53
```

Page 93

```
 1           GIRARDI
 2    Q.   What did you mean by that?          04:06:54
 3    A.   There were discussions as we        04:06:55
 4  have talked about previously about         04:06:58
 5  eventually closing the Westport office.    04:06:58
 6    Q.   Why was that listed on here?        04:07:01
 7    A.   Because it probably came up on      04:07:03
 8  the phone call.                            04:07:04
 9    Q.   Why would it have come up on        04:07:05
10  that phone call if you were discussing Mr. 04:07:10
11  Fried?                                     04:07:12
12        MS. SELTZER:  Objection.             04:07:13
13    A.   We discussed a number of other      04:07:14
14  things on this call probably in addition   04:07:16
15  to Mr. Fried, including cost savings       04:07:18
16  initiatives that the company was           04:07:22
17  considering at the time.                   04:07:23
18    Q.   Okay.  You also wrote "treat his    04:07:24
19  daughter as we would treat any other       04:07:26
20  employee."                                 04:07:28
21    A.   Yes.                                04:07:29
22    Q.   "Maintain status quo until          04:07:29
23  11:30."  What did you mean by that?        04:07:32
24    A.   I believe in the context of the     04:07:33
25  cost savings initiatives that were         04:07:36
```

24 (Pages 90 to 93)

VERITEXT REPORTING COMPANY

212-267-6868                              516-608-2400

c9dfbb84-ebd6-4083-b8a8-7b260e306ed0

Page 94

GIRARDI

1    GIRARDI
2    discussed Scott raised the issue that    04:07:37
3    Burt's daughter was an employee at    04:07:42
4    Westport. He was concerned as to how it    04:07:44
5    would look if she was part of the    04:07:46
6    reduction in force that was being planned.    04:07:48
7    Our view as a board was that if she was    04:07:50
8    worth retaining as an employee, we would    04:07:53
9    retain her. If she wasn't, we would treat    04:07:56
10   her like any other employee.    04:07:58
11       Q.   And do you know was she -- do    04:08:00
12   you know when she was selected -- was    04:08:04
13   there a list of people --    04:08:06
14       A.   No.    04:08:07
15       Q.   -- who were going to be laid    04:08:08
16   off?    04:08:10
17       A.   No, there wasn't.    04:08:10
18       Q.   So how did people know who was    04:08:11
19   going to be laid off or not?    04:08:13
20       A.   We didn't know who was going to    04:08:15
21   be laid. Scott mentioned that she was an    04:08:17
22   employee, and that given the situation    04:08:19
23   with Burt he was sensitive to it, and the    04:08:21
24   view of the board was that it's a    04:08:24
25   reduction in force. If she is worth    04:08:26

Page 95

GIRARDI

1    GIRARDI
2    keeping, you can keep her. If not we    04:08:28
3    treat her like any other employee which is    04:08:31
4    what I wrote.    04:08:33
5        Q.   At this point in time was it    04:08:33
6    already decided if the Westport office was    04:08:35
7    going to be closed or not?    04:08:37
8        A.   It hadn't been decided. It    04:08:39
9    was -- it was certainly targeted as an    04:08:41
10   office that was costly and that we would    04:08:43
11   attempt to close.    04:08:45
12       Q.   Do you know when it was decided    04:08:46
13   that the Westport office was going to    04:08:47
14   close?    04:08:51
15       A.   I don't remember exactly.    04:08:51
16   Probably sometime in December, but I don't    04:08:52
17   remember exactly when.    04:08:56
18       Q.   Okay. Now, it says here    04:08:57
19   "general counsel relocate eventually to    04:09:01
20   Milford." Do you know what that means?    04:09:04
21       A.   I believe Greg DiCarlo worked    04:09:05
22   out of Westport, which I didn't know at    04:09:09
23   the time, and his view was that if the    04:09:11
24   Westport office would eventually close we    04:09:14
25   could move Greg to Milford.    04:09:16

Page 96

GIRARDI

1    GIRARDI
2        Q.   Do you know when Mr. DiCarlo    04:09:18
3    became general counsel of LVI?    04:09:20
4        A.   No. No, I don't.    04:09:22
5        Q.   Do you know how long he has been    04:09:23
6    with LVI?    04:09:24
7        A.   No.    04:09:25
8        Q.   And you also wrote "surety" I    04:09:26
9    think "demonstrate strategy. Ability to    04:09:32
10   de-lever" --    04:09:37
11       A.   Delever.    04:09:38
12       Q.   Delever is that short for    04:09:39
13   de-leverage?    04:09:42
14       A.   Yes.    04:09:42
15       Q.   And can you just -- sorry. Help    04:09:43
16   me out with that?    04:09:45
17       A.   "Demonstrates strategy, ability    04:09:46
18   to de-lever and improve coverage ratios    04:09:48
19   and performance."    04:09:51
20       Q.   What did you mean by that?    04:09:52
21       A.   The sureties are an important    04:09:54
22   part of the business. We were concerned    04:09:55
23   given Burt's outburst at the board meeting    04:09:57
24   that he was going to attempt to undermine    04:10:00
25   us with the sureties. So we felt it was    04:10:02

Page 97

GIRARDI

1    GIRARDI
2    important that Scott and whoever else was    04:10:06
3    appropriate on the board go to the    04:10:08
4    sureties and have a meeting with them and    04:10:10
5    assure them that we have got a much    04:10:12
6    stronger balance sheet and that we are    04:10:15
7    prepared to go forward.    04:10:17
8        Q.   So it appears to me that    04:10:19
9    everything written on this document had to    04:10:21
10   do with Burt Fried?    04:10:23
11       MS. SELTZER:   Objection.    04:10:25
12       A.   Is that a question?    04:10:29
13       Q.   Is that correct?    04:10:30
14       A.   Closing the Westport office, I    04:10:32
15   don't know that that has to with Burt    04:10:35
16   Fried. No.    04:10:37
17       Q.   So on this call, the only one    04:10:37
18   item you discussed that you claimed was    04:10:41
19   not related to Burt Fried was the Westport    04:10:45
20   office?    04:10:47
21       A.   The Denver off site didn't    04:10:48
22   relate to Burt Fried either.    04:10:51
23       Q.   Can you point that --    04:10:53
24       A.   At the bottom of the page.    04:10:54
25       Q.   Other. Okay. Now, that is    04:10:57

25  (Pages 94 to 97)

VERITEXT REPORTING COMPANY

212-267-6868

516-608-2400

c9dfbb84-ebd6-4083-b8a8-7b260e306ed0

102

