# Exhibit 6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
No. 10 Civ. 9308(JSR)

-----------------------------------------x

BURTON T. FRIED,

Plaintiff,

- against -

LVI SERVICES, INC., LVI PARENT CORP., CODE HENNESSY SIMMONS, LLC d/b/a CHS PRIVATE EQUITY V LP; APOLLO INVESTMENT CORP., SCOTT E. STATE, in his official and individual capacities; BRIAN SIMMONS, in his official and individual capacities; RAJAY BAGARIA, in his official and individual capacities; GERALD J. GIRARDI, in his official and individual capacities,

Defendants.

-----------------------------------------x

June 2, 2011
10:03 a.m.

2

VIDEOTAPE DEPOSITION of GREGORY DICARLO, taken by the Plaintiff, pursuant to Notice, held at the offices of Thompson Wigdor & Gilly, LLP, 85 Fifth Avenue, New York, New York, before Debbie Zaromatidis, a Shorthand Reporter and Notary Public of the State of New York.

3

APPEARANCES:

THOMPSON WIGDOR & GILLY, LLP
Attorneys for Plaintiff
85 Fifth Avenue
New York, New York 10003
BY: SHAFFIN A. DATOO, ESQ.

SIDLEY AUSTIN, LLP
Attorneys for Defendants
787 Seventh Avenue
New York, New York 10019
BY: JOANNE SELTZER, ESQ.

ALSO PRESENT:
BURTON FRIED
J.D. MARTINEZ, Videographer

4

STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED by and between the Attorneys for the respective parties hereto that filing and sealing be and the same are hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections except as to the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within examination may be signed and sworn to before any notary public with the same force and effect as though signed and sworn to before this Court.

5

THE VIDEOGRAPHER: We are on 10:03:36
the record. My name is J.D. Martinez of 10:03:57
Veritext New York. The date today is June 10:03:59
2, 2011, and the time is approximately 10:04:02
10:04 a.m. This deposition is being held 10:04:06
at Thompson Wigdor & Gilly LLP located at 10:04:08
85 Fifth Avenue, New York, New York. The 10:04:12
caption of this case is Burton T. Fried 10:04:15
versus LVI Services, Inc., et al., filed 10:04:17
in the United States District Court, 10:04:21
Southern District of New York. The name 10:04:22
of the witness is Gregory DiCarlo. 10:04:24
At this time the attorneys will 10:04:27
identify themselves and the parties they 10:04:29
represent. After which our court 10:04:31
reporter, Debbie Zaromatidis, will swear 10:04:32
in the witness, and we can proceed. 10:04:35
MS. SELTZER: Joanne Seltzer, 10:04:37
Sidley Austin on behalf of the defendants. 10:04:39
MR. DATOO: Shaffin Datoo, 10:04:39
Thompson Wigdor & Gilly for the plaintiff 10:04:41
Burt Fried. 10:04:43

GREGORY DICARLO, 10:04:43
having first been duly sworn by a Notary 10:04:43
Public of the State of New York, was 10:04:43
examined and testified as follows: 10:04:43
EXAMINATION BY MR. DATOO: 10:04:51
Q. Good morning, Mr. DiCarlo. 10:04:51
A. Good morning. 10:04:53
Q. As you know, my name is Shaffin 10:04:54
Datoo, and I represent Mr. Fried in this 10:04:55
case. I am going to ask you some 10:04:57
questions today, and hopefully you can 10:05:03
give me some answers because you're an 10:05:05
attorney. I assume you know what a 10:05:08
deposition is, so we don't have to really 10:05:09
cover a lot of ground rules. 10:05:12
I just want to ask you some 10:05:16
quick preliminary questions. 10:05:19
A. Sure. 10:05:21
Q. Is your ability to tell the 10:05:22
truth in any way impaired today? 10:05:23
A. No. 10:05:25
Q. Okay. And I'm -- I'm going to 10:05:26
assume that IF you answer a question that 10:05:32
you understood it. If you don't 10:05:34

DICARLO
understand it, please let me know, and 10:05:35
I'll ask it a different way. If you need 10:05:37
a break, let me know. The only condition 10:05:39
I have is that you answer the last 10:05:41
question asked. 10:05:42
A. Okay. 10:05:43
Q. In connection with this lawsuit, 10:05:44
did you provide your attorney with all 10:05:46
responsive documents? 10:05:48
A. Yes. 10:05:49
Q. Okay. And where did you look to 10:05:51
find the documents? 10:05:53
A. Predominantly with the people 10:05:54
that would have those documents including 10:05:59
IT. 10:06:01
Q. Okay. Did you check 10:06:02
your -- your office for any documents? 10:06:07
A. I had no documents -- 10:06:08
Q. Okay. 10:06:10
A. -- in my stuff. 10:06:11
Q. Do you have a personal e-mail 10:06:13
account? 10:06:15
A. Personal? 10:06:15
Q. Yes. 10:06:16

DICARLO
A. Yes. 10:06:16
Q. Did you look there for any 10:06:17
responsive documents? 10:06:18
A. No. I don't use my personal 10:06:19
e-mail account for any business-related 10:06:23
purposes. 10:06:25
Q. Okay. Do you keep any 10:06:26
work-related documents at home? 10:06:29
A. No. 10:06:31
Q. Have you ever been sued? 10:06:31
A. Yes. 10:06:34
Q. How many times? 10:06:34
A. Once. 10:06:38
Q. And when was that? 10:06:39
A. That was around 1996. 10:06:40
Q. And -- 10:06:45
A. To the best of my recollection. 10:06:46
Q. Sorry? 10:06:47
A. To the best of my recollection. 10:06:48
Q. And what was the nature of that 10:06:49
lawsuit? 10:06:51
A. I was a board member for my 10:06:51
condominium association. 10:06:53
Q. Okay. 10:06:55

