Exhibit 7

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

No. 10 Civ. 9308(JSR)

-------------------------------------x

BURTON T. FRIED,

                              Plaintiff,

          - against -

LVI SERVICES, INC., LVI PARENT CORP., CODE

HENNESSY SIMMONS, LLC d/b/a CHS PRIVATE

EQUITY V LP; APOLLO INVESTMENT CORP.,

SCOTT E. STATE, in his official and

individual capacities; BRIAN SIMMONS, in

his official and individual capacities;

RAJAY BAGARIA, in his official and

individual capacities; GERALD J. GIRARDI,

in his official and individual capacities,

                              Defendants.

-------------------------------------x

                              June 3, 2011

                              9:10   a.m.

**2**

VIDEOTAPE DEPOSITION of JOHN LEONARD, taken by the Plaintiff, pursuant to Notice, held at the offices of Thompson Wigdor & Gilly, LLP, 85 Fifth Avenue, New York, New York, before Debbie Zaromatidis, a Shorthand Reporter and Notary Public of the State of New York.

**4**

S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between the Attorneys for the respective parties hereto that filing and sealing be and the same are hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections except as to the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within examination may be signed and sworn to before any notary public with the same force and effect as though signed and sworn to before this Court.

**3**

A P P E A R A N C E S :

THOMPSON WIGDOR & GILLY, LLP
    Attorneys for Plaintiff
        85 Fifth Avenue
        New York, New York 10003
BY:   SHAFFIN A. DATOO, ESQ.


SIDLEY AUSTIN, LLP
    Attorneys for Defendants
        787 Seventh Avenue
        New York, New York 10019
BY:   JOANNE SELTZER, ESQ.


ALSO PRESENT:
    BURTON FRIED
    J.D. MARTINEZ, Videographer

**5**

                                    09:10:42
        THE VIDEOGRAPHER:  Good      09:10:42
morning.  My name is J.D. Martinez of   09:10:42
Veritext New York.  The date today is June   09:10:42
3, 2011, and the time on the video is 9:10   09:10:42
01 a.m.  Today's deposition is being held   09:10:42
at the office of Thompson Wigdor & Gilly,   09:10:42
LLP located at 85 Fifth Avenue, New York,   09:10:42
New York.  The caption of the case is   09:10:42
Burton T. Fried versus LVI Services, Inc.   09:10:42
et al.. filed in the United States   09:10:42
District Court, Southern District of New   09:10:42
York.  The name of the witness is John   09:10:42
Leonard.                            09:10:42
        At this time the attorneys will   09:10:42
identify themselves and the parties they   09:10:42
represent after which our court reporter,   09:10:42
Debbie Zaromatidis, will swear in the   09:10:42
witness, and we can proceed.        09:10:42
        MS. SELTZER:  Joanne Seltzer   09:10:42
Sidley Austin for all defendants.   09:10:42
        MR. DATOO:  Shaffin Datoo   09:10:42
Thompson Wigdor & Gilly for the plaintiff
Burt Fried.

2 (Pages 2 to 5)

**VERITEXT REPORTING COMPANY**

212-267-6868                                    516-608-2400

**6**

```
1            LEONARD
2    J O H N   L E O N A R D,
3    having first been duly sworn by a Notary
4    Public of the State of New York, was
5    examined and testified as follows:
6    EXAMINATION BY MR. DATOO:          09:10:42
7       Q.   Good morning, Mr. Leonard.
8       A.   Good morning.            09:10:42
9       Q.   As you know, my name is Shaffin  09:10:42
10   Datoo, and I represent Mr. Fried in this  09:10:42
11   lawsuit. I am just going to ask you a   09:10:42
12   whole bunch of questions today, and     09:10:42
13   hopefully you can answer all of them    09:10:42
14   unless your attorney directs you not to  09:10:42
15   answer. I am just going to start off with  09:10:42
16   a couple of ground rules.          09:10:42
17          Do you understand that the    09:10:42
18   answers you are about to give are under  09:10:42
19   oath and that you are subject to the    09:10:42
20   penalties of perjury if you give an     09:10:42
21   untruthful answer?               09:10:42
22      A.   Yes.                  09:10:42
23      Q.   I am going to assume that if you  09:10:42
24   answer a question that you understood it.  09:10:42
25   If you don't understand a question, let me  09:10:42
```

**7**

```
1            LEONARD
2    know, and I will ask the question in a   09:10:42
3    different way. Please give verbal answers  09:10:42
4    to my questions. Don't nod your head or   09:10:42
5    shake it; otherwise, the court reporter   09:10:42
6    won't be able to take it down, and also   09:10:42
7    please let me finish asking a question    09:10:42
8    before you answer it; otherwise, the court  09:10:42
9    reporter will not be able to take that    09:10:42
10   down. If you need a break, let me know.   09:10:42
11   The only condition I have is that you     09:10:42
12   answer the last question asked.         09:10:42
13          Is your ability to tell the    09:10:42
14   truth in any way impaired today?        09:10:42
15      A.   No.                   09:10:42
16      Q.   Okay. Now, in connection with  09:10:42
17   this lawsuit, did you provide your       09:10:42
18   attorney with all responsive documents?   09:10:42
19      A.   I did not provide documents.   09:10:42
20      Q.   Okay. Do you have any documents  09:10:42
21   that have anything to do with this       09:10:42
22   lawsuit?                    09:10:42
23      A.   I have one document.         09:10:42
24      Q.   And which document is that?    09:10:42
25      A.   It is some notes I took down   09:10:42
```

**8**

```
1            LEONARD
2    from a phone call I had between myself and  09:10:42
3    Burt.                      09:10:42
4       Q.   And did you provide those notes  09:10:42
5    to your attorney?               09:10:42
6       A.   I did not.              09:10:42
7       Q.   Okay.                 09:10:42
8          MS. SELTZER:  You'll get them   09:10:42
9    when I get them.               09:10:42
10      Q.   Okay. Do you intend to provide  09:10:42
11   that to your attorney?             09:10:42
12      A.   Yes.                  09:10:42
13         MR. DATOO:  Okay. Joanne, I    09:10:42
14   request production of those notes.      09:10:42
15      Q.   Do you recall when you had that  09:10:42
16   conversation with Mr. Fried that you took  09:10:42
17   notes on?                    09:10:42
18      A.   I believe it was in early     09:10:42
19   January of 2011.               09:10:42
20      Q.   Okay. And do you know what you  09:10:42
21   discussed with Mr. Fried?           09:10:42
22      A.   We discussed initially my injury  09:10:42
23   that I had had from an accident and then  09:10:42
24   his disappointment in me and supposedly   09:10:42
25   how I had changed regarding my actions   09:10:42
```

**9**

```
1            LEONARD
2    with the company.               09:10:42
3       Q.   Okay. Why did you take notes   09:10:42
4    about that conversation?            09:10:42
5       A.   One, because there had been a   09:10:42
6    lawsuit filed against LVI prior to that   09:10:42
7    and, two, just to make sure I had it clear  09:10:42
8    in my head what was discussed in case I   09:10:42
9    was asked about it.              09:10:42
10      Q.   Okay. Is it your practice to   09:10:42
11   take notes of conversations you have over  09:10:42
12   the phone?                   09:10:42
13      A.   Not usually.             09:10:42
14      Q.   Okay. What -- what did you say  09:10:42
15   on this phone call?              09:10:42
16      A.   Not too much. I listened.     09:10:42
17   Basically Burt said he no longer wanted to  09:10:42
18   have anything to do with me or wanted me  09:10:42
19   to have nothing to do with his family and  09:10:42
20   that he was upset with my actions and the  09:10:42
21   way I had dealt with the situation of the  09:10:49
22   reduction of forces that we had and      09:10:49
23   basically said I turned into a mouse.    09:10:49
24      Q.   How long was this conversation?  09:10:49
25      A.   I would say ten minutes.      09:10:49
```

**VERITEXT REPORTING COMPANY**

212-267-6868                                         516-608-2400

34

```
1           LEONARD
2    Q.  Okay.  Did Mr. Fried at      09:29:21
3  this -- at this point in time did Mr.    09:29:24
4  Fried ever tell that he wanted to retire   09:29:26
5  or use words to that effect?         09:29:28
6    A.  He had said he, you know, wanted   09:29:29
7  to go to the beach many times through our   09:29:33
8  career, but I don't know in 2006 if he   09:29:38
9  said that.                           09:29:41
10    Q.  Okay.  When -- when did he say   09:29:45
11  that to you?                        09:29:45
12    A.  Over different periods of our   09:29:46
13  relationship through our career, so I   09:29:50
14  can't give you an exact time.        09:29:52
15    Q.  And what did you understand that   09:29:55
16  to mean?                            09:29:56
17    A.  That at some point he would like   09:29:56
18  to retire and sit on the beach.      09:29:58
19    Q.  Did he tell you when that was?   09:30:01
20    A.  No.                          09:30:03
21    Q.  Do you know who Robert McNamara   09:30:04
22  is?                                 09:30:20
23    A.  Yes.                         09:30:20
24    Q.  Who is he?                    09:30:20
25    A.  He is the former CEO of LVI    09:30:23
```

35

```
1           LEONARD
2  Services, Inc.                      09:30:26
3    Q.  And was he -- was he hired to   09:30:26
4  replace Mr. Fried as CEO?            09:30:28
5    A.  Yes.                         09:30:30
6    Q.  And while Mr. McNamara was CEO,   09:30:34
7  what was Mr. Fried's job title?      09:30:36
8    A.  Chairman.                     09:30:38
9    Q.  Do you know -- while Mr.        09:30:39
10  McNamara was CEO, do you know what Mr.   09:30:48
11  Fried's job duties were as chairman?   09:30:52
12    A.  No.                          09:30:54
13    Q.  Do you know what he did as     09:30:54
14  chairman?                           09:30:55
15    MS. SELTZER:  Objection.  Asked   09:30:56
16  and answered.  You can answer it again.   09:30:57
17    A.  Yes.  He did legal work.  He did   09:30:58
18  some oversight of sales at different   09:31:06
19  times.  He did review of contracts of   09:31:10
20  bonds, oversaw some of the marketing   09:31:15
21  efforts coming out of Westport, the office   09:31:22
22  he worked at, travel, general guidance of   09:31:25
23  any issues contractually that I would have   09:31:37
24  or Bob would have.                  09:31:44
25    Q.  Okay.  Now, when you say -- you   09:31:45
```

36

```
1           LEONARD
2  mentioned that Mr. Fried did some work in   09:31:48
3  sales.  Does that include securing and   09:31:55
4  attempting to secure contracts for LVI   09:31:57
5  Services?                           09:32:00
6    A.  From time to time.            09:32:00
7    Q.  Okay.  And what else did you   09:32:02
8  mean by sales?                      09:32:07
9    A.  There were periods of time where   09:32:12
10  he oversaw some of the national      09:32:14
11  salespeople.                        09:32:16
12    Q.  And was he working less than   09:32:23
13  five days a week when he was chairman?   09:32:25
14    MS. SELTZER:  Objection.  Under   09:32:27
15  McNamara?                           09:32:28
16    MR. DATOO:  Under McNamara.      09:32:30
17    A.  Not in general.              09:32:33
18    Q.  What do you mean by that?     09:32:34
19    A.  I mean I don't know if he worked   09:32:35
20  five days a week every week when he worked   09:32:37
21  for Bob, but in general he worked a full   09:32:39
22  work week if that is your question.   09:32:41
23    Q.  Okay.  That is.  Thank you.   09:32:43
24    And did Mr. Fried in his role as   09:32:45
25  chairman under McNamara step away from the   09:32:48
```

37

```
1           LEONARD
2  day-to-day responsibilities?         09:32:51
3    A.  Yes.                         09:32:59
4    Q.  And now while Mr. McNamara was   09:32:59
5  CEO, do you have any personal knowledge of   09:33:02
6  Mr. Fried's work performance as chairman?   09:33:04
7    A.  Do I have any -- repeat the    09:33:07
8  question, please.                   09:33:14
9    Q.  How -- how was Burt -- was Burt   09:33:15
10  doing a good job as chairman under Mr.   09:33:19
11  McNamara?                           09:33:21
12    A.  Yes.                         09:33:22
13    Q.  Now, while Mr. McNamara was CEO,   09:33:23
14  did Mr. Fried ever tell you that he wanted   09:33:29
15  to retire or use words to that effect?   09:33:31
16    A.  I don't believe so.          09:33:34
17    Q.  Now, did there come a time when   09:33:44
18  Mr. Fried became the interim CEO of LVI   09:33:47
19  Services?                           09:33:51
20    A.  Yes.                         09:33:51
21    Q.  Do you recall when that was?   09:33:53
22    A.  Approximately April of 2010.   09:33:55
23    Q.  Do you know why?             09:34:00
24    A.  Mr. McNamara had resigned the   09:34:04
25  position.                           09:34:08
```

10  (Pages 34 to 37)

**38**

```
1            LEONARD
2    Q.  Okay.  And do you know if Mr.      09:34:10
3  Freed volunteered to become interim CEO or  09:34:11
4  if he was asked to become interim CEO?     09:34:17
5    A.  I don't know.                        09:34:20
6    Q.  Okay.  And what job duties did       09:34:26
7  Mr. Fried assume as interim CEO?           09:34:28
8    A.  Oversight of the company.            09:34:31
9    Q.  Okay.  And do you know if he         09:34:34
10  continued to perform or if he continued to  09:34:36
11  do what he did as chairman while he was     09:34:39
12  interim CEO?                               09:34:41
13    A.  Yes.                                 09:34:43
14    Q.  Okay.  Now, while Mr. Fried was      09:34:44
15  interim CEO, what was he working on?       09:34:48
16    MS. SELTZER:  I object to the            09:34:52
17  form.                                      09:34:53
18    A.  Running the company day to day.      09:34:58
19  I mean you need to be more specific if     09:35:01
20  you --                                     09:35:03
21    Q.  What did that involve?               09:35:03
22    A.  It involved working with me in       09:35:15
23  overseeing the overall performance of the  09:35:16
24  company, dealing with any issues with the  09:35:19
25  company, looking at where the company was  09:35:22
```

**39**

```
1            LEONARD
2  functionally, all the responsibilities of   09:35:27
3  overseeing the company.  Too much to list.   09:35:33
4    Q.  Now, at this point in time when       09:35:43
5  Mr. Fried was interim CEO, what office was   09:35:44
6  he working in?                              09:35:48
7    A.  Westport, Connecticut.                09:35:50
8    Q.  And do you know if he spent any       09:35:51
9  time in the New York office during this     09:35:53
10  period of time?                             09:35:54
11    A.  I do not personally know.            09:35:55
12    Q.  Okay.  Was Mr. Fried required to     09:35:57
13  travel as interim CEO?                      09:36:00
14    A.  I am sure from time to time he       09:36:13
15  had to travel, but I don't know his         09:36:15
16  travel.                                     09:36:17
17    Q.  Okay.  And during the time that      09:36:17
18  Mr. Fried was interim CEO, did LVI have a   09:36:19
19  lot of contracts in New York City?          09:36:22
20    A.  Rephrase the question because        09:36:33
21  I -- I don't understand it.                 09:36:34
22    Q.  Was LVI Services doing a lot of      09:36:35
23  work in New York City?                      09:36:37
24    A.  No.                                  09:36:38
25    Q.  Was LVI -- while Mr. Fried was       09:36:39
```

