# Exhibit 8

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
No. 10 Civ. 9308(JSR)

----------------------------------------x

BURTON T. FRIED,

Plaintiff,

- against -

LVI SERVICES, INC., LVI PARENT CORP., CODE HENNESSY SIMMONS, LLC d/b/a CHS PRIVATE EQUITY V LP; APOLLO INVESTMENT CORP., SCOTT E. STATE, in his official and individual capacities; BRIAN SIMMONS, in his official and individual capacities; RAJAY BAGARIA, in his official and individual capacities; GERALD J. GIRARDI, in his official and individual capacities,

Defendants.

----------------------------------------x

June 1, 2011
2:03 p.m.

VIDEOTAPE DEPOSITION of JOHN SCHNABEL, taken by the Plaintiff, pursuant to Notice, held at the offices of Thompson Wigdor & Gilly, LLP, 85 Fifth Avenue, New York, New York, before Debbie Zaromatidis, a Shorthand Reporter and Notary Public of the State of New York.

A P P E A R A N C E S :

THOMPSON WIGDOR & GILLY, LLP
Attorneys for Plaintiff
85 Fifth Avenue
New York, New York 10003
BY: SHAFFIN A. DATOO, ESQ.

SIDLEY AUSTIN, LLP
Attorneys for Defendants
787 Seventh Avenue
New York, New York 10019
BY: JOANNE SELTZER, ESQ.

ALSO PRESENT:
BURTON FRIED
J.D. MARTINEZ, Videographer

SCHNABEL

S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between the Attorneys for the respective parties hereto that filing and sealing be and the same are hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections except as to the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within examination may be signed and sworn to before any notary public with the same force and effect as though signed and sworn to before this Court.

SCHNABEL

THE VIDEOGRAPHER: We are on the record. My name is J.D. Martinez of Veritext New York. The date today is June 1, 2011, and the time is approximately 2:04 p.m. This deposition is being held in the office of Thompson Wigdor & Gilly LLP located at 85 Fifth Avenue, New York, New York. The caption of this case is Burton T. Fried versus LVI Services, Inc. et al. filed in the United States District Court, Southern District of New York. The name of the witness is John Schanbel. 02:03:51 02:04:27 02:04:30 02:04:32 02:04:35 02:04:38 02:04:41 02:04:44 02:04:46 02:04:49 02:04:52 02:04:55

At this time the attorneys will identify themselves and the parties they represent after which our court reporter Debbie Zaromatidis will swear in the witness, and we can proceed. 02:04:58 02:04:59 02:05:02 02:05:03 02:05:05

MS. SELTZER: Joanne Seltzer at Sidley Austin, LLP on behalf of all defendants in this matter. 02:05:07 02:05:10 02:05:11

MR. DATOO: Shaffin Datoo, Thompson Wigdor & Gilly on behalf of the plaintiff Burt Fried. 02:05:13 02:05:15 02:05:25

SCHNABEL
MS. SELTZER: I object to the 02:20:59
form. You can answer. 02:21:00
A. There would be obviously formal 02:21:01
board meetings, but there would be monthly 02:21:06
written updates from the company on 02:21:10
performance, and there would be impromptu 02:21:13
phone calls, not scheduled phone calls but 02:21:18
impromptu ones with Burt or later Scott 02:21:20
State and probably more with Paul Cutrone 02:21:25
than anyone else between me or my -- my 02:21:28
staff. 02:21:34
Q. Do you still have any of these 02:21:35
monthly written updates that you just 02:21:36
referred to? 02:21:39
A. Yes, it would be the normal 02:21:39
monthly reporting package from the CFO. 02:21:41
Q. Okay. And what was contained in 02:21:44
those updates? 02:21:46
A. Mostly operating results, 02:21:47
financial statements, the normal financial 02:21:53
statements as well as key operating 02:21:56
metrics. 02:21:59
MR. DATOO: Joanne, I'll put it 02:22:03
in writing, but I just want to put it on 02:22:04

SCHNABEL
the record. I would like production of 02:22:07
these monthly written updates for 2009 and 02:22:08
2010. 02:22:11
MS. SELTZER: I think we 02:22:12
produced to you everything that we had 02:22:13
marked board members, but I will -- I will 02:22:16
check. 02:22:17
MR. DATOO: Okay. 02:22:19
Q. So other than attending board 02:22:21
meetings and receiving these monthly 02:22:23
written updates and I think -- 02:22:28
A. I am sorry. And there is 02:22:29
also -- along with that would be on a 02:22:31
monthly basis the CFO would write some 02:22:33
sort of a synopsis of those results. 02:22:35
MR. DATOO: Okay. Joanne, I 02:22:38
would like to include that in my request. 02:22:39
MS. SELTZER: Put it in 02:22:41
writing. I'll take it under advisement. 02:22:43
Q. And did you mention that you 02:22:51
were involved in some phone calls as well? 02:22:52
A. Yes. If we had any questions, 02:22:55
we would usually just pick up the phone 02:22:58
and call. Management was always -- always 02:23:01

SCHNABEL
accessible, and that is how we dealt with 02:23:03
it, so it was a little bit informal. 02:23:06
Q. And how often would you have 02:23:08
these informal communications with 02:23:09
management? 02:23:11
A. I would say on an average basis 02:23:11
twice a month, two or three times a month. 02:23:15
Q. Okay. Now, how many employees 02:23:17
does LVI Services have? 02:23:23
A. Salaried or total? 02:23:25
Q. In total. 02:23:31
A. I really don't know the answer 02:23:32
to that. 02:23:37
Q. Hundreds, thousands? 02:23:39
A. I would say low thousands. 02:23:41
Q. Low thousands. And was this 02:23:43
true -- 02:23:52
A. And it is a guess by the way. 02:23:53
It is a guess. 02:23:54
Q. Okay. And was that number 02:23:55
around the same in 2010, all of 2010? 02:23:57
A. Well, I think we -- there 02:24:00
is -- it is a project oriented business. 02:24:04
So it depended upon the project flow at 02:24:06

SCHNABEL
the time, and so they were not all 02:24:08
full-time employees I would say. So -- 02:24:12
and 2010 wasn't a banner year. So I 02:24:14
suspect that we actually had less employee 02:24:17
hours in 2010 than we did in previous -- 02:24:19
the previous year. That is a guess. 02:24:22
Q. Can you ballpark how many 02:24:25
employees you had in 2010? 02:24:27
A. No, I could not. 02:24:28
Q. Would it be in the hundreds or 02:24:30
in the -- 02:24:31
A. It would be the same answer. It 02:24:32
is a complete guess on my part so 02:24:34
thousands. If I said that before as a 02:24:36
guess I would stick with that. 02:24:38
Q. Okay. Does LVI Services have 02:24:39
any offices? 02:24:45
MS. SELTZER: Offices? 02:24:47
MR. DATOO: Offices. 02:24:48
A. Yes. 02:24:49
Q. How many ballpark? 02:24:50
A. Ballpark 20. 02:24:53
Q. Okay. Do you know who Robert 02:24:54
McNamara is? 02:24:59