```
1           BAGARIA
2  of you a document marked Plaintiff's    12:57:49
3  Exhibit 7.                   12:57:52
4         Can you take a look at the     12:57:52
5  document and let me know if you have ever  12:57:56
6  seen it before?              12:57:58
7     A.  Yes.                 12:57:59
8     Q.  Now, at the -- on the first   12:58:00
9  page, the top line you wrote, "Schnabel   12:58:06
10 and Burt are both delusional."          12:58:08
11        What did you mean by that?    12:58:11
12    A.  I can't recall what I meant    12:58:12
13 exactly.                    12:58:16
14    Q.  Do you know why you referred to  12:58:16
15 Mr. Schnabel as delusional?         12:58:18
16    A.  I don't.               12:58:25
17    Q.  Do you think Mr. Schnabel is   12:58:27
18 delusional?                  12:58:30
19    MS. SELTZER:  Objection.        12:58:31
20    A.  Generally speaking, no.      12:58:32
21    Q.  How about specifically speaking?  12:58:40
22    A.  No.                  12:58:42
23    Q.  Then why would you write this?  12:58:42
24    MS. SELTZER:  Objection.  Asked   12:58:44
25 and answered.                12:58:45
```

103

```
1           BAGARIA
2     A.  Again, I don't know what the   12:58:45
3  context was when I made that statement.  12:58:47
4     Q.  Now, do you know if a discussion  12:59:06
5  took place between Mr. Simmons and Mr.   12:59:08
6  Fried on November 10, 2010?         12:59:11
7     A.  Sorry.  Can you repeat the    12:59:13
8  question?                  12:59:14
9     Q.  Do you know if a conversation   12:59:15
10 took place between Mr. Simmons and Mr.   12:59:16
11 Fried on November 10, 2010?         12:59:18
12    A.  I can't recall.           12:59:20
13    Q.  Do you know if those two ever   12:59:21
14 had a conversation after the board meeting  12:59:22
15 about Mr. Fried's job duties or his role  12:59:25
16 at LVI?                    12:59:27
17    A.  I believe they did.         12:59:28
18    Q.  And do you know what they     12:59:35
19 discussed?                  12:59:36
20    A.  I don't know the specifics.    12:59:37
21    Q.  Do you know in general what they  12:59:38
22 discussed?                  12:59:39
23    A.  In general I believe they     12:59:40
24 discussed some diminished role, but the  12:59:41
25 specifics of that are something I can't  12:59:48
```

104

```
1           BAGARIA
2  recall.                    12:59:49
3     Q.  Do you know why Mr. Simmons had  12:59:49
4  a discussion with Mr. Fried if the board  12:59:51
5  charged Mr. Schnabel with having that   12:59:53
6  discussion with Mr. Fried?         12:59:55
7     A.  I don't know.            12:59:58
8     Q.  Has the board ever made a     01:00:18
9  decision to terminate any other employee  01:00:24
10 of LVI Services other than Mr. Fried?   01:00:26
11    A.  Under what time period?       01:00:29
12    Q.  Since the time you became a    01:00:31
13 board member.                01:00:34
14    A.  Not to my recollection.      01:00:35
15    Q.  How about since the time Apollo  01:00:39
16 made its investment, initial investment?  01:00:41
17    A.  I can't speak to that.       01:00:45
18    Q.  Is there anyone that could?    01:00:46
19    A.  Possibly.  Possibly Jerry,    01:00:48
20 possibly Teddy, although I -- I don't know  01:00:51
21 whether they would have recollection of it  01:00:53
22 or not.                    01:00:55
23    MR. DATOO:  Plaintiff's 8.       01:01:10
24    (Plaintiff's Exhibit 8 marked    01:01:11
25 for identification.)            01:01:13
```

105