DICARLO
A. And the entire board was sued by 10:06:55
a disgruntled resident. 10:06:57
Q. Has anyone ever accused you of 10:07:02
discrimination? 10:07:07
A. No. 10:07:08
Q. Have you ever given sworn 10:07:08
testimony before? 10:07:13
A. Yes. 10:07:13
Q. How many times? 10:07:14
A. I believe twice. 10:07:15
Q. And when was the first time you 10:07:19
gave sworn testimony? 10:07:23
A. The first time was a deposition 10:07:24
about twenty years ago. 10:07:26
Q. And what was the nature of that 10:07:28
case? 10:07:30
A. To the best of my knowledge, 10:07:30
since I was not a party to it, it had to 10:07:33
do with a union employee on a construction 10:07:35
project that was laid off and brought a 10:07:39
claim because he believed he was laid off 10:07:42
due to his union activities. 10:07:46
Q. And when was the second time you 10:07:48
gave sworn testimony? 10:07:54

14

DICARLO

Q. Okay. Do you know for how long? 10:11:14

A. I believe it is -- I'm sure it 10:11:15 is in excess of 20 years. I don't know 10:11:19 how much in excess. 10:11:21

Q. And do you recall what his last 10:11:25 job title at LVI Services was? 10:11:27

A. I believe it was chairman. 10:11:29

Q. Now, did Mr. Fried also work for 10:11:30 LVI Parent? 10:11:32

A. Not to my knowledge. 10:11:33

Q. Okay. Did he have a -- did he 10:11:34 serve on the board of LVI Parent? 10:11:39

A. I believe he did, yes. 10:11:41

Q. And was he chairman of the board 10:11:42 of LVI Parent? 10:11:44

A. I believe he was, yes. 10:11:46

Q. Did you attend any board 10:11:48 meetings of LVI Parent Corp. since you've 10:11:51 been employed? 10:11:54

A. No. 10:11:55

Q. Is there a reason why not? 10:11:55

A. Not to my knowledge. I've just 10:11:59 never been asked. 10:12:02

Q. Okay. Now, when did you start 10:12:03

15

DICARLO

working at LVI Services? 10:12:09

A. May of 2005. 10:12:10

Q. And what was your job title 10:12:13 then? 10:12:18

A. Counsel. 10:12:18

Q. And who did you report to? 10:12:18

A. Burt Fried. 10:12:22

Q. And at that time what was Mr. 10:12:23 Fried's job title? 10:12:32

A. At the time I started I believe 10:12:33 it was president and CEO. 10:12:34

Q. And what office did you work in 10:12:36 when you first started? 10:12:43

A. An office in Westport, 10:12:44 Connecticut. 10:12:46

Q. Did you spend all of your time 10:12:51 there? 10:12:52

A. Yes. 10:12:53

Q. And what were your job duties as 10:12:53 counsel? 10:12:55

A. It was reviewing contracts, 10:12:55 providing assistance with litigated 10:12:58 matters, drafting various legal documents 10:13:02 required by the company. 10:13:11

16

DICARLO

Q. Were there any other 10:13:16 attorneys -- 10:13:25

MR. DATOO: Strike that. 10:13:26

Q. Were there any other people that 10:13:27 had -- held the position as counsel? 10:13:28

A. No. 10:13:30

Q. Okay. So were you and Mr. Fried 10:13:31 the only attorneys there that you know of? 10:13:34

A. That's correct, yes. 10:13:36

MS. SELTZER: Objection. At 10:13:37 the time, right? In '05? 10:13:38

MR. DATOO: Yes. 10:13:41

Q. Do you know what Mr. Fried's 10:13:42 duties were as CEO, president and CEO when 10:13:43 you first started? 10:13:47

A. I understood them to be that he 10:13:48 ran the entire company. He was 10:13:51 responsible for every aspect of the 10:13:54 company's success and growth. 10:13:56

Q. Okay. And while Mr. Fried was 10:13:58 CEO, did you share any of your job duties 10:14:02 with Mr. Fried? 10:14:04

MS. SELTZER: I object to the 10:14:08 form, but you can answer. 10:14:09

17

DICARLO

A. The best way I could describe is 10:14:10 that I reported to Burt. I managed and 10:14:16 dealt with the day-to-day routine legal 10:14:20 matters, the filing -- I mean the 10:14:25 reviewing of contracts, any routine 10:14:28 matter, if a branch needed assistance on 10:14:32 drafting a release or the lack or having 10:14:36 something like that reviewed. Anything 10:14:38 beyond that that required some authority 10:14:42 for decision making, I reported to Burt on 10:14:43 it, and generally Burt would give me a 10:14:48 direction as to how he wanted to handle 10:14:52 it, and then I would implement what he 10:14:54 wanted done. 10:14:56

Q. Okay. Did you ever work with 10:14:57 Mr. Fried on legal matters other than 10:15:00 reporting -- other than seeking his 10:15:04 approval for certain things? 10:15:06

A. Yeah. We worked together on any 10:15:07 significant litigated matters certainly. 10:15:11 We worked together on any nonroutine 10:15:16 contract negotiation, something of -- of a 10:15:20 larger significance dollar-wise or 10:15:24 something unusual in the project itself 10:15:28

22

DICARLO
A. My job title? 10:19:26
Q. Yes. 10:19:27
A. It was still counsel. 10:19:27
Q. And who did you report to when Mr. McNamara was CEO? 10:19:28 10:19:30
A. I was never formally told who I report to, but in practice I reported to Burt. 10:19:32 10:19:35 10:19:36
Q. And while Mr. McNamara was CEO, were you still working in the Westport office? 10:19:43 10:19:46 10:19:47
A. Yes. 10:19:48
Q. Did you work at the Westport office your entire time at LVI Services? 10:19:48 10:19:50
A. Yes. 10:19:52
Q. And while Mr. McNamara was CEO, did your job duties change in any way from when Mr. Fried was CEO? 10:19:53 10:19:55 10:19:58
A. No. 10:20:00
Q. Okay. Now, while Mr. McNamara was CEO, did the nature of your -- working relationship with Burt remain the same? 10:20:00 10:20:05 10:20:10
A. Yes, it did. 10:20:12
Q. Were you both performing legal 10:20:16

23

DICARLO
work? 10:20:18
A. Yes. 10:20:18
Q. And was Mr. Fried still handling the same legal work that he did when he was CEO? 10:20:19 10:20:24 10:20:30
A. Yes. 10:20:31
Q. And the same with you? 10:20:31
A. Yes. 10:20:33
Q. Okay. And this is all while Mr. McNamara was CEO, correct? 10:20:33 10:20:35
A. Correct. 10:20:38
Q. Okay. And did you continue to seek Mr. Fried's advice on certain matters? 10:20:38 10:20:40 10:20:42
A. Yes. 10:20:42
Q. Okay. While Mr. McNamara was CEO? 10:20:43 10:20:45
A. Yes. 10:20:45
Q. Okay. And while Mr. McNamara was CEO, did you feel that Mr. Fried was interfering with your ability to do your job in any way? 10:20:46 10:20:48 10:20:51 10:20:53
A. No. 10:20:54
Q. Did you feel that Mr. 10:20:55