**40**

```
1            LEONARD
2  interim CEO was LVI Services doing any       09:36:46
3  work -- or LVI doing any work at Madison     09:36:52
4  Square Garden?                              09:36:56
5    A.  Yes.                                  09:36:56
6    Q.  And how big was that contract?        09:36:57
7    A.  28 million.                           09:37:01
8    Q.  Is that considered --                 09:37:02
9    A.  27.5.                                 09:37:03
10    Q.  And is that considered a big         09:37:05
11  contract?                                   09:37:07
12    A.  Yes.                                 09:37:07
13    Q.  And while Mr. Fried was interim      09:37:08
14  CEO, was LVI doing any work at 130          09:37:09
15  Liberty?                                    09:37:14
16    A.  Yes.                                 09:37:14
17    Q.  And do you know what the value       09:37:16
18  of that contract was?                       09:37:18
19    A.  Approximately 30 million.            09:37:19
20    Q.  Is that considered a big             09:37:32
21  contract?                                   09:37:33
22    A.  Yes.                                 09:37:34
23    Q.  Were those two of the biggest        09:37:34
24  contracts LVI had?                          09:37:38
25    A.  Yes.                                 09:37:39
```

**41**

```
1            LEONARD
2    Q.  Was LVI doing any other work in       09:37:40
3  New York City other than the two we just    09:37:45
4  talked about?                               09:37:47
5    MS. SELTZER:  Once again during           09:37:48
6  the interim period?                          09:37:49
7    MR. DATOO:  During the interim            09:37:52
8  period.                                      09:37:53
9    A.  Yes, and just for the record you      09:37:53
10  first said LVI services, and I said no      09:37:55
11  because LVI ServiceS was not doing the      09:37:59
12  work.  If you are referring to LVI as a     09:38:01
13  whole, any LVI?                             09:38:03
14    Q.  Yes.                                 09:38:05
15    A.  Yes.                                 09:38:05
16    Q.  Okay.  So other than the two we      09:38:05
17  just talked about --                        09:38:08
18    A.  Were they doing work in New          09:38:12
19  York?                                       09:38:14
20    Q.  New York City.                       09:38:14
21    A.  Or were we doing work in New         09:38:15
22  York City?                                  09:38:19
23    Q.  Yes.                                 09:38:19
24    A.  LVI?                                 09:38:19
25    Q.  Yes.                                 09:38:21
```

11 (Pages 38 to 41)

**42**

```
1              LEONARD
2    A.   Yes.                    09:38:22
3    Q.   Can you give me the names of    09:38:22
4  other projects that LVI was doing work in   09:38:24
5  New York City?                  09:38:27
6    A.   HPD.                   09:38:28
7    Q.   What does that stand for?     09:38:29
8    A.   You know what? I -- I don't    09:38:30
9  remember the acronym off the top of my    09:38:33
10 head, but it is downtown.           09:38:35
11   Q.   I am sorry. Where was the     09:38:37
12 location of that?                09:38:39
13   A.   It is on the west side of New   09:38:40
14 York.                        09:38:41
15   Q.   Manhattan?              09:38:42
16   A.   Yes, midtown.             09:38:45
17   Q.   And what kind of work was LVI   09:38:45
18 doing there?                   09:38:49
19   A.   Abatement and demolition of such  09:38:50
20 structures.                    09:38:53
21   Q.   Do you recall what the value of  09:38:53
22 that contract was?               09:38:54
23   A.   There is two contracts, 5     09:38:56
24 million each approximately.          09:39:00
25   Q.   And are those considered large  09:39:01
```

**43**

```
1              LEONARD
2  contracts?                    09:39:03
3    A.   Yes.                   09:39:04
4    Q.   Any other work that LVI was    09:39:04
5  doing in New York City while Mr. Fried was   09:39:08
6  interim CEO?                   09:39:10
7    A.   Yes, but not that I can list off  09:39:11
8  the top of my head.               09:39:15
9    Q.   Just give me as many as you can.  09:39:17
10   A.   When he was interim CEO?      09:39:20
11   Q.   Yes. Well, you know what? Let's  09:39:22
12 broaden the period. Even after the time   09:39:27
13 he was interim CEO just say to -- let's   09:39:29
14 limit it to the time -- let's start at the  09:39:33
15 time Mr. Fried was interim CEO, which     09:39:35
16 would be I believe April 2010 to November   09:39:37
17 2010, the end of November.           09:39:41
18   A.   You know what? I can't list    09:39:47
19 anything off the top of my head. I know   09:39:49
20 there are projects that we were doing, but   09:39:52
21 I can't give you the names of them.      09:39:53
22   Q.   Can you give me an approximate   09:39:55
23 number of the total value of the contracts   09:39:57
24 LVI Services had during that period of    09:40:01
25 time I just mentioned?             09:40:03
```

**44**

```
1              LEONARD
2    A.   The total value --          09:40:05
3    Q.   You know what?            09:40:12
4    A.   Or what was --            09:40:13
5    Q.   Forget that question. I      09:40:14
6  withdraw it.                   09:40:16
7         Was LVI doing a          09:40:17
8  substantial -- in your opinion a       09:40:20
9  substantial amount of business in New York   09:40:21
10 City?                        09:40:22
11        MS. SELTZER:   I object to the   09:40:23
12 form, but you can answer.           09:40:24
13   A.   Yes.                   09:40:25
14   Q.   Was LVI doing the majority of   09:40:26
15 its business in New York City?         09:40:29
16   A.   No.                    09:40:31
17   Q.   Okay. What percentage of LVI's   09:40:31
18 business would you say it was doing in New   09:40:35
19 York City during this period of time I    09:40:37
20 mentioned?                    09:40:38
21   A.   I would have to see reports and   09:40:42
22 what I call job by jobs.            09:40:44
23   Q.   Can you ballpark it?         09:40:45
24   A.   No.                    09:40:47
25   Q.   Okay. Was LVI -- during this    09:40:47
```

**45**

```
1              LEONARD
2  period of time, was LVI doing any work at   09:40:54
3  Yankee Stadium?                 09:40:56
4    A.   Yes.                   09:40:58
5    Q.   What kind of work was it doing   09:40:58
6  at Yankee Stadium?               09:41:01
7    A.   Abatement and demolition.      09:41:03
8    Q.   And what was the value of that   09:41:05
9  contract?                     09:41:06
10   A.   Over 3 million.            09:41:07
11   Q.   Is that considered a large     09:41:14
12 contract?                     09:41:16
13   A.   Yes.                   09:41:17
14   Q.   Now, did Mr. Fried play a role   09:41:17
15 in securing the MSG contract?         09:41:28
16   A.   Yes.                   09:41:31
17   Q.   What role did he play?        09:41:32
18   A.   He met with the procurement     09:41:35
19 manager or head of procurement for Turner,   09:41:42
20 and he also met with the Madison Square    09:41:47
21 Garden project team regarding issues with   09:41:51
22 some perceptual information regarding our   09:41:56
23 company that concerned them and also      09:42:00
24 regarding some pricing when we submitted   09:42:03
25 in terms of our bid.              09:42:08
```

12 (Pages 42 to 45)

**VERITEXT REPORTING COMPANY**

212-267-6868                                  516-608-2400

**46**

LEONARD

1
2    Q.    Would you say he helped LVI in    09:42:10
3    securing the contract?    09:42:13
4    A.    Yes.    09:42:13
5    Q.    And with respect to 130 Liberty,    09:42:14
6    did Mr. Fried play a role in securing that    09:42:18
7    contract?    09:42:21
8    A.    Not the leading role but he had    09:42:22
9    a role.    09:42:28
10    Q.    And would you say he helped LVI    09:42:28
11    secure that contract?    09:42:30
12    A.    I can't answer that.    09:42:33
13    Q.    Okay.  Is it because you don't    09:42:38
14    know or --    09:42:39
15    A.    Yes, because I don't know.    09:42:40
16    Q.    Okay.  With respect to HPD, did    09:42:42
17    Mr. Fried play a role in securing that    09:42:45
18    contract?    09:42:47
19    A.    I don't know.    09:42:51
20    Q.    Okay.  With respect to Yankee    09:42:52
21    Stadium, did Mr. Fried play a role in    09:42:55
22    securing that contract?    09:42:59
23    A.    Yes.    09:43:00
24    Q.    And what role did he play?    09:43:00
25    A.    He and I worked with a company    09:43:03

**47**

LEONARD

1
2    called Demco to secure working with them    09:43:09
3    as a sub to perform the demolition work.    09:43:16
4    Q.    And would you say that Mr. Fried    09:43:23
5    helped LVI secure that contract?    09:43:30
6    A.    Yes.    09:43:31
7    Q.    Now, in connection with these    09:43:32
8    four contracts we just talked about, did    09:43:40
9    Mr. Fried travel to New York for any    09:43:41
10    meetings in connection with these    09:43:46
11    contracts?    09:43:47
12    A.    At least for MSG.    09:43:48
13    Q.    Do you know how many times?    09:43:58
14    A.    I know of at least one meeting    09:43:59
15    that he went to.    09:44:10
16    Q.    Do you know when that was?    09:44:11
17    A.    No.    09:44:12
18    Q.    Approximately?    09:44:12
19    A.    You know, it is somewhere in    09:44:18
20    either the end of 2009 or the beginning of    09:44:25
21    2010.    09:44:27
22    Q.    Okay.    09:44:28
23    A.    Or early 2010.  I don't know as    09:44:28
24    I said exactly.    09:44:33
25    Q.    Okay.  And do you know if Mr.    09:44:34

**48**

LEONARD

1
2    Fried -- in connection with these four    09:44:36
3    contracts we just discussed, do you know    09:44:38
4    if Mr. Fried made any calls from the    09:44:40
5    Westport office to New York with respect    09:44:43
6    to these contracts?    09:44:45
7    A.    Again, to New York what are you    09:44:49
8    referring to?    09:44:52
9    Q.    To MSG, to HPD, to Yankee    09:44:53
10    Stadium, to 130 Liberty Street?    09:44:59
11    MS. SELTZER:  If you know.    09:45:02
12    A.    I know he made some calls to    09:45:03
13    Turner for MSG.    09:45:04
14    Q.    Who is Turner?    09:45:06
15    A.    Turner is the general    09:45:07
16    contractor.    09:45:08
17    Q.    Is that Turner Construction    09:45:09
18    Company?    09:45:11
19    A.    Yes.    09:45:12
20    Q.    Now, while Mr. Fried was the    09:45:12
21    interim CEO of LVI service, was he    09:45:26
22    searching for a permanent CEO?    09:45:29
23    A.    Yes.    09:45:34
24    Q.    Do you know why?    09:45:35
25    A.    Again, I don't believe he wanted    09:45:36

**49**

LEONARD

1
2    to run the day-to-day operations.    09:45:38
3    Q.    Did he tell you what he wanted    09:45:41
4    to do once they found -- once LVI Services    09:45:46
5    found a new CEO?    09:45:49
6    A.    Not specifically that I    09:45:50
7    remember.    09:45:56
8    Q.    Okay.  Did he tell you that he    09:45:56
9    wanted to step back into his chairman    09:45:59
10    role?    09:46:02
11    A.    I believe he did, yes.    09:46:02
12    Q.    Okay.  And did he ever tell you    09:46:07
13    that he planned to die in his chair?    09:46:11
14    A.    Yes.    09:46:14
15    Q.    And when did he tell you that?    09:46:15
16    A.    Again, I don't know exactly    09:46:20
17    when.  He probably told me that several    09:46:26
18    times.    09:46:29
19    Q.    Okay.    09:46:29
20    A.    But I can't give you an exact    09:46:30
21    date.    09:46:31
22    Q.    How about an approximate date?    09:46:32
23    A.    Pick a week probably.    09:46:33
24    Q.    Okay.  That often?    09:46:41
25    A.    No.  I would say after, you    09:46:43

13  (Pages 46 to 49)

VERITEXT REPORTING COMPANY

212-267-6868                              516-608-2400

**50**

LEONARD

1
2  know, from some -- sometime after 2005.   09:46:44
3      Q.   Okay.  Now, do you know if Mr.   09:46:47
4  Fried planned to return to his role as   09:46:56
5  chairman after a new CEO was found?   09:46:58
6          MS. SELTZER:  Objection.  Asked   09:47:01
7  and answered.  You can answer.   09:47:02
8      A.   I believe that was his intent.   09:47:03
9      Q.   Okay.  Now, while -- while Mr.   09:47:05
10  Fried was interim CEO, was LVI going   09:47:17
11  through a restructuring?   09:47:20
12      A.   Yes.   09:47:21
13      Q.   Why was that?   09:47:22
14      A.   The debt that we had and the   09:47:24
15  covenants that we were under we just   09:47:37
16  weren't going to be able to meet all of   09:47:43
17  the obligations and the parameters for   09:47:45
18  those.   09:47:48
19      Q.   What do you mean by the   09:47:48
20  covenants we were under?   09:47:49
21      A.   There is certain covenants that   09:47:51
22  we had to work within based on debt to   09:47:53
23  EBIT DA, and I don't know the specifics   09:47:58
24  down to the detail that I can give you an   09:48:05
25  exact definition.   09:48:08

**51**

LEONARD

1
2      Q.   Okay.  Now, what was Mr. Fried's   09:48:09
3  role in the restructuring, if any?   09:48:13
4      A.   I wasn't part of the   09:48:15
5  restructuring, so he was the lead role for   09:48:22
6  management, but I can't tell you exactly   09:48:25
7  what that is.   09:48:28
8      Q.   In your opinion, did Mr. Fried   09:48:28
9  hinder the restructuring in any way?   09:48:31
10      A.   He did not hinder it, but there   09:48:33
11  was some issues from a management   09:48:51
12  perspective that had to be dealt with it,   09:48:57
13  so I don't know if it hindered it or   09:48:59
14  didn't, but there is issues that were   09:49:01
15  definitely from a management perspective   09:49:03
16  that he dealt with as well, so I don't   09:49:05
17  think he hindered it, but I can't tell you   09:49:09
18  for sure.   09:49:12
19      Q.   Okay.  What issues are those?   09:49:12
20      A.   From the original deal with Code   09:49:20
21  Hennessy there was a working capital   09:49:22
22  adjustment where management had some   09:49:24
23  monies withheld from the deal that were   09:49:27
24  owed to management that he was trying to   09:49:33
25  make sure was paid to management.   09:49:37