SCHNABEL

A. Yes. 02:25:01
Q. Who is he? 02:25:01
A. The former CEO of LVI. 02:25:02
Q. And did Falcon have an investment in LVI when Mr. McNamara was CEO? 02:25:05 02:25:10 02:25:14
A. I -- I do not believe so, and this is a little bit of -- trying to remember what happened in 2005. We were endeavoring to have Burt trans -- transfer over to a chairman role and bring in a CEO. We were actively looking for a CEO in the time period before the sale of the company, and I believe Bob McNamara was hired only after the sale. 02:25:15 02:25:18 02:25:20 02:25:22 02:25:28 02:25:30 02:25:35 02:25:37 02:25:40
Q. Okay. Do you know why Mr. Fried was going to transition to a chairman role? 02:25:41 02:25:45 02:25:47
A. That was his wish. 02:25:48
Q. Okay. And as chairman do you know what his job duties were? 02:25:49 02:25:55
MS. SELTZER: I am sorry. Just objection. Under Robert McNamara? 02:26:00 02:26:01
MR. DATOO: Yes. 02:26:04

SCHNABEL

A. Under Robert McNamara. I do not know specifically what they were, but in talking to Burt I realized that he had quite in depth knowledge of the business. So that he was not -- he was a caretaker, chairman, very active. What his day-to-day duties were wasn't clear, but you could talk to him about the -- the most strategic matter, and he would have an understanding of it and could give an opinion about it. 02:26:04 02:26:10 02:26:12 02:26:19 02:26:21 02:26:26 02:26:28 02:26:30 02:26:33 02:26:35 02:26:37
Q. So you don't know exactly what he did, but you do know he knew the business well? 02:26:38 02:26:40 02:26:42
A. Yes. 02:26:42
Q. Okay. Do you know what his work performance was like as chairman? 02:26:43 02:26:45
A. Under Bob McNamara? 02:26:48
Q. Yes. 02:26:51
A. I don't -- I don't really know. From after we sold the business until we reentered the business there really is a kind of a dark period there where I don't really have -- have any interaction with 02:26:52 02:26:54 02:26:58 02:27:01 02:27:03

SCHNABEL

Burt, but as we made our investment -- we made our toehold investment, we started speaking to Burt. It was clear that, you know, he was fully engaged, and he was a respected member and was somebody who -- you would want to talk to if you were going to make an investment in this company. 02:27:06 02:27:10 02:27:14 02:27:17 02:27:20 02:27:22 02:27:25 02:27:26
Q. When did you I guess sell your investment in LVI? 02:27:26 02:27:29
A. In 2005 along with Blue Point, who controlled the investment at that time. 02:27:31 02:27:33 02:27:35
Q. And when did you I guess make another investment? 02:27:35 02:27:39
A. In 2009. So we had fully divested our private investment in 2005 with Blue Point. In 2000 -- early 2009 through a series of transactions we accumulated senior debt, LVI senior debt. 02:27:41 02:27:44 02:27:47 02:27:51 02:27:53
Q. All right. Now, did there come a time when Mr. Fried became the interim CEO -- 02:27:57 02:28:10 02:28:12
A. Yes. 02:28:13

SCHNABEL

Q. -- of LVI. Do you know when that was? 02:28:13 02:28:15
A. I want to say that it is March of 2010. 02:28:15 02:28:30
Q. Okay. Do you know why he became the interim CEO? 02:28:37 02:28:39
A. Well, yes. Bob McNamara left for another position. We were in -- without a CEO. We would start a search immediately, but we all realized that Burt had been CEO, very capable and continued to do that in the interim period, and as long as he was willing to do that that would be the best outcome. 02:28:41 02:28:44 02:28:49 02:28:54 02:28:56 02:28:59 02:29:01 02:29:02
Q. Do you know if he asked to be interim CEO or he was asked to be interim CEO? 02:29:05 02:29:07 02:29:12
A. I am -- I am sure we asked him. I mean I think it is one of those things where we kind of look at ourselves -- we are looking in the room here and who is the guy that has operated this company and has done well. Not a bunch of financial guys. So I -- I would assume we made the 02:29:13 02:29:15 02:29:17 02:29:21 02:29:22 02:29:25 02:29:27

SCHNABEL

first move, but I think Burt, who had a rather substantial investment in the company, also would have thought probably he was the right person for the job. 02:29:30 02:29:32 02:29:34 02:29:36

Q. What do you mean by Burt having a substantial investment in the company? 02:29:38 02:29:40

A. Well, he still had an -- money -- monies due him. In what form at that point in time in 2010 -- I mean there were still some management payment that still was owed him. So just by virtue of the fact that he had the largest stake it was substantial. 02:29:42 02:29:46 02:29:49 02:29:52 02:29:57 02:30:01 02:30:05

Q. Was he the only one owed money -- 02:30:05 02:30:08

A. On the management team, no. No. I would say a top dozen managers at least. 02:30:08 02:30:11

Q. And why were they owed money? 02:30:14

A. That was due to the transaction, the recapitalization of the company. They received a payment on the recapitalization. How it was structured any more I don't -- don't recall, but essentially these were structured as a 02:30:16 02:30:18 02:30:21 02:30:24 02:30:27 02:30:29

SCHNABEL

payment up front and then over time to keep management incentivized while the company made a turn around. 02:30:33 02:30:35 02:30:40

Q. And did the company eventually pay Mr. Fried and the management team any money that was owed? 02:30:41 02:30:49 02:30:51

A. I think the next payment that -- after the recapitalization, the next payment I don't believe has been made yet, so it is still due and forthcoming. 02:30:53 02:30:55 02:30:58 02:31:00

Q. And is that payment contingent on certain variables or targets or goals? 02:31:03 02:31:05

A. Those payments are -- are different than the -- I don't believe -- I don't remember any more that there is -- you have to understand there is also a management option pool that does have a time vesting component and a performance component in it. So whether those -- how those payments are structured any more I don't want to venture a guess. I am just not comfortable at it, and I don't remember. 02:31:11 02:31:13 02:31:17 02:31:19 02:31:20 02:31:25 02:31:28 02:31:31 02:31:32 02:31:35 02:31:36

Q. And prior to the 02:31:37

SCHNABEL

recapitalization, did the company pay Mr. Fried in -- and the other management employees any money that they may have been entitled to? 02:31:38 02:31:43 02:31:47 02:31:48

A. Well, obviously salary and bonus, sure. I assume so. I -- the last time I was really involved with the compensation was upon the sale of the company in 2005, in which case the management team received a substantial amount of options. 02:31:50 02:31:52 02:31:54 02:31:56 02:31:58 02:32:02 02:32:07