```
1           BAGARIA
2     (Document handed to witness.)    01:01:14
3     Q.  Mr. Bagaria, you have in front  01:01:15
4  of you a document marked Plaintiff's    01:01:17
5  Exhibit 8.                   01:01:19
6         Please take a look at this    01:01:20
7  document and let me know if you have seen  01:01:20
8  it before.                  01:01:22
9     A.  Yes, I have seen this.       01:01:25
10    Q.  Do you recall when was the first  01:01:27
11 time you saw this document?         01:01:28
12    A.  I don't.               01:01:30
13    Q.  If you look at the first page,  01:01:32
14 it appears that this was e-mailed to you  01:01:38
15 by Mr. State on November 16; is that    01:01:40
16 correct?                    01:01:44
17    A.  Yes.                 01:01:44
18    Q.  Do you recall receiving this   01:01:45
19 then?                      01:01:47
20    A.  Again, I don't recall the     01:01:49
21 specific date when I received it.      01:01:51
22    Q.  Okay.  Do you know what this   01:01:52
23 document is?                 01:01:54
24    A.  Yes.                 01:01:55
25    Q.  What is it?             01:01:58
```

27  (Pages 102 to 105)

Page 127

```
1           GIRARDI
2    A.  No.                04:33:25
3    Q.  Okay.  You just assumed someone  04:33:26
4  was going to pick up the tab?        04:33:29
5    A.  Yes.               04:33:31
6        MS. SELTZER:  Objection.  Is    04:33:32
7  that a question?          04:33:33
8        MR. DATOO:  I guess he answered  04:33:33
9  it.  So --               04:33:34
10       THE WITNESS:  I answered it.     04:33:36
11 Sorry.                   04:33:37
12       MS. SELTZER:  That is okay.      04:33:38
13   Q.  Have you ever had any   04:33:39
14 communications with any accountants    04:33:41
15 regarding any contingencies for this case?  04:33:42
16   A.  No.                04:33:45
17   Q.  Okay.              04:33:46
18       MR. DATOO:  Why don't we take a  04:33:49
19 five-minute break, and then we will    04:33:50
20 conclude.                04:33:52
21       MS. SELTZER:  Sure.   04:33:54
22       THE VIDEOGRAPHER:  We're going  04:33:55
23 off the record.  4:33 p.m.     04:33:56
24       (Recess taken.)       04:41:26
25       THE VIDEOGRAPHER:  We're    04:41:26
```

Page 128

```
1           GIRARDI
2  returning to the record.  4:41 p.m.    04:41:27
3    Q.  Mr. Girardi, did you participate  04:41:30
4  in the negotiation of the terms of the  04:41:32
5  investor securities agreement?   04:41:34
6    A.  Yes.               04:41:36
7        MR. DATOO:  I have no further    04:41:40
8  questions.               04:41:40
9        THE VIDEOGRAPHER:  We're going  04:41:42
10 off the record.  The time is 4:41, end of  04:41:43
11 today's questioning.         04:41:46
12       (Time noted:  4:41 p.m.)    04:41:49
13
14
15
16
17
18
19           GERALD GIRARDI
20
21 Subscribed and sworn to before me
22 this     day of        , 2011
23
24
25
```

Page 129

```
1           GIRARDI
2  C E R T I F I C A T I O N
3
4
5
6    I, DEBBIE ZAROMATIDIS, a Shorthand
7  Reporter and a Notary Public, do hereby
8  certify that the foregoing witness, GERALD
9  GIRARDI, was duly sworn on the date
10 indicated, and that the foregoing is a
11 true and accurate transcription of my
12 stenographic notes.
13   I further certify that I am not
14 employed by nor related to any party to
15 this action.
16
17
18
19
20
21
22
23           DEBBIE ZAROMATIDIS
24
25
```

Page 2011

```
          ERRATA SHEET
     VERITEXT/NEW YORK REPORTING, LLC

CASE NAME: Fried, Burton T. v. LVI Services, Inc., et al.
DATE OF DEPOSITION: May 23,
WITNESSES' NAME: GERALD GIRARDI

PAGE  LINE (S)   CHANGE      REASON
____|_____|_____|_____
____|_____|_____|_____
____|_____|_____|_____
____|_____|_____|_____
____|_____|_____|_____
____|_____|_____|_____
____|_____|_____|_____
____|_____|_____|_____
____|_____|_____|_____
____|_____|_____|_____
____|_____|_____|_____
____|_____|_____|_____
____|_____|_____|_____
____|_____|_____|_____
____|_____|_____|_____

SUBSCRIBED AND SWORN TO BEFORE ME
THIS ____ DAY OF _____, 20__.

_____
(NOTARY PUBLIC)        MY COMMISSION EXPIRES:
```

32  (Pages 127 to 2011)

c9dfbb84-ebd6-4083-b8a8-7b260e306ed0