24

DICARLO
Fried -- while Mr. McNamara was CEO, did you feel that Mr. Fried was stepping on your toes? 10:20:59 10:21:02 10:21:04
A. No. 10:21:06
Q. Now, while Mr. McNamara was CEO, were you ever confused as to who was making the final decisions at LVI? 10:21:06 10:21:18 10:21:20
MS. SELTZER: Objection to the form. 10:21:22 10:21:23
A. I won't say I was confused by it, but I didn't necessarily know who was making the final decision on each and every matter. 10:21:23 10:21:25 10:21:28 10:21:30
Q. Okay. Why is that? 10:21:31
A. I was not privy to any communication or every communication Burt might have had with Mr. McNamara. So whether or not Burt was making the decision or making that decision only after consulting with Mr. McNamara, I don't know. 10:21:33 10:21:35 10:21:37 10:21:39 10:21:41 10:21:42 10:21:45
Q. Okay. Do you know if other employees were confused as to who was making the final decisions at LVI? 10:21:46 10:21:49 10:21:51

25

DICARLO
MS. SELTZER: I object to the form. He didn't say he was confused, but go ahead. 10:21:54 10:21:55 10:21:57
MR. DATOO: Okay. 10:21:58
A. Not that I am aware of. 10:22:00
Q. And while Mr. McNamara was CEO, were you ever confused as to who to report to on certain matters? 10:22:02 10:22:08 10:22:10
A. No. It was consistently Burt. 10:22:11
Q. Okay. Do you know if other employees or do you know if any employees -- employee was confused as to who to report to on certain matters -- 10:22:14 10:22:20 10:22:25 10:22:26
MR. SELTZER: Objection. 10:22:29
Q. -- while Mr. McNamara was CEO? 10:22:31
MS. SELTZER: Objection. Asked and answered, but you can answer again. 10:22:34 10:22:35
A. Not that I am aware of. 10:22:36
Q. Now, while Mr. McNamara was CEO, do you have personal -- do you have any personal knowledge of Mr. Fried's work performance? 10:22:37 10:22:41 10:22:43 10:22:45
A. No, other than my direct dealings with Mr. Fried as I previously 10:22:45 10:22:47

DICARLO

mentioned. 10:22:49
Q. And based on your direct 10:22:49 dealings, how would you describe his work 10:22:51 performance? 10:22:53
A. It was good. 10:22:53
Q. Now, did there come a time when 10:22:54 Mr. Fried became the interim CEO of LVI 10:22:56 Services? 10:23:00
A. I don't know if that was his 10:23:00 title, but there was a time after Bob 10:23:05 McNamara left that Burt became president 10:23:08 or CEO again. 10:23:12
Q. Okay. Do you know why Mr. Fried 10:23:14 became president or CEO again? 10:23:17
A. I do not. 10:23:21
Q. Okay. Do you know who asked 10:23:22 him? Do you know if anyone asked him to be 10:23:26 the president or CEO again? 10:23:28
A. I don't know. 10:23:30
Q. Do you know what job duties Mr. 10:23:31 Fried performed when he was the president 10:23:35 or CEO again? 10:23:37
A. I believe he performed the 10:23:39 duties of running the business again in 10:23:42

DICARLO

its entirety. 10:23:45
Q. And did he also keep his prior 10:23:46 job duties that he had as chairman? 10:23:50
A. I don't know. 10:23:53
Q. Now, while Mr. Fried was the CEO 10:23:54 and president again, were you still 10:24:02 counsel? 10:24:05
A. Yes. 10:24:06
Q. And did you still continue to 10:24:06 report to Mr. Fried? 10:24:10
A. Yes. 10:24:11
Q. Were your job duties still the 10:24:12 same? 10:24:17
A. Yes. 10:24:17
Q. And while Mr. Fried was the 10:24:18 president and CEO, did your working 10:24:21 relationship with him change in any way? 10:24:26
A. No. 10:24:28
Q. Were you still working on legal 10:24:29 matters together during this time period? 10:24:30
A. Yes. 10:24:32
Q. Were you -- did you continue to 10:24:32 seek advice from Mr. Fried on certain 10:24:37 matters? 10:24:39

DICARLO

A. Yes. 10:24:39
Q. Now, while Mr. Fried was the CEO 10:24:40 and president again of LVI Services, did 10:24:49 you feel that he was interfering with your 10:24:51 ability to do your job? 10:24:53
A. No. 10:24:54
Q. During the same period of type, 10:24:55 did you feel that he was stepping on your 10:24:58 toes? 10:24:59
A. No. 10:24:59
Q. Now, while Mr. Fried was the 10:25:00 president and CEO again of LVI Services, 10:25:06 do you have personal knowledge of his work 10:25:09 performance? 10:25:11
A. Only with respect to what I 10:25:12 worked with him on. 10:25:17
Q. And based on your dealings with 10:25:18 Mr. Fried, how would you describe his work 10:25:19 performance? 10:25:22
A. Good. 10:25:23
Q. Now, while Mr. Fried was the 10:25:27 president and CEO again of LVI Services, 10:25:29 was the company searching for a permanent 10:25:33 CEO? 10:25:36

DICARLO

A. That was my understanding, yes. 10:25:37
Q. Do you know why? 10:25:38
A. I do not. 10:25:39
Q. Do you know what Mr. Fried 10:25:40 planned to do after the company found a 10:25:43 permanent CEO? 10:25:44
A. No. 10:25:46
Q. Do you know if he planned to 10:25:53 return to his former role? 10:25:54
A. I don't know. 10:25:56
Q. Now, while Mr. Fried was the 10:25:57 president and CEO of LVI Services for a 10:26:05 second time, did you have any 10:26:08 conversations or e-mail communications 10:26:10 with anyone at LVI Services about Mr. 10:26:12 Fried's job duties or his role at LVI? 10:26:16
MS. SELTZER: I object to the 10:26:18 form, but you can answer. 10:26:19
A. Give me the time frame one more 10:26:20 time? I am sorry. 10:26:22
Q. While Mr. Fried was the CEO and 10:26:24 president of LVI Services for the second 10:26:27 time, did you have any conversations or 10:26:29 e-mail communications with anyone about 10:26:32