**52**

LEONARD

1
2      Q.   And did he -- and was that   09:49:40
3  money paid to management?   09:49:45
4      A.   A portion of it, yes.  I don't   09:49:47
5  know the exact -- if it is a hundred   09:49:52
6  percent principal, but it was close to the   09:49:55
7  principal amount, if not all.   09:49:57
8      Q.   And were you --   09:50:00
9      A.   And there was some interest that   09:50:00
10  was owed.   09:50:02
11      Q.   And did you receive any money   09:50:02
12  from this?   09:50:04
13      A.   I did.   09:50:04
14      Q.   How much approximately?   09:50:05
15      A.   Approximately 400,000 dollars, 4   09:50:06
16  to 500,000 dollars.   09:50:11
17      Q.   Okay.  Now, while Mr. Fried was   09:50:13
18  the interim CEO and prior to Mr. State's   09:50:23
19  hire, did you have any communications with   09:50:26
20  anyone about Mr. Fried's job duties or his   09:50:28
21  future role at LVI?   09:50:31
22          MS. SELTZER:  Objection.   09:50:33
23  Anyone at LVI or anyone under the world?   09:50:34
24          MR. DATOO:  Anyone at LVI.   09:50:37
25      A.   No.   09:50:40

**53**

LEONARD

1
2      Q.   Now, prior to Mr. State's hire,   09:50:46
3  did you speak with him about Mr. Fried?   09:50:49
4      A.   I spoke to Mr. State prior to   09:50:59
5  his hire.   09:51:00
6      Q.   How many times?   09:51:01
7      A.   I don't know.   09:51:02
8      Q.   Was it more than one?   09:51:02
9      A.   Yes.   09:51:04
10      Q.   More than two?   09:51:06
11      A.   Yes.   09:51:07
12      Q.   More than three?   09:51:17
13      A.   Yes.   09:51:18
14      Q.   More than four?   09:51:18
15      A.   I don't know.   09:51:19
16      Q.   And do you recall when is the   09:51:20
17  first time you spoke to him, Mr. State?   09:51:21
18      A.   I believe I spoke to him first   09:51:26
19  at a meeting in Colorado that I had with   09:51:28
20  him.   09:51:33
21      Q.   Do you recall when that was?   09:51:33
22      A.   No.   09:51:41
23      Q.   And when you spoke to him, was   09:51:42
24  anyone else -- was that in person or over   09:51:44
25  the phone?   09:51:46

**14 (Pages 50 to 53)**

58

```
                 LEONARD
1
2      A.   I don't recall.            09:55:22
3      Q.   Do you recall when Mr. State was  09:55:23
4   hired?                             09:55:24
5      A.   I believe September, early  09:55:25
6   September.                         09:55:32
7      Q.   Early September?           09:55:32
8      A.   Or it could have been late  09:55:33
9   September.                         09:55:34
10     Q.   Okay.                      09:55:35
11     A.   September.                 09:55:37
12     Q.   2010?                      09:55:37
13     A.   Yes, sir.                  09:55:39
14     Q.   Mr. Leonard, I am handing you a  09:55:39
15  document that's been previously marked as  09:55:56
16  Plaintiff's Exhibit 10.            09:55:58
17          (Document handed to witness.)  09:56:01
18     A.   You'll have to bear with me.  09:56:09
19          MS. SELTZER:  Let the record  09:56:13
20  show that Mr. Leonard is not a recipient  09:56:14
21  or a sender of these e-mails and as far as  09:56:20
22  I can see none of the e-mails in this.  09:56:23
23          MR. DATOO:  Okay.          09:56:27
24     Q.   If you can take a look at this  09:56:28
25  document.  Let me know if you've seen it  09:56:29
```

59

```
                 LEONARD
1
2   before, please.                    09:56:31
3          (Pause.)                    09:56:33
4      A.   I don't believe so.        09:56:44
5      Q.   Okay.  And can you flip to the  09:56:46
6   second page of the document.  And you see  09:56:48
7   the heading other.  Do you see that on the  09:56:52
8   page?                              09:56:54
9      A.   Yes.                       09:56:54
10     Q.   If you look at the fourth full  09:56:55
11  paragraph underneath that paragraph, it  09:56:57
12  starts with "in the best case scenario."  09:57:00
13          Do you see that?           09:57:02
14     A.   Yes.                       09:57:03
15     Q.   If I can direct your attention  09:57:03
16  to the second sentence of that paragraph  09:57:04
17  it reads:  "Several members of the senior  09:57:06
18  team have told me that Burt will never  09:57:09
19  retire because he has no other interests  09:57:12
20  and nothing else to do."            09:57:15
21          Do you see that?           09:57:16
22     A.   Yes.                       09:57:17
23     Q.   Did you tell Mr. State that?  09:57:18
24     A.   Not verbatim.              09:57:20
25     Q.   Did you use words to that  09:57:25
```

60

```
                 LEONARD
1
2   effect?                            09:57:26
3      A.   I used words that I don't   09:57:27
4   believe Burt will retire.          09:57:31
5      Q.   And if you can flip to the first  09:57:33
6   page, right in the middle of it -- this  09:57:38
7   appears to be an e-mail from Scott State  09:57:45
8   to Robert Hogan, and it is dated September  09:57:51
9   19, 2010.                          09:57:53
10     A.   Yes, sir.                  09:57:55
11     Q.   Do you know if this was prior to  09:57:55
12  when Mr. State was hired?          09:57:59
13     A.   I don't know.              09:58:00
14     Q.   Why don't you take a look at the  09:58:03
15  e-mail and let me know.  That might  09:58:05
16  refresh your recollection.         09:58:14
17          (Pause.)                   09:58:15
18     A.   It looks like it was prior to  09:58:22
19  his hiring because he is asking for a  09:58:23
20  modification to the proposal.      09:58:25
21     Q.   Okay.  So it appears you did  09:58:27
22  have a discussion with Mr. State prior to  09:58:29
23  his hire about Mr. Fried, right?   09:58:31
24          MS. SELTZER:  Objection.  He  09:58:33
25  never testified to that.  I mean how are  09:58:34
```

61

```
                 LEONARD
1
2   you drawing that conclusion?       09:58:37
3          MR. DATOO:  He said that he  09:58:39
4   does not remember having a conversation  09:58:40
5   with Mr. State prior to his hire about Mr.  09:58:41
6   Fried.                             09:58:45
7          MS. SELTZER:  Right.  But when  09:58:45
8   did he say that -- I mean he is -- he  09:58:46
9   testified that he has had several  09:58:49
10  conversations with Mr. State, right, and  09:58:51
11  he did not -- and and said that he didn't  09:58:54
12  remember whether they were about Mr. Fried  09:58:58
13  or not.                            09:59:00
14          MR. DATOO:  Right.  So now I'm  09:59:01
15  saying so it appears that you did have a  09:59:01
16  conversation with Mr. State.       09:59:05
17          MS. SELTZER:  That -- I am  09:59:06
18  trying to find out where you are drawing  09:59:08
19  that from.                         09:59:09
20          MR. DATOO:  The witness just  09:59:10
21  testified that he had several phone calls,  09:59:11
22  several communications.            09:59:13
23          MS. SELTZER:  I get that, but  09:59:14
24  where from this document are you getting  09:59:16
25  that conversation from?            09:59:18
```

16  (Pages 58 to 61)

**VERITEXT REPORTING COMPANY**

212-267-6868                                        516-608-2400

**62**

```
1              LEONARD
2       MR. DATOO:  That he said to Mr.   09:59:19
3   State or words to the effect in the second  09:59:21
4   --                                   09:59:23
5       MS. SELTZER:  Yes, but he        09:59:23
6   didn't say when.  In other words, you are  09:59:25
7   assuming that it was before -- that this  09:59:26
8   is what this was referring to.       09:59:28
9   Whereas --                           09:59:30
10      MR. DATOO:  The witness just     09:59:30
11  testified that this was before Mr. State  09:59:31
12  was hired.                           09:59:33
13      MS. SELTZER:  Yes, I get that,   09:59:34
14  but I what I was saying is you are drawing  09:59:36
15  the conclusion that he made those    09:59:38
16  statements to Mr. State prior to Mr. State  09:59:40
17  coming on, and it may not have been the  09:59:41
18  case.                                09:59:43
19      MR. DATOO:  The e-mail is dated  09:59:43
20  September 19.                        09:59:45
21      MS. SELTZER:  Yes, I know.  So   09:59:46
22  his testimony that he had this       09:59:48
23  conversation about Mr. Fried doesn't  09:59:50
24  necessarily have anything to do with what  09:59:51
25  is being referenced in this e-mail.  09:59:53
```

**63**

```
1              LEONARD
2   I am not trying to be                09:59:54
3   obstructionist.  I am just telling you  09:59:56
4   what he is testifying is that he had those  09:59:57
5   conversations with Mr. State, but it  09:59:59
6   doesn't necessarily mean that these are  10:00:01
7   the conversations that are referred to in  10:00:02
8   this e-mail.  These could have been other  10:00:04
9   management people that said that to him at  10:00:07
10  this time.                           10:00:09
11      MR. DATOO:  Right, but I just    10:00:09
12  asked him, Mr. Leonard that, and he said  10:00:10
13  he did say that to Mr. State.        10:00:12
14      MS. SELTZER:  Yes, but -- I      10:00:14
15  understand that, but did you ask him when  10:00:15
16  he said that to Mr. State, before he was  10:00:17
17  hired, after he was hired, yesterday?  10:00:19
18      MR. DATOO:  It would clearly be  10:00:22
19  before he was hired because the e-mail is  10:00:23
20  dated September 19.  I don't -- I am not  10:00:25
21  understanding you, Joanne.  I am just not  10:00:28
22  getting it.                          10:00:30
23      MS. SELTZER:  Okay.  You've got  10:00:31
24  a name out here, and it talks about senior  10:00:32
25  management speaking -- saying something  10:00:34
```

**64**

```
1              LEONARD
2   about Burt never retiring.           10:00:36
3       MR. DATOO:  Yes.                 10:00:38
4       MS. SELTZER:  Right, and you     10:00:39
5   asked Mr. Leonard -- unless I am      10:00:40
6   misremembering what you said, and you  10:00:42
7   asked him if he ever had that conversation  10:00:44
8   with State about Burt not retiring.  10:00:50
9   Are --                               10:00:50
10      MR. DATOO:  Prior to Mr.         10:00:50
11  State's hire.                        10:00:50
12      MS. SELTZER:  Prior to Mr.       10:00:53
13  State's hire?  Did you say prior to Mr.  10:00:54
14  State's hire?                        10:00:57
15      MR. DATOO:  This is all prior.   10:00:59
16      MS. SELTZER:  Then I withdraw    10:01:01
17  the objection and this entire thing.  Go  10:01:02
18  ahead.                               10:01:04
19      Q.   Prior to Mr. State's hire it  10:01:05
20  appears that you had a conversation with  10:01:08
21  him about Mr. Fried, correct?        10:01:10
22      A.   Correct.                    10:01:12
23      Q.   Okay.  And does this refresh  10:01:13
24  your recollection as to what you discussed  10:01:16
25  with Mr. State prior to his hire about Mr.  10:01:20
```

**65**

```
1              LEONARD
2   Fried?                               10:01:22
3       A.   It doesn't refresh it, but I do  10:01:22
4   not deny that I could have discussed with  10:01:26
5   Mr. State prior to his hiring that I did  10:01:31
6   not believe that Burt would retire.  10:01:36
7       Q.   Why did the issue of Mr. Fried's  10:01:40
8   retirement come up in a conversation with  10:01:43
9   Mr. State prior to his hire?         10:01:46
10      A.   Again, I don't know exactly, but  10:01:48
11  I assume because I understood that what  10:01:50
12  Scott wanted to do was to run the company,  10:01:55
13  and he may have asked me if I thought Mr.  10:02:01
14  Fried would retire, and if he would have  10:02:03
15  asked me or if he did ask me my answer  10:02:06
16  would have been or was that I did not  10:02:08
17  believe he would retire.             10:02:11
18      Q.   Okay.  Thank you.           10:02:12
19      A.   You're welcome.  Do you want  10:02:16
20  this back?                           10:02:19
21      Q.   You can -- you can keep it.  10:02:20
22  Just keep them in front of you.  I don't  10:02:22
23  want to lose them.                   10:02:24
24      A.   Okay.                       10:02:26
25      Q.   I have a bad habit of losing  10:02:27
```

17 (Pages 62 to 65)

**74**

LEONARD

1
2  end it is my issue.  You do your job.        10:12:09
3      Q.    Now, do you know what exactly       10:12:12
4  Mr. Fried was doing that was interfering      10:12:18
5  with Mr. State's ability to act as CEO?       10:12:20
6      A.    I don't know exactly the            10:12:22
7  reasons, but I have my opinion on certain     10:12:36
8  things.                                       10:12:39
9      Q.    Well, give me your opinion.         10:12:40
10     A.    I believe that Scott thought        10:12:42
11 there was a chain of command, and that        10:12:43
12 everybody reported and dealt with him, and    10:12:47
13 that he would deal with anything he wanted     10:12:50
14 to deal with with Burt, and anything else     10:12:53
15 just wasn't what he wanted, and there were    10:12:58
16 issues that Burt dealt with that I don't      10:13:01
17 believe Scott wanted him to deal with.        10:13:07
18     Q.    Now, do you know if Mr. Fried       10:13:10
19 ever attempted to overrule a decision that    10:13:18
20 Mr. State made?                               10:13:21
21     A.    I don't know of any such time.      10:13:24
22     Q.    Do you know if Mr. Fried always     10:13:26
23 deferred to Mr. State?                        10:13:30
24         MS. SELTZER:  I object to the         10:13:32
25 form.                                         10:13:33

**75**

LEONARD

1
2      A.    I believe so.                       10:13:34
3      Q.    Do you know if  State ever told     10:13:36
4  Mr. Fried not to handle a particular          10:13:42
5  assignment?                                   10:13:46
6      A.    I don't know that.                  10:13:47
7      Q.    Okay.  Do you know if Mr. Fried     10:13:50
8  ever refused to give up an assignment or a    10:13:52
9  job duty that Mr. State asked him to give     10:13:57
10 up?                                           10:14:00
11     A.    I don't know that.                  10:14:00
12     Q.    Did Mr. State make very clear to    10:14:01
13 LVI employees what the chain of command       10:14:07
14 was?                                          10:14:09
15         MS. SELTZER:  I object to the         10:14:11
16 form.                                         10:14:12
17     A.    I don't know if he put out any      10:14:13
18 kind of communication.                        10:14:21
19     Q.    Did you know who to report to?      10:14:26
20     A.    Yes.                                10:14:28
21     Q.    Who?                                10:14:28
22     A.    Scott State.                        10:14:29
23     Q.    How did you know that?              10:14:30
24     A.    Because I worked for the CEO.       10:14:32
25     Q.    Okay.  Do you know if any of the    10:14:34