Q. Did that at any point jeopardize the recapitalization? 02:32:08 02:32:15

MS. SELTZER: I object to the form. You can answer. 02:32:17 02:32:18

A. It was part of the negotiation. I -- the way I would -- I would view it is that management wanted to have some sort of form of for lack of a better word stay bonus of some sort. This was the form that it took. That is at least how I -- I look at it. That was negotiated. That wasn't something that was just given, but, you know, the -- there was quite a bit of 02:32:19 02:32:20 02:32:23 02:32:27 02:32:30 02:32:31 02:32:35 02:32:37 02:32:41

SCHNABEL

conversation about valuation of securities that we exchanged for common stock. So every constituent at the table had something to negotiate, and so I guess if you weren't willing to be flexible I guess anything could have put that transaction in jeopardy, but clearly it was one of the more important things on the table. 02:32:45 02:32:47 02:32:50 02:32:53 02:32:55 02:32:58 02:33:00 02:33:02

Q. And despite that Falcon -- did Falcon continue -- 02:33:04 02:33:06

A. Yes. 02:33:07

Q. -- with the investment in LVI? 02:33:07

A. Yes. Well, not only continue. I think it is better -- we actually took some of other senior notes and exchanged them for common. 02:33:09 02:33:19 02:33:21 02:33:23

Q. What does that mean? 02:33:24

A. The recapitalization basically was -- took -- took the firm's balance sheet and essentially shrunk it by paying down or converting senior debt, so there was less senior debt post transaction than there was previously. Some of that was done through a cash investment. Some of 02:33:25 02:33:28 02:33:30 02:33:33 02:33:35 02:33:37 02:33:40

SCHNABEL

that was done through a conversion. 02:33:42
Falcon did not make a new cash investment 02:33:44
to the company but took -- willingly took 02:33:47
some of its senior debt and converted it 02:33:51
into common. 02:33:54
Q. Is there any way if you could 02:33:54
tell me if it is good -- if that is a good 02:33:56
thing or a bad thing? 02:33:58
A. If -- if LVI does really well, 02:33:59
it is a superb thing. 02:34:02
Q. Okay. 02:34:04
A. And if the company doesn't do 02:34:05
well, it is an incredibly stupid thing. 02:34:06
Q. And how has it turned out so 02:34:09
far? 02:34:11
A. So far it is too -- it is too 02:34:11
early to tell actually. I think the 02:34:13
company is rebounding, and we still are 02:34:16
very happy with our investment thus far. 02:34:17
Q. Okay. Now, while Mr. Fried was 02:34:21
interim CEO, what -- what job duties was 02:34:28
he performing? Do you know? 02:34:32
A. He was performing all the duties 02:34:34
that he had done in -- in the past I -- I 02:34:39

SCHNABEL

assume. Again, I wasn't there from day to 02:34:43
day, so I couldn't really check what was 02:34:46
on his desk, but he was involved with all 02:34:48
the major bidding. He was involved with 02:34:51
all employee issues, major customer 02:34:54
issues. So I would assume that he had his 02:35:00
fingers in every pie as he usually did in 02:35:03
the past. 02:35:06
Q. So would it be fair to say that 02:35:07
he assumed -- he was doing -- he was 02:35:09
performing the job duties that he held as 02:35:13
chairman in addition to those that he 02:35:15
assumed as CEO? 02:35:19
A. I don't know the answer to that. 02:35:21
All I can say is that he -- Burt can -- if 02:35:24
Burt chooses to be the CEO, he could be a 02:35:30
CEO today as far as I am concerned, so he 02:35:33
did that role. Now, whether he took some 02:35:38
of his former responsibilities and gave 02:35:41
that out or he continued to do them, that 02:35:43
I don't know. 02:35:46
Q. Okay. And while Mr. Fried was 02:35:46
the interim -- interim CEO, do you have 02:35:51
any personal knowledge of his work 02:35:54

SCHNABEL

performance? 02:35:56
A. We spoke a lot on the phone. It 02:35:57
was a very difficult business environment. 02:36:05
It continues to be challenging, but I 02:36:10
perceived no difference in his -- his 02:36:15
performance than ever before, and I always 02:36:17
had the highest respect for him and 02:36:20
continue -- and continue. So I know -- I 02:36:22
think he performed the same. 02:36:25
Q. And while Mr. Fried was the 02:36:26
interim CEO, did you have any 02:36:28
conversations or e-mail communications 02:36:31
with anybody at LVI or any board members 02:36:33
about Mr. Fried's job duties or his future 02:36:39
at LVI? 02:36:41
A. Well, only -- the only time that 02:36:48
we spoke about his job duties was after 02:36:50
Scott State had been hired as a CEO. 02:36:52
Q. Okay. So you -- you didn't have 02:36:55
any conversations -- 02:36:57
A. Before that, no. 02:36:59
Q. Okay. 02:37:00
A. And frankly, I mean I -- I have 02:37:00
to say just our opinion as -- as investors 02:37:02

SCHNABEL

in the company was quite independent. We 02:37:11
did not depend upon anybody else's opinion 02:37:14
of Burt. We had our own opinion about 02:37:17
Burt, you know -- 02:37:20
Q. And what -- what was your 02:37:22
opinion about Burt? 02:37:24
A. No -- the highest regard. The 02:37:25
fact that he was there gave us much 02:37:28
comfort. 02:37:30
Q. Are you less comfortable now 02:37:30
that he is not there? 02:37:32
A. I would much rather him be 02:37:33
there. 02:37:35
Q. Okay. Now, did there come a 02:37:35
time when Scott State was hired as 02:37:51
president and CEO of LVI Services? 02:37:53
A. I mean he was hired -- yes. 02:37:55
Q. And do you know when that was? 02:38:05
A. Sometime in 2010. I probably 02:38:09
should know this. I -- I am guessing the 02:38:15
summer. 02:38:18
Q. Don't worry. You're not the 02:38:18
only one that doesn't know his exact date 02:38:20
of hire. 02:38:22

SCHNABEL

anything exceptional in that time period 02:42:48
that was I would have thought anything 02:42:50
bizarre was happening or different was 02:42:53
happening. I assumed it was business as 02:42:55
usual. 02:42:57

Q. Okay. Now, where does -- where 02:42:57
do you keep your office at Falcon? 02:43:03

A. We have a -- an address at 450 02:43:05
Park Avenue, which is where I work, but we 02:43:09
also have a Boston office which is the 02:43:12
home office. 02:43:13

Q. And you work in the New York 02:43:14
office? 02:43:15

A. I do. 02:43:16

Q. Okay. Do you live in New York? 02:43:16

A. I live in Long Island. 02:43:18

Q. Okay. Now, after Mr. State 02:43:19
started working at LVI Services, did there 02:43:24
come a time when Mr. State began 02:43:27
transitioning Mr. Fried's job duties to 02:43:29
others? 02:43:31