DICARLO
was run through Burt. 10:35:06
Q. And did you speak to Mr. State 10:35:07
prior to your appointment to general 10:35:09
counsel about your role at LVI? 10:35:11
A. No. 10:35:15
Q. When was the first time that you 10:35:32
spoke to Mr. State about your role at LVI? 10:35:34
MS. SELTZER: Objection to 10:35:36
form. 10:35:37
A. I don't recall speaking to Mr. 10:35:37
State about my role at LVI. 10:35:39
Q. When -- I believe you testified 10:35:41
that Mr. State told you that you were to 10:35:42
report to him? 10:35:44
A. No, he didn't. I was told by 10:35:52
John Leonard that Mr. State said I should 10:35:53
report to him. 10:35:56
Q. Okay. Did you ever have any 10:35:56
conversations with Mr. State about your 10:35:58
job duties? 10:35:59
MS. SELTZER: Objection. Asked 10:36:00
and answered. 10:36:01
A. No. 10:36:02
Q. To this day? 10:36:03

DICARLO
A. To this day. 10:36:05
Q. Now, while -- after Mr. State 10:36:06
was hired and before you were appointed 10:36:17
general counsel, did you feel that Mr. 10:36:19
Fried was interfering with your ability to 10:36:21
do your job? 10:36:22
A. No, it was business as usual. 10:36:23
Q. Okay. During that period of 10:36:25
time? 10:36:31
A. Correct. 10:36:31
Q. Now, after you became general 10:36:32
counsel, did you feel that Mr. Fried was 10:36:33
interfering with your ability to do your 10:36:36
job? 10:36:38
A. I don't feel he was interfering 10:36:38
with my ability to do my job. I feel the 10:36:45
conflict that had arisen between Burt and 10:36:48
Scott State was causing me confusion as to 10:36:51
the proper reporting relationships and the 10:36:55
level of involvement each of them should 10:36:58
have in any particular matter. 10:37:00
Q. Okay. And would it have been 10:37:01
ideal for you if the two of them worked it 10:37:07
out? 10:37:10

DICARLO
MS. SELTZER: I object to the 10:37:11
form. 10:37:12
A. Ideal. I don't know about 10:37:12
ideal. I -- subjective term. I could 10:37:14
have worked with either of them as they 10:37:21
saw fit as long as I had clear direction. 10:37:26
Q. Okay. But neither Mr. Fried nor 10:37:29
Mr. State gave you that direction; is that 10:37:31
correct? 10:37:33
A. The direction I received was 10:37:38
through John Leonard that I was to report 10:37:40
directly to Scott State. 10:37:43
Q. And did Mr. Fried ever tell you 10:37:44
to report directly to him during this 10:37:46
period of time that you were appointed 10:37:48
general counsel? 10:37:51
A. No, he never indicated that, but 10:37:52
he did continue to require my input of my 10:37:54
keeping him in the loop on several 10:38:03
matters. 10:38:05
Q. So was -- 10:38:05
A. A variety of matters. 10:38:06
Q. Was Mr. Fried conducting 10:38:08
business as usual -- 10:38:13

DICARLO
MS. SELTZER: I object to the 10:38:14
form. 10:38:16
Q. -- with respect to your working 10:38:16
relationship? 10:38:17
MS. SELTZER: I object to the 10:38:18
form. 10:38:19
A. It -- it was business as usual 10:38:23
but maybe a little more involvement than I 10:38:25
was used to by Mr. Fried. 10:38:31
Q. Would it have been the same 10:38:33
level of involvement as when Mr. Fried was 10:38:35
chairman the first time? 10:38:39
A. For the most part with at least 10:38:40
one exception I could think of, yes. 10:38:43
Q. And what exception is that? 10:38:46
A. The exception was that -- that I 10:38:48
found very unusual was shortly after I was 10:38:51
appointed general counsel Mr. Fried 10:38:54
e-mailed me that he wanted to be copied on 10:38:59
all comments I made to contracts. In 10:39:03
other words, I would review a contract. I 10:39:08
would put together a list of comments, and 10:39:10
I would e-mail those to the appropriate 10:39:12
branch and regional managers. Burt asked 10:39:14

50

DICARLO

had heard had happened during the portions 10:53:52
when he was not present. 10:53:55

Q. Okay. How long -- do you know 10:53:57
how long after the board meeting did Mr. 10:54:01
Fried mention to you that Mr. State made a 10:54:02
comment about his age? 10:54:04

A. I don't recall if it was shortly 10:54:05
thereafter. I don't remember. 10:54:09

Q. After -- after hearing what Mr. 10:54:11
Fried told you, did you investigate? 10:54:15

MS. SELTZER: Can I put in an 10:54:19
objection here? As you know, Mr. DiCarlo 10:54:21
is general counsel. 10:54:23

MR. DATOO: Yes. 10:54:25

MS. SELTZER: So if there were 10:54:26
any activities that you took on on behalf 10:54:27
of the company as general counsel in 10:54:29
preparation for litigation, you're not to 10:54:31
disclose those. 10:54:33

MR. DATOO: Well, I am just 10:54:37
asking if he investigated. I don't want 10:54:38
to know -- 10:54:39

MS. SELTZER: Yes, but I mean 10:54:40
if that was part and parcel of what he was 10:54:41

51

DICARLO

doing as a general counsel for the 10:54:43
company, then he should really not talk 10:54:46
about what he did with respect to that 10:54:49
investigation. 10:54:51

MR. DATOO: I don't want to 10:54:51
know what he did. I just want to know 10:54:53
whether he investigated or not. 10:54:55

MS. SELTZER: Okay. 10:54:57

A. I -- I wouldn't say I 10:55:01
investigated it, but I did discuss it with 10:55:04
John Leonard and was told that the company 10:55:06
is aware of Burt's concern because he had 10:55:12
made it clear at the board meeting of his 10:55:15
allegation of age discrimination, and I 10:55:17
believe counsel was already engaged at 10:55:25
that point to handle it. 10:55:27