**76**

LEONARD

1
2  LVI employees were confused -- let's just     10:14:37
3  start with the management team -- as to       10:14:40
4  who to report to?                             10:14:41
5      A.    I think the only person that may    10:14:45
6  have been confused was Mr. DiCarlo.  The      10:14:48
7  operational management team I don't           10:14:56
8  believe was confused, and I don't know        10:14:58
9  about back office, but I think they knew      10:15:01
10 they reported to Mr. Cutrone, the CFO.        10:15:06
11     Q.    Okay.  Did you have a               10:15:08
12 conversation with Mr. DiCarlo in which you    10:15:10
13 told him that he reports to Scott State?      10:15:13
14     A.    I believe I did.                    10:15:15
15     Q.    Okay.  Did that -- in your mind     10:15:16
16 would that have ended any confusion as to     10:15:22
17 who Mr. DiCarlo reports to?                   10:15:22
18     A.    From my perspective, yes.          10:15:25
19     Q.    Okay.  And do you recall when       10:15:26
20 you had that conversation with him?           10:15:28
21     A.    No, I mean it must have been        10:15:29
22 sometime in October I would guess of 2010.    10:15:32
23     Q.    Early, late?                        10:15:35
24     A.    I don't recall.                     10:15:36
25     Q.    Okay.  Now, after Mr. State         10:15:37

**77**

LEONARD

1
2  started working at LVI Services, was Mr.      10:15:44
3  Fried doing a good job on whatever it is      10:15:49
4  he was working on?                            10:15:50
5      A.    From my perspective, yes.          10:15:52
6      Q.    Okay.  Now, after Mr. State         10:15:56
7  started working at LVI Services, did there    10:15:58
8  come a time when Mr. State began              10:16:01
9  transitioning Mr. Fried's job duties to       10:16:04
10 other employees?                              10:16:06
11     A.    He asked me who could transition    10:16:07
12 into his job duties.  I don't know if they    10:16:18
13 were ever transitioned prior to Burt          10:16:21
14 leaving.                                      10:16:24
15     Q.    Okay.                               10:16:25
16         MS. SELTZER:  Any time you want       10:16:27
17 to take just a five-minute break because      10:16:28
18 we have been going an hour and more.          10:16:30
19         MR. DATOO:  I was just going to       10:16:33
20 offer up a break.                             10:16:34
21         THE VIDEOGRAPHER:  We're going        10:16:36
22 off the record, 10:16 a.m. End of tape        10:16:37
23 number 1.                                     10:16:41
24         (Recess taken.)                       10:24:34
25         THE VIDEOGRAPHER:  We're              10:24:34

20  (Pages 74 to 77)

**90**

|   |   |
|---|---|
| 1 | LEONARD |
| 2 | that has been previously marked as          10:38:24 |
| 3 | Plaintiff's Exhibit 31.                    10:38:26 |
| 4 | (Document handed to witness.)     10:38:31 |
| 5 | Q.   Can you take a look at the       10:38:31 |
| 6 | document and let me know if you have seen    10:38:40 |
| 7 | it before?                        10:38:42 |
| 8 | A.   I have.                      10:38:42 |
| 9 | Q.   Okay.  And is this the list of     10:38:43 |
| 10 | job duties that Mr. State e-mailed to you?    10:38:45 |
| 11 | A.   Yes.                        10:38:47 |
| 12 | Q.   And did you review the list of     10:38:50 |
| 13 | job duties?                       10:38:55 |
| 14 | MS. SELTZER:   Shaffin, I am      10:38:56 |
| 15 | sorry. I don't mean to interrupt you, but    10:38:58 |
| 16 | just so you know there is a page missing    10:39:01 |
| 17 | from this document.                 10:39:03 |
| 18 | MR. DATOO:   Oh, there is?       10:39:05 |
| 19 | MS. SELTZER:   Yes. 422, which I   10:39:07 |
| 20 | believe is the actual list itself.          10:39:08 |
| 21 | MR. DATOO:   I have it in mine.    10:39:10 |
| 22 | Do you have it -- do you have it in yours?    10:39:12 |
| 23 | A.   I don't.                     10:39:14 |
| 24 | Q.   There is no 422 there?          10:39:15 |
| 25 | A.   No.                        10:39:17 |

**91**

|   |   |
|---|---|
| 1 | LEONARD |
| 2 | A.   I believe it is the same as 432    10:39:19 |
| 3 | blank without my answers, but --         10:39:22 |
| 4 | MR. DATOO:   For the sake of      10:39:27 |
| 5 | completeness, we are going to want         10:39:28 |
| 6 | a -- that is interesting.              10:39:31 |
| 7 | Can we go off the record for a       10:39:31 |
| 8 | second.                         10:39:33 |
| 9 | THE VIDEOGRAPHER:   We're going   10:39:34 |
| 10 | off the record.  10:39 a.m.            10:39:35 |
| 11 | (Recess taken.)                 10:47:20 |
| 12 | THE VIDEOGRAPHER:   We're       10:47:20 |
| 13 | returning to the record.  10:47 a.m.       10:47:24 |
| 14 | Q.   Mr. Leonard, I handed you a     10:47:27 |
| 15 | document that was previously marked as     10:47:29 |
| 16 | Plaintiff's Exhibit 31. I am pulling it      10:47:30 |
| 17 | back from you, and I am going to hand you   10:47:34 |
| 18 | a document that is going to be marked as    10:47:36 |
| 19 | Plaintiff's Exhibit 31 A.             10:47:40 |
| 20 | (Plaintiff's Exhibit 31 A marked    10:47:47 |
| 21 | for identification.)                10:47:51 |
| 22 | (Document handed to witness.)     10:47:53 |
| 23 | Q.   Please take a look at that       10:47:54 |
| 24 | document and let me know if you have seen   10:47:56 |
| 25 | it before.                        10:47:58 |

**92**

|   |   |
|---|---|
| 1 | LEONARD |
| 2 | A.   Yes.                        10:48:00 |
| 3 | Q.   Okay.  And is this the list of     10:48:00 |
| 4 | job duties that Mr. State e-mailed you?     10:48:04 |
| 5 | A.   Yes.                        10:48:09 |
| 6 | Q.   What was -- did you review the    10:48:09 |
| 7 | list of job duties when it was e-mailed to    10:48:20 |
| 8 | you?                            10:48:23 |
| 9 | A.   Yes.                        10:48:23 |
| 10 | Q.   What was your reaction when you    10:48:24 |
| 11 | looked at the list?                  10:48:26 |
| 12 | MS. SELTZER:   At the -- at the     10:48:30 |
| 13 | first list, right?                   10:48:31 |
| 14 | MR. DATOO:   At the first list,     10:48:34 |
| 15 | so which would be the third page of the    10:48:36 |
| 16 | document.                       10:48:38 |
| 17 | A.   I don't remember having any      10:48:39 |
| 18 | reaction.                        10:48:43 |
| 19 | Q.   Okay.  Do you know if         10:48:47 |
| 20 | this -- this list -- and I am still         10:48:48 |
| 21 | referring to the third page, which is       10:48:50 |
| 22 | marked LVI 000422 in the bottom right.     10:48:52 |
| 23 | A.   Yes, sir.                    10:48:56 |
| 24 | Q.   Do you know if these were the     10:48:56 |
| 25 | duties that Mr. Fried was performing while   10:48:58 |

**93**

|   |   |
|---|---|
| 1 | LEONARD |
| 2 | chairman under Mr. McNamara?         10:49:01 |
| 3 | A.   I believe so.                  10:49:04 |
| 4 | Q.   Okay.  And what did you        10:49:05 |
| 5 | understand this list to be?            10:49:13 |
| 6 | A.   His areas of responsibility.       10:49:14 |
| 7 | Q.   Okay.  Now, did you speak to     10:49:22 |
| 8 | anybody in LVI about this list?          10:49:24 |
| 9 | MS. SELTZER:   Objection.        10:49:28 |
| 10 | MR. DATOO:   The third page.      10:49:29 |
| 11 | MS. SELTZER:   Before responding   10:49:31 |
| 12 | or at any time?                   10:49:32 |
| 13 | MR. DATOO:   Well, after -- oh,    10:49:33 |
| 14 | at any time after he received this.        10:49:34 |
| 15 | MS. SELTZER:   Okay.            10:49:36 |
| 16 | A.   I am sure I talked to Scott       10:49:45 |
| 17 | about it.                        10:49:47 |
| 18 | Q.   Okay.  Now, would that have been   10:49:48 |
| 19 | in addition to --                  10:49:52 |
| 20 | MR. DATOO:   Strike that.        10:50:01 |
| 21 | Q.   Did you speak to Scott over the    10:50:02 |
| 22 | phone or in person?                10:50:03 |
| 23 | A.   I don't remember specifically      10:50:04 |
| 24 | when I talked to Scott, and if I -- if it      10:50:13 |
| 25 | was in person or over the phone.         10:50:15 |

24  (Pages 90 to 93)

VERITEXT REPORTING COMPANY

212-267-6868                                  516-608-2400

**94**

LEONARD

1
2    Q.    Do you recall what you          10:50:17
3    discussed?                              10:50:21
4    A.    No, not in detail.              10:50:21
5    Q.    Do you -- how about in general?    10:50:26
6    A.    No, not even in general.  I mean    10:50:30
7    I am sure I talked to him about the duties    10:50:41
8    and my responses in some way, shape or    10:50:47
9    form, but I don't remember an exact      10:50:49
10   conversation with him.                  10:50:51
11   Q.    Did you take any notes of that    10:50:53
12   conversation?                           10:50:54
13   A.    No.                              10:50:55
14   Q.    Do you recall speaking to        10:50:55
15   anybody else about this list of job duties    10:50:57
16   after you received it?                  10:50:59
17   A.    No.                              10:51:00
18   Q.    Okay.  Now, if I could draw your    10:51:02
19   attention to the next page, which is    10:51:08
20   marked LVI 000423.  Do you see that?    10:51:12
21   A.    Yes.                              10:51:17
22   Q.    Now, did you edit the list that    10:51:17
23   was sent to you by Mr. State and mark it    10:51:24
24   up as reflected in the last two pages of    10:51:29
25   the document?                           10:51:33

**95**

LEONARD

1
2          MS. SELTZER:  I object to form.    10:51:34
3    A.    When you say mark it up --      10:51:36
4    Q.    Make edits to it.               10:51:39
5    A.    I made responses to it.         10:51:41
6    Q.    Okay.  So I just want to go     10:51:42
7    through these.                          10:51:45
8    A.    Sure.                            10:51:46
9    Q.    For the first job duty, you     10:51:47
10   responded with Mark Canessa and David    10:51:52
11   Pearson; is that correct?               10:51:56
12   A.    Yes.                              10:51:57
13   Q.    Okay.                            10:51:59
14   A.    And Scott State.                 10:52:00
15   Q.    And Scott State.  Okay.         10:52:03
16         And did these three individuals    10:52:06
17   assume these duties after Mr. Fried was    10:52:11
18   terminated?                             10:52:15
19   A.    Yes.                              10:52:16
20         Mr. Canessa was involved with    10:52:29
21   Squibb and Harsco, still involved with    10:52:33
22   Harsco, and may be still with Squibb.  I    10:52:36
23   am not a hundred percent sure.  David    10:52:41
24   Pearson is involved with Lenley's, and I    10:52:43
25   don't believe anybody is involved with    10:52:47

**96**

LEONARD

1
2    Emcor.                                  10:52:50
3    Q.    Why not?                         10:52:50
4    A.    I don't know.                    10:52:51
5    Q.    Should someone be involved with    10:52:56
6    Emcor?                                  10:52:58
7          MS. SELTZER:  Objection.         10:52:59
8    A.    I don't know.                    10:53:00
9    Q.    What is Emcor?                   10:53:06
10   A.    Emcor Middle East is a group out    10:53:08
11   of the middle east that bought Emcor I    10:53:10
12   believe.                                10:53:14
13   Q.    All right.  So no one at LVI is    10:53:22
14   developing or implementing new business    10:53:26
15   initiatives with Emcor after Mr. Fried was    10:53:28
16   terminated?                             10:53:32
17   A.    Emcor Middle East, no.           10:53:33
18   Q.    Is there another Emcor entity?    10:53:42
19   A.    There is several.                10:53:44
20   Q.    Is anyone working with any Emcor    10:53:44
21   entity to develop or implement new     10:53:46
22   business initiatives?                   10:53:49
23   A.    I don't know.                    10:53:50
24   Q.    Okay.  With respect to the       10:53:50
25   second point, you wrote Jim Mooney and    10:53:52

**97**

LEONARD

1
2    Frank Aiello.                           10:53:57
3          Did these two individuals assume    10:53:59
4    this responsibility after Mr. Fried was    10:54:01
5    terminated?                             10:54:04
6    A.    Yes -- well, yes, and then Jim    10:54:05
7    Mooney resigned, local BDs also are    10:54:13
8    involved, and Scott State is also      10:54:19
9    involved.                               10:54:21
10   Q.    What are -- who are the local    10:54:27
11   BDs?                                    10:54:32
12   A.    Many of the branch offices have    10:54:33
13   a business development person.          10:54:34
14   Q.    And do you know which business    10:54:37
15   development people took over these     10:54:45
16   responsibilities from Mr. Fried after he    10:54:47
17   was terminated?                         10:54:48
18         MS. SELTZER:  Objection.  Are    10:54:49
19   you talking specifically Turner, Tischman,    10:54:51
20   Yale?                                   10:54:54
21         MR. DATOO:  Yes, that second    10:54:55
22   point.                                  10:54:56
23         MS. SELTZER:  Just those two.    10:54:57
24   Okay.                                   10:54:59
25   A.    Turner is Frank and Scott.  I    10:54:59

25  (Pages 94 to 97)

VERITEXT REPORTING COMPANY

212-267-6868                                    516-608-2400

**98**

```
 1              LEONARD
 2    don't know if anyone is dealing with      10:55:11
 3    Tischman.  Yale is being dealt with by    10:55:13
 4    Craig Lyons.                              10:55:18
 5        Q.   And you referred -- is Craig     10:55:28
 6    Lyons a business development manager?     10:55:30
 7        A.   Yes.                             10:55:32
 8        Q.   Okay.  Is there anyone else who  10:55:32
 9    you didn't write down -- did anyone else  10:55:38
10    who you didn't write down assume this     10:55:42
11    Mr. Fried's  -- these responsibilities    10:55:44
12    after Mr. Fried was terminated?           10:55:48
13        A.   For these clients?               10:55:50
14        Q.   Yes.                             10:55:51
15        A.   No.                              10:55:52
16        Q.   And actually just going back to  10:55:52
17    the first point, same question, did anyone 10:55:54
18    else who you did not write down assume    10:55:57
19    this responsibility after Mr. Fried was   10:56:00
20    terminated?                               10:56:01
21             MS. SELTZER:  And once again     10:56:03
22    are we talking in general about           10:56:04
23    development and implementation or just the 10:56:06
24    specific initiatives that are listed?     10:56:08
25             MR. DATOO:  These specific       10:56:10
```