MS. SELTZER: I object to the 02:43:33
form, but you can answer. 02:43:34

A. I only became aware that some 02:43:35

SCHNABEL

things were now no longer in his purview 02:43:49
at the very end of Mr. Burt's tenure 02:43:52
there -- Mr. Fried's tenure there. So 02:43:58
before that I was not aware of any 02:44:01
transferring of duties, but obviously I 02:44:03
became aware that he was accustomed to 02:44:07
being involved with certain things and now 02:44:10
all of a sudden was not either invited to 02:44:11
be or -- or was told not to be a part of 02:44:15
something. 02:44:17

Q. Do you know what those items 02:44:18
were? 02:44:19

A. There were some strategic 02:44:19
alliances, one overseas in particular I 02:44:26
think in England, which I recall 02:44:30
specifically. Other than that, there may 02:44:38
have been others, but I just don't recall 02:44:41
to be honest. 02:44:43

Q. With respect to this overseas 02:44:44
strategic alliance, do you know whose 02:44:46
purview that fell within? 02:44:50

MS. SELTZER: I object to the 02:44:52
form. 02:44:53

A. Who now -- you mean -- 02:44:53

SCHNABEL

Q. I believe you -- you testified 02:44:56
that Mr. -- towards the end Mr. Fried was 02:44:58
no longer responsible for this strategic 02:45:02
alliance overseas; is that correct? 02:45:06

A. Yes. 02:45:07

Q. Do you know who became 02:45:08
responsible for that? 02:45:09

A. I think Mr. State wanted to take 02:45:10
that responsibility directly. 02:45:14

Q. Okay. 02:45:16

A. At least that is what Mr. Fried 02:45:17
told me. 02:45:19

Q. And do you know if Mr. State 02:45:20
made a comment about Mr. Fried's age? 02:45:30

A. Other than in the board meeting, 02:45:33
kind of the last board meeting that Mr. 02:45:41
Fried was at, other than that, no. 02:45:44

Q. Did you ever have a telephone 02:45:45
conversation with Mr. Fried prior to the 02:45:46
board meeting in which he told you that 02:45:49
Mr. State made a comment about his age? 02:45:51

MS. SELTZER: I object to the 02:45:55
form, but you can answer. 02:45:56

A. I don't recall having a specific 02:46:00

SCHNABEL

conversation about it. However, I don't 02:46:03
believe that at that meeting I was 02:46:06
surprised that -- that Mr. Fried felt that 02:46:08
way. So we must have had a conversation. 02:46:13
I mean I -- that is the only way I 02:46:16
could -- I could have been advised. 02:46:18

Q. Do you recall when you had that 02:46:20
conversation with Mr. Fried? 02:46:21

A. No, I -- I mean I don't remember 02:46:23
-- I don't specifically remember the 02:46:27
conversation. So it is hard to say when, 02:46:28
but my guess is that it would have been 02:46:30
within the week or two before the meeting. 02:46:33

Q. And do you recall what was 02:46:35
discussed? 02:46:37

A. No, other than certain of his 02:46:38
legacy responsibilities were taken from 02:46:45
him and that there seemed to be a real 02:46:49
problem between them, which is kind of odd 02:46:57
given the fact that Mr. Fried had actually 02:47:05
brought Mr. Scott State to the table. So 02:47:12
it is -- it was a very bizarre story 02:47:14
actually. 02:47:17

Q. You -- you mentioned that Mr. 02:47:18

SCHNABEL

Fried told you that he had some of his legacy responsibilities removed from him; is that correct? 02:47:20 02:47:21 02:47:24

A. Yes. 02:47:25

Q. Did he tell you what those legacy responsibilities were? 02:47:26 02:47:28

A. I think that -- other than the -- the strategic alliance overseas, the only other thing that specifically comes to mind is the contract that was negotiated for Madison Square Garden that he normally would have reviewed a contract of that magnitude and had not. 02:47:30 02:47:40 02:47:43 02:47:44 02:47:49 02:47:53 02:47:58

Q. Do you know who that was assigned to? 02:48:09 02:48:10

A. I would assume the general counsel and I would assume the CEO would have looked that as well. 02:48:11 02:48:15 02:48:17

Q. Now, you also testified that there appeared to be a real problem between Mr. Fried and Mr. State, correct? 02:48:18 02:48:22 02:48:24

MS. SELTZER: I object to the characterization. 02:48:27 02:48:28

A. There was a clear miss -- there 02:48:29

SCHNABEL

was clearly a miscommunication between the two of them. 02:48:34 02:48:36

Q. And -- 02:48:37

A. And so -- and that developed quickly. 02:48:39 02:48:41

Q. And why do you -- why do you say that? 02:48:41 02:48:48

MS. SELTZER: Objection. Which part? 02:48:48 02:48:49

Q. The first part, the miscommunication. 02:48:50 02:48:51

A. Why there was a miscommunication? 02:48:52 02:48:53

Q. Yes. 02:48:54

A. I am not really sure. That is kind of one of the great mysteries of this whole thing. Burt has never been uncommunicative with me, so I don't know Scott as well to be honest. So -- but I would assume that we brought him into -- into the company as CEO. There was a legacy job that Burt had already occupied. I assumed it was something that they had talked about, and that it was 02:48:54 02:48:56 02:49:00 02:49:02 02:49:04 02:49:09 02:49:13 02:49:19 02:49:21 02:49:23

SCHNABEL

understood. That was obviously incorrect. 02:49:26

Q. Understood as to what Mr. Fried's role was going to be? 02:49:30 02:49:33

A. Yes. 02:49:34

Q. Did Mr. Fried ever tell you if Mr. State made -- asked -- did Mr. Fried ever tell you if Mr. State asked him how long he expected to continue to work at LVI? 02:49:34 02:49:41 02:49:48 02:49:50 02:49:52

A. I am sorry? 02:49:53

Q. Did Mr. Fried ever tell you -- 02:49:55

A. Did Mr. Fried -- yes, he did tell me that. 02:49:57 02:50:04

Q. Do you recall when that was? 02:50:04

A. Sometime before the board meeting, a week or two. 02:50:06 02:50:07

Q. Do you know if it was part of the same conversation you may have had? 02:50:08 02:50:11

A. Probably. 02:50:12

Q. And do you recall it -- exactly what he said other than what you just testified to? 02:50:13 02:50:16 02:50:19

A. Other than that he wasn't unhappy -- he was unhappy about that. 02:50:20 02:50:23

SCHNABEL

Q. Did he tell you why? 02:50:25

A. No, I think -- I think the statement stood for itself. I mean there was no more explanation. 02:50:27 02:50:35 02:50:37

Q. What do you mean -- how did you interpret that statement? 02:50:39 02:50:41

A. Well, it was among many other statements. Right. So he was -- he was -- he had a very unpleasant conversation with Scott. He did mention that. He had also talked about, you know, Burt had actually put down on the schedule what he had done and what he thought he could do going forward that would be supportive, and he characterized to me how that was not something that Scott would contemplate. 02:50:43 02:50:46 02:50:48 02:50:52 02:50:53 02:51:00 02:51:02 02:51:04 02:51:06 02:51:13 02:51:15