Q. Now, what did Mr. Leonard tell 10:55:34
you about the November -- about what 10:55:36
happened at the November 4 meeting to 10:55:38
the -- and I am not asking you to disclose 10:55:42
any attorney-client communications you had 10:55:46
with him. 10:55:48

MS. SELTZER: So you just want 10:55:49
the factual things that John told him? 10:55:50

52

DICARLO

MR. DATOO: Yes. 10:55:53

MS. SELTZER: Right. Okay. 10:55:54

A. The way it was described to me 10:55:55
was that Burt accused Mr. State of making 10:56:01
the statement I described earlier about 10:56:08
his age and that he accused Mr. State of 10:56:10
age discrimination, and that I think the 10:56:15
only thing John said was that there was a 10:56:20
blow up about it among the board, and he 10:56:22
didn't have any more detail than that 10:56:25
because I don't believe John was in the 10:56:28
room at the time that was discussed. 10:56:29

Q. Did you hear what happened at 10:56:32
the board meeting from anybody else? 10:56:34

A. No. 10:56:37

A. Well, I should correct that and 10:56:48
say I did have discussions, but I -- I 10:56:51
would classify them as attorney-client 10:56:53
privileged communications. 10:56:56

Q. And who did you have the 10:56:56
discussions with? 10:56:58

A. Scott State. 10:56:59

Q. And when did you have that 10:56:59
discussion? 10:57:00

53

DICARLO

A. I believe it was December 3. 10:57:01

Q. Okay. Did you hear anything 10:57:06
else about what happened at the November 4 10:57:13
meeting from anybody? 10:57:16

A. No. 10:57:17

Q. Okay. Did you speak to Mr. 10:57:19
Fried after the November 4 board 10:57:25
meeting -- 10:57:27

MS. SELTZER: Other than -- 10:57:29

Q. -- about what happened? 10:57:30

MS. SELTZER: Other than what 10:57:32
he has already testified to? 10:57:33

MR. DATOO: Correct. 10:57:34

A. About what happened at the board 10:57:35
meeting? 10:57:37

Q. Yes. 10:57:38

A. No. 10:57:38

MR. DATOO: Okay. I am 10:57:45
probably just going to have to -- can we 10:57:46
go off? 10:57:48

THE VIDEOGRAPHER: We're going 10:57:49
off the record. The time is 10:57 a.m. 10:57:49

(Recess taken.) 10:59:34

THE VIDEOGRAPHER: We're 10:59:42

DICARLO
MS. SELTZER: It has arrived, so -- 11:21:11 11:21:15
MR. DATOO: Okay. Well, let me just finish up with this. 11:21:16 11:21:19
MS. SELTZER: Okay. 11:21:20
Q. If you look at the second page, Burt says -- Burt writes: "Please copy me on all of your e-mails containing your comments to the contract provisions bonded on -- and on bonded after your review if you have not discussed your comments previously with me and advise me of the replies." 11:21:21 11:21:23 11:21:28 11:21:30 11:21:32 11:21:36 11:21:38 11:21:40
So Mr. Fried wanted you to copy him, correct? 11:21:42 11:21:44
A. Correct. 11:21:46
Q. And that is only if you didn't discuss any of your comments that you made with him previously, correct? 11:21:46 11:21:51 11:21:55
A. Correct. 11:21:56
Q. And he wanted you to advise him of any replies to your comments, correct? 11:21:57 11:22:00
A. Correct. 11:22:02
Q. And would that just be keeping Mr. Fried in the loop? 11:22:03 11:22:09

DICARLO
A. It was highly unusual in our relationship and the method under which we worked prior to this e-mail. I did not copy Burt on my contract comments, and I had not for five plus years. I dealt with them myself. I went to Burt or copied Burt on the select few where we were unable to negotiate or I or management without Burt's input was unable to negotiate an acceptable resolution to a problematic provision, and I when I say acceptable I mean within the parameters that had evolved over the course of my time working with Burt. I had -- I had an idea or a clear idea of what was acceptable and what we could negotiate up to a point. If I was unable to get it negotiated to within those parameters, I would go to Burt. It was a very small percentage of all the contracts I reviewed that I would run by Burt, so this was highly unusual. 11:22:10 11:22:15 11:22:20 11:22:26 11:22:28 11:22:33 11:22:37 11:22:40 11:22:44 11:22:47 11:22:50 11:22:52 11:22:55 11:22:59 11:23:02 11:23:05 11:23:07 11:23:09 11:23:15 11:23:18 11:23:20 11:23:29
Q. Now, because most of this was redacted, you know, I can't really tell what was going on in here, but was Mr. Fried by virtue of this e-mail asking you to report to him or just run things by him? 11:23:30 11:23:32 11:23:34 11:23:37 11:23:39 11:23:42

DICARLO
A. First of all, this was not anything to do with a casino. I don't know if you think that is related, but it is not. 11:23:42 11:23:49 11:23:52 11:23:54
Q. I am not -- 11:23:54
A. I just want to make that clear because I wasn't sure if there was a connection there. 11:23:56 11:23:58 11:23:59
Q. No, I was -- earlier on I was asking whether Mr. Fried sent you this e-mail because of an error that was made in connection with a casino -- a demolition project for a casino. 11:24:00 11:24:02 11:24:04 11:24:07 11:24:11
A. The answer is emphatically no. 11:24:12
Q. I am sorry? 11:24:15
A. Emphatically no. 11:24:16
Q. To what question? 11:24:18
A. To the question of whether this e-mail was made in relation to a mistake being made on a contract with respect to a casino. This neither relates to a casino nor a mistake made in the contract, this e-mail. 11:24:19 11:24:20 11:24:23 11:24:24 11:24:28 11:24:31

DICARLO
Q. No, I'm not talking about the e-mail chain. I am talking specifically about what Mr. Fried wrote in this e-mail, whether it was in response to an error or to an oversight made in connection with a contract for the demolition of a casino. 11:24:31 11:24:33 11:24:35 11:24:38 11:24:40 11:24:43
A. And the answer is no. 11:24:45
Q. Okay. 11:24:47
A. No. 11:24:47
Q. Now, as I said -- as I was saying earlier, did Mr. Fried tell you to report to him? 11:24:48 11:24:53 11:24:57
A. He did not. 11:24:57
Q. Okay. And was Mr. Fried making recommendations as to what provisions should be included in this contract or what should be negotiated? 11:24:59 11:25:04 11:25:08 11:25:12
A. Yes. 11:25:14
Q. And who was making the final decisions on what goes in the contract and 11:25:15 11:25:16