**99**

```
 1              LEONARD
 2    initiatives.                              10:56:11
 3             MS. SELTZER:  Okay.              10:56:12
 4        A.   Scott State is involved.  Tom    10:56:13
 5    Gillmore is involved with Squibb.  To some 10:56:15
 6    degree Ted Southern is involved with      10:56:27
 7    Squibb.                                   10:56:31
 8        Q.   With respect to the third point  10:56:34
 9    you listed yourself, Mr. -- I'm sorry, Mr. 10:56:36
10    State, Mr. Annarumma and Mr. DiCarlo.     10:56:42
11        Did these three individuals           10:56:45
12    assume this responsibility after Mr. Fried 10:56:49
13    was terminated?                           10:56:52
14        A.   Yes, and I don't -- I don't      10:57:02
15    agree that Mr. Fried was terminated but   10:57:09
16    after Mr. Fried left, yes.                10:57:12
17        Q.   Why don't you agree with the     10:57:18
18    fact that Mr. Fried was terminated?       10:57:21
19        A.   From my understanding he had an  10:57:23
20    offer to take on a chairman's role, which 10:57:26
21    he declined to take.                      10:57:32
22             MR. DATOO:  Can we go off the    10:57:36
23    record?                                   10:57:38
24             THE VIDEOGRAPHER:  We're going   10:57:39
25    off the record.  The time is 10:57 a.m.   10:57:40
```

**100**

```
 1              LEONARD
 2             (Recess taken.)                  10:57:43
 3             THE VIDEOGRAPHER:  We're         11:04:11
 4    returning to the record, 11:04 a.m.       11:04:11
 5             (Plaintiff's Exhibit 52 marked   11:04:18
 6    for identification.)                      11:04:21
 7             (Document handed to witness.)    11:04:22
 8        Q.   Mr. Leonard, you have in front   11:04:22
 9    of you a document that has been marked as 11:04:24
10    Plaintiff's Exhibit 52.  Do you see it?   11:04:26
11             MS. SELTZER:  And let the        11:04:29
12    record show that Mr. Leonard never wrote, 11:04:30
13    received or was copied on this document.  11:04:32
14        Q.   Can you take a look at this      11:04:35
15    document and let me know if you've seen it 11:04:36
16    before?                                   11:04:39
17        A.   No.                              11:04:39
18        Q.   Okay.  Can you read the first    11:04:39
19    sentence -- do you see the first sentence 11:04:46
20    of the document?                          11:04:48
21        A.   Yes.                             11:04:49
22        Q.   Does that change your opinion as 11:04:49
23    to whether or not Mr. Fried was terminated 11:04:51
24    or not?                                   11:04:52
25             MS. SELTZER:  I object to the    11:04:53
```

**101**

```
 1              LEONARD
 2    form.                                     11:04:54
 3        A.   No.                              11:04:55
 4        Q.   Okay.                            11:04:55
 5             MR. DATOO:  Mark this as         11:05:14
 6    Plaintiff's 53.                           11:05:15
 7             (Plaintiff's Exhibit 53 marked   11:05:18
 8    for identification.)                      11:05:19
 9             (Document handed to witness.)    11:05:19
10        Q.   Mr. Leonard, you have in front   11:05:20
11    of you a document that has been marked as 11:05:22
12    Plaintiff's Exhibit 53.                   11:05:25
13        Can you take a look at the            11:05:26
14    document and let me know if you have seen 11:05:27
15    it before?                               11:05:29
16             MS. SELTZER:  Same notice on     11:05:30
17    the record that Mr. Leonard is neither a  11:05:31
18    sender, receiver nor copied on this       11:05:33
19    particular document.                      11:05:36
20        A.   No, I have not seen it.          11:05:36
21        Q.   Okay.  Can you take a look at    11:05:38
22    the first sentence for me and let me know 11:05:39
23    if that changes your opinion or your      11:05:43
24    belief as to whether Mr. Fried was        11:05:45
25    terminated or not?                        11:05:47
```

26 (Pages 98 to 101)

102

```
 1              LEONARD
 2      A.   The only thing it does is tell    11:05:49
 3  me that he was separated from LVI          11:05:51
 4  Services, but I believe that he was made   11:05:57
 5  an offer to continue as chairman with LVI, 11:05:59
 6  and that may have been under a different   11:06:03
 7  employment agreement, but to me that       11:06:06
 8  doesn't mean he was terminated.            11:06:09
 9      Q.   Okay.  Mr. Leonard, I am handing  11:06:11
10  you a document that's been marked,         11:06:22
11  previously marked as Plaintiff's Exhibit   11:06:25
12  11.                                        11:06:27
13          (Document handed to witness.)     11:06:28
14      Q.   Can you take a look at the        11:06:28
15  document and let me know if you've seen it 11:06:30
16  before?                                    11:06:32
17          MS. SELTZER:  Same -- same        11:06:33
18  comment.  Mr. Leonard is neither a sender  11:06:35
19  nor a recipient or copied on this.  What   11:06:41
20  was the number, Shaffin?                   11:06:45
21          MR. DATOO:  11.                    11:06:47
22          MS. SELTZER:  Thanks.             11:06:48
23      A.   I have not seen it.               11:06:49
24      Q.   Can I draw your attention to the  11:06:50
25  second paragraph, first sentence?  Can you 11:06:53
```

103

```
 1              LEONARD
 2  review that sentence and let me know if    11:06:56
 3  that changes your opinion or your belief   11:06:58
 4  as to whether Mr. Fried was terminated or  11:07:00
 5  not?                                       11:07:02
 6      A.   Again, when you use the phrase    11:07:03
 7  terminate, I understand what you are       11:07:10
 8  getting at, but I go to the fourth         11:07:14
 9  paragraph where there is an offer to       11:07:18
10  continue to work with LVI, and that is my  11:07:20
11  basis for why I don't believe he was       11:07:24
12  terminated, that there was an offer for    11:07:31
13  continuing services with us with LVI.      11:07:35
14      Q.   In a different capacity?          11:07:38
15      A.   I understood it to be as          11:07:41
16  in -- as a chairman on the board and -- in 11:07:50
17  a different capacity, I don't know if      11:07:58
18  that -- what you are referring to as a     11:08:00
19  different capacity.                        11:08:03
20      Q.   Would he be doing the same job    11:08:04
21  as he did when he was an employee of LVI   11:08:06
22  Services?                                  11:08:08
23      A.   He would be the chairman.  I      11:08:09
24  don't believe he would be doing the same   11:08:11
25  responsibilities that were listed in       11:08:13
```

104

```
 1              LEONARD
 2  Exhibit 423.                               11:08:17
 3      Q.   Handing the witness a document    11:08:21
 4  that has been previously marked as         11:08:25
 5  Plaintiff's Exhibit 12.                    11:08:27
 6          (Document handed to witness.)     11:08:28
 7      Q.   Mr. Leonard, if you can take a    11:08:29
 8  look at the document and let me know if    11:08:31
 9  you have seen it before?                   11:08:33
10          MS. SELTZER:  Same, neither       11:08:35
11  recipient, sender and certainly not a      11:08:36
12  party to this.                             11:08:40
13      Q.   Sorry.  Repeat the question.      11:08:49
14      Q.   Can you take a look at the        11:08:51
15  document and let me know if you have seen  11:08:52
16  it before?                                 11:08:55
17      A.   I have not.                       11:08:56
18      Q.   Okay.  Can I correct your         11:08:57
19  attention to the first paragraph, second  11:09:05
20  sentence.  Can you review that sentence    11:09:08
21  and let me know as to whether that changes 11:09:10
22  your opinion or belief as to whether or    11:09:12
23  not Mr. Fried was terminated from LVI      11:09:15
24  Services -- LVI.                           11:09:17
25      A.   Again, from my original           11:09:19
```

105

```
 1              LEONARD
 2  statement I said he wasn't terminated      11:09:20
 3  because I believed he was offered a        11:09:27
 4  position to continue, and I stand by that, 11:09:28
 5  but I understand your point on this letter 11:09:35
 6  that it calls for his employment to be     11:09:35
 7  terminated and then offered a continuing   11:09:38
 8  relationship as a consultant.              11:09:42
 9      Q.   Now, let's talk about that offer  11:09:44
10  for a bit.  Did you -- did you know the    11:09:47
11  terms of the offer to remain as a          11:09:52
12  consultant or a chairman?                  11:09:57
13      A.   When?                             11:09:58
14      Q.   At the time.                      11:10:00
15      A.   What time?                        11:10:04
16      Q.   At the time it was offered to     11:10:05
17  Mr. Fried.                                 11:10:06
18      A.   I believe shortly after.          11:10:07
19      Q.   And what did you think about the  11:10:13
20  terms?                                     11:10:14
21      A.   I thought they were reasonable.   11:10:14
22      Q.   Okay.  Can I direct your          11:10:17
23  attention to the third paragraph of the    11:10:23
24  document?                                  11:10:28
25      A.   Yes, sir.                         11:10:29
```

27  (Pages 102 to 105)

**106**

1          LEONARD
2      Q.   And if you -- what -- what were    11:10:31
3  the financial terms?              11:10:39
4      A.   That I understood or that I am    11:10:44
5  looking at right now?             11:10:47
6      Q.   That you understood at the time.   11:10:48
7      A.   A retainer of 150,000 per year    11:10:51
8  plus an hourly rate above that for time    11:10:55
9  spent working on or with or for LVI.      11:10:57
10     Q.   And at the time, was it your      11:11:01
11 understanding that the 150,000 dollars per   11:11:03
12 year was guaranteed?              11:11:05
13     A.   I assume so.              11:11:06
14     Q.   Okay.  And after reading this     11:11:12
15 document, what do you think now?          11:11:14
16     A.   I believe it is not guaranteed.   11:11:16
17     Q.   Okay.  Do you know -- was -- at   11:11:20
18 the time do you know if Mr. Fried was     11:11:25
19 guaranteed a certain number of hours?     11:11:26
20     A.   I didn't know if he was          11:11:28
21 guaranteed any hours.             11:11:33
22     Q.   Does -- after reading this       11:11:34
23 document, do you know if he was guaranteed   11:11:36
24 any hours?                    11:11:38
25          MS. SELTZER:   Just the general   11:11:45

**107**

1          LEONARD
2  objection.  Obviously Mr. Leonard is not a   11:11:47
3  lawyer.  This is -- this is obviously a    11:11:49
4  legal document.  He's never seen it       11:11:52
5  before, so, you know, you're asking him to   11:11:53
6  sort of opine on the terms of this        11:11:56
7  agreement is a little unfair.         11:11:59
8          MR. DATOO:   Okay.         12:12:02
9          MS. SELTZER:   But go forward.    11:12:03
10         MR. DATOO:   March on.        11:12:15
11         (Pause.)                 11:12:31
12     A.   Repeat the question, please.     11:12:31
13     Q.   After reviewing this document,   11:12:32
14 do you know if Mr. Fried was guaranteed a    11:12:35
15 minimum number of hours?              11:12:36
16     A.   I do not believe so.          11:12:40
17     Q.   Okay.  And do you -- at the time   11:12:42
18 do you know if Mr. Fried had to waive his    11:12:45
19 right to sue LVI for age discrimination if   11:12:47
20 he wanted to sell the terms of this deal?   11:12:51
21     A.   I do not know.             11:12:54
22     Q.   Okay.  And if I can direct your   11:12:56
23 attention to the second page, in the I      11:12:58
24 guess first full paragraph, Roman numeral    11:13:03
25 2.                        11:13:08

**108**

1          LEONARD
2          MS. SELTZER:   Same objection.    11:13:10
3      Q.   If you take a look at that.      11:13:11
4      A.   I would agree that this document   11:13:21
5  is asking him to waive his rights for any    11:13:24
6  claims under the age discrimination and    11:13:29
7  employment act.               11:13:32
8      Q.   Okay.  And can I -- and at the    11:13:33
9  time were you aware how long -- aware of    11:13:37
10 the length of time Mr. Fried could work    11:13:41
11 under this arrangement?             11:13:43
12     A.   No.                  11:13:44
13     Q.   Okay.  Did you think there was a   11:13:45
14 certain guaranteed term?              11:13:49
15         MS. SELTZER:   I object to the    11:13:51
16 term --                    11:13:52
17     Q.   At the time.             11:13:53
18         MS. SELTZER:   That is really a    11:13:54
19 legal term.                  11:13:56
20     Q.   Did you -- at the time did you    11:13:57
21 feel that this arrangement would last for   11:13:58
22 a certain length of time?            11:14:00
23     A.   I believe that it would have     11:14:02
24 lasted as long as Burt wanted to continue   11:14:04
25 on.                      11:14:06

**109**

1          LEONARD
2      Q.   Okay.  And can I direct your     11:14:07
3  attention to the second paragraph on the    11:14:09
4  first page.  If you read the last         11:14:10
5  sentence.                  11:14:16
6      A.   I see the last sentence.         11:14:24
7      Q.   And does that change your mind    11:14:25
8  as to -- well, do you now know if this     11:14:29
9  arrangement would have lasted for as long    11:14:34
10 as Mr. Fried wanted it to last?         11:14:36
11     A.   I believe it would have.  I see    11:14:39
12 quite clearly that either party could      11:14:42
13 terminate by providing 30 days notice.     11:14:45
14     Q.   And does -- in your opinion does   11:14:47
15 that mean that LVI could terminate this    11:14:50
16 agreement on 30 days notice?          11:14:52
17     A.   Yes.                  11:14:54
18     Q.   Okay.  Now, is there           11:14:54
19 anything -- based on your review of what    11:14:59
20 you just read, is there anything         11:15:01
21 preventing LVI from terminating this       11:15:03
22 agreement a day after Mr. Fried signs it?   11:15:06
23     A.   No.                  11:15:08
24     Q.   And if you take a look at the     11:15:09
25 third paragraph, assuming that were the    11:15:11

VERITEXT REPORTING COMPANY

212-267-6868                          516-608-2400

**110**

LEONARD

1
2  case do you know how much Mr. Fried would    11:15:16
3  be guaranteed to receive?                    11:15:18
4          MS. SELTZER:  Same objection.        11:15:20
5     A.  37,500 dollars.                        11:15:36
6     Q.  Okay.  Now, after reviewing this       11:15:38
7  contract, does that change your mind as to    11:15:41
8  whether you thought the terms were fair?      11:15:46
9     A.  No.                                    11:15:48
10    Q.  Okay.  You still think it was a        11:15:54
11 fair arrangement?                             11:15:56
12    A.  Yes.                                   11:15:57
13    Q.  Okay.  Getting -- going back to        11:15:57
14 Plaintiff's Exhibit 31, the list of job       11:16:15
15 duties, just let me know when you have it     11:16:19
16 in front of you.                              11:16:28
17    A.  All right.  Yes, sir.                  11:16:29
18    Q.  If you -- I just want to pick up       11:16:31
19 where we left off.  So if you flip to the     11:16:34
20 second to last page.                          11:16:37
21    A.  423?                                   11:16:40
22    Q.  Yes.  Excuse me.  Going back to        11:16:42
23 where we were, I believe we were on the       11:16:48
24 one, two -- the third point now.  You         11:16:51
25 listed Mr. State, Mr. Annarumma, and Mr.      11:16:55