Q. How did you feel about that? 02:51:16

A. I didn't feel good about that. 02:51:26

Q. Why not? 02:51:27

A. Well, I think almost anybody at least with a clear mind would rather have Burt Fried be a part of the board than not be a part of it. So I was happy that 02:51:28 02:51:31 02:51:33 02:51:36

SCHNABEL

Q. Okay. 03:07:13

A. In addition to receiving I 03:07:15 wanted to make sure that I knew from him. 03:07:17

Q. And did you speak to Mr. Fried 03:07:19 after you saw this list? 03:07:24

A. I did. I am sure I did. 03:07:26

Q. And what did -- do you recall 03:07:31 when you spoke to Mr. Fried? 03:07:34

A. I don't, but obviously it would 03:07:35 be in that week before the board meeting. 03:07:37 I assumé that I would have tried to see 03:07:40 where he was coming from in all of these 03:07:44 things. That is why I was sure that 03:07:46 he -- that all of these responsibilities 03:07:51 would be subject to the ultimate authority 03:07:53 of the CEO. 03:07:55

Q. And in that conversation did he 03:07:56 agree? 03:08:00

A. Well, that is what he told me. 03:08:01

Q. Okay. 03:08:03

A. That is what he told me. 03:08:04

Q. I am sorry? 03:08:05

A. That is what he told me. 03:08:06

Q. Was anything -- was anything 03:08:07

SCHNABEL

else discussed? 03:08:09

A. Other than, you know, expressing 03:08:10 frustration as to why this is such a big 03:08:16 issue, I don't think so. 03:08:18

Q. Who was expressing the 03:08:20 frustration, you or Mr. Fried? 03:08:21

A. Mostly Mr. Fried, but I too was 03:08:23 somewhat befuddled. 03:08:26

Q. And why? Why were you befuddled? 03:08:29

A. Well, I -- again I looked at 03:08:35 this with hope saying, look, I think there 03:08:37 is some sort of a role that we could 03:08:39 produce here and perhaps maybe soften some 03:08:41 things, take some things off the list, 03:08:43 recast them if it was, you know, truly 03:08:46 something that was that sensitive. That 03:08:49 is why. 03:08:53

Q. And did Mr. Fried agree with 03:08:54 your approach? 03:08:57

MS. SELTZER: I object to the 03:08:59 form. 03:09:00

A. I don't know. I don't know 03:09:01 what -- if he would ultimately have 03:09:05 relented on anything. 03:09:08

SCHNABEL

Q. Now, prior to the November 4 03:09:09 board meeting, other than what you just 03:09:26 testified to did you have any other 03:09:27 conversations with anybody within LVI or 03:09:28 on the board about Mr. Fried's job duties 03:09:31 or his future at LVI? 03:09:33

A. If I -- if I -- certainly not 03:09:35 with an employee of LVI. Did I talk to 03:09:44 any of the board members? I really do not 03:09:50 think so. 03:09:54

Q. How about Mr. Leonard? 03:09:55

MS. SELTZER: Objection. You 03:09:58 mean as -- as a an executive of LVI? 03:10:00

MR. DATOO: Yes. 03:10:04

MS. SELTZER: I think it has 03:10:05 been asked and answered. 03:10:06

MR. DATOO: Yes. 03:10:07

A. No, I did not speak with him 03:10:08 prior to the board meeting. 03:10:10

Q. Getting back to -- going back to 03:10:11 the conversation you had with Mr. Fried 03:10:18 regarding his job duties, did you document 03:10:22 your conversation with Mr. Fried? 03:10:24

A. I do not think so, no. 03:10:26

SCHNABEL

Q. Okay. And was anyone -- was 03:10:29 this a telephone call? 03:10:32

A. Yes. 03:10:33

Q. And was anyone else on the line? 03:10:34

A. No. 03:10:38

Q. Okay. How often did you see Mr. 03:10:39 Fried? 03:10:42

MS. SELTZER: Objection. 03:10:45

Q. While Mr. State was the CEO? 03:10:46

A. Does seeing include phone calls? 03:10:49

Q. No, just actually seeing him. 03:10:53

A. Face to face. Not very often. 03:10:55 It would have been mostly phone calls and 03:11:01 outside of board meetings two or three 03:11:06 times perhaps. 03:11:09

Q. And was that in New York or -- 03:11:10

A. Yes. 03:11:13

Q. -- somewhere else? 03:11:13

A. It would have been in New York, 03:11:14 but it would have only been in their 03:11:16 offices. I never went to his office. 03:11:18

Q. And this was during the time Mr. 03:11:20 State was CEO? 03:11:21

A. Yes. 03:11:22

SCHNABEL

Q. Okay. And how about while Mr. Fried was the interim CEO, how many times did you see him face to face? 03:11:23 03:11:28 03:11:32

A. Besides board meetings not often at all face to face. I mean it would have been impromptu. There would have been no reason to. We could communicate through e-mail and phone efficiently. So I -- the only time that we would come together and talk -- he is a board member of another portfolio company of ours, so we would meet in our offices for that, and we would chat a little bit, but that would happen rarely. Twice maybe. 03:11:33 03:11:43 03:11:45 03:11:48 03:11:50 03:11:54 03:12:01 03:12:04 03:12:09 03:12:11 03:12:14

Q. With respect to this other company or with respect to LVI business? 03:12:16 03:12:17

A. Well, he would be on the other company's business in our offices, and I would speak to him ad hoc, you know, just because he was there. 03:12:19 03:12:20 03:12:23 03:12:26

Q. About LVI business? 03:12:28

A. Yes. We would talk about -- yeah. 03:12:29 03:12:32

Q. And with respect to phone calls 03:12:33

SCHNABEL

while Mr. State was CEO, how many times would you communicate by phone about LVI business? 03:12:37 03:12:42 03:12:48

A. Before this matter or including this matter? 03:12:49 03:12:55

Q. Well, while -- including this matter. 03:12:56 03:12:58

A. Including this matter. 03:12:59

Q. This matter meaning the job duties? 03:13:00 03:13:02

A. The job duties? 03:13:03

Q. Okay. 03:13:04

A. All of it. We probably spoke on the phone I am guessing about maybe ten times. 03:13:05 03:13:08 03:13:13

Q. While Mr. State was CEO? 03:13:14

A. Yes. 03:13:16

Q. All about LVI business? 03:13:16

A. All about LVI business. 03:13:18

Q. And only one time about his job duties and his future? 03:13:19 03:13:22

A. No. I would think we had a couple of phone calls about that. I mean -- when -- when Scott State took over 03:13:23 03:13:25 03:13:27

SCHNABEL

there was less reason for me to talk to him directly about LVI until this -- this time. 03:13:30 03:13:32 03:13:36