DICARLO

second page of that document, and if you 11:35:21
look to the second full paragraph above 11:35:22
the word Scott. Do you see that? 11:35:24
A. Yes. 11:35:26
Q. Okay. If I can draw your 11:35:27
attention to the second sentence in the 11:35:28
second full paragraph, it reads: "Most 11:35:31
troublesome is that he is just stepping 11:35:34
all over our new general counsel, Greg 11:35:37
DiCarlo, which tends to marginalize Greg 11:35:41
at a time when I need him to step up." 11:35:43
Now, was Mr. Fried stepping all 11:35:52
over you at this point in time? 11:35:54
MS. SELTZER: I object to the 11:35:57
form. 11:35:58
A. I wouldn't use the words 11:35:58
stepping all over, no. I would say it was 11:36:06
business as usual, meaning as it had been 11:36:08
for the entirety of the time I had been 11:36:15
with LVI up to that point. What was 11:36:18
happening, as I said, was there was 11:36:21
confusion on my part about reporting 11:36:24
relationships and the authority of both 11:36:32
Scott and Burt to direct my activities. 11:36:36

DICARLO

Q. Now, at this point in time, was 11:36:41
there confusion about your reporting 11:36:43
relationship? 11:36:47
A. Well, because Scott wrote this 11:36:48
e-mail on October 29, it is clear to me 11:36:55
that I had had at least some conversation 11:37:01
with John Leonard up to this point where I 11:37:02
expressed that confusion over the 11:37:07
reporting relationship of being unsure of 11:37:09
how I should handle direction from Burt 11:37:11
versus Scott. 11:37:14
Q. And this was prior to the e-mail 11:37:15
that Mr. Fried sent you on November 1, 11:37:18
correct? 11:37:20
A. It is indeed. 11:37:21
Q. Okay. So what resulted in your 11:37:22
confusion? 11:37:24
A. I don't have any memory of what 11:37:27
the specific issues were that gave rise to 11:37:30
that -- 11:37:34
Q. Okay. 11:37:34
A. -- in that two or three-day time 11:37:35
frame. 11:37:37
Q. So do you know what Mr. State 11:37:38

DICARLO

was talking about when he said Mr. Fried 11:37:39
was just stepping all over you? 11:37:42
A. No, not specifically. 11:37:43
Q. And did you feel marginalized at 11:37:45
this point in time? 11:37:49
A. I don't think I felt 11:37:50
marginalized. Confused. 11:37:53
Q. Do you know what Mr. State was 11:37:55
talking about when he wrote it tends to 11:37:58
marginalize you? 11:38:02
A. I don't. 11:38:03
Q. Okay. Did there come a time 11:38:03
when Mr. Fried was terminated? 11:38:46
A. I know there was a time when Mr. 11:38:48
Fried left. I am not entirely clear on 11:38:58
whether it was a termination or not. 11:39:00
Q. Okay. 11:39:02
A. Or a voluntary departure. 11:39:03
Q. Did you ever have a conversation 11:39:09
with Mr. Fried in which he told you he was 11:39:11
separating from the company? 11:39:13
A. He -- he must have said 11:39:15
something to me prior to leaving. I know 11:39:20
he just didn't walk out, but I don't have 11:39:22

DICARLO

a specific recollection of a conversation. 11:39:24
Q. Do you recall speaking with Mr. 11:39:25
Fried at the Westport office while 11:39:27
Ms. Shari Dembin was present? 11:39:32
A. I don't recall. 11:39:34
Q. Okay. Do you know -- 11:39:38
MR. DATOO: Strike that. 11:39:46
Q. You testified that you don't 11:39:47
know if Mr. Fried was terminated or he 11:39:49
left voluntarily? 11:39:52
A. Correct. 11:39:53
Q. Okay. Do you know if he was 11:39:54
terminated as an employee of LVI? 11:39:57
A. I am not entirely sure. 11:40:00
Q. Okay. 11:40:05
MS. SELTZER: Go ahead. 11:40:07
Q. Do you know when Mr. 11:40:08
Fried -- Mr. Fried's last day at work was? 11:40:23
A. I believe it was November 30. 11:40:26
Q. Okay. 11:40:29
A. 2010. 11:40:30
Q. And in between the time Mr. 11:40:31
Fried sent you the e-mail on November 1 11:40:35
and November 30, 2010, did you have a 11:40:39

82

DICARLO

MS. SELTZER: Over -- over the period that Scott State was -- 11:44:46 11:44:48

MR. DATOO: No, over the period that Mr. DiCarlo was referring to. 11:44:50 11:44:51

MS. SELTZER: So the entire period that Mr. Fried was in the Westport office is what you are saying? 11:44:53 11:44:54 11:44:56

MR. DATOO: It is -- 11:44:58

A. It was -- it was infrequent that he wouldn't be there, although he was out of the office more often during the time he came back on as president and CEO. After McNamara left before Scott came on when Burt took on running the company again, he tended to be out of the office a bit more. I know he traveled to England at one point relating to business. He certainly traveled with me on several occasions -- a number of occasions to Mississippi, to New Orleans, to Washington. We went to a number of places regarding, you know, litigated matters that we traveled on. 11:44:59 11:45:01 11:45:04 11:45:08 11:45:11 11:45:14 11:45:16 11:45:19 11:45:21 11:45:26 11:45:28 11:45:31 11:45:35 11:45:37 11:45:40

Q. Do you know if Mr. Fried spent any time in the the New York City office of LVI? 11:45:41 11:45:43 11:45:45

83

DICARLO

A. Once Bob McNamara came on board I am not aware of Burt spending any time there. 11:45:46 11:45:51 11:45:54

Q. How about when Mr. Fried was -- became president and CEO for the second time? 11:45:54 11:46:03 11:46:05

A. Not that I am aware. 11:46:05

Q. Do you know if Mr. Fried tried to secure contracts for LVI throughout his -- his time at LVI? 11:46:07 11:46:15 11:46:20