**111**

LEONARD

1
2  DiCarlo.                                      11:17:03
3     A.  Yes.                                   11:17:04
4     Q.  Now, after Mr. Fried -- we will        11:17:05
5  use the word separated.  After he             11:17:08
6  separated from LVI, did these three           11:17:11
7  individuals assume this responsibility?       11:17:16
8     A.  Yes.                                   11:17:19
9     Q.  Did anyone else who is not             11:17:20
10 written down on this list assume this         11:17:22
11 responsibility as well?                       11:17:24
12    A.  No.                                    11:17:25
13    Q.  Okay.  With respect to the             11:17:27
14 fourth point, you wrote down Mr. DiCarlo      11:17:31
15 and Mr. Cullen and -- and yourself            11:17:36
16 working with you.                             11:17:39
17         Did these three individuals           11:17:41
18 assume this responsibility after Mr. Fried    11:17:46
19 separated?                                    11:17:48
20    A.  Yes.                                   11:17:49
21    Q.  Okay.  Anyone else who is not          11:17:50
22 written on -- down on here assume that        11:17:53
23 responsibility as well?                       11:17:55
24    A.  Mr. DiCarlo's paralegal assists        11:17:56
25 and Mr. State gets involved from time to      11:18:03

**112**

LEONARD

1
2  time.                                         11:18:09
3     Q.  And the fifth point, you listed        11:18:09
4  Mr. DiCarlo.  Did Mr. DiCarlo assume this     11:18:16
5  responsibility after Mr. Fried separated?     11:18:19
6     A.  Yes.                                   11:18:21
7     Q.  And did anyone else assume this        11:18:23
8  responsibility as well?                       11:18:25
9     A.  Maybe Mr. State and the board as       11:18:27
10 well.                                         11:18:34
11    Q.  Sorry?                                 11:18:35
12    A.  Mr. State and maybe the board --       11:18:36
13    Q.  Oh, the --                             11:18:39
14    A.  -- as well.                            11:18:40
15    Q.  And the sixth point, you wrote         11:18:46
16 down Mr. DiCarlo.  Did Mr. DiCarlo assume     11:18:48
17 this responsibility after Mr. Fried           11:18:51
18 separated?                                    11:18:53
19    A.  Yes.                                   11:18:54
20    Q.  Okay.  Anyone else?                    11:19:07
21    A.  There may be some assistance           11:19:10
22 from the CFO on certain pieces of this as     11:19:16
23 well as maybe Mr. Annarumma had certain       11:19:22
24 pieces of this but for the most part Mr.      11:19:27
25 DiCarlo.                                      11:19:30

**113**

LEONARD

1
2     Q.  And for the seventh point, you         11:19:31
3  wrote down Mr. DiCarlo and yourself.  Did     11:19:33
4  you two assume this responsibility after      11:19:37
5  Mr. Fried separated?                          11:19:38
6     A.  Yes.                                   11:19:40
7     Q.  Anyone else?                           11:19:42
8     A.  Maybe Mr. Thibodeaux and Mr.           11:19:44
9  Sookram had certain pieces of it.             11:19:48
10    Q.  And going to the next page, the        11:19:55
11 eighth point.  Did Mr. Sookram assume that    11:19:59
12 responsibility?                               11:20:05
13    A.  Yes.                                   11:20:06
14    Q.  And anyone else?                       11:20:06
15    A.  Myself.                                11:20:08
16    Q.  And the ninth point, did Mr.           11:20:09
17 DiCarlo, yourself, and Mr. State assume       11:20:15
18 this responsibility after Mr. Fried           11:20:18
19 separated?                                    11:20:21
20    A.  Yes.                                   11:20:21
21    Q.  Anyone else?                           11:20:22
22    A.  No.                                    11:20:24
23    Q.  The next point, which would be         11:20:28
24 the tenth point, did you assume this          11:20:33
25 responsibility along with your                11:20:36

**29  (Pages 110 to 113)**

**114**

LEONARD

1
2  administrative assistant?                 11:20:38
3      A.   No.                              11:20:39
4      Q.   Did any -- who assumed this      11:20:40
5  responsibility?                           11:20:42
6      A.   Joe Annarumma.                   11:20:42
7      Q.   The next point, which I believe  11:20:46
8  is the 11th point, did you -- did Mr.     11:20:54
9  State assume this responsibility?         11:20:58
10     A.   We haven't dealt with it, but I  11:21:01
11 assume he will.                           11:21:06
12     Q.   The next point after that, you   11:21:07
13 listed Mark Canessa.  Did Mr. Canessa     11:21:13
14 assume this responsibility after Mr. Fried 11:21:16
15 separated?                                11:21:18
16     A.   Yes.                             11:21:21
17     Q.   Anyone else?                     11:21:25
18     A.   The branches may have.  Some     11:21:26
19 branches oversee their own submissions.   11:21:41
20     Q.   And when you mean by             11:21:43
21 branches --                               11:21:47
22     A.   A branch operating office.       11:21:48
23     Q.   Okay.  And is there a particular 11:21:50
24 individual who would be responsible for   11:21:52
25 this?                                     11:21:53

**115**

LEONARD

1
2      A.   The branch president.            11:21:54
3      Q.   Okay.  And who -- how much       11:21:55
4  branch presidents are there?             11:21:58
5      A.   Approximately 22.                11:22:00
6      Q.   Are you familiar with a document 11:22:03
7  that is referred to as The Bible -- The   11:22:08
8  Bible?                                    11:22:16
9      A.   Yes.                             11:22:16
10     Q.   And would The Bible list who are 11:22:17
11 the branch managers?                      11:22:19
12     MS. SELTZER:  Objection.              11:22:21
13 I -- he may not even know what you're     11:22:23
14 talking about here.                       11:22:24
15     MR. DATOO:  He just said he is        11:22:26
16 familiar with the document known as The   11:22:27
17 Bible.                                    11:22:29
18     MS. SELTZER:  Did he say that         11:22:30
19 he's seen it?                             11:22:31
20     MR. DATOO:  He is familiar with       11:22:32
21 it.                                       11:22:33
22     MS. SELTZER:  Okay, but he may        11:22:34
23 have heard about it, but that doesn't     11:22:36
24 necessarily mean that he's actually seen  11:22:39
25 it.  You may want to clarify it now.      11:22:41

**116**

LEONARD

1
2      MR. DATOO:  I am just going to        11:22:44
3  ask my next question.                     11:22:45
4      Q.   Do you know if The Bible lists   11:22:46
5  who the branch managers are?              11:22:47
6      A.   Yes.                             11:22:50
7      Q.   Okay.  Going on to the next      11:22:50
8  point, the next two actually.  You listed 11:22:52
9  Greg DiCarlo for both.                    11:23:02
10     Did Mr. DiCarlo assume the            11:23:04
11 responsibilities -- these responsibilities 11:23:06
12 after Mr. Fried left?                     11:23:07
13     A.   Yes.                             11:23:08
14     Q.   Anyone else?                     11:23:09
15     A.   I don't believe so.              11:23:10
16     Q.   And the last point, you listed   11:23:20
17 Mark Canessa.  Do you know if Mr. Canessa 11:23:21
18 assumed this responsibility after Mr.     11:23:24
19 Fried left?                               11:23:26
20     A.   Yes.                             11:23:27
21     Q.   Anyone else?                     11:23:27
22     A.   I don't believe so.              11:23:28
23     Q.   Okay.  Now, do you know if Mr.   11:23:29
24 Fried was performing all of these duties  11:23:34
25 while he was chairman under Scott State?  11:23:35

**117**

LEONARD

1
2      A.   For the most part, I believe so, 11:23:37
3  yes.                                      11:23:43
4      Q.   Do you know if Mr. State made    11:23:43
5  any comment about Mr. Fried's age?        11:23:57
6      MS. SELTZER:  I object to the         11:23:59
7  form, but you can answer.                 11:24:00
8      A.   Secondhand, yes.                 11:24:02
9      Q.   Okay.  And how did you find out  11:24:03
10 secondhand?                               11:24:08
11     A.   I believe from Mr. State and Mr. 11:24:09
12 Fried.                                    11:24:12
13     Q.   And do you know what the comment 11:24:12
14 was?                                      11:24:15
15     A.   Not verbatim.                    11:24:16
16     Q.   Do you know -- can you tell me   11:24:22
17 in general?                               11:24:26
18     A.   I believe it was a comment to    11:24:26
19 the effect you're 71.  What are you going 11:24:34
20 to do going forward or what are you going 11:24:39
21 to do for the rest of your life or        11:24:42
22 something to that --                      11:24:45
23     Q.   Okay.  And you said you heard    11:24:47
24 this from Mr. Fried and Mr. State?        11:24:49
25     A.   I believe so.                    11:24:52

**30 (Pages 114 to 117)**

**VERITEXT REPORTING COMPANY**

212-267-6868                          516-608-2400

**146**

```
1            LEONARD
2  number 2.                    11:54:53
3       (Recess taken.)          12:04:22
4       THE VIDEOGRAPHER:  We're      12:04:22
5  returning to the record 12:04 a.m. --   12:04:23
6  12:04 p.m., beginning of tape number 3.   12:04:28
7    Q.   Mr. Leonard, are you familiar   12:04:31
8  with Shari Dembin?              12:04:32
9    A.   Yes.                 12:04:33
10    Q.   How so?              12:04:34
11    A.   I have worked with her for many   12:04:35
12  years, and I have known her for longer.   12:04:37
13    Q.   Okay.  And was she employed by   12:04:40
14  LVI Services?                 12:04:42
15    A.   Yes.                 12:04:43
16    Q.   Do you know for how long?       12:04:44
17    A.   Approximately?           12:04:45
18    A.   Yes.                 12:04:54
19    A.   Ten to fifteen years.        12:04:55
20    Q.   Okay.  And do you know if she is   12:04:57
21  related to Mr. Fried?           12:04:59
22    A.   I do.                12:05:00
23    Q.   And how do you know that?      12:05:01
24    A.   Generally I know that because   12:05:03
25  she had the same last name, and I know her   12:05:09
```

**147**

```
1            LEONARD
2  mother and brother and sister.        12:05:11
3    Q.   Family friends?           12:05:14
4    A.   Yes.                 12:05:15
5    Q.   Okay.  And when did you first   12:05:16
6  find out that Ms. Dembin was related to   12:05:18
7  Mr. Fried?                   12:05:21
8    A.   I don't know when I first found   12:05:22
9  out but many, many years ago.        12:05:28
10    Q.   Okay.  And how is she related to   12:05:30
11  Mr. Fried?                   12:05:33
12    A.   She is his daughter.        12:05:33
13    Q.   And do you know what her job   12:05:35
14  title was, her last job title?       12:05:36
15       MS. SELTZER:  With LVI?       12:05:38
16       MR. DATOO:  With LVI Services.   12:05:41
17    A.   Not specifically.          12:05:42
18    Q.   Generally?             12:05:43
19    A.   Yes, risk management and       12:05:44
20  bonding.                    12:05:48
21    Q.   And do you know what her job   12:05:53
22  duties were?                  12:05:54
23    A.   Generally.             12:05:55
24    Q.   What were they?           12:05:55
25    A.   She oversaw all bonds, bid    12:05:56
```

**148**

```
1            LEONARD
2  bonds, you know, taking in the requests   12:06:02
3  and sending them out and getting them back   12:06:07
4  from the bonding company.  She oversaw the   12:06:09
5  travel in terms of working with Garber.   12:06:16
6  She oversaw all of our company       12:06:19
7  paraphernalia, shirts and things like   12:06:25
8  that.  She did insurance requests,       12:06:30
9  certificates of insurance.  She oversaw   12:06:37
10  any company meeting that we had as an   12:06:40
11  internal company.               12:06:42
12    Q.   And how long was she performing   12:06:44
13  these duties for?               12:06:45
14    A.   Over ten years.           12:06:46
15    Q.   Okay.  And do you know what her   12:06:54
16  work performance was like?          12:06:58
17    A.   Not specifically, but overall,   12:06:59
18  you know, anything I had to do with was   12:07:05
19  always very good.               12:07:07
20    Q.   And do you know who she reported   12:07:09
21  to?                      12:07:10
22    A.   No.                 12:07:10
23    Q.   Would it have been Mr.       12:07:20
24  Annarumma?                   12:07:26
25       MS. SELTZER:  Objection.       12:07:27
```

**149**

```
1            LEONARD
2    A.   On -- on some responsibilities,   12:07:28
3  yes.                      12:07:30
4    Q.   And the others, do you know who   12:07:30
5  she might have reported to?          12:07:32
6    A.   Mr. Fried.             12:07:37
7    Q.   Now, did there come a time when   12:07:39
8  Ms. Dembin was terminated?          12:07:41
9    A.   When you say terminated, let go,   12:07:43
10  yes.                      12:07:51
11    Q.   Separated?             12:07:51
12    A.   Separated.             12:07:52
13    Q.   Left.                12:07:53
14    A.   Separated.             12:07:54
15    Q.   And when was that?         12:07:55
16    A.   I believe January 15, 2011.   12:07:57
17    Q.   Why?                 12:08:01
18    A.   Reduction in force.        12:08:02
19    Q.   Who made the decision to include   12:08:05
20  her in the RIF? By RIF I mean reduction in   12:08:09
21  force.                      12:08:13
22    A.   Understood.  You know, I believe   12:08:14
23  it was a group decision in terms of   12:08:18
24  cutting all overhead we could.       12:08:26
25    Q.   Who was part of that group that   12:08:29
```

38 (Pages 146 to 149)

**VERITEXT REPORTING COMPANY**

212-267-6868                    516-608-2400

---

**150**

LEONARD

1
2  made the decision?                          12:08:30
3      A.   Scott, regional managers,          12:08:31
4  myself, Paul Cutrone.                       12:08:39
5      Q.   And when was the decision to       12:08:40
6  include her in the RIF first made?          12:08:46
7      A.   I don't think there was ever an    12:08:49
8  inclusion or noninclusion for Shari         12:08:51
9  specifically.                              12:08:57
10     Q.   Well, when was she first           12:08:58
11 identified as someone who should or could   12:09:00
12 be laid off?                               12:09:03
13     A.   I would say -- we had -- we had    12:09:08
14 a meeting in Colorado where we presented    12:09:10
15 the budgets, and at that time we saw that   12:09:14
16 we were in trouble in terms of overall      12:09:17
17 spend on the SG and A compared to our       12:09:25
18 revenue goals. So at that time, somewhere   12:09:30
19 at that time it was discussed on reducing   12:09:33
20 anywhere we could both, you know, on the    12:09:38
21 grant side, which was very thin at the      12:09:44
22 time anyway, or anywhere else.              12:09:47
23     Q.   Now, was it after at that          12:09:49
24 meeting or after where you started          12:09:51
25 discussing specific people to lay off?      12:09:53

---

**151**

LEONARD

1
2      A.   It was after, probably after      12:09:55
3  that meeting. Yes, maybe it was discussed   12:09:56
4  at that meeting as well. I don't recall     12:10:01
5  specifically.                              12:10:03
6      Q.   Okay. And why was Ms. Dembin       12:10:04
7  identified as someone who should or could   12:10:08
8  be laid off?                               12:10:10
9      A.   Actually, it was reducing the      12:10:11
10 Westport office, so it was everybody at     12:10:19
11 the office besides legal, and she was in    12:10:23
12 that office.                               12:10:27
13     Q.   Did you -- why didn't you reduce   12:10:30
14 legal as well?                             12:10:35
15     A.   Because it was our belief that     12:10:40
16 we needed legal for contract review and     12:10:42
17 legal matters, and it would not make sense  12:10:45
18 to reduce it and go to outside services     12:10:48
19 that would be way in excess of doing it     12:10:54
20 ourselves.                                 12:10:57
21     Q.   Why did you decide to reduce the   12:10:57
22 Westport office or target the Westport      12:10:59
23 office?                                    12:11:05
24          MS. SELTZER:  I object to the      12:11:06
25 form.                                      12:11:07