Q. Okay. 03:13:36

A. But we probably still spoke anyway. I mean we were -- he -- Mr. Fried actually spoke at our annual conference that year as -- as a representative of the board. So I talked to him a couple of times about that, and then I am sure we two or three times we had maybe one super in depth conversation but other than -- but I am sure we talked more than just once about this issue. 03:13:36 03:13:39 03:13:42 03:13:45 03:13:48 03:13:50 03:13:56 03:13:59 03:14:00 03:14:02

Q. And how about while he was -- while Mr. Fried was interim CEO? How often did you speak to him on the phone about LVI business? 03:14:04 03:14:06 03:14:09 03:14:11

A. If there was not a board meeting and there wasn't anything out of the norm, probably once a month, but occasionally we would look at an add on or an acquisition possibility or he would -- he would voluntarily call to update on a major 03:14:13 03:14:17 03:14:22 03:14:25 03:14:30 03:14:35

SCHNABEL

piece of business. So, you know, twice a month I guess would be the average while he was interim CEO. 03:14:38 03:14:44 03:14:45

Q. Now, did you attend the board meeting on November 4? 03:14:47 03:14:54

A. Yes. 03:14:56

Q. And how long did that meeting last for? 03:14:56 03:15:00

A. I would say four or five hours. 03:15:01

Q. And were Mr. Fried's job duties or his future at LVI discussed at this board meeting? 03:15:13 03:15:17 03:15:20

A. Only with respect to was there some way to resolve the chairman role. 03:15:20 03:15:29

Q. And at what point in the board meeting was this issue discussed? 03:15:40 03:15:45

A. At the end. 03:15:46

Q. And how long was it discussed for? 03:15:50 03:15:52

A. There were several iterations where Burt spoke to the board only so management I think was asked to leave the room if -- if I am remembering this correctly, and so he spoke I would say 03:15:53 03:16:01 03:16:03 03:16:07 03:16:09

SCHNABEL

about not quite an hour, but I mean it was 03:16:14 more than 20, 30 minutes, and that is with 03:16:20 some response back and forth from the rest 03:16:24 of the board members. Then he left along 03:16:26 with Scott, and then as a board we spoke 03:16:28 for a while as well. I am not -- now, 03:16:31 again, I am guessing how long that would 03:16:35 have been, but I -- it had to be at least 03:16:37 an hour. 03:16:42

Q. And what did Mr. Fried say at 03:16:43 this meeting? 03:16:47

A. Well, he felt that we had come 03:16:47 to an impasse or that he had come to an 03:16:53 impasse with Scott, and he felt that 03:16:55 that -- that this didn't make any sense 03:17:05 whatsoever. He felt that he could not 03:17:12 continue with his -- he would not just 03:17:12 work at the pleasure of the CEO, that he 03:17:15 wanted to have some defined 03:17:19 responsibilities, and he felt he was not 03:17:23 accorded the respect he is due as a 03:17:29 long-term servant of the company, and he 03:17:32 also made it clear that he did not 03:17:40 want -- that if he was no longer going to 03:17:43

SCHNABEL

have these specific duties that he no 03:17:45 longer wanted any outside parties who may 03:17:47 depend upon him to think that he did have 03:17:52 something to do with them. So, in other 03:17:56 words, if the surety, and he used that as 03:17:57 an example, took comfort in the fact that 03:18:01 Burt was there looking -- overlooking the 03:18:04 underwriting of any particular contract he 03:18:09 wanted us to affirmative -- the board to 03:18:14 affirmatively or the company to 03:18:18 affirmatively tell the sureties that he no 03:18:20 longer was involved. 03:18:24

Q. Do you think that was a fair 03:18:25 request? 03:18:27

A. I think it was -- I don't know 03:18:27 to be honest with you. I think it is 03:18:37 completely within him as a person that I 03:18:38 have known for fifteen, sixteen years. 03:18:43 Burt is someone who integrity means a lot 03:18:46 to. So he would not want anyone to borrow 03:18:50 his -- you know, his reputation. So that 03:18:57 I think is -- is fair. I think that we 03:19:03 didn't want to just kind of blow up our 03:19:09 relationship with the surety. So I think 03:19:13

SCHNABEL

he put us a little bit on the spot. So I 03:19:15 think fair is a -- fair is a kind of a 03:19:19 difficult word, but I understand where he 03:19:25 was coming from. It was completely in 03:19:26 character, and I had sympathy for it. 03:19:28

Q. Did you view Mr. Fried as making 03:19:31 a threat? 03:19:39

A. I think others might have. 03:19:40 I -- I certainly personally did not. I 03:19:42 did -- knowing Burt I understood where he 03:19:46 was coming from. 03:19:48

Q. How would you describe Mr. 03:19:49 Fried's demeanor at this meeting while he 03:19:51 was speaking? 03:19:53

A. He -- he delivered his 03:19:54 thoughts -- you know, he wasn't -- he 03:20:04 wasn't overly emotional. He certainly was 03:20:09 together. He was calm. I think as there 03:20:12 was a little bit of back and forth I think 03:20:15 he did become more agitated, but I -- I 03:20:19 think everybody else did, too. It was 03:20:22 certainly uncomfortable. 03:20:30

Q. Why was that? 03:20:32

A. Well, he is was clearly unhappy. 03:20:32

SCHNABEL

Burt is not someone to -- he communicates 03:20:35 very well, and so I think in that 03:20:39 circumstance anybody would have been 03:20:42 uncomfortable, and I mean ultimately he 03:20:43 does tell the board that he believes that 03:20:47 this is age related. I mean that was the 03:20:49 last statement or -- that he wanted to 03:20:53 leave this with. 03:20:57

Q. Did he say why he felt this was 03:20:58 age related? 03:21:00

A. He had mentioned that -- a 03:21:01 previous conversation he had with Scott, 03:21:04 and that was -- that was it. 03:21:09

Q. Is it the same comment that he 03:21:10 told you that Mr. State made? 03:21:12

A. Yes. 03:21:13

Q. Okay. And after Mr. Fried 03:21:14 spoke -- sorry. Was Mr. State present 03:21:19 while Mr. Fried -- was Mr. State present 03:21:21 while Mr. Fried spoke? 03:21:24

A. Yes. 03:21:25

Q. And did Mr. -- sorry. 03:21:26

MR. DATOO: Strike that. 03:21:31

Q. While Mr. Fried was speaking, 03:21:32

SCHNABEL
Q. Other than the first page, can you tell me if you have seen this document before? 04:43:15 04:43:17 04:43:18
A. I don't think I have. 04:43:19
Q. Is that the first time you've seen this document? 04:43:40 04:43:42
A. I think it is. 04:43:43
Q. Did anyone ever -- do you know what this document is? 04:43:49 04:43:53
A. Yes. 04:43:54
Q. What is it? 04:43:54
A. It is a communication to the company that Mr. Fried has been -- maybe he has been wrongfully terminated at this point. I don't know but -- or that he has been harmed. 04:43:56 04:44:03 04:44:09 04:44:12 04:44:14
Q. Do you recall having a discussion regarding this letter? 04:44:15 04:44:16
A. Yes. 04:44:17
Q. Do you know when you had that discussion? 04:44:17 04:44:19
A. I am sure there was a board meeting convened, a telephonic board meeting convened shortly after this 04:44:19 04:44:24 04:44:28