A. Yes. 11:46:22

Q. And did he secure a lot of contracts in New York City? 11:46:23 11:46:26

A. Define a lot. 11:46:27

Q. Did he secure any contracts in New York City? 11:46:35 11:46:36

A. Yes. 11:46:37

Q. How many approximately? 11:46:37

A. MSG. I am not entirely sure of his involvement on 130 Liberty or if Bob McNamara drove that more than Burt in '07, '08. Those -- those are what I can think of at the moment. 11:46:38 11:46:50 11:46:53 11:46:57 11:47:06

84

DICARLO

Q. Okay. And as part of securing these -- the MSG contract, would Mr. Fried have to -- would Mr. Fried travel in to New York to attempt to secure that contract? 11:47:07 11:47:09 11:47:12 11:47:15 11:47:18

A. I -- I know of it at least -- of two certainly occasions when he did travel to New York. One was during the negotiation process for a meeting where they had some concerns about LVI, and Burt went to allay those concerns, and I know he went to Turner's office in New York City to execute the contract in person. 11:47:19 11:47:22 11:47:24 11:47:27 11:47:32 11:47:34 11:47:38 11:47:42

Q. And do you recall when this was? 11:47:45

A. I believe the MSG contract was executed I think it was in June 2010. 11:47:47 11:47:51

Q. And is that contract still being performed? 11:48:02 11:48:03

A. Yes. 11:48:04

Q. What is the size of that contract? 11:48:04 11:48:05

A. Dollar value? 11:48:06

Q. Yes. 11:48:06

85

DICARLO

A. Approximately 27 million dollars. 11:48:07 11:48:08

Q. Is that considered a large contract? 11:48:08 11:48:10

A. It is. 11:48:11

Q. Is that LVI's largest contract? 11:48:11

MS. SELTZER: Objection. During which period of time? 11:48:15 11:48:16

Q. During 2010. 11:48:18

A. It is the largest one I am aware of. 11:48:19 11:48:24

Q. Okay. 11:48:25

A. Yes. 11:48:26

Q. And do you know if Mr. Fried was involved in securing the 130 Liberty contract? 11:48:26 11:48:29 11:48:32

A. My understanding is that when we had initially negotiated for that job in the fall of 2005 Burt was primarily involved in 2005 with this negotiation, and I assisted him with that. LVI could not come to terms at that time, and we walked away from the job. In 2007 after the fire at 130 Liberty and the 11:48:32 11:48:39 11:48:42 11:48:49 11:48:53 11:48:58 11:49:02 11:49:09

86

DICARLO
termination of the contractor that was hired to do the work, there were negotiations again. 11:49:12 11:49:14 11:49:17
My understanding is that Bob McNamara I would say would have been more involved than Burt in that negotiation if not almost exclusively, and I think he -- he even negotiated that contract and had it drafted up without my involvement at all. I never even saw that contract until after it was executed. 11:49:18 11:49:20 11:49:24 11:49:29 11:49:35 11:49:37 11:49:39 11:49:43
Q. So now in connection with securing contracts, would it be common to travel to the site of where -- 11:49:44 11:49:51 11:49:58
MR. DATOO: Strike that. 11:50:00
Q. Is the MSG contract still currently ongoing? 11:50:02 11:50:06
A. Yes. 11:50:07
Q. And how many employees are working at MSG? 11:50:08 11:50:10
A. I have no idea. 11:50:13
Q. Do you know if it is -- do you have any idea? 11:50:14 11:50:16
A. None. 11:50:16

87

DICARLO
Q. Okay. Do you know of any other contracts that Mr. Fried secured for LVI or assisted in securing? 11:50:17 11:50:24 11:50:27
MS. SELTZER: Throughout his entire period of employment? 11:50:30 11:50:31
MR. DATOO: Yes, through Mr. DiCarlo's entire period of employment. 11:50:32 11:50:35
A. None come to mind, but I -- I have a sense that there were others. 11:50:37 11:50:43
Q. Okay. In New York City? 11:50:45
A. Not necessarily specific to New York City, but certainly he was active in negotiating work on an ongoing basis throughout the country. 11:50:47 11:50:49 11:50:54 11:50:58
Q. And when he did that, would he remain at the Westport office or would he travel? 11:50:59 11:51:00 11:51:03
A. I suppose it varied depending on the need for him to be personally present somewhere. 11:51:03 11:51:06 11:51:09
Q. Do you know if there were any contracts that Mr. Fried attempted to secure but didn't in New York City? 11:51:09 11:51:12 11:51:14
A. Nothing is coming to mind that I 11:51:18

88

DICARLO
could think of. 11:51:27
Q. Okay. And in instances where someone was unsuccessful in securing contracts, would that result in travel? 11:51:28 11:51:31 11:51:34
MS. SELTZER: I object to the form. 11:51:41 11:51:42
A. It is possible. It is possible. 11:51:43
Q. Okay. Are you familiar with Shari Dembin? 11:51:44 11:51:46
A. Yes. 11:51:47
Q. How so? 11:51:48
A. She is Burt's daughter and was a coworker of mine in the Westport office for the entirety of the time I was there up until mid-January 2011. 11:51:49 11:51:52 11:51:55 11:51:58
Q. And do you know how long she was employed by LVI? 11:52:05 11:52:07
A. I believe it was fifteen or sixteen years. 11:52:08 11:52:09
Q. And did she work at the Westport office the entire time you were there? 11:52:10 11:52:12
A. Yes. 11:52:14
Q. Do you know if she worked in another office prior to the Westport 11:52:14 11:52:16

89

DICARLO
office? 11:52:18
A. Yes. She had said she used to work in the New York office prior to the Westport office -- office opening in I believe in 2003. 11:52:19 11:52:22 11:52:25 11:52:27
Q. Okay. Is the Westport office currently open? 11:52:29 11:52:31
A. Yes. 11:52:32
Q. And how long is it going to remain open for? 11:52:33 11:52:35
A. The lease expires at the end of August 2011 at which point we will vacate. 11:52:36 11:52:38
Q. And -- and do you know where you are going? 11:52:42 11:52:43
A. We don't have a new space these leased as of yet. 11:52:44 11:52:51
Q. When does the lease expire -- I'm sorry? 11:52:52 11:52:54
A. No, that is it. 11:52:55
Q. When does the lease expire for the Westport office? 11:52:56 11:52:58
A. End of August 2011. 11:52:59
Q. And you mentioned we. Who else is there? 11:53:01 11:53:03