---

**152**

LEONARD

1
2      A.   Because the Westport office        12:11:07
3  could be reduced and consolidated in terms  12:11:12
4  of its size in -- in the square footage     12:11:17
5  that was needed for legal, and it was a     12:11:21
6  nonoperating office.                       12:11:27
7      Q.   Now, was -- was Ms. Dembin         12:11:28
8  offered the opportunity to work out of      12:11:37
9  another office, so she could have avoided   12:11:38
10 being laid off?                            12:11:41
11     A.   I don't believe so.               12:11:42
12     Q.   Why not?                          12:11:43
13     A.   Because it was believed that her   12:11:49
14 duties could be done with people that we    12:11:49
15 had in New York.                           12:11:51
16     Q.   Who -- who believed that?         12:11:52
17     A.   I think everybody involved.       12:11:58
18     Q.   Now, why wasn't -- was this a      12:12:04
19 new revelation to the group or is           12:12:11
20 this -- the fact that her job duties could  12:12:17
21 be performed by others?                    12:12:17
22          MS. SELTZER:  I object to the      12:12:19
23 form.                                      12:12:20
24     A.   No, this was a necessity in        12:12:21
25 terms of trying to stay alive for the       12:12:24

---

**153**

LEONARD

1
2  company.                                   12:12:31
3      Q.   Well, do you know how much she     12:12:31
4  made a year?                               12:12:32
5      A.   Yes.                              12:12:33
6      Q.   How much?                         12:12:33
7      A.   85,000.                           12:12:34
8      Q.   And do you know -- did LVI have    12:12:41
9  previous layoffs prior to January -- the    12:12:43
10 layoff that occurred in January 2011?       12:12:45
11     A.   I am sure.                        12:12:48
12     Q.   Do you know why Ms. Dembin was     12:12:49
13 never identified or was not                 12:12:50
14 identified -- sorry.                       12:12:54
15          MR. DATOO:  Strike that.          12:12:54
16     Q.   Do you know why Ms. Dembin         12:12:55
17 wasn't laid off in connection with the      12:12:57
18 prior layoffs?                             12:12:58
19     A.   The prior layoffs could have      12:12:59
20 been at the branch level. It could have     12:13:02
21 been on a job level. You know, the          12:13:04
22 question you asked is so broad. So          12:13:06
23 it -- it has nothing do with the Westport   12:13:09
24 office because -- you need to be more       12:13:13
25 specific in terms of previous layoffs.     12:13:17

**39 (Pages 150 to 153)**

VERITEXT REPORTING COMPANY

212-267-6868                                        516-608-2400

**154**

LEONARD

1
2     Q.   Well, in connection -- well,     12:13:19
3   let's talk about this layoff.     12:13:21
4     A.   Okay.     12:13:23
5     Q.   Maybe we will work backwards.     12:13:24
6   How did you -- how did this group identify     12:13:26
7   who to lay off?     12:13:31
8         MS. SELTZER:   I object to the     12:13:32
9   form.     12:13:33
10    A.   It was basically any nonrevenue     12:13:36
11  producing employee that could be let go     12:13:41
12  where we could continue operating.     12:13:50
13    Q.   And did you -- did this group     12:13:54
14  look at every nonrevenue producing     12:13:58
15  employee in the LVI organization?     12:14:02
16    A.   I believe they did.     12:14:06
17    Q.   And how many total people were     12:14:10
18  laid off in January of 2011?     12:14:17
19    A.   I don't know the exact number.     12:14:20
20    Q.   Do you know who was laid off?     12:14:22
21    A.   I don't know exactly.  I need to     12:14:24
22  see the list that we had.     12:14:31
23        MR. DATOO:   51.     12:14:49
24        (Plaintiff's Exhibit 51 marked     12:14:51
25  for identification.)     12:14:52

**155**

LEONARD

1
2         (Document handed to witness.     12:14:53
3     Q.   Mr. Leonard, you have in front     12:14:54
4   of you a document that has been marked as     12:14:56
5   Plaintiff's Exhibit 51.     12:14:58
6         Can you review the document and     12:15:00
7   let me know if you have seen it before?     12:15:01
8     A.   Yes.     12:15:03
9     Q.   Okay.  Can you flip to the     12:15:03
10  second page?     12:15:06
11    A.   Yes.     12:15:12
12    Q.   Do you know if this lists all     12:15:13
13  the employees that were laid off in     12:15:17
14  connection with the January 2011 RIF?     12:15:19
15    A.   Yes.     12:15:22
16    Q.   Okay.  Now, who is Lorraine     12:15:22
17  Glenn?     12:15:37
18    A.   She is an employee that worked     12:15:37
19  in New York.     12:15:38
20    Q.   What was her position?     12:15:39
21    A.   I don't know her job title.     12:15:41
22    Q.   Do you know what she did?     12:15:43
23    A.   She did some work in workers     12:15:46
24  comp and risk management, some insurance     12:15:52
25  items working I think for Joe Annarumma.     12:15:57

**156**

LEONARD

1
2     Q.   Was she considered nonrevenue     12:16:05
3   producing?     12:16:07
4     A.   Yes.     12:16:08
5     Q.   And who is Robin Keller?     12:16:08
6     A.   She was a receptionist at the     12:16:11
7   Westport office.     12:16:16
8     Q.   Nonrevenue producing?     12:16:17
9     A.   Yes.     12:16:19
10    Q.   We know who Shari Dembin is.     12:16:20
11  Was she nonrevenue producing?     12:16:29
12    A.   Yes.     12:16:31
13    Q.   How about Peggy Craemer?     12:16:32
14    A.   Yes.     12:16:34
15    Q.   Nonrevenue producing?     12:16:34
16    A.   Yes.     12:16:36
17    Q.   Do you know what her job title     12:16:36
18  was?     12:16:38
19    A.   No.     12:16:38
20    Q.   Do you know what office she     12:16:38
21  worked in?     12:16:41
22    A.   Yes.     12:16:42
23    Q.   What office?     12:16:42
24    A.   Westport.     12:16:43
25    Q.   Do you know what she did?     12:16:43

**157**

LEONARD

1
2     A.   Yes, marketing prequalification     12:16:45
3   information, submissions.     12:16:51
4     Q.   Okay.  How about Marcy Juran,     12:16:54
5   was she nonrevenue producing?     12:16:58
6     A.   Yes.     12:17:00
7     Q.   Do you know what she did?     12:17:01
8     A.   Yes.     12:17:02
9     Q.   What?     12:17:04
10    A.   Again, assisted in submitting     12:17:05
11  prequals and graphics in marketing.     12:17:11
12    Q.   Okay.  Do you know who Kristin     12:17:14
13  Braun is?     12:17:20
14    A.   Yes.     12:17:21
15    Q.   Was she nonrevenue producing?     12:17:21
16    A.   Yes.     12:17:23
17    Q.   What office did she work in?     12:17:23
18    A.   Westport.     12:17:25
19    Q.   And do you know what she did?     12:17:26
20    A.   Yes.     12:17:27
21    Q.   What?     12:17:28
22    A.   Assisted in marketing and     12:17:29
23  prequals in the Westport office with     12:17:32
24  Peggy and Marcy.     12:17:36
25    Q.   Do you know who Jerry Fields is?     12:17:37

**40 (Pages 154 to 157)**

**VERITEXT REPORTING COMPANY**

212-267-6868

516-608-2400

**158**

```
 1          LEONARD
 2    A.   Yes.              12:17:39
 3    Q.   And what office did he work in?   12:17:39
 4    A.   Texas.            12:17:42
 5    Q.   And was he considered nonrevenue   12:17:44
 6  producing?               12:17:48
 7    A.   As far as I was concerned, yes.   12:17:49
 8    Q.   What do you mean by that?   12:17:52
 9    A.   He worked in a branch that was   12:17:53
10  an operating branch, but I did not believe   12:17:58
11  he was producing and performing to what   12:18:02
12  was needed.              12:18:05
13    Q.   So was he a performance   12:18:06
14  termination?             12:18:08
15    A.   No, he was we could reduce and   12:18:09
16  live without him.        12:18:19
17    Q.   Was he in a revenue-producing   12:18:20
18  role?                    12:18:22
19    A.   Yes.             12:18:22
20    Q.   Do you feel that he was doing a   12:18:23
21  good job?               12:18:29
22    MS. SELTZER:  Objection. You   12:18:31
23  can answer.              12:18:32
24    A.   Fair.            12:18:33
25    Q.   And why was he included in the   12:18:35
```

**159**

```
 1  layoff?                 12:18:37
 2    A.   We believed we could produce the   12:18:38
 3  same revenue without him.   12:18:41
 4    Q.   And who is Matt Dembin? -- do   12:18:43
 5  you know who Matt Dembin is?   12:18:50
 6    A.   I do.            12:18:51
 7    Q.   And what office did he work in?   12:18:51
 8    A.   Out of the Westport office.   12:18:53
 9    Q.   And was he a nonrevenue   12:18:59
10  producing employee?      12:19:01
11    A.   No.             12:19:01
12    Q.   Okay. So he worked in a revenue   12:19:07
13  producing role?         12:19:09
14    A.   Yes.             12:19:10
15    Q.   Why was he included in the   12:19:11
16  layoff?                 12:19:13
17    A.   Because we believed we could   12:19:14
18  achieve the goals without him.   12:19:16
19    Q.   Was he a performance   12:19:18
20  termination?            12:19:22
21    MS. SELTZER:  I object to the   12:19:23
22  form.                   12:19:24
23    A.   Again, it wasn't for   12:19:24
24  performance. It was that we believed we   12:19:29
```

**160**

```
 1          LEONARD
 2  could do what we were doing at the time   12:19:31
 3  without his services.     12:19:35
 4    Q.   Okay. Do you know who Ron   12:19:36
 5  Nardone is?             12:19:39
 6    A.   Yes.             12:19:40
 7    Q.   What office did he work in?   12:19:41
 8    A.   Technically out of -- you know,   12:19:43
 9  he was a corporate employee, but he worked   12:19:47
10  the majority of time in the Boston office.   12:19:49
11    Q.   And was he a nonrevenue   12:19:52
12  producing employee?      12:19:59
13    A.   No.             12:20:00
14    Q.   He was in a revenue-producing   12:20:00
15  role?                   12:20:02
16    A.   Yes.             12:20:02
17    Q.   And why was he included in the   12:20:03
18  layoff?                 12:20:04
19    A.   Same as above. We did not   12:20:05
20  believe we needed his services to make the   12:20:08
21  revenues and profits that we had   12:20:12
22  projected.              12:20:14
23    Q.   Okay. And Charles Lafever, do   12:20:15
24  you know who he is?       12:20:21
25    A.   Yes, Lafever.     12:20:21
```

**161**

```
 1          LEONARD
 2    Q.   Lafever.          12:20:23
 3    A.   Yes. He was in corporate   12:20:25
 4  business development as well.   12:20:26
 5    Q.   Was he a nonrevenue producing   12:20:32
 6  employee?               12:20:34
 7    A.   No, he was a revenue-producing   12:20:34
 8  employee.               12:20:36
 9    Q.   And what office did he work out   12:20:36
10  of?                     12:20:37
11    A.   I believe the home office.   12:20:38
12    Q.   Do you know where he lived?   12:20:39
13    A.   I believe Pennsylvania, but I am   12:20:41
14  not -- not a hundred percent sure.   12:20:48
15    Q.   And do you know who Mike   12:20:50
16  Debene --               12:20:56
17    A.   Debenedet --      12:20:57
18    Q.   -- Mr. Debenedet is?   12:20:59
19    A.   Yes.             12:21:01
20    Q.   And did he work in a nonrevenue   12:21:01
21  producing role?         12:21:03
22    A.   No.             12:21:04
23    Q.   He worked in a revenue-producing   12:21:12
24  role?                   12:21:14
25    A.   No. He was project manager, so   12:21:14
```

41 (Pages 158 to 161)

VERITEXT REPORTING COMPANY

212-267-6868

516-608-2400

162

LEONARD

1
2    he supported, but he did not create          12:21:21
3    revenue.                                      12:21:28
4        Q.   And what office did he work in?      12:21:29
5        A.   Connecticut.                         12:21:30
6        Q.   Westport or Milford?                 12:21:31
7        A.   I am sorry. Milford,                 12:21:33
8    Connecticut.                                  12:21:35
9        Q.   And why was he included in the       12:21:35
10   layoff?                                       12:21:37
11       A.   We believed we could achieve the     12:21:38
12   budget goals we had in Connecticut without    12:21:39
13   his services.                                 12:21:42
14       Q.   So now were -- were any other        12:21:42
15   employees other than those that appear on     12:21:56
16   this list considered for layoff?             12:22:00
17       A.   No, all employees.                   12:22:06
18       Q.   And do you know why out of the       12:22:06
19   -- out of the 11 employees that were laid     12:22:14
20   off, do you know why six of them came from    12:22:16
21   the Westport office?                          12:22:24
22       MS. SELTZER:   I object to the            12:22:26
23   form.                                         12:22:27
24       A.   I -- yes, because it was a           12:22:30
25   nonproducing office that we thought we        12:22:33

163

LEONARD

1
2    could consolidate or shrink.                  12:22:36
3        Q.   Who suggested that Ms. Dembin be     12:22:43
4    included in the -- in the RIF?                12:22:47
5        MS. SELTZER:   Objection. Asked           12:22:51
6    and answered.                                 12:22:53
7        A.   I don't believe anybody              12:22:54
8    suggested it.                                 12:22:55
9        Q.   So how did her name come up?         12:22:56
10       MS. SELTZER:   Again.                     12:22:59
11       A.   Because she was an employee at       12:23:01
12   the Westport office.                          12:23:03
13       Q.   Did you look -- did the group        12:23:04
14   look at other branch offices to determine     12:23:06
15   whether they could be closed or reduced?      12:23:10
16       A.   Yes.                                 12:23:15
17       Q.   And were there any other offices     12:23:16
18   that you determined could be closed or        12:23:17
19   reduced?                                      12:23:19
20       A.   No, except for Jerry Fields and      12:23:20
21   Mike Debenedet.                               12:23:27
22       Q.   I am sorry. What -- what do you      12:23:28
23   mean by that?                                 12:23:28
24       A.   They were in branch offices that     12:23:34
25   we thought could deliver the goals without    12:23:36