SCHNABEL
letter, sort of 16th, 17th. I don't know. 04:44:30
Q. Do you remember who was present on -- during that telephonic meeting? 04:44:33 04:44:35
A. I -- I assume the entire board was there. I can't -- I don't remember anyone not being there. 04:44:37 04:44:41 04:44:43
Q. Do you know if Mr. Jeffrey Smith was on the line? 04:44:44 04:44:45
A. I don't recall, but I would not be surprised that he would be. 04:44:47 04:44:55
Q. And what would -- 04:44:57
MS. SELTZER: Okay. This is where we have to draw a line. If Jeffrey Smith was on that telephone call, and I don't know whether he was or he wasn't, he was acting as counsel for the board, and I am not going to let Mr. Schnabel testify as to the contents of that conversation. 04:44:58 04:45:00 04:45:02 04:45:04 04:45:06 04:45:09 04:45:12
MR. DATOO: First of all, we don't know that. Second of all, he served as a secretary taking the minutes. 04:45:14 04:45:15 04:45:17
MS. SELTZER: No, he was also serving as counsel for the board. 04:45:19 04:45:20
MR. DATOO: Let me just go 04:45:22

SCHNABEL
through it. I am not going to ask him -- 04:45:23
MS. SELTZER: Okay. 04:45:25
MR. DATOO: Well, I don't even know what I am going to ask him yet. 04:45:26 04:45:27
Q. What would be the purpose of Mr. Smith being on the phone? 04:45:30 04:45:32
A. Well, he was company counsel. He was on every board meeting and -- 04:45:33 04:45:35
Q. Was -- 04:45:37
A. -- he would be viewed as corporate -- you know, corporate counsel for this -- for this particular purpose. 04:45:38 04:45:40 04:45:42
Q. Was he also the secretary to the board? 04:45:45 04:45:46
A. Yes, he was. 04:45:46
Q. And was he also responsible for taking minutes? 04:45:48 04:45:49
A. Yes, he was. 04:45:50
Q. And would this have been an instance where minutes would be taken? 04:45:51 04:45:56
MS. SELTZER: Objection to the form. 04:46:02 04:46:03
A. Yes, I mean can you re -- can you tell me -- ask me in a different way? 04:46:03 04:46:12

SCHNABEL
Q. Sure. Well, let me just ask a series of questions. Mr. Smith was secretary of the board, correct? 04:46:14 04:46:20 04:46:22
A. Yes. 04:46:23
Q. And it was part of his job as secretary to take minutes of board meetings? 04:46:23 04:46:27 04:46:30
A. Yes. 04:46:31
Q. And was this a board meeting? 04:46:31
A. I don't recall if there was a formal call of a meeting -- call of a meeting, but certainly everybody on the board was on the phone call. 04:46:33 04:46:35 04:46:37 04:46:39
Q. And in those instances are minutes taken? 04:46:41 04:46:46
A. If it is a formal board call, yes, I would assume there would be. 04:46:50 04:46:53
Q. Okay. And if minutes don't exist, is that -- so should minutes have existed of that meeting? 04:46:56 04:46:58 04:47:02
A. I didn't really view that as -- as a board meeting. I didn't have this letter. I think people were reacting to the letter. I think they were looking 04:47:03 04:47:07 04:47:12 04:47:14

142

SCHNABEL

for counsel, and they wanted everyone to hear the counsel together, and I would assume that we were talking to Jeffrey. We are not -- we are certainly not talking to Greg DiCarlo. There is no other counsel on the line. This is a legal matter, so I mean I -- to be honest with you I don't think I would have -- I would have defined it quite that closely, but I didn't -- I knew that we were asking him him his opinion. 04:47:16 04:47:19 04:47:27 04:47:30 04:47:33 04:47:34 04:47:36 04:47:41 04:47:42 04:47:47 04:47:51

Q. Do you know if he was on the line for sure? 04:47:52 04:47:53

A. For sure. For sure no. But I would assume he would have been. 04:47:54 04:48:02

Q. Would he have been on the line the whole time? 04:48:04 04:48:06

A. Yes. I mean if this was not a board meeting, and we were talking about this and he was a part of it, we wouldn't have recused him. We just would have been talking to him. 04:48:07 04:48:11 04:48:13 04:48:15 04:48:18

Q. Did you take any notes of this meeting? 04:48:19 04:48:21

143

SCHNABEL

A. There was nothing to take notes of. No. 04:48:22 04:48:23

Q. Do you recall when this meeting took place, telephonic meeting? 04:48:24 04:48:26

A. I assume sometime after this, but closely after this date. I mean I don't know what day of the week is the 15th. I mean -- 04:48:30 04:48:32 04:48:34 04:48:36

MS. SELTZER: The 16th is a Tuesday. So -- 04:48:38 04:48:40

A. Tuesday so a day or two later. 04:48:42

Q. Okay. And was anything decided at the end of this meeting? 04:48:45 04:48:58

MS. SELTZER: Objection. 04:48:59

MR. DATOO: I am no asking about any communication with counsel. 04:49:00 04:49:01

MS. SELTZER: No, he is not going to talk about anything that was discussed and decided at that particular meeting with counsel. You are not to answer that question. 04:49:03 04:49:04 04:49:05 04:49:07 04:49:09

MR. DATOO: I am not asking him about any communications he had with counsel. I just want to know what they 04:49:10 04:49:11 04:49:12

144

SCHNABEL

decided. 04:49:15

MS. SELTZER: Whatever the decision was arrived at was arrived at with counsel's consent or with counsel's counsel, so I am not going to let him answer that you can take that to the judge. He is not going to talk about it. 04:49:15 04:49:16 04:49:18 04:49:22 04:49:24 04:49:27

MR. DATOO: Okay. 04:49:31

Q. What did you do after this meeting? 04:49:32 04:49:34

A. I probably spoke to my partners. 04:49:34

Q. About what? 04:49:40

A. The fact that -- that Burt was going to pursue legal recourse. 04:49:42 04:49:47

Q. Okay. Did you speak to anybody -- when you say partners, who do you mean by partners? 04:49:50 04:49:52 04:49:55

A. Partners at Falcon. 04:49:56

Q. Did you speak to anybody else after the phone call, any other board members after the phone call? 04:49:58 04:49:59 04:50:02

A. No. I mean they probably showed me an e-mail where you'll probably show me an e-mail where I said I do -- -- I do not 04:50:04 04:50:10 04:50:13

145

SCHNABEL

recall doing that because I was not happy with this outcome. 04:50:19 04:50:20

Q. Now, at this point in time prior to having this telephonic board meeting, was Mr. Simmons' letter proposal finalized at that point? 04:50:22 04:50:23 04:50:26 04:50:31