90

DICARLO

A. Associate counsel Tom Cullen and paralegal Jeannie Naggy. 11:53:04 11:53:06
Q. Is there a discussion about you and your team moving to the Milford office? 11:53:08 11:53:09 11:53:12
A. There has been some discussion of that, but that is not going to happen. 11:53:12 11:53:13
Q. Why not? 11:53:16
A. It is not a very conducive environment to the type of work we do. 11:53:17 11:53:24
Q. Okay. Is there any discussion about renting a suite? 11:53:26 11:53:28
A. There is discussion about renting a smaller space for the three of us. 11:53:31 11:53:33 11:53:35
Q. Okay. 11:53:35
A. Somewhere in the Connecticut area, yes. 11:53:36 11:53:37
Q. Do you know what Ms. Dembin's job title was? 11:53:38 11:53:43
A. I -- I am not sure, no. 11:53:44
Q. Do you know what she did? 11:53:48
A. She processed bond requests, insurance certificate requests. She had 11:53:49 11:53:57

91

DICARLO

some involvement with travel, and I don't -- I am not sure exactly what her duties were with respect to it, but I know she had some involvement with it, and she handled meeting planning when -- whenever there was a need for a significant meeting, management meetings. 11:54:02 11:54:06 11:54:08 11:54:09 11:54:15 11:54:18 11:54:21
Q. Okay. Do you know who she reported to? 11:54:23 11:54:30
A. I understood it to be Burt Fried just based on what I saw, but I've never heard one way or the other who she reported to while Burt was there. 11:54:31 11:54:34 11:54:38 11:54:40
Q. And do you have any personal knowledge about the quality of her work? 11:54:42 11:54:47
A. Not really, no. 11:54:48
Q. What do you mean by "not really"? 11:54:55 11:54:57
A. Well, my involvement with her really was just relating to the bond requests. So a bond request would come in. She would gather the information out of the package that came to get it to the broker, and then she would route the 11:54:57 11:55:02 11:55:04 11:55:06 11:55:08 11:55:11

92

DICARLO

contract and the whole request as a whole to me, so that I could review the contract. So, you know, to the extent that she had to deal with that, there was, you know, no issues with it. 11:55:14 11:55:16 11:55:24 11:55:26 11:55:28
Q. Now, did there come a time when Ms. Dembin was terminated? 11:55:30 11:55:32
A. Yes. 11:55:34
Q. Do you recall when that was? 11:55:34
A. I believe her last day was January 14 of 2011. 11:55:35 11:55:38
Q. Do you know why she was terminated? 11:55:41 11:55:42
A. She was terminated as part of a reduction in force with four or five other people people in the Westport office as well as a number of other people throughout the country. 11:55:43 11:55:45 11:55:52 11:55:54 11:55:57
Q. Now, other than Ms. Dembin, do you know the names of those people that were terminated -- that were part of the reduction in force at the Westport office? 11:55:57 11:56:01 11:56:02 11:56:05
A. At the Westport office? 11:56:07
Q. Yes. 11:56:09

93

DICARLO

A. Yes, I do. 11:56:09
Q. Can you give me their names? 11:56:10
A. Sure. It was Robin Keller, Kristin Braun, Peggy Craemer, Marcy Juran. I think that is it. 11:56:11 11:56:16 11:56:35
Q. And do you know what Marcy Juran's job title was? 11:56:36 11:56:37
A. I don't know her title, but she was marketing. 11:56:40 11:56:41
Q. And do you know what Ms. Peggy Craemer's job title was? 11:56:42 11:56:48
A. No, but again marketing. 11:56:50
Q. How about Robin Keller? 11:56:52
A. Receptionist and also -- well her title was receptionist. 11:56:53 11:56:57
Q. Did she do any marketing? 11:57:00
A. No, she was Shari Dembin's backup when Shari was not in the office to do, you know, bond requests and insurance requests in Shari's absence. 11:57:01 11:57:04 11:57:07 11:57:09
Q. And Kristin Braun, do you know what her job title was? 11:57:11 11:57:13
A. She was also marketing. 11:57:15
Q. Okay. And were there any other 11:57:17

C E R T I F I C A T I O N

I, DEBBIE ZAROMATIDIS, a Shorthand Reporter and a Notary Public, do hereby certify that the foregoing witness, GREGORY DICARLO, was duly sworn on the date indicated, and that the foregoing is a true and accurate transcription of my stenographic notes.

I further certify that I am not employed by nor related to any party to this action.

DEBBIE ZAROMATIDIS

ERRATA SHEET
VERITEXT/NEW YORK REPORTING, LLC

CASE NAME: Fried, Burton T. v. LVI Services, Inc., et al.
DATE OF DEPOSITION: June 2, 2011
WITNESSES' NAME: Gregory DiCarlo

| PAGE | LINE (S) | CHANGE | REASON |
|---|---|---|---|
| ____ | ______ | ____________________ | ____________________ |
| ____ | ______ | ____________________ | ____________________ |
| ____ | ______ | ____________________ | ____________________ |
| ____ | ______ | ____________________ | ____________________ |
| ____ | ______ | ____________________ | ____________________ |
| ____ | ______ | ____________________ | ____________________ |
| ____ | ______ | ____________________ | ____________________ |
| ____ | ______ | ____________________ | ____________________ |
| ____ | ______ | ____________________ | ____________________ |
| ____ | ______ | ____________________ | ____________________ |
| ____ | ______ | ____________________ | ____________________ |
| ____ | ______ | ____________________ | ____________________ |
| ____ | ______ | ____________________ | ____________________ |
| ____ | ______ | ____________________ | ____________________ |
| ____ | ______ | ____________________ | ____________________ |

______________________
Gregory DiCarlo

SUBSCRIBED AND SWORN TO BEFORE ME
THIS ____ DAY OF ___________, 20__.

_______________ (NOTARY PUBLIC)    _______________ MY COMMISSION EXPIRES:

E X H I B I T S

| PLAINTIFF'S EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 47 | E-mail | 57 |
| 48 | E-mail | 70 |