164

LEONARD

1
2    their services.                               12:23:42
3        Q.   Now, did you ever have any           12:23:43
4    conversations with Ms. Dembin's              12:23:51
5    supervisors about including her in the        12:23:55
6    RIF?                                          12:24:00
7        MS. SELTZER:   I object to the            12:24:01
8    form.                                         12:24:02
9        A.   When you say any discussions         12:24:06
10   with her supervisors, as to making her        12:24:07
11   part of the RIF?                              12:24:11
12       Q.   Yes.                                 12:24:12
13       A.   I don't believe so.                  12:24:13
14       Q.   Then why did you -- why did you      12:24:19
15   include -- how did you know that she          12:24:21
16   wasn't essential or necessary or someone      12:24:24
17   else could do her job duties?                 12:24:26
18       MS. SELTZER:   I object to the            12:24:28
19   form.                                         12:24:29
20       A.   Because it was stated that they      12:24:29
21   could be done in New York.                    12:24:32
22       Q.   Who stated it?                       12:24:34
23       A.   Joseph Annarumma.                    12:24:35
24       Q.   Okay. And so did you have a          12:24:38
25   discussion with Mr. Annarumma about           12:24:43

165

LEONARD

1
2    Ms. Dembin's job duties?                      12:24:45
3        A.   Not specifically, no.                12:24:47
4        Q.   How about generally?                 12:24:51
5        A.   I don't know even generally.         12:24:52
6    I -- I am sure someone had a discussion       12:24:58
7    that it could be handled in his staff.        12:25:01
8        Q.   I am sorry. I don't know what        12:25:05
9    you mean. Can you -- can you explain it       12:25:08
10   to me?                                        12:25:10
11       A.   I -- you know, I don't recall        12:25:10
12   if I had a conversation with him, but         12:25:12
13   I -- I am assume that someone had a           12:25:15
14   conversation that it could be dealt with      12:25:17
15   by his staff in New York.                     12:25:19
16       Q.   You mean her job duties could be     12:25:20
17   assumed by his staff in New York?             12:25:26
18       A.   Correct.                             12:25:27
19       Q.   Okay. And do you know who is         12:25:28
20   performing Ms. Dembin's job duties            12:25:30
21   currently?                                    12:25:32
22       A.   Not specifically.                    12:25:33
23       Q.   How about generally?                 12:25:35
24       A.   I believe Kathy Majors and Jovan     12:25:37
25   Vaughn handle those along with Jeannie        12:25:44

42  (Pages 162 to 165)

VERITEXT REPORTING COMPANY

212-267-6868                                              516-608-2400

**166**

```
1            LEONARD
2  Nagy.                        12:25:53
3      Q.  Is Ms. Nagy in New York?    12:25:54
4      A.  No.  She is a paralegal in  12:25:56
5  Connecticut.                  12:25:58
6      Q.  In Westport, Connecticut?   12:25:59
7      A.  Yes, sir.              12:26:01
8      Q.  Is the office still open?   12:26:01
9      A.  Right now, yes.        12:26:03
10     Q.  When is it going to close?  12:26:09
11     A.  When the lease is up in the 12:26:10
12 office or if it is subleased prior. 12:26:12
13     Q.  And do you know where the legal 12:26:14
14 team is going to move to?        12:26:15
15     A.  No.                   12:26:16
16     Q.  Were there any employees who 12:26:17
17 were considered for layoff that were not 12:26:39
18 laid off?                      12:26:43
19         MS. SELTZER:  Objection.  Asked 12:26:44
20 and answered.                  12:26:46
21     A.  Not to my knowledge.    12:26:46
22     Q.  So everyone on the list were 12:26:50
23 always on the list --           12:26:57
24         MS. SELTZER:  Objection.  12:26:58
25     Q.  -- of people to be laid off? 12:26:59
```

**167**

```
1            LEONARD
2         MS. SELTZER:  I object to form. 12:27:01
3      A.  I mean when you say always on 12:27:03
4  the list --                    12:27:05
5      Q.  Well did any --         12:27:09
6      A.  -- this was the list.   12:27:10
7      Q.  I am sorry.  If you turn to the 12:27:11
8  document you have in front of you. 12:27:16
9      A.  Yes.                  12:27:17
10     Q.  Were any of other people -- 12:27:18
11 other than the people that appear on this 12:27:20
12 list, were there any other names or were 12:27:22
13 there any other people who were selected 12:27:26
14 for layoff but were not laid off or 12:27:29
15 identified for layoff but were not laid 12:27:33
16 off?                           12:27:36
17         MS. SELTZER:  I object to the 12:27:36
18 form, but you can answer if you understand 12:27:37
19 it.                            12:27:40
20     A.  I don't believe so.     12:27:40
21         MR. DATOO:  Why don't we take a 12:27:56
22 break for a few minutes.         12:27:58
23         THE VIDEOGRAPHER:  We're going 12:27:59
24 off the record.  The time is 12:28 p.m.. 12:28:00
25         (Recess taken.)          12:30:25
```

**168**

```
1            LEONARD
2         THE VIDEOGRAPHER:  We're    12:30:25
3  returning to the record, 12:30 p.m.  12:30:26
4      Q.  If I can -- Mr. Leonard, if I 12:30:37
5  could direct your attention to Exhibit 51 12:30:40
6  again.                         12:30:43
7         MS. SELTZER:  The last one. 12:30:48
8      A.  This one?               12:30:49
9      Q.  Yes, the first page.  It appears 12:30:50
10 to be an e-mail from to all regional 12:30:54
11 managers, and I think Mr. -- the COO, CFO. 12:30:59
12 I assume that includes Mr. Cutrone and 12:31:05
13 yourself.                      12:31:08
14     A.  (Witness nodding.)       12:31:10
15     Q.  Now, you e-mailed a list of 12:31:13
16 proposed employee reductions, correct? 12:31:15
17     A.  Yes.                  12:31:18
18     Q.  And which group of people came 12:31:19
19 up with this list?               12:31:24
20     A.  Basically the group that the 12:31:25
21 e-mail was sent to.              12:31:33
22     Q.  So that included Mr. State, Mr. 12:31:34
23 Cutrone, yourself, and the regional 12:31:37
24 managers?                      12:31:39
25     A.  Yes.                  12:31:40
```

**169**

```
1            LEONARD
2      Q.  Okay.                 12:31:40
3      A.  But it included people that 12:31:44
4  worked for them as well.         12:31:46
5      Q.  What do you mean?        12:31:49
6      A.  Whoever, you know, was the 12:31:50
7  oversight, they were supposed to go down 12:31:55
8  and see if there was anybody that could be 12:31:58
9  in the list, which I sent again and made 12:32:01
10 sure that we looked at everywhere we can. 12:32:05
11 So, you know, Cutrone his people, took 12:32:07
12 care of his people.  Regional managers 12:32:13
13 took care of their areas.  Everyone took 12:32:15
14 care of theirs areas and scrubbed to see 12:32:20
15 what the -- what people we could propose 12:32:20
16 to reduce overhead.              12:32:24
17     Q.  Okay.  And did anyone add any 12:32:26
18 employees to this list?          12:32:36
19     A.  After this list?         12:32:37
20     Q.  Yes.                  12:32:39
21     A.  No.                   12:32:40
22     Q.  Okay.                 12:32:41
23     A.  At that time.           12:32:46
24     Q.  What do you mean?        12:32:46
25     A.  I can't say that there hasn't 12:32:49
```

43 (Pages 166 to 169)

170

```
                    LEONARD
 1
 2      been any layoffs since January 15.        12:32:52
 3      Q.   Okay.                                12:32:54
 4      A.   There may as well -- there may       12:32:55
 5   have been some since then.                   12:32:57
 6      Q.   Have there been?                      12:32:59
 7      A.   Yes.  There has been some.            12:33:00
 8      Q.   Do you know when that layoff          12:33:19
 9   occurred?                                     12:33:20
10      A.   No.  I just know off the top of       12:33:21
11   my head we have had -- we have reduced        12:33:25
12   more in a couple of places, and we have      12:33:28
13   let a couple of people go.                    12:33:30
14      Q.   Was it a -- was it a RIF or were      12:33:32
15   they performance terminations?               12:33:36
16      A.   No, for the most part                 12:33:37
17   performance and/or RIF.  There may have       12:33:41
18   been one or two RIFs where we just decided   12:33:46
19   we could go forward without of them.          12:33:48
20      Q.   One or two RIFs or just one or        12:33:50
21   two employees that had been --                12:33:53
22      A.   One or two employees.                 12:33:54
23      Q.   Okay.  Do you know what office        12:33:56
24   those employees came from?                    12:33:57
25      A.   One was in I believe the Florida      12:33:58
```

171

```
                    LEONARD
 1
 2   corp. -- the Florida office.                  12:34:08
 3      Q.   Do you know what -- what he or         12:34:12
 4   she did?                                      12:34:14
 5      A.   One was a health and safety           12:34:14
 6   officer.                                      12:34:17
 7      Q.   Okay.                                 12:34:17
 8      A.   And I am trying to think if           12:34:19
 9   there are any others that --                  12:34:21
10      A.   We also did some in Connecticut       12:34:26
11   as well, four or five employees there or      12:34:30
12   two or three employees there.                 12:34:33
13      Q.   In Milford?                           12:34:34
14      A.   Yes.                                  12:34:35
15      Q.   Do you know what positions they       12:34:36
16   occupied?                                     12:34:37
17      A.   Project management and -- and         12:34:38
18   administrative.                               12:34:43
19      Q.   Now, were there any prior             12:34:44
20   versions of the list that you attached to    12:34:51
21   your e-mail?                                  12:34:55
22      A.   I don't believe so.                   12:34:56
23      Q.   Okay.  Are there any e-mails          12:34:58
24   that -- that discuss names of particular      12:35:01
25   people or positions?                          12:35:10
```

172

```
                    LEONARD
 1
 2      A.   I don't believe so.                   12:35:12
 3      Q.   Okay.  So how long before you         12:35:13
 4   sent this e-mail did you have a list of       12:35:21
 5   names of people that were proposed to be     12:35:25
 6   laid off?                                     12:35:28
 7      MS. SELTZER:  You mean the list           12:35:29
 8   that is attached?                             12:35:32
 9      MR. DATOO:  Right.                          12:35:33
10      A.   Knowing myself, ten minutes, but     12:35:33
11   I am not sure.                                12:35:35
12      Q.   Okay.  Do you know who developed      12:35:36
13   this list?                                    12:35:37
14      A.   The group that I just discussed,     12:35:38
15   the regional management, CFO, COO.           12:35:43
16      Q.   Do you know -- did you receive        12:35:47
17   this list by e-mail?                          12:35:49
18      A.   No, I think I created this list.     12:35:50
19      Q.   Okay.  And what did you -- did        12:35:52
20   you create this list based off of             12:35:54
21   anything?                                     12:35:56
22      A.   Based off the discussions with       12:35:56
23   the group.                                    12:35:59
24      Q.   And did you create this list          12:35:59
25   immediately after you had a discussion        12:36:02
```

173

```
                    LEONARD
 1
 2   with this group?                              12:36:05
 3      MS. SELTZER:  Objection.  Asked           12:36:06
 4   and answered.                                 12:36:07
 5      A.   No, because this was discussed       12:36:08
 6   and talked about and put together over a     12:36:12
 7   period of time, you know, a couple of         12:36:17
 8   weeks at least.                               12:36:20
 9      Q.   Okay.  And that was after the         12:36:20
10   regional managers meeting you had?            12:36:24
11      A.   Yes.                                  12:36:26
12      Q.   Okay.  Now, the employees that        12:36:27
13   were laid off in connection with the          12:36:38
14   January 2011 RIF, have -- have any of         12:36:39
15   them -- have you hired any people             12:36:45
16   subsequent to assume their job duties?        12:36:48
17      A.   No.                                  12:36:52
18      Q.   Okay.  I asked you very early on      12:36:52
19   in the deposition about the total number     12:36:56
20   of employees within the entire LVI            12:36:58
21   organization.                                 12:37:02
22      Do you recall that?                        12:37:02
23      A.   Yes.                                  12:37:03
24      Q.   And I don't remember the answer,     12:37:03
25   so I am just going to ask you it again.       12:37:07
```

44 (Pages 170 to 173)

174

```
1                LEONARD
2    How many did you say there are?        12:37:09
3        MS. SELTZER:  I object to the      12:37:15
4    form.  In the -- I think there were    12:37:16
5    two -- two answers there.  One was the  12:37:18
6    LVI --                                  12:37:20
7    Q.    Okay.  Well, let's -- actually I  12:37:21
8    do have the answer.  I believe you -- you  12:37:23
9    testified earlier that LVI Services      12:37:25
10   employs approximately 50 people; is that  12:37:27
11   correct?                                12:37:29
12   A.    Yes, maybe less though now.       12:37:30
13   Q.    Okay.  And within the entire LVI  12:37:33
14   organization, I believe you testified that  12:37:35
15   LVI employs approximately 400 to 500     12:37:38
16   people; is that correct?                12:37:42
17   A.    Yes.                              12:37:43
18   Q.    Okay.  Now, is that -- did you    12:37:44
19   only take into account the salaried      12:37:48
20   employees?                              12:37:51
21   A.    Yes.                              12:37:52
22   Q.    How many nonsalaried employees    12:37:53
23   work for LVI Services?                  12:37:58
24   A.    For LVI Services?                 12:38:00
25   Q.    Yes.                              12:38:04
```

175

```
1                LEONARD
2    A.    Minimal.                          12:38:08
3    Q.    Sorry?                            12:38:11
4    A.    Very minimal.                     12:38:11
5    Q.    Okay.  And how about for the      12:38:13
6    entire LVI organization?                12:38:14
7    A.    It depends on the day, 2 to       12:38:16
8    3,000.                                  12:38:18
9    Q.    Okay.                             12:38:19
10       MR. DATOO:  Okay.  Thank you       12:38:24
11   very much.  I have no further questions.  12:38:26
12       THE VIDEOGRAPHER:  We're going     12:38:27
13   off the record.  12:38 p.m.  End of      12:38:28
14   today's questioning.                    12:38:31
15       (Time noted: 12:38 p.m.)           12:38:37
16
17
18
19
20               JOHN LEONARD
21
22   Subscribed and sworn to before me
23   this      day of        , 2011
24
25                       .
```

176

```
1                LEONARD
2           C E R T I F I C A T I O N
3
4
5
6        I, DEBBIE ZAROMATIDIS, a Shorthand
7    Reporter and a Notary Public, do hereby
8    certify that the foregoing witness, JOHN
9    LEONARD, was duly sworn on the date
10   indicated, and that the foregoing is a
11   true and accurate transcription of my
12   stenographic notes.
13       I further certify that I am not
14   employed by nor related to any party to
15   this action.
16
17
18
19
20
21
22
23          DEBBIE ZAROMATIDIS
24
25
```

177

```
1                LEONARD
2           E X H I B I T S
3
4    PLAINTIFF'S
5    EXHIBIT     DESCRIPTION          PAGE
6    31A    E-mail with attachment     91
7    49     E-mail                     130
8    50     E-mail                     132
9    51     Document                   154
10   52     E-mail                     100
11   53     E-mail                     101
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

45 (Pages 174 to 177)

**VERITEXT REPORTING COMPANY**

212-267-6868                    516-608-2400