A. Can you say that again? 04:50:34

Q. Sure. The letter you referred to that Mr. Simmons was putting together, which would contain the proposal to Mr. Fried, was it finalized at the time you had this telephonic -- 04:50:35 04:50:37 04:50:39 04:50:41 04:50:44

A. I am sure. I am sure that this is a reaction to it. Sure. I would -- I would think that it was delivered. 04:50:46 04:50:48 04:50:50

Q. You think the letter in front of you, which is Plaintiff's Exhibit 8, was in reaction to the proposal? 04:50:52 04:50:54 04:50:57

A. I would assume so, yes. I mean I guess I am wrong, but I -- I would assume so. 04:51:00 04:51:04 04:51:06

Q. Handing you a document that has been previously marked as Plaintiff's Exhibit 11, can you take a look at the 04:51:16 04:51:21 04:51:23

146

SCHNABEL

document and let me know if you've seen it before? 04:51:25 04:51:28

A. I have not seen this before. 04:51:35

All right. So you got -- you did this beforehand. 04:51:36 04:51:40

Q. Is -- is this the terms of the proposal or the -- or Mr. Simmons' letter that you were referring to earlier? 04:51:40 04:51:44 04:51:49

A. The numbers look right. 04:51:51

Q. So do you -- do you still believe that the letter, Plaintiff's Exhibit -- 04:52:08 04:52:10 04:52:12

A. No, the dates are the day after. 04:52:12

Q. Okay. 04:52:14

MS. SELTZER: Can we go off the record just one second? 04:52:16 04:52:17

MR. DATOO: Sure. 04:52:19

THE VIDEOGRAPHER: We're going off the record. The time is 4:52. 04:52:20 04:52:20

(Discussion held off the record.) 04:52:20 04:53:16

THE VIDEOGRAPHER: We are returning to the record at 4:53 p.m. 04:53:16 04:53:22

Q. Now, if you -- if you look at 04:53:24

147

SCHNABEL

Plaintiff's Exhibit 8, did you see this letter? 04:53:28 04:53:35

A. Sorry. What is 8? 04:53:37

Q. Plaintiff's 8. It should say at the bottom. 04:53:39 04:53:42

A. This is 11. 04:53:43

Q. I am sorry. 04:53:44

MS. SELTZER: This is 11. 04:53:45

Q. I am sorry. Plaintiff's 11? 04:53:46

A. Yes. 04:53:48

Q. Did you see this letter before it was delivered to Mr. Fried? 04:53:48 04:53:51

A. No. 04:53:54

Q. Okay. But I believe you testified earlier that this was consistent with -- 04:53:55 04:53:58 04:54:01

MS. SELTZER: Objection. That -- that is not what he said. 04:54:04 04:54:05

MR. DATOO: Well, you didn't let me finish question first of all. 04:54:08 04:54:09

MS. SELTZER: Well, he was about to answer, so I wanted to jump in before -- before he did. 04:54:11 04:54:12 04:54:15

Q. Is this letter consistent -- do 04:54:16

148

SCHNABEL

the terms of this letter -- are the terms of this letter consistent with the proposal you were talking about? 04:54:18 04:54:20 04:54:24

A. The -- the proposal that I knew about was a longer proposal. It was several pages in length. I see that the week before it looks like what happens is I am now -- I am assuming that this was delivered to the company. The board meets that night, and there is a sense that we need to send something to say, hey, Burt there is something on the table for you to consider. 04:54:25 04:54:28 04:54:40 04:54:43 04:54:52 04:54:54 04:54:56 04:54:58 04:55:00 04:55:02

Q. Okay. 04:55:02

A. But that we used an abbreviated letter of this sort, I did not know about it or I certainly don't recall. 04:55:04 04:55:07 04:55:10

THE VIDEOGRAPHER: Going off the record, 4:55 p.m. End of tape number 2. 04:55:22 04:55:23 04:55:29

(Recess taken.) 05:04:03

THE VIDEOGRAPHER: We are returning to the record. 5:04 p.m., beginning of tape number 3. 05:04:03 05:04:04 05:04:08

149

SCHNABEL

(Document handed to witness.) 05:04:10

Q. Mr. Schnabel, I have handed you a document that has previously been marked as Plaintiff's Exhibit number 12. 05:04:10 05:04:12 05:04:15

A. Okay. 05:04:17

Q. Look at the document and let me know if you've seen it before. 05:04:18 05:04:20

A. Not with this letterhead, but, yes, I have scene this before. 05:04:22 05:04:24

Q. So the -- and do the contents of this document -- 05:04:26 05:04:29

A. So this was the cover letter to this (indicating). 05:04:29 05:04:32

Q. When you say -- 05:04:33

A. 11 was a cover letter of 12. 05:04:34

MS. SELTZER: They were both attached to the same e-mail. So the answer would be yes to that, and they are Bates stamped consecutively. So -- 05:04:37 05:04:45 05:04:47 05:04:50

MR. DATOO: Yes, I just -- 05:04:52

A. Okay. 05:04:53

Q. Okay. So is this I guess the proposal that you've seen before, the longer form you were referring to earlier? 05:04:54 05:04:58 05:05:00

SCHNABEL

because Scott will not stay. 05:21:57

Q. And you chose Scott? 05:22:00

A. I think practically I chose Scott. Not because I didn't want Burt but because we didn't have a CEO. If Scott would have left, that would have been practically very difficult for us. 05:22:05 05:22:09 05:22:12 05:22:15 05:22:18

Q. Why is that? 05:22:19

A. Well, we just went through a CEO search and found nobody other than Scott, who was referred to us by Burt, realized that we would have to go back to the well. We were in a company that was not doing very well in that particular quarter and saw some more difficulties ahead. 05:22:20 05:22:24 05:22:26 05:22:30 05:22:32 05:22:34 05:22:38

(Continued on next page.) 05:22:38

SCHNABEL

A. If -- if I had lobbied that Burt had to stay or I would vote against any proposal, it definitely would have been viewed by Scott as a no confidence vote from me. 05:22:43 05:22:48 05:22:52 05:22:58 05:23:00

MR. DATOO: Okay. Thank you very much. No further questions. 05:23:03 05:23:11

THE VIDEOGRAPHER: We're going off the record, 5:23 p.m. End of today's questioning. 05:23:14 05:23:14 05:23:17

(Time noted: 5:23 p.m.) 05:23:20

JOHN SCHANBEL

Subscribed and sworn to before me this day of , 2011

SCHNABEL

C E R T I F I C A T I O N

I, DEBBIE ZAROMATIDIS, a Shorthand Reporter and a Notary Public, do hereby certify that the foregoing witness, JOHN SCHANBEL, was duly sworn on the date indicated, and that the foregoing is a true and accurate transcription of my stenographic notes.

I further certify that I am not employed by nor related to any party to this action.

DEBBIE ZAROMATIDIS

SCHNABEL

E X H I B I T S

| PLAINTIFF'S EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 38 | E-mail | 50 |
| 40 | E-mail | 95 |