# Exhibit 11

1

1

2  UNITED STATES DISTRICT COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  No. 10 Civ. 9308(JSR)

5  ----------------------------------------x

6  BURTON T. FRIED,

7                          Plaintiff,

8            – against –

9  LVI SERVICES, INC., LVI PARENT CORP., CODE

10  HENNESSY SIMMONS, LLC d/b/a CHS PRIVATE

11  EQUITY V LP; APOLLO INVESTMENT CORP.,

12  SCOTT E. STATE, in his official and

13  individual capacities; BRIAN SIMMONS, in

14  his official and individual capacities;

15  RAJAY BAGARIA, in his official and

16  individual capacities; GERALD J. GIRARDI,

17  in his official and individual capacities,

18                          Defendants.

19  ----------------------------------------x

20                          May 26, 2011

                            10:03 a.m.

21

22

23

24

25

2

```
1
2
3
4          VIDEOTAPE DEPOSITION of SCOTT
5    STATE, taken by the Plaintiff, pursuant to
6    Notice, held at the offices of Thompson
7    Wigdor & Gilly, LLP, 85 Fifth Avenue, New
8    York, New York, before Debbie Zaromatidis,
9    a Shorthand Reporter and Notary Public of
10   the State of New York.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

4

```
1
2          S T I P U L A T I O N S
3
4          IT IS HEREBY STIPULATED AND
5    AGREED by and between the Attorneys for
6    the respective parties hereto that filing
7    and sealing be and the same are hereby
8    waived.
9          IT IS FURTHER STIPULATED AND
10   AGREED that all objections except as to
11   the form of the question, shall be
12   reserved to the time of the trial.
13         IT IS FURTHER STIPULATED AND
14   AGREED that the within examination may be
15   signed and sworn to before any notary
16   public with the same force and effect as
17   though signed and sworn to before this
18   Court.
19
20
21
22
23
24
25
```

3

```
1
2    A P P E A R A N C E S :
3
4    THOMPSON WIGDOR & GILLY, LLP
5    Attorneys for Plaintiff
6         85 Fifth Avenue
7         New York, New York 10003
8    BY:   SHAFFIN A. DATOO, ESQ.
9         MATTHEW GORMAN, ESQ.
10
11   SIDLEY AUSTIN, LLP
12   Attorneys for Defendants
13        787 Seventh Avenue
14        New York, New York 10019
15   BY:   JOANNE SELTZER, ESQ.
16
17
18   ALSO PRESENT:
19        BURTON FRIED
20        J.D. MARTINEZ, Videographer
21
22
23
24
25
```

5

```
1
2          THE VIDEOGRAPHER:  Good        10:09:27
3    morning.  My name is J.D. Martinez of    10:09:27
4    Veritext New York.  The date today is May  10:09:29
5    26, 2011, and the time is approximately    10:09:31
6    10:09 a.m.  This deposition is being held  10:09:34
7    in the office of Thompson Wigdor & Gilly   10:09:38
8    LLP located at 85 Fifth Avenue, New York,  10:09:41
9    New York.  The caption of this case is     10:09:45
10   Burton T. Fried versus LVI Services, Inc.,  10:09:47
11   et al. filed in the United States District  10:09:51
12   Court, Southern District of New York.  The  10:09:53
13   name of the witness is Scott State, and at  10:09:56
14   this time the attorneys will identify       10:09:58
15   themselves and the parties they represent  10:09:59
16   after which our court reporter, Debbie      10:10:01
17   Zaromatidis, will swear in the witness,    10:10:05
18   and we can proceed.                         10:10:05
19         MS. SELTZER:  Joanne Seltzer   10:10:08
20   with Sidley Austin for all of the          10:10:09
21   defendants.                                 10:10:11
22         MR. DATOO:  Shaffin Datoo with  10:10:12
23   Thompson Wigdor & Gilly representing the   10:10:14
24   plaintiff Burton Fried.                     10:10:16
25
```

2  (Pages 2 to 5)

**6**

```
1
2    S C O T T   S T A T E,              10:10:17
3    having first been duly sworn by a Notary  10:10:17
4    Public of the State of New York, was      10:10:17
5    examined and testified as follows:        10:10:17
6    EXAMINATION BY MR. DATOO:                  10:10:25
7        Q.   Good morning, Mr. State.          10:10:25
8        A.   Who is this gentleman?            10:10:26
9        Q.   I am just about to introduce him  10:10:28
10   to you.  As you know, my name is Shaffin   10:10:30
11   Datoo.  To my left is my colleague Matthew 10:10:32
12   Gorman.  To his left, as you know, is Mr.  10:10:35
13   Burt Fried.                                10:10:38
14       A.   Right.                            10:10:38
15       Q.   Is your ability to tell the       10:10:39
16   truth in any way impaired today?           10:10:41
17       A.   No.                               10:10:43
18       Q.   Do you understand that the        10:10:43
19   answers you are about to give are under    10:10:45
20   oath and that you are subject to penalties 10:10:47
21   of perjury if you give an untruthful       10:10:50
22   answer?                                    10:10:52
23       A.   Yes.                              10:10:52
24       Q.   I am going to assume that if you  10:10:53
25   answer a question that you understood it.  10:10:55
```

**7**

```
1                    STATE
2    If you don't understand a question, let me 10:10:57
3    know, and I will ask the question in a     10:10:59
4    different way.                             10:11:00
5        A.   Okay.                             10:11:01
6        Q.   Please give verbal answers to my  10:11:02
7    questions.  Don't nod your head or shake   10:11:04
8    it.  Otherwise, the court reporter won't   10:11:06
9    be able to take it down, and please let me 10:11:08
10   finish asking my question before you start 10:11:11
11   answering it Or the court reporter won't   10:11:13
12   be able to take it down.                   10:11:15
13       A.   Okay.                             10:11:16
14       Q.   If you need a break, let me       10:11:17
15   know.  The only condition I have is that   10:11:19
16   you answer the last question asked.        10:11:20
17       A.   Okay.                             10:11:22
18       Q.   In connection with this lawsuit,  10:11:23
19   did you provide your attorney with all     10:11:25
20   responsive documents?                      10:11:27
21       A.   Yes.                              10:11:27
22       Q.   And where did you look to find    10:11:28
23   these documents?                           10:11:30
24       A.   Computers, hard files, office.    10:11:31
25       Q.   Do you have a personal e-mail     10:11:35
```

**8**

```
1                    STATE
2    account?                                   10:11:37
3        A.   Yes.                              10:11:37
4        Q.   And did you review any e-mails    10:11:38
5    in your personal e-mail account?           10:11:40
6        A.   Yes.                              10:11:42
7        Q.   And did you provide any           10:11:42
8    responsive e-mails in your personal e-mail 10:11:44
9    account to your attorney?                  10:11:47
10       A.   Yes.                              10:11:47
11       Q.   And do you keep any work-related  10:11:49
12   documents at home?                         10:11:50
13       A.   Very few but, yes, some.          10:11:51
14       Q.   And did you look through those    10:11:53
15   documents to see if there are any          10:11:54
16   responsive documents?                      10:11:55
17       A.   Yes.                              10:11:56
18       Q.   And did you provide those to      10:11:56
19   your attorneys if there were any?          10:11:57
20       A.   Yes.                              10:11:58
21       Q.   Have you ever been sued before?   10:11:59
22       A.   Yes.                              10:12:02
23       Q.   How many times?                   10:12:03
24       A.   Once.                             10:12:04
25       Q.   And what was --                   10:12:05
```

**9**

```
1                    STATE
2        A.   I'm sorry.  Twice.                10:12:08
3        Q.   And when was the first one?       10:12:10
4        A.   About 2003.                       10:12:15
5        Q.   And what was the nature of that   10:12:17
6    lawsuit?                                   10:12:18
7        A.   It was as a director of a         10:12:18
8    foreign subsidiary of a company that I     10:12:21
9    used to run, which was in Australia, and   10:12:23
10   under Australian law directors could be    10:12:27
11   sued personally for issues associated with 10:12:31
12   companies.                                 10:12:35
13       Q.   Okay.  And what was -- what were  10:12:36
14   the allegations in the lawsuit?            10:12:38
15       A.   The company had taken a loan      10:12:40
16   from another party, and the loan had not   10:12:43
17   been properly repaid.  The third party     10:12:47
18   sued the company I believe and all the     10:12:52
19   directors.                                 10:12:54
20       Q.   And how did that lawsuit end?     10:12:55
21       A.   That lawsuit went on for eight    10:12:58
22   or nine years.  It was resolved last       10:13:02
23   February.  It settled out of court between 10:13:04
24   the company and the other party.  I -- I   10:13:08
25   had nothing really to do with the          10:13:12
```

3 (Pages 6 to 9)

**10**

STATE

1
2  settlement other than I did travel to      10:13:14
3  Australia for a hearing, which actually      10:13:17
4  was started and then stopped, and then a      10:13:22
5  settlement was reached between the      10:13:24
6  parties.      10:13:26
7      Q.  Okay.  And the second lawsuit,      10:13:26
8  when was that lawsuit filed?  Do you      10:13:29
9  remember?      10:13:31
10     A.  About 2009 or '10 I would guess.      10:13:31
11     Q.  And is that lawsuit still      10:13:39
12  pending?      10:13:41
13     A.  No.      10:13:41
14     Q.  Was it resolved?      10:13:42
15     A.  Yes.      10:13:43
16     Q.  And --      10:13:44
17     A.  It was -- it was dismissed.      10:13:45
18     Q.  And what were the nature of      10:13:47
19  allegations in that case?      10:13:49
20     A.  There was a contract between two      10:13:50
21  parties that I was a guarantor of certain      10:13:52
22  aspects.  The parties were in a dispute,      10:13:57
23  and I -- I believe to induce the parties      10:14:00
24  to try to solve their dispute the      10:14:02
25  plaintiff sued me as guarantor.  The      10:14:05

**11**

STATE

1
2  parties ultimately resolved their dispute,      10:14:08
3  and so they dismissed the suit that they      10:14:10
4  had against me.      10:14:12
5      Q.  Okay.  Now, other than this      10:14:13
6  lawsuit, have you ever been accused of      10:14:18
7  discrimination before?      10:14:20
8      A.  No.      10:14:21
9      Q.  Okay.  Have you ever given any      10:14:22
10  sworn testimony before?      10:14:24
11     A.  Yes.      10:14:26
12     Q.  How many times?      10:14:26
13     A.  At least four or five.      10:14:27
14     Q.  And the first -- do you recall      10:14:35
15  when the first time was that you gave      10:14:37
16  sworn testimony?      10:14:39
17     A.  Probably in that Australian      10:14:40
18  litigation I believe.      10:14:46
19     Q.  Okay.  And do you recall when      10:14:48
20  the second time you gave sworn testimony      10:14:52
21  was?      10:14:55
22     A.  I gave expert testimony in about      10:14:56
23  that same time frame on a dispute in      10:15:00
24  Omaha, Nebraska.      10:15:04
25     Q.  And what was the nature of that      10:15:07

**12**

STATE

1
2  dispute?      10:15:10
3      A.  It was an action between two      10:15:10
4  parties, one of whom was the operator of a      10:15:16
5  nuclear power point, and there was a      10:15:18
6  dispute about a 5 or 600 million dollar      10:15:20
7  decommissioning obligation.  I was      10:15:24
8  retained as an expert for the plaintiffs      10:15:26
9  and provided testimony regarding that      10:15:29
10  issue.      10:15:31
11     Q.  And what area did you provide      10:15:32
12  expert testimony in?      10:15:37
13     A.  On issues associated with the      10:15:38
14  cost of decommissioning, financial      10:15:40
15  obligations.  No legal -- I didn't provide      10:15:42
16  any legal expertise.  I am a nuclear      10:15:45
17  engineer by background.      10:15:48
18     Q.  What do you mean by      10:15:49
19  decommissioning?      10:15:51
20     A.  Removal -- shut down and removal      10:15:52
21  of the nuclear power plant after it ceases      10:15:54
22  operation.      10:15:58
23     Q.  And do you recall the name of      10:16:04
24  that case?      10:16:04
25     A.  It involved Nebraska Public      10:16:08

**13**

STATE

1
2  Power District I believe.  I don't recall      10:16:15
3  the case.  It was litigated -- I was      10:16:17
4  retained by a firm from Washington, D.C.,      10:16:20
5  and the lawyer's name was John Matthews,      10:16:24
6  but I -- I am not certain of any of the      10:16:28
7  other details.      10:16:32
8      Q.  Do you know if this lawsuit was      10:16:32
9  in Nebraska state court or Nebraska      10:16:35
10  federal court?      10:16:39
11     A.  I am assuming it was federal      10:16:40
12  court, but I am not certain about that.      10:16:42
13     Q.  Do you have any documents that      10:16:44
14  would identify the parties to this lawsuit      10:16:48
15  or the index number?      10:16:51
16     A.  No.      10:16:53
17     Q.  When was the third time you gave      10:16:54
18  sworn testimony?      10:17:00
19     A.  I believe there was a contract      10:17:01
20  dispute between a former employer and a      10:17:10
21  third-party in the early 2000s time frame.      10:17:16
22  I -- I know I provided sworn testimony in      10:17:20
23  an arbitration.  It wasn't in court, and I      10:17:23
24  don't know if that is what you are -- you      10:17:28
25  know, if you're referring to -- if that is      10:17:30

4 (Pages 10 to 13)

VERITEXT REPORTING COMPANY

212-267-6868                                        516-608-2400

**14**

```
             STATE
 1
 2   considered sworn testimony as you are    10:17:33
 3   discussing this or not, but that was    10:17:34
 4   obviously under oath.  It was in    10:17:36
 5   arbitration.    10:17:38
 6      Q.   Okay.  What I mean by sworn    10:17:38
 7   testimony is any time you've given    10:17:40
 8   testimony under oath be it at a lawsuit,    10:17:42
 9   arbitration, hearing.    10:17:44
10      A.   Okay.    10:17:45
11      Q.   Anything like that.    10:17:46
12      A.   So that would -- that would    10:17:46
13   qualify.    10:17:48
14      Q.   And you said that was a contract    10:17:49
15   dispute?    10:17:51
16      A.   It was a contract dispute.    10:17:52
17      Q.   And what were you -- why -- what    10:17:53
18   issues were you testifying on?    10:17:56
19      A.   I -- as a principal of the    10:17:58
20   company, I was called to testify on my    10:18:01
21   knowledge of the dispute.    10:18:03
22      Q.   Okay.  And when was the fourth    10:18:05
23   time you gave sworn testimony?    10:18:09
24      A.   I gave testimony in the dispute    10:18:10
25   that I -- the second area where I -- where    10:18:14
```

**15**

```
             STATE
 1
 2   litigation was taken against me, and I    10:18:18
 3   gave testimony in that case on behalf of    10:18:21
 4   the defendants.  I am sorry.  I was    10:18:27
 5   deposed by the plaintiffs related to my    10:18:30
 6   knowledge about the case.    10:18:34
 7      Q.   Do you recall where that case    10:18:35
 8   was pending, what state?    10:18:37
 9      A.   I believe it was in --    10:18:40
10   ultimately in federal court in Oregon.    10:18:45
11      Q.   Do you know the names of the    10:18:54
12   parties to that litigation?    10:18:55
13      A.   The plaintiffs were    10:18:56
14   individual -- primarily I believe    10:18:59
15   individuals that had sued a public entity    10:19:01
16   named TriMet, a public transit entity in    10:19:07
17   Portland, Oregon related to a contract    10:19:10
18   dispute.    10:19:13
19      Q.   Do you have any documents that    10:19:14
20   would identify the index number or the    10:19:19
21   parties to that lawsuit?    10:19:22
22      A.   No.    10:19:23
23      Q.   Do you recall if there were any    10:19:23
24   other times that you've given sworn    10:19:25
25   testimony?    10:19:27
```

**16**

```
             STATE
 1
 2      A.   I don't recall.  I -- I don't    10:19:27
 3   believe so, but I am not a hundred percent    10:19:30
 4   certain.    10:19:33
 5      Q.   How many times have you    10:19:33
 6   testified as an expert witness?    10:19:35
 7      A.   In court just the one time.    10:19:37
 8      Q.   Okay.  Have you submitted any    10:19:40
 9   affidavits in connection with your -- in    10:19:46
10   connection with a lawsuit in which you    10:19:48
11   were an expert?    10:19:52
12      MS. SELTZER:  I object to the    10:19:53
13   form.    10:19:54
14      Q.   Have you -- let's see.  Have you    10:19:55
15   submitted any documents or made any    10:20:01
16   statements --    10:20:03
17      MS. SELTZER:  Like an expert    10:20:04
18   report?  Is that what you want to know?    10:20:06
19      MR. DATOO:  Yes.    10:20:07
20      A.   Yes.    10:20:08
21      Q.   How many times?    10:20:08
22      A.   At least once.    10:20:09
23      Q.   And do you recall when that was?    10:20:10
24      A.   It was part of the activity that    10:20:11
25   we discussed previously that I had    10:20:13
```

**17**

```
             STATE
 1
 2   testified as an expert.    10:20:15
 3      Q.   In the decommissioning case?    10:20:16
 4      A.   Correct.    10:20:18
 5      Q.   Okay.  And have you ever signed    10:20:19
 6   any affidavits under oath as an expert?    10:20:22
 7      A.   I believe in that case I did.    10:20:28
 8      Q.   Have you ever signed any    10:20:30
 9   affidavits in any other types of cases?    10:20:31
10      A.   I believe I have.    10:20:33
11      Q.   Do you know how many times?    10:20:35
12      A.   No.    10:20:37
13      Q.   Do you recall any cases in which    10:20:40
14   you signed an affidavit?    10:20:43
15      A.   I believe all of the litigation    10:20:44
16   that we have discussed I probably signed    10:20:49
17   an affidavit in those situations.  I don't    10:20:52
18   recall specifically other situations where    10:20:56
19   I have, but I am reasonably certain that I    10:20:59
20   have.    10:21:02
21      Q.   Okay.  Did you do anything to    10:21:02
22   prepare for this deposition?    10:21:08
23      A.   I reviewed e-mails and    10:21:11
24   correspondence that had been provided to    10:21:13
25   me.    10:21:16
```

5 (Pages 14 to 17)

18

```
              STATE
1
2    Q.   Did you meet with your        10:21:16
3  attorneys?                           10:21:18
4    A.   I met with my attorney        10:21:18
5  yesterday.                           10:21:20
6    Q.   And for how long?             10:21:20
7    A.   Maybe an hour.                10:21:21
8    Q.   And did you read Mr. Fried's  10:21:26
9  deposition transcript?               10:21:29
10   A.   I have not.                   10:21:30
11   Q.   Did you read any excerpts or  10:21:31
12 summaries regarding his deposition   10:21:33
13 transcript?                          10:21:35
14   A.   I have not.                   10:21:36
15   Q.   Mr. State, how old are you?   10:21:37
16   A.   Forty-seven.                  10:21:39
17   Q.   And what is your date of birth?  10:21:41
18   A.   September 4, 1963.            10:21:43
19   Q.   And do you know the plaintiff in  10:21:45
20 this lawsuit, Mr. Fried?             10:21:51
21   A.   Yes, I do.                    10:21:52
22   Q.   And how so?                   10:21:53
23   A.   As a business acquaintance for  10:21:54
24 at least ten to twelve years I would say.  10:21:59
25   Q.   Did you know Mr. Fried prior to  10:22:01
```

19

```
              STATE
1
2  working with him at LVI?             10:22:09
3    A.   Yes.                          10:22:11
4    Q.   And what was the nature of that  10:22:11
5  relationship?                        10:22:13
6    A.   I would say he and I were     10:22:14
7  friendly competitors and colleagues  10:22:17
8  working in similar business situations.  10:22:18
9    Q.   Did you work for a competitor of  10:22:24
10 LVI?                                 10:22:26
11   A.   I ran a company that competed in  10:22:29
12 certain sectors that LVI competes in.  10:22:29
13   Q.   What was the name of that     10:22:32
14 company?                             10:22:33
15   A.   Mactec, Inc., M-A-C-T-E-C.    10:22:34
16   Q.   And in what sectors did Mactec  10:22:39
17 compete with LVI?                    10:22:42
18   A.   We performed remedial        10:22:49
19 activities, decommissioning.  We were  10:22:51
20 involved in certain demolition activities,  10:22:53
21 and we would once in a while run across  10:22:54
22 one another.                         10:22:57
23   Q.   And how long did you work at  10:23:00
24 Mactec?                              10:23:01
25   A.   About nine years I believe.  10:23:02
```

20

```
              STATE
1
2    Q.   And what was your position    10:23:05
3  there?                               10:23:06
4    A.   CEO.                          10:23:06
5    Q.   And did you work at Mactec    10:23:07
6  immediately before LVI?              10:23:10
7    A.   No.                           10:23:13
8    Q.   How -- when did you start     10:23:13
9  working at Mactec?                   10:23:18
10   A.   In 1993.                      10:23:20
11   Q.   And when did you stop working at  10:23:21
12 Mactec?                              10:23:24
13   A.   In 2002.  That would be nine  10:23:24
14 years.                               10:23:28
15   Q.   And what were the nature of your  10:23:36
16 interactions with Mr. Fried while you were  10:23:38
17 at Mactec?                           10:23:40
18   A.   I recall the first time we met  10:23:41
19 one another was at a bankruptcy hearing in  10:23:43
20 lower Manhattan, and we both had a  10:23:48
21 business interest in the assets of the  10:23:53
22 company that was -- the company whose --  10:23:57
23 which assets were being sold at  10:24:00
24 bankruptcy.  He I believe purchased phone  10:24:03
25 records and other intellectual property of  10:24:05
```

21

```
              STATE
1
2  that company, and I purchased some of  10:24:07
3  their equipment, and, as I recall, after  10:24:09
4  the hearing he and I believe went back  10:24:13
5  to his office and had a discussion and  10:24:20
6  over the ensuing years now and again would  10:24:22
7  have conversations on the phone.  I think  10:24:24
8  on one or two occasions we may have met  10:24:27
9  each other when we were in the same  10:24:29
10 city.                                10:24:32
11   Q.   And how frequent were these   10:24:32
12 interactions?                        10:24:34
13   A.   I would say in the late '90s  10:24:35
14 early 2000s not regular but maybe somewhat  10:24:41
15 frequent.  Not weekly, not monthly, and  10:24:46
16 then in a period of time up through the  10:24:50
17 initial discussions of my employment with  10:24:55
18 LVI not as regular, and then of course  10:24:57
19 during the discussion phase where I became  10:25:02
20 employed by the company more frequent.  10:25:06
21   Q.   And after Mactec where did you  10:25:11
22 work?                                10:25:13
23   A.   I started my own company called  10:25:13
24 U.S. Development Group, and I ran that  10:25:15
25 business from 2002 through my starting  10:25:17
```

6 (Pages 18 to 21)

22

```
          STATE
1
2    with LVI.                    10:25:21
3        Q.  And what type of company was  10:25:24
4    U.S. Development?            10:25:26
5        A.  It was a company that I formed  10:25:27
6    to manage investments that I was involved  10:25:28
7    with, to develop companies, to provide  10:25:31
8    advice and support in distressed company  10:25:36
9    situations.                  10:25:40
10       Q.  And were -- was that in any  10:25:41
11   particular area that you would provide  10:25:44
12   advice or invest in?         10:25:47
13       A.  Several.  There were several  10:25:49
14   areas.  A lot of it was associated with  10:25:51
15   engineering, remediation, manufacturing,  10:25:55
16   nuclear issues.  I had investments and  10:25:57
17   activities in the restaurant trade, in the  10:26:02
18   wine trade, just various things that I had  10:26:06
19   an interest in.              10:26:09
20       Q.  And was U.S. Development a  10:26:10
21   competitor of LVI?           10:26:12
22       A.  No.                  10:26:13
23       Q.  And how did -- how did your  10:26:15
24   company do, perform financially?  10:26:17
25       MS. SELTZER:  Objection.  Which  10:26:20
```

23

```
          STATE
1
2    year?                        10:26:21
3        MR. DATOO:  In general.     10:26:23
4    A.  Fine.                    10:26:24
5        Q.  Okay.  Why did you decide to  10:26:25
6    leave your company?          10:26:29
7        A.  It -- I was the only employee.  10:26:30
8    I was never actually an employee.  It is a  10:26:34
9    company that I formed to hold and manage  10:26:37
10   investments.  I simply stepped away from  10:26:39
11   day-to-day activities in that business.  10:26:42
12   In that business, I would often step into  10:26:46
13   other companies and help manage them out  10:26:47
14   of situations.  So the engagement with LVI  10:26:51
15   that I -- that I am now involved with I am  10:26:54
16   an employee of LVI.  In other situations,  10:26:58
17   I would have done similar types of things  10:27:00
18   on a short-term basis to help companies  10:27:02
19   recover from, you know, bad situations and  10:27:06
20   that type of thing.          10:27:08
21       Q.  So is U.S. Development still  10:27:09
22   operating?                   10:27:11
23       A.  Yes, it is -- it is a shell  10:27:11
24   company at this point that is sitting  10:27:13
25   doing nothing.               10:27:16
```

24

```
          STATE
1
2        Q.  Okay.  It is not earning any  10:27:16
3    income?                      10:27:20
4        A.  No.  I am sorry.  I don't  10:27:20
5    believe so.  It may have -- I don't think  10:27:24
6    so.  It may have residual income, but  10:27:29
7    I -- nothing material.       10:27:32
8        Q.  Okay.  Do you know how old Mr.  10:27:33
9    Fried is?                    10:27:37
10       A.  I would guess either 70 or 71.  10:27:38
11       Q.  Okay.  Was Mr. Fried employed by  10:27:43
12   LVI Services, Inc.?          10:27:47
13       A.  I don't know that.       10:27:49
14       Q.  Okay.  Do you know how long he  10:27:52
15   worked for LVI?              10:27:56
16       A.  Which entity?            10:27:57
17       Q.  LVI Services, Inc.        10:27:58
18       A.  No.                  10:28:00
19       Q.  How about LVI Parent?     10:28:01
20       A.  No.                  10:28:03
21       Q.  Okay.  Do you make distinctions  10:28:04
22   between the various LVI entities?  10:28:09
23       A.  In certain circumstances I  10:28:12
24   would, yes.                  10:28:14
25       Q.  And what circumstances are  10:28:15
```

25

```
          STATE
1
2    those?                       10:28:18
3        A.  The operating business -- first  10:28:18
4    let's maybe step back a little bit.  There  10:28:23
5    are dozens of operating subsidiaries of  10:28:27
6    the company.  Most of those roll up to LVI  10:28:29
7    Services, Inc., which I would consider the  10:28:33
8    operating company.  Above that I would  10:28:35
9    typically consider most of the layers of  10:28:38
10   entities simply entities that were  10:28:41
11   structured for investment purposes.  10:28:44
12       Q.  And have you heard of a company  10:28:47
13   called LVI Parent?           10:28:50
14       A.  I have.               10:28:51
15       Q.  And is that the holding company  10:28:52
16   of the operating company?    10:28:57
17       A.  I'm not sure that it is today.  10:29:00
18       Q.  Is there a holding company of  10:29:02
19   the operating company?       10:29:04
20       A.  I believe so.           10:29:05
21       Q.  Okay.  And do you know which  10:29:07
22   entity, LVI entity you are employed by?  10:29:10
23       A.  I believe it is LVI Services,  10:29:13
24   Inc.                         10:29:15
25       Q.  So that would be the operating  10:29:16
```

7 (Pages 22 to 25)

VERITEXT REPORTING COMPANY

212-267-6868                                                          516-608-2400

26

```
 1          STATE
 2   company?                        10:29:18
 3       A.   Correct.               10:29:18
 4       Q.   And do you know if Mr. Fried was  10:29:19
 5   also employed by the same company?  10:29:21
 6          MS. SELTZER:  Objection.  Asked  10:29:24
 7   and answered.                    10:29:25
 8       A.   I do not.              10:29:25
 9       Q.   Okay.  Are you employed by the  10:29:26
10   holding company of the operating company  10:29:29
11   as well?                         10:29:33
12       A.   No.                    10:29:34
13       Q.   Do you hold any position with  10:29:34
14   the operating -- holding company?  10:29:35
15       A.   I may be a director, but  10:29:37
16   I'm -- I'm not certain if I hold an  10:29:41
17   officer position in that company.  10:29:43
18       Q.   Do you know if Mr. Fried held a  10:29:45
19   position with the holding company?  10:29:46
20       A.   I do not.              10:29:49
21       Q.   Okay.  And do you know how long  10:29:50
22   Mr. Fried worked for LVI in general?  10:29:55
23       A.   I believe it was twenty  10:29:59
24   something years.                 10:30:03
25       Q.   And do you recall what his last  10:30:04
```

27

```
 1          STATE
 2   job title was at LVI?            10:30:06
 3       A.   The last job title --  10:30:11
 4       Q.   Prior to his separation.  10:30:13
 5       A.   I believe his title was  10:30:14
 6   chairman.                        10:30:19
 7       Q.   Okay.  Do you know if Mr. Fried  10:30:19
 8   had a title with the holding company?  10:30:27
 9       A.   I do not know.         10:30:32
10       Q.   Now, are you currently employed?  10:30:33
11       A.   Yes.                   10:30:37
12       Q.   And where do you -- where do you  10:30:37
13   work?                            10:30:41
14       A.   I work in Denver.      10:30:42
15       Q.   What company do you work for?  10:30:44
16       A.   LVI Services, Inc.     10:30:46
17       Q.   Okay.  And how long have you  10:30:48
18   worked there?                    10:30:50
19       A.   Since I believe September 28.  10:30:51
20       Q.   Is that the day you first  10:30:54
21   started working?                 10:30:57
22       A.   I believe the -- either the 28th  10:30:58
23   or the 30th was my first day.  I am not a  10:31:02
24   hundred percent certain.  Roughly  10:31:07
25   that -- that range.              10:31:08
```

28

```
 1          STATE
 2       Q.   What is your current job title?  10:31:09
 3       A.   CEO and president.     10:31:14
 4       Q.   And what are your job duties?  10:31:16
 5       A.   I manager the day-to-day  10:31:20
 6   activities of the business.  I set the  10:31:22
 7   strategy.  I monitor performance and  10:31:26
 8   execute on the strategic plan that we have  10:31:30
 9   laid out for the company.        10:31:33
10       Q.   Anything else?         10:31:37
11       A.   I think that generally covers  10:31:38
12   what I do.                       10:31:42
13       Q.   Okay.  What are your -- what do  10:31:42
14   you mean by day to day -- you're  10:31:49
15   responsible for the day-to-day activities  10:31:51
16   of the company?                  10:31:53
17       A.   The daily operational  10:31:54
18   performance issues of the company, dealing  10:31:57
19   with contracts that we have, dealing with  10:32:00
20   issues with lenders, with the bank, with  10:32:04
21   insurers, with sureties.  I meet with  10:32:08
22   customers.  I deal with marketing issues.  10:32:12
23   If there is health and safety issues, I  10:32:17
24   deal with those.  Generally manage the  10:32:20
25   company.                         10:32:23
```

29

```
 1          STATE
 2       Q.   Now, do you deal with these  10:32:23
 3   issues hands on or are you ultimately  10:32:27
 4   responsible or you just let other people  10:32:31
 5   deal with them, and you are ultimately  10:32:35
 6   responsible?                     10:32:37
 7          MS. SELTZER:  Objection to the  10:32:38
 8   form.  You're talking about delegating?  10:32:39
 9          MR. DATOO:  Yes.          10:32:41
10          MS. SELTZER:  Do you delegate?  10:32:42
11       A.   Yes.  Do you delegate these  10:32:43
12   functions to others?             10:32:45
13       A.   I delegate certain functions and  10:32:46
14   I do some of them myself.        10:32:48
15       Q.   And how do you determine which  10:32:49
16   ones you delegate and which ones you keep  10:32:51
17   yourself?                        10:32:53
18       A.   Largely by priority.  The more  10:32:53
19   important the function is and the more it  10:32:57
20   would specifically require my involvement  10:33:00
21   I would generally become engaged in those  10:33:02
22   situations.  If it is routine  10:33:03
23   administrative types of activities, I may  10:33:09
24   delegate much of that.           10:33:12
25       Q.   And what do you take into  10:33:13
```

8 (Pages 26 to 29)

VERITEXT REPORTING COMPANY

212-267-6868                                        516-608-2400

30

STATE

1
2  account when you delegate tasks to certain  10:33:21
3  people?                          10:33:24
4      A.  Their ability to perform the       10:33:27
5  work, the risks associated with the task,  10:33:28
6  the rewards associated with the task, and  10:33:31
7  specifically whether performance of that   10:33:36
8  task can be accomplished without my        10:33:39
9  involvement.                     10:33:40
10     Q.  You also testified that you're    10:33:41
11 responsible for strategy of the company,  10:33:46
12 correct?                         10:33:52
13     A.  That's correct.            10:33:52
14     Q.  And what do you mean by that?    10:33:53
15     A.  The markets that we serve and    10:33:54
16 the performance at the company are fluid,  10:33:55
17 and the company over the past several      10:33:59
18 years has -- has had a difficult          10:34:02
19 performance environment and as a result   10:34:07
20 has not performed as well as I think most  10:34:11
21 everyone would have expected it should     10:34:13
22 including Mr. Fried.  And so what I've set  10:34:16
23 about doing is developing a strategy to    10:34:20
24 grow the company into market sectors that  10:34:24
25 are complimentary to things the company    10:34:27

31

STATE

1
2  has done in the past and to look for      10:34:31
3  opportunities to bring the company back   10:34:32
4  from where it was at the end of last year,  10:34:35
5  which was very close to being in default   10:34:38
6  with lender covenants, and in general get  10:34:41
7  the company back on track to be           10:34:46
8  successful.                      10:34:49
9      Q.  And who do you work with at LVI  10:34:49
10 with respect to developing strategy and   10:34:52
11 implementing strategy?               10:34:55
12     A.  I work with my -- my core        10:34:57
13 operating team.  I work with John Leonard.  10:34:59
14 I work with Mark Canessa.  I work with     10:35:01
15 Greg DiCarlo, Kamal Sookram, Paul Cutrone,  10:35:08
16 and Joseph Annarumma, and then as it would  10:35:15
17 relate to health and safety aspects, Gary  10:35:23
18 Thibodeaux, and those are my seven direct  10:35:27
19 reports.                         10:35:32
20     Q.  What is Mark Canessa's job       10:35:32
21 title?                           10:35:42
22     A.  He is a senior vice president.   10:35:42
23     Q.  Of any area in particular?      10:35:43
24     A.  He -- he is a senior vice       10:35:45
25 president of the company.  His objective   10:35:48

32

STATE

1
2  is strategy as it would relate to major   10:35:50
3  marketing and business development        10:35:53
4  opportunities.                   10:35:55
5      Q.  And what is -- is it Gary        10:35:56
6  Thibodeaux?                      10:36:04
7      A.  Thibodeaux, yes.             10:36:05
8      Q.  What is his job title?          10:36:06
9      A.  He is the director of health and  10:36:08
10 safety.                          10:36:10
11     Q.  Does he have a vice president     10:36:10
12 title?                           10:36:16
13     A.                              10:36:16
14         MS. SELTZER:  Objection.  He     10:36:18
15 just said director.  I assume that is the  10:36:20
16 corporate title.                 10:36:22
17     A.  He may be.  I'm not certain if   10:36:23
18 he is -- we have got -- remember, I       10:36:25
19 explained we have say 25 plus            10:36:29
20 subsidiaries.  He may be an officer in     10:36:31
21 some of those.  He may not be.            10:36:33
22 I -- without having documentation in front  10:36:35
23 of me, I couldn't tell you specifically.   10:36:37
24     Q.  And Greg DiCarlo, what is his    10:36:39
25 job title?                        10:36:41

33

STATE

1
2      A.  He is general counsel.          10:36:42
3      Q.  And Kamal Sookram?             10:36:43
4      A.  He is the vice president of      10:36:50
5  administration.                  10:36:52
6      Q.  Mr. Annarumma?                10:36:53
7      A.  Mr. Annarumma is the treasurer.  10:37:00
8  He is also a vice president.           10:37:03
9      Q.  I believe you also testified     10:37:09
10 that you're responsible for performance.   10:37:11
11 What do you mean by performance?           10:37:17
12     A.  The overall performance of the   10:37:19
13 company is what I am referring to in, and  10:37:22
14 that could be a number of things.  The     10:37:26
15 financial performance, performance against  10:37:28
16 our objectives in terms of health and     10:37:30
17 safety, performance relative to growing    10:37:32
18 our backlog and, you know, all the general  10:37:35
19 types of issues that you might -- one      10:37:41
20 might measure to determine how well we are  10:37:43
21 doing.                           10:37:46
22     Q.  And who do you work within -- I  10:37:46
23 guess in this performance aspect of your  10:37:50
24 job duties?                      10:37:52
25     A.  Much of that performance if it   10:37:53

9 (Pages 30 to 33)

VERITEXT REPORTING COMPANY

34

```
 1            STATE
 2   is health and safety related it would be   10:37:55
 3   Gary Thibodeaux.  If it is operational, it   10:37:58
 4   would be John Leonard.  If it is         10:38:01
 5   financial, it would be Paul Cutrone and     10:38:03
 6   Joseph Annarumma, and if it is            10:38:05
 7   administrative it would be Kamal Sookram.  10:38:07
 8      Q.   And I believe you also testified   10:38:10
 9   that you're responsible for the strategic  10:38:11
10   plan.  Is that similar to the strategy     10:38:14
11   area we just discussed or is it different?  10:38:19
12      A.   No, it's the same.              10:38:21
13      Q.   Okay.  Are there any other areas   10:38:23
14   that you're responsible for?            10:38:25
15      A.   I would say generally that       10:38:27
16   covers what I do.                      10:38:29
17      Q.   Okay.  Is there someone in       10:38:31
18   particular that is responsible for the     10:38:38
19   strategic growth at the company?         10:38:40
20      A.   Me.                          10:38:42
21      Q.   You're ultimately responsible     10:38:43
22   for that, correct?                     10:38:45
23      A.   Correct.                       10:38:46
24      Q.   Is there anyone who has been      10:38:47
25   delegated the duty of working with you to  10:38:49
```

35

```
 1            STATE
 2   develop the company business-wise?       10:38:53
 3      A.   No.                           10:38:55
 4      Q.   Okay.  Are you the sole person    10:38:55
 5   responsible for that?                   10:38:59
 6      A.   I am the sole person that is      10:39:00
 7   ultimately responsible for that.  I draw   10:39:02
 8   on input from my management team to       10:39:04
 9   support that activity.                  10:39:08
10      Q.   And how does LVI generate        10:39:10
11   income?                             10:39:15
12      A.   We perform -- we are a           10:39:15
13   contractor, and we perform work on job    10:39:18
14   sites across the country.               10:39:20
15      Q.   So does most of your income come  10:39:21
16   from getting -- from securing contracts?   10:39:23
17      A.   It comes from performing         10:39:27
18   contracts that have been secured on a     10:39:29
19   basis where they are profitable.         10:39:31
20      Q.   And who secures these contracts   10:39:38
21   for you to perform?                    10:39:41
22      A.   It varies.  There is a lot of     10:39:42
23   analysis that I've done on that specific   10:39:43
24   question.  On very small contracts, they   10:39:45
25   are typically secured at the office level,  10:39:50
```

36

```
 1            STATE
 2   and there is literally thousands of those  10:39:52
 3   contracts performed every year.  As the    10:39:55
 4   contract size gets bigger and it becomes    10:39:57
 5   more of a strategic acquisition activity,   10:39:59
 6   it moves up the chain of command to office  10:40:03
 7   manager level to secure the work, to       10:40:06
 8   regional management -- excuse me -- to      10:40:09
 9   secure the work, to CEO level to secure     10:40:13
10   the work, and ultimately if it is a very    10:40:16
11   large project I go close the deal.         10:40:18
12      Q.   In what instances or --          10:40:20
13           MR. DATOO:  Strike that.         10:40:26
14      Q.   What would you consider a large   10:40:27
15   contract that would be big enough to       10:40:29
16   involve you?                          10:40:31
17      A.   Something being in the 10 to 20   10:40:31
18   to 30 million dollar range.             10:40:33
19      Q.   Are the contracts --            10:40:44
20           MR. DATOO:  Strike that.         10:40:51
21      Q.   Are all the contracts that LVI   10:40:52
22   secures I guess done by people within LVI?  10:40:54
23           MS. SELTZER:  Objection to the   10:40:57
24   form of the question.                   10:40:59
25      A.   If I understand your question    10:41:00
```

37

```
 1            STATE
 2   correctly, if we secure a contract we      10:41:01
 3   execute the contract.  Most of it is       10:41:04
 4   executed with our own labor force, but     10:41:05
 5   certain aspects of nearly every job may    10:41:08
 6   have a subcontractor or a supplier that    10:41:11
 7   also is involved.                      10:41:13
 8      Q.   Okay.                         10:41:14
 9      A.   Did that answer -- was that what  10:41:18
10   you were asking or not?                 10:41:20
11      Q.   No, it wasn't.                  10:41:21
12      A.   Okay.                         10:41:23
13      Q.   What I am asking is:  Is it LVI   10:41:23
14   personnel that go out and secure these     10:41:25
15   contracts?                           10:41:27
16           MS. SELTZER:  I object to the    10:41:33
17   form.                               10:41:34
18      A.   To a large extent we go secure   10:41:34
19   our own work.  We don't have -- I         10:41:37
20   think -- if I understand now what you are  10:41:39
21   asking, we don't use a lot of consultants  10:41:41
22   and finders to bring work to us.  We       10:41:44
23   generally try to find our own business.    10:41:47
24      Q.   And is there a team or anyone in  10:41:49
25   particular that goes out and finds        10:41:52
```

10 (Pages 34 to 37)

38

```
 1              STATE
 2  business for LVI?                    10:41:54
 3      A.   The individual offices have  10:41:56
 4  their own sales functions, and so they go  10:41:58
 5  out and secure business on that basis.  As  10:42:02
 6  it becomes more strategic and larger, it  10:42:06
 7  typically would fall into a group called  10:42:09
 8  ISG that is run by a gentleman named Rich  10:42:12
 9  McManus, and that group generally finds,  10:42:17
10  estimates, and bids larger projects.  10:42:21
11      Q.   What do you mean by larger  10:42:23
12  projects?                            10:42:26
13      A.   The multi-million dollar  10:42:26
14  projects, typically large either  10:42:28
15  demolition or abatement work.        10:42:30
16      Q.   What does ISG stand for?  10:42:32
17      A.   Well, I've -- it -- I believe it  10:42:34
18  is Industrial Service Group, but I've had  10:42:42
19  people tell me otherwise.  I -- I have not  10:42:44
20  actually looked up the tile.  I just call  10:42:47
21  it ISG.                              10:42:49
22      Q.   And that is a group within LVI?  10:42:50
23      A.   That is a group within LVI.  10:42:52
24      Q.   Where is that group based?  10:42:54
25      A.   Richard McManus is based in  10:42:55
```

39

```
 1              STATE
 2  Philadelphia.  Michael Marcheschi is based  10:42:58
 3  in Denver, and then there is senior  10:43:01
 4  project people based at a few different  10:43:04
 5  locations, business development people  10:43:06
 6  that work in that group.  Ted Southern is  10:43:07
 7  based in Pennsylvania, and Thomas Gillmore  10:43:11
 8  is based in Tennessee.               10:43:15
 9      Q.   And how many people are in this  10:43:17
10  group?                               10:43:21
11      A.   It varies based on work  10:43:21
12  activity.  There are a handful, maybe half  10:43:26
13  a dozen in general.                  10:43:32
14      Q.   What is Mr. McManus' job title?  10:43:33
15      A.   He is president of ISG.  10:43:36
16      Q.   Is ISG a -- an entity of -- an  10:43:38
17  LVI entity or is it -- is ISG an LVI  10:43:43
18  entity?                              10:43:49
19      A.   It is an LVI entity.  It is -- I  10:43:50
20  couldn't tell you its corporate form, or  10:43:53
21  where it's domiciled.  It doesn't  10:43:55
22  generally take contracts under its own  10:43:57
23  name.  It secures business for affiliated  10:44:00
24  LVI entities.                        10:44:02
25      Q.   Okay.  Do you know how old Mr.  10:44:03
```

40

```
 1              STATE
 2  McManus is?                          10:44:05
 3      A.   I believe he is in his 50s.  10:44:06
 4      Q.   And I think you testified the  10:44:11
 5  other gentleman in the group is Mr.  10:44:14
 6  Marcheschi?                          10:44:18
 7      A.   Marcheschi.                 10:44:19
 8      Q.   Marcheschi?                 10:44:20
 9      A.   Yes.                        10:44:21
10      Q.   Do you know what his title is?  10:44:22
11      A.   He is a vice president.  10:44:24
12      Q.   Of anything in particular?  10:44:25
13      A.   ISG.  I don't know if he is a  10:44:26
14  vice president of any specific other  10:44:30
15  subsidiaries.                        10:44:31
16      Q.   Do you know how old Mr.  10:44:32
17  Marcheschi is?                       10:44:34
18      A.   He is probably in his 50s.  10:44:35
19      Q.   You mentioned that there were  10:44:38
20  other -- I believe it was other senior  10:44:41
21  personnel in ISG as well?            10:44:43
22          MS. SELTZER:   Objection.  10:44:48
23      A.   Senior project managers.  10:44:49
24      Q.   Senior project managers.  Can  10:44:51
25  you tell me the names of those senior  10:44:53
```

41

```
 1              STATE
 2  project managers?                    10:44:55
 3      A.   There is Chris Schalechi.  I  10:44:55
 4  don't -- I don't know the spelling of his  10:44:59
 5  name.                                10:45:03
 6      Q.   That is okay.               10:45:04
 7      A.   That is currently working on a  10:45:05
 8  project for us at Alcoa.  I think -- I  10:45:07
 9  think he is currently the only senior  10:45:12
10  project manager that would have some  10:45:14
11  affiliation with ISG, and just to explain  10:45:17
12  the way that works individuals like him  10:45:19
13  would typically be part of that  10:45:23
14  organization at the stage where we are  10:45:25
15  pursuing a specific project, and then if  10:45:27
16  the project is secured and it is assigned  10:45:30
17  to an operating unit they would transition  10:45:32
18  and really become part of that operating  10:45:35
19  unit.  So it is -- people come through  10:45:37
20  that organization as we are pursuing large  10:45:39
21  work.                                10:45:42
22      Q.   Okay.  How old is Chris?  10:45:43
23      A.   I have no idea.              10:45:47
24      Q.   Okay.  Can you -- can you guess?  10:45:49
25          MS. SELTZER:   Objection.  10:45:51
```

11 (Pages 38 to 41)

42

```
              STATE
1
2     A.   No.                          10:45:52
3     Q.   Okay.  Are there any other   10:45:53
4  senior project managers in ISG?      10:45:56
5     A.   Not that come -- I -- there may  10:46:02
6  be.  Not that come to mind right now.  10:46:05
7     Q.   Is there a document that lists  10:46:08
8  all the people that work for ISG?     10:46:11
9     A.   I don't know.                10:46:13
10    Q.   Do you think there would be?  10:46:17
11    A.   I don't know.                10:46:19
12    Q.   You mentioned that Ted Southern  10:46:22
13 is a part of ISG; is that correct?   10:46:26
14    A.   Correct.                     10:46:28
15    Q.   Do you know what Mr. Southern's  10:46:28
16 job title is?                        10:46:30
17    A.   He is a business development  10:46:31
18 professional primarily engaged in the  10:46:33
19 power sector.                        10:46:36
20    Q.   Do you know how old Mr. Southern  10:46:38
21 is?                                  10:46:40
22    A.   I do not.                    10:46:40
23    Q.   I think you also mentioned that  10:46:41
24 Tom Gillmore --                      10:46:46
25    A.   Yes.                         10:46:47
```

43

```
              STATE
1
2     Q.   -- is a member of ISG as well?  10:46:48
3     A.   Yes.                         10:46:50
4     Q.   And do you know what his job  10:46:50
5  title is?                            10:46:52
6     A.   I believe he is a vice       10:46:52
7  president.                           10:46:54
8     Q.   Of any area in particular?   10:46:55
9     A.   I -- I don't know that it is  10:46:57
10 specific.                            10:47:00
11    Q.   Do you know how old he is?   10:47:00
12    A.   I believe he -- he is late 50s,  10:47:02
13 early 60s.                           10:47:09
14    Q.   Where is he based out of?    10:47:10
15    A.   Tennessee.                   10:47:11
16    Q.   Where is Mr. Southern based out  10:47:12
17 of?                                  10:47:22
18    A.   Pennsylvania.                10:47:22
19    Q.   Chris, do you know where Chris  10:47:23
20 is based out of?                     10:47:25
21    A.   He is working at a project site  10:47:26
22 in Maryland right now, Frederick,    10:47:28
23 Maryland.                            10:47:32
24    Q.   Do you know where he is      10:47:32
25 regularly based out of?              10:47:33
```

44

```
              STATE
1
2     A.   I believe he is based out of  10:47:34
3  Louisiana I think is where his home is.  10:47:38
4     Q.   How about Mr. Marcheschi?    10:47:40
5     A.   He is based in Denver.       10:47:42
6     Q.   All right.  And Mr. McManus?  10:47:44
7     A.   Is based in -- north of      10:47:47
8  Philadelphia.                        10:47:49
9     Q.   Now, I believe you testified  10:47:56
10 that ISG attempts to go out and secure the  10:47:57
11 larger contracts; is that correct?   10:48:02
12    A.   They are the entity that we use  10:48:04
13 within the company to engage in pursuit of  10:48:07
14 large work.                          10:48:12
15    Q.   And the smaller work I believe  10:48:13
16 you testified that it is handled at the  10:48:15
17 office level?                        10:48:17
18    A.   Correct.                     10:48:17
19    Q.   And how -- who handles it at the  10:48:18
20 office level?                        10:48:21
21    A.   It is at the discretion of the  10:48:22
22 office manager as to specifically how they  10:48:24
23 would engage an internal sales force or  10:48:27
24 how they might use other professionals in  10:48:29
25 the office to pursue that work.      10:48:32
```

45

```
              STATE
1
2     Q.   Now, when you say office     10:48:35
3  manager, is that a job title?        10:48:40
4     A.   Typically they are referred to  10:48:42
5  as branch managers.                  10:48:44
6     Q.   And in each office, is there an  10:48:46
7  internal sales force?                10:49:00
8     A.   No.                          10:49:01
9     Q.   Does each office try to secure  10:49:03
10 contracts for LVI?                   10:49:15
11    A.   Yes.                         10:49:16
12    Q.   If there is no internal sales  10:49:17
13 force at an office, who goes -- who  10:49:21
14 attempts to secure contracts for LVI?  10:49:23
15    A.   One of the things that I did  10:49:25
16 early on is I -- I looked at the sales and  10:49:27
17 marketing performance of the company, and  10:49:30
18 I collected data on thousands of projects  10:49:32
19 over the last ten years and concluded that  10:49:37
20 at the office level with the size of the  10:49:42
21 projects that we pursued it was best left  10:49:45
22 to the office manager to decide how they  10:49:47
23 staffed and pursued smaller work, and so  10:49:49
24 when we budgeted for 2011 I went to each  10:49:53
25 office and said it is up to you to decide  10:49:57
```

12  (Pages 42 to 45)

**46**

```
          STATE
 1
 2    how you secure work.  You've got a        10:50:01
 3    financial plan.  You've got a set of       10:50:03
 4    objectives, and you need to meet those in   10:50:05
 5    the best way, most efficient way possible,  10:50:07
 6    and whether you employ and engage an        10:50:10
 7    internal sales force or not is completely   10:50:13
 8    your decision.  I am going to measure your  10:50:16
 9    performance, and meeting this plan and how  10:50:18
10    you make the bread is not that important    10:50:20
11    to me, and the result of that I guess I     10:50:22
12    would call a change in direction because    10:50:27
13    there was a lot of driven sales from above  10:50:30
14    in prior years has been remarkable.  We     10:50:35
15    have increased sales.  I would say we are   10:50:38
16    -- we will probably be up 20 percent this   10:50:43
17    year over last year.                        10:50:45
18        Q.   And this year --                   10:50:47
19        A.   Being 2011.                        10:50:48
20        Q.   Okay.  And is that based on the    10:50:50
21    first quarter of 2011?                      10:50:52
22        A.   That is based on the performance   10:50:54
23    through now, through today, and the fact    10:50:56
24    that our backlog has increased 50 percent   10:50:59
25    this year.                                  10:51:02
```

**47**

```
          STATE
 1
 2        Q.   And are you measuring this at      10:51:03
 3    the same time through 2010?                 10:51:05
 4        MS. SELTZER:  I object to the           10:51:08
 5    form.                                       10:51:09
 6        A.   I'm measuring                      10:51:10
 7    backlog -- essentially, yes.  The           10:51:12
 8    methodology to measure those types of       10:51:14
 9    parameters is the same.                     10:51:16
10        Q.   So would it be fair to say that    10:51:17
11    if you look at January 1, 2010 through      10:51:20
12    today -- I am sorry, January 1, 2010        10:51:26
13    through I guess May 25, 2010 --             10:51:29
14        MS. SELTZER:  '10 or '11?               10:51:38
15        Q.   '11, the earnings during that      10:51:40
16    period -- during the same period in '11     10:51:42
17    are up 20 percent?                          10:51:45
18        A.   We --                              10:51:46
19        MS. SELTZER:  I am sorry.  Just         10:51:47
20    to make sure, you are talking about         10:51:48
21    January to May of 2010 compared to January  10:51:49
22    to May of 2011.                             10:51:52
23        MR. DATOO:  Yes.  I believe Mr.         10:51:54
24    State said they are up about 20 percent,    10:51:56
25    so I am trying to get the time periods      10:51:58
```

**48**

```
          STATE
 1
 2    that he is measuring that.                  10:52:00
 3        MS. SELTZER:  Okay.                      10:52:02
 4        A.   Yes.  It is roughly as you would   10:52:03
 5    describe it.  It is a measurement of        10:52:04
 6    revenue and profitability and backlog and   10:52:06
 7    work that we are engaged in and projecting  10:52:08
 8    where we are at today through where we      10:52:11
 9    believe we will finish this year at.         10:52:14
10        Q.   Okay.  The holding company, do     10:52:15
11    you know what it does?                      10:52:29
12        MS. SELTZER:  Objection.  You           10:52:31
13    are talking about LVI Parent?               10:52:32
14        MR. DATOO:  Yes, I am referring         10:52:34
15    to --                                       10:52:35
16        Q.   I am going to refer to the         10:52:36
17    holding company as LVI Parent.  Is that     10:52:37
18    okay with you?                              10:52:39
19        A.   That's --                          10:52:40
20        Q.   I --                               10:52:42
21        A.   Fine.                              10:52:43
22        Q.   I want to make sure that when I    10:52:43
23    say something you know exactly what I am    10:52:46
24    saying.                                     10:52:48
25        A.   In the restructuring, there were  10:52:48
```

**49**

```
          STATE
 1
 2    entities that were deconsolidated.  I am    10:52:51
 3    not sure -- we can speak of generally the   10:52:53
 4    holding company, and if that is LVI         10:52:56
 5    Parent, then I'll trust you if you tell me  10:52:58
 6    that LVI Parent is the holding company      10:53:01
 7    that exists today.  It's not something      10:53:03
 8    I've spent a lot of time focusing on nor    10:53:06
 9    really care about, so --                    10:53:08
10        Q.   Well, I'll just call it LVI        10:53:10
11    Parent, the holding company?                10:53:12
12        A.   Okay.                              10:53:14
13        Q.   Whether it is true or not.         10:53:15
14        A.   Generally, yes.                    10:53:16
15        Q.   We can call it anything, but for   10:53:18
16    ease we will just refer to it as LVI        10:53:19
17    Parent.                                     10:53:22
18        A.   Okay.                              10:53:22
19        Q.   Do you know what it does, LVI      10:53:23
20    Parent?                                     10:53:24
21        A.   I believe it simply holds the      10:53:24
22    shareholdings of the investors.             10:53:26
23        Q.   And who are the investors?         10:53:29
24        A.   There is three equity investors   10:53:32
25    in the company, Apollo, Code Hennessy       10:53:34
```

13 (Pages 46 to 49)

50

1          STATE
2    Simmons, and Falcon, and there are I        10:53:37
3    believe about fifteen debt investors in      10:53:43
4    the company led by an -- and a syndicate      10:53:47
5    CIBC. And -- I am sorry. And then there       10:53:51
6    are a number of employees, management and    10:53:56
7    others that have options to become           10:53:58
8    investors through a stock option program.    10:53:59
9          Q.    And would that latter group be    10:54:02
10   considered equity investors?                 10:54:09
11         A.    It would be pseudo equity. That  10:54:10
12   wouldn't become equity unless you            10:54:13
13   exercised an option you had to purchase      10:54:15
14   equity.                                      10:54:18
15         Q.    Now, the three equity investors, 10:54:18
16   how much do they own together? Do you        10:54:23
17   know?                                        10:54:26
18         A.    They own let's call it roughly    10:54:27
19   90 percent.                                  10:54:32
20         Q.    Do you know what percentage of   10:54:33
21   LVI Parent that Apollo owns?                 10:54:39
22         A.    Apollo owns I believe about 37   10:54:41
23   percent. I believe Code Hennessy owns        10:54:44
24   about 35 percent, and I think Falcon owns    10:54:47
25   a little under 20 just roughly speaking.     10:54:51

51

1          STATE
2          Q.    And what is the difference       10:54:54
3    between the equity investors and the debt    10:54:57
4    investors?                                   10:55:00
5          A.    The debt investors are our       10:55:01
6    senior lenders, and in their capacities as   10:55:04
7    lenders they hold as collateral all of the   10:55:06
8    equity of the company basically.             10:55:09
9    They -- they're senior in the                10:55:14
10   capitalization structure of the company,     10:55:15
11   so in effect they have a                     10:55:17
12   significant -- substantial amount of         10:55:20
13   control.                                     10:55:21
14         Q.    Does LVI Parent have a board of  10:55:21
15   directors?                                   10:55:31
16         A.    I don't know.                    10:55:31
17         Q.    Okay. Are you a director of      10:55:32
18   LVI?                                         10:55:36
19         A.    Yes.                             10:55:36
20         Q.    Do you know which entity you are 10:55:38
21   a director of?                               10:55:40
22         A.    I believe -- well, I am a        10:55:41
23   director of many entities.                   10:55:43
24         Q.    LVI entities?                    10:55:45
25         A.    Correct.                         10:55:47

52

1          STATE
2          Q.    Is there a -- are you -- do you  10:55:48
3    serve as a director with Rajay Bagaria?      10:55:51
4          A.    Yes.                             10:55:57
5          Q.    And do you know what entity you  10:55:58
6    serve on a board of with Mr. Bagaria?        10:56:00
7          A.    I believe LVI Services, Inc.     10:56:04
8          Q.    Okay. And on that board you      10:56:06
9    serve on with Mr. Bagaria, do you -- are     10:56:09
10   there any other directors?                   10:56:12
11         MS. SELTZER:    Any other?             10:56:13
12         MR. DATOO:    Any other                10:56:15
13   directors.                                   10:56:17
14         A.    Yes.                             10:56:17
15         Q.    Can you give me their names?     10:56:18
16         A.    Jerry Girardi, Brian Simmons,    10:56:19
17   Rob Hogan, Richard Fiorucci, Robert Buck.    10:56:27
18         Q.    Seven board members?             10:56:40
19         A.    And John Schnable, yes.          10:56:41
20   There -- with myself there would be eight.   10:56:43
21   Yes.                                         10:56:46
22         Q.    Okay. And is that the current    10:56:46
23   composition of the board?                    10:56:50
24         A.    Yes.                             10:56:51
25         Q.    And do you know if all of these  10:56:51

53

1          STATE
2    people were on the board in 2000 -- in       10:56:54
3    November of 2010?                            10:56:57
4          A.    I believe so.                    10:56:58
5          Q.    Was there anyone else on the     10:57:00
6    board in November of 2010?                   10:57:02
7          MS. SELTZER:    Objection. Which       10:57:05
8    point of November of 2010?                   10:57:07
9          Q.    First half of November 2010.     10:57:09
10         A.    Yes, Mr. Fried.                  10:57:12
11         Q.    Now, how often does the board    10:57:13
12   meet?                                        10:57:18
13         A.    The board meets quarterly.       10:57:18
14         Q.    And where do they usually meet?  10:57:20
15         A.    We have been meeting since I've  10:57:22
16   been in the company at offices that Apollo   10:57:24
17   occupies.                                    10:57:28
18         Q.    And how many times have you met  10:57:32
19   since you've been with the company?          10:57:33
20         A.    Three.                           10:57:35
21         Q.    And all three times has it been  10:57:35
22   at Apollo?                                   10:57:40
23         A.    Yes, it is.                      10:57:41
24         Q.    In New York?                     10:57:42
25         A.    Yes.                             10:57:43

14 (Pages 50 to 53)

VERITEXT REPORTING COMPANY

212-267-6868                                      516-608-2400

54

```
 1              STATE
 2      Q.   When were you first appointed to   10:57:43
 3   the board of directors?              10:57:45
 4      A.   I believe the appointment took   10:57:46
 5   place at the November meeting, but I'm not   10:57:50
 6   certain when that resolution was        10:57:58
 7   circulated and signed.               10:57:59
 8      Q.   What types of decisions does the   10:58:01
 9   board of directors make?             10:58:04
10      A.   The board of directors I would   10:58:09
11   say is typical of a company, any company.   10:58:11
12   It is a governance board. It monitors the   10:58:13
13   performance of the business and provides   10:58:16
14   required approvals for capital spending,   10:58:19
15   insures we are in compliance with our     10:58:23
16   lender restrictions, those types of      10:58:26
17   things.                          10:58:29
18      Q.   And can you give me some         10:58:29
19   examples of actual decisions that they    10:58:31
20   make?                          10:58:34
21      A.   You mean resolutions they would   10:58:35
22   sign?                          10:58:37
23      Q.   Yes.                        10:58:37
24      A.   They would sign -- for example,   10:58:38
25   on the annual audit they would sign off on   10:58:41
```

55

```
 1              STATE
 2   the audit of the company. It would run    10:58:45
 3   through the audit committee, and they      10:58:47
 4   would sign off on the audit of the        10:58:49
 5   company. They would -- they would sign    10:58:51
 6   off on resolutions associated with        10:58:53
 7   appointment of our outside auditors. They  10:58:56
 8   would sign off on resolutions associated   10:58:59
 9   with various business transactions that    10:59:03
10   require a board resolution. You know,     10:59:06
11   many things you would engage in in        10:59:09
12   business would require a resolution from   10:59:10
13   your board to evidence to your          10:59:12
14   counterparties that you've got the       10:59:14
15   authorization to do that.             10:59:16
16      Q.   Are there certain decisions that   10:59:17
17   you cannot make that the board can only   10:59:19
18   make?                          10:59:22
19      A.   That --                      10:59:23
20      Q.   That you as CEO cannot make?     10:59:25
21      A.   About what? I am not clear.      10:59:27
22      Q.   That is what I am --            10:59:30
23      MS. SELTZER:   I object to the        10:59:31
24   form. Do you mean are there any decisions  10:59:32
25   that impact what he --                10:59:34
```

56

```
 1              STATE
 2      Q.   Just any decisions. You're the   10:59:36
 3   CEO of LVI, correct?                 10:59:38
 4      A.   Correct.                     10:59:40
 5      Q.   And you can make decisions       10:59:40
 6   regarding --                       10:59:44
 7      A.   The business.                 10:59:45
 8      Q.   The business, correct?          10:59:46
 9      A.   Correct.                     10:59:47
10      Q.   Now, are there any decisions     10:59:48
11   that you cannot make without board        10:59:49
12   approval?                        10:59:51
13      MS. SELTZER:   Objection.            10:59:52
14   Again, with respect to LVI Services?      10:59:53
15      MR. DATOO:   Yes, with respect       10:59:56
16   to LVI.                          10:59:57
17      MS. SELTZER:   Okay.               10:59:59
18      A.   There would be certain decisions  11:00:00
19   that I could make that it would be       11:00:01
20   required that I have their approval to    11:00:03
21   execute.                         11:00:06
22      Q.   Do you know what those decisions  11:00:07
23   are?                          11:00:08
24      A.   There is many -- you know, read   11:00:09
25   the by-laws of the company. There is many  11:00:13
```

57

```
 1              STATE
 2   different things that would require the    11:00:15
 3   board's consent to allow the company to   11:00:17
 4   engage or commit to certain things. I     11:00:24
 5   would come to the board with a rationale   11:00:26
 6   for doing something, and the board then    11:00:28
 7   either approves it or doesn't.          11:00:30
 8      Q.   Have you ever asked for board     11:00:31
 9   approval on decisions that you can        11:00:35
10   make --                         11:00:40
11      MR. DATOO:   Strike that.           11:00:41
12      Q.   Have you ever asked for board     11:00:43
13   approval for decisions that do not require  11:00:51
14   board approval?                    11:00:53
15      MS. SELTZER:   I object to the        11:00:54
16   form.                          11:00:55
17      A.   I -- I've asked for I guess       11:00:55
18   interpretations of -- of what           11:00:57
19   my -- whether I might be required to have  11:01:05
20   board approval to make certain decisions.  11:01:08
21   Being new to the company, I -- you know, I  11:01:12
22   didn't want to run out and make a lot of   11:01:15
23   decisions that may require board approval.  11:01:18
24   You know, there are certain things, gray   11:01:20
25   areas where I believe I've got specified   11:01:22
```

15 (Pages 54 to 57)

VERITEXT REPORTING COMPANY

212-267-6868                                    516-608-2400

58

```
         STATE
1
2    authority, but to ensure that I am -- I am  11:01:24
3    properly informing the board I may ask,    11:01:29
4    you know, is this a decision that requires  11:01:31
5    any authorization from the board           11:01:35
6    just -- just to be safe and open about how  11:01:38
7    we are conducting our business.            11:01:42
8        Q.   Does the board of directors make  11:01:43
9    any personnel decisions?                   11:01:45
10       MS. SELTZER:  Objection.  With         11:01:48
11   respect to LVI Services?                   11:01:49
12       MR. DATOO:  Yes.                       11:01:50
13       A.   Does the board of directors make  11:01:51
14   --                                         11:01:53
15       Q.   Any personnel decisions with      11:01:54
16   regard to LVI Services.                    11:01:56
17       A.   What -- can you be -- what type?  11:01:57
18       Q.   Hiring, firing, disciplining.     11:02:00
19       A.   Yes.                              11:02:03
20       Q.   And in what -- I guess which one  11:02:03
21   of the ones I just mentioned?              11:02:07
22       A.   All of those.                     11:02:10
23       Q.   So do you require board approval  11:02:11
24   if you are disciplining an employee?       11:02:16
25       A.   No, they hired me.  I work for    11:02:17
```

59

```
         STATE
1
2    them.                                      11:02:19
3        Q.   Okay.                             11:02:19
4        A.   I'm the employee that -- I        11:02:20
5    believe the board has ultimate authority   11:02:22
6    to make all of those decisions related to  11:02:23
7    that.                                      11:02:27
8        Q.   I guess my question is before     11:02:27
9    any personnel decision is made, do you     11:02:30
10   need board approval or is there only       11:02:32
11   specific personnel decisions?              11:02:36
12       A.   I'm not sure that I need board    11:02:38
13   approval.  I did a reduction in force in   11:02:40
14   January, which I'm sure you are aware of,   11:02:44
15   and as part of that reduction in force I   11:02:44
16   know I went to at least one of the board   11:02:48
17   members and asked if it was a -- an issue  11:02:50
18   that they -- he believed I should bring in 11:02:53
19   front of the board, and I -- as I recall,  11:02:56
20   it -- you know, in his opinion it wasn't,  11:02:59
21   and so I moved forward with -- with that   11:03:01
22   action.                                    11:03:04
23       Q.   Do you recall who that was?       11:03:04
24       A.   I believe I asked that of Rob     11:03:06
25   Hogan.                                     11:03:09
```

60

```
         STATE
1
2        Q.   Since you've been on the board,   11:03:09
3    were you given any anti-discrimination     11:03:27
4    training by --                             11:03:29
5        A.   By the board?                     11:03:30
6        Q.   By the board.                     11:03:31
7        A.   I don't recall.                   11:03:37
8        Q.   And do you know if LVI Parent     11:03:37
9    has a handbook?                            11:03:39
10       MS. SELTZER:  The holding             11:03:40
11   company?                                   11:03:42
12       MR. DATOO:  Yes.  That is who we       11:03:42
13   were referring to.                         11:03:43
14       A.   I don't know.                     11:03:46
15       Q.   Do you know if they have an       11:03:48
16   equal employment opportunity policy?       11:03:49
17       A.   We are speaking of the holding    11:03:51
18   company?                                   11:03:53
19       A.   The holding company, LVI Parent.  11:03:54
20       A.   I don't know.                     11:03:57
21       Q.   Do you know in LVI Parent has an  11:03:58
22   anti-discrimination policy?                11:04:00
23       A.   I don't know.                     11:04:02
24       Q.   Do you know if LVI Parent has an  11:04:03
25   anti-retaliation policy?                   11:04:04
```

61

```
         STATE
1
2        A.   I don't know.                     11:04:04
3        Q.   Do you know what LVI Acquisition  11:04:06
4    Corp. is?                                  11:04:09
5        A.   I believe it was an entity that   11:04:09
6    was formed in the restructuring in         11:04:11
7    September.                                 11:04:13
8        Q.   Do you know does it have a        11:04:13
9    relationship with the holding company, LVI 11:04:15
10   Parent?                                    11:04:17
11       A.   I believe it is an investment     11:04:17
12   vehicle.                                   11:04:19
13       Q.   That has ownership in LVI         11:04:19
14   Parent?                                    11:04:25
15       A.   I'm not a hundred percent         11:04:25
16   familiar with the exact structure of that  11:04:27
17   transaction.                               11:04:29
18       Q.   Do you know who would be?         11:04:30
19       A.   Paul Cutrone probably would be    11:04:37
20   the most familiar.                         11:04:38
21       Q.   Would he also know -- do you      11:04:40
22   think he would know the name of the        11:04:42
23   holding company, the legal name of the     11:04:43
24   holding company?                           11:04:46
25       A.   Yes.                              11:04:47
```

16 (Pages 58 to 61)

VERITEXT REPORTING COMPANY

212-267-6868

516-608-2400

**62**

```
1              STATE
2      Q.   And do you think he would also   11:04:48
3    know the legal name of your employer?   11:04:49
4      A.   Yes.                   11:04:52
5      Q.   Does LVI Parent, the holding   11:05:01
6    company, have any employees?       11:05:03
7      A.   I don't believe so.       11:05:04
8      Q.   Do you know if it has any   11:05:07
9    officers?                    11:05:10
10     A.   It may.  I don't know.     11:05:10
11     Q.   Do you know how many it may   11:05:14
12   have?                       11:05:16
13     A.   No.                  11:05:30
14     Q.   Do you know who Jeffrey Smith   11:05:17
15   is?                         11:05:21
16     A.   Yes.                 11:05:21
17     Q.   Who is he?             11:05:21
18     A.   He is an attorney with Sidley   11:05:22
19   Austin.                     11:05:26
20     Q.   Is he -- do you know if he is an   11:05:26
21   officer of LVI Parent?           11:05:28
22     A.   I do not.              11:05:30
23     Q.   Okay.  Do you know if he has a   11:05:31
24   title within the LVI organization?   11:05:33
25     A.   He may.  He may.  I'm not a   11:05:37
```

**63**

```
1              STATE
2    hundred percent certain.         11:05:42
3      Q.   Do you know if he is the       11:05:43
4    secretary?                   11:05:44
5      A.   If he has a title I believe that   11:05:44
6    is what it would be.            11:05:46
7      Q.   And would that be secretary of   11:05:47
8    LVI Parent?                  11:05:50
9      A.   I don't know.            11:05:51
10     Q.   Okay.  Is he on the board of   11:05:53
11   directors?                   11:05:56
12     A.   No.                  11:05:56
13     Q.   Does LVI Parent own any assets?  11:05:58
14     A.   I don't know.            11:06:01
15     Q.   Does LVI Parent have its own   11:06:04
16   bank account?                11:06:08
17     A.   I don't know.            11:06:09
18     Q.   Does LVI Parent have any       11:06:09
19   offices?                    11:06:12
20     A.   I don't know.            11:06:13
21     Q.   Where is LVI Parent          11:06:15
22   headquartered?               11:06:18
23     A.   I don't know.            11:06:19
24     Q.   Does LVI Parent, the holding   11:06:21
25   company, have any subsidiaries?    11:06:25
```

**64**

```
1              STATE
2      A.   I don't know.            11:06:27
3      Q.   Would LVI Services, Inc. be a   11:06:30
4    subsidiary of the holding company?   11:06:36
5      A.   I would believe it is, but I am   11:06:37
6    not -- that is why I said I don't -- I am   11:06:40
7    not a hundred percent certain what the   11:06:42
8    legal structure under the parent be.   11:06:44
9      Q.   Do you know if it would be       11:06:46
10   a -- if LVI Services would be a       11:06:49
11   wholly-owned subsidiary?          11:06:52
12     A.   I believe so.            11:06:53
13     Q.   Do you know what the           11:06:58
14   relationship is between LVI Acquisition   11:06:59
15   and LVI Services?             11:07:03
16     A.   It's a -- it's an indirect owner   11:07:04
17   of the company, investor in the company.   11:07:11
18     Q.   You testified earlier that   11:07:14
19   you're a member of several boards within   11:07:19
20   the LVI organization, correct?   11:07:24
21       MS. SELTZER:  I object to the   11:07:26
22   form.                       11:07:27
23     A.   I believe that is correct.   11:07:28
24     Q.   Do you know how many entities   11:07:29
25   you're on the board of within LVI?   11:07:32
```

**65**

```
1              STATE
2      A.   No.                  11:07:34
3      Q.   Do you know why you are on so   11:07:35
4    many boards?                 11:07:40
5      A.   Every entity we have organized   11:07:41
6    in various states requires typically two   11:07:43
7    directors or more, and those two directors   11:07:47
8    would typically be myself and our CFO,   11:07:49
9    Paul Cutrone.                11:07:52
10     Q.   So is it by virtue of your   11:07:53
11   position as the CEO that you've been   11:07:56
12   appointed to all of these boards?   11:07:58
13     A.   That's correct.          11:07:59
14     Q.   And do you know if the same   11:08:00
15   holds true for Mr. Cutrone?       11:08:01
16     A.   I would say that is probably   11:08:03
17   correct.                    11:08:05
18     Q.   Now, do you know if LVI Services   11:08:05
19   has a board of directors?         11:08:12
20     A.   We discussed that.  Yes.  I   11:08:13
21   believe LVI Services has a board of   11:08:17
22   directors.                  11:08:19
23     Q.   Okay.  Do you know if the   11:08:19
24   holding company has a board of directors?   11:08:22
25       MS. SELTZER:  Objection.  Asked   11:08:24
```

17 (Pages 62 to 65)

66

```
1              STATE
2  and answered.                    11:08:25
3      A.   LVI Parent?              11:08:25
4      Q.   Yes.                     11:08:27
5      A.   I don't know.            11:08:27
6      Q.   Okay. Does LVI Services have   11:08:28
7  any employees?                   11:08:39
8      A.   LVI Services, Inc.?      11:08:40
9      Q.   Yes.                     11:08:42
10     A.   Yes, I believe it does.  11:08:43
11     Q.   How many?               11:08:45
12     A.   I don't know.            11:08:46
13     Q.   Okay. The company that you work  11:08:48
14  for, does that have any employees?   11:08:52
15     A.   Yes.                     11:08:54
16     Q.   Okay. How many?         11:08:55
17     A.   I don't know.            11:08:57
18     Q.   Is it more than a hundred --   11:08:58
19     A.   Thousands.               11:09:02
20     Q.   Okay. And does -- the company   11:09:03
21  you work for I am going to refer to that  11:09:04
22  as LVI Services. Is that okay? Is that  11:09:10
23  going to cause any confusion?    11:09:12
24     A.   No. Recognize that we are   11:09:14
25  talking about -- if you want to  11:09:15
```

67

```
1              STATE
2  generically call it LVI Services, are we  11:09:17
3  including the 25 or 30 subsidiaries that  11:09:20
4  are part of the organization or are we  11:09:23
5  talking just about -- you're going have to  11:09:25
6  be very specific if you want to discuss  11:09:29
7  that.                            11:09:31
8      Q.   Okay. I -- I'm trying to be   11:09:32
9  specific. I am not trying to confuse you.  11:09:34
10  I am referring to LVI Services, Inc.,  11:09:38
11  which is the company you          11:09:41
12  testified that you work for.      11:09:43
13     A.   Okay.                    11:09:44
14     Q.   That you're the CEO of.   11:09:45
15     A.   Okay.                    11:09:47
16     Q.   So how many employees does that  11:09:48
17  company have?                     11:09:49
18     A.   I don't know.            11:09:50
19     Q.   Okay. How about LVI as -- all  11:09:51
20  together?                        11:09:58
21     A.   Including all of the operating  11:09:58
22  subsidiaries, I would guess 3 to 4,000  11:10:01
23  today. It can vary hundreds in a day.  11:10:06
24     Q.   And the LVI all together, how  11:10:09
25  many officers does it have?       11:10:17
```

68

```
1              STATE
2      A.   I don't know.            11:10:18
3      Q.   Okay. Now, when you were hired  11:10:19
4  by the company you work for, LVI Services,  11:10:24
5  Inc., were you given any           11:10:27
6  anti-discrimination training?     11:10:28
7      A.   I believe I was given manuals.  11:10:30
8  I don't recall any face-to-face training  11:10:33
9  per se.                          11:10:37
10     Q.   Do you know if you received a  11:10:38
11  handbook?                        11:10:39
12     A.   I did.                   11:10:40
13     Q.   Okay. Did you review that  11:10:41
14  handbook?                        11:10:42
15     A.   Yes.                     11:10:43
16     Q.   Do you know if that handbook  11:10:44
17  contained an equal employment opportunity  11:10:47
18  policy?                          11:10:49
19     A.   I believe it did.        11:10:49
20     Q.   Do you recall reading it?  11:10:50
21     A.   I believe I did.         11:10:51
22     Q.   And do you recall if the  11:10:52
23  handbook had anti-discrimination policy?  11:10:54
24     A.   I believe it did.        11:10:57
25     Q.   Do you recall reading it?  11:10:58
```

69

```
1              STATE
2      A.   I believe I did.         11:10:59
3      Q.   And do you recall if the  11:11:00
4  handbook had an anti-retaliation policy?  11:11:01
5      A.   I don't recall that.     11:11:04
6      Q.   Who are LVI Services -- who are  11:11:08
7  LVI's competitors?                11:11:12
8      A.   In general or --         11:11:13
9      Q.   In general.              11:11:15
10     A.   In what sector -- what market  11:11:15
11  sector?                          11:11:18
12     Q.   In general.              11:11:18
13     A.   We compete with demolition firms  11:11:19
14  across the country, Brandenburg, CST,  11:11:22
15  Marcor, Nuprecon, Demco. We compete with  11:11:27
16  a lot of abatement firms in the response  11:11:31
17  sector. We compete with Balfour, a lot of  11:11:35
18  smaller companies in that space. It is a  11:11:39
19  wide range of companies. There is  11:11:41
20  literally hundreds that we would compete  11:11:44
21  with.                            11:11:46
22     Q.   Would you consider LVI a full  11:11:51
23  service firm in the industry that it is  11:11:53
24  in?                              11:11:55
25     MS. SELTZER: I object to the  11:11:55
```

18 (Pages 66 to 69)

VERITEXT REPORTING COMPANY

212-267-6868                              516-608-2400

70

STATE

1  form.                                    11:11:56
2  A.   I would consider LVI to be full   11:11:56
3  service in -- in a few industry sectors   11:11:59
4  specifically in demolition and asbestos   11:12:02
5  abatement.  Absolutely.  Well, I shouldn't   11:12:05
6  even say that.  In the demolition space   11:12:09
7  not a hundred percent.  There is certain   11:12:11
8  aspects of that that -- that I wouldn't   11:12:13
9  say we are a hundred percent full service.   11:12:16
10  In -- with regards to classifying us as a   11:12:20
11  specialty contractor, there is a number of   11:12:23
12  areas that we would possess weakness in.   11:12:26
13      In the response sector, I think   11:12:30
14  we are a pretty full service as it would   11:12:32
15  relate to responding to major events of   11:12:35
16  flood and wind, but as it would relate to,   11:12:37
17  for example, radiological issues probably   11:12:42
18  not.  So there is holes in the business.   11:12:46
19  There is a number of holes in the business   11:12:48
20  that could be filled.                     11:12:50
21      Q.   Does LVI derive the majority of   11:12:51
22  its revenue from any particular sectors?   11:12:55
23      A.   Explain the sectors -- explain   11:13:03
24  what you are referring to as sectors?   11:13:05

71

STATE

1      Q.   Areas.                           11:13:06
2      A.   Of the country?                  11:13:07
3      Q.   No, in terms of the area that   11:13:08
4  you do business in.                       11:13:10
5      MS. SELTZER:   Like demolition?   11:13:11
6      MR. DATOO:   Exactly.            11:13:12
7      MS. SELTZER:   Remediation.      11:13:13
8      Q.   Remediation response.           11:13:16
9      A.   Roughly 100 percent of our      11:13:17
10  business comes from three sectors,        11:13:19
11  response, abatement, demolition, and if we   11:13:20
12  looked at our breakdown today this year we   11:13:23
13  will probably do 15 to 20 percent of our   11:13:26
14  business in response and in what we would   11:13:29
15  call remediation maybe 50 percent and 30   11:13:33
16  percent in demolition, although            11:13:37
17  remediation and demolition sometimes       11:13:38
18  overlap.  Oftentimes we will be performing   11:13:41
19  both scopes of work within a given         11:13:44
20  project.                                  11:13:46
21      Q.   And who would -- who are LVI's   11:13:47
22  competitors in demolition?               11:13:51
23      A.   In just demolition?            11:13:53
24      Q.   Yes.                           11:13:54

72

STATE

1      A.   I would say the competitors we   11:13:55
2  would normally see are Brandenburg,        11:13:57
3  Bierlein, CST, Nuprecon, D.H. Griffin, and   11:14:02
4  then smaller firms like Silverado on the   11:14:08
5  west coast, a lot of competitors.  There   11:14:12
6  is -- there is a number of players, and   11:14:16
7  then in the nuclear space it would        11:14:18
8  typically just be Demco.                  11:14:21
9      Q.   And in terms of revenue,         11:14:24
10  currently where would you place LVI with   11:14:25
11  respect to its competitors?               11:14:27
12      A.   In what?                        11:14:28
13      Q.   Just rank them in terms of      11:14:30
14  revenue.                                  11:14:32
15      A.   In what, a sector or as --     11:14:33
16      Q.   In the demolition area.         11:14:35
17      A.   Okay.  I would say we are in the   11:14:37
18  top three.                                11:14:43
19      Q.   And historically do you know if   11:14:43
20  historically you would place LVI in the   11:14:49
21  top three?                                11:14:51
22      MS. SELTZER:   I object to the   11:14:52
23  form.  Historically going back how far?   11:14:53
24      MR. DATOO:   As far as Mr. State   11:14:57

73

STATE

1  has knowledge of.                         11:14:59
2      A.   I would say the company has been   11:14:59
3  in the top ten for many years, in the top   11:15:01
4  three the last few years for sure.         11:15:04
5      Q.   And who would be LVI's           11:15:10
6  competitors in the remediation area?      11:15:14
7      A.   In asbestos abatement, that type   11:15:17
8  of thing?                                 11:15:20
9      Q.   Yes.  Is that what you mean by   11:15:21
10  remediation?                              11:15:22
11      A.   Yes.  There is a lot of smaller   11:15:23
12  companies, and this is where we get into a   11:15:26
13  lot of the really small work that I        11:15:28
14  described to you, and I frankly don't know   11:15:30
15  much of any of those competitors, but in   11:15:33
16  the larger project sphere Marco would be   11:15:36
17  our primary competitor, and then the      11:15:41
18  demolition firms would typically have that   11:15:43
19  capability as well.  There is another firm   11:15:45
20  named ARG, which has been a competitor     11:15:47
21  and, you know, in any specific city or     11:15:52
22  market is typically where you see that     11:15:55
23  type of competition.  There is not a lot   11:15:57
24  of national players at that level.         11:15:59

19 (Pages 70 to 73)

74

```
 1              STATE
 2      Q.   And just like you did before,    11:16:01
 3   where would you rank LVI with respect to   11:16:04
 4   its competitors in terms of revenue?    11:16:09
 5          MS. SELTZER:  Objection.      11:16:12
 6      Q.   In the remediation area.       11:16:13
 7          MS. SELTZER:  Currently?       11:16:15
 8          MR. DATOO:  Currently.        11:16:16
 9      A.   If the remediation is specific    11:16:17
10   to asbestos, it is -- it is going to be    11:16:18
11   probably first.  If it is specific to     11:16:22
12   environmental remediation in general, it   11:16:24
13   would be maybe top ten.             11:16:27
14      Q.   And how about historically?    11:16:29
15      A.   Historically I think the        11:16:32
16   asbestos area has been ranked first,      11:16:34
17   general remediation probably the same.  In 11:16:38
18   the top ten to fifteen.                11:16:41
19      Q.   Who would you consider LVI's    11:16:42
20   main competitors in the response area?    11:16:52
21      A.   I would say Balfour is our main   11:16:54
22   competitor that we typically see         11:16:56
23   everywhere we go.                  11:16:58
24      Q.   And where would you rank LVI in   11:17:00
25   terms of revenue against Balfour and its   11:17:02
```

75

```
 1              STATE
 2   other competitors?                 11:17:07
 3      A.   We are a middle of the pack      11:17:08
 4   player.  It is a growing business.       11:17:09
 5   Balfour is much larger, much better      11:17:11
 6   established.                       11:17:14
 7      Q.   Is that currently?            11:17:14
 8      A.   That is currently, yes.         11:17:15
 9      Q.   How about historically?        11:17:16
10      A.   That is the same historically.   11:17:18
11      Q.   Now, does LVI as a whole have    11:17:22
12   any offices?                       11:17:28
13          MS. SELTZER:  I object to the    11:17:30
14   form.                            11:17:31
15      A.   We have branches.           11:17:32
16      Q.   Okay.  Does it have any -- how   11:17:33
17   many branches?                   11:17:36
18      A.   Roughly 25.                 11:17:36
19      Q.   And does it currently have a     11:17:42
20   branch in Westport, Connecticut?        11:17:44
21      A.   We have a location there that we  11:17:46
22   are in the process of closing.  Yes.      11:17:47
23      Q.   And when is that location going   11:17:49
24   to be closed?                      11:17:51
25      A.   When our lease runs out.       11:17:52
```

76

```
 1              STATE
 2      Q.   Do you know when that is?       11:17:54
 3      A.   I -- soon.  I think in the next    11:17:55
 4   few months.                       11:17:58
 5      Q.   Is it an empty office right now?   11:17:59
 6      A.   We have got three staff that are  11:18:02
 7   there right now.                    11:18:04
 8      Q.   Who is there right now? Can you   11:18:05
 9   give me their names?                11:18:08
10      A.   Greg DiCarlo, Jeannie Nagy.     11:18:09
11      Q.   Sorry.  Jeannie?             11:18:14
12      A.   Jeannie Nagy.               11:18:17
13      Q.   Can you spell that for me?  Is   11:18:17
14   it an N or --                      11:18:19
15      A.   Yes, N.                    11:18:20
16      Q.   As in Nancy?                11:18:21
17      A.   Yes. And Tom -- I forget his    11:18:25
18   last name.  There is three attorneys.     11:18:28
19      Q.   Where is LVI headquartered?     11:18:30
20          MS. SELTZER:  Objection.      11:18:45
21      A.   Which one?                 11:18:46
22      Q.   Is there a headquarters for the   11:18:47
23   company that you work for?            11:18:48
24      A.   I would say in -- in the way I    11:18:49
25   look at the business, the -- there is not   11:18:53
```

77

```
 1              STATE
 2   something that I would truly classify as a  11:19:00
 3   headquarters in the way I view -- the way  11:19:02
 4   we do business today.  Our corporate      11:19:05
 5   office where we have corporate support     11:19:07
 6   functions and what we call our corporate   11:19:09
 7   support center is in New York.          11:19:15
 8      Q.   Would you consider that the      11:19:16
 9   principal office, the main office?         11:19:18
10      A.   No.                       11:19:20
11      Q.   What would you consider the main  11:19:21
12   office?                           11:19:23
13      A.   I'm not sure I would consider    11:19:23
14   there to be a main office.  It is the main  11:19:25
15   administrative office.               11:19:27
16      Q.   Does that office have the most   11:19:29
17   employees?                       11:19:32
18      A.   No.                       11:19:32
19      Q.   Which office would?          11:19:33
20      A.   I'm not sure any office would    11:19:35
21   have the most employees to be honest with  11:19:39
22   you.  I think the most employees would be  11:19:42
23   at a project site.  We -- we have, for     11:19:44
24   example, 700 employees at Madison Square   11:19:50
25   Garden right now.  That is a lot more than  11:19:54
```

20  (Pages 74 to 77)

78

```
 1            STATE
 2   we have in any office.            11:19:56
 3       Q.   Currently?               11:19:56
 4       A.   Yes, on the project we are doing  11:19:57
 5   there right now.                  11:20:00
 6       Q.   How long have you been working   11:20:00
 7   on that project?                  11:20:05
 8       A.   This specific phase about three  11:20:06
 9   weeks.                            11:20:10
10       Q.   Were there any phases before     11:20:10
11   this one?                         11:20:12
12       A.   There were phases into last      11:20:13
13   year.                             11:20:12
14       Q.   And have you always had that     11:20:15
15   number of employees at MSG?        11:20:19
16       A.   No, it's -- it's varied greatly. 11:20:22
17       Q.   From how many to how many?       11:20:26
18       A.   From 50 to as many as we have    11:20:28
19   now.                              11:20:31
20       Q.   Continuously over the course of  11:20:31
21   the last year?                    11:20:34
22       A.   Over roughly probably a year.    11:20:35
23   Certainly before my time with the company  11:20:38
24   there was work there.             11:20:41
25       Q.   What work are you doing at MSG?  11:20:42
```

79

```
 1            STATE
 2       A.   It's demolition work and         11:20:44
 3   asbestos abatement.               11:20:45
 4       MR. DATOO:  Can we go off the        11:20:47
 5   record for a second?              11:20:48
 6       MS. SELTZER:  Sure.              11:20:49
 7       THE VIDEOGRAPHER:  Off the           11:20:50
 8   record. 11:20 a.m.                11:20:51
 9       (Discussion held off the            11:21:22
10   record.)                          11:21:22
11       THE VIDEOGRAPHER:  We're             11:21:22
12   returning to the record. 11:21 a.m.  11:21:24
13       Q.   Do you know who Robert McNamara   11:21:27
14   is?                               11:21:29
15       A.   Yes.                         11:21:29
16       Q.   Who is he?                   11:21:30
17       A.   He is the former CEO of the      11:21:30
18   company.                          11:21:32
19       Q.   Do you know how long he was the  11:21:33
20   CEO?                              11:21:35
21       A.   I believe three or four years.   11:21:35
22       Q.   And while Mr. McNamara was CEO,  11:21:40
23   do you know what Mr. Fried's job tile was?  11:21:45
24       A.   I believe he was chairman.       11:21:48
25       Q.   Chairman of?                 11:21:51
```

80

```
 1            STATE
 2       A.   The board.                   11:21:54
 3       Q.   Was he also an employee?         11:21:54
 4       MS. SELTZER:  Objection. Which       11:21:58
 5   entity?                           11:22:00
 6       Q.   Of any LVI entity.           11:22:00
 7       A.   Today I can tell you I believe   11:22:02
 8   that he was, but if you want to be   11:22:05
 9   specific about when I knew that, then, you  11:22:07
10   know, that is a different question.  11:22:11
11       Q.   Well, at any time do you know if  11:22:13
12   he was an employee of LVI Services, Inc.?  11:22:15
13       A.   I know he had a long history     11:22:17
14   with the company. I know he was an   11:22:21
15   employee for many years.          11:22:22
16       Q.   Of LVI Services, Inc.?         11:22:22
17       A.   Of I believe LVI Services, Inc.  11:22:25
18       Q.   Okay. And while Mr. McNamara    11:22:28
19   was CEO, what were Mr. Fried's job duties?  11:22:31
20       A.   As described to me, he provided  11:22:34
21   strategic advice. He was involved with  11:22:41
22   acquisitions. There were a few other  11:22:46
23   things that -- you know, there's been a  11:22:53
24   number of iterations on what Mr. Fried's  11:22:56
25   job duties were, and I'm speaking now of a  11:22:59
```

81

```
 1            STATE
 2   conversation that he and I had before I  11:23:04
 3   became employed by the company.     11:23:05
 4       Q.   Now, you mentioned strategic     11:23:12
 5   advice and acquisitions. Is there    11:23:15
 6   anything else?                    11:23:16
 7       A.   I believe that he told me that   11:23:17
 8   he processed offers of employment and that  11:23:18
 9   he generally managed the legal area that  11:23:27
10   Greg DiCarlo and that group are part of.  11:23:29
11       Q.   Is that all?                 11:23:33
12       A.   I believe so.                11:23:34
13       Q.   And you -- is this based on      11:23:34
14   firsthand knowledge or is it based on what  11:23:38
15   someone told you?                 11:23:40
16       A.   That is based on what someone    11:23:41
17   told me.                          11:23:43
18       Q.   And who was that someone?        11:23:43
19       A.   Mr. Fried.                   11:23:45
20       Q.   And do you have any reason to    11:23:46
21   doubt that he performed these duties under  11:23:48
22   Mr. McNamara?                     11:23:50
23       A.   I don't know . I haven't asked   11:23:51
24   Mr. McNamara, so I -- you know, I would  11:23:55
25   have to rely on what Mr. Fried told me.  11:23:58
```

21 (Pages 78 to 81)

82

1          STATE
2     Q.  Do you have any reason to doubt   11:24:01
3  that what he said is true?        11:24:02
4     A.  No.                  11:24:03
5     (Document handed to witness.)    11:24:20
6     Q.  Mr. State, you have in front of   11:24:26
7  you a document that has been previously   11:24:28
8  marked as Plaintiff's Exhibit 2.  Please   11:24:31
9  take a took at the second page of the    11:24:33
10 document and let me know if you've seen it  11:24:39
11 before.              11:24:42
12    A.  Yes, I believe I have.      11:24:42
13    Q.  And what is this document?    11:24:44
14    A.  This document is named chairman  11:24:45
15 areas of responsibility.        11:24:48
16    Q.  And how did you come to see this  11:24:49
17 document?              11:24:53
18    A.  I believe Mr. Fried gave this to  11:24:53
19 me at a meeting we had in October.    11:24:57
20    Q.  And do you know what this     11:25:05
21 document is?            11:25:08
22    A.  I believe it is a document of    11:25:09
23 proposed responsibilities for Mr. Fried    11:25:12
24 subsequent to my hiring in the company.   11:25:16
25    Q.  What do you mean by proposed?    11:25:19

83

1          STATE
2     A.  I believe these are duties that   11:25:20
3  he believed or areas of responsibilities   11:25:23
4  that he believed he should have going    11:25:26
5  forward.              11:25:28
6     Q.  Do you know if these were areas  11:25:28
7  of responsibilities that he had currently  11:25:30
8  at the time?            11:25:33
9     A.  I do not.            11:25:33
10    Q.  When did you start working for    11:25:34
11 LVI?                11:25:38
12    A.  I believe we discussed this.  It  11:25:39
13 was around the 28th of September.      11:25:42
14    Q.  Did you know what he was doing   11:25:44
15 since you -- between the time you started  11:25:46
16 and the time you received this document   11:25:48
17 from Mr. Fried?            11:25:50
18    MS. SELTZER:  Objection to the    11:25:51
19 form.  Since September -- from September   11:25:52
20 to October 19 --          11:25:56
21    A.  During this --          11:25:58
22    Q.  From the time he --        11:25:59
23    A.  This two to three-week period.   11:26:01
24    Q.  Yes.              11:26:04
25    A.  He and I were largely        11:26:05

84

1          STATE
2  transitioning things that he had been    11:26:07
3  doing as interim CEO to myself.  We hadn't  11:26:09
4  gotten into -- passed this transition    11:26:12
5  phase what -- what these duties would be   11:26:14
6  or responsibilities would be.       11:26:17
7     Q.  And do you know if these were   11:26:18
8  duties that he performed under Mr.     11:26:21
9  McNamara?              11:26:22
10    A.  I do not.            11:26:23
11    Q.  Do you have any reason to      11:26:24
12 believe that he didn't perform all of    11:26:29
13 these duties under Mr. McNamara?      11:26:31
14    A.  Can we -- I need to get my     11:26:35
15 reading glasses.  I can't -- I can't read  11:26:37
16 this.  So --            11:26:39
17    Q.  Sure.              11:26:41
18    A.  Can we stop for a second?     11:26:41
19    Q.  You know --            11:26:43
20    MS. SELTZER:  Why don't we take    11:26:44
21 a break.              11:26:45
22    Q.  You know, I am going to       11:26:46
23 withdraw -- because there was a question   11:26:48
24 pending, I am going to withdraw it, and   11:26:50
25 then we can take a break.        11:26:52

85

1          STATE
2     MS. SELTZER:  Okay.        11:26:54
3     THE VIDEOGRAPHER:  We're going  11:26:56
4  off the record.  This is the end of tape  11:26:57
5  1.  11:27 a.m.            11:27:02
6     (Recess taken.)          11:34:49
7     THE VIDEOGRAPHER:  We're      11:34:49
8  returning to the record.  11:35 a.m.    11:35:02
9  beginning of tape number 2.       11:35:05
10    Q.  Mr. State, I am going -- you    11:35:07
11 have before you plaintiff's -- a document  11:35:10
12 previously marked Plaintiff's Exhibit 2.   11:35:13
13 Do you see that?          11:35:16
14    A.  Yes, I do.            11:35:16
15    Q.  I believe you testified you've  11:35:17
16 seen this document before?       11:35:19
17    A.  Yes.              11:35:21
18    Q.  And my -- I am going to hand you  11:35:21
19 another document.          11:35:29
20    A.  I -- I am sorry.  Let me clarify  11:35:37
21 one thing.  You said you have seen this   11:35:39
22 document.  I've seen the second page of    11:35:42
23 this document previously.        11:35:44
24    Q.  Okay.              11:35:46
25    A.  And I think that is what you    11:35:46

22  (Pages 82 to 85)

86

```
 1            STATE
 2    were referring to.             11:35:48
 3    Q.   Yes.                      11:35:48
 4    A.   Okay.                     11:35:49
 5    Q.   Yes.                      11:35:50
 6    A.   The first page I don't -- I'm   11:35:51
 7    not sure if I've seen that before or not.   11:35:53
 8    Q.   So you've seen the second   11:35:55
 9    page --                        11:35:57
10    A.   Of --                     11:35:57
11    Q.   -- of Plaintiff's Exhibit --   11:35:57
12    A.   Number 2.                 11:35:59
13    Q.   -- 2 before, correct?     11:36:00
14    A.   Right.                    11:36:04
15         (Document handed to witness.)   11:36:19
16         MS. SELTZER:  Is this a new   11:36:19
17    one?                           11:36:20
18         MR. DATOO:  It has --     11:36:21
19         MS. SELTZER:  Has this been   11:36:22
20    introduced before?             11:36:24
21         MR. DATOO:  Yes, this is 19.  I   11:36:25
22    am sorry.  I don't think we made copies of   11:36:27
23    yesterday's.                   11:36:29
24         MS. SELTZER:  Remind me.       11:36:30
25    I'll --                        11:36:32
```

87

```
 1            STATE
 2         MR. DATOO:  Yes, we have all   11:36:32
 3    the green tabs.                11:36:34
 4    Q.   Mr. State, you have in front of   11:36:35
 5    you a document that has been previously   11:36:36
 6    marked as Plaintiff's Exhibit 19.   11:36:38
 7    A.   Yes.                      11:36:41
 8    Q.   Have you seen this document   11:36:42
 9    before?                        11:36:45
10    A.   I don't believe so.       11:36:45
11    Q.   Do you -- do you see that this   11:36:47
12    document appears to have been -- this   11:36:53
13    e-mail appears to have been drafted by Mr.   11:36:55
14    Fried?                         11:36:58
15    A.   Yes.                      11:36:58
16    Q.   And it appears that he sent it   11:36:58
17    to Mr. Simmons, Mr. Bagaria, and Mr.   11:37:01
18    Schnabel.                      11:37:05
19         Do you see that?          11:37:05
20    A.   Yes.                      11:37:06
21    Q.   And do you see the -- let me   11:37:07
22    direct your attention to the first   11:37:11
23    sentence.  It reads:  "Brian will be   11:37:13
24    sharing with you a list of chairman   11:37:18
25    responsibilities which I delivered to   11:37:20
```

88

```
 1            STATE
 2    Scott and performed when Bob McNamara was   11:37:22
 3    CEO."                          11:37:26
 4         Do you see that?          11:37:28
 5    A.   Okay.  Yes, I see that sentence.  11:37:29
 6    Q.   So my question to you is:  Do   11:37:31
 7    you have any reason to believe that Mr.   11:37:33
 8    Fried did not perform all the duties   11:37:34
 9    listed on the second page of Plaintiff's   11:37:37
10    Exhibit 2 under Mr. McNamara?   11:37:40
11    A.   I -- I -- I have no reason to   11:37:43
12    suggest that -- that these duties were not   11:37:48
13    performed by him.  I don't know if they   11:37:51
14    were other than I think the first   11:37:54
15    bullet -- I believe that activity that is   11:37:58
16    described there occurred after Mr.   11:38:00
17    McNamara was gone.  So there is no way he   11:38:02
18    could have done those things with   11:38:04
19    McNamara.                      11:38:07
20    Q.   Do you know that for a fact or   11:38:08
21    is that just what you think?   11:38:09
22    A.   I am pretty sure that a number   11:38:10
23    of those things, Squibb and Emcor Middle   11:38:14
24    East were introduced by Mr. Fried when he   11:38:19
25    was in the role of interim CEO.  I   11:38:21
```

89

```
 1            STATE
 2    don't -- I just don't think they were   11:38:24
 3    things that were done when Mr. McNamara   11:38:26
 4    was still at the company, but I am -- I am   11:38:28
 5    not a hundred percent certain.   11:38:31
 6    Q.   Okay.  Thank you very much.   11:38:32
 7    A.   Would you like these back or --   11:38:40
 8         MS. SELTZER:  No.         11:38:42
 9    Q.   You can --                11:38:43
10    A.   Keep them in a pile.      11:38:45
11    Q.   You can flip them over.   11:38:47
12    A.   Flip them over.           11:38:48
13    Q.   It will probably be easier when   11:38:50
14    we go back to them.            11:38:51
15    A.   Got it.                   11:38:52
16    Q.   Now, while Mr. McNamara was CEO,   11:38:53
17    do you have any personal knowledge of Mr.   11:38:56
18    Fried's work performance?      11:38:58
19    A.   No, I do not.             11:38:59
20    Q.   Now, did there come a time when   11:39:00
21    Mr. Fried became the interim CEO?   11:39:04
22    A.   I believe the answer to that is   11:39:06
23    yes.  I -- from -- from what I've been   11:39:08
24    told.                          11:39:11
25    Q.   And do you know when he became   11:39:11
```

23  (Pages 86 to 89)

90

```
 1        STATE
 2    interim CEO?                    11:39:14
 3        A.  I would assume shortly after Mr. 11:39:15
 4    McNamara left.                   11:39:17
 5        Q.  Do you know why Mr. McNamara    11:39:19
 6    left?                           11:39:21
 7        A.  I do not.                11:39:21
 8        Q.  And do you know why Mr. Fried   11:39:22
 9    became interim CEO?              11:39:25
10        A.  I think it is because Mr.      11:39:27
11    McNamara left.                   11:39:28
12        Q.  And do you know if someone asked 11:39:30
13    him to become interim CEO?       11:39:31
14        A.  I do not.                11:39:34
15        Q.  Do you know how he became the   11:39:35
16    interim CEO?                     11:39:39
17        A.  No.                      11:39:40
18        MS. SELTZER:  Objection to the  11:39:42
19    form.                           11:39:43
20        Q.  Okay.  Do you know what job     11:39:44
21    duties Mr. Fried assumed when he became  11:39:47
22    interim CEO?                     11:39:50
23        A.  No.                      11:39:51
24        Q.  Do you know if he kept his prior 11:39:55
25    job duties while he was interim CEO?    11:39:57
```

91

```
 1        STATE
 2        A.  I do not.                11:40:01
 3        Q.  While Mr. Fried was interim CEO, 11:40:02
 4    do you have any personal knowledge of his 11:40:06
 5    work performance?                11:40:07
 6        A.  I do not.                11:40:08
 7        Q.  And did there come a time when   11:40:09
 8    you were hired as CEO?           11:40:20
 9        A.  Pardon me?               11:40:21
10        Q.  Did there come a time when you   11:40:22
11    were hired as CEO?               11:40:24
12        A.  Yes.                     11:40:25
13        Q.  And -- we have to do this to    11:40:25
14    make the record clear.           11:40:27
15        A.  Okay.                    11:40:28
16        Q.  When was that?           11:40:29
17        A.  Approximately September 28.  You 11:40:29
18    know, if you can confirm the date, we can 11:40:35
19    establish the 28th.  I think -- I think  11:40:37
20    that is the date.  I am not a hundred    11:40:39
21    percent sure.                    11:40:41
22        Q.  Okay.                    11:40:41
23        (Document handed to witness.)   11:40:57
24        Q.  Mr. State, you have in front of  11:40:58
25    you a document that has been previously  11:41:00
```

92

```
 1        STATE
 2    marked as Plaintiff's Exhibit 17.      11:41:02
 3        A.  Yes.                     11:41:04
 4        Q.  Can you review the document and  11:41:04
 5    let me know if you have ever seen it     11:41:05
 6    before?                         11:41:07
 7        A.  I -- I know that I've seen the   11:41:08
 8    text.  I don't know that I've seen this  11:41:10
 9    exact piece of paper before.     11:41:13
10        Q.  Okay.  Did you approve       11:41:14
11    this -- the text of this document before 11:41:20
12    it was issued?                   11:41:21
13        A.  I -- I don't -- I don't know    11:41:22
14    that I would say I approved it.  I       11:41:23
15    am -- I'm not a hundred percent sure.  I 11:41:27
16    believe this was issued before I was an  11:41:29
17    employee of the company, so on that basis 11:41:31
18    I'm not sure I could technically approve 11:41:34
19    it.                            11:41:36
20        Q.  I am handing you a document that 11:41:37
21    we --                          11:41:53
22        (Plaintiff's Exhibit 22 marked  11:41:53
23    for identification.)             11:41:56
24        (Document handed to witness.)   11:41:56
25        Q.  Mr. State, you have in front of  11:41:56
```

93

```
 1        STATE
 2    you a document that has been marked      11:41:58
 3    Plaintiff's Exhibit 22.          11:41:59
 4        A.  Okay.                    11:42:01
 5        Q.  Can you please --          11:42:01
 6        A.  Yes, I remember this.      11:42:02
 7        Q.  Okay.                    11:42:04
 8        A.  Okay.  So I approved the    11:42:10
 9    contents of this release.  I wouldn't say 11:42:12
10    I approved the release because I couldn't. 11:42:14
11    I wasn't a member of the company, but I  11:42:16
12    gave some information, which I believe the 11:42:18
13    age went in there.  I don't know that    11:42:22
14    the -- where this came from in here.     11:42:27
15        Q.  Do you know why the release     11:42:29
16    refers to your age?              11:42:32
17        A.  No idea.                 11:42:33
18        Q.  Do you know why the release     11:42:35
19    doesn't refer to Mr. Fried's age?       11:42:36
20        A.  No.  Do you have an earlier     11:42:38
21    draft of this by chance?         11:42:45
22        Q.  I don't think so.         11:42:48
23        A.  This says that there was --     11:42:51
24    there was an attached file in this e-mail. 11:42:53
25    I am just curious -- you asked why age was 11:42:56
```

24  (Pages 90 to 93)

VERITEXT REPORTING COMPANY

212-267-6868                           516-608-2400

94

```
             STATE
1
2    in there.  I think this came from Mr.     11:43:00
3    Fried with maybe a blank in there or Amy   11:43:02
4    McGahan or something.  I think the public  11:43:07
5    relations firm wanted that information.    11:43:09
6    If you notice, I gave those items to them  11:43:10
7    at their request.              11:43:12
8        Q.    Now, according to the press     11:43:14
9    release -- you can -- you can go back to   11:43:20
10   that document if you would like.           11:43:24
11       A.    Okay.              11:43:25
12       Q.    According to the press release,  11:43:25
13   it says that Mr. Fried -- in the first     11:43:28
14   paragraph, it says that Mr. Fried would    11:43:30
15   continue to play an active role in         11:43:34
16   supporting the company's expansion into    11:43:36
17   new service areas and geographies.         11:43:38
18       Do you see that?          11:43:42
19       A.    Okay.  I see that.  11:43:43
20       Q.    Was it your intention at the    11:43:44
21   time to have Mr. Fried play an active role 11:43:45
22   in LVI?                      11:43:48
23       A.    Yes, I -- I think coming into   11:43:49
24   the company I had an absolute interest in  11:43:55
25   Mr. Fried supporting a number of           11:43:58
```

95

```
             STATE
1
2    objectives, and -- but I didn't write      11:44:00
3    this.  So I think you understand that,     11:44:02
4    this release.                  11:44:04
5        Q.    Yes.               11:44:06
6        A.    Okay.              11:44:07
7        Q.    But did you approve its        11:44:08
8    contents?                    11:44:09
9        A.    Yes, I did approve -- I gave    11:44:10
10   corrections and approved the content prior 11:44:12
11   to issuing it.                 11:44:14
12       Q.    And what did you -- what did you 11:44:22
13   mean by active role?            11:44:23
14       MS. SELTZER:  I object to the        11:44:25
15   form.  It is not his words.      11:44:26
16       Q.    You approved --              11:44:27
17       A.    I didn't write this.  11:44:28
18       Q.    You approved the word, and you  11:44:29
19   approved that sentence, correct?           11:44:31
20       A.    No, I wouldn't say I approved   11:44:32
21   that sentence at all.  I gave them         11:44:34
22   information and approved the release of    11:44:36
23   this document.  It was done prior to my    11:44:38
24   employment with the company.     11:44:41
25       Q.    But you approved the contents of 11:44:42
```

96

```
             STATE
1
2    this document, correct?          11:44:43
3        MS. SELTZER:  Objection.  He         11:44:44
4    didn't testify to that.  He approved this  11:44:45
5    going out I think was what he was talking  11:44:47
6    about.  I don't think he was talking about 11:44:50
7    the details of what is inside this.        11:44:52
8        A.    I think the best way to figure  11:44:54
9    this out is if you could locate what came  11:44:56
10   to me with this e-mail I could   11:45:00
11   probably -- I -- I mean I don't remember   11:45:05
12   exactly what that said.  You know, it just 11:45:09
13   says -- this says, "Please review each of  11:45:12
14   the attached," and I don't know what each  11:45:15
15   is.  I am assuming one of them is a draft   11:45:17
16   of this prepared by Amy McGahan, our       11:45:19
17   public relations professional.  My         11:45:22
18   comments are tracked in red.  "Seeking     11:45:24
19   your and CHS comments and approval.  Would 11:45:26
20   like to issue early Monday and post on our 11:45:28
21   website.  If questions, please call."      11:45:32
22       So I don't know what -- I'm not       11:45:34
23   sure what the two attachments are.  One of 11:45:37
24   them appears to be a bio, and the other    11:45:39
25   would appear to be an earlier draft of     11:45:43
```

97

```
             STATE
1
2    this document.  I don't know what red      11:45:46
3    lines were in that draft.  You know,       11:45:48
4    this -- I didn't see this until after its  11:45:52
5    -- I mean I saw this text after it was     11:45:55
6    released if that makes sense, but what I   11:45:57
7    saw coming in I -- I don't know what Amy   11:46:00
8    McGahan had drafted.  You know,  11:46:04
9    I've -- I've met her once.  It was after I 11:46:06
10   was an employee of the company.  So if we  11:46:08
11   could look at that I think I could         11:46:11
12   probably take you through that a little    11:46:12
13   better.                      11:46:14
14       Q.    Okay.              11:46:15
15       MR. DATOO:  Joanne, no       11:46:17
16   attachments were produced in connection    11:46:18
17   with the E discovery.  So we request that  11:46:19
18   any attachments to the document Bates      11:46:22
19   stamped LVI P 001781, which has been       11:46:26
20   marked as Plaintiff's Exhibit 22, be       11:46:32
21   produced.                    11:46:34
22       MS. SELTZER:  We will see if we       11:46:36
23   have it.  I think everything that is       11:46:37
24   responsive has been produced to you.       11:46:39
25       A.    There would have been an        11:46:41
```

25 (Pages 94 to 97)

98

```
 1            STATE
 2   attachment to this. It would have been an      11:46:42
 3   attachment from the e-mail that Burt had        11:46:44
 4   sent it looks like to myself and others.        11:46:46
 5        MS. SELTZER:  This September               11:46:49
 6   24.                                             11:46:50
 7        A.   That is where the attachment          11:46:50
 8   was, was on that e-mail not -- mine was a       11:46:52
 9   response which would not have included an       11:46:55
10   attachment.                                     11:46:57
11        Q.   Okay.                                 11:46:57
12        MR. DATOO:  Joanne, we request             11:46:58
13   production of the attachment to --              11:47:00
14        MS. SELTZER:  I bet it has been            11:47:02
15   produced, but I'll -- if it is there, it        11:47:04
16   has been produced. So --                        11:47:06
17        MR. DATOO:  I didn't -- I                   11:47:07
18   didn't come across a lot of attachments in      11:47:08
19   the production.                                 11:47:10
20        MS. SELTZER:  Okay. I'll look              11:47:11
21   for it.                                         11:47:12
22        MR. DATOO:  Okay. Perfect.                 11:47:13
23   And to the extent it is necessary, I'm          11:47:19
24   just going to reserve my rights to recall       11:47:21
25   Mr. State to question him if necessary          11:47:23
```

99

```
 1            STATE
 2   about these documents if they have not          11:47:26
 3   been previously produced.                       11:47:28
 4        MS. SELTZER:  You can -- you                11:47:30
 5   can reserve anything that you like.             11:47:31
 6        MR. DATOO:  Yes.                           11:47:33
 7        MS. SELTZER:  I would ask one              11:47:44
 8   thing. During the course of the next            11:47:45
 9   break, go to your data file and see             11:47:47
10   because --                                      11:47:49
11        MR. DATOO:  Okay.                          11:47:49
12        MS. SELTZER:  -- I bet you it              11:47:51
13   is there.                                       11:47:53
14        MR. DATOO:  Okay. We will                  11:47:53
15   check.                                          11:47:54
16        MS. SELTZER:  So rather than               11:47:55
17   bringing Mr. State back from Colorado, I        11:47:56
18   think you should check first what you've        11:47:59
19   got.                                            11:48:00
20        MR. DATOO:  Okay.                          11:48:01
21        Q.   Mr. State, before you were hired      11:48:02
22   by LVI, did you have any conversations or       11:48:06
23   e-mail communications with Mr. Fried about      11:48:10
24   his job duties or his role at LVI?              11:48:12
25        A.   I -- I believe I had at least         11:48:15
```

100

```
 1            STATE
 2   one conversation. I don't recall any            11:48:18
 3   e-mail exchanges with him on that issue.        11:48:21
 4        Q.   Do you recall when that               11:48:24
 5   conversation was?                               11:48:25
 6        A.   I believe -- I believe it was a       11:48:26
 7   day before or right around the date I           11:48:31
 8   accepted the offer of employment.               11:48:35
 9        Q.   And what did you and Mr. Fried        11:48:39
10   discuss?                                        11:48:50
11        A.   I -- the primary purpose of the       11:48:51
12   discussion was -- the conversation was         11:48:53
13   requested by myself to understand               11:48:58
14   essentially what he and I would be doing        11:49:02
15   in the company, and so I -- I expressed to     11:49:07
16   the investors -- I think probably just          11:49:12
17   Code Hennessy. I don't recall Apollo            11:49:15
18   being involved with that. I had expressed      11:49:18
19   to them a concern that I understand             11:49:20
20   what -- what Burt thought his activities        11:49:23
21   should be going forward.                        11:49:25
22        Q.   And did you discuss what his          11:49:29
23   activities would be going forward with him     11:49:31
24   on the phone?                                   11:49:33
25        A.   The -- the discussion of what         11:49:34
```

101

```
 1            STATE
 2   his job duties were is as I described           11:49:36
 3   previously. I think I gave you four items       11:49:40
 4   that I recalled that had been discussed.        11:49:43
 5   I don't know if you want to go back and         11:49:46
 6   reread those, but --                            11:49:49
 7        Q.   And what was the discussion           11:49:56
 8   surrounding those four items?                   11:49:57
 9        A.   I -- I was very unclear on            11:49:59
10   what -- what role Burt had had with Bob         11:50:01
11   McNamara, and as part of that discussion I      11:50:07
12   know I asked him what -- what things he         11:50:10
13   was doing. I recall Burt telling me             11:50:12
14   that -- that with McNamara he had a great       11:50:14
15   relationship and that he made a commitment     11:50:17
16   when Bob came in that he would stay a day,     11:50:23
17   a week, a month, a year or however long        11:50:25
18   Bob wanted, and he would leave if Bob           11:50:28
19   asked him to leave, but Bob's opinion was      11:50:30
20   that -- that he didn't want to be there if     11:50:32
21   Burt wasn't there, that it was essentially     11:50:36
22   a team effort.                                  11:50:39
23        Q.   And did -- just so I am               11:50:40
24   straight, did Burt tell you what                11:50:43
25   his -- the areas that he was working in         11:50:45
```

26  (Pages 98 to 101)

**102**

1     STATE
2  with you on the phone?                11:50:48
3     MS. SELTZER:  Under McNamara    11:50:50
4  or --                                 11:50:52
5     Q.   Under -- well, you said you had  11:50:52
6  a conversation with Mr. Fried --      11:50:54
7     A.   Uh-huh.                       11:50:58
8     Q.   -- before you were hired, and  11:50:58
9  that was to discuss what you and he would  11:51:00
10 be doing at the company, correct?     11:51:04
11    A.   Well, it was to discuss -- I  11:51:08
12 wanted his input on what he believed he  11:51:09
13 would be doing at the company.        11:51:12
14    Q.   And what -- what did he tell  11:51:14
15 you?                                  11:51:16
16    A.   Those four items that I provided  11:51:16
17 to you.                               11:51:18
18    Q.   Which was -- was one of them  11:51:18
19 strategic advice?                     11:51:20
20    A.   It was strategic advice and --  11:51:22
21    Q.   Acquisitions?                 11:51:25
22    A.   Well, he said he had supported  11:51:26
23 McNamara on acquisitions.  He didn't say  11:51:28
24 that that was something that he would  11:51:31
25 assume would be a responsibility of his  11:51:32

**103**

1     STATE
2  moving forward.                       11:51:34
3     Q.   What --                       11:51:37
4     A.   And review of contracts I     11:51:39
5  remember was one of the items.  It wasn't  11:51:41
6  an extensive list.  I mean I remembered it  11:51:44
7  because it was just a few things.     11:51:46
8     Q.   Was the other one manage the  11:51:47
9  legal team?                           11:51:50
10    A.   Yes, oversee the legal        11:51:51
11 component.                            11:51:54
12    Q.   And were those the only four  11:51:55
13 areas he told you?                    11:51:57
14    A.   That is all -- that is all that  11:51:58
15 I recall.                             11:52:01
16    Q.   And he said to you in terms of  11:52:01
17 that is what he would be doing going  11:52:03
18 forward?                              11:52:07
19    A.   No.  I asked him what he had  11:52:07
20 done previously, and understand that at  11:52:09
21 the time, you know, I am asking Burt what  11:52:12
22 he had done previously not the day before  11:52:14
23 because he is in that -- in that role he  11:52:16
24 is the interim CEO with a different set of  11:52:19
25 duties.  I was asking what he had done  11:52:22

**104**

1     STATE
2  with Bob in Bob's previous involvement.  11:52:23
3  And -- and at the time I remember Burt  11:52:26
4  specifically said to me, if you want to  11:52:31
5  confirm any of this, call Bob McNamara.  11:52:33
6  He will -- he will confirm this for you.  11:52:36
7     Q.   And did you call Bob McNamara?  11:52:38
8     A.   No.  I specifically recall I  11:52:41
9  said to Burt you know what?  I appreciate  11:52:42
10 you offering that, but I trust you.  I  11:52:44
11 don't need to have that call with Bob  11:52:46
12 McNamara, and then shortly thereafter I  11:52:48
13 accepted the position with the company.  11:52:51
14    Q.   And why did you ask Mr. Fried  11:52:53
15 what he did under Bob McNamara?        11:52:54
16    A.   Because I didn't know.        11:52:58
17    Q.   Okay.  And did you have a      11:52:59
18 discussion as to what he was going to be  11:53:01
19 doing under you?                      11:53:03
20    A.   No, because I -- that discussion  11:53:10
21 I would say didn't occur because that is  11:53:11
22 when Burt said to me, look, the way this  11:53:13
23 worked with Bob is I told him if -- if he  11:53:15
24 wanted I would stay a day, a week, a  11:53:22
25 month, a year, whatever, and Bob's retort  11:53:22

**105**

1     STATE
2  was no, I want you to stay here as long as  11:53:25
3  I am here.  Those were the specific words.  11:53:27
4     And so based on that, I didn't    11:53:29
5  think there was any issue going forward  11:53:31
6  about any of those things.  I thought we  11:53:33
7  would sort that out over time, and that  11:53:36
8  is, you know, what essentially led to the  11:53:38
9  October 19 meeting where we got together  11:53:41
10 to talk about those things.           11:53:43
11    Q.   And so prior to your          11:53:44
12 conversation with Mr. Fried, did you have  11:53:50
13 any idea what he did under Mr. McNamara?  11:53:51
14    A.   Not really.                   11:53:53
15    Q.   What do you mean by not really?  11:53:54
16    A.   I don't -- I had no specific  11:53:56
17 information as to what he had done.    11:53:58
18    Q.   Did you speak to anybody about  11:54:02
19 what Mr. Fried had done prior to you  11:54:05
20 speaking with Mr. Fried?              11:54:07
21    A.   I -- I don't recall if I did or  11:54:08
22 not.                                  11:54:11
23    Q.   And did you document this      11:54:11
24 conversation you had with Mr. Fried?  11:54:14
25    A.   No, I don't believe so.       11:54:16

VERITEXT REPORTING COMPANY

212-267-6868                    516-608-2400

**106**

```
 1            STATE
 2    I -- I -- I think I may have had a        11:54:18
 3    conversation with Simmons or Hogan or     11:54:22
 4    may -- there may have been -- there may   11:54:29
 5    have been some communication that -- I    11:54:31
 6    think there was.  There was some          11:54:32
 7    communication with them shortly after that 11:54:34
 8    said okay I've discussed this.  I          11:54:36
 9    understand it, and I accept the offer of   11:54:38
10    employment.                                11:54:40
11       Q.   Did you -- but nothing before     11:54:40
12    you spoke to Burt?                         11:54:42
13       A.   Well, I -- I think at the time    11:54:43
14    we were negotiating the job offer the      11:54:47
15    terms and conditions of the offer had      11:54:50
16    largely been agreed to, and I said, you    11:54:52
17    know, there is one last item.  I want to   11:54:55
18    understand some of this history, and that  11:54:58
19    was part of that whole process.            11:55:01
20       Q.   And how did you feel about the    11:55:02
21    conversation with Mr. Fried?               11:55:03
22       A.   I felt like, you know, he was at  11:55:05
23    a position where he was interested in kind 11:55:10
24    of stepping back from a lot of the daily   11:55:13
25    activity.  He had told me at one point     11:55:16
```

**107**

```
 1            STATE
 2    earlier I recall that he -- he felt like  11:55:18
 3    he should be not coming in through the     11:55:22
 4    front door but going out through the back  11:55:24
 5    door, which I took to mean he kind of      11:55:27
 6    wanted to get out of the fray.             11:55:30
 7       Q.   Do you know what he meant by      11:55:32
 8    that?                                      11:55:33
 9            MS. SELTZER:  Objection.          11:55:35
10       A.   I don't know.                     11:55:36
11       Q.   What do you mean by the fray?     11:55:37
12       A.   The daily grind of running a      11:55:38
13    complex business like this.                11:55:41
14       Q.   And was that in reference -- do   11:55:42
15    you know if that was in reference to his   11:55:45
16    position as interim CEO or as chairman     11:55:46
17    under McNamara?                            11:55:50
18       A.   I don't know.                     11:55:51
19       Q.   You didn't make that             11:55:52
20    distinction?                               11:55:53
21       A.   No.  At the time I had that       11:55:54
22    conversation I didn't have any idea what   11:55:57
23    he had done under McNamara.                11:55:58
24       Q.   And when you said that you got    11:56:05
25    the impression that he wanted to step back 11:56:06
```

**108**

```
 1            STATE
 2    from the daily grind, do you know if he   11:56:08
 3    was referring to his position as interim   11:56:10
 4    CEO or as -- or as chairman?               11:56:12
 5            MS. SELTZER:  Objection.  Asked   11:56:15
 6    and answered, but you can answer.          11:56:16
 7       A.   Okay.  I don't know.  I recall a  11:56:19
 8    conversation in -- in -- you know, there   11:56:22
 9    were to or three conversations            11:56:25
10    at -- around this time, and I don't        11:56:28
11    remember which one is which specifically.  11:56:29
12       Q.   With Mr. Freed?                   11:56:31
13       A.   Yes, but I do remember him at     11:56:32
14    one point saying that he was -- said I am  11:56:33
15    71 years old, and I really don't want to   11:56:40
16    be doing this any more, and I don't know   11:56:43
17    if that meant -- specifically exactly what 11:56:43
18    that meant, but this was prior to me       11:56:46
19    having any understanding of what duties he 11:56:48
20    may or may not have.                       11:56:49
21       Q.   And was this while he was         11:56:51
22    interim CEO he made that statement to you? 11:56:53
23       A.   This was prior to my being        11:56:55
24    hired.  So I believe, yes, by deduction it 11:56:57
25    would have been in that period of time.    11:57:00
```

**109**

```
 1            STATE
 2       Q.   Okay.  Now, you said you had      11:57:02
 3    multiple conversations with Mr. Fried,     11:57:07
 4    correct?                                   11:57:11
 5       A.   Yes, more than one.               11:57:11
 6       Q.   Okay.  So other than the one      11:57:12
 7    conversation we just discussed --          11:57:20
 8       A.   You know, I believe the          11:57:21
 9    discussion -- the elements that we have    11:57:22
10    discussed here were in more than one       11:57:24
11    conversation that I had with him.  I don't 11:57:27
12    believe all of these things were discussed 11:57:27
13    in that one conversation.                  11:57:29
14       Q.   Okay.  The last conversation you  11:57:30
15    had with Mr. Fried prior to your hire, is  11:57:38
16    that the conversation where you discussed  11:57:40
17    what his job duties were under McNamara?   11:57:41
18       A.   I believe so.                     11:57:44
19       Q.   Okay.  And prior to that          11:57:45
20    conversation, do you recall when you had a 11:57:47
21    conversation with Mr. Fried?               11:57:51
22       A.   Somewhere in the roughly ten-day  11:57:52
23    period between when I had met with the     11:58:00
24    management team and when -- ten-day        11:58:02
25    period?  No, it was more than that.  It    11:58:08
```

**28  (Pages 106 to 109)**

VERITEXT REPORTING COMPANY

212-267-6868                                        516-608-2400

**110**

```
 1           STATE
 2   was -- I am trying to think about the      11:58:10
 3   dates.  If I accepted employment from the  11:58:11
 4   23rd of September, backing away from that   11:58:15
 5   I think I had met the management team       11:58:19
 6   around August 10.  So somewhere -- excuse   11:58:21
 7   me -- between August 10 and September 23    11:58:25
 8   there were -- there was a lot of back and   11:58:27
 9   forth with many different people, Rob       11:58:29
10   Hogan, Burt, Brian Simmons.  I met Rajay    11:58:32
11   and Jerry at Apollo.  I met John Schnabel   11:58:37
12   and a couple of his partners at Falcon.     11:58:41
13   So many things were going back and forth.   11:58:44
14       Q.  Do you recall what you spoke        11:58:48
15   with Burt about on that call?               11:58:51
16       MS. SELTZER:  Objection.  Which         11:58:53
17   call?                                       11:58:54
18       MR. DATOO:  The one immediately         11:58:56
19   before the call where they discussed Mr.    11:58:57
20   Fried's job duties.                         11:59:00
21       A.  The call before that?               11:59:01
22       Q.  Correct.                            11:59:03
23       A.  I don't remember -- I mean          11:59:04
24   I -- I simply remember specific elements    11:59:08
25   of discussions.  I can't tell you exactly   11:59:12
```

**111**

```
 1           STATE
 2   when those discussions took place.          11:59:14
 3       Q.  But it was all during the period    11:59:16
 4   where Mr. Fried was interim CEO?            11:59:18
 5       A.  It was during the period I would    11:59:20
 6   say between -- yes, I would -- I            11:59:23
 7   would -- I think so.  I think so.           11:59:26
 8       Q.  Did you document any of those       11:59:28
 9   telephone conversations you had with Mr.    11:59:30
10   Fried?                                      11:59:32
11       A.  No.                                 11:59:32
12       Q.  Okay.  The conversation you had     11:59:32
13   with Mr. Fried in which he told you I am    11:59:44
14   71 years old, I don't want to be -- I       11:59:47
15   don't want to be doing this on a daily      11:59:49
16   basis or words to that effect, do you       11:59:51
17   recall when you had that conversation with  11:59:54
18   him?                                        11:59:55
19       A.  I -- I believe it was probably      11:59:56
20   in August.                                  12:00:00
21       Q.  Okay.  While he was still           12:00:03
22   interim CEO?                                12:00:06
23       A.  I believe so.                       12:00:07
24       Q.  Okay.  Did he tell you that he      12:00:08
25   didn't want to be performing his chairman   12:00:12
```

**112**

```
 1           STATE
 2   duties?                                     12:00:16
 3       MS. SELTZER:  Objection.               12:00:17
 4       A.  I didn't know what his chairman     12:00:18
 5   duties were, so I don't know how to answer  12:00:19
 6   that question.                              12:00:22
 7       Q.  Okay.  Now, before you were         12:00:22
 8   hired by LVI, did you want Mr. Fried to     12:00:40
 9   retire?                                     12:00:45
10       A.  I -- I thought Mr. Fried wanted     12:00:45
11   to retire.  I don't know that I would say   12:00:48
12   I wanted him to retire.  I -- it was my     12:00:51
13   understanding that was his objective.       12:00:54
14       Q.  And what --                         12:00:55
15       A.  And I say that specifically         12:00:56
16   based on this comment that was made about   12:00:58
17   I should be -- I shouldn't be coming in     12:01:01
18   through the front door.  I should be        12:01:06
19   leaving through the back door.  I mean it   12:01:08
20   was I thought a circumspect way of saying   12:01:12
21   I would like to retire.                     12:01:15
22       Q.  Was that based solely on that       12:01:16
23   conversation or that statement that he      12:01:18
24   made?                                       12:01:19
25       A.  Was what based?                     12:01:21
```

**113**

```
 1           STATE
 2       Q.  Coming -- your impression that      12:01:22
 3   it was his objective to retire.             12:01:24
 4       A.  I -- I believe it was that at       12:01:25
 5   that time probably, and I recall having a   12:01:30
 6   discussion with I believe it was Brian      12:01:32
 7   Simmons, and -- and I had asked him what    12:01:37
 8   his understanding was of what Burt wanted   12:01:40
 9   to do, and I think he told me something to  12:01:44
10   the effect that as part of their            12:01:46
11   investment in '05 they had understood that  12:01:48
12   it was Burt's objective to retire, and      12:01:51
13   that -- that they thought it was either     12:01:54
14   Simmons or Hogan told me they thought he    12:02:00
15   was working part time.                      12:02:03
16       Q.  Did you ever ask Burt if it was     12:02:04
17   his objective to retire?                    12:02:10
18       A.  I don't know.  I don't              12:02:11
19   specifically recall that exact question.    12:02:13
20       Q.  Did Mr. Fried ever tell you that    12:02:16
21   he had no intention of retiring?            12:02:17
22       A.  I don't recall him ever telling     12:02:20
23   me that.                                    12:02:29
24       Q.  Did you get the impression that     12:02:29
25   Mr. Fried was never going to retire?        12:02:31
```

29  (Pages 110 to 113)

**114**

STATE

1
2     MS. SELTZER:  I object to form.  12:02:34
3     A.   I believe at some point I      12:02:35
4   concluded that -- that he was never going   12:02:36
5   to retire.  And can we back up just a      12:02:38
6   little bit?                   12:02:41
7     Q.   Sure.                12:02:41
8     A.   At the time I took the job, I   12:02:42
9   was not aware that Mr. Fried was even an   12:02:45
10   employee of the company in his role as   12:02:47
11   chairman.  I had understood in his role as   12:02:49
12   CEO or interim CEO he was an employee, but  12:02:52
13   I didn't even know that in his chairman   12:02:55
14   role under McNamara he had been an   12:03:00
15   employee.  It -- and through no one's   12:03:02
16   fault I just was not aware of that.   12:03:07
17     Q.   Okay.  And you -- you mentioned   12:03:09
18   that you had a discussion with Brian   12:03:11
19   Simmons regarding Mr. Fried's -- regarding  12:03:14
20   Mr. Fried.               12:03:24
21     A.   Yes.                12:03:25
22     Q.   And do you recall when that   12:03:25
23   discussion was?              12:03:27
24     A.   I believe that discussion   12:03:27
25   occurred shortly before the conversation I  12:03:33

**115**

STATE

1
2   had with Mr. Fried about his duties.   12:03:36
3   Somewhere in that call it one-week time   12:03:39
4   frame.                 12:03:43
5     Q.   And do you know why Mr. Simmons   12:03:44
6   had the impression that Mr. Fried wanted   12:03:45
7   to retire?                12:03:47
8     A.   It was my understanding they had  12:03:48
9   had a conversation to that effect.   12:03:53
10     Q.   Did Mr. Simmons tell you that?   12:03:56
11     A.   I -- I believe so.  I am not a   12:03:58
12   hundred percent positive, but I believe   12:04:04
13   those were his words.          12:04:06
14     Q.   And do you -- did you document   12:04:07
15   that conversation with Mr. Simmons?   12:04:09
16     A.   No.                12:04:11
17     Q.   Is it your practice to document   12:04:12
18   conversations you have with other people?  12:04:15
19     A.   Very seldom.           12:04:17
20     Q.   Okay.               12:04:18
21     (Document handed to witness.)   12:04:18
22     Q.   Mr. State, I am handing you a   12:04:47
23   document that has been previously marked   12:04:49
24   as Plaintiff's Exhibit 10.  Please take a   12:04:51
25   look at the document and let me know if   12:04:53

**116**

STATE

1
2   you've seen it before.         12:04:55
3     (Document handed to witness.)   12:05:03
4     A.   I -- I recognize the -- I   12:05:03
5   haven't seen -- I don't believe I've seen   12:05:06
6   this document because it is -- it looks   12:05:08
7   like it is from Hogan to Simmons, but the  12:05:10
8   substance of the document from myself to   12:05:13
9   Hogan, yes.               12:05:15
10     Q.   Now, let me direct your   12:05:16
11   attention to the second page.   12:05:23
12     A.   Okay.              12:05:26
13     Q.   The fourth paragraph.  Do you   12:05:26
14   see the first sentence?  It reads:  "In the  12:05:33
15   best case scenario Burt will decide to   12:05:36
16   retire at some date certain from LVI upon   12:05:38
17   a new CEO being named and offer to support  12:05:41
18   the business under a consulting agreement   12:05:44
19   in any way the new CEO sees fit."   12:05:46
20     Do you see that?           12:05:50
21     A.   Yes.                12:05:50
22     Q.   And when you wrote this e-mail,   12:05:51
23   it was before you were hired by LVI,   12:05:53
24   correct?                12:05:58
25     A.   I believe -- what is the date on  12:05:58

**117**

STATE

1
2   it?  It was written on September 19.   12:06:01
3     Q.   Was that before you got an offer  12:06:07
4   for employment?              12:06:10
5     A.   I don't think so.  No, it   12:06:11
6   couldn't have been because this e-mail   12:06:14
7   from me is specifically about the offer of  12:06:16
8   employment.  Notice on -- it is called   12:06:19
9   regarding offer was the title of the   12:06:24
10   e-mail.                 12:06:26
11     Q.   Is this before you accepted the   12:06:26
12   offer?                 12:06:28
13     A.   I believe so.           12:06:29
14     Q.   Okay.  Now, what did you mean by  12:06:30
15   that first sentence in paragraph 4 on page  12:06:35
16   2?                   12:06:39
17     A.   I -- I believe, you know, what I  12:06:39
18   was thinking about at the time is that   12:06:44
19   rather than have uncertainty about when   12:06:47
20   Burt was going to retire we would   12:06:49
21   basically come to some conclusion right up  12:06:52
22   front about the date, you know, having   12:06:54
23   believed that that was his intention.  It   12:06:56
24   didn't make sense to me to leave that   12:06:59
25   loose end out there where everyone would   12:07:02

VERITEXT REPORTING COMPANY

212-267-6868                                    516-608-2400

118

```
STATE
 1
 2   wonder when that was going to happen.    12:07:05
 3       Q.   What did you mean by the best    12:07:08
 4   case scenario?                           12:07:10
 5       A.  -- you know, as an alternate     12:07:12
 6   to not -- not saying okay here is my plan.  12:07:15
 7   I just felt like it was good for everybody  12:07:18
 8   to be above board and say here is what we  12:07:21
 9   are going to do.  The alternate case is it  12:07:24
10   would be mysterious to everybody, and no   12:07:27
11   one would know what was going to happen.   12:07:30
12       Q.   Did you expect him to retire?   12:07:33
13       A.   I thought he wanted to.          12:07:36
14       Q.   But you never asked him          12:07:37
15   directly?                                 12:07:39
16       MS. SELTZER:   Objection.             12:07:39
17       A.   I don't know.  I mean I -- I     12:07:40
18   just -- there were so many signs that I    12:07:42
19   perceived anyway from him that that was    12:07:45
20   his intention.  I'm not sure that I ever   12:07:47
21   said so you want to retire.  I -- I don't  12:07:49
22   recall doing that.                        12:07:52
23       Q.   What signs did you -- did he     12:07:53
24   give you?                                 12:07:54
25       A.   The discussion --               12:07:55
```

119

```
STATE
 1
 2       MS. SELTZER:   Objection.             12:07:56
 3       A.  -- that I have -- I've laid out   12:07:57
 4   for you.  The -- you know, the -- the     12:07:59
 5   statement that he is 71, and he doesn't   12:08:02
 6   want to do this any more, which, you know,  12:08:04
 7   later in the meeting I had with him he     12:08:06
 8   corrected me and said he was 70 and       12:08:07
 9   laughed about it, the statement about I    12:08:09
10   should be going through -- out through the  12:08:11
11   back door instead of through the front     12:08:14
12   door.  There were, you know, enough of     12:08:16
13   these things that it -- it just appeared   12:08:18
14   to me that was the intention.  So it       12:08:20
15   wouldn't have struck me to say tell me     12:08:23
16   exactly, you know, you want to retire.  I  12:08:27
17   wasn't -- it never even crossed my mind.   12:08:29
18       Q.   Did you ever talk to him and ask  12:08:32
19   him when do you expect to retire?         12:08:33
20       A.   No, I -- this -- this e-mail     12:08:35
21   right here clearly says, you know, we     12:08:37
22   would have -- under the best case scenario  12:08:39
23   we would -- we could come to that         12:08:41
24   conclusion.  Now, remember, at this point  12:08:43
25   in time I didn't even know Burt was an     12:08:45
```

120

```
STATE
 1
 2   employee of the company.  So retirement to  12:08:48
 3   me, you know, meant he was essentially     12:08:52
 4   going to step away from the business, as I  12:08:55
 5   had been told was his intention all along,  12:08:57
 6   and as chairman of the board it wasn't     12:09:01
 7   really in my purview to be making those    12:09:04
 8   kinds of decisions.  He didn't work for    12:09:08
 9   me.  I didn't know he was an employee of   12:09:10
10   the company, and as an employee of the     12:09:12
11   company I still to this day don't know who  12:09:13
12   he would have worked for.  It became very  12:09:17
13   confusing when I discovered he was an      12:09:20
14   employee.                                 12:09:22
15       Q.   Now, was there any problem with  12:09:23
16   Mr. Fried not retiring?                    12:09:26
17       A.   I -- I am sorry.  I don't follow  12:09:27
18   what -- what do you mean by problem?      12:09:31
19       Q.   You -- you mentioned -- you     12:09:34
20   testified earlier that there was a lot of  12:09:36
21   uncertainty regarding if Mr. Fried was    12:09:37
22   going to retire.  Why was that such a big  12:09:40
23   deal?                                     12:09:43
24       A.   I think it was a distraction to  12:09:43
25   a lot of people to not know who is in     12:09:46
```

121

```
STATE
 1
 2   charge and who is doing what and, you      12:09:49
 3   know, as I said when I -- when I           12:09:52
 4   discovered that Mr. Fried was an employee  12:09:54
 5   it sealed -- there seemed to be a great    12:09:56
 6   deal of ambiguity as to what that meant    12:09:58
 7   because every other employee of the       12:10:01
 8   company worked for me, and he didn't.     12:10:03
 9       Q.   He didn't report to you?         12:10:06
10       A.   No.                              12:10:07
11       Q.   How do you know that?            12:10:09
12       A.   I have an org chart that -- I    12:10:10
13   don't think he reported to McNamara.  I   12:10:14
14   don't know who he reported to.            12:10:16
15       Q.   What did it say on the org       12:10:17
16   chart?                                    12:10:22
17       A.   He is not on there.             12:10:26
18       Q.   Did you ever ask him who he      12:10:30
19   reports today?                            12:10:32
20       A.   No, I -- I don't recall ever    12:10:32
21   asking him.                               12:10:34
22       Q.   Did you ever ask anybody who he  12:10:35
23   reported to?                              12:10:38
24       A.   I think when I found out he was  12:10:39
25   an employee I asked one of the investors.  12:10:40
```

122

STATE

I said how does the chairman of the board spend their time, where do they report because it was frankly something I had never seen before. 12:10:42 12:10:46 12:10:48 12:10:50

Q. And what did that person tell you? 12:10:51 12:10:53

A. I -- I just remember having -- I don't remember what they said. I am not sure -- I think that is one of the -- when the discussion came up about well Burt just works part time, which I later was corrected by Burt that he had never worked part time. 12:10:53 12:10:57 12:10:59 12:11:01 12:11:04 12:11:06 12:11:08

Q. Well, putting aside Mr. Fried's job tile, who did -- what does -- someone with his job duties, who does that person usually report to? 12:11:09 12:11:11 12:11:15 12:11:18

MS. SELTZER: Objection. 12:11:19

A. What job duties? 12:11:19

Q. The ones as you understood him to be -- 12:11:21 12:11:22

A. The ones he said he had under McNamara? 12:11:23 12:11:26

Q. Correct. 12:11:27

123

STATE

A. The four? 12:11:27

Q. Yes. 12:11:28

A. I don't know. That -- that is -- those are duties that someone in a role similar to what I believe was later offered to Mr. Fried on a consulting basis would typically do, strategic advice, support historical litigation matters, that type of thing. 12:11:29 12:11:31 12:11:35 12:11:38 12:11:41 12:11:48 12:11:50

Q. My question was who would someone that had those job responsibilities usually report to? 12:11:51 12:11:53 12:11:55

MS. SELTZER: I object to the form. 12:11:57 12:11:58

A. Those duties? 12:11:58

Q. Yes, the duties that Mr. Fried said he had. 12:11:59 12:12:01

A. They could report to a number of different people. Those duties are kind of a hodgepodge of things. They are not any specific job title that I could see. 12:12:02 12:12:04 12:12:06 12:12:10

Q. So there were multiple people that Mr. Fried could have reported to if he had those job duties, correct? 12:12:15 12:12:18 12:12:19

124

STATE

A. No, not that he would report to. There were multiple people that could have done those things. 12:12:21 12:12:24 12:12:26

Q. But who would someone with those job duties report to? 12:12:27 12:12:28

MS. SELTZER: I object to the form. 12:12:29 12:12:30

A. I don't know that there is -- I have ever seen a person that would have specifically had that set of job duties. It just -- it is foreign to me. 12:12:31 12:12:33 12:12:34 12:12:37

Q. Well, how about if you parse out job duties as opposed to a whole -- 12:12:40 12:12:41

A. Okay. Let's do that. So the strategic advice, that is a job duty that I would retain myself. That is what I do. I told you that when we started. Right. 12:12:43 12:12:46 12:12:48 12:12:50

Q. With a team of people? 12:12:53

A. With a team of people that I choose to support me. Correct. 12:12:54 12:12:56

Q. And that team reports to whom? 12:12:57

A. They report to me. 12:13:01

Q. Okay. 12:13:01

A. But I choose the team. 12:13:02

125

STATE

Q. All right. 12:13:03

A. Okay. 12:13:04

Q. And acquisitions? 12:13:05

A. I do that myself. 12:13:06

Q. With a team? 12:13:07

A. With outside support. 12:13:08

Q. What do you mean by outside support? 12:13:09 12:13:10

A. Outside M&A support. I use some legal, outside legal typically done with investment bankers and legal. 12:13:10 12:13:13 12:13:15

Q. Does anyone from LVI assist you in acquisitions? 12:13:17 12:13:20

A. No. 12:13:21

Q. You are the only person? 12:13:21

A. Yes. 12:13:24

Q. And how about offers of employment? 12:13:26 12:13:28

A. That is an HR function. HR would do that. 12:13:28 12:13:30

Q. And a person with that -- who was responsible for offers of employment? Who would that person report to? 12:13:31 12:13:33 12:13:35

A. It would be done by a clerk. 12:13:39



VERITEXT REPORTING COMPANY
212-267-6868 516-608-2400

---

130

STATE

1
2      Q.   Okay.  So there are people that    12:16:54
3   have the job duties that Mr. Fried said he    12:16:57
4   had at LVI that report to other people at    12:17:00
5   LVI, correct?                12:17:04
6      A.   I believe that is correct.    12:17:05
7      Q.   Okay.  Now, in that paragraph,    12:17:08
8   staying with the fourth paragraph in    12:17:29
9   the -- in the third sentence you    12:17:31
10   write -- actually in the second sentence    12:17:33
11   it reads:  "Several members of the senior    12:17:34
12   team have told me that Burt will never    12:17:36
13   retire because he has no other interests    12:17:38
14   and nothing else to do."        12:17:40
15       Who are you referring to from    12:17:42
16   the senior team?            12:17:44
17      A.   I believe John Leonard had told    12:17:45
18   me that, and -- you know, I'm not sure    12:17:49
19   that I -- I think what John had told me    12:17:57
20   was that -- he had told me that, and he    12:18:00
21   said everybody believes this or something    12:18:02
22   to that effect.  I didn't like go poll the    12:18:04
23   group and say what do you think.  That    12:18:07
24   was, you know, not what I was interested    12:18:09
25   in.                12:18:11

131

STATE

1
2      Q.   So when you wrote senior team,    12:18:11
3   you are referring solely to John Leonard?    12:18:13
4      A.   I was referring to John Leonard    12:18:16
5   and -- other members of the senior group    12:18:17
6   that had been in the company a long time.    12:18:21
7      Q.   So prior to you accepting an    12:18:25
8   offer for employment from LVI, you were    12:18:28
9   told by people that Burt would never    12:18:30
10   retire?                12:18:40
11      A.   That they thought that.  I    12:18:40
12   didn't believe that.  I didn't believe    12:18:41
13   that the employees at the company had    12:18:42
14   specific knowledge as to what Burt's    12:18:43
15   intentions were.  This is why -- this is    12:18:46
16   why I had a conversation with Burt three    12:18:48
17   days later because I had gotten certain    12:18:50
18   information from Simmons that said this is    12:18:52
19   the intentions, and, you know, I was    12:18:55
20   getting conflicting data.  I was    12:18:59
21   collecting data trying to figure out for    12:19:02
22   myself what was going on.        12:19:04
23      Q.   But yet you never asked Mr.    12:19:05
24   Fried if he intended to retire?    12:19:08
25      A.   I just didn't -- I -- I don't    12:19:09

132

STATE

1
2   know if I did or not.  That is -- that is    12:19:11
3   my testimony.  I told you I didn't    12:19:13
4   specifically recall saying it in those    12:19:16
5   words, but I -- I got this what I believed    12:19:17
6   was an assurance on the phone the day I    12:19:22
7   accepted the job that, you know, had -- my    12:19:24
8   interpretation was that that was what he    12:19:30
9   wanted to do.            12:19:35
10      Q.   Did Mr. Fried ever tell you he    12:19:35
11   wanted to retire?            12:19:37
12      A.   I think he did.  Not in those    12:19:38
13   specific words, but I think what was said    12:19:40
14   to me was concluded by me to mean that.    12:19:42
15      Q.   Who is John Leonard?        12:19:46
16      A.   John Leonard is -- excuse me --    12:19:49
17   the COO of the company.        12:19:52
18      Q.   And how long has he worked for    12:19:53
19   the company?            12:19:55
20      A.   I believe over 20 years.    12:19:56
21      Q.   Do you know if he and Mr. Fried    12:19:58
22   worked together?            12:20:00
23      A.   I believe they worked together    12:20:01
24   for many years.            12:20:03
25      Q.   And so you don't think Mr.    12:20:03

133

STATE

1
2   Leonard would know Burt's intentions about    12:20:05
3   his retirement?            12:20:07
4      A.   No.                12:20:08
5      Q.   And you think you would have a    12:20:09
6   better indication of that based on three    12:20:13
7   phone conversations?            12:20:14
8       MS. SELTZER:  Objection to the    12:20:15
9   form.                12:20:17
10      A.   I believe I would have the    12:20:17
11   ability to make my own conclusion based on    12:20:18
12   collecting information from different    12:20:21
13   people, and based on information from    12:20:23
14   someone that owns the company telling me    12:20:27
15   it is Burt's desire to retire it is a    12:20:30
16   logical conclusion I could draw.    12:20:33
17      Q.   Okay.  Why did you write in the    12:20:35
18   second -- third sentence "That is not a    12:20:40
19   healthy situation for Burt or LVI."?    12:20:42
20      A.   The healthy situation for LVI    12:20:45
21   relates back to the second paragraph,    12:20:51
22   second sentence, and that is the concern I    12:20:54
23   had with a singular focus and confusion    12:20:58
24   with the team about who is in charge.  I    12:21:02
25   felt like a significant problem in the    12:21:04

VERITEXT REPORTING COMPANY

212-267-6868                         516-608-2400

134

```
 1          STATE
 2   past with the company is people didn't      12:21:09
 3   know who was ultimately in charge, and      12:21:11
 4   that unless we had somebody ultimately in   12:21:14
 5   charge that everybody understood was        12:21:19
 6   ultimately in charge it is an unhealthy     12:21:21
 7   situation because people are confused.      12:21:24
 8       Q.  So you weren't referring to the     12:21:26
 9   second sentence in the fourth paragraph     12:21:27
10   that Burt not wanting to retire was not a   12:21:30
11   healthy situation?                          12:21:34
12       A.  I'm sorry.  Could you --            12:21:35
13       Q.  The third sentence in the fourth    12:21:37
14   paragraph, that was not in reference to     12:21:39
15   the second sentence in the fourth           12:21:42
16   paragraph?                                  12:21:46
17           MS. SELTZER:  You are talking       12:21:48
18   about what the healthy situation is?        12:21:49
19           MR. DATOO:  Yes.                    12:21:51
20           MS. SELTZER:  I think he            12:21:58
21   testified to what he thought he was         12:21:58
22   referring to.                               12:21:58
23           MR. DATOO:  I am just making        12:21:58
24   sure.  I am closing --                      12:22:00
25       Q.  Your testimony is that that         12:22:01
```

135

```
 1          STATE
 2   third sentence had nothing to do and did    12:22:03
 3   not relate to the second sentence?          12:22:05
 4       A.  The second sentence being?          12:22:09
 5       Q.  Burt not wanting to retire          12:22:11
 6   because he has no other interest, that is   12:22:13
 7   not a healthy situation, that is who you    12:22:15
 8   referred to Burt not wanting to ever        12:22:17
 9   retire?                                     12:22:19
10       A.  I think that you would have to      12:22:20
11   read all of this together to really get     12:22:28
12   what I am getting at.  I don't know that    12:22:30
13   that specifically refers to the prior       12:22:33
14   sentence.  I think it refers to kind of     12:22:35
15   the entire message I -- I provided here.    12:22:38
16       Q.  So why would you put it in the      12:22:41
17   middle of the paragraph if it has nothing   12:22:43
18   to do with that paragraph?                  12:22:47
19           MS. SELTZER:  I object to the       12:22:49
20   form.                                       12:22:50
21       A.  It is kind of a stream of           12:22:50
22   conscious.  I probably wrote this e-mail    12:22:53
23   in less than five minutes.  You know, I     12:22:56
24   was capturing information.  Remember, the   12:22:58
25   purpose of this was I had a job offer I     12:23:00
```

136

```
 1          STATE
 2   was considering, and fundamentally it was   12:23:03
 3   a response to the offer and terms of the    12:23:08
 4   offer, and then at the end of that this is  12:23:10
 5   the other.  It is not specific to the job   12:23:12
 6   offer.                                      12:23:14
 7       Q.  Okay.                               12:23:14
 8           (Document handed to witness.)       12:23:54
 9       Q.  Mr. State, you have a document      12:23:54
10   in front of you that has been previously    12:23:55
11   marked as Plaintiff's Exhibit 18.  Please   12:23:58
12   review the document and let me know if      12:24:00
13   you've seen it before.                      12:24:03
14           (Pause.)                            12:24:04
15       A.  Yes, I have seen this before.       12:24:05
16       Q.  Okay.  Now, it appears that you     12:24:06
17   have sent Mr. Hogan an e-mail on September  12:24:14
18   14, 2010; is that correct?                  12:24:16
19       A.  Yes.                                12:24:19
20       Q.  And what were you and Mr. Hogan     12:24:21
21   discussing?                                 12:24:23
22       A.  As an element of the offer that     12:24:25
23   had been made to me, and I am trying to     12:24:32
24   think -- I think the original offer came    12:24:33
25   to me around the 10th of September maybe.   12:24:36
```

137

```
 1          STATE
 2   I am not a hundred percent certain of the   12:24:40
 3   date, and as part of the offer there were   12:24:42
 4   elements that included stock options in     12:24:49
 5   the company, and as part of that I wanted   12:24:53
 6   to understand under the various             12:24:56
 7   agreements, by-laws, shareholder           12:25:02
 8   agreements, those types of things, what     12:25:04
 9   that really meant, and so I had requested   12:25:06
10   those documents.  I had requested          12:25:10
11   documents on the prior performance of the  12:25:12
12   company.  I was trying to establish the     12:25:14
13   valuation basis that the investors had      12:25:18
14   used to put additional money in the         12:25:22
15   company because the stock options were      12:25:24
16   going to have a strike price or a starting  12:25:26
17   price based on that number, and so I        12:25:30
18   wanted to fully understand if I was taking  12:25:33
19   stock options in the company what they      12:25:35
20   were -- what they would potentially be      12:25:38
21   worth some day.  So I requested these       12:25:40
22   various documents.  I received the          12:25:42
23   shareholders agreement.  I went through     12:25:45
24   it, and it was I'll have to say -- I've     12:25:50
25   seen probably a hundred shareholders        12:25:53
```

35  (Pages 134 to 137)

VERITEXT REPORTING COMPANY

212-267-6868                                    516-608-2400

**138**

STATE

1
2  agreements. It was the most unusual        12:25:55
3  provision I had ever seen in an agreement   12:25:57
4  like that, that a person would be named     12:25:59
5  specifically as having a role on the board  12:26:01
6  forever, and it just struck me as odd, and  12:26:07
7  I -- I wondered how something like that      12:26:11
8  had gotten in there, and -- and so I just    12:26:14
9  wanted to understand it.                    12:26:17
10     Q.  Were you trying to figure out        12:26:18
11  how to remove Mr. Fried as chairman of the 12:26:21
12  board?                                      12:26:24
13     A.  No, not at all.  I just -- I          12:26:24
14  wanted to understand how -- how a           12:26:27
15  provision like that had come in there.  I   12:26:29
16  knew that there were -- there was certain   12:26:32
17  tension I guess I would call it between     12:26:34
18  Falcon and Apollo and Code Hennessy, and    12:26:36
19  this was a contentious restructuring, and   12:26:39
20  I just didn't see specifically how those    12:26:41
21  words would ever make their way into an     12:26:44
22  agreement without a significant discussion  12:26:47
23  among the parties, and I was looking for    12:26:49
24  some understanding of what all that meant.  12:26:51
25     Q.  Why doesn't this e-mail discuss      12:26:53

**139**

STATE

1
2  any of the agreements that you referred     12:27:00
3  to?                                         12:27:01
4      MS. SELTZER:  I object to the           12:27:02
5  form.                                       12:27:03
6      Q.  About stock --                      12:27:03
7      A.  Of what agreements?                 12:27:04
8      Q.  Options and strike prices.          12:27:05
9      A.  I think there is probably other     12:27:09
10  e-mail that does.  I had requested this     12:27:11
11  information prior to September 14.  If you  12:27:20
12  look at the startup e-mail chain, I think  12:27:22
13  it says this is from Hogan to me.  It says 12:27:24
14  the current securities agreement           12:27:27
15  stipulates that Burt blah blah.            12:27:28
16      So prior to that I had requested        12:27:30
17  that information and asked for it I          12:27:31
18  believe under that -- on this basis.  I am  12:27:34
19  certain I asked for it on that basis        12:27:37
20  because there was a long discussion back   12:27:39
21  and forth about a number of -- those       12:27:40
22  items.                                      12:27:43
23      Q.  Well, in this document you write    12:27:43
24  this is -- well, let me backup.  Mr. Hogan 12:27:49
25  writes to you, "The current investor        12:27:51

**140**

STATE

1
2  securities agreement stipulates that Burt   12:27:54
3  will be on board so long as he is employed  12:27:55
4  by the company.  If he is no longer         12:27:59
5  employed by the company, he may remain on   12:28:01
6  the board or someone else may be elected    12:28:03
7  to take his place with the vote of two of   12:28:05
8  the three major shareholders."              12:28:09
9      You then wrote in response "That        12:28:11
10  is in 4.1 A sub 2 I believe.  In the        12:28:15
11  covenant section 5.1(a)V I think it         12:28:19
12  requires unanimous consent of the          12:28:29
13  investors to remove his as chairman of the 12:28:31
14  board.  Am I missing something?"            12:28:33
15      It appears that you were                12:28:35
16  discussing how to remove Mr. Fried as       12:28:36
17  chairman of the board; is that correct?     12:28:39
18      MS. SELTZER:  Objection.  That          12:28:40
19  is your --                                  12:28:41
20      Q.  I am just asking you --             12:28:41
21      MS. SELTZER:  No, that is not           12:28:43
22  how you phrased it.                         12:28:44
23      Q.  I just said it appears that you     12:28:45
24  were trying to find out how to remove Mr.   12:28:46
25  Fried; is that correct?                     12:28:48

**141**

STATE

1
2      A.  No.                                  12:28:49
3      Q.  Then why -- what -- what did you    12:28:50
4  mean by your response to Mr. Hogan's        12:28:51
5  e-mail?                                      12:28:54
6      A.  It's right there in plain           12:28:54
7  English.  I just said that this provision   12:28:57
8  says this.  You know, I -- look I --        12:28:59
9      Q.  Why were you --                      12:29:02
10     A.  If I had a specific reason why I     12:29:03
11  was asking, it would have been in there.    12:29:05
12  I was reviewing a whole bunch of            12:29:07
13  documents.  I had the first draft of an     12:29:12
14  offer letter.  There were many elements of 12:29:14
15  the offer letter that I had to look at.     12:29:17
16  That was one of them.  I was simply doing   12:29:19
17  due diligence, collecting information.      12:29:22
18     Q.  But why were you having a            12:29:24
19  discussion with Mr. Hogan about how you     12:29:28
20  could remove Mr. Fried as chairman of the  12:29:29
21  board?                                      12:29:31
22     A.  I --                                 12:29:31
23     MS. SELTZER:  Objection.  That           12:29:32
24  is not what there has been discussion       12:29:33
25  about, and you continue to characterize it 12:29:35

**36  (Pages 138 to 141)**

**142**

                    STATE
1
2   as that, but that is not what the document   12:29:36
3   says, and it is certainly not the            12:29:38
4   testimony he's given you.  So he is not      12:29:40
5   going to answer a question that you are      12:29:42
6   creating because that is not what he said,   12:29:44
7   and that is not what the document says.      12:29:46
8   So if you want to move on, let's move on.    12:29:47
9        Q.   I am going to stay on the          12:29:49
10  document.                                    12:29:51
11       A.   Okay.                    12:29:51
12       Q.   Why were you having an e-mail      12:29:51
13  exchange with Mr. Hogan about how Mr.        12:29:54
14  Fried can be removed as chairman of the      12:30:00
15  board?                              12:30:02
16       MS. SELTZER:  Objection.  Asked  12:30:03
17  and answered.                       12:30:04
18       Q.   You can answer it.              12:30:05
19       A.   I don't believe I am having that  12:30:06
20  discussion with him.  I don't say how        12:30:08
21  could he be removed.  I say it requires a    12:30:10
22  unanimous consent.  Is that correct? Is my   12:30:15
23  reading of that correct?  I didn't say I     12:30:19
24  want -- I want to use that in some way.      12:30:20
25       Q.   Why were you asking him that      12:30:23

**143**

                    STATE
1
2   question?                           12:30:25
3        A.   Because it -- as I said, it was   12:30:25
4   the most unusual provision I had ever seen   12:30:27
5   in the shareholders agreement of any         12:30:29
6   company to have a person named, and I was    12:30:31
7   trying to understand -- my thought process   12:30:33
8   at the time is that there is some            12:30:35
9   uncertainty that Falcon has about this       12:30:38
10  investment, and low and behold if you read   12:30:41
11  the top response from him it says, you       12:30:45
12  know, Falcon required this, Falcon being a   12:30:48
13  minority shareholder, and that is -- that    12:30:51
14  is what I wanted to understand.  Falcon is   12:30:53
15  a small shareholder in the company, and      12:30:55
16  there is a long relationship with Burt,      12:30:59
17  and I simply wanted to know how a            12:31:01
18  provision like that, which I viewed to be    12:31:03
19  very unusual, would get into that type of    12:31:05
20  agreement.                          12:31:09
21       Q.   And so do you know why Mr. Hogan  12:31:09
22  wrote at the end of his response to your     12:31:11
23  e-mail "In the end you will run the          12:31:12
24  business and report to the entire board,     12:31:14
25  not solely the chairman"?              12:31:17

**144**

                    STATE
1
2        A.   No. You would have to ask him.    12:31:19
3        Q.   Okay.  Now, other than these two  12:31:21
4   e-mails that we have just reviewed, did      12:31:31
5   you have any other communications with       12:31:33
6   anyone about Mr. Fried's job duties or his   12:31:35
7   role at LVI before you were hired?           12:31:38
8        A.   I -- I don't think so.            12:31:40
9        Q.   Okay.                    12:31:51
10       MR. DATOO:  Joanne, you want to   12:31:58
11  take lunch now?                      12:32:00
12       MS. SELTZER:  Sure.              12:32:01
13       MR. DATOO:  Yes?                12:32:01
14       MS. SELTZER:  Yes.              12:32:02
15       THE VIDEOGRAPHER:  We're going   12:32:03
16  off the record. 12:32 p.m. End of tape      12:32:04
17  number 2.                           12:32:08
18       (Luncheon recess: 12:32 p.m.)      12:32:22
19
20
21
22
23
24
25

**145**

                    STATE
1
2   A F T E R N O O N  S E S S I O N    12:32:22
3        1:46 p.m.                 01:46:52
4        THE VIDEOGRAPHER:  We're          01:46:52
5   returning to the record.  1:46 p.m.    01:46:52
6   beginning of tape number 3.           01:46:55
7   S C O T T   S T A T E, resumed.       01:46:55
8   CONTINUED EXAMINATION                 01:46:55
9   BY MR. DATOO:                       01:46:58
10       Q.   Mr. State, if I could draw your  01:46:58
11  attention to Plaintiff's Exhibit 22.   01:47:00
12       A.   I have that here?              01:47:05
13       Q.   Which should be in that stack of  01:47:06
14  documents if you can find it.          01:47:08
15       A.   Okay.                    01:47:20
16       Q.   Perfect.  And just if you can     01:47:20
17  continue to keep that in front of you, I    01:47:22
18  am going to hand you a document that is      01:47:26
19  going to be marked as Plaintiff's Exhibit   01:47:28
20  39.                                 01:47:52
21       (Plaintiff's Exhibit 39 marked    01:47:53
22  for identification.)                 01:47:55
23       (Document handed to witness).     01:47:56
24       Q.   Mr. State, do you have          01:47:57
25  Plaintiff's Exhibit 22 and Plaintiff's     01:47:58

**37  (Pages 142 to 145)**

**146**

| | | |
|---|---|---|
| 1 | STATE | |
| 2 | Exhibit 39 in front of you, both of them | 01:48:00 |
| 3 | in front of you? | 01:48:02 |
| 4 | A. Yes. | 01:48:03 |
| 5 | Q. Perfect. Going back to the line | 01:48:03 |
| 6 | of questioning I asked you earlier | 01:48:05 |
| 7 | regarding a press release, do you recall | 01:48:07 |
| 8 | that? | 01:48:09 |
| 9 | A. I do. | 01:48:09 |
| 10 | Q. And one of the questions I asked | 01:48:10 |
| 11 | you is if you approved the contents of the | 01:48:14 |
| 12 | press release which was | 01:48:19 |
| 13 | previously -- which was Plaintiff's | 01:48:24 |
| 14 | Exhibit 17. | 01:48:26 |
| 15 | A. Right. | 01:48:30 |
| 16 | Q. Do you recall that? | 01:48:31 |
| 17 | A. Right. Yes. | 01:48:32 |
| 18 | Q. And there was a little confusion | 01:48:32 |
| 19 | over whether you approved the contents of | 01:48:34 |
| 20 | Plaintiff's Exhibit 17 or if you approved | 01:48:40 |
| 21 | the contents of certain attachments to an | 01:48:42 |
| 22 | e-mail that is embedded in Plaintiff's | 01:48:47 |
| 23 | Exhibit 22; is that correct? | 01:48:51 |
| 24 | A. Correct. | 01:48:54 |
| 25 | Q. Okay. If I can draw your | 01:48:54 |

**147**

| | | |
|---|---|---|
| 1 | STATE | |
| 2 | attention to Plaintiff's Exhibit 39, did | 01:48:59 |
| 3 | you approve the contents of the last four | 01:49:08 |
| 4 | pages of Plaintiff's Exhibit 39? | 01:49:18 |
| 5 | A. I -- I believe I did, but | 01:49:39 |
| 6 | it's -- this is quite a bit different from | 01:49:43 |
| 7 | what finally went out I guess, but I would | 01:49:48 |
| 8 | say in general yes. | 01:49:58 |
| 9 | Q. Okay. In going back to a | 01:50:00 |
| 10 | question that I had earlier, you see in | 01:50:02 |
| 11 | the first paragraph of Plaintiff's 39 -- | 01:50:07 |
| 12 | A. Yes. | 01:50:12 |
| 13 | Q. -- the last sentence of the | 01:50:12 |
| 14 | first paragraph. What did you understand | 01:50:14 |
| 15 | that sentence to mean with reference to | 01:50:19 |
| 16 | "Mr. Fried will continue to play an active | 01:50:26 |
| 17 | role in supporting the company's expansion | 01:50:31 |
| 18 | into new service areas and geographies"? | 01:50:34 |
| 19 | A. Just what the words say. He | 01:50:38 |
| 20 | would have an active role as we required | 01:50:40 |
| 21 | to help us. | 01:50:42 |
| 22 | Q. And what did you envision that | 01:50:43 |
| 23 | role being at this point in time when you | 01:50:44 |
| 24 | approved the contents of this document? | 01:50:46 |
| 25 | A. I don't know that I envisioned | 01:50:51 |

**148**

| | | |
|---|---|---|
| 1 | STATE | |
| 2 | it to be anything at that time. | 01:50:53 |
| 3 | Q. Okay. I also want to go back to | 01:50:54 |
| 4 | a line of questioning I asked you earlier | 01:51:01 |
| 5 | about conversations you had with Mr. Fried | 01:51:04 |
| 6 | prior to your hiring. | 01:51:09 |
| 7 | Do you recall those questions? | 01:51:10 |
| 8 | A. I do. | 01:51:12 |
| 9 | Q. In one -- in one of your | 01:51:12 |
| 10 | responses I believe you testified that in | 01:51:15 |
| 11 | one conversation you had with Mr. Fried he | 01:51:18 |
| 12 | said something to you along the lines of I | 01:51:22 |
| 13 | am 71 years old. I don't want to keep | 01:51:26 |
| 14 | doing this or words to that effect. | 01:51:31 |
| 15 | Do you recall testifying to | 01:51:33 |
| 16 | that? | 01:51:34 |
| 17 | A. Yes. | 01:51:34 |
| 18 | Q. And I believe you testified that | 01:51:35 |
| 19 | you may have had that conversation with | 01:51:36 |
| 20 | Mr. Fried in or about August of 2010? | 01:51:38 |
| 21 | MS. SELTZER: Objection. I | 01:51:43 |
| 22 | don't think he testified to that. | 01:51:44 |
| 23 | A. I am not sure -- I think he said | 01:51:45 |
| 24 | it was between August 10 and September 23. | 01:51:47 |
| 25 | Q. Okay. | 01:51:50 |

**149**

| | | |
|---|---|---|
| 1 | STATE | |
| 2 | A. Sometime in that time frame. | 01:51:51 |
| 3 | Q. And is that when you had your | 01:51:52 |
| 4 | series of conversations with Mr. Fried? | 01:51:55 |
| 5 | A. I -- I believe so. | 01:51:58 |
| 6 | Q. Okay. And I believe you | 01:51:59 |
| 7 | testified that either the day you accepted | 01:52:01 |
| 8 | the offer from LVI or the day before that | 01:52:04 |
| 9 | you had a conversation -- excuse | 01:52:07 |
| 10 | me -- with Mr. Fried in which he told you | 01:52:15 |
| 11 | what some of his job duties were under | 01:52:15 |
| 12 | McNamara; is that correct? | 01:52:18 |
| 13 | A. I -- I believe that is correct. | 01:52:19 |
| 14 | Yes. | 01:52:21 |
| 15 | Q. And I just want to make -- I | 01:52:22 |
| 16 | want to inquire into that conversation or | 01:52:25 |
| 17 | perhaps the one before that. | 01:52:30 |
| 18 | Did Mr. Fried make that comment | 01:52:31 |
| 19 | about his age during that | 01:52:35 |
| 20 | conversation -- that last | 01:52:39 |
| 21 | conversation you had with Mr. Fried where | 01:52:40 |
| 22 | he told you what his job duties were under | 01:52:42 |
| 23 | Mr. McNamara or was this a different | 01:52:45 |
| 24 | conversation? | 01:52:47 |
| 25 | A. I -- I don't know. I can't | 01:52:48 |

**38  (Pages 146 to 149)**

150

```
1              STATE
2    remember.                    01:52:53
3    Q.   And was -- was it a telephone   01:52:53
4    conversation or face to face?   01:52:55
5    A.   It was telephone.        01:52:56
6    Q.   And was anyone else on the line?  01:52:58
7    A.   Not that I am aware.      01:53:00
8    Q.   And do you know how long that   01:53:06
9    conversation lasted?          01:53:07
10   A.   Probably no more than fifteen   01:53:08
11   minutes.                      01:53:10
12   Q.   Okay.  And what else -- what did  01:53:10
13   you discuss for the fifteen minutes?  01:53:12
14   A.   Which conversation are we   01:53:14
15   talking about?                01:53:19
16   Q.   On the -- the last one you had   01:53:20
17   with Mr. Fried immediately before you   01:53:23
18   accepted your offer.          01:53:25
19   A.   As I recall, the discussion was   01:53:29
20   specifically about the offer, the path   01:53:31
21   forward, just general -- general things   01:53:36
22   like that.                    01:53:39
23   Q.   What do you mean by the path   01:53:40
24   forward?                      01:53:42
25   A.   The company moving forward,   01:53:42
```

151

```
1              STATE
2    business objectives, that sort of thing.  01:53:44
3    Q.   And -- and the conversation that   01:53:46
4    you had with Mr. Fried where -- where he   01:53:50
5    made this comment about his age, how long   01:53:55
6    was that conversation?        01:53:57
7    A.   I -- I don't remember.  I -- it   01:53:59
8    may have been in that conversation you're   01:54:03
9    speaking about.  I don't remember   01:54:05
10   specifically which conversation that   01:54:06
11   occurred in.                  01:54:09
12   Q.   Do you know when Mr. Fried made   01:54:10
13   that remark was anyone else a part of that   01:54:16
14   conversation?                 01:54:20
15   A.   I -- I think it was just he and   01:54:20
16   I on the phone.               01:54:24
17   Q.   And you don't recall -- you   01:54:25
18   don't know how long that conversation   01:54:28
19   lasted if it was a separate conversation?   01:54:29
20   A.   No.                      01:54:31
21   Q.   What is your annual salary?   01:54:31
22   A.   4 --                     01:54:42
23   Q.   As CEO --                01:54:43
24   MS. SELTZER:  I thought you   01:54:45
25   were going to get into --      01:54:46
```

152

```
1              STATE
2    MR. DATOO:  No.               01:54:48
3    A.   400,000 dollars per year.   01:54:49
4    Q.   And what is your total      01:54:51
5    compensation package?         01:54:52
6    A.   That is undecided I guess.   01:54:53
7    Q.   Is it because it is based on a   01:54:56
8    bonus?                        01:54:59
9    A.   There -- there is a bonus   01:54:59
10   component, but I don't have an employment   01:55:02
11   agreement with the company.   01:55:03
12   Q.   You don't have an employment   01:55:05
13   agreement?                    01:55:06
14   A.   No.                      01:55:06
15   Q.   Is one in the works?       01:55:07
16   A.   I think there is one being   01:55:08
17   worked on, yes.               01:55:10
18   Q.   Okay.                    01:55:11
19   (Plaintiff's Exhibit 23 marked   01:56:11
20   for identification.)          01:56:13
21   (Document handed to witness.)   01:56:14
22   Q.   Mr. State, you have in front of   01:56:21
23   you a document marked Plaintiff's Exhibit   01:56:22
24   23.                           01:56:24
25   Have you seen this document   01:56:26
```

153

```
1              STATE
2    before?                       01:56:28
3    A.   Yes.                     01:56:29
4    Q.   Does your signature appear on   01:56:29
5    this document?                01:56:34
6    A.   My signature appears here, but I   01:56:36
7    am trying to remember if this is -- if   01:56:39
8    this signature page is with the correct   01:56:42
9    version of this document.  I am not   01:56:45
10   certain it is, and I say that because for   01:56:47
11   some reason I think acceptance -- the   01:56:50
12   offer I accepted I thought was on the   01:56:54
13   23rd, but that is just my recollection.   01:56:58
14   Q.   Is this --               01:57:06
15   A.   It may not be material.  I   01:57:07
16   am -- I am just saying that this offer was   01:57:09
17   revised once or more than once, and I   01:57:12
18   thought that the last version of this was   01:57:15
19   dated September 23, and this is dated   01:57:18
20   September 22.                 01:57:21
21   Q.   Did you sign a version that was   01:57:22
22   dated September 22?           01:57:23
23   A.   No, but this signature page is   01:57:25
24   correct.  I'm just not sure.  If you look   01:57:27
25   at the bottom of that page, it's got a   01:57:31
```

39 (Pages 150 to 153)

**154**

```
1            STATE
2   document tracking number on it.        01:57:35
3      Q.   Uh-huh.                        01:57:37
4      A.   The rest of the pages don't have  01:57:37
5   that.  See I don't -- like I said, I don't  01:57:39
6   know.  I don't know that there is any   01:57:42
7   material difference.  It is just --    01:57:44
8      Q.   Yes.                           01:57:45
9      A.   I am not sure.                 01:57:45
10     Q.   I am presenting this document to  01:57:46
11  you as it was given to us by counsel.  01:57:48
12     A.   I -- I understand.  Yes.       01:57:49
13     Q.   Is this an offer letter you    01:57:52
14  signed or is this your employment      01:57:53
15  contract?                              01:57:55
16     A.   This is an offer letter.       01:57:55
17     Q.   Okay.  And why did you -- why is  01:57:57
18  there an employment contract being     01:58:02
19  negotiated now as opposed to before you  01:58:05
20  started employment?                    01:58:07
21     A.   I think because the offer letter  01:58:08
22  was presented either on the 22nd or 23rd,  01:58:12
23  as I indicated, and I was expected to  01:58:16
24  start within a week.  And so those     01:58:19
25  terms -- I think it was turned over to the  01:58:24
```

**155**

```
1            STATE
2   attorneys.  Essentially this offer letter  01:58:26
3   was turned over to the attorneys as a  01:58:28
4   document to start with to draft an     01:58:30
5   employment agreement.                  01:58:32
6      Q.   Okay.  Do you know why it's    01:58:33
7   taken so long?                         01:58:38
8      A.   I think people have just been  01:58:38
9   busy.                                  01:58:40
10     Q.   Does that bother you?          01:58:40
11     A.   No.                            01:58:42
12     Q.   Okay.  Do you know if the terms  01:58:42
13  of your employment agreement are going to  01:58:49
14  vary substantially from the offer letter?  01:58:51
15     A.   Let me look.  Salary, no;      01:58:52
16  management incentive, no.  Equity plan,  01:58:59
17  there will be some differences there.  01:59:08
18  Other provisions, no; benefits, no;    01:59:14
19  expense reimbursement, no.             01:59:18
20     Q.   With respect to the equity plan,  01:59:24
21  do you know how that is going to vary?  Is  01:59:28
22  that still -- let me back up.          01:59:30
23          Is that still subject to       01:59:31
24  negotiation?                           01:59:34
25     A.   It has been subject to         01:59:35
```

**156**

```
1            STATE
2   negotiation.  I believe there is       01:59:37
3   essentially an agreement in principle on  01:59:39
4   what that is going to look like.       01:59:41
5      Q.   And how does that differ from  01:59:48
6   the offer letter you signed?           01:59:48
7      A.   The basic terms don't differ  01:59:48
8   substantially.  What is different is as we  01:59:50
9   progressed through the end of last year  01:59:54
10  the company's performance was plummeting,  01:59:56
11  and by the end of the year the         02:00:00
12  structure of this -- and this gets back to  02:00:03
13  a lot of my initial questions about this  02:00:12
14  before I accepted the offer.  The fair  02:00:14
15  market value of the company by the end of  02:00:17
16  the year was zero or less due to just  02:00:19
17  essentially a fourth quarter that was  02:00:21
18  horrific.                              02:00:23
19          And so since we hadn't agreed to  02:00:23
20  an employment contract by that date, I  02:00:26
21  went to the investors and said, look, the  02:00:31
22  strike price on the options in here    02:00:33
23  assumes a value of the company of 40   02:00:35
24  million dollars, and today it is       02:00:38
25  worthless, and the reasons it is worthless  02:00:40
```

**157**

```
1            STATE
2   are subject to a lot of problems       02:00:46
3   that -- that were present in the company  02:00:50
4   at the time I accepted the offer but in my  02:00:52
5   opinion hadn't been properly disclosed to  02:00:54
6   me.                                    02:00:57
7          And so there were further       02:00:58
8   discussions about how to account for the  02:00:59
9   fact that the company's value was      02:01:02
10  potentially substantially different than  02:01:04
11  it had been represented, and as a result  02:01:06
12  we -- we did some reconfiguration on that.  02:01:10
13     Q.   All right.  So how is it       02:01:17
14  different than what is written here?   02:01:19
15     A.   As I said, the general         02:01:20
16  provisions are the same.  There is     02:01:22
17  adjustment in the way the strike price for  02:01:26
18  the options essentially would be       02:01:30
19  calculated to account for the fact that  02:01:32
20  the value of the company was substantially  02:01:35
21  less than that strike price would have  02:01:37
22  tied to at the time I took the job.    02:01:40
23     Q.   You just mentioned that there  02:01:43
24  were some problems with the company that  02:01:47
25  were not disclosed to you before you   02:01:50
```

**40  (Pages 154 to 157)**

158

```
1              STATE
2    accepted; is that correct?              02:01:52
3       A.   That's correct.                 02:01:53
4       Q.   What -- what problems are you    02:01:54
5    referring to?                           02:01:56
6       A.   There were projects that were   02:01:57
7    performing badly that bonus -- early    02:01:59
8    completion bonus, for example, on a     02:02:05
9    project had been taken for 130 Liberty  02:02:07
10   Street to the tune of about 2 million   02:02:11
11   dollars, which we had to completely     02:02:12
12   reverse out in the fourth quarter.      02:02:14
13   It -- just a number of different project 02:02:19
14   performance issues that hadn't probably 02:02:21
15   been vetted out very well at that point in 02:02:23
16   time and as a result the earnings of the 02:02:25
17   company, as it was presented to me in   02:02:29
18   September, a big part of that was reversed 02:02:32
19   out in the fourth quarter prior to year  02:02:38
20   end closing.                            02:02:40
21      Q.   What do you mean by reversed     02:02:41
22   out?                                    02:02:44
23      A.   The company had booked up profit 02:02:44
24   on projects that wasn't real, and when we 02:02:48
25   got towards the end of those projects and 02:02:54
```

159

```
1              STATE
2    most notable is the 130 Liberty project 02:02:57
3    where the company at some point in      02:03:00
4    probably March or April -- we are       02:03:04
5    currently investigating -- had booked an 02:03:09
6    early completion bonus for that project to 02:03:14
7    be completed by the end of the year. It  02:03:17
8    is very unusual that you would book an   02:03:20
9    early completion bonus nine months before 02:03:22
10   you are scheduled to complete the job.   02:03:24
11   That is bonus being paid earlier.        02:03:26
12      Q.   Is that because you are          02:03:28
13   anticipating too far in advance that it is 02:03:29
14   going to be completed early?             02:03:31
15      A.   That's correct.                  02:03:33
16      Q.   Okay.                            02:03:34
17      A.   So that bonus was booked. It     02:03:34
18   inflated earnings in probably the second 02:03:37
19   quarter of the year, second or third     02:03:39
20   quarter, and by the fourth quarter it was 02:03:40
21   fully understood that not only was the   02:03:42
22   company not going to finish early the    02:03:44
23   company was going to finish substantially 02:03:47
24   late, and as a result we sustained       02:03:48
25   liquidated damage claims of a million    02:03:53
```

160

```
1              STATE
2    dollars.                                02:03:56
3       Q.   With respect to the 130 Liberty 02:03:56
4    Street project, who is responsible for I 02:04:00
5    guess booking the early completion bonus? 02:04:04
6       A.   That would have been done by    02:04:07
7    senior management.                      02:04:08
8       Q.   Do you know who?                02:04:10
9       A.   It would have been Burt and Paul 02:04:10
10   Cutrone and maybe John Leonard.         02:04:13
11      Q.   And when -- do you know when    02:04:15
12   this -- when the early bonus was booked? 02:04:19
13      A.   I am not certain. I -- as I     02:04:23
14   said, we are investigating that right now. 02:04:25
15      Q.   Okay. So you just think it was  02:04:27
16   senior management at this point?        02:04:29
17      A.   It had to do it. Those          02:04:31
18   decisions are made at month end closings. 02:04:33
19      Q.   But you don't know when         02:04:35
20   the -- when the early bonus was booked? 02:04:37
21      A.   No.                             02:04:39
22      Q.   And your investigation is still 02:04:44
23   ongoing?                                02:04:46
24      A.   Yes.                            02:04:46
25      Q.   Are there any other projects    02:04:47
```

161

```
1              STATE
2    that were performing badly?             02:04:49
3       A.   I know in different regions that 02:04:51
4    there were small projects that we had   02:04:59
5    issues with. At the company -- I believe 02:05:01
6    at the time I joined the company we were 02:05:03
7    projecting about 17 million dollars in  02:05:06
8    earnings before interest, taxes,        02:05:09
9    depreciation and amortization, and the  02:05:11
10   company finished at year end at 12 and a 02:05:13
11   half. So it was nearly a 5 million dollar 02:05:16
12   swing from what was expected at the end of 02:05:18
13   September to what really occurred three  02:05:21
14   months later.                           02:05:23
15      Q.   Did you -- is the reason the 12 02:05:30
16   and a half million -- did you arrive at  02:05:32
17   the 12 and a half million figure because 02:05:37
18   you took certain -- the company took     02:05:39
19   certain reserves?                        02:05:41
20      A.   No.                              02:05:42
21      Q.   How about write-downs?           02:05:42
22      A.   Write-downs absolutely. That is  02:05:44
23   what 130 Liberty is. Basically it is a   02:05:46
24   write-down.                             02:05:51
25      Q.   Okay. How much of a write-down  02:05:51
```

**41 (Pages 158 to 161)**

162

```
 1              STATE
 2   was 130 Liberty?                    02:05:53
 3      A.   The early completion bonus was  02:05:55
 4   about 2 million, and I think the project  02:05:57
 5   itself we probably wrote down another 2  02:06:00
 6   million.                            02:06:02
 7      Q.   Why is that?                02:06:03
 8      A.   The performance on the job. We  02:06:03
 9   were nearing completion by the end of the  02:06:07
10   year, and we calculated performance on the  02:06:08
11   job and realized that the job was way off  02:06:11
12   plan.                               02:06:14
13      Q.   And who is responsible for that?  02:06:15
14      A.   For?                       02:06:17
15      Q.   The job being way off plan.   02:06:18
16      A.   I -- I mean I don't know      02:06:20
17   who -- the performance of the job took a  02:06:25
18   lot longer and cost a lot more than was  02:06:27
19   planned.                            02:06:31
20      Q.   Is there someone to blame for  02:06:31
21   that?                               02:06:33
22      A.   I don't know if there was anyone  02:06:33
23   specific to blame for something like that.  02:06:37
24   It is an issue where the estimate to do  02:06:40
25   the work was not correct relative to the  02:06:42
```

163

```
 1              STATE
 2   cost that it ultimately took to finish the  02:06:45
 3   job.                                02:06:50
 4      Q.   Whose -- in this -- in the 130  02:06:51
 5   Liberty case, who -- do you know who was  02:06:54
 6   involved in the estimate?            02:06:57
 7      A.   It was before my time.       02:06:58
 8      Q.   Okay.   Prior to accepting the  02:07:00
 9   offer from LVI, did you meet with Paul  02:07:14
10   Cutrone to discuss the financial condition  02:07:17
11   of the company?                     02:07:20
12      A.   I met with Paul Cutrone in early  02:07:21
13   August when I met the senior management  02:07:24
14   team of the company, and I requested from  02:07:25
15   Rob Hogan, which I know there is      02:07:28
16   documentation to support this, in addition  02:07:31
17   to the shareholder agreements certain  02:07:35
18   financial statements, that type of thing.  02:07:36
19   I did not meet with Paul Cutrone again  02:07:40
20   after that initial meeting in August prior  02:07:43
21   to accepting employment.             02:07:46
22      Q.   Do you blame anyone for not  02:07:48
23   disclosing certain problems to you?   02:07:55
24      A.   Do I blame anyone --         02:07:57
25      Q.   Yes.                        02:08:00
```

164

```
 1              STATE
 2      A.   I mean what do you mean? I --  02:08:01
 3      Q.   You said that there were certain  02:08:03
 4   problems with the company that were not  02:08:05
 5   disclosed to you --                 02:08:07
 6      A.   I think --                  02:08:08
 7      Q.   -- before you accepted your  02:08:10
 8   offer.                              02:08:11
 9      A.   I mean I think there were issues  02:08:11
10   with the company that were just not  02:08:13
11   discussed.                          02:08:15
12      Q.   Okay. And who -- is that      02:08:15
13   anyone's fault?                     02:08:18
14      A.   I don't know.  I guess we are  02:08:19
15   going to find out.                  02:08:20
16      Q.   Okay.  So you -- is your      02:08:21
17   investigation going beyond the -- certain  02:08:24
18   projects? Is it also going into why  02:08:31
19   certain people didn't disclose certain  02:08:35
20   things to you?                      02:08:37
21      A.   We are looking at everything.  02:08:37
22      Q.   Okay.  When did this          02:08:42
23   investigation start?                02:08:48
24      A.   Around the time of the February  02:08:49
25   board meeting I would guess.  It is when  02:08:58
```

165

```
 1              STATE
 2   we had like the first view of what the  02:09:01
 3   2010 closing was going to look like.  02:09:05
 4      Q.   And why are you investigating  02:09:07
 5   this?                               02:09:08
 6      A.   I want to understand what      02:09:09
 7   happened.  I -- you know, you said who do  02:09:11
 8   you blame? Well, I am not saying I want to  02:09:14
 9   blame anyone.  I'd just like to understand  02:09:16
10   the -- from estimating to performance to  02:09:18
11   the end how we end up with a job that  02:09:24
12   turned so bad so quick.             02:09:26
13      Q.   And in connection with that,  02:09:27
14   you're also looking into why certain  02:09:29
15   things weren't disclosed to you or weren't  02:09:30
16   discussed?                          02:09:33
17      A.   Yes, I mean -- it is the whole  02:09:34
18   thing.  I -- there is -- there is a lot of  02:09:36
19   issues with that project.  The -- the  02:09:38
20   performance of the work that became very  02:09:45
21   questionable was contracted with Mr.  02:09:46
22   McNamara one day before he resigned from  02:09:49
23   the company, and he went to work for the  02:09:52
24   client that we were working for that we  02:09:55
25   are now in a situation where we have got 4  02:09:57
```

42  (Pages 162 to 165)

**166**

STATE

```
1          STATE
2   million dollars less margin than we        02:10:01
3   thought 90 days earlier.                    02:10:03
4       Q.   So you think -- it is your -- do   02:10:05
5   you think there may be some wrongdoing on   02:10:08
6   Mr. McNamara's part?                        02:10:10
7       A.   I don't know.                      02:10:12
8       Q.   Okay.  That is what you are        02:10:13
9   looking into?                               02:10:14
10      A.   I don't know.  We are looking at   02:10:15
11  everything, and we will make some           02:10:17
12  decisions based on that.                    02:10:18
13      Q.   Okay.  After you started working   02:10:20
14  at LVI, do you know what Mr. Fried's job    02:10:25
15  tile was?                                   02:10:31
16      A.   After I started working there?     02:10:33
17      Q.   Yes.                               02:10:35
18      A.   Chairman I believe.                02:10:35
19      Q.   Chairman.  Okay.                   02:10:36
20          So obviously the interim CEO tag    02:10:37
21  was removed, correct?                       02:10:40
22      A.   Somewhere along -- I -- I wasn't   02:10:42
23  involved with that, but I presume           02:10:46
24  somewhere that was removed.                 02:10:47
25      Q.   Okay.                              02:10:49
```

**167**

```
1          STATE
2       A.   If it ever existed, I assume it   02:10:50
3   was, yes.                                   02:10:52
4       Q.   His -- when he was interim CEO?   02:10:53
5       A.   Yes, I don't know -- I            02:10:56
6   wasn't -- I wasn't there, so I don't know   02:10:58
7   how that was done.                          02:11:01
8       Q.   And when you started, do you      02:11:01
9   know what Mr. Fried's job duties were at    02:11:07
10  LVI?                                        02:11:09
11      A.   Okay.  Let -- can you maybe       02:11:10
12  define that better.  When -- when I         02:11:17
13  started, and he was now chairman --         02:11:19
14      Q.   Yes.                               02:11:23
15      A.   -- do I know what his duties       02:11:23
16  were as chairman?                           02:11:25
17      Q.   Yes.                               02:11:25
18      A.   Is that the question?             02:11:26
19      Q.   Yes.                               02:11:27
20      A.   Okay.  Thank you.                 02:11:27
21          No.                                 02:11:28
22      Q.   Okay.  Did there come a time      02:11:29
23  when you found out -- when you found out    02:11:32
24  what his duties were as chairman?           02:11:34
25      A.   Yes, prior to --                  02:11:36
```

**168**

```
1          STATE
2       Q.   I am sorry.  Sorry let me back    02:11:40
3   up.  I just want to clarify the time frame  02:11:42
4   for you.                                    02:11:44
5       A.   Okay.                              02:11:44
6       Q.   Did there come a time when you    02:11:45
7   found out what Mr. Fried's job duties were  02:11:46
8   as chairman after you started working at    02:11:48
9   LVI?                                        02:11:50
10          MS. SELTZER:  I am sorry,           02:11:51
11  Shaffin.  At the time he started at LVI,    02:11:52
12  are you asking him if he -- if he found     02:11:59
13  out what his duties were as chairman        02:12:02
14  during the time that he was working there?  02:12:04
15          MR. DATOO:  Yes.                   02:12:07
16          MS. SELTZER:  Okay.                02:12:08
17      A.   I -- I was provided by Burt on I   02:12:09
18  believe October 14 --                       02:12:12
19      Q.   Okay.                              02:12:13
20      A.   -- a list of areas of            02:12:14
21  responsibilities, which was subsequently    02:12:17
22  modified slightly on October 19, which I    02:12:23
23  think is the first exhibit that you showed  02:12:26
24  me or one of the first exhibits.            02:12:28
25      Q.   Okay.  So between the time that   02:12:30
```

**169**

```
1          STATE
2   you started and between the time Mr. Fried  02:12:36
3   provided you with this list of duties, do   02:12:40
4   you know what he was doing at LVI?          02:12:45
5       A.   I think he was actively working   02:12:47
6   transitioning projects that he had been     02:12:52
7   involved with as CEO to myself.  Just       02:12:54
8   general transition.  I think the -- the     02:12:59
9   term -- I know there was an e-mail          02:13:05
10  exchange with Burt at one point called      02:13:07
11  transition matters or something like that,  02:13:09
12  and we were transitioning things that he    02:13:10
13  had picked up as interim CEO to me.         02:13:13
14      Q.   And other than the CEO duties      02:13:15
15  that he was transitioning to you, was he    02:13:24
16  doing anything else other than              02:13:28
17  transitioning?                              02:13:30
18      A.   I don't know.                      02:13:31
19      Q.   Do you know what he was working    02:13:32
20  on?                                         02:13:35
21      A.   Yes.  We were involved in a       02:13:35
22  number of different projects, and there     02:13:38
23  was a transition on -- we took over a       02:13:41
24  small company in the Baltimore area.        02:13:46
25  There was a transition ongoing related to   02:13:50
```

**43  (Pages 166 to 169)**

VERITEXT REPORTING COMPANY

170

```
1           STATE
2    that, which was taking substantial time.    02:13:52
3    We had a -- an initial relationship    02:13:58
4    developing with a company in the UK.  We    02:14:04
5    had -- let me see what else.  I    02:14:06
6    can't -- we are talking about a fairly    02:14:16
7    small window of time.  I can't remember.    02:14:17
8    I was just coming into a company with a    02:14:19
9    lot of things going on so --    02:14:22
10       Q.   And he was transitioning that to    02:14:23
11   you?    02:14:25
12       A.   Yes.    02:14:26
13       Q.   Okay.  And were there other    02:14:26
14   duties or other things that he was doing    02:14:28
15   other than transitioning things to you?    02:14:30
16       A.   I don't know.    02:14:33
17       Q.   Okay.  Did you ask him to    02:14:34
18   transition other duties that were not    02:14:37
19   picked up by him as interim CEO to other    02:14:42
20   people?    02:14:45
21       MS. SELTZER:  I object to the    02:14:46
22   form of the question.  If you understand    02:14:47
23   it --    02:14:50
24       A.   I -- well, I think -- I think I    02:14:51
25   may -- are you asking if there were duties    02:14:55
```

171

```
1           STATE
2    that were not duties that Burt had under    02:14:57
3    the position as interim CEO that were    02:15:00
4    being transferred to others?    02:15:04
5        Q.   Yes.    02:15:08
6        A.   I don't believe so.    02:15:08
7        Q.   Did you ask him to transition    02:15:15
8    non-CEO duties to other people?    02:15:16
9        A.   I don't know that -- he had no    02:15:18
10   specific duties other than the    02:15:21
11   none -- than the CEO duties that I was    02:15:25
12   aware of in this time frame until October    02:15:25
13   14 when I was provided a list that said    02:15:27
14   here is what I believe my duties are.    02:15:30
15       Q.   And --    02:15:34
16       A.   Prior to that, I had no    02:15:35
17   documentation of any of those things.    02:15:36
18       Q.   Okay.  I am going to hand you a    02:15:38
19   document.  It is going to be marked    02:16:27
20   Plaintiff's 24.    02:16:49
21       (Plaintiff's Exhibit 24 marked    02:16:51
22   for identification.)    02:16:53
23       (Document handed to witness.)    02:16:53
24       Q.   Please take a look at that    02:16:53
25   document and let me know if you have ever    02:16:55
```

172

```
1           STATE
2    seen it before.    02:16:56
3        MS. SELTZER:  May I have a    02:16:58
4    copy?    02:16:59
5        MR. DATOO:  I'm sorry, Joanne.    02:17:00
6        MS. SELTZER:  That's okay.    02:17:03
7        A.   It's got my name on it.  I am    02:17:06
8    not familiar with it.    02:17:08
9        Q.   Do you have any reason to doubt    02:17:09
10   that you sent these e-mails or received    02:17:14
11   these e-mails?    02:17:17
12       A.   I think there is just one e-mail    02:17:17
13   here, isn't there, or is it a series -- a    02:17:20
14   chain.    02:17:25
15       Q.   I think it is a chain.    02:17:25
16       A.   No.    02:17:26
17       Q.   And this -- this e-mail chain is    02:17:27
18   dated October 7, 2010, correct?    02:17:32
19       A.   It is -- the -- yes.    02:17:34
20       Q.   So --    02:17:40
21       A.   Yes, it looks like everything    02:17:40
22   was on October 7.    02:17:42
23       Q.   And this is about a week after    02:17:49
24   you started?    02:17:50
25       A.   Roughly, yes.    02:17:51
```

173

```
1           STATE
2        Q.   Who is Peter Roose?    02:17:52
3        A.   I have no idea.    02:17:57
4        Q.   Okay.  Who is Brian Messisco?    02:17:58
5        A.   He is a former LVI employee.    02:18:04
6        Q.   Do you know what his title was?    02:18:07
7        A.   I believe vice president, but I    02:18:10
8    am not certain.    02:18:14
9        Q.   Do you know of what entity?    02:18:14
10       A.   No.  Well, according to this he    02:18:17
11   worked for LVI Services, Inc.    02:18:20
12       Q.   Do you know what he -- was he a    02:18:22
13   vice president of a certain area?    02:18:25
14       A.   He was involved in business    02:18:27
15   development.    02:18:28
16       Q.   Do you know what office he    02:18:29
17   worked at?    02:18:34
18       A.   He worked in North Carolina.    02:18:34
19       Q.   Was he responsible for business    02:18:37
20   development for a certain region or a    02:18:43
21   certain area?    02:18:46
22       A.   His primary involvement was in    02:18:46
23   the I would call mid Atlantic.  He was    02:18:48
24   involved quite a bit in Washington D.C.,    02:18:53
25   but he kind of traveled in different    02:18:55
```

44  (Pages 170 to 173)

VERITEXT REPORTING COMPANY

212-267-6868                                                   516-608-2400

174

```
 1          STATE
 2  areas.                        02:18:58
 3     Q.  Do you know what project this   02:18:58
 4  e-mail is referring to?           02:19:00
 5     A.  I have no idea.            02:19:02
 6     Q.  Do you know if Mr. Fried was   02:19:12
 7  previously working on this project?    02:19:13
 8     A.  I have no idea.            02:19:15
 9     Q.  Do you recall why you asked Mr.  02:19:16
10  Messisco to tell Burt that he would now be  02:19:26
11  working with you on this project?    02:19:31
12     A.  Yes, because I was the CEO of   02:19:33
13  the company.                 02:19:39
14     Q.  And do you know what kind of   02:19:39
15  project this was?              02:19:41
16     A.  I -- I don't believe there was   02:19:41
17  any project at all.  I believe, if I read   02:19:43
18  this, it looks to me like this was a   02:19:46
19  company that was interested in some kind   02:19:48
20  of a venture, an undescribed venture   02:19:51
21  with -- with LVI.               02:19:55
22     Q.  So would this be one of the CEO   02:19:56
23  duties that Mr. Fried was transitioning to   02:19:59
24  you?                       02:20:02
25     A.  Yes, I think so.           02:20:02
```

175

```
 1          STATE
 2     Q.  Okay.  And do you know if Mr.   02:20:03
 3  Fried or did you permit Mr. Fried to have   02:20:12
 4  any involvement in this project?     02:20:14
 5     A.  I honestly don't know anything   02:20:16
 6  about this project.  I mean I recognize   02:20:19
 7  this name.  I had no involvement with   02:20:24
 8  this.  I don't know if there was ever any   02:20:26
 9  follow-up with this.  I don't know who did   02:20:28
10  or didn't meet with any of these people.   02:20:29
11     Q.  You don't know or you just don't   02:20:32
12  remember?                   02:20:34
13     A.  I don't know.             02:20:35
14     MR. DATOO:  25.             02:20:58
15     (Plaintiff's Exhibit 25 marked   02:21:00
16  for identification.)              02:21:01
17     (Document handed to witness.)    02:21:01
18     Q.  Mr. State, you have in front of   02:21:03
19  you a document that is been marked as   02:21:04
20  Plaintiff's Exhibit 25.            02:21:06
21     Can you take a look at the      02:21:07
22  document and let me know if you've seen it   02:21:09
23  before.                     02:21:11
24     (Pause.)                  02:21:30
25     A.  I am sure I have.  It doesn't   02:21:30
```

176

```
 1          STATE
 2  stick out in my mind as something that I   02:21:32
 3  actively remember.  I am clearly involved   02:21:34
 4  in this e-mail chain.             02:21:37
 5     Q.  And it is dated October 9, 2010,   02:21:38
 6  the e-mail chain?              02:21:41
 7     A.  Yes.                   02:21:43
 8     Q.  Going back to October 8?      02:21:43
 9     A.  Yes.                   02:21:49
10     Q.  You see in the first page, third   02:21:50
11  sentence "All MSAs are kept by Greg and   02:22:00
12  his paralegal to add to our master list"?   02:22:03
13     A.  Where are you at?          02:22:06
14     Q.  First page, top e-mail.       02:22:06
15     A.  From John Leonard to myself?   02:22:08
16     Q.  Yes, third sentence.        02:22:10
17     A.  I see that.              02:22:12
18     Q.  What are MSAs?           02:22:14
19     A.  Master service agreements.    02:22:15
20     Q.  What are those?           02:22:17
21     A.  They are general contracting   02:22:18
22  arrangements with various parties that we   02:22:20
23  work with that have basic terms and   02:22:22
24  conditions and rates that we use to bill   02:22:24
25  for work.                   02:22:26
```

177

```
 1          STATE
 2     Q.  What does MSA actually stand   02:22:27
 3  for?                       02:22:36
 4     A.  I just said it.  Master service   02:22:36
 5  agreement.                  02:22:37
 6     Q.  I am sorry.  It was the lunch   02:22:38
 7  hangover.                   02:22:41
 8     Now, who used to sign all MSAs   02:22:52
 9  prior to your hiring at LVI?         02:22:55
10     A.  I don't know.             02:22:57
11     Q.  Can I direct your attention to   02:22:58
12  the second -- I guess the bottom of the   02:23:00
13  first page going on to the second page,   02:23:04
14  that e-mail.                  02:23:07
15     A.  Okay.                  02:23:08
16     Q.  Can you just review that e-mail   02:23:09
17  and let me know it refreshes your   02:23:11
18  recollection?                 02:23:12
19     A.  Okay.  It says Burt signed all   02:23:13
20  MSAs.                      02:23:19
21     Q.  Do you know if that is accurate?   02:23:22
22     A.  No.                    02:23:24
23     Q.  Do you have any reason to      02:23:24
24  believe that is not accurate?         02:23:25
25     A.  I don't have any reason to      02:23:27
```

**45  (Pages 174 to 177)**

VERITEXT REPORTING COMPANY

212-267-6868                               516-608-2400

178

```
 1           STATE
 2   believe that.                      02:23:28
 3       Q.  Why did you transition this duty  02:23:34
 4   to Mr. Cutrone?                     02:23:35
 5       A.  Because he is the chief    02:23:37
 6   financial officer of the company and it  02:23:38
 7   seemed obvious to me that a contractual  02:23:40
 8   document like that would flow through him.  02:23:45
 9       Q.  Why would it have to be signed  02:23:46
10   by him?                            02:23:50
11       A.  Because I decided that is the  02:23:50
12   way I wanted to do it.             02:23:54
13       Q.  And is -- with Burt signing  02:23:55
14   these MSAs, was that a CEO duty or was  02:24:00
15   that something else he was doing?  02:24:03
16       A.  It is a management duty for  02:24:05
17   someone in the company, yes.       02:24:07
18       Q.  Is it a                   02:24:08
19       A.  I don't sign them.  You know, it  02:24:09
20   is a duty within typically the finance or  02:24:12
21   contracts organization of a company.  You  02:24:18
22   can put it in either place.        02:24:20
23       Q.  And was there something wrong  02:24:21
24   with having Mr. Fried sign these MSAs?  02:24:23
25       A.  No.                       02:24:25
```

179

```
 1           STATE
 2       Q.  So why did you then shift it to  02:24:26
 3   Mr. Cutrone?                       02:24:28
 4       A.  Because I decided that is what I  02:24:29
 5   wanted to do.                      02:24:33
 6       Q.  Why?                      02:24:33
 7       A.  I don't know.  I -- because it  02:24:34
 8   is a document with financial information  02:24:36
 9   in it.                             02:24:40
10       Q.  I assume when you make a     02:24:40
11   decision there are reasons for your  02:24:41
12   decision; is that correct?         02:24:44
13       A.  Absolutely.  There are reasons  02:24:44
14   for my decisions.  I just told you it was  02:24:46
15   a document with financial information, so  02:24:48
16   I transitioned it to Paul.  If you read  02:24:50
17   the e-mail carefully, you will see that  02:25:07
18   where I wanted to have this document  02:25:09
19   signed was actually by John Leonard, who  02:25:11
20   would be the operations person that would  02:25:13
21   own MSAs, and most of the MSAs came out of  02:25:16
22   a company called North Star, which John  02:25:19
23   ostensibly runs through another individual  02:25:22
24   in the bay area, but Paul, as we talked  02:25:27
25   about earlier, is an officer and director  02:25:30
```

180

```
 1           STATE
 2   of essentially every subsidiary of the  02:25:32
 3   company  as --                     02:25:35
 4       Q.  Do you know if Mr. Fried --  02:25:37
 5       A.  -- as myself is, and as Burt was  02:25:39
 6   but no longer subsequent to my arrival  02:25:42
 7   with the company.  So not knowing who  02:25:44
 8   could be authorized signers, generally  02:25:46
 9   when you would get down to any generic  02:25:48
10   document you would typically want it to be  02:25:50
11   signed by somebody that you know is an  02:25:52
12   officer and/or director of every  02:25:55
13   subsidiary.                        02:25:57
14       MR. DATOO:  26.                02:26:20
15       (Plaintiff's Exhibit 26 marked  02:26:22
16   for identification.)               02:26:23
17       (Document handed to witness.)  02:26:23
18       Q.  Mr. State, you have in front of  02:26:24
19   you a document marked Plaintiff's Exhibit  02:26:26
20   26.                                02:26:28
21       Can you review the document and  02:26:28
22   let me know if you've seen it from  02:26:30
23       A.  I -- I recognize it is from  02:26:32
24   me -- it is between myself and John  02:26:39
25   Leonard, yes.                      02:26:41
```

181

```
 1           STATE
 2       Q.  Okay.  And it is dated October  02:26:42
 3   9, 2010, correct?                  02:26:46
 4       A.  Correct.                   02:26:47
 5       Q.  In the first sentence you wrote  02:26:48
 6   "I am taking Burt's place on the reviews  02:26:53
 7   for Nardone and Dembin."           02:26:55
 8       Do you see that?               02:26:57
 9       A.  Yes.                       02:26:58
10       Q.  Who is Nardone?            02:26:58
11       A.  Ron Nardone.               02:27:00
12       Q.  And who is he?             02:27:02
13       A.  He is a former employee that was  02:27:03
14   a business development person in Boston.  02:27:06
15       Q.  Was he a vice president?  02:27:09
16       A.  I don't know.              02:27:16
17       Q.  Was he responsible for a certain  02:27:17
18   area?                              02:27:18
19       A.  He did commercial accounts.  02:27:19
20       Q.  Nationwide?                02:27:21
21       A.  Primarily in the east but I  02:27:27
22   think he extended nationwide.      02:27:29
23       Q.  And who is Dembin?          02:27:31
24       A.  That would be Matt Dembin.  02:27:32
25       Q.  And who is that?            02:27:35
```

46 (Pages 178 to 181)

**182**

```
 1              STATE
 2      A.   He was a business development    02:27:36
 3   employee working primarily with hotels and   02:27:38
 4   hospitality.                          02:27:41
 5      Q.   Nationwide?                    02:27:43
 6      A.   Yes, pretty much.             02:27:44
 7      Q.   Was he based out of a certain   02:27:45
 8   branch?                               02:27:48
 9      A.   He -- he worked primarily in the   02:27:48
10   northeast, New York, New Jersey, Westport.   02:27:51
11      Q.   Now, were you -- when you refer   02:27:54
12   to reviews in the first sentence, was that   02:28:05
13   performance reviews?                  02:28:07
14      A.   Yes.                          02:28:08
15      Q.   And why were you taking Burt's   02:28:09
16   place on the reviews for these people?   02:28:13
17      A.   Because he and I agreed that I   02:28:15
18   would.                               02:28:17
19      Q.   Okay.                         02:28:17
20      A.   Not in this e-mail, but there is   02:28:20
21   other e-mail I am absolutely certain   02:28:22
22   somewhere that says that.  I mean I can   02:28:25
23   almost visualize the words.  Do you want   02:28:31
24   me to transition these to you?  It is   02:28:34
25   probably in this e-mail called   02:28:36
```

**183**

```
 1              STATE
 2   transitionary matters or something like   02:28:38
 3   that.                                 02:28:39
 4      Q.   So he asked you?              02:28:40
 5      A.   Yes.                          02:28:41
 6      Q.   And is this something a CEO   02:28:41
 7   does, is review the performance of   02:28:43
 8   employees?                           02:28:45
 9      A.   Yes.                          02:28:45
10      Q.   Okay.  Of all employees or just   02:28:46
11   certain level employees?             02:28:48
12      A.   It -- these are employees that I   02:28:49
13   wouldn't typically have seen as a CEO   02:28:52
14   doing, but the process had been started at   02:28:56
15   the CEO level, and so I continued it at   02:28:59
16   the CEO level.                        02:29:01
17      Q.   Because in the past the CEO   02:29:02
18   would do employee reviews?           02:29:05
19      A.   No.  There was an employee   02:29:06
20   review done on these two individuals for   02:29:07
21   poor performance, and the follow-up review   02:29:10
22   was transitioned to me after I came into   02:29:12
23   the company.                         02:29:14
24      Q.   Okay.  And when Mr. Fried asked   02:29:16
25   you if you wanted -- whether he should   02:29:24
```

**184**

```
 1              STATE
 2   transitions this to you, was it the   02:29:29
 3   responsibility of reviews in general or   02:29:30
 4   just reviews for these two individuals?   02:29:32
 5      A.   Reviews for these two   02:29:34
 6   individuals.                          02:29:35
 7      Q.   So do you know if Mr. Fried was   02:29:35
 8   reviewing other employees?            02:29:37
 9      A.   I do not.                     02:29:38
10      Q.   Okay.                         02:29:40
11           (Plaintiff's Exhibit 27 marked   02:30:20
12   for identification.)                  02:30:20
13           (Document handed to witness.)   02:30:20
14      Q.   Mr. State, you have in front of   02:30:22
15   you a document that has been marked   02:30:23
16   Plaintiff's Exhibit 27.              02:30:25
17           Can you review the document and   02:30:32
18   let me know if you have seen it before?   02:30:33
19      A.   I am familiar with the content.   02:30:36
20   I don't know if I have seen this specific   02:30:37
21   document or not.                     02:30:39
22      Q.   Do you have any reason to doubt   02:30:39
23   that you didn't receive any of these   02:30:41
24   e-mails?                             02:30:45
25      A.   No.                           02:30:45
```

**185**

```
 1              STATE
 2      Q.   Okay.  Or send any of these   02:30:46
 3   e-mails?                             02:30:56
 4      A.   No.                           02:30:57
 5      Q.   Did you ask Burt to look for new   02:30:57
 6   office space for the New York office?   02:31:04
 7      A.   No.                           02:31:06
 8      Q.   Did you ask anybody to look for   02:31:07
 9   new office space for the New York office?   02:31:09
10      A.   I asked Joseph Annarumma to take   02:31:10
11   that task up.                        02:31:13
12      Q.   Did you meet with Burt on   02:31:14
13   October 19?                          02:31:21
14      A.   Yes.                          02:31:22
15      Q.   And did the topic of new office   02:31:22
16   space for the New York office even come   02:31:28
17   up?                                  02:31:30
18      A.   I -- I believe it did come up.   02:31:31
19      Q.   And what was -- why did it come   02:31:33
20   up?                                  02:31:36
21      A.   Because the lease is expiring in   02:31:36
22   the current location and we were looking   02:31:39
23   for -- we needed to look for either a   02:31:41
24   place to go or to renegotiate the lease in   02:31:43
25   the space we were in.                02:31:46
```

47  (Pages 182 to 185)

VERITEXT REPORTING COMPANY

212-267-6868                                          516-608-2400

**186**

```
1            STATE
2    Q.    And why were you discussing that    02:31:47
3  with Mr. Fried?                             02:31:53
4    A.    Mr. Fried came in and discussed     02:31:54
5  it with me.                                 02:31:56
6    Q.    Okay.  Do you know what gave him    02:31:57
7  the impression that you asked him to look   02:31:59
8  for new office space?                       02:32:01
9        MS. SELTZER:  Objection.  I           02:32:03
10  don't think he testified to that.          02:32:04
11       MR. DATOO:  No, I just asked          02:32:06
12  him do you know what gave him the          02:32:07
13  impression?                                02:32:09
14       MS. SELTZER:  That?                   02:32:11
15       MR. DATOO:  That gave Mr. Fried       02:32:12
16  the impression.                            02:32:13
17       MS. SELTZER:  Of what?                02:32:14
18       MR. DATOO:  That he should look       02:32:16
19  for new office space.                      02:32:17
20   A.    No.                                 02:32:18
21   Q.    Okay.  Now, did you find            02:32:19
22  out -- did there come a time when you      02:32:29
23  found out that Mr. Fried was looking for   02:32:31
24  new office space?                          02:32:32
25   A.    Yes, he had -- he had, as I         02:32:33
```

**187**

```
1            STATE
2  understood it, I think via Matt            02:32:36
3  Dembin -- a friend of Matt Dembin's was at 02:32:42
4  Studley, and they somehow connected and    02:32:45
5  engaged a broker to look for space or      02:32:47
6  something to that effect.                   02:32:49
7    Q.    And did Burt inform you that he    02:32:50
8  was looking for new office space?          02:32:54
9    A.    I believe at that meeting it was   02:32:56
10  discussed that we were going to look for   02:32:58
11  new office space, and did he inform me?    02:33:00
12  I -- I don't know.                          02:33:05
13   Q.    Did there come a time when you     02:33:10
14  found out that he was looking for new      02:33:12
15  office space?                               02:33:13
16   A.    Yes, I knew he -- I knew he had    02:33:14
17  made contact with a broker, but he hadn't  02:33:17
18  been assigned the duty of looking for new  02:33:23
19  office space.                               02:33:26
20   Q.    And how did you know that he had   02:33:26
21  made contact with a broker?                02:33:30
22   A.    I believe it is in this e-mail,    02:33:31
23  isn't it?  He said it is -- he said it is  02:33:32
24  my decision.  Please advise.               02:33:35
25   Q.    Okay.  And did you ask Mr. Fried   02:33:36
```

**188**

```
1            STATE
2  to I guess pass this task along to Mr.     02:33:40
3  Annarumma?                                  02:33:46
4    A.    I believe I did, and then I let    02:33:46
5  Joe know to work with Burt as he saw fit.  02:33:48
6  I've passed -- "I have asked Burt to pass  02:33:53
7  this task over to you and support you per  02:33:55
8  year needs/requests, your call, and if you 02:33:57
9  need Burt to help on this."                02:34:01
10   Q.    Now, did you feel that Mr. Fried   02:34:15
11  was interfering with your ability to       02:34:17
12  perform your job duties as CEO?            02:34:18
13       MS. SELTZER:  Objection.  At         02:34:21
14  any period of time?                         02:34:22
15       MR. DATOO:  At any point in          02:34:23
16  time.                                       02:34:24
17   A.    I felt like there was              02:34:26
18  potentially confusion among a lot of the   02:34:30
19  staff about who to go to with certain      02:34:33
20  matters, and that was part of the genesis  02:34:37
21  of why I wanted to understand what Burt    02:34:45
22  saw as his duties and try to sort out why  02:34:47
23  certain things I would have expected to    02:34:50
24  come to me weren't necessarily coming to   02:34:52
25  me.                                         02:34:54
```

**189**

```
1            STATE
2    Q.    And when did you start noticing    02:34:55
3  this confusion amongst staff?               02:34:56
4    A.    Probably the first day I was in    02:35:03
5  the company.                                02:35:05
6    Q.    Okay.  And why did you feel that   02:35:06
7  there was confusion amongst the staff?     02:35:09
8    A.    I think part of it was we had to   02:35:11
9  transition from Burt to myself as CEO, so  02:35:17
10  there is a natural confusion, and there is 02:35:19
11  a natural process of handing things over,  02:35:21
12  and we established -- I think Burt and I   02:35:24
13  established very well early on a process   02:35:27
14  to transition a number of those items.     02:35:29
15       My view of that transition was I     02:35:33
16  get a debriefing on the item and take it   02:35:37
17  and deal with it, and I think Burt may     02:35:39
18  have believed that I should have had       02:35:41
19  additional follow-up with him, but in a    02:35:44
20  lots of situations I felt like I knew      02:35:46
21  what -- what the issues were, and I just   02:35:48
22  handled things.                             02:35:50
23   Q.    And did there come a time when     02:35:50
24  you felt he was actually interfering with  02:35:52
25  your ability to do your job?               02:35:54
```

**48  (Pages 186 to 189)**

190

```
 1              STATE
 2      A.  I don't know if the word         02:35:56
 3   interfere is exactly the proper word, but  02:36:02
 4   there was a nexus of situations where the  02:36:05
 5   situations we were dealing with didn't     02:36:13
 6   require both of us, but both of us were    02:36:15
 7   involved.                              02:36:18
 8      Q.  And was it a problem if both of  02:36:21
 9   you were involved in these situations?   02:36:23
10      A.  In some circumstances if it      02:36:25
11   wasn't clear who the decision maker was  02:36:26
12   going to be for the company, yes.        02:36:29
13      Q.  And why was that going to be a   02:36:31
14   problem?                               02:36:36
15      A.  Because I was in charge of       02:36:36
16   running the company and making decisions,  02:36:40
17   and if -- and if I didn't have people    02:36:44
18   coming to me with the issues that       02:36:47
19   decisions needed to be made about then the  02:36:49
20   company was going to underperform.       02:36:52
21      Q.  If people came to Burt, how      02:36:54
22   would that interfere with you?           02:36:55
23      A.  It wouldn't as long as it        02:36:57
24   eventually got me.  It would just slow   02:36:58
25   down the process of an issue that may have  02:37:01
```

191

```
 1              STATE
 2   arisen.                                02:37:07
 3      Q.  And in those instances where     02:37:07
 4   people came to Burt, did he pass it along  02:37:11
 5   to you?                                02:37:13
 6      A.  I think in general, yes.         02:37:16
 7      Q.  And how many times -- how many   02:37:18
 8   times did people contact Burt as opposed  02:37:28
 9   to contacting you?                     02:37:30
10      A.  If they didn't contact me, I     02:37:31
11   wouldn't know.                         02:37:33
12      Q.  Do you know how many times Burt  02:37:33
13   passed things along to you?            02:37:34
14      A.  There is probably half a dozen   02:37:35
15   times I would guess maybe.             02:37:38
16      Q.  And so was there really a        02:37:40
17   problem with the two of you working --   02:37:42
18   like if someone came to Burt and he passed  02:37:45
19   it along to you as long as it didn't    02:37:47
20   result in a delay?                     02:37:51
21      A.  As long as it wasn't a delay and  02:37:52
22   we had a clear path forward, I think it  02:37:54
23   probably would work.                   02:37:56
24      Q.  And can you think of one         02:37:57
25   instance where there was a delay?       02:37:58
```

192

```
 1              STATE
 2      A.  Well, I know there was a delay   02:38:01
 3   on the office space, but it wasn't       02:38:05
 4   material to us finding office space.  We  02:38:07
 5   had a significant amount of time to go   02:38:09
 6   deal with that.  In terms of other delays,  02:38:13
 7   I think there was an issue with a group  02:38:18
 8   out of the UK that we were looking at    02:38:21
 9   doing business with, and they were       02:38:23
10   confused as to who they should work with,  02:38:25
11   and that confusion led to some an        02:38:28
12   animosity with them, and they thought we  02:38:32
13   really didn't have our act together.  Part  02:38:35
14   of it was establishing that the          02:38:37
15   marketplace that we-- we knew who was on  02:38:39
16   first base, and we just needed to make   02:38:44
17   sure that as we transitioned forward that  02:38:46
18   that the marketplace knew who to talk to  02:38:50
19   and who not to talk to in circumstances  02:38:54
20   and -- and why.                        02:38:57
21      Q.  Now, with respect to the delay   02:39:02
22   on the office space, can you give me a   02:39:04
23   little bit of background on that, about  02:39:06
24   that?                                  02:39:08
25      MS. SELTZER:  Objection.  The        02:39:11
```

193

```
 1              STATE
 2   delay occasioned by --                 02:39:12
 3      MR. DATOO:  I think by someone       02:39:14
 4   reaching out to Mr. Fried.             02:39:15
 5      A.  Well, when we -- when we         02:39:16
 6   assigned Joseph, who handles all the    02:39:19
 7   leases and property for the company at   02:39:21
 8   this point, and he is the treasurer and  02:39:23
 9   has all that documentation to take it   02:39:25
10   over, we had to go back to the brokers,  02:39:27
11   and there was some uncertainty whether we  02:39:33
12   were going to retain those brokers or use  02:39:35
13   different brokers.  I believe we         02:39:37
14   ultimately used that group.  So there    02:39:39
15   was -- you know, there was just a period  02:39:40
16   of time in that handoff that -- that there  02:39:42
17   there was an inefficiency.             02:39:46
18      Q.  How was Mr. Fried involved in    02:39:48
19   that?                                  02:39:50
20      A.  I mean -- I don't follow.        02:39:50
21      Q.  Did --                          02:39:55
22      A.  How was he involved with Joseph  02:39:56
23   Annarumma?                             02:39:58
24      Q.  How was he involved in that      02:39:59
25   delay of it getting to you?            02:40:01
```

**49 (Pages 190 to 193)**

194

STATE

1
2    A.   It is not personally -- I am not    02:40:02
3    saying that Burt personally delayed    02:40:04
4    anything.  I am just saying the process of    02:40:06
5    going to one place when it should be here    02:40:08
6    causes an inherent delay.    02:40:10
7    Q.   But did it go to another place?    02:40:12
8    Did it go to --    02:40:15
9    A.   It went to Joseph Annarumma.    02:40:17
10    Q.   Okay.  And did that have    02:40:20
11    anything to do with having confusion    02:40:22
12    amongst the staff as to whether people    02:40:24
13    should go to you or whether people should    02:40:26
14    go to Mr. Fried?    02:40:29
15    A.   I think so, yes.    02:40:30
16    Q.   How so in the context of the    02:40:32
17    office space?    02:40:33
18    A.   I think that Burt had stepped    02:40:34
19    forward and said he was going to take care    02:40:36
20    of this or something to that effect.  I    02:40:38
21    didn't ask him to.  I mean it may have    02:40:40
22    been construed as me asking him to do    02:40:42
23    that.  I think he wanted to do it.  And if    02:40:45
24    he wanted to do it, there wasn't anybody    02:40:47
25    in the office that was going to say, oh,    02:40:49

195

STATE

1
2    well, you -- you know, it was yes, sir,    02:40:51
3    and so it was ass and elbows to go do    02:40:53
4    whatever Burt wanted.    02:40:57
5    Q.   Okay.  I think you are going to    02:40:59
6    have to try to walk me through this    02:41:01
7    because I am just not understanding.  I    02:41:04
8    don't know if it is because I had a big    02:41:05
9    sandwich or not, but did you task    02:41:07
10    Mr. Annarumma with looking for new office    02:41:14
11    space?    02:41:17
12    A.   Yes.    02:41:17
13    Q.   And did you task Mr. Fried with    02:41:17
14    looking for new office space?    02:41:19
15    A.   No.    02:41:21
16    Q.   Could --    02:41:21
17    A.   Mr. Fried tasked Mr. Fried with    02:41:23
18    looking for new office space.    02:41:25
19    Q.   Could he have construed what you    02:41:28
20    discussed in the meeting with him --    02:41:30
21    A.   No.    02:41:31
22    Q.   -- needing to look for new    02:41:31
23    office space?    02:41:34
24    A.   I do not -- in my opinion, no.    02:41:34
25    Q.   Okay.  And Mr. Annarumma was    02:41:36

196

STATE

1
2    looking for new office space, and would he    02:41:39
3    report to you with the status or with what    02:41:42
4    he found or would he have reported to Mr.    02:41:45
5    Fried?    02:41:47
6    A.   He ultimately reported it to me.    02:41:47
7    Q.   Okay.  When you say ultimately,    02:41:50
8    do you mean that it finally ended up with    02:41:53
9    you or he reported it directly to you?    02:41:56
10    A.   He reported it directly to me.    02:41:59
11    Q.   Okay.  So in that situation was    02:42:02
12    there any confusion amongst the staff as    02:42:04
13    to who to go to, yourself or Mr. Fried?    02:42:06
14    MS. SELTZER:  Are you talking    02:42:11
15    about Mr. Annarumma as the staff?    02:42:12
16    MR. DATOO:  Yes.    02:42:15
17    MS. SELTZER:  As the staff?    02:42:16
18    MR. DATOO:  As the staff in the    02:42:17
19    real estate context.    02:42:18
20    A.   Not after Exhibit 27 was issued    02:42:20
21    by me where I said your call and if you    02:42:22
22    need Burt to this please make sure    02:42:24
23    to coordinate with John.  That would be    02:42:29
24    John Leonard.  The response from Joseph    02:42:31
25    Annarumma was okay.  Will do.  Also will    02:42:34

197

STATE

1
2    coordinate with Johnny, which is John    02:42:38
3    Leonard, on certain building owners as to    02:42:40
4    the benefit and terms, et cetera.  So    02:42:42
5    after this was clarified with Joseph    02:42:44
6    Annarumma, he knew he should report to me    02:42:47
7    on it.    02:42:50
8    Q.   But didn't he always know to    02:42:51
9    report to you on it since you tasked him    02:42:52
10    directly with looking for new office    02:42:54
11    space?    02:42:57
12    MS. SELTZER:  Objection.  I    02:42:57
13    think you've got the story wrong.  I think    02:42:59
14    there is confusion.    02:43:01
15    MR. DATOO:  I don't know.  I    02:43:02
16    don't think so.    02:43:03
17    A.   I don't know -- you would have    02:43:04
18    to ask Joseph Annarumma.  I don't know who    02:43:05
19    he thought he reported to until I told him    02:43:09
20    report to me.    02:43:11
21    Q.   Why do you think he would have    02:43:12
22    reported to anyone else if you tasked him    02:43:14
23    with looking for new office space?    02:43:16
24    A.   Because I think historically    02:43:19
25    over the last 20 or 25 years he probably    02:43:21

**50  (Pages 194 to 197)**

**198**

STATE

1
2   reported to Burt when Burt was the CEO,          02:43:25
3   and I think there was confusion -- like I        02:43:28
4   said, I think there was confusion about          02:43:31
5   who was responsible for what.                    02:43:34
6       Q.   And did Mr. Annarumma report to         02:43:35
7   Burt at all with respect to this office          02:43:39
8   space?                                           02:43:41
9       A.   I don't know. I am assuming he          02:43:41
10  did.                                             02:43:43
11      Q.   Why would you assume that?              02:43:44
12      A.   When Burt was CEO and Joseph was        02:43:46
13  treasurer, I assuming Joseph reported to         02:43:47
14  Burt.                                            02:43:50
15      Q.   I am talking about right now            02:43:50
16  with respect to the new office space             02:43:52
17  assignment, do you know if he reported to        02:43:53
18  Burt with respect to that specific              02:43:55
19  assignment?                                      02:43:57
20      A.   I don't believe he did.                 02:43:57
21      Q.   Okay. So why do you believe             02:43:58
22  that there might have been confusion as to       02:44:03
23  who Mr. Annarumma reported to with respect       02:44:06
24  to this assignment if you don't believe he       02:44:09
25  reported to Mr. Fried on this issue?             02:44:11

**199**

STATE

1
2       A.   Because at the meeting you are          02:44:13
3   talking about in my office on October 19         02:44:16
4   Mr. Fried was there and indicated that he        02:44:19
5   wanted to go look for office space.  Mr.         02:44:28
6   Annarumma was there, and Mr. Annarumma           02:44:28
7   suggested a broker other than Studley, and       02:44:32
8   Mr. Fried said no, they are no good.  We         02:44:34
9   don't want to use them, and so, you know,        02:44:37
10  it was apparent LVI that direction was           02:44:40
11  being given by Mr. Fried.                        02:44:42
12      Q.   Direction to whom?                       02:44:45
13      A.   To Joseph.                               02:44:47
14      Q.   But he was --                            02:44:48
15      A.   He was telling Joseph basically         02:44:50
16  this is the route we are going to go.            02:44:51
17      Q.   How do you know he was telling          02:44:53
18  Joseph that? I thought he was speaking --        02:44:55
19      A.   Because he told him that in             02:44:57
20  front of me.                                     02:44:58
21      Q.   Joseph was also present for that        02:45:00
22  meeting?                                         02:45:01
23      A.   For that portion of the meeting,        02:45:02
24  yes.  This was a three-hour meeting that         02:45:03
25  we had that day.                                 02:45:06

**200**

STATE

1
2       Q.   On October 19?                          02:45:07
3       A.   Yes.                                    02:45:09
4       Q.   And moving on to the second            02:45:10
5   point, you said there might have                 02:45:14
6   been -- or there might have been confusion       02:45:20
7   from the outside as to who was on first          02:45:22
8   base.                                            02:45:25
9          How do you know that this group          02:45:29
10  out of the UK was confused as to who was         02:45:33
11  in charge?                                       02:45:35
12      A.   They told me.                           02:45:36
13      Q.   What did they say to you?               02:45:38
14      A.   They said we don't know who to         02:45:39
15  deal with.                                       02:45:41
16      Q.   And did they put that in writing       02:45:41
17  or was it over the phone?                        02:45:43
18      A.   I -- I don't know. It may be in         02:45:44
19  writing. I am not sure.                          02:45:49
20      Q.   Would it have been in an e-mail        02:45:50
21  to you?                                          02:45:52
22      A.   It would have been in an e-mail        02:45:53
23  to me.                                           02:45:55
24      Q.   Do you recall when this was?           02:45:56
25      A.   Sometime in December.                   02:45:57

**201**

STATE

1
2       Q.   December -- December of 2010?          02:46:04
3       A.   I believe -- yes.  I am not a          02:46:07
4   hundred percent sure.  I -- let's see.           02:46:09
5   I -- I can't -- it was sometime in the           02:46:15
6   last quarter of last year, my first three        02:46:17
7   months on the job. I don't know exactly          02:46:20
8   when it was.                                      02:46:22
9       Q.   And what was the name of this UK       02:46:23
10  group?                                           02:46:26
11      A.   Squibb, S-Q-U-I-B-B.                    02:46:26
12      Q.   And did they have a relationship       02:46:29
13  with LVI that preexisted your hiring?            02:46:33
14      A.   They had met with LVI once prior       02:46:37
15  to my hiring.                                    02:46:39
16      Q.   So while Mr. Fried was interim         02:46:41
17  CEO?                                             02:46:43
18      A.   Correct.                                02:46:44
19      Q.   And then -- I don't know if you        02:46:44
20  answered this question or not.  When did         02:46:49
21  they send you an e-mail or express to you        02:46:51
22  that they didn't know who was in charge?        02:46:55
23      A.   I just said it was sometime            02:46:57
24  during my first three months on the job.        02:47:03
25      Q.   Was Mr. --                              02:47:05

VERITEXT REPORTING COMPANY

212-267-6868                                        516-608-2400

**202**

STATE

1
2     A.   And -- and I know that time     02:47:06
3  frame because in January I flew to the UK   02:47:08
4  to meet with them, and sometime in        02:47:10
5  December I believe they came and met with   02:47:13
6  us in -- in New York.                     02:47:16
7     Q.   Well, there couldn't have been    02:47:18
8  any confusion with them in December of    02:47:19
9  2010, correct?                            02:47:22
10        MS. SELTZER:   Objection.          02:47:23
11    Q.   Mr. Fried was no longer           02:47:25
12 employed.                                 02:47:27
13        MS. SELTZER:   Why would that      02:47:27
14 not have been a confusion for them?       02:47:29
15        MR. DATOO:   They would be         02:47:31
16 confused as to who was in charge when Mr.  02:47:33
17 Fried --                                  02:47:36
18    A.   At that point they would be       02:47:36
19 confused as to what is going on. We used   02:47:37
20 to talk to this guy and where did he go.   02:47:39
21    Q.   Well, that is not on Mr. Fried,   02:47:41
22 is it?                                    02:47:43
23    A.   That is -- I am not saying        02:47:44
24 anything that you are talking about is on   02:47:45
25 Mr. Fried. I am talking about confusion   02:47:47

**203**

STATE

1
2  among people.                            02:47:49
3     Q.   Okay.                             02:47:50
4     A.   Is that anyone's fault? I don't   02:47:51
5  think so. It isn't necessarily anyone's   02:47:53
6  fault. You are trying to lay fault with   02:47:56
7  somebody. I don't know what you are       02:47:57
8  trying to prove.                          02:47:59
9     Q.   Okay. Did you have a telephone    02:48:00
10 conversation with Mr. Fried on October 14,  02:48:09
11 2010?                                     02:48:11
12    A.   I don't know.                      02:48:13
13        MS. SELTZER:   After this          02:48:25
14 exhibit can we take a break?              02:48:26
15        MR. DATOO:   What?                 02:48:27
16        MS. SELTZER:   I said after this   02:48:28
17 exhibit can we take a break?              02:48:29
18        MR. DATOO:   Sure.                 02:48:32
19        (Plaintiff's Exhibit 28 marked    02:48:33
20 for identification.)                      02:48:34
21        (Document handed to witness.)     02:48:34
22    Q.   Mr. State, you have in front of   02:48:35
23 you a document that has been marked as    02:48:36
24 Plaintiff's Exhibit 28.                   02:48:38
25    A.   Okay.                             02:48:40

**204**

STATE

1
2     Q.   Please take a look at this        02:48:41
3  document and let me know if you have seen   02:48:42
4  it before.                                02:48:44
5     A.   I don't know if I have seen it    02:48:44
6  or not. I assume I have. I am on the      02:48:46
7  back and forth.                           02:48:50
8     Q.   Does this refresh your            02:48:50
9  recollection as to whether you had a      02:48:51
10 telephone conversation with Mr. Fried on   02:48:53
11 October 14, 2010?                         02:48:54
12    A.   It -- no. It may -- it            02:48:57
13 indicates that I believed I could have a   02:49:01
14 conversation on that date. I am assuming   02:49:05
15 I did, but I don't -- I can't say for     02:49:07
16 certain I did.                            02:49:09
17    Q.   And do you recall what            02:49:09
18 was -- did you have a                     02:49:11
19 conversation -- telephone conversation     02:49:12
20 with Mr. Fried on or about October 14,    02:49:13
21 2010?                                     02:49:17
22    A.   I don't know.                      02:49:18
23    Q.   Prior to your meeting with Mr.    02:49:19
24 Fried on October 19, 2010, did you have a   02:49:21
25 conversation with Mr. Fried over the phone   02:49:25

**205**

STATE

1
2  leading up to that?                      02:49:27
3     A.   I -- I don't know.                 02:49:28
4     Q.   Okay. During this -- from the     02:49:32
5  time you started to the time you had a    02:49:42
6  meeting with Mr. Fried on October 19, how   02:49:44
7  many times did you see him face to face?   02:49:49
8     A.   Zero.                             02:49:51
9     Q.   Why is that?                       02:49:52
10    A.   Because he worked out of          02:49:56
11 Westport, and I was either in New York or   02:49:59
12 I made visits to probably half a dozen    02:50:02
13 offices in my first two weeks.            02:50:06
14    Q.   And how often were you in New     02:50:07
15 York?                                     02:50:09
16    A.   I was in New York I believe the   02:50:09
17 first week I was with the company. I      02:50:11
18 believe the second week I was with the    02:50:14
19 company I was at a number of different    02:50:16
20 offices on the west coast. I am not       02:50:18
21 certain about the locations, and the third  02:50:26
22 week I believe is possibly the week of    02:50:28
23 October 19. You would have to look at a   02:50:30
24 calendar to figure that out.              02:50:32
25    Q.   And you worked out of Colorado?   02:50:33

**52  (Pages 202 to 205)**

206

```
 1              STATE
 2     A.  I work out of an airplane.   02:50:35
 3     Q.  Okay.  Where do you -- do you   02:50:38
 4  have a home -- a home office meaning do   02:50:40
 5  you have a primary office?      02:50:43
 6     A.  I reside in Denver, Colorado.   02:50:45
 7     Q.  Does LVI have an office in   02:50:48
 8  Denver?                          02:50:50
 9     A.  Yes.                       02:50:50
10     Q.  And do you regularly work out of  02:50:51
11  that office?                     02:50:53
12     A.  Yes.                       02:50:53
13     Q.  Do you consider that your home   02:50:54
14  office, not personal residential home, but   02:50:55
15  your home office?                02:50:59
16     A.  Yes.                       02:50:59
17     Q.  And how much time do you spend   02:51:00
18  in that office?                  02:51:01
19     A.  Maybe five days a month.     02:51:02
20     Q.  Okay.  And the other days?   02:51:04
21     A.  I am on a job location with a   02:51:06
22  customer or somewhere in the United States   02:51:09
23  dealing with company matters.     02:51:13
24         MR. DATOO:  Okay.          02:51:16
25         THE VIDEOGRAPHER:  We're going   02:51:18
```

207

```
 1              STATE
 2  off the record.  The time is 2:51 p.m.   02:51:20
 3  End of tape number 3.            02:51:24
 4        (Recess taken.)            03:02:06
 5        THE VIDEOGRAPHER:  We are    03:02:06
 6  returning to the record.  3:02 p.m.,   03:02:06
 7  beginning of tape number 4.      03:02:09
 8     Q.  Mr. State, I believe you      03:02:10
 9  testified earlier that when you first   03:02:13
10  started at LVI Mr. Fried was transitioning   03:02:16
11  all his interim CEO duties to you; is that   03:02:21
12  correct?                         03:02:30
13     A.  I believe that is correct.  Yes.   03:02:30
14     Q.  And did you have a conversation   03:02:30
15  with Mr. Fried or an e-mail exchange with   03:02:30
16  him about these transition plans?   03:02:32
17     A.  I -- I believe I've referenced   03:02:36
18  an e-mail that I recalled.  I think it was   03:02:38
19  called transitionary matters or something   03:02:41
20  that -- from Mr. Fried to myself.   03:02:43
21     Q.  And was this an e-mail exchange   03:02:46
22  or was it an e-mail from Mr. Fried to   03:02:52
23  you -- or was it an e-mail from Mr. Fried   03:02:57
24  to you?                          03:03:00
25     A.  I -- I think it was an exchange,   03:03:00
```

208

```
 1              STATE
 2  but I -- I am not a hundred percent sure.   03:03:03
 3     Q.  And what do you recall was   03:03:07
 4  contained in this exchange?      03:03:09
 5     A.  I don't recall.  If you've got   03:03:10
 6  it, we can go through it.         03:03:14
 7     Q.  If -- if I had it here, I would   03:03:15
 8  show it to you.                  03:03:18
 9     A.  Okay.  I know there was an   03:03:19
10  e-mail exchange or something like that   03:03:21
11  participation matters or something like   03:03:23
12  that.  I -- I mean I just remember that   03:03:25
13  title.  I don't -- I don't remember what   03:03:31
14  all was in it.                   03:03:33
15     Q.  And do you know who initiated   03:03:34
16  the e-mail exchange?             03:03:35
17     A.  I believe it was an e-mail from   03:03:36
18  Burt to me, and I don't -- I don't know if   03:03:39
19  I responded to it or not.  I just -- I   03:03:42
20  recall in my mind that the word matters   03:03:45
21  struck out -- struck me because it was   03:03:48
22  kind of a legal term.  So --      03:03:50
23     Q.  And do you recall what the   03:03:52
24  substance of the e-mail was --   03:03:55
25         MS. SELTZER:  Objection.    03:03:57
```

209

```
 1              STATE
 2     Q.  -- other than the title?   03:03:58
 3         MS. SELTZER:  Asked and   03:03:59
 4  answered.  You can answer again.   03:04:00
 5     A.  No.                        03:04:02
 6     Q.  It had to do with transitioning   03:04:02
 7  duties though, correct?          03:04:06
 8     A.  I -- I -- I don't know if it had   03:04:07
 9  anything to do with any specific duties.   03:04:11
10  I think it was more ongoing discussions   03:04:13
11  that were taking place with various   03:04:16
12  parties that would be transitioning   03:04:18
13  from -- from Burt to myself.      03:04:21
14     Q.  So was it --                03:04:22
15     A.  I don't know that it was   03:04:24
16  specific to duties.              03:04:25
17     Q.  So was it essentially an update   03:04:28
18  as to what Mr. Fried was working on that   03:04:30
19  he was going to pass on to you?   03:04:33
20         MS. SELTZER:  Objection.  You   03:04:35
21  may answer.                      03:04:38
22     A.  I -- I don't recall.         03:04:38
23        (Plaintiff's Exhibit 29 marked   03:05:32
24  for identification.)             03:05:33
25        (Document handed to witness.)   03:05:36
```

53  (Pages 206 to 209)

VERITEXT REPORTING COMPANY

212-267-6868                                    516-608-2400

210

```
 1              STATE
 2      Q.   Mr. State, you have in front of    03:05:37
 3   you a document marked Plaintiff's Exhibit   03:05:38
 4   29.                          03:05:40
 5      A.   Yes.                   03:05:40
 6      Q.   I asked you earlier if you had a   03:05:41
 7   telephone call with Mr. Fried on October    03:05:44
 8   14, 2010.  Do you recall that?           03:05:47
 9      A.   Yes.                   03:05:49
10      Q.   And you testified that you don't   03:05:49
11   remember having a conversation with him    03:05:52
12   that day, correct?               03:05:54
13      A.   Correct.               03:05:55
14      Q.   Can you just review this        03:05:56
15   document and let me know if it refreshes    03:05:57
16   your recollection as to whether you had a   03:06:00
17   conversation with Mr. Fried on October    03:06:02
18   15 -- 14?                     03:06:04
19      A.   It confirms that I did.  It     03:06:06
20   doesn't refresh my recollection if I did.   03:06:09
21      Q.   Okay.  Do you have any reason to   03:06:12
22   believe -- can you tell me what this       03:06:14
23   document is?                   03:06:18
24      A.   It is an e-mail to Brian Simmons   03:06:18
25   and Rob Hogan related to the discussion    03:06:23
```

211

```
 1              STATE
 2   that I had with Burt apparently that      03:06:26
 3   morning.                      03:06:31
 4      Q.   Okay.  Now, do you have any      03:06:32
 5   reason to believe that what you wrote in    03:06:41
 6   here is not an accurate description of     03:06:43
 7   what you and Mr. Fried discussed?         03:06:45
 8      A.   I -- you know, like I said, I    03:06:49
 9   don't recall the discussion specifically.   03:06:52
10   So I don't have any reason not to believe   03:06:54
11   that this is accurate.             03:06:55
12      Q.   Now, you wrote in the first     03:06:57
13   paragraph midway through the sentence that   03:07:20
14   starts with "I was clear to indicate that   03:07:22
15   I expected no direct involvement in the    03:07:25
16   day-to-day activities of LVI or business    03:07:27
17   on a going forward basis."            03:07:31
18         Do you see that?            03:07:34
19      A.   Yes.                   03:07:34
20      Q.   What did you mean by that?      03:07:35
21      A.   That the daily activities of    03:07:36
22   running the company would flow through me.   03:07:39
23      Q.   Okay.  And at that point in time   03:07:42
24   did you know what Mr. Fried was doing?     03:07:45
25      A.   Did -- what do you mean?  What   03:07:47
```

212

```
 1              STATE
 2   was he doing at that moment in time?      03:07:52
 3      Q.   No.  What he was doing at the    03:07:54
 4   company while you were CEO.           03:07:56
 5      A.   I don't know.            03:07:58
 6      Q.   Well, do you have any reason to   03:08:01
 7   believe that he was involved in the       03:08:04
 8   day-to-day activities of the business?     03:08:05
 9      A.   I -- yes, there were certain    03:08:07
10   activities as we discussed earlier that    03:08:10
11   there seemed to be continued involvement.   03:08:13
12      Q.   Okay.  Such as?            03:08:15
13      A.   I -- in that time frame, I -- I   03:08:16
14   don't know specifically.  I would have to   03:08:21
15   -- I don't know how I could even figure    03:08:28
16   out at that specific moment in time what    03:08:30
17   those things were.               03:08:32
18      Q.   Well, was Mr. Fried involved in   03:08:33
19   the day-to-day activities of the business   03:08:34
20   at that point in time?             03:08:36
21      A.   In some activities, absolutely.   03:08:37
22      Q.   And could you tell me what some   03:08:39
23   of those activities are?             03:08:41
24      A.   I think there was dealings at   03:08:42
25   the time with -- with this group named    03:08:44
```

213

```
 1              STATE
 2   Squibb.  There were I believe -- I know we   03:08:47
 3   were involved in the acquisition of some    03:08:56
 4   assets from a company in Washington, D.C.   03:08:59
 5   We were negotiating contract terms with    03:09:03
 6   that particular company for a project at a   03:09:06
 7   federal building in Washington, D.C.       03:09:09
 8   I -- you're asking about specifics of six   03:09:15
 9   months ago.  I -- I can't off the top of    03:09:23
10   my head tell you what those were.         03:09:26
11      Q.   And these two things that Mr.    03:09:28
12   Fried was working on, were these two       03:09:35
13   things that were not transitioned to you?   03:09:38
14      A.   They were things that I felt    03:09:40
15   like probably should have been quickly     03:09:43
16   transitioned.  They weren't complex       03:09:45
17   matters, but there was a resistance to     03:09:47
18   moving them over I guess.            03:09:51
19      Q.   A resistance from whom?        03:09:53
20      A.   From Burt.               03:09:56
21      Q.   And what gave you that        03:09:57
22   impression?                   03:09:58
23      A.   Because they weren't just      03:09:58
24   transitioned to me.               03:10:00
25      Q.   Were there a lot of things that   03:10:01
```

VERITEXT REPORTING COMPANY

212-267-6868                           516-608-2400

214

```
                    STATE
 1
 2    needed to be transitioned to you?         03:10:02
 3       A.   There were I think at lot --       03:10:04
 4       Q.   Were there a lot of items that     03:10:06
 5    needed to be transitioned to you?          03:10:07
 6       A.   Not particularly, no.              03:10:09
 7       Q.   Okay.  And why do you feel these   03:10:10
 8    weren't transitioned to you?               03:10:17
 9       A.   I don't know.                      03:10:18
10       Q.   In the next sentence you wrote     03:10:19
11    "Like most of my discussions with Burt on  03:10:31
12    his continuing role, he agreed."           03:10:34
13           What did Mr. Fried agree with?      03:10:35
14       A.   I think there was a general        03:10:37
15    agreement every time we spoke that the     03:10:38
16    day-to-day operations will be transferred  03:10:40
17    to you, but subsequent to that I think     03:10:42
18    somewhere in here I say -- then I got this 03:10:48
19    list, and there is all these duties that   03:10:50
20    didn't make any sense to me.               03:10:53
21       Q.   Let's -- let's go to that list.    03:10:55
22       A.   This is the October 14th version   03:11:09
23    or the October 19 version?                 03:11:11
24       Q.   This is the October 14 version.    03:11:26
25           (Plaintiff's Exhibit 30 marked      03:11:29
```

215

```
                    STATE
 1
 2    for identification.)                       03:11:31
 3           (Document handed to witness.)       03:11:31
 4       Q.   Mr. State, you have a document     03:11:32
 5    in front of you marked as Plaintiff's      03:11:34
 6    Exhibit 30.                                03:11:36
 7           Please review the document and      03:11:36
 8    let me know if you have seen it before.    03:11:37
 9       A.   I believe I have seen this, yes.   03:11:39
10       Q.   Okay.  Is this the list that you   03:11:41
11    were referring to in Plaintiff's Exhibit   03:11:43
12    29?                                        03:11:45
13       A.   I think so, yes.  Yes.             03:11:45
14       Q.   Did you ask Mr. Fried to provide   03:11:47
15    you with this list?                        03:11:48
16       A.   I don't believe I did.             03:11:49
17       Q.   Okay.  So he did it of his own     03:11:51
18    accord?                                    03:11:53
19       A.   I believe so.                      03:11:54
20       Q.   Do you know why he did that?       03:11:55
21       A.   I think it was in anticipation     03:11:57
22    of this meeting we were going to have on   03:12:04
23    the 19th.  He prepared an agenda for that  03:12:06
24    meeting as well, which I don't believe I   03:12:09
25    got in advance, but I think I got it at    03:12:10
```

216

```
                    STATE
 1
 2    that meeting.                              03:12:14
 3       Q.   Well, with respect to the --       03:12:15
 4    these duties that you referred to,         03:12:18
 5    what -- what was your reaction when you    03:12:22
 6    saw this document?                         03:12:24
 7       A.   I was frankly pretty surprised     03:12:25
 8    that -- I was surprised.                   03:12:32
 9       Q.   Why were you surprised?            03:12:34
10       A.   That is a pretty extensive list    03:12:35
11    of things that are mostly operational in   03:12:37
12    nature that surprised me.                  03:12:41
13       Q.   Why exactly did it surprise you,   03:12:44
14    the fact that they are operational in      03:12:48
15    nature?                                    03:12:50
16       A.   Because my expectation from the    03:12:51
17    prior discussion I had had about duties    03:12:56
18    and the discussion I had had no more than  03:12:59
19    two hours prior to this was that all       03:13:03
20    operational things would -- day-to-day     03:13:05
21    activities would come to me, and there is  03:13:08
22    many things in here that are day-to-day    03:13:10
23    activities.                                03:13:12
24       Q.   And were these things that         03:13:13
25    Mr. Fried was holding on to or that he was 03:13:16
```

217

```
                    STATE
 1
 2    transitioning to you?                      03:13:19
 3       A.   No, these are all things that he   03:13:20
 4    anticipated holding on to.                 03:13:22
 5       Q.   Okay.  And which one -- did you    03:13:24
 6    consider all of these duties day to day?   03:13:32
 7       A.   No.  There was -- let me look.     03:13:32
 8           (Pause.)                            03:13:47
 9       Q.   You can number the points to       03:13:48
10    make it easier.                            03:13:50
11       A.   No.  There is just one point in    03:13:51
12    here that I considered to be truly         03:13:53
13    relevant to what I had hoped to have Burt  03:13:55
14    really help me with, and that was being a  03:13:58
15    resource for all of the historical LVI     03:14:00
16    business, employee and legal matters, and  03:14:04
17    there were many of those, and he was an    03:14:07
18    absolute resource for all of them,         03:14:09
19    and -- and that is what I really needed    03:14:12
20    help with.                                 03:14:14
21       Q.   And are there -- why would you     03:14:16
22    consider the remainder of these duties     03:14:21
23    day-to-day duties that he would transition 03:14:24
24    to you?                                    03:14:26
25       A.   Because everything in here is a    03:14:27
```

55  (Pages 214 to 217)

**218**

```
 1           STATE
 2   staff level function that as the CEO I      03:14:29
 3   would determine who did all of these        03:14:34
 4   things.  These are all operating            03:14:37
 5   day-to-day things that companies do, and    03:14:38
 6   the CEO of the company should have the      03:14:42
 7   discretion to decide how they get done.     03:14:45
 8       Q.   And was there a problem if Mr.     03:14:47
 9   Fried performed these duties?               03:14:50
10       MS. SELTZER:  Objection to the          03:14:55
11   form, but you can answer.                   03:14:56
12       A.   I don't -- I wouldn't say there    03:14:57
13   was a problem with anybody doing these      03:15:01
14   duties.  It is just my decision to decide   03:15:02
15   who does them.                              03:15:05
16       Q.   And is there -- was there          03:15:09
17   anything preventing you from having Mr.     03:15:10
18   Fried do these duties?                      03:15:12
19       A.   No, I just made a decision that    03:15:14
20   I thought that it would fit better to have  03:15:16
21   these things assigned, and I told Mr.       03:15:18
22   Fried that.                                 03:15:22
23       Q.   Why is that?                       03:15:22
24       A.   Because they fit in typical        03:15:23
25   staff level functions in the company, and   03:15:26
```

**219**

```
 1           STATE
 2   they could be done by staff level people    03:15:29
 3   that report directly to me that do any      03:15:31
 4   number of things.                           03:15:34
 5       Q.   What do you mean by staff level?   03:15:35
 6       A.   Not executive level.  These are    03:15:37
 7   administrative kinds of activities, many    03:15:40
 8   of these.                                   03:15:42
 9       Q.   Do you think the first point is    03:15:43
10   an administrative duty?                     03:15:46
11       A.   No, but it is also an agenda       03:15:49
12   that I looked at and flat -- flatly         03:15:51
13   rejected as being something I didn't want   03:15:56
14   to pursue.                                  03:15:59
15       Q.   Well, I just want to go through    03:16:00
16   these because --                            03:16:01
17       A.   All right.                         03:16:02
18       Q.   You said that some of these        03:16:04
19   were -- these were administrative in        03:16:06
20   nature, and they could be handled by the    03:16:09
21   staff level.                                03:16:12
22       A.   Right.  Okay.                      03:16:12
23       Q.   Well, I will make this easier.     03:16:13
24   Which ones do you think could have been     03:16:16
25   handled by staff level?                     03:16:18
```

**220**

```
 1           STATE
 2       A.   Well, I can tell you how they      03:16:20
 3   are handled today.  The LVI relationship    03:16:23
 4   with the surety is handled at a staff       03:16:27
 5   level.                                      03:16:29
 6       Q.   By -- who handles it?              03:16:30
 7       A.   It is handled out of Greg          03:16:32
 8   DiCarlo's group.  Our paralegal handled it  03:16:34
 9   and does a secretary in the New York        03:16:38
10   office.                                     03:16:40
11       Q.   Okay.                              03:16:43
12       A.   The same with the next item,       03:16:44
13   reviewing of -- these items are all         03:16:47
14   together, surety, bid and payment bonds,    03:16:51
15   performance bonds, that is all -- that is   03:16:54
16   surety as well.  Those two items actually   03:16:56
17   go together.  Selection of --              03:16:59
18       Q.   Uh-huh.  Sorry.  Just to stop      03:17:01
19   you right there.  Who is responsible for    03:17:03
20   that right now?                             03:17:05
21       A.   The same.                          03:17:05
22       Q.   The same paralegal and             03:17:06
23   secretary?                                  03:17:08
24       A.   Both a paralegal and a             03:17:08
25   secretary.                                  03:17:10
```

**221**

```
 1           STATE
 2       Q.   Okay.                              03:17:11
 3       A.   The selection of outside counsel   03:17:12
 4   is handled by our general counsel.          03:17:12
 5       Q.   Do you consider that               03:17:14
 6   administrative or staff level?              03:17:15
 7       A.   It -- he is a -- it is a staff     03:17:17
 8   function, general counsel, and Burt and I   03:17:19
 9   agreed to appoint Greg DiCarlo as the       03:17:21
10   general counsel at the company.  That is    03:17:25
11   something a general counsel does.           03:17:29
12       Q.   But do you consider general        03:17:29
13   counsel a staff level employee?             03:17:31
14       A.   Yes, it is a senior staff          03:17:33
15   person.  Absolutely.                        03:17:36
16       Q.   Who would you --                   03:17:36
17       A.   Operational would be like COO, a   03:17:37
18   CFO, administration where you've got a      03:17:40
19   large operating organization underneath     03:17:42
20   them.  A staff level person would be        03:17:44
21   somebody that is in a position where it is  03:17:46
22   just them or them and a few other people    03:17:48
23   that support them in a staff function.      03:17:51
24       Q.   Okay.                              03:17:53
25       A.   Managing litigation, the legal     03:17:56
```

56  (Pages 218 to 221)

**222**

```
STATE
 1
 2   staff had to do that.  Meaning if I've --      03:18:02
 3   if I've got a general counsel and Burt and     03:18:05
 4   Rob Hogan and I agreed that Greg DiCarlo       03:18:08
 5   would be general counsel, and I -- Burt        03:18:10
 6   asked me if I could let Greg know that he      03:18:12
 7   would like -- that we had determined that      03:18:14
 8   he should be general counsel, and we did       03:18:17
 9   that, that is the job the general counsel      03:18:18
10   does.  Resource for all historical LVI         03:18:20
11   business we discussed I think.                 03:18:23
12       Q.   Uh-huh.                               03:18:24
13       A.   Review and approve all offers of      03:18:25
14   employment.  Mind boggling, all offers         03:18:28
15   employment of -- for the entire company,       03:18:33
16   really?  You know, the -- I have reviewed      03:18:35
17   exactly no offers of employment in my job      03:18:38
18   as CEO.  None.                                 03:18:42
19       Q.   So who does this function now?        03:18:45
20       A.   It goes through the vice              03:18:46
21   president administration and legal.            03:18:48
22       Q.   So a vice president reviews this      03:18:49
23   stuff?                                         03:18:52
24       A.   Uh-huh.  Yes.                         03:18:52
25       Q.   Do you consider a vice president      03:18:54
```

**223**

```
STATE
 1
 2   a staff level position?                        03:18:56
 3       A.   No, the -- these job offers we        03:18:57
 4   are discussing are offers in offices.  We      03:19:02
 5   have got officers in offices that              03:19:04
 6   determine what an offer letter should look     03:19:07
 7   like.                                          03:19:11
 8       Q.   I understand that, but I am           03:19:11
 9   asking you which of these duties can be        03:19:12
10   handled by staff level employees.             03:19:15
11       A.   Okay.                                 03:19:17
12       Q.   And I think you said that with        03:19:18
13   respect to review and approval of all LVI      03:19:20
14   office employment, you said it goes            03:19:24
15   through your vice president                    03:19:26
16   administration.                                03:19:28
17       My question then was:  Do you              03:19:28
18   consider a vice president a staff level        03:19:30
19   employee?                                      03:19:34
20       A.   A vice president is not               03:19:34
21   necessarily a staff level employee.  A         03:19:35
22   vice president is an officer designation.      03:19:38
23   It doesn't mean that your job is -- is         03:19:40
24   operational in nature.  It means that          03:19:43
25   you're a vice president.  You're an            03:19:45
```

**224**

```
STATE
 1
 2   officer.                                       03:19:48
 3       Q.   And do you usually make staff         03:19:48
 4   level employees officers or give them vice     03:19:50
 5   president titles?                              03:19:52
 6       A.   Some of them are and some of          03:19:53
 7   them aren't.                                   03:19:54
 8       Q.   Which ones are?                       03:19:55
 9       A.   The -- the position of general        03:19:56
10   counsel is a staff level position.  I          03:20:00
11   consider myself to have four staff level       03:20:02
12   people, our director of health and safety,     03:20:05
13   senior vice president Mark Canessa;            03:20:08
14   treasurer/vice president, Joseph Annarumma     03:20:12
15   and what -- did I say Mark Canessa?  And        03:20:15
16   Greg DiCarlo, general counsel, four staff      03:20:20
17   level people.  I consider myself to have       03:20:23
18   three operating people that have larger        03:20:25
19   organizations under them, Kamal Sookram,       03:20:29
20   who has got administration, and Paul           03:20:32
21   Cutrone, who is CFO, and John Leonard, who     03:20:35
22   is the COO.                                    03:20:38
23       Q.   And how about the next points or      03:20:39
24   you can continue to go through and tell me     03:20:42
25   which ones are administrative in nature?       03:20:43
```

**225**

```
STATE
 1
 2       A.   Negotiate all company                 03:20:48
 3   acquisitions, not a staff level position       03:20:50
 4   but not something that I would consider        03:20:52
 5   delegating to anyone outside of the CEO.       03:20:54
 6   That is what a CEO should do.                  03:20:58
 7       Q.   Okay.                                 03:21:01
 8       A.   And Burt told me this was             03:21:01
 9   something that Bob liked him to do in the      03:21:04
10   past, and that is fine.  That is certainly     03:21:06
11   at the discretion of the CEO to decide         03:21:08
12   that.  Monitoring employee air travel,         03:21:10
13   staff level job if not -- I don't -- I've      03:21:14
14   never looked at air travel at all.             03:21:18
15   Securing approvals for surety bonding,         03:21:22
16   that is the same as these items above it,      03:21:25
17   which were related to surety and bonding.      03:21:28
18   It is essentially a duplicate.                 03:21:30
19       Q.   So that is handled by a               03:21:31
20   paralegal and a secretary?                     03:21:33
21       A.   Uh-huh.  Review and approve all       03:21:35
22   plan submissions of prequalifications,         03:21:37
23   that is a staff level job that a marketing     03:21:39
24   support person handles.  Prepare and           03:21:42
25   review and approve all LVI contracts, that     03:21:44
```

**57  (Pages 222 to 225)**

226

```
 1          STATE
 2   is -- that falls under the general        03:21:49
 3   counsel, and the general counsel would    03:21:51
 4   marshal the resources needed to do that.  03:21:53
 5   Prepare all LVI consulting agreements,     03:21:57
 6   again something that falls under the       03:22:01
 7   general counsel, and then coordinate all   03:22:02
 8   public relations communications, website   03:22:06
 9   updates with the LVI public relations      03:22:08
10   firm, I terminated the public relations    03:22:12
11   firm. I saw basically no value in what     03:22:15
12   they did for the company, and we have got  03:22:18
13   a minimum wage person doing that kind of   03:22:21
14   work right now.                            03:22:25
15       Q.   Now, did there come a time when   03:22:27
16   you forwarded this list of job duties to   03:22:29
17   John Leonard?                              03:22:32
18       A.   Yes.  I forwarded it to John in   03:22:33
19   this same time frame and asked him since I 03:22:36
20   was new in the company who else -- I       03:22:40
21   had -- I believe others had to be involved 03:22:42
22   with these kinds of activities.  I         03:22:44
23   couldn't believe that these were duties    03:22:46
24   that only a chairman of the board could    03:22:48
25   do.                                        03:22:51
```

227

```
 1          STATE
 2          (Plaintiff's Exhibit 31 marked     03:23:00
 3   for identification.)                       03:23:02
 4          (Document handed to witness.)       03:23:02
 5       Q.   Mr. State, you have in front of   03:23:04
 6   you a document marked Plaintiff's Exhibit  03:23:07
 7   31.                                        03:23:10
 8       A.   Yes.                              03:23:10
 9       Q.   Can you take a look at that and   03:23:11
10   let me know if you've seen it before?      03:23:13
11       A.   Yes, I have.                      03:23:15
12       Q.   Sorry.  And is this the -- you    03:23:16
13   sent -- did you send Mr. Leonard this list 03:23:38
14   of job duties?                             03:23:40
15       A.   Yes, it looks like I sent them    03:23:42
16   to him the same day I got them probably.   03:23:43
17   Yes.                                       03:23:47
18       Q.   And if you flip to the last two   03:23:48
19   pages.                                     03:23:52
20       A.   Correct.                          03:23:54
21       Q.   What exactly did Mr. Leonard      03:23:55
22   write underneath each job duty?            03:24:01
23       A.   He gave me individuals that he    03:24:05
24   thought would be appropriate to do these   03:24:09
25   types of things.                           03:24:12
```

228

```
 1          STATE
 2       Q.   So now if you look at the -- I    03:24:13
 3   think I may have asked you this earlier,   03:24:28
 4   but I just don't remember since it was     03:24:30
 5   early in the morning.                      03:24:32
 6          How old is Mark Canessa            03:24:33
 7   approximately?                             03:24:35
 8       A.   Fifties.  I don't know.           03:24:36
 9       Q.   Who is David Pearson?             03:24:44
10       A.   He is a regional manager in the   03:24:48
11   Boston area.                               03:24:51
12       Q.   Is he a staff level employee?     03:24:52
13       A.   He is an -- he is an executive.   03:25:00
14       Q.   So he is not a staff level        03:25:02
15   employee?                                  03:25:04
16       A.   No, he's got operational duties.  03:25:04
17       Q.   Do you know how old he is         03:25:06
18   approximately?                             03:25:11
19       A.   I would guess 50s.  I don't       03:25:17
20   know.                                      03:25:19
21       Q.   Who is Jim Mooney?                03:25:19
22       A.   He was a project executive on --  03:25:21
23   he is no longer with the firm.             03:25:25
24       Q.   Was he a staff level employee?    03:25:30
25       A.   Yes, I -- he was in a project     03:25:31
```

229

```
 1          STATE
 2   management type role.  He had operational  03:25:34
 3   responsibilities.  He kind of floated      03:25:37
 4   between a number of different things.      03:25:38
 5       Q.   Do you know how old he was        03:25:40
 6   approximately?                             03:25:42
 7       A.   I only met him once.  I don't     03:25:42
 8   have any idea.                             03:25:45
 9       Q.   Who is Frank Aiello?              03:25:46
10       A.   Frank Aiello is regional manager  03:25:53
11   in New Jersey.                             03:25:56
12       Q.   Is he a staff level employee?     03:25:56
13       A.   He is an executive.               03:25:58
14       Q.   Do you know approximately how     03:26:00
15   old Mr. Aiello is?                         03:26:01
16       A.   Fifty-ish.  I don't know.  He's   03:26:02
17   got a lot of gray hair.                    03:26:06
18          MS. SELTZER:  If I could just      03:26:08
19   say one thing, which kind of might short   03:26:09
20   circuit this whole thing possibly.         03:26:14
21          MR. DATOO:  Uh-huh.                03:26:15
22          MS. SELTZER:  You produced         03:26:17
23   something back to us, something called the 03:26:17
24   bible that has every person and their      03:26:19
25   dates of birth in it.  Rather than asking  03:26:24
```

58  (Pages 226 to 229)

230

```
 1              STATE
 2   the witness, why don't you just look at   03:26:27
 3   that document.                    03:26:31
 4        MR. DATOO:  I just don't know   03:26:31
 5   how current the --              03:26:33
 6        MR. SELTZER:  Their dates of   03:26:33
 7   birth aren't going to change.        03:26:34
 8        MR. DATOO:  I don't know how   03:26:37
 9   current it is because some of these people 03:26:38
10   Mr. State testified have left.        03:26:41
11        A.   They all have been on     03:26:42
12   something you got that is historical.   03:26:44
13        MR. SELTZER:  Okay.  Go ahead.  03:26:46
14        MR. DATOO:  Well, I can go --   03:26:47
15        A.   We could play guessing games if 03:26:49
16   you want.  I don't know the age of   03:26:51
17   anybody.                        03:26:52
18        MR. DATOO:  Well, if you --- if 03:26:52
19   someone is not on that list if you agree 03:26:54
20   to provide me with their age, then I don't 03:26:57
21   need to ask these questions.        03:27:00
22        MR. SELTZER:  Sure.  I don't   03:27:01
23   have a problem with that.  I just think it 03:27:03
24   would make this a little faster.      03:27:04
25        MR. DATOO:  Okay.            03:27:07
```

231

```
 1              STATE
 2        Q.   Now, if you look at the third 03:27:14
 3   point.                          03:27:15
 4        A.   The what?                03:27:16
 5        Q.   The third point, LVI      03:27:16
 6   relationship manager with surety and   03:27:18
 7   surety agent.                    03:27:21
 8        A.   Correct.                03:27:22
 9        Q.   You testified earlier that that 03:27:22
10   is being handled by a paralegal and a   03:27:24
11   secretary, correct?              03:27:25
12        A.   Right.  The paperwork part of 03:27:26
13   that is being handled by the paralegal   03:27:28
14   that works for Greg DiCarlo and a     03:27:31
15   secretary in New York.            03:27:34
16        Q.   So then do you know why Mr.  03:27:35
17   Leonard suggested that you, Mr. Annarumma, 03:27:39
18   and Mr. DiCarlo handle this job duty?   03:27:43
19        A.   Because the paralegal works for 03:27:46
20   Greg DiCarlo, and the secretary works for 03:27:49
21   Joe Annarumma, and I don't know why -- you 03:27:53
22   know, myself I deal with Richard Fiorucci, 03:27:57
23   our surety agent.                03:28:00
24        Q.   But why do you think this is  03:28:02
25   appropriate for you, Annarumma -- sorry. 03:28:04
```

232

```
 1              STATE
 2        Why would Mr. -- do you know why 03:28:06
 3   Mr. Leonard would recommend or believe   03:28:08
 4   that you, Mr. Annarumma, and Greg DiCarlo 03:28:11
 5   could perform this job duty if it could be 03:28:15
 6   performed by a staff level --        03:28:18
 7        MS. SELTZER:  I object to the   03:28:21
 8   form.                           03:28:21
 9        Q.   -- employee?              03:28:22
10        A.   It is performed by staff level 03:28:23
11   people that work for these individuals.  I 03:28:24
12   asked him where it would go.  It is going 03:28:26
13   to go in their organizations.  It is not 03:28:28
14   done by them.                    03:28:30
15        Q.   And how do you know Mr. Fried 03:28:30
16   didn't have anyone working for him     03:28:32
17   with -- to help him with these job duties? 03:28:37
18        A.   I don't know that he did or he 03:28:40
19   didn't.  Does it -- does what he sent me 03:28:42
20   say he had anybody?  No.  I don't know.  03:28:45
21        Q.   Well, what -- here is my      03:28:49
22   confusion, and maybe you can help me out 03:28:51
23   here, but I believe you testified that a 03:28:54
24   lot of these items on -- on this list of 03:28:59
25   duties were staff level duties.        03:29:02
```

233

```
 1              STATE
 2        A.   Right.                   03:29:04
 3        Q.   Were you under the impression 03:29:05
 4   that Mr. Fried himself was performing   03:29:07
 5   these duties?                    03:29:08
 6        A.   I think some of them, yes.  Some 03:29:09
 7   of them he may have had other people   03:29:14
 8   helping him.  I don't know.          03:29:16
 9        Q.   So on those duties where he may 03:29:18
10   have had people helping --          03:29:20
11        A.   Okay.                   03:29:24
12        Q.   Actually let me back up.  Did 03:29:24
13   you ever ask him if he had anyone helping 03:29:27
14   him out on these duties?            03:29:29
15        A.   I don't remember when we met -- 03:29:31
16   when we met on 19th I know we went through 03:29:33
17   most or all those.  I don't remember if 03:29:36
18   we talked about how they were all      03:29:39
19   specifically handled or not.        03:29:40
20        Q.   So was there a reason why Mr.  03:29:42
21   Fried could not be responsible for some of 03:29:43
22   these duties?                    03:29:45
23        A.   Why he couldn't be?          03:29:46
24        Q.   Yes.                    03:29:47
25        MS. SELTZER:  Objection.  Asked 03:29:49
```

VERITEXT REPORTING COMPANY

212-267-6868                              516-608-2400

234

```
            STATE
 1
 2    and answered, but you can answer it again.   03:29:50
 3        A.   There is no specific reason why   03:29:51
 4    he couldn't be involved.           03:29:54
 5        Q.   Okay.  Who is Tom Cullen?      03:29:56
 6        A.   That is the individual that I    03:30:07
 7    couldn't remember the name.  He works for   03:30:08
 8    Greg DiCarlo.                       03:30:10
 9        Q.   Is he an attorney?          03:30:11
10        A.   He is an attorney, yes.       03:30:12
11        Q.   And you testified earlier that   03:30:13
12    this -- the fourth point on the list of   03:30:21
13    duties was a staff level -- could be    03:30:23
14    handled by a staff -- at the staff level   03:30:26
15    by a paralegal and a secretary?      03:30:28
16        A.   Right.                     03:30:29
17        Q.   Do you know why Mr. Leonard    03:30:30
18    suggested that Mr. DiCarlo, Mr. Cullen and   03:30:31
19    you should be responsible for that point?   03:30:31
20        A.   That would be him, not me.   03:30:38
21        Q.   I am sorry.                03:30:40
22        A.   Yes.                       03:30:41
23        Q.   Mr. DiCarlo, Mr. Cullen, and Mr.   03:30:41
24    Leonard would be responsible for that    03:30:45
25    duty?                               03:30:46
```

235

```
            STATE
 1
 2        A.   Because they ultimately are    03:30:47
 3    responsible, but it is, you know -- the   03:30:48
 4    processing work is done by their      03:30:51
 5    paralegal.  Tom is a staff level attorney,   03:30:55
 6    and they handle all of that work.     03:30:56
 7        Q.   And, again, is there any reason   03:30:59
 8    why Mr. Fried couldn't have had the    03:31:01
 9    responsibility for that?            03:31:06
10        A.   No.                        03:31:07
11        Q.   Okay.  And do you know if Mr.   03:31:08
12    Fried had anyone working for him to assist   03:31:11
13    him with that job duty?             03:31:15
14        A.   I am assuming that some of the   03:31:16
15    same people that are actually responsible   03:31:20
16    for it today are still responsible for   03:31:21
17    doing the same things they were doing   03:31:23
18    before.                             03:31:25
19        Q.   Okay.  And then you said       03:31:25
20    selecting all outside counsel.  The fifth   03:31:33
21    point -- one, two, three, four, the fifth   03:31:36
22    point was a staff level position as well?   03:31:39
23        A.   Yes, Greg DiCarlo is staff,    03:31:41
24    general counsel, staff.             03:31:44
25        Q.   Is there any reason why Mr.   03:31:45
```

236

```
            STATE
 1
 2    Fried cannot be responsible for that?   03:31:47
 3        A.   No.                        03:31:48
 4        Q.   Okay.  The sixth point, I     03:31:49
 5    believe you said that was also a staff   03:31:56
 6    level position?                     03:31:58
 7        A.   Uh-huh.                    03:31:58
 8        Q.   Or it could be handled by a    03:31:59
 9    staff level employee.  Is there any reason   03:32:00
10    why Mr. Fried could not have been      03:32:03
11    responsible for handling that job duty?   03:32:06
12        A.   No.                        03:32:07
13        Q.   The seventh point -- pass the   03:32:08
14    seventh point.  Go to the eighth point,   03:32:17
15    review and approve all offers of      03:32:19
16    employment.  You said that could be   03:32:21
17    handled by a staff level employee.    03:32:23
18        A.   Right.                     03:32:27
19        Q.   Do you consider Mr. Sookram a   03:32:27
20    staff level employee?               03:32:29
21        A.   No, but the staff level employee   03:32:30
22    that handles that works for him.      03:32:34
23        Q.   And what would Mr. Sookram's   03:32:36
24    role be in reviewing and approving offers   03:32:38
25    of employment?                      03:32:40
```

237

```
            STATE
 1
 2        A.   He would make sure it complies   03:32:41
 3    with our policies and procedures that the   03:32:43
 4    proper documentation is collected by the   03:32:45
 5    people sending the offer out, checks and   03:32:47
 6    balances.                           03:32:49
 7        Q.   Is he a vice president?       03:32:49
 8        A.   I believe he is.            03:32:51
 9        Q.   So someone at a higher level    03:32:52
10    than a secretary would have to review an   03:32:55
11    offer for employment going out, correct?   03:32:57
12        A.   They would approve it.  They    03:32:59
13    don't have to review it.            03:33:07
14        Q.   Okay.  And is there any reason   03:33:07
15    why Mr. Fried could not handle this    03:33:07
16    responsibility?                     03:33:07
17        A.   I -- I don't know.          03:33:07
18        Q.   If you go to --            03:33:09
19        A.   Just read the bullet if you    03:33:25
20    want.                               03:33:27
21        Q.   Okay.  The -- I think it is the   03:33:27
22    tenth point, monitor all employee air   03:33:29
23    travel.                             03:33:32
24        A.   Yes.                       03:33:32
25        Q.   You said that could be handled   03:33:33
```

VERITEXT REPORTING COMPANY

212-267-6868                                          516-608-2400

238

```
 1            STATE
 2   at the staff level?                03:33:35
 3      A.   Right.                      03:33:35
 4      Q.   Do you know why Mr. Leonard said 03:33:36
 5   that he could handle that job      03:33:38
 6   responsibility?                    03:33:40
 7      A.   Because he could.          03:33:40
 8      Q.   Okay.  Would he have to review 03:33:43
 9   employee air travel?               03:33:45
10      A.   I don't -- I don't know.  I 03:33:47
11   don't believe Mr. Leonard has anything do 03:33:49
12   with employee air travel today.    03:33:51
13      Q.   Is there any reason why Mr. 03:33:53
14   Fried could not have been responsible for 03:33:55
15   that?                              03:33:56
16      A.   No.                        03:33:57
17      Q.   The next point, secure approvals 03:33:57
18   from surety of bonding for mentor protege 03:34:05
19   and teaming surety bond requirements, Mr. 03:34:09
20   Leonard suggested that you be responsible 03:34:15
21   for that.                          03:34:17
22      A.   Okay.                      03:34:18
23      Q.   Wasn't that -- didn't you  03:34:19
24   testify earlier that that was a staff 03:34:20
25   level -- that could be handled at the 03:34:23
```

239

```
 1            STATE
 2   staff level?                       03:34:25
 3      A.   Yes.                       03:34:25
 4      Q.   So is there any reason why Mr. 03:34:26
 5   Fried could not have been responsible for 03:34:28
 6   that?                              03:34:29
 7      A.   Other than that I didn't plan to 03:34:30
 8   do any of that, no.                03:34:31
 9      Q.   Okay.  Did you know who is today 03:34:33
10   responsible?                       03:34:37
11      A.   I am not doing any of that  03:34:37
12   today.                             03:34:38
13      Q.   Do you know who is?        03:34:38
14      A.   I am not pursuing any of that 03:34:40
15   type of activity with mentor protege 03:34:42
16   relationships.  It is not a business 03:34:45
17   function we are pursuing.          03:34:48
18      Q.   Okay.  The next point, review 03:34:49
19   and approve all plans, prequalification 03:34:55
20   submissions nationwide prepared at 03:34:58
21   Westport office.  You said that could be 03:35:00
22   handled at the staff level by a marketing 03:35:07
23   person?                            03:35:09
24      A.   Right.                     03:35:10
25      Q.   And do you know why Mr. Leonard 03:35:10
```

240

```
 1            STATE
 2   suggested Mark Canessa should be   03:35:17
 3   responsible for that?              03:35:19
 4      A.   Ask him next week.  I don't 03:35:20
 5   know.                              03:35:22
 6      Q.   Okay.  Is there any reason why 03:35:22
 7   Mr. Fried could not have been responsible 03:35:24
 8   for this?                          03:35:26
 9      A.   He could be, but I am not sure 03:35:26
10   that -- the specific business kind of 03:35:28
11   things we are doing at -- I am not sure 03:35:34
12   would add a lot.                   03:35:37
13      Q.   And the next point, which is 03:35:39
14   prepare, review -- do you see that? 03:35:43
15      A.   Yes.                       03:35:46
16      Q.   You said that could be handled 03:35:47
17   at the staff level by the -- I guess the 03:35:51
18   next two points?                   03:35:54
19      A.   Yes, they are general counsel, 03:35:54
20   staff type of functions.           03:35:57
21      Q.   Is there any reason why Mr. 03:35:58
22   Fried could not have been responsible for 03:36:00
23   that?                              03:36:02
24      A.   Other than the fact that he and 03:36:02
25   I agreed to make Greg DiCarlo the general 03:36:03
```

241

```
 1            STATE
 2   counsel, no.                       03:36:06
 3      Q.   When did you agree to make him 03:36:07
 4   the general counsel?               03:36:10
 5      A.   There is e-mail traffic.  I 03:36:10
 6   don't know when we agreed to do that. 03:36:13
 7   You -- you certainly must have it.  It is 03:36:15
 8   e-mails between Burt and I.         03:36:21
 9      Q.   Was it in the first week of your 03:36:23
10   employment, the first two weeks of your 03:36:24
11   employment?                        03:36:26
12      A.   I don't know.  I just know that 03:36:27
13   he and I agreed that we should do that. 03:36:28
14   It may have been before or after this 03:36:30
15   list.  I don't know.               03:36:32
16      Q.   Why was Mr. Fried involved in 03:36:32
17   that decision?                     03:36:34
18      A.   Because Greg had worked with him 03:36:34
19   for many years and I felt out of due 03:36:36
20   respect to Burt that it made sense that he 03:36:38
21   be involved in letting Greg know that we 03:36:40
22   were making him general counsel, and Burt 03:36:43
23   wholeheartedly supported it.  He said it 03:36:46
24   was a great idea.  He said it should have 03:36:49
25   been done long ago.                03:36:52
```

61  (Pages 238 to 241)

VERITEXT REPORTING COMPANY

212-267-6868                                        516-608-2400

242

```
1              STATE
2    Q.   The last point -- so now at this    03:36:54
3    point in time after seeing the list of job   03:37:02
4    duties, did you have an idea what Mr.    03:37:03
5    Fried was doing at LVI?              03:37:07
6    A.   I had an idea what -- what Mr.    03:37:08
7    Fried believed his duties were.  Was he   03:37:16
8    doing those?  I can't say that I knew or   03:37:18
9    didn't know what he was doing.        03:37:22
10   Q.   Well, what was your idea of what   03:37:24
11   his duties were?                     03:37:27
12        MS. SELTZER:  I object to the    03:37:28
13   form.                                03:37:30
14   A.   I don't understand.             03:37:30
15   Q.   Are you talking about the list    03:37:31
16   that that -- is that what you base your   03:37:32
17   idea on what Mr. Fried's duties were?    03:37:35
18   A.   After I got the list?           03:37:38
19   Q.   Yes.                           03:37:39
20   A.   After I got the list, I          03:37:40
21   understood that is what -- what Mr. Fried   03:37:41
22   believed his duties were.            03:37:45
23   Q.   Well, do you know what his       03:37:46
24   duties actually were, like what he was   03:37:48
25   doing at the company?                03:37:51
```

243

```
1              STATE
2    A.   We were still in the process of   03:37:52
3    transitioning things.  I don't know      03:37:53
4    specifically if he was doing these things   03:37:56
5    or not.  I couldn't tell you.        03:37:58
6    Q.   Okay.  Just to -- drawing your   03:38:00
7    attention back to Plaintiff's Exhibit 29.   03:38:07
8    A.   Where -- when was that?         03:38:11
9    Q.   This is the e-mail dated October   03:38:14
10   14.                                  03:38:15
11   A.   Okay.  Yes.                     03:38:15
12   Q.   Which should be right there.  I   03:38:17
13   just want to draw your attention to the   03:38:19
14   second paragraph, and there is a        03:38:21
15   first -- second sentence.            03:38:28
16   A.   Okay.                          03:38:29
17   Q.   You wrote: "I can't be more      03:38:30
18   clear than I have been, and I don't see   03:38:35
19   spending 1 million a year to have Burt   03:38:38
20   review air travel, administrative items   03:38:42
21   and BS."                             03:38:47
22        What did you mean by BS?        03:38:48
23   A.   That would be bullshit.         03:38:49
24   Q.   And did you know if Mr. Fried    03:38:51
25   was reviewing those administrative items   03:38:53
```

244

```
1              STATE
2    or if he was just responsible that these   03:38:56
3    administrative items were reviewed?     03:38:59
4    A.   I -- I think most of what is in   03:39:01
5    this list says things like review.  The   03:39:03
6    word review is in here I believe.       03:39:06
7    Q.   And do you know if that was an   03:39:08
8    approval?                            03:39:11
9    A.   Do I know if what was an         03:39:15
10   approval.                            03:39:17
11   Q.   If Mr. Fried when he listed      03:39:18
12   these duties, if it was that he was      03:39:20
13   ultimately responsible for them.        03:39:24
14        MS. SELTZER:  I object to the    03:39:28
15   form.                                03:39:29
16   A.   I -- I don't know.              03:39:29
17   Q.   All right.  Well, let's -- let   03:39:32
18   me see if I can ask it in a different way   03:39:34
19   here.                                03:39:37
20        Mr. Fried gave you a list of     03:39:37
21   duties, correct?                     03:39:43
22   A.   Correct.                       03:39:46
23        And this is what he thinks is    03:39:46
24   what --                              03:40:00
25        MR. DATOO:  Strike that.        03:40:01
```

245

```
1              STATE
2    Q.   Mr. Fried has told you these     03:40:02
3    were the duties he was performing under   03:40:04
4    Mr. McNamara, correct?               03:40:05
5         MS. SELTZER:  I object to the    03:40:08
6    form.                                03:40:09
7    A.   I don't know that this was the   03:40:09
8    way this was presented to me at all.    03:40:11
9    Q.   How was it presented to you?     03:40:12
10   A.   It is called areas of           03:40:14
11   responsibilities.  I mean I am not saying   03:40:15
12   one way or the other -- I mean I don't   03:40:16
13   know if Burt said these are things he was   03:40:18
14   doing for McNamara or not.  I don't      03:40:20
15   remember that specifically.          03:40:23
16   Q.   Earlier in the deposition I      03:40:24
17   showed you an e-mail where -- that Mr.    03:40:26
18   Fried sent to some of the board members.   03:40:29
19   A.   Oh, I know what you are          03:40:34
20   referring to.                        03:40:36
21   Q.   Okay.  Where he said these are a   03:40:37
22   list of duties that I performed under Mr.   03:40:39
23   McNamara.  Do you recall that?         03:40:42
24   A.   I do recall that.              03:40:43
25   Q.   And then I asked you do you have   03:40:44
```

VERITEXT REPORTING COMPANY

212-267-6868                                    516-608-2400

246

```
1              STATE
2   any reason to doubt that he was performing    03:40:45
3   these duties under McNamara, and you said    03:40:48
4   no.                                          03:40:51
5        Do you recall that?                     03:40:51
6   A.   I do, yes.                              03:40:53
7   Q.   So when Mr. Fried gave you this         03:41:02
8   list, what was your understanding of what    03:41:03
9   these duties represented?                    03:41:05
10  A.   The item you referred to from           03:41:06
11  this morning was from October 19. This is    03:41:10
12  from October 14.                             03:41:14
13  Q.   Okay.                                    03:41:15
14  A.   So the October 19 item says             03:41:16
15  these were things I did for McNamara. I      03:41:21
16  just testified a few minutes ago I don't     03:41:24
17  remember if he told me these were things     03:41:26
18  he did for McNamara on the 14th.             03:41:28
19  Q.   Was there a different list that         03:41:31
20  he gave to you on the 19th?                  03:41:33
21  A.   Yes, it is different. The -- if         03:41:35
22  you compare the two lists, they are          03:41:37
23  slightly different.                          03:41:40
24  Q.   Is there a material difference          03:41:41
25  in the lists?                                03:41:43
```

247

```
1              STATE
2   A.   I -- yes, there is more items on        03:41:44
3   the 19th list than there are on the 14th     03:41:46
4   list.                                        03:41:51
5   Q.   If I can draw your attention to         03:41:51
6   Plaintiff's Exhibit 2. If you flip over      03:42:17
7   to the second page.                          03:42:23
8   A.   Yes.                                     03:42:27
9   Q.   Can you tell me the                      03:42:28
10  differences between the two lists?           03:42:36
11       MS. SELTZER: You really want            03:42:38
12  to go through this process? Seriously?       03:42:39
13       MR. DATOO: I think he can               03:42:42
14  point them out to me, sure. He doesn't       03:42:43
15  have to read through every one.              03:42:44
16  A.   Well, I am going to.                     03:42:46
17       MR. DATOO: It is going to take          03:42:48
18  me just as long as it is going to take the   03:42:49
19  witness.                                      03:42:51
20       MS. SELTZER: Well, that is              03:42:52
21  something you could do, you know, on your    03:42:53
22  own time. But go ahead.                      03:42:54
23  A.   That is fine. We will just go           03:42:55
24  through them.                                 03:42:57
25  Q.   You don't have to read them out         03:42:58
```

248

```
1              STATE
2   loud. Just tell me the difference.           03:43:00
3   A.   Well, let's look. You can               03:43:01
4   visually see that the list is longer. It     03:43:04
5   is just visual. So there is a new item       03:43:07
6   called daily review selection and           03:43:12
7   distribution of non-nationwide federal       03:43:15
8   public bid opportunities.                    03:43:18
9   Q.   Sorry.                                   03:43:20
10  A.   The last item on Exhibit 2.             03:43:21
11  Q.   Okay. Is that the only                  03:43:25
12  difference between the two lists?            03:43:29
13  A.   Well, the original list "monitor       03:43:30
14  all employee air travel" is now all         03:43:32
15  monitor -- "monitor all employee air        03:43:35
16  travel for compliance with LVI policies."   03:43:37
17  Q.   Is that a different duty or does       03:43:40
18  that just kind of clarify why he is         03:43:42
19  monitoring?                                  03:43:44
20  A.   You asked me to compare them.          03:43:45
21  That is what I am doing for you, sir.       03:43:47
22  Q.   Okay. All right.                        03:43:49
23  A.   Let's see.                              03:43:51
24       MS. SELTZER: Let's have a              03:44:02
25  little bit of decorum. Okay.                03:44:03
```

249

```
1              STATE
2        MR. DATOO: I am just looking           03:44:05
3   at the document.                             03:44:06
4        MS. SELTZER: They are                   03:44:07
5   different lists. There is different          03:44:08
6   dates, and they do differ. You asked him     03:44:09
7   how they differ, and he is trying to be      03:44:12
8   polite and telling you --                    03:44:13
9        MR. DATOO: I am not doing               03:44:15
10  anything.                                    03:44:16
11       MS. SELTZER: You are sitting            03:44:17
12  there laughing and snickering and making     03:44:18
13  faces, and I think it is highly              03:44:20
14  unprofessional.                              03:44:23
15       MR. DATOO: Mr. State said they          03:44:24
16  are different in length.                     03:44:25
17       MS. SELTZER: They are                   03:44:26
18  different. There is one additional duty      03:44:27
19  on this one than there is on this one.       03:44:29
20       MR. DATOO: I found that funny.          03:44:31
21       MS. SELTZER: Okay. Get a hold           03:44:33
22  of yourself here.                            03:44:34
23       MR. DATOO: Joanne, please.              03:44:35
24  Don't get upset.                             03:44:36
25       MS. SELTZER: I am not getting           03:44:38
```

VERITEXT REPORTING COMPANY

212-267-6868                                        516-608-2400

250

```
 1              STATE
 2   upset.  I just find it rude.          03:44:39
 3        MR. DATOO:  If you want to take  03:44:42
 4   a break, we can take a break, so you can  03:44:44
 5   comport yourself.                      03:44:46
 6        MS. SELTZER:  I don't want to    03:44:47
 7   take a break.  I am fine.  I would ask you  03:44:48
 8   to comport yourself.                   03:44:51
 9        A.   The lists are markedly similar.  03:44:51
10        Q.   They are markedly --        03:44:55
11        A.   They are similar.  There may be  03:44:57
12   some refinement or two, clarification of  03:44:59
13   some of the items.  They are similar.  03:45:03
14        Q.   What are the additional items or  03:45:05
15   two on the list?                       03:45:07
16        A.   I believe I indicated that there  03:45:07
17   is an additional item at the end of the  03:45:09
18   list.                                  03:45:10
19        Q.   So one item, not two items?  03:45:11
20        A.   There is one there.  I        03:45:13
21   don't -- look if you want to go through it  03:45:15
22   line by line, we can do that.          03:45:16
23        Q.   Let's go through it.  You     03:45:18
24   know --                                03:45:19
25        A.   All right.  Let's do it.      03:45:19
```

251

```
 1              STATE
 2        MS. SELTZER:  Can I just ask     03:45:20
 3   what the point is here?                03:45:21
 4        MR. DATOO:  The witness has       03:45:24
 5   said these two lists are different, and  03:45:25
 6   then he said that there is one additional  03:45:26
 7   duty, and then he said there are one or  03:45:29
 8   two different items and then some       03:45:30
 9   refinements.                           03:45:32
10        MS. SELTZER:  So what?           03:45:33
11        MR. DATOO:  I just want to make  03:45:34
12   it clear as to whether -- how many      03:45:36
13   additional items are on October 19.  If  03:45:38
14   the witness says there is one, which is  03:45:40
15   what I have seen, he can say one, and we  03:45:42
16   don't have to go through this.  If he   03:45:45
17   wants to hedge and say one or two --    03:45:47
18        MS. SELTZER:  He is not           03:45:49
19   hedging.  He is looking at the two lists.  03:45:51
20        MR. DATOO:  One or two is         03:45:54
21   hedging.                               03:45:55
22        MS. SELTZER:  Fine.  He will --  03:45:56
23        MR. DATOO:  There is a way to     03:45:57
24   get certainty.  If he wants to continue to  03:45:58
25   hedge, fine.  We will spend more time and  03:46:00
```

252

```
 1              STATE
 2   read it.                               03:46:03
 3        MS. SELTZER:  Fine.              03:46:03
 4        A.   There is one new item and one  03:46:04
 5   changed item that I have seen so far.  03:46:06
 6        Q.   And which is the new item?    03:46:08
 7        A.   The last one that we have     03:46:09
 8   discussed.                             03:46:10
 9        Q.   Okay.  And what is the changed  03:46:11
10   item?                                  03:46:12
11        A.   It has to do with the air travel  03:46:13
12   that's now got an additional disclaimer  03:46:15
13   for compliance with LVI policies.      03:46:19
14        Q.   Okay.  So now after you got this  03:46:23
15   either -- either list from Mr. Fried --  03:46:36
16        A.   Okay.                        03:46:39
17        Q.   -- do you now know what he was  03:46:40
18   doing at LVI after you started working  03:46:44
19   there?                                 03:46:46
20        MS. SELTZER:  I object to the     03:46:46
21   form of the question.                  03:46:48
22        A.   Well, based on number 2, I know  03:46:48
23   what he was --                         03:46:52
24        Q.   I am sorry.  Plaintiff's Exhibit  03:46:53
25   2?                                     03:46:55
```

253

```
 1              STATE
 2        A.   Correct.                      03:46:55
 3        Q.   Okay.                         03:46:56
 4        A.   Based on that, I wouldn't     03:46:56
 5   dispute that these were things that he was  03:47:00
 6   doing under Mr. McNamara because I believe  03:47:02
 7   he says that.  Is that correct?  I -- I  03:47:05
 8   think you're the one that said it -- told  03:47:09
 9   me that.                               03:47:11
10        Q.   I am just trying to figure out  03:47:12
11   what he was doing at LVI while you were  03:47:13
12   CEO.                                   03:47:16
13        A.   Okay.  I -- I assume he was  03:47:16
14   doing some of these things.            03:47:19
15        Q.   Why some and not all?        03:47:21
16        A.   Because I don't know.         03:47:25
17        Q.   Okay.  Going back to Plaintiff's  03:47:26
18   Exhibit 29.                            03:47:36
19        A.   Okay.                         03:47:39
20        Q.   Just let me know when you have  03:47:40
21   it in front of you.  Do you have it up?  03:47:41
22        A.   Yes.                          03:47:50
23        Q.   If you look at the last       03:47:50
24   paragraph?                             03:47:52
25        A.   Right.                        03:47:52
```

64  (Pages 250 to 253)

**254**

STATE

1
2    Q.   You wrote:  "I am okay making      03:47:52
3    moves on a number of senior people that      03:47:54
4    don't pull their weight and not looking to      03:47:57
5    involve the investors in those decisions      03:47:59
6    or action."      03:48:01
7        What did you mean by senior      03:48:02
8    people?      03:48:03
9    A.   Removing people or -- moving or      03:48:03
10   removing people in their job functions.      03:48:09
11   Q.   But what did you mean by senior      03:48:11
12   people?      03:48:13
13   A.   Senior would be senior      03:48:13
14   executives.  For example, I moved Mark      03:48:14
15   Canessa from one role to another.  I moved      03:48:18
16   some people around and changed their job      03:48:20
17   duties.      03:48:21
18   Q.   But what did you mean by senior?      03:48:22
19   A.   Senior level.      03:48:23
20   Q.   Senior level.  Okay.  It had      03:48:24
21   nothing to do with Mr. Fried's age?      03:48:29
22   A.   No.      03:48:31
23       MS. SELTZER:   Now, that one I      03:48:33
24   am going to laugh at.      03:48:34
25       MR. DATOO:   I don't find that      03:48:36

**255**

STATE

1
2    funny at all.      03:48:37
3        MS. SELTZER:   I do.      03:48:40
4        MR. DATOO:   Not in an age      03:48:40
5    discrimination case, Joanne.      03:48:42
6        MS. SELTZER:   Okay.      03:48:44
7        MR. DATOO:   Perhaps you should      03:48:46
8    take some of your own advice.      03:48:47
9        MS. SELTZER:   Yes.      03:48:49
10   Q.   Now, did you speak to anybody      03:48:50
11   about the list of job duties that Mr.      03:48:51
12   Fried sent you, either list?      03:48:53
13   A.   I believe I spoke to Mr.      03:48:55
14   Simmons, and I may have spoken to Mr.      03:48:57
15   Leonard after he responded to my request      03:49:01
16   from him.      03:49:06
17   Q.   And do you recall when you spoke      03:49:07
18   to Mr. Simmons?      03:49:09
19   A.   Somewhere in this -- within a      03:49:11
20   day or two I would guess of this -- the      03:49:15
21   fourth -- somewhere between the 14th and      03:49:22
22   the 21st.  That would be my guess.      03:49:25
23   Q.   And did you -- was it a      03:49:28
24   face-to-face conversation with Mr. Simmons      03:49:30
25   or over the phone?      03:49:31

**256**

STATE

1
2    A.   No, I -- I didn't see Brian      03:49:32
3    other than by phone -- I talked with him      03:49:34
4    by phone.  He and I never met.      03:49:36
5    Q.   And how long did that      03:49:38
6    conversation last?      03:49:39
7    A.   I have no idea.      03:49:40
8    Q.   And was he the only one on the      03:49:40
9    phone?      03:49:43
10   A.   I -- I believe so, but I am not      03:49:43
11   certain.      03:49:45
12   Q.   And did you document your      03:49:45
13   discussion with Mr. Simmons?      03:49:46
14   A.   No.      03:49:48
15   Q.   And what did you two discuss?      03:49:48
16   A.   I believe we discussed this list      03:49:50
17   of duties.      03:49:53
18   Q.   And what did you say?      03:49:54
19   A.   He agreed with me that these      03:49:58
20   didn't seem like duties that would be      03:50:01
21   typical of a chairman of the company.      03:50:03
22   Q.   And what did you say?      03:50:06
23   A.   I said he agreed with me.  I      03:50:08
24   said yes.  I agree with you.  You are      03:50:10
25   agreeing with me.      03:50:13

**257**

STATE

1
2    Q.   Was anything else said?      03:50:14
3    A.   I don't know.      03:50:15
4    Q.   Okay.  And you said you had a      03:50:16
5    conversation with Mr. Leonard as well      03:50:19
6    about this list.      03:50:20
7    A.   I said I may have.  I am not      03:50:21
8    certain of that.      03:50:23
9    Q.   Okay.  Do you recall speaking to      03:50:24
10   Mr. Leonard over the phone or meeting him      03:50:27
11   in person to discuss this list of job      03:50:29
12   duties?      03:50:31
13   A.   Not specifically, no.  I am      03:50:32
14   fairly certain we didn't meet on it, and I      03:50:37
15   am -- I don't recall if we discussed it by      03:50:39
16   phone.      03:50:41
17   Q.   Do you recall the nature of your      03:50:42
18   discussion?      03:50:44
19   A.   I said I didn't recall we had a      03:50:45
20   discussion, so I don't know what the      03:50:47
21   nature of the discussion would be if we      03:50:49
22   didn't have it.      03:50:51
23   Q.   Okay.  So you think you had a      03:50:52
24   discussion?      03:50:55
25   A.   I don't know.  I said I may      03:50:56

VERITEXT REPORTING COMPANY

212-267-6868                                            516-608-2400

258

STATE

1
2  have. Just based on the fact that I got     03:50:57
3  information back and there doesn't appear    03:51:00
4  to be any additional e-mail after that,      03:51:02
5  there may have been a discussion for me to   03:51:04
6  clarify with him what any of these things    03:51:08
7  might have meant.                            03:51:10
8     Q.   Okay.  Now, you testified           03:51:11
9  earlier that you had a meeting with Mr.      03:51:16
10  Fried on October 19, correct?               03:51:18
11     A.   Yes.  Yes, I did.  I don't know     03:51:20
12  if I testified to that, but I know I did    03:51:23
13  have a meeting on the 19th.                 03:51:25
14     Q.   Okay.  What did you discuss at      03:51:27
15  that meeting with Mr. Fried?                03:51:35
16     A.   It was a pretty long meeting.       03:51:39
17  I -- as I recall, I believe Mr. Fried came  03:51:42
18  in around noon, and we went -- I think we   03:51:44
19  walked to a restaurant for lunch with       03:51:48
20  Joseph Annarumma and possibly Paul          03:51:50
21  Cutrone, and then we came back to the       03:51:56
22  office and Burt presented an agenda for     03:51:58
23  the meeting, and I don't recall that        03:52:02
24  agenda having been provided in advance.  I  03:52:06
25  think he handed that to me when we sat      03:52:09

259

1
2  down, which was fine, and I know that       03:52:12
3  first on the list was what his duties       03:52:17
4  would be, and then there is a long list of  03:52:20
5  other items that I believe we were          03:52:22
6  transitioning or discussing or different    03:52:25
7  things that we were -- we were going to     03:52:27
8  discuss that day, and then somewhere in     03:52:30
9  that list I believe was a discussion item   03:52:33
10  that we got to at about 3 o'clock where     03:52:40
11  Joseph Annarumma came in, and that is when  03:52:40
12  we talked about the office space that we    03:52:43
13  discussed earlier today.                    03:52:45
14     Q.   Now, was Mr. Annarumma and Paul     03:52:46
15  Cutrone present for the entire meeting?     03:52:51
16     A.   No.  They -- I think as we were     03:52:53
17  -- as I recall it, as we were breaking up   03:52:55
18  the meeting at about 3 o'clock because I    03:52:57
19  had a 3 o'clock appointment that day with   03:53:00
20  Richard Fiorucci, and, as we were kind of   03:53:04
21  breaking up the meeting, I believe Joseph   03:53:07
22  and maybe Paul came in, and we said, hey,   03:53:10
23  there is this item associated with the      03:53:13
24  office move, and that is when that was      03:53:15
25  discussed.                                  03:53:17

260

STATE

1
2     Q.   How long were they in the           03:53:17
3  meeting for?                                03:53:20
4     A.   Five minutes.  I don't know.        03:53:20
5     Q.   And the only thing that was         03:53:21
6  discussed when they were there was the New  03:53:23
7  York office issue?                          03:53:25
8     A.   I believe that is the case, yes.    03:53:25
9     Q.   And how long was the overall        03:53:27
10  meeting?                                    03:53:29
11     A.   I think it ran close to three      03:53:29
12  hours from -- including lunch it ran        03:53:31
13  about -- we were together about three       03:53:33
14  hours I believe.                            03:53:35
15     Q.   And where did the meeting take     03:53:36
16  place?                                      03:53:37
17     A.   It took place at 80 Broad          03:53:38
18  Street.                                     03:53:40
19     Q.   Do you have an office there?       03:53:41
20     A.   Yes.                                03:53:42
21     Q.   Was the door closed?               03:53:42
22     A.   Yes.                                03:53:43
23     Q.   And what else was discussed at     03:53:44
24  this meeting?                               03:53:49
25     A.   I know there was an agenda,        03:53:50

261

STATE

1
2  which -- it had -- there were many items    03:53:54
3  on the agenda.                              03:54:00
4     Q.   Was every topic on the agenda       03:54:02
5  covered?                                    03:54:05
6     A.   I believe -- I believe we did      03:54:06
7  cover every topic because there were        03:54:08
8  topics -- I'm trying to think.  There were  03:54:09
9  topics related to a CIO search that had     03:54:12
10  been initiated that I decided not to        03:54:15
11  conduct or to continue.  There was a topic  03:54:17
12  related to a VP of HR search that           03:54:20
13  was -- had been initiated that I decided I  03:54:24
14  didn't want to continue that I was putting  03:54:25
15  on hold.  There was the office issue.       03:54:28
16  What else did we talk about.  I -- there    03:54:33
17  was a lot of items on the agenda.           03:54:36
18     Q.   Okay.  Now, during that            03:54:38
19  discussion, that meeting, did you make any  03:54:40
20  comments regarding Mr. Fried's age?         03:54:42
21     A.   I made one comment where I         03:54:44
22  said -- when Burt and I were talking about  03:54:47
23  the duties that he had or desired to have.  03:54:49
24  At one point I said, Burt, you told me      03:54:54
25  you're 71 years old, and you don't want to  03:54:57

66  (Pages 258 to 261)

262

| | STATE | |
|---|---|---|
| 1 | STATE | |
| 2 | be doing this any more. I don't | 03:55:00 |
| 3 | understand. And he kind of chuckled and | 03:55:02 |
| 4 | corrected me and said I am only 70, and I | 03:55:05 |
| 5 | said oh. Okay. Sorry. But that was the | 03:55:08 |
| 6 | only item that came up like that at all. | 03:55:12 |
| 7 | Q. Why did his age even come up? | 03:55:16 |
| 8 | A. Because he had told me not more | 03:55:18 |
| 9 | than two or three weeks before when I | 03:55:21 |
| 10 | discussed with him on the phone prior to | 03:55:24 |
| 11 | taking the job that the duties he would | 03:55:26 |
| 12 | have would be strategic support and, you | 03:55:29 |
| 13 | know, these few items and -- and that | 03:55:33 |
| 14 | he -- he was 70 -- well apparently he told | 03:55:35 |
| 15 | me he was 70. I thought he had said 71, | 03:55:38 |
| 16 | and he didn't want to be doing this any | 03:55:41 |
| 17 | more, and that is -- you know, that is why | 03:55:43 |
| 18 | he wanted to essentially back away, and | 03:55:45 |
| 19 | that is what I understood. | 03:55:47 |
| 20 | Q. Is that what he was talking | 03:55:48 |
| 21 | about at this meeting, backing away from | 03:55:50 |
| 22 | the duties? | 03:55:52 |
| 23 | A. At what meeting? | 03:55:53 |
| 24 | Q. At the October 19 meeting. | 03:55:53 |
| 25 | A. No, he was talking about that | 03:55:55 |

263

| | STATE | |
|---|---|---|
| 1 | STATE | |
| 2 | when I spoke to him on the phone prior to | 03:55:57 |
| 3 | joining the company. | 03:56:00 |
| 4 | Q. But at the actual meeting why | 03:56:01 |
| 5 | did his age come up? | 03:56:03 |
| 6 | A. Oh, I don't know. I -- there | 03:56:05 |
| 7 | was kind of banter going back and forth. | 03:56:07 |
| 8 | Q. What was the banter? | 03:56:09 |
| 9 | A. I don't -- I don't think there | 03:56:11 |
| 10 | was anything serious about it. | 03:56:12 |
| 11 | Q. Well, apparently Mr. Fried | 03:56:14 |
| 12 | thinks so. But what was the banter? | 03:56:16 |
| 13 | A. I think it was about the | 03:56:19 |
| 14 | specific duties that he thought he should | 03:56:21 |
| 15 | have and that I thought a number of them | 03:56:23 |
| 16 | were staff level types of duties. I | 03:56:28 |
| 17 | believe that we had options to do a lot of | 03:56:31 |
| 18 | those things and that, you | 03:56:36 |
| 19 | know -- that -- I didn't see why he as | 03:56:38 |
| 20 | chairman of the company would want to do | 03:56:40 |
| 21 | any of those things. It just -- it | 03:56:42 |
| 22 | literally did not make sense to me, and I | 03:56:45 |
| 23 | told him that, and his retort to me was, | 03:56:48 |
| 24 | look, it doesn't matter who you give these | 03:56:51 |
| 25 | to. I am the best there is at all of | 03:56:54 |

264

| | STATE | |
|---|---|---|
| 1 | STATE | |
| 2 | these things, and you would be | 03:56:56 |
| 3 | shortsighted to have anyone else do these | 03:56:57 |
| 4 | things. That is what was said. | 03:57:00 |
| 5 | Q. So in connection with his job | 03:57:02 |
| 6 | duties, you made a comment about his age? | 03:57:04 |
| 7 | A. No. | 03:57:08 |
| 8 | Q. So then when did this age | 03:57:08 |
| 9 | comment come up during this conversation? | 03:57:12 |
| 10 | A. It came up as we were talking | 03:57:14 |
| 11 | about -- back and forth about discussions | 03:57:16 |
| 12 | that we had associated with what he wanted | 03:57:17 |
| 13 | to do, my hiring into the company, and I | 03:57:21 |
| 14 | simply repeated to him this is what you | 03:57:24 |
| 15 | said to me. I didn't say it to him. I | 03:57:26 |
| 16 | said this is what you said to me. | 03:57:29 |
| 17 | Q. And what -- do you remember | 03:57:31 |
| 18 | exactly what you said about Mr. Fried's | 03:57:32 |
| 19 | age? | 03:57:34 |
| 20 | A. What I said was: Burt, you told | 03:57:35 |
| 21 | me you're 71 years old, and you don't want | 03:57:37 |
| 22 | to be doing this, meaning this kind of | 03:57:40 |
| 23 | stuff any more. I don't understand this | 03:57:42 |
| 24 | list. | 03:57:45 |
| 25 | Q. And then what did Mr. -- | 03:57:46 |

265

| | STATE | |
|---|---|---|
| 1 | STATE | |
| 2 | A. And he had said -- and he | 03:57:48 |
| 3 | laughed and said, look, I am only 70. And | 03:57:50 |
| 4 | that is the end of it. It wasn't a stare | 03:57:53 |
| 5 | down. There was nothing. It was just | 03:57:58 |
| 6 | passed along. | 03:58:00 |
| 7 | Q. Was that the end of the meeting? | 03:58:01 |
| 8 | A. You know, there was probably an | 03:58:03 |
| 9 | hour plus of additional discussion at the | 03:58:05 |
| 10 | meeting. This discussion of duties was | 03:58:08 |
| 11 | item one on the list. | 03:58:09 |
| 12 | Q. Did you ask Mr. Fried at this | 03:58:11 |
| 13 | meeting how long he expected work for? | 03:58:13 |
| 14 | A. No, I don't think I did. | 03:58:14 |
| 15 | Q. And did you ask Mr. Fried at | 03:58:17 |
| 16 | this meeting what if he got hit by a bus? | 03:58:19 |
| 17 | A. I -- I don't recall asking him | 03:58:22 |
| 18 | that. | 03:58:24 |
| 19 | Q. Now, after this meeting, did you | 03:58:25 |
| 20 | send an e-mail to Mr. Simmons and Mr. | 03:58:30 |
| 21 | Hogan? | 03:58:32 |
| 22 | A. I may have. | 03:58:33 |
| 23 | MR. DATOO: I think it | 03:58:39 |
| 24 | is -- why don't we take a break. | 03:58:41 |
| 25 | THE VIDEOGRAPHER: Going off | 03:58:42 |

**67 (Pages 262 to 265)**

266

STATE

1
2  the record.  3:58 p.m.  End of tape number  03:58:43
3  4.                                      03:58:48
4      (Recess taken.)                     04:13:10
5      THE VIDEOGRAPHER:  We're            04:13:10
6  returning to the record.  4:14 p.m.,    04:14:05
7  beginning of tape number 5.             04:14:08
8      (Plaintiff's Exhibit 32 marked      04:14:31
9  for identification.)                    04:14:32
10     (Document handed to witness.)       04:14:32
11     Q.  Mr. State, I am handing you a   04:14:33
12  document that has been marked as       04:14:35
13  Plaintiff's Exhibit 32.  Please take a  04:14:37
14  look at the document and let me know if  04:14:38
15  you have ever seen this before.        04:14:40
16     A.  Yes.                            04:14:41
17     Q.  Is this the e-mail that you sent  04:14:42
18  to Mr. Simmons and Mr. Hogan after your  04:14:43
19  meeting with Mr. Fried?                04:14:46
20     A.  It looks that way, yes.  It is 5  04:14:47
21  o'clock, the 19th.  Yeah.  Yes.        04:14:49
22     Q.  Now, in that -- in the first    04:14:52
23  paragraph of the e-mail, did you inform  04:14:57
24  Mr. Simmons and Mr. Hogan that it was your  04:14:59
25  objective to have Mr. Fried retire?    04:15:01

267

STATE

1
2      MS. SELTZER:  Objection.  Where     04:15:04
3  are you reading?                        04:15:05
4      MR. DATOO:  The first, second,      04:15:06
5  third, fourth sentence.                 04:15:09
6      MS. SELTZER:  Uh-huh.               04:15:11
7      A.  Yeah.  Okay.  Can you repeat the  04:15:11
8  question?                               04:15:13
9      Q.  In -- in that e-mail, did you    04:15:14
10  inform Mr. Simmons and Mr. Hogan that it  04:15:17
11  was your objective to have Mr. Fried    04:15:20
12  retire?                                 04:15:22
13     A.  In my e-mail I say I was clear   04:15:22
14  with him that it was my objective to him  04:15:25
15  truly retire and just -- and be just an  04:15:27
16  on-call resource.                       04:15:30
17     Q.  Okay.  Was it your objective to  04:15:31
18  have Mr. Fried retire?                  04:15:33
19     A.  I -- it was my objective, yes,   04:15:35
20  to have him retire on the terms that he  04:15:37
21  had indicated to me or what I believe he  04:15:40
22  wanted to do from before I ever joined the  04:15:43
23  company.                                04:15:45
24     Q.  Do you know if it was his        04:15:45
25  objective to retire?                    04:15:46

268

STATE

1
2      A.  I have -- I have no idea.  It    04:15:48
3  was -- I believe it was his objective   04:15:49
4  before I came to work at the company.  Was  04:15:51
5  it his objective that day?  I don't know.  04:15:55
6      Q.  Now, after you came to the      04:15:58
7  company, do you know if it -- if it was  04:15:59
8  his objective to retire?                04:16:01
9      A.  I -- I don't know.              04:16:03
10     Q.  Okay.  In the second page of    04:16:04
11  that e-mail -- sorry, second paragraph of  04:16:09
12  that e-mail, the second sentence, first  04:16:12
13  page.                                   04:16:16
14     A.  Got you.                        04:16:17
15     Q.  You wrote; "The management team  04:16:17
16  is growing weary of his constant meddling  04:16:18
17  in every aspect of the business and     04:16:23
18  continued interference."                04:16:24
19     A.  Right.                          04:16:26
20     Q.  What did you -- when you        04:16:27
21  referred to the management team, who were  04:16:28
22  you referring to?                      04:16:30
23     A.  That would be the management    04:16:30
24  group, the senior level folks that report  04:16:33
25  to me.                                  04:16:35

269

STATE

1
2      Q.  Who would that be?             04:16:35
3      A.  The seven individuals that I had  04:16:37
4  mentioned previously.                   04:16:40
5      Q.  Can you name them again?  John  04:16:41
6  Leonard, Paul Cutrone?                  04:16:44
7      A.  Kamal Sookram, Greg DiCarlo,    04:16:47
8  Gary Thibodeaux, Mark Canessa, and Joseph  04:16:50
9  Annarumma.                              04:16:55
10     Q.  And what did Mr. Leonard tell   04:16:56
11  you that gave you the impression that Mr.  04:17:04
12  Fried was meddling and interfering?     04:17:07
13     A.  I -- I -- I don't recall the    04:17:09
14  specifics of what any one individual said  04:17:13
15  to me.  I just -- I just know I was     04:17:15
16  getting feedback from people that involved  04:17:17
17  not understanding who they should       04:17:21
18  necessarily take direction from.        04:17:22
19     Q.  Was that the consensus?         04:17:25
20     A.  What do you mean by consensus.   04:17:27
21     Q.  Was that the consensus of what  04:17:31
22  everyone said to you on the management   04:17:32
23  group?                                  04:17:36
24     A.  No one said they wanted more     04:17:36
25  involvement.  I mean I just recall that  04:17:37

VERITEXT REPORTING COMPANY

212-267-6868                          516-608-2400

270

STATE

1
2   people were saying that they would like to   04:17:39
3   know who was in charge.   04:17:46
4       Q.   And did you interpret that to   04:17:46
5   mean that Mr. Fried was meddling   04:17:46
6   constantly and interfering?   04:17:47
7       A.   I -- yes, I guess you could say   04:17:49
8   that.  Yes.   04:17:52
9       Q.   But you don't recall any   04:17:52
10  specifics of what they told you as   04:17:55
11  examples of this?   04:17:58
12      A.   Well, I think -- let's go back   04:17:58
13  to -- do we have the agenda from the   04:18:01
14  October 19 meeting?   04:18:07
15      Q.   I don't have it here.   04:18:09
16      A.   Was that produced anywhere?   04:18:11
17      MS. SELTZER:   It was produced   04:18:13
18  by Mr. Fried.  It was one of Mr. Fried's   04:18:13
19  documents.  It was shown to him at his   04:18:15
20  deposition I believe.   04:18:17
21      MR. DATOO:   Yes, I believe so.   04:18:18
22  I'm just --   04:18:20
23      MS. SELTZER:   It just might   04:18:21
24  refresh his recollection if he had it in   04:18:23
25  front of him.  That is all.  But go ahead.   04:18:25

271

STATE

1
2       A.   Yes, a lot of those items that   04:18:27
3   were being discussed around this time were   04:18:29
4   things that Burt and I kept basically   04:18:32
5   running into each or on with folks -- I   04:18:34
6   think the practice in the past when   04:18:39
7   McNamara was in the company, if McNamara   04:18:41
8   wasn't available and McNamara's role in   04:18:46
9   the company was he was effectively a half   04:18:49
10  time CEO -- he worked for LVI, and he   04:18:51
11  worked for Penn Hall.  He worked for two   04:18:54
12  different companies, and so I think there   04:18:56
13  were circumstances where people had gotten   04:18:58
14  used to getting input from Burt if Bob   04:19:00
15  wasn't available.  And so it was a   04:19:04
16  standard practice I think if you can't get   04:19:07
17  one you just call the other one, and that   04:19:09
18  really wasn't the way I wanted   04:19:11
19  things -- how I wanted things to work.   04:19:13
20      Q.   Okay.  I think my -- my specific   04:19:15
21  question was what did -- maybe it wasn't   04:19:17
22  my question.  I don't remember.  But what   04:19:20
23  did John Leonard tell you that made you   04:19:22
24  believe that Mr. Fried was meddling   04:19:27
25  constantly and interfering with the   04:19:30

272

STATE

1
2   business?   04:19:32
3       MS. SELTZER:   Objection.  Asked   04:19:32
4   and answered, but you can answer it again.   04:19:33
5       A.   I -- I don't know -- I don't   04:19:35
6   recall specific -- a specific discussion   04:19:37
7   on that.   04:19:41
8       Q.   And was it one discussion or   04:19:42
9   multiple discussions with Mr. Leonard?   04:19:45
10      A.   I -- look, I don't know of any   04:19:47
11  specific discussion.  I just recall there   04:19:49
12  were a number of things that kept coming   04:19:52
13  back, and there was confusion about who   04:19:55
14  was doing what, and whether you want to   04:19:58
15  call that meddling or just confusion, you   04:20:02
16  know, to me it is the same thing.   04:20:04
17      Q.   Well, you used the word meddling   04:20:06
18  and interfering?   04:20:08
19      A.   Yes.  Okay.   04:20:09
20      Q.   And my -- to me they seem   04:20:10
21  harsher than confusion.  Does that go with   04:20:14
22  you as well?   04:20:17
23      A.   Well, I'll -- okay.   04:20:17
24  They're -- they're harsher.   04:20:26
25      Q.   So were these terms accurate?   04:20:27

273

STATE

1
2       A.   Yes.  I mean I just -- I think   04:20:30
3   there was a level of frustration that I   04:20:32
4   had by this point in time.  I just had   04:20:34
5   this three-hour meeting with Burt, and,   04:20:36
6   you know, if it is a characterization that   04:20:40
7   is harsh, it is probably because I was   04:20:44
8   just done with a meeting that we had gone   04:20:46
9   through many items, including a list   04:20:48
10  duties that I didn't agree with.  I told   04:20:51
11  Burt that I didn't agree with those items,   04:20:53
12  that I intended to give most of those to   04:20:55
13  other people, and that is what I -- that   04:20:57
14  is how I felt.  That is what I wrote.   04:21:00
15  Those are my words.   04:21:02
16      Q.   So were you exaggerating the   04:21:03
17  extent of any issues with Mr. Fried and   04:21:05
18  the senior management team?   04:21:09
19      MS. SELTZER:   Objection to   04:21:11
20  form.  Go ahead.   04:21:13
21      A.   I don't know if I was or I   04:21:14
22  wasn't.  I don't recall specifically what   04:21:16
23  was on my mind at that time.   04:21:18
24      Q.   In order to save time, I am just   04:21:19
25  going to ask you do you recall any   04:21:22

VERITEXT REPORTING COMPANY

212-267-6868                                   516-608-2400

274

STATE
1
2  specific conversations with any of the        04:21:24
3  other six that would give you the            04:21:27
4  impression that Mr. Fried was constantly     04:21:32
5  meddling and interfering with the            04:21:34
6  business?                                    04:21:36
7      A.  I think with -- with Joseph          04:21:36
8  Annarumma there may have been some issues.  04:21:38
9  I don't know if he said there was constant   04:21:41
10 interference, but there was some I believe   04:21:44
11 disagreement about tracking down lease       04:21:46
12 space.  On -- you know, in terms of          04:21:50
13 specifics, I know there was involvement      04:21:55
14 related to this purchase of the Hudak        04:21:58
15 assets, and John Leonard would have been     04:22:01
16 involved with that as would have probably    04:22:03
17 Paul Cutrone to some extent.  I am trying    04:22:06
18 to remember the other items that we          04:22:13
19 discussed on the agenda that day.  You       04:22:16
20 know, I think what triggered this is just    04:22:18
21 a number of these items that were on our     04:22:21
22 agenda that day and realizing that, you      04:22:23
23 know, things were kind of out of control     04:22:26
24 in some -- in some ways.  I wish -- you      04:22:28
25 know, I wish I had the agenda.  Then I       04:22:31

275

STATE
1
2  could truly give you some specifics.         04:22:33
3      Q.  I'll -- I'll bring that out for      04:22:35
4  you in a bit.                                04:22:37
5      A.  Okay.                                04:22:38
6      Q.  Now, other than Mr. Annarumma,       04:22:38
7  Mr. Leonard, and Mr. Cutrone, do you         04:22:42
8  recall any specific conversations with the   04:22:45
9  other people on the management team that     04:22:47
10 gave you the impression that Mr. Fried was   04:22:51
11 constantly meddling and interfering with     04:22:52
12 the business?                                04:22:55
13     A.  I think I had a conversation         04:22:55
14 with John Leonard not specifically about     04:22:57
15 himself but about Greg DiCarlo and -- and,   04:23:00
16 you know, essentially John trying to         04:23:05
17 advocate that, you know, Greg needed some    04:23:08
18 space, and, you know, did I -- but again I   04:23:11
19 don't recall anything that was specific as   04:23:16
20 to what was said.                            04:23:20
21     Q.  Anything else?                       04:23:21
22     A.  Nothing that comes to mind.          04:23:22
23     Q.  Okay.  Now, with respect to John     04:23:25
24 Annarumma, do you recall when that           04:23:27
25 conversation took place?                     04:23:31

276

STATE
1
2      A.  No, I just remember something        04:23:35
3  being said to the effect that we were        04:23:38
4  using a broker because they were buddies     04:23:40
5  of Matt Dembin's or something, and that      04:23:44
6  Joe's wife was in the real estate business   04:23:49
7  and, you know, why -- why is that the        04:23:51
8  business -- I mean there was just some       04:23:53
9  discomfort about how that was being          04:23:56
10 handled.  I don't know exactly when that     04:23:58
11 was, if it was at this time or at a          04:24:01
12 different team.  I don't recall.             04:24:03
13     Q.  And did -- did Mr. Annarumma         04:24:05
14 complain to you about that?                  04:24:08
15     A.  I think he did actually.             04:24:09
16     Q.  And what was the nature of his       04:24:11
17 complaint about Mr. Fried?                   04:24:14
18     A.  That he was a big boy, and he        04:24:15
19 could do this job.  It wasn't that big a     04:24:17
20 deal, and he didn't need anybody's help.     04:24:19
21     Q.  Mr. Annarumma didn't need           04:24:22
22 anybody's help?                             04:24:24
23     A.  Right.                               04:24:25
24     Q.  Was it your understanding that       04:24:25
25 Mr. Annarumma was working with Mr. Fried    04:24:26

277

STATE
1
2  on this or Mr. Fried was supervising him     04:24:29
3  on this?                                     04:24:32
4      A.  I don't -- I don't know how they     04:24:32
5  were working together on it at that time.    04:24:35
6      Q.  And how did you interpret            04:24:36
7  that -- why did you interpret that to mean   04:24:42
8  that Mr. Fried was meddling and             04:24:45
9  interfering?                                 04:24:46
10     A.  Why would I interpret it that        04:24:47
11 way?                                         04:24:51
12     Q.  Yes.                                 04:24:51
13     A.  Because that is kind of what it      04:24:52
14 sounds like.                                 04:24:55
15     Q.  Did you ever talk to Mr. Fried       04:24:56
16 about that?                                  04:24:57
17     A.  I -- I don't believe I talked to     04:24:57
18 him on October 19, if that is what you       04:25:01
19 mean.                                        04:25:03
20     Q.  No, just in general discussion       04:25:04
21 about Mr. Annarumma's complaint.             04:25:05
22     A.  I don't recall.  I don't believe     04:25:08
23 so.                                          04:25:09
24     Q.  Okay.  And was it only one time      04:25:10
25 you spoke to Annarumma about this?           04:25:13

VERITEXT REPORTING COMPANY

212-267-6868                                    516-608-2400

278

```
1          STATE
2      A.   In that time frame, I believe    04:25:16
3   so.                              04:25:20
4      Q.   What do you mean that time       04:25:20
5   frame?                            04:25:23
6      A.   In that short window of time.    04:25:23
7   I've had a number of discussions      04:25:25
8   subsequent about various things.      04:25:27
9      Q.   So post October 19, correct?     04:25:30
10     A.   Yes.  Post, you know, November,  04:25:34
11  December time frame.               04:25:38
12     Q.   Okay.  And with respect to the   04:25:39
13  conversation you had with Mr. Leonard or 04:25:44
14  Mr. Cutrone about the purchase of the  04:25:46
15  Hudak -- Hudak --                  04:25:48
16     A.   Hudak.                      04:25:50
17     Q.   -- Hudak assets, what did they   04:25:51
18  tell you about Burt's role in that?    04:25:53
19     A.   Well, I think that had been      04:25:57
20  initiated prior to my time, and there was 04:25:58
21  a negotiation going on and trying to   04:26:02
22  finalize terms and conditions, and there 04:26:05
23  was I believe uncertainty among the group 04:26:09
24  about who was going to actually make the 04:26:12
25  decision about what terms and conditions 04:26:14
```

279

```
1   the company would accept in that       04:26:16
2   transaction.                       04:26:18
3      Q.   And what gave you the impression 04:26:18
4   that Mr. Fried was meddling or interfering 04:26:22
5   in that?                           04:26:25
6      A.   Because he was directly         04:26:26
7   participating in calls and providing   04:26:27
8   direction to people as to what we were 04:26:30
9   going to do.                       04:26:32
10     Q.   And do you feel that should have 04:26:32
11  been your role?                    04:26:34
12     A.   I think so, yes.             04:26:35
13     Q.   Okay.  And did you talk to Mr.   04:26:36
14  Fried about that?                  04:26:38
15     A.   I don't recall talking to him    04:26:39
16  about that.                        04:26:40
17     Q.   And do you recall when you had   04:26:41
18  this conversation with Mr. Leonard and Mr. 04:26:43
19  Cutrone?                           04:26:47
20     A.   I told you I don't recall       04:26:47
21  whether I had a specific discussion with 04:26:50
22  either one of them.  I just recall     04:26:51
23  discussions.                       04:26:53
24     Q.   Okay.  Did you discuss with the  04:26:54
25                                     
```

280

```
1          STATE
2   two -- the two items we just discussed,  04:26:59
3   did you document on any of those, any  04:27:02
4   communications with Annarumma about the 04:27:05
5   real estate he complained about Burt   04:27:07
6   or the purchase of the Hudak -- Hudak   04:27:09
7   assets?                            04:27:14
8      A.   I don't -- I don't know if I did 04:27:15
9   or I didn't.  If I did, I think it     04:27:18
10  would -- we -- if you've got an e-mail to 04:27:21
11  show me, I would say yes.  I just don't 04:27:24
12  remember.                          04:27:27
13     Q.   Okay.  And you also testified    04:27:27
14  that John Leonard -- you spoke John     04:27:30
15  Leonard, and he mentioned that Greg    04:27:37
16  DiCarlo needed some space?          04:27:39
17     A.   Yes, I think John -- I mean I    04:27:41
18  don't know if this is a view Greg shares 04:27:44
19  or doesn't share, but I think John was 04:27:46
20  concerned that Greg, you know, had -- had 04:27:48
21  been in a position where he was being  04:27:50
22  elevated to general counsel, and I wanted 04:27:53
23  to make sure that Greg had ample room to 04:27:55
24  perform his duties the way he wanted to 04:27:58
25  perform them.                      04:28:00
```

281

```
1          STATE
2      Q.   And why did you -- why did you   04:28:02
3   interpret that as Mr. Fried meddling or 04:28:05
4   interfering with the business?        04:28:08
5      A.   Well, because if -- if Greg      04:28:10
6   DiCarlo was working directly for me, it is 04:28:13
7   somewhat problematic if Greg is concerned 04:28:16
8   about making decisions without feeling 04:28:19
9   like he has to ask someone else if he can 04:28:20
10  do something.                      04:28:22
11     Q.   Okay.  And do you recall when    04:28:23
12  you had this conversation with Mr.     04:28:25
13  Leonard?                           04:28:27
14     A.   No.                         04:28:27
15     Q.   And did you ever talk to Mr.     04:28:28
16  Fried about this?                  04:28:30
17     A.   I don't believe so.          04:28:31
18     Q.   Okay.  And is this all you       04:28:33
19  recall about Mr. Fried's constant meddling 04:28:37
20  and interfering?                   04:28:41
21     A.   Right now, yes.              04:28:42
22     Q.   Okay.  Now, did you ever send an 04:28:46
23  e-mail or have a conversation with any of 04:28:51
24  these people letting them know that they 04:28:53
25  report to you?                     04:28:56
```

VERITEXT REPORTING COMPANY

212-267-6868                                        516-608-2400

282

                    STATE
1
2       A.   I don't know if I sent an        04:28:58
3    e-mail.  I published and org chart fairly  04:29:01
4    soon after coming to the company because I  04:29:04
5    changed -- you know, my statement about    04:29:06
6    senior people, I had changed roles of some  04:29:09
7    of the senior management team, and I put    04:29:11
8    out an org chart.  I know I changed the     04:29:14
9    job title of Kalam Sookram.  I recently     04:29:17
10   made Joseph Annarumma vice president.  So   04:29:20
11   there was something that went out within    04:29:22
12   the company.  I don't know if -- you know,  04:29:24
13   if I sent it out or if someone else did,    04:29:28
14   but yes.                        04:29:30
15          MR. DATOO:  Joanne, to the        04:29:32
16   extent it hasn't been produced --          04:29:33
17          MS. SELTZER:  It has been.         04:29:35
18          MR. DATOO:  Okay.               04:29:37
19          MS. SELTZER:  Trust me.  In        04:29:39
20   fact, I think it might have also come from  04:29:40
21   Mr. Fried.                      04:29:43
22          MR. DATOO:  Okay.               04:29:43
23          MS. SELTZER:  I think it was in    04:29:44
24   your collection actually and also in mine.  04:29:45
25          MR. DATOO:  Okay.               04:29:49

283

                    STATE
1
2       A.   I just don't know if I sent it    04:29:50
3    out or someone else did.  I -- I don't      04:29:51
4    recall.                         04:29:53
5       Q.   Do you recall when the org chart  04:29:54
6    was sent out?                   04:29:55
7       A.   No, shortly after I started       04:29:56
8    working there.                  04:29:58
9       Q.   And was it your belief that the   04:29:59
10   org chart would have cleared up any        04:30:04
11   confusion as to who reported to who?       04:30:06
12      A.   It looked pretty clear to me.     04:30:08
13      Q.   And if there was any confusion,   04:30:10
14   do you believe that Burt was the cause of   04:30:13
15   that confusion?                 04:30:15
16      A.   I don't know.               04:30:16
17      Q.   Why do you think that confusion   04:30:19
18   existed then?                   04:30:21
19      A.   What confusion are we talking     04:30:24
20   about?                       04:30:26
21      Q.   Confusion as to who is making     04:30:26
22   the decisions and who reports to who.      04:30:28
23      A.   Because I think historically it   04:30:30
24   just happened a lot.  I think that the      04:30:33
25   relationship that Burt and Bob had was     04:30:35

284

                    STATE
1
2    different than the relationship that Burt   04:30:38
3    and I were going to have, and that Bob      04:30:40
4    didn't mind a lot of things being dealt     04:30:42
5    with by Burt that I felt like I could       04:30:47
6    handle, and that may be because Bob had     04:30:49
7    two companies he was running.  I don't      04:30:52
8    know.                        04:30:54
9       Q.   Do you think there was confusion  04:30:54
10   because people were just used to reporting  04:30:56
11   to Mr. Fried?                   04:30:58
12      A.   Could -- it could be that.  Some  04:30:59
13   of that certainly.                 04:31:00
14      Q.   So would -- if someone were to    04:31:01
15   report to Mr. Fried as opposed to report    04:31:04
16   to you, would that be Mr. Fried's fault?    04:31:06
17          MS. SELTZER:  Objection to        04:31:12
18   form.                        04:31:13
19      A.   What -- reports to --           04:31:13
20      Q.   If there was any confusion as to  04:31:15
21   who to reports to who --            04:31:17
22      A.   Okay.                       04:31:17
23      Q.   -- would that be Mr. Fried's     04:31:18
24   fault in light of the fact that you sent    04:31:22
25   an org chart out shortly after you         04:31:22

285

                    STATE
1
2    started?                      04:31:25
3       A.   Would it be his fault that       04:31:25
4    they -- no, I am not here to blame him for  04:31:26
5    anything.                     04:31:30
6       Q.   So if there was any confusion,   04:31:30
7    which seems to me -- which seems to be the  04:31:35
8    basis of the second sentence in           04:31:43
9    Plaintiff's 32, paragraph 2, why would you  04:31:45
10   construe that as Mr. Fried meddling and     04:31:49
11   interfering with the business?           04:31:52
12      A.   Because at the time I wrote this  04:31:53
13   e-mail at 5 o'clock on Tuesday, October     04:31:56
14   19, after spending three hours I was        04:32:00
15   probably frustrated and felt like the      04:32:02
16   things that were going on were meddling.    04:32:06
17   Were they meddling?  Semantics.  You       04:32:08
18   decide.                       04:32:11
19      Q.   Okay.                       04:32:11
20          MR. DATOO:  We are going to       04:32:33
21   look at the agenda.                04:32:35
22          MS. SELTZER:  I think that        04:32:37
23   would be helpful.                 04:32:38
24          MR. DATOO:  Okay.               04:32:38
25      A.   You know what?  I -- there were   04:32:39

VERITEXT REPORTING COMPANY

212-267-6868                                    516-608-2400

**286**

| | | STATE |
|---|---|---|
1    two items that were on the agenda that I    04:32:41
2    know were issues.  One is the CIO search,    04:32:51
3    and the other is the HR search, and I know    04:32:51
4    Burt was particularly unhappy or expressed    04:32:51
5    unhappiness that I was terminating the CIO    04:32:52
6    search, and I just saw no need for that    04:32:55
7    position, and I believe today I can say it    04:33:02
8    was the right choice.  It is not a    04:33:04
9    position we needed to fill.    04:33:05
10    Q.   So --    04:33:07
11    A.   And the same with the HR    04:33:08
12    position.  I just didn't feel like -- that    04:33:09
13    there was a need for those, and I hadn't    04:33:13
14    been there long enough to fully assess    04:33:14
15    them, and so I killed one of them, and    04:33:16
16    I -- I put the other one on hold and    04:33:19
17    ultimately terminated that search as well.    04:33:21
18    Q.   So with respect to the CIO    04:33:23
19    search, was -- did you view that as Mr.    04:33:25
20    Fried meddling or interfering with the    04:33:30
21    business?    04:33:33
22    A.   I -- I think he was an advocate    04:33:33
23    to do that, and I had heard enough and    04:33:36
24    made my decision, and there was probably a    04:33:39

**287**

| | | STATE |
|---|---|---|
1    disagreement about whether we should do    04:33:42
2    that or not.    04:33:45
3    Q.   Did he support your decision    04:33:45
4    ultimately?    04:33:47
5    A.   I don't know that we ever got to    04:33:47
6    a position where it was supported or not    04:33:50
7    supported.  Shortly after this, things    04:33:52
8    kind of diverged.  So --    04:33:55
9    Q.   Do you know if -- was Mr. Fried    04:33:57
10    searching for a CIO prior to your hiring    04:33:59
11    by LVI?    04:34:01
12    A.   In parallel with my hiring I    04:34:02
13    believe.    04:34:03
14    Q.   So when he was interim CEO he    04:34:04
15    was looking for a CIO?    04:34:07
16    A.   Right.    04:34:09
17    Q.   And did he inform you that he    04:34:09
18    was searching for a CIO?    04:34:14
19    A.   Yes.    04:34:16
20    Q.   And you -- and you said you    04:34:16
21    terminated the search?    04:34:21
22    A.   Yes.  And I -- I told him that    04:34:22
23    as well.    04:34:25
24    Q.   Okay.  And did he make an issue    04:34:26

**288**

| | | STATE |
|---|---|---|
1    of your decision on that?    04:34:27
2    A.   I don't -- you know, I just    04:34:29
3    remember him being displeased or my    04:34:31
4    interpreting him as being displeased.  I    04:34:33
5    don't know -- I don't specifically recall    04:34:40
6    what was said or not said.    04:34:41
7    Q.   Okay.  And with the DHR I assume    04:34:43
8    you mean director of human resources?    04:34:45
9    A.   Yeah.    04:34:47
10    Q.   Does the same go for that?    04:34:47
11    A.   Yes.  There was an issue at the    04:34:50
12    time with an -- an ICE investigation into    04:34:52
13    employment practices that Burt's opinion    04:34:55
14    was that an HR executive was needed to    04:35:01
15    ensure that didn't happen again.  I felt    04:35:04
16    like there were other issues that had    04:35:06
17    caused that problem and didn't believe we    04:35:09
18    needed to hire somebody in that position.    04:35:14
19    I believe we ultimately needed to hire a    04:35:16
20    person in HR compliance, and, you know,    04:35:19
21    that is a different job description than    04:35:22
22    we were looking for.    04:35:26
23    Q.   So do you know if Mr. Fried was    04:35:27
24    searching for a DHR while he was interim    04:35:29

**289**

| | | STATE |
|---|---|---|
1    CEO?    04:35:32
2    A.   I -- it was initiated.  I don't    04:35:33
3    know when it actually began.  I -- I    04:35:36
4    inherited an initiated search, but I don't    04:35:39
5    know that it had really gotten off the    04:35:42
6    ground.    04:35:44
7    Q.   And Mr. Fried informed you that    04:35:45
8    he was searching for or thinking about    04:35:46
9    looking for a DHR?    04:35:49
10    A.   I believe so.    04:35:51
11    Q.   And you killed that one as well?    04:35:52
12    A.   Yes.    04:35:54
13    Q.   And did Mr. Fried take any issue    04:35:55
14    with that?    04:35:58
15    A.   I don't -- I -- I think -- I    04:35:58
16    didn't actually terminate that search    04:36:01
17    until after Mr. Fried had left the    04:36:02
18    company, so I guess not.    04:36:04
19    Q.   So were these just two examples    04:36:06
20    of him transitioning duties to you or him    04:36:08
21    bringing issues to your attention?    04:36:18
22    MS. SELTZER:  Objection to the    04:36:20
23    form.    04:36:21
24    A.   I --    04:36:22

73  (Pages 286 to 289)

290

STATE

1
2    Q.   Like --                      04:36:23
3    A.   I don't know how to          04:36:24
4    characterize, you know, every interaction.  04:36:25
5    You know, there is a -- a somewhat gray    04:36:27
6    area here between transitioning and        04:36:32
7    staking out turf that is mine, and, you    04:36:34
8    know, it is just a whole process of --     04:36:37
9    Q.   Well, he ceded decision making   04:36:39
10   authorities to you on these two issues,    04:36:43
11   didn't he?                       04:36:45
12   A.   I -- well, I took decision    04:36:45
13   making authority. I -- you could say he    04:36:48
14   ceded probably, but it really didn't       04:36:53
15   matter because I knew it was a decision    04:36:55
16   that I was going to ultimately make. I     04:36:57
17   mean there was no reason I wouldn't make    04:36:59
18   that decision.                   04:37:01
19   Q.   So it was -- was this -- you   04:37:01
20   raised this.                    04:37:04
21   A.   Okay.                     04:37:04
22   Q.   And I am just trying to figure  04:37:05
23   out why. Is it an example of Burt doing    04:37:07
24   something he shouldn't have been doing or   04:37:09
25   is this just something that came to your   04:37:11

291

STATE

1
2    mind that was discussed at the October     04:37:13
3    19th meeting?                    04:37:15
4    A.   It is an example of -- you know,  04:37:16
5    I was thinking about the agenda and what   04:37:18
6    we discussed at that meeting and what my   04:37:20
7    frustration subsequent to that meeting     04:37:23
8    would have been that would have led to me   04:37:25
9    making the statement about meddling and    04:37:28
10   interfering in the aspects of the          04:37:30
11   business.                        04:37:31
12   Q.   But why would you be frustrated  04:37:32
13   about a search for a CIO and a DHR -- or a  04:37:34
14   search for a C -- for a CIO that began     04:37:39
15   before you were hired and when it was      04:37:42
16   brought to your attention you killed it?   04:37:45
17   A.   Because we had spent about      04:37:47
18   30,000 dollars that I felt like was just   04:37:48
19   wasted.                         04:37:52
20   Q.   Was that money spent --        04:37:52
21   A.   To initiate the search.        04:37:54
22   Q.   But was that money spent while  04:37:56
23   Mr. Fried was the CEO?               04:37:57
24   A.   It was committed to and        04:37:59
25   ultimately we paid for it after I was the  04:38:01

292

STATE

1
2    CEO.                            04:38:04
3    Q.   But that was -- that didn't come  04:38:05
4    under your watch, correct?           04:38:07
5    A.   Yeah. It was -- we paid under   04:38:09
6    my watch.                       04:38:11
7    Q.   Because it was committed?       04:38:11
8    A.   Yes.                      04:38:13
9    Q.   Prior to your watch?           04:38:13
10   A.   Yeah.                     04:38:15
11   Q.   Okay. And how about the DHR?    04:38:15
12   A.   The same kind of scenario. I    04:38:17
13   don't recall if we had significant monies  04:38:19
14   committed to support that or not.          04:38:22
15   Q.   So this is just where you       04:38:24
16   disagreed with the decision Mr. Fried made  04:38:26
17   while he was the interim CEO before you    04:38:28
18   even were employed by LVI?           04:38:31
19   A.   To some extent, yes. I mean a   04:38:33
20   lot of the issues here are management      04:38:35
21   style and strategy oriented where we have  04:38:39
22   very different management styles, and I    04:38:43
23   had a very different view of where I       04:38:45
24   thought the company should go.             04:38:50
25   Q.   Okay.                     04:38:52

293

STATE

1
2    MR. DATOO:  Do you want to take   04:38:58
3    a break while Matt --              04:38:59
4    MS. SELTZER:  No, why don't you   04:39:01
5    keep going because it is getting on --    04:39:03
6    MR. DATOO:  So we will circle    04:39:06
7    back.                           04:39:07
8    MS. SELTZER:  Yes. Unless you    04:39:07
9    need to take a break.               04:39:09
10   THE WITNESS:  No. Let's go on.    04:39:10
11   (Plaintiff's Exhibit 33 marked     04:39:32
12   for identification.)               04:39:34
13   (Document handed to witness.)      04:39:36
14   Q.   Mr. State, you have in front of  04:39:36
15   you a document marked Plaintiff's Exhibit  04:39:38
16   33.                             04:39:44
17   A.   Right.                    04:39:46
18   Q.   Can you just take a look at it.  04:39:47
19   Let me know if you have seen it before.    04:39:49
20   A.   Yes, I have seen parts of it. I  04:39:51
21   don't know that I have seen the top part   04:39:53
22   of it before.                     04:39:55
23   Q.   Okay. Can you tell me what this  04:39:55
24   is?                             04:40:01
25   A.   Yes, I believe I had spoken to  04:40:01

294

STATE

1
2     Mr. Simmons that evening.  This was a late   04:40:04
3     evening e-mail to him, and he -- I believe   04:40:11
4     he had asked me to simply put some text      04:40:17
5     together for -- for him.  He wanted to       04:40:20
6     deal with issues related to Burt and at      04:40:25
7     the time I think lacked I think the          04:40:34
8     motivation at that point in the evening to   04:40:36
9     do this and simply requested that I do it    04:40:38
10    on his behalf, and then I believe there      04:40:41
11    should be a follow on to this.  He then --   04:40:44
12    he took this and actually changed it         04:40:47
13    somewhat and did send an e-mail or a         04:40:50
14    letter to Mr. Fried.                         04:40:52
15        Q.   Why was Mr. Simmons dealing with   04:40:52
16    this?                                        04:40:54
17        A.   My primary concern with this is,   04:40:55
18    you know, having not known Burt was an       04:41:01
19    employee of the company when I came to the   04:41:03
20    company and then finding out he was an       04:41:05
21    employee and then really not understanding   04:41:08
22    his employment status with the company and   04:41:11
23    how his being chairman of the board          04:41:12
24    somehow also involved him being an           04:41:15
25    employee that didn't work for anyone in      04:41:19

295

STATE

1
2     the company, it -- to me the issue was       04:41:20
3     dealing with it as chairman of the board,    04:41:24
4     and as the managing shareholder, although    04:41:27
5     not the largest shareholder, Code Hennessy   04:41:30
6     I think agreed with the other shareholders   04:41:33
7     that they would take the lead in managing    04:41:35
8     the investment aspect of this, and Brian     04:41:37
9     Simmons simply said he would take the lead   04:41:45
10    on dealing with -- with Burt issues from     04:41:46
11    the perspective that he is the chairman of   04:41:49
12    the board, and this is the board talking,    04:41:52
13    not -- I wasn't really in a position to      04:41:53
14    make those decisions.                        04:41:56
15        Q.   So did you draft this e-mail in     04:41:57
16    response to a request by Mr. Simmons?        04:42:00
17        A.   Yes.  I think he -- I think we      04:42:03
18    had a conversation, and I -- I just recall   04:42:05
19    there was some suggestion that we needed     04:42:10
20    to get this together, and he didn't          04:42:14
21    have -- he was getting on a plane or         04:42:15
22    something.  I don't remember what all it     04:42:18
23    was.                                         04:42:20
24        Q.   And was there a conversation        04:42:20
25    prior to you writing this e-mail with any    04:42:25

296

STATE

1
2     other board members about Mr. Fried's job    04:42:30
3     duties or his role?                          04:42:32
4         A.   I -- I think I just spoke -- I      04:42:34
5     think it was Brian that I spoke with.        04:42:36
6         Q.   And now if I can direct your        04:42:38
7     attention to the first page.                 04:42:41
8         A.   Okay.                               04:42:44
9         Q.   In the second -- the third         04:42:45
10    sentence, you write: "My goal with           04:42:47
11    the" -- "my goal with the letter is to       04:42:50
12    attempt to present some positives that       04:42:52
13    serve to break the ice and then deliver      04:42:54
14    the bad news."                               04:42:56
15             What were you referring to by       04:42:57
16    bad news?                                     04:42:59
17        A.   I think the bad news was that       04:42:59
18    his of duties that had been presented just   04:43:02
19    simply weren't in -- on my agenda, that I    04:43:04
20    didn't want those duties being performed     04:43:08
21    by somebody that would be the chairman of    04:43:10
22    the company.                                 04:43:14
23        Q.   So was it because of his job        04:43:15
24    duties or was it because of the way he       04:43:17
25    performed his duties?                        04:43:20

297

STATE

1
2         MS. SELTZER:  Objection to the          04:43:21
3     form.                                        04:43:22
4         A.   It was simply because the duties   04:43:23
5     were not duties that I believed were the     04:43:27
6     kinds of things that he should be doing.     04:43:30
7         Q.   He, Mr. Fried or he --             04:43:32
8         A.   He Mr. Fried.                       04:43:34
9         Q.   Was there anything wrong with      04:43:36
10    the way he was discharging these duties?     04:43:37
11        MS. SELTZER:  Objection to the          04:43:42
12    form, but you can answer.                    04:43:42
13        A.   Okay.  I -- I don't know.  I       04:43:43
14    don't know that there was anything wrong     04:43:50
15    with the way his duties were being           04:43:50
16    performed.                                    04:43:50
17        Q.   In your -- if you go to the        04:43:51
18    second page, the top line --                 04:44:06
19        A.   Yes.                                04:44:13
20        Q.   -- the first full sentence "He     04:44:14
21    told me his own objective is to develop      04:44:15
22    the LVI team for the long haul and to        04:44:18
23    maximize LVI performance from the team."     04:44:20
24        A.   Right.                              04:44:24
25        Q.   What did you mean by the long      04:44:25

75 (Pages 294 to 297)

VERITEXT REPORTING COMPANY

212-267-6868                                    516-608-2400

**298**

```
 1            STATE
 2   haul?                        04:44:27
 3       A.  I am -- I think the words speak   04:44:27
 4   for themselves.  Like long-term we have   04:44:33
 5   got to build value in the company year    04:44:35
 6   after year after year after year.  It is a  04:44:38
 7   continual process.               04:44:41
 8       Q.  And did you not think that   04:44:41
 9   Mr. Fried would be there for the long     04:44:43
10   haul?                          04:44:45
11       A.  I didn't know.  I -- the long   04:44:45
12   haul to me is we do what is right.  We    04:44:47
13   move forward, and we grow the business    04:44:50
14   year after year after year.  I -- I had no   04:44:52
15   idea -- if you recall, we made an offer to  04:44:55
16   Mr. Fried of a consulting relationship    04:44:57
17   that was open ended, and I like everyone  04:45:01
18   else would have been very happy if we had  04:45:04
19   been able to come to an agreement on that. 04:45:05
20       Q.  That was a non-guaranteed offer  04:45:08
21   though, correct?                 04:45:10
22       A.  I don't know.  I didn't -- I    04:45:11
23   wasn't involved in that offer, so I don't   04:45:13
24   know.                          04:45:14
25       Q.  You weren't involved in       04:45:15
```

**299**

```
 1            STATE
 2   negotiating the terms?            04:45:16
 3       A.  No.                     04:45:18
 4       Q.  Did you review the offer?     04:45:18
 5       A.  I don't think I reviewed it.  I   04:45:19
 6   think I saw it about the time it went out.  04:45:21
 7       Q.  Do you know that your -- do you  04:45:25
 8   know if your signature block was set up to  04:45:27
 9   sign that agreement on behalf of the      04:45:29
10   company?                       04:45:31
11       A.  It probably have been, but     04:45:31
12   I don't believe I saw the document before  04:45:33
13   it went out.                    04:45:36
14       Q.  Who negotiated that document?  04:45:37
15       A.  I think Brian Simmons offered   04:45:39
16   it.  I don't know if -- I wouldn't say     04:45:41
17   that it was a negotiation.  I think he     04:45:43
18   offered that document.           04:45:46
19       Q.  Do you know the terms of the   04:45:46
20   agreement?                     04:45:47
21       A.  Generally I think I do, yes.  I   04:45:48
22   mean I would have to look at it, but I     04:45:51
23   think generally I saw it and saw the      04:45:53
24   terms.                         04:45:55
25       Q.  And based on -- on what you    04:45:55
```

**300**

```
 1            STATE
 2   remember the terms were, you said you     04:45:59
 3   would be very happy with that arrangement? 04:46:00
 4       A.  It would have been an         04:46:02
 5   arrangement that I felt like was good for   04:46:03
 6   both parties.                   04:46:05
 7       Q.  Okay.  We will -- we will go   04:46:05
 8   through that later on.            04:46:09
 9       A.  Okay.                    04:46:10
10       Q.  Now, in this e-mail you wrote in  04:46:11
11   the I guess first full paragraph starting  04:46:23
12   "In terms of" -- you said you were -- "In   04:46:26
13   terms of your future daily involvement I   04:46:28
14   am of the opinion that we need to         04:46:31
15   transition all of your activities to the   04:46:32
16   management team and that you become an    04:46:35
17   on-call resource for Scott."          04:46:37
18       Do you see that?              04:46:39
19       A.  Yes.                     04:46:40
20       Q.  If all of Mr. Fried's activities  04:46:41
21   were transitioned, what would he be left   04:46:47
22   with?                          04:46:52
23       A.  Whatever support was required   04:46:52
24   that I asked for.                04:46:56
25       Q.  But that would -- would that   04:46:57
```

**301**

```
 1            STATE
 2   have involved him agreeing to this        04:47:01
 3   agreement that -- that we just mentioned?  04:47:06
 4       MS. SELTZER:  I object to the    04:47:10
 5   form.                          04:47:11
 6       A.  I -- there was no agreement that  04:47:11
 7   I had contemplated.  I don't know if when  04:47:14
 8   Simmons took this language and converted  04:47:17
 9   it and then put -- I don't know if he put   04:47:19
10   an agreement with it.  I don't -- I wasn't  04:47:22
11   involved in that aspect of this.          04:47:25
12       Q.  I guess as of -- you know,     04:47:26
13   October 21, if you transitioned all his   04:47:28
14   duties, he would have been left with just   04:47:31
15   being as a resource to you?           04:47:33
16       A.  Correct.                  04:47:35
17       Q.  And would he have still been   04:47:36
18   employed by the company?             04:47:39
19       A.  I -- I believe that by this time  04:47:40
20   the conclusion was that he would probably  04:47:44
21   become a consultant to the company, but   04:47:47
22   I -- like I said, I wasn't intimately     04:47:49
23   involved in that aspect of this.          04:47:53
24       Q.  Okay.  And if you became -- he  04:47:55
25   became a consultant, that would have been  04:47:59
```

302

```
1          STATE                      04:48:01
2   subject to the terms of the consulting   04:48:01
3   agreement we just discussed?         04:48:04
4      A.   Yeah.  I believe there was -- I   04:48:06
5   believe a consulting agreement was offered  04:48:08
6   --                               04:48:08
7      Q.   Okay.                     04:48:12
8      A.   -- as part of a process that   04:48:12
9   Brian was -- was running.         04:48:16
10        (Plaintiff's Exhibit 34 marked   04:48:51
11  for identification.)              04:48:53
12        (Document handed to witness.)    04:49:04
13  MS. SELTZER:  While we are         04:49:05
14  paused for a second, it is a quarter to  04:49:07
15  five, and I am not going to let him go   04:49:09
16  much passed 6 o'clock.  So I am just   04:49:11
17  making you aware of that.          04:49:13
18        MR. DATOO:  Let's just -- can   04:49:15
19  we count how much time we have used?    04:49:16
20        THE VIDEOGRAPHER:  Okay.  Going   04:49:20
21  off the record.  4:49 p.m.          04:49:21
22        (Recess taken.)              04:50:27
23        THE VIDEOGRAPHER:  We're        04:50:27
24  returning to the record.  4:50 p.m.     04:50:36
25      Q.   Mr. State, you have in front of   04:50:45
```

303

```
1          STATE
2   you a document that has been marked as   04:50:47
3   Plaintiff's Exhibit 5.  Do you see that?  04:50:49
4      A.   No, 34.                    04:50:52
5      Q.   I am sorry. 34.             04:50:53
6      A.   Okay.                     04:50:54
7      Q.   Do you see that?            04:50:55
8      A.   Yes.                      04:50:57
9      Q.   Is this the agenda that you were   04:50:58
10  referring to earlier on in your testimony?  04:51:00
11     A.   Yes.                      04:51:01
12     Q.   And have you had a chance to   04:51:02
13  review the agenda?                04:51:04
14     A.   Yes.                      04:51:05
15     Q.   And after reviewing it, does it   04:51:06
16  refresh your recollection as to instances   04:51:08
17  in which you believe Mr. Fried was   04:51:15
18  meddling or interfering with the business?  04:51:18
19     A.   It -- it refreshes my        04:51:20
20  recollection of the meeting.  I think I   04:51:23
21  can't say there is specifically items here   04:51:26
22  that reflect any issues with meddling.  I   04:51:29
23  know with the issue with Squibb Demolition   04:51:33
24  we had gotten crossed -- we had crossed   04:51:36
25  paths on how that was going to be handled.  04:51:41
```

304

```
1          STATE
2      If you recall, one of Mr.        04:51:43
3   Fried's requested duties was dealing with   04:51:45
4   specifically this item, and I didn't feel   04:51:50
5   like moving forward in the way that the   04:51:51
6   plan had unfolded there, and I kind of   04:51:55
7   shut that off for a couple of months.  The   04:52:00
8   corporate lodging proposal as an item   04:52:02
9   that Mr. Fried had brought forward, a good   04:52:06
10  suggestion for the company.  We ultimately   04:52:10
11  didn't use it.  We found an alternative   04:52:12
12  service.  The meeting with CIBC was   04:52:15
13  something that became irrelevant because   04:52:19
14  it was in December, and Mr. Fried had left   04:52:21
15  the company by then.  LVI Mazzocchi, there   04:52:24
16  was a little bit of a crossover there in   04:52:28
17  that it was litigation I would have   04:52:31
18  expected Mr. Fried continue to be involved   04:52:34
19  with, and I was aware of what was going on   04:52:37
20  in that dispute.  We ultimately are taking   04:52:40
21  a very different path on that litigation   04:52:44
22  than had been anticipated.  And   04:52:47
23  acquisitions, just a number of items, but   04:52:51
24  this is what what I recall we covered that   04:52:58
25  day.  I don't -- I know if we covered -- I   04:53:01
```

305

```
1          STATE
2   am sorry. I don't know if we covered the   04:53:04
3   last item.  I think we did because   04:53:06
4   I -- yes, we did because I remember   04:53:08
5   commenting that I had made a request from   04:53:10
6   the legal from Sidley to update some of   04:53:12
7   those items.                      04:53:19
8      So it was a long meeting, and   04:53:20
9   there were a number of things -- there   04:53:21
10  were things we agreed on, but there were a   04:53:23
11  number of things that we may not have   04:53:25
12  agreed on or I may have had plans that   04:53:27
13  were different than what Mr. Fried would   04:53:31
14  have preferred.  I wouldn't say it was   04:53:34
15  contentious at all.  You could see my   04:53:35
16  e-mail after this.  I honestly said Burt   04:53:38
17  showed no animosity toward me, and I fully   04:53:41
18  appreciated that, but we really can have   04:53:44
19  different views about how to run a   04:53:47
20  business like this.                04:53:48
21     Q.   Just so I am clear, was there   04:53:49
22  anything that you discussed during your   04:53:51
23  October 19 meeting with Burt that served   04:53:55
24  as a basis for your statement other than   04:53:57
25  what you just testified to that he was   04:53:59
```

77  (Pages 302 to 305)

306

```
 1              STATE
 2   meddling and interfering in the business?   04:54:01
 3       A.   No, I have not.            04:54:03
 4       Q.   Is there anything that we      04:54:05
 5   haven't discussed yet that occurred prior   04:54:06
 6   to the meeting that served as your basis   04:54:09
 7   for making a statement that Mr. Fried     04:54:11
 8   meddled or interfered?               04:54:16
 9       A.   I don't recall anything in that   04:54:17
10   time frame.                        04:54:18
11       (Document handed to witness.)     04:54:30
12       Q.   Mr. State, you have in front of   04:54:30
13   you a document that has been previously   04:54:32
14   marked as Plaintiff's Exhibit 4.        04:54:33
15       Please take a look at it and let   04:54:35
16   me know if you've seen it before.       04:54:37
17       A.   Not the top parts.  The later   04:54:39
18   parts, yes.                       04:54:41
19       Q.   And the later parts that you are   04:54:42
20   referring to, I assume that means the very   04:54:53
21   bottom of the first page and the second   04:54:53
22   and third page?                    04:54:56
23       A.   Yes, where I had sent this out.   04:54:57
24       Q.   And you sent this e-mail on     04:54:59
25   October 29, 2010, correct?            04:55:01
```

307

```
 1              STATE
 2       A.   Right.                  04:55:03
 3       Q.   Okay.                  04:55:04
 4       A.   Essentially on that one       04:55:06
 5   month -- I believe I had been asked by I   04:55:07
 6   think -- somebody had asked me to send out   04:55:10
 7   a one-month recycle of what was going on   04:55:13
 8   in the company.                    04:55:16
 9       Q.   And this was ten days after the   04:55:18
10   prior e-mail to Mr. Simmons and Mr. Hogan,   04:55:20
11   correct?                         04:55:24
12       A.   Yes.                   04:55:24
13       Q.   Okay.  Now, if I can direct your   04:55:26
14   attention to the second page, second    04:55:30
15   paragraph, the one immediately above your   04:55:33
16   name.                           04:55:36
17       A.   Okay.                  04:55:37
18       Q.   "Burt has inserted himself     04:55:37
19   uninvited in several areas since the     04:55:39
20   blowup earlier this week."            04:55:42
21       What did you mean by blowup?     04:55:43
22       A.   I don't remember what that was   04:55:45
23   referring to.  It had to be something that   04:55:53
24   they had been aware of.  Oh, I think --   04:55:55
25       Q.   Was this in reference to your   04:56:00
```

308

```
 1              STATE
 2   October 19 meeting?                 04:56:01
 3       A.   I don't know that it was because   04:56:02
 4   it was, as I said, it is ten days -- this   04:56:04
 5   is on a Friday.  It says earlier this    04:56:07
 6   week, so it would have been during the    04:56:10
 7   week of the 24th.  I don't remember what   04:56:12
 8   it was.  It was something obviously that   04:56:16
 9   these -- that Bagaria and Simmons knew    04:56:18
10   about, and it may have been -- it may have   04:56:23
11   been a conversation that Simmons had     04:56:26
12   initiated with Burt after the October 19   04:56:29
13   meeting.  I don't -- I don't remember.   04:56:33
14       Q.   So you are not aware of any    04:56:35
15   blowup?                         04:56:37
16       A.   You know, I am aware         04:56:37
17   that -- that I -- I am not -- I am not    04:56:39
18   aware of what it was now.  I know that I   04:56:41
19   wouldn't have said blowup earlier this   04:56:43
20   week if it weren't something that these   04:56:45
21   individuals were already aware of or they   04:56:49
22   would have said what blowup.           04:56:49
23       Q.   And --                  04:56:51
24       A.   But I just don't recall what    04:56:52
25   it -- I don't know what it was.  I think   04:56:54
```

309

```
 1              STATE
 2   it -- you know, thinking about it I don't   04:56:55
 3   believe it involved me necessarily.  I   04:56:57
 4   think it may have involved a discussion   04:56:59
 5   between Mr. Simmons and Burt,  Mr.      04:57:04
 6   Bagaria -- I don't know.  I just know that   04:57:09
 7   there was conflict in that time frame.    04:57:11
 8       Q.   And you believe it was between   04:57:13
 9   Mr. Fried or Mr. Bagaria and --        04:57:14
10       A.   Yes, I don't --            04:57:20
11       Q.   -- Mr. Simmons?            04:57:21
12       A.   That is my guess.  I don't know   04:57:22
13   for sure.                        04:57:24
14       Q.   You also -- and going to the    04:57:24
15   first part of that sentence, you said that   04:57:26
16   "Burt has inserted himself uninvited in   04:57:28
17   several areas since the blowup earlier   04:57:31
18   this week."                       04:57:34
19       Do you know what areas you were   04:57:35
20   referring to?                     04:57:38
21       A.   I don't recall.            04:57:38
22       Q.   Do you have any --          04:57:40
23       MR. DATOO:  Strike that.         04:57:45
24       Q.   Were there any additional     04:57:49
25   instances where you felt after your     04:57:51
```

VERITEXT REPORTING COMPANY

212-267-6868                                    516-608-2400

310

STATE

1
2  October 19 meeting that Mr. Fried          04:57:53
3  interfered or meddled in the business of     04:57:58
4  LVI?                                         04:58:01
5      A.   I don't recall.                     04:58:01
6      Q.   In the second sentence, you         04:58:02
7  wrote:  "Most troublesome is that he is      04:58:07
8  just stepping all over our new general       04:58:10
9  counsel, Greg DiCarlo, which tends to        04:58:12
10 marginalize Greg at a time when I need him   04:58:15
11 to step up."                                 04:58:18
12     A.   Right.                              04:58:19
13     Q.   What did you mean by that?          04:58:20
14     A.   I don't recall the specific         04:58:22
15 instance, and I think this was around the    04:58:23
16 time that I had expressed that John          04:58:26
17 Leonard had told me there were -- he was     04:58:28
18 concerned about something, and I am -- I     04:58:30
19 am guessing it may have had to do with a     04:58:31
20 legal issue that Greg should be handling     04:58:34
21 and -- and, you know, I don't know that      04:58:36
22 there was a fight, but I think we had just   04:58:40
23 made Greg general counsel, and I wanted      04:58:43
24 Greg to be a general counsel, and I think    04:58:45
25 there was a concern expressed by John, and   04:58:49

311

STATE

1
2  I don't know if Greg expressed it directly   04:58:53
3  to me that, hey, I thought I was the         04:58:56
4  general counsel, but apparently I don't      04:58:58
5  get to make these decisions.                 04:59:01
6      Q.   So do you know what you were        04:59:03
7  referring to when you said --                04:59:03
8      A.   I don't -- no, I don't recall       04:59:05
9  what the specific issue was.                 04:59:06
10     Q.   So let me just finish my            04:59:08
11 question, so the record is clear.            04:59:10
12          Do you know what you were           04:59:11
13 referring to when you said Mr. Fried was     04:59:11
14 stepping all over Mr. DiCarlo?               04:59:14
15     A.   I don't recall what it was.         04:59:16
16     Q.   Okay.  Did Mr. DiCarlo ever         04:59:17
17 complain to you that Mr. Fried was           04:59:21
18 stepping all over him?                       04:59:22
19     A.   I don't recall if -- I don't        04:59:23
20 recall who made mention of it.               04:59:25
21     Q.   Okay.  Did Mr. DiCarlo ever         04:59:27
22 complain to you -- complain to you about     04:59:31
23 Mr. Fried?                                   04:59:33
24     A.   When? Ever?                         04:59:34
25     Q.   At any point in time.              04:59:40

312

STATE

1
2      A.   Up to today?                        04:59:42
3      Q.   Let's just say through November     04:59:43
4  30.                                          04:59:45
5      A.   Probably not through November       04:59:46
6  30.                                          04:59:49
7      Q.   Okay.  And did he complain about    04:59:49
8  him through today?                           04:59:52
9      A.   I think there is -- there's been    04:59:53
10 some comments, yes.                          04:59:56
11     Q.   And what comments has he made?      04:59:57
12     A.   Just, you know, issues              04:59:59
13 associated with the long working             05:00:01
14 relationship they had and instances where    05:00:06
15 Mr. Fried may have been difficult or         05:00:12
16 overbearing with staff or things             05:00:16
17 like -- just common work things.             05:00:18
18     Q.   All right.  So innocous             05:00:21
19 statements or did --                         05:00:24
20          MS. SELTZER:  Objection.            05:00:25
21     Q.   -- or did it rise to a level        05:00:26
22 higher than that?                            05:00:28
23          MS. SELTZER:  I object to the       05:00:28
24 form.                                        05:00:29
25     A.   I -- I don't know how to            05:00:29

313

STATE

1
2  characterize the statements.  They were      05:00:31
3  statements.                                  05:00:33
4      Q.   And do you recall when they were    05:00:33
5  made?                                        05:00:35
6      A.   Over various times.                 05:00:36
7      Q.   But after Mr. Fried was             05:00:39
8  terminated?                                  05:00:40
9      A.   I think so, yes.                    05:00:41
10     Q.   Now, if I can direct your           05:00:42
11 attention to the last paragraph on the       05:00:51
12 last page of this document, in the third     05:00:54
13 sentence you wrote "Downsizing the           05:01:00
14 satellite office in Westport to a minor      05:01:02
15 footprint and reducing staff would save      05:01:05
16 another 1 million plus per year."            05:01:07
17          Do you see that?                    05:01:09
18     A.   Right.                              05:01:10
19     Q.   How did you -- why did you --       05:01:11
20          MR. DATOO:  Strike that.            05:01:14
21     Q.   Why did you raise this in this      05:01:15
22 e-mail?                                      05:01:19
23     A.   This was a one-month review of     05:01:19
24 the company, so I was outlining the          05:01:21
25 business -- business opportunities that we   05:01:26

VERITEXT REPORTING COMPANY

212-267-6868                                   516-608-2400

314

```
 1          STATE
 2    were working on, the business that we were   05:01:34
 3    conducting, and by that time this is -- we   05:01:36
 4    are at -- this is the end of October? Yes,   05:01:39
 5    end of October, first of November.  It was   05:01:42
 6    becoming apparent to me that the company   05:01:43
 7    was in some serious trouble and that we   05:01:45
 8    were going to have to take costs out of   05:01:51
 9    the business in order for us to survive   05:01:53
10    basically, and so that is -- that was --   05:01:56
11    the basis of this is to put the board on   05:01:59
12    notice that I was actively involved and   05:02:01
13    had been for really since the time I   05:02:04
14    started looking at the cost structure of   05:02:07
15    the company and where we had cost   05:02:09
16    inefficiencies or lack of performance that   05:02:13
17    I felt like we needed to deal with.   05:02:14
18        Q.   Was this -- was this the first   05:02:17
19    time you informed the board that you were   05:02:21
20    thinking about closing or downsizing the   05:02:21
21    satellite office in Westport?   05:02:25
22        A.   I -- I don't know -- I   05:02:26
23    don't -- it is the first time I believe I   05:02:29
24    did it in writing.  I don't know if in   05:02:30
25    speaking with any of the individual board   05:02:33
```

315

```
 1          STATE
 2    members if I had expressed that as an   05:02:35
 3    option we were looking at or not.   05:02:38
 4        Q.   Why the Westport office?   05:02:40
 5        A.   It was a -- a marketing support   05:02:43
 6    office, and my view was that the business   05:02:46
 7    development of the company was one of the   05:02:49
 8    chief issues, that the success rate with   05:02:51
 9    business development was frankly horrific.   05:02:56
10    I ended up -- as part of the closing of   05:03:00
11    that office we terminated four senior   05:03:02
12    business development people and -- I don't   05:03:05
13    know -- half a dozen or ten other people   05:03:06
14    around the company not associated with   05:03:09
15    those functions, but the business   05:03:11
16    development aspect of the company was   05:03:13
17    broken, and it -- it just didn't work.   05:03:15
18        Q.   And did that office also contain   05:03:19
19    people that did not perform any business   05:03:22
20    development or marketing functions?   05:03:25
21        A.   It -- it contained I believe two   05:03:26
22    additional administrative people.   05:03:29
23        Q.   Who were they?   05:03:31
24        A.   It -- Sheri Dembin and the   05:03:33
25    receptionist, and I don't recall her name.   05:03:38
```

316

```
 1          STATE
 2        Q.   Was Mr. DiCarlo's legal team   05:03:41
 3    also headquartered there?   05:03:44
 4        A.   They are housed in that facility   05:03:46
 5    right now, yes.   05:03:47
 6        Q.   Were they housed in that   05:03:49
 7    facility during the time you wrote this   05:03:53
 8    e-mail?   05:03:54
 9        A.   Yes.   05:03:55
10        Q.   Okay.  Now, other than the   05:03:56
11    communication we just discussed in October   05:04:05
12    of 2010, did you have any other   05:04:07
13    discussions or communications with anyone   05:04:10
14    about Mr. Fried or his job duties?   05:04:12
15        A.   I don't know.   05:04:15
16        Q.   Okay.   05:04:18
17        (Plaintiff's Exhibit 35 marked   05:04:26
18    for identification.)   05:04:28
19        (Document handed to witness.)   05:04:37
20        Q.   Mr. State, you have in front of   05:04:38
21    you a document marked Plaintiff's Exhibit   05:04:40
22    35.   05:04:43
23        Can you review the document and   05:04:43
24    let me know if you have seen it before?   05:04:46
25        A.   Yes.   05:04:47
```

317

```
 1          STATE
 2        Q.   Okay.   05:04:49
 3        A.   That is -- that's the kind of   05:04:52
 4    substance I recall that was an issue with   05:04:54
 5    me as the stepping all over our general   05:04:58
 6    counsel.   05:05:00
 7        Q.   Well, this --   05:05:01
 8        A.   The general counsel didn't   05:05:03
 9    report to Burt, but I remember this   05:05:04
10    frankly pissing me off that, you know, he   05:05:08
11    was essentially saying report -- report   05:05:14
12    back to me on this, and this guy is the   05:05:16
13    general counsel.   05:05:18
14        Q.   Well, this was -- this e-mail --   05:05:18
15    did you sent this e-mail to Mr. Gary and   05:05:23
16    Mr. Simmons after you sent the -- after   05:05:26
17    you sent plaintiff's --   05:05:30
18        A.   The prior --   05:05:35
19        Q.   Exhibit 4, correct.   05:05:37
20        A.   Where I indicated that   05:05:38
21    they -- that the general counsel was   05:05:40
22    essentially receiving direction not from   05:05:43
23    me but from -- but from Burt.   05:05:45
24        Q.   Well, that is not what you wrote   05:05:50
25    in this e-mail.   05:05:52
```

VERITEXT REPORTING COMPANY

212-267-6868                                        516-608-2400

318

```
            STATE
 1
 2      A.   I said he was stepping all over    05:05:52
 3   him.  That would mean he was providing     05:05:54
 4   direction to him.                          05:05:56
 5      Q.   Is -- is that what you meant        05:05:57
 6   by --                                      05:06:01
 7      A.   Yeah.                              05:06:01
 8      Q.   -- by stepping all over?           05:06:02
 9      A.   Yeah, that he was -- you know,     05:06:04
10   he was managing or directing the           05:06:06
11   activities of Mr. DiCarlo.                  05:06:08
12      Q.   And is that based on a             05:06:10
13   conversation you had with Mr. Leonard?     05:06:12
14      A.   I -- we have been through this,    05:06:13
15   I don't know where I got that information. 05:06:15
16      Q.   The reason I am going through       05:06:20
17   this again with you is because when I      05:06:20
18   asked you the first time --                05:06:22
19      A.   Uh-huh.                            05:06:23
20      Q.   -- what did you mean by stepping   05:06:25
21   all over, you said you didn't know or      05:06:27
22   didn't remember?                           05:06:30
23      A.   I don't remember specifically      05:06:30
24   what it was, and it wasn't this issue on   05:06:32
25   Exhibit 35.  It was something else, and    05:06:34
```

319

```
            STATE
 1
 2   then the next day this rose up, and you    05:06:36
 3   see I say "another turf battle this         05:06:42
 4   morning with Burt."                        05:06:44
 5      Q.   Well, it wasn't the next day.      05:06:45
 6   It was at least two days after?            05:06:47
 7      A.   It was November 1 versus           05:06:48
 8   what --                                    05:06:50
 9      Q.   October 29?                        05:06:51
10      A.   It was Monday versus Friday.       05:06:51
11   That would be the next business day.       05:06:54
12      Q.   Okay.  Now, drawing your           05:06:56
13   attention to Plaintiff's 35.               05:06:59
14      A.   Yes.                               05:07:01
15      Q.   How do you know Mr. Fried gave     05:07:01
16   that direction to Mr. DiCarlo on November  05:07:03
17   1?                                         05:07:06
18      A.   I think DiCarlo sent it to me.     05:07:06
19   Now, I specifically state in here this is  05:07:15
20   what I referred to as Burt stepping on     05:07:18
21   Greg.  Does that clarify what I meant by   05:07:20
22   stepping on Greg?  It is in plain English  05:07:23
23   here.                                      05:07:25
24      Q.   Well, I don't understand how you   05:07:25
25   could mean this to be stepping all over    05:07:27
```

320

```
            STATE
 1
 2   Mr. DiCarlo if this only happened two days 05:07:30
 3   after or three days after you sent an      05:07:34
 4   e-mail.  So, yes, I don't quite get that,  05:07:36
 5   but that is not my question.               05:07:38
 6      A.   Okay.                              05:07:39
 7      Q.   My question is:  How did you       05:07:40
 8   know Mr. Fried gave this direction to Mr.  05:07:42
 9   DiCarlo on November 1?                     05:07:44
10      MS. SELTZER:   Asked and                05:07:45
11   answered, but you can answer again.        05:07:47
12      MR. DATOO:   I don't think he           05:07:48
13   did.  But --                               05:07:49
14      MS. SELTZER:   Yes, he did.  He         05:07:51
15   actually did.                              05:07:53
16      A.   I think DiCarlo -- I got it in     05:07:53
17   some kind of e-mail string somewhere.  I   05:07:57
18   don't -- I don't know if DiCarlo           05:07:59
19   specifically sent it to me and said, hey,  05:08:02
20   look what is going on or if it came from   05:08:04
21   John Leonard or I just -- I don't remember 05:08:07
22   specifically the basis on which this came  05:08:10
23   to me.  I just remember it being           05:08:13
24   symptomatic of the kinds of things I was   05:08:16
25   concerned about at the time, and -- and if 05:08:18
```

321

```
            STATE
 1
 2   you note again when Burt was interim CEO I 05:08:21
 3   understood he was an employee of the       05:08:26
 4   company.  At this point in time I didn't   05:08:28
 5   know he was an employee of the company.    05:08:29
 6   If you look at my last statement, it says  05:08:31
 7   that.  "Essentially although not an        05:08:33
 8   employee of LVI as chairman Burt believes  05:08:35
 9   he can direct employees of the company     05:08:38
10   including my direct reports.  That isn't   05:08:40
11   going to work."  I -- I didn't even        05:08:43
12   understand -- I mean the whole             05:08:45
13   relationship of Burt being an employee     05:08:49
14   frankly didn't make sense.  If he was      05:08:51
15   chairman of the board, it just wasn't      05:08:53
16   something that that -- that I even thought  05:08:55
17   about.                                     05:08:58
18      Q.   So now this --                     05:08:58
19      MR. DATOO:   Actually withdrawn.        05:09:02
20      Joanne, to the -- to the extent         05:09:04
21   any e-mails from Mr. DiCarlo -- withdrawn. 05:09:07
22      I guess I'll talk -- if you have        05:09:19
23   any e-mails that evidence Mr. DiCarlo      05:09:21
24   forwarding I guess what is in italics --   05:09:25
25      MS. SELTZER:   I think you got          05:09:29
```

81 (Pages 318 to 321)

**322**

```
1              STATE
2  everything, but I'll look again.        05:09:30
3      MR. DATOO:  Because I know Mr.      05:09:33
4  DiCarlo wasn't a custodian, so I don't  05:09:34
5  know if it would have been picked up in 05:09:37
6  it.                                     05:09:39
7      MS. SELTZER:  I see.  Let me        05:09:39
8  look it up.  I don't even know if we have 05:09:40
9  his collection.                         05:09:43
10     MR. DATOO:  Yes, because we         05:09:44
11 didn't have him as custodian, so he     05:09:45
12 probably wouldn't have anything he sent. 05:09:48
13     MS. SELTZER:  Okay.                 05:09:56
14     A.   I would swear under oath that  05:09:56
15 someone sent me this.  I don't -- I can't 05:09:56
16 remember how it came into my possession, 05:09:56
17 but I didn't make it up if that is what  05:09:58
18 you are concerned about.                05:10:01
19     Q.   Hopefully you are not swearing 05:10:02
20 only to this thing.  You have been telling 05:10:04
21 the truth the entire time.              05:10:06
22     A.   No, that is fine.              05:10:07
23     Q.   Looking at the italicized      05:10:09
24 portion of the e-mail.                  05:10:10
25     A.   Yes.                           05:10:11
```

**323**

```
1              STATE
2      Q.   It says -- you wrote:  "Please 05:10:12
3  copy me" --                             05:10:14
4      A.   This is not what I wrote.  This 05:10:16
5  is what Burt wrote to DiCarlo.          05:10:17
6      Q.   Okay.                          05:10:20
7      A.   Okay.                          05:10:20
8      Q.   And you -- that is -- and do you 05:10:21
9  believe that he wrote it because you saw 05:10:23
10 it an in an e-mail?                     05:10:25
11     MS. SELTZER:  I am sorry.           05:10:27
12     Q.   I am asking his -- the nature  05:10:28
13 of --                                   05:10:32
14     A.   This was in an e-mail that     05:10:32
15 someone sent to me and said this is a   05:10:36
16 problem.  I don't know.  I -- I don't   05:10:39
17 recall where the words came out of, but it 05:10:42
18 was in an e-mail from Burt to Greg, and 05:10:45
19 somehow the e-mail from Burt to Greg got 05:10:48
20 to me.                                  05:10:51
21     Q.   Okay.                          05:10:51
22     A.   This has to be in Burt's e-mail. 05:10:52
23     MS. SELTZER:  Yes.                  05:10:55
24     A.   You can find this in his e-mail. 05:10:56
25 I am absolutely certain it is there.  He 05:10:58
```

**324**

```
1              STATE
2  sent it to him.                         05:10:59
3      MR. DATOO:  Joanne, to the          05:11:01
4  extent you haven't produced that e-mail, 05:11:02
5  we request production of it.            05:11:03
6      MS. SELTZER:  I don't know          05:11:05
7  whether we did or didn't.               05:11:06
8      MR. DATOO:  Because it depends      05:11:08
9  on the search terms.  It may or may not 05:11:09
10 have come up, so to the extent it hasn't 05:11:11
11 been produced we request production of  05:11:14
12 that document.                          05:11:15
13     MS. SELTZER:  Okay.                 05:11:16
14     Q.   In the italicized portion it   05:11:16
15 reads presumably and according to your  05:11:19
16 testimony in Mr. Fried's voice, "Please 05:11:23
17 copy me on all of your e-mails containing 05:11:25
18 your comments to contract provisions after 05:11:28
19 you review if you have not discussed your 05:11:31
20 comments previously with me and advise me 05:11:34
21 of the replies."                        05:11:36
22     So is that -- what do you           05:11:37
23 understand that to mean?                05:11:39
24     A.   It -- to me it gave Greg a split 05:11:39
25 reporting requirement where Burt was    05:11:43
```

**325**

```
1              STATE
2  telling him, hey, I want to keep track of 05:11:45
3  what you are doing, and in my opinion it 05:11:48
4  should be Greg's decision as to who needs 05:11:50
5  to keep track of what he is doing other 05:11:53
6  than me.                                05:11:55
7      Q.   Well, Mr. Fried and Mr. DiCarlo 05:11:55
8  had a working relationship prior to your 05:11:58
9  hire, correct?                          05:12:03
10     A.   Yes.                           05:12:03
11     Q.   And Mr. -- you know Mr.        05:12:04
12 Fried -- do you know if Mr. Fried is an  05:12:06
13 attorney?                               05:12:07
14     A.   Yes, I believe he is.          05:12:07
15     Q.   And do you know if Mr. Fried   05:12:09
16 handled some legal responsibilities of LVI 05:12:12
17 prior to your hire?                     05:12:16
18     A.   Previously he -- he did, yes.  05:12:17
19     Q.   Okay.  And is Mr. Fried asking 05:12:19
20 in this e-mail -- do you understand this 05:12:24
21 e-mail to mean that Mr. Fried is asking to 05:12:26
22 approve or for Mr. DiCarlo to get approval 05:12:28
23 from Mr. Fried in any way or just to keep 05:12:31
24 him in the loop?                        05:12:34
25     A.   My understanding is that as you 05:12:35
```

                                    **82 (Pages 322 to 325)**

326

```
1            STATE
2   term it keeping him in the loop would mean  05:12:40
3   he would be essentially providing       05:12:42
4   direction just based on the way things had  05:12:45
5   worked in the past.              05:12:49
6       Q.  Well, did he say anywhere in    05:12:49
7   this e-mail that he needed to approve any   05:12:51
8   of his contract provisions or comments?    05:12:53
9       A.  I -- I don't know what else was  05:12:56
10  in this e-mail.  I remember just seeing    05:13:01
11  this part and thinking that is not going   05:13:03
12  to work, which that is actually what I     05:13:04
13  said.  That isn't going to work out.      05:13:07
14      Q.  Just because Mr. Fried --       05:13:09
15      A.  I -- I don't know what he was    05:13:10
16  in -- find the e-mail.  If you find the   05:13:13
17  e-mail, you will see what the rest of the  05:13:14
18  context was of this discussion between    05:13:16
19  Burt and Greg DiCarlo.  There may have    05:13:19
20  been a lengthy discussion of other things  05:13:21
21  that I don't know about.            05:13:23
22      Q.  Did Mr. DiCarlo complain to you  05:13:24
23  about this direction?              05:13:26
24      A.  I -- like I said, I don't      05:13:26
25  remember why I got this, but someone sent  05:13:28
```

327

```
1            STATE
2   this to me as a red flag, and I don't     05:13:30
3   remember if it was Greg DiCarlo or John   05:13:33
4   Leonard or Paul Cutrone or the man on the  05:13:35
5   moon.  I don't know.  I do not remember    05:13:38
6   why I ended up with this.           05:13:41
7       Q.  Okay.  Did you speak to Mr.     05:13:43
8   DiCarlo after you saw this?          05:13:45
9       A.  I don't remember if I did or    05:13:46
10  not.                       05:13:48
11      Q.  Did you speak to Mr. Fried about  05:13:48
12  this?                      05:13:50
13      A.  I don't recall if I did or not.  05:13:51
14      Q.  Why would you address it with   05:13:51
15  Mr. Bagaria and Mr. Simmons?          05:13:54
16      A.  Because previously on Friday,   05:13:57
17  the last working day prior to November 1,  05:13:59
18  I had written them my one-month review and  05:14:03
19  indicated that there was an issue -- I     05:14:06
20  believed an issue with DiCarlo who we just  05:14:07
21  named general counsel.             05:14:10
22      Q.  Now --                 05:14:11
23      A.  And I was simply affirming with  05:14:12
24  them that this is -- at the time I made   05:14:15
25  the statement to them I didn't provide any  05:14:17
```

328

```
1            STATE
2   documentary evidence so to speak, and so I  05:14:18
3   said look this is -- this is what I am     05:14:21
4   talking about.                 05:14:23
5       Q.  And did you understand this     05:14:24
6   instruction to be an instance of Mr. Fried  05:14:32
7   interfering or meddling with the company   05:14:33
8   or your ability to do your job?        05:14:36
9       A.  I believed it was, yes.        05:14:38
10      Q.  And how was it interfering with  05:14:39
11  the company?                  05:14:40
12      A.  Because he was giving direction  05:14:41
13  to Greg DiCarlo to run a lot of things by  05:14:43
14  him, and that may have been fine, but that  05:14:47
15  was really my decision or Greg's decision  05:14:49
16  to determine what -- what we needed to run  05:14:52
17  by him.                     05:14:55
18      Q.  Did you tell -- ever tell Mr.   05:14:56
19  Fried that you don't want Mr. DiCarlo to run  05:14:58
20  anything by you?               05:15:02
21      A.  No.                  05:15:03
22      Q.  And did you ever tell Mr.      05:15:03
23  DiCarlo not to run anything by Mr. Fried?  05:15:05
24      A.  That is the same question you    05:15:08
25  just asked I think.             05:15:09
```

329

```
1            STATE
2       Q.  Answer it again then.         05:15:10
3       A.  No.                  05:15:11
4       Q.  Okay.  So then how was Mr. Fried  05:15:12
5   supposed to know or not whether he could   05:15:14
6   give this direction to Mr. DiCarlo?      05:15:18
7       A.  Because Mr. DiCarlo had been    05:15:20
8   made general counsel and was a direct     05:15:23
9   report to me, and if Mr. Fried wanted     05:15:26
10  DiCarlo to run everything by him he should  05:15:30
11  have said -- he should have asked me if    05:15:33
12  that was okay, and he didn't.  It simply   05:15:36
13  didn't happen that way.             05:15:39
14      Q.  Did there come a time when the   05:15:40
15  board of LVI -- the board that you sit on  05:15:45
16  with Mr. Bagaria and Mr. Schnabel had a   05:15:50
17  meeting on November 4?             05:15:55
18      A.  Yes.                  05:15:57
19      Q.  And did you attend that meeting?  05:15:58
20      A.  Yes.                  05:16:00
21      Q.  And where did that meeting take  05:16:01
22  place?                     05:16:03
23      A.  It took place at Apollo's      05:16:03
24  offices in New York.             05:16:05
25      Q.  Okay.  And now prior to the     05:16:06
```

83  (Pages 326 to 329)

VERITEXT REPORTING COMPANY

212-267-6868                                              516-608-2400

330

```
 1           STATE
 2    meeting and other than the communications   05:16:08
 3    we have just discussed, did you have any   05:16:12
 4    communications with anybody else about Mr.   05:16:14
 5    Freed or his job duties leading up to the   05:16:16
 6    board meeting?                     05:16:19
 7       A.   On the day of the meeting or --   05:16:19
 8       Q.   Leading up to it, so two, three,   05:16:22
 9    four days prior.                   05:16:24
10       A.   I suspect there were probably   05:16:26
11    discussions because I think there had been   05:16:28
12    some heated discussions with Simmons and   05:16:29
13    Mr. Fried, and -- I don't recall the   05:16:36
14    specifics, but I am sure there was   05:16:44
15    probably some discussions that had taken   05:16:46
16    place.                          05:16:48
17       Q.   That -- in which you were   05:16:48
18    involved in?                      05:16:50
19       A.   I think there were some I may   05:16:51
20    have been involved with, and I think there   05:16:52
21    were a number of discussions the outside   05:16:53
22    investors, the -- the investors were   05:16:55
23    involved with, not -- that didn't include   05:16:58
24    myself.                         05:17:00
25       Q.   And what were the nature of   05:17:00
```

331

```
 1           STATE
 2    those discussions?                 05:17:02
 3       MS. SELTZER:   I object to form.   05:17:03
 4       A.   The ones I was involved with?   05:17:04
 5       Q.   Yes.                    05:17:06
 6       A.   I don't recall.             05:17:06
 7       Q.   Was it about Mr. Fried's job   05:17:07
 8    duties?                         05:17:09
 9       A.   I assume there were probably   05:17:09
10    discussions about his duties, but I don't   05:17:11
11    recall any specifics.               05:17:13
12       Q.   Okay.   And you -- you testified   05:17:16
13    earlier that you believe there was heated   05:17:18
14    discussions between Mr. Simmons and Mr.   05:17:26
15    Fried?                          05:17:26
16       A.   I believe that is the case.    05:17:26
17       Q.   How do you know that?         05:17:26
18       A.   I just recall that there was   05:17:26
19    something that had occurred, and I wasn't   05:17:28
20    involved with it, and I -- you know, I am   05:17:32
21    assuming that it had to do with when   05:17:37
22    Simmons sent the letter that said here is   05:17:40
23    the path we are going down, that there was   05:17:42
24    some dialogue back and forth and possibly   05:17:45
25    e-mail.   I don't know.   There may be   05:17:48
```

332

```
 1           STATE
 2    written communication that I wouldn't have   05:17:50
 3    been party to as well.              05:17:51
 4       Q.   Now, how long did the board   05:17:55
 5    meeting last?                     05:17:57
 6       A.   I think the board meeting -- I   05:17:57
 7    think it went from eight to noon as a   05:18:05
 8    board meeting with -- with outside   05:18:09
 9    participants, and then I believe at noon   05:18:13
10    there was a closed session of just the   05:18:16
11    board members.                    05:18:19
12       Q.   Were you involved in that closed   05:18:20
13    session?                        05:18:21
14       A.   I believe I was.   I think -- I   05:18:22
15    believe the board had either as an early   05:18:24
16    matter of business made me a director or I   05:18:27
17    had been appointed a director prior to the   05:18:29
18    meeting, so I did -- I was a participant   05:18:31
19    in that meeting.                   05:18:33
20       Q.   And was Mr. Fried a participant   05:18:35
21    in that meeting as well?             05:18:37
22       A.   Yes, he was.              05:18:38
23       Q.   Okay.   Now, were Mr. Fried's job   05:18:39
24    duties or his role at LVI discussed at   05:18:42
25    this board meeting?                05:18:45
```

333

```
 1           STATE
 2       A.   In the closed session only as I   05:18:46
 3    recall.                         05:18:48
 4       Q.   And in the closed session was   05:18:48
 5    anyone other than the board members   05:18:50
 6    present?                        05:18:52
 7       A.   I believe the secretary of the   05:18:53
 8    board was present.                 05:18:54
 9       Q.   And who was that?            05:18:55
10       A.   Jeffrey Smith.              05:18:56
11       Q.   And what was -- why was he   05:18:57
12    present?                        05:18:59
13       A.   I believe he was just serving as   05:19:00
14    secretary of the board.   I don't recall   05:19:03
15    what specifically his role would have been   05:19:06
16    at the meeting.                   05:19:09
17       Q.   What is the purpose of having a   05:19:09
18    secretary?                       05:19:11
19       A.   He was taking minutes for the   05:19:12
20    meeting and I -- I am assuming that is it.   05:19:14
21    I don't know what -- what else he might   05:19:19
22    have been doing.                   05:19:21
23       Q.   And in your opinion what is the   05:19:22
24    point of taking minutes?             05:19:24
25       A.   Just to document major   05:19:25
```

**84  (Pages 330 to 333)**

VERITEXT REPORTING COMPANY

212-267-6868                                          516-608-2400

334

STATE

1  decisions, resolutions, conclusions, that    05:19:28
2  type of thing.                                05:19:31
3      Q.   Now, at this closed session,        05:19:32
4  did -- how long was the closed session?       05:19:42
5      A.   Maybe an hour.  I don't know for     05:19:44
6  sure.                                         05:19:50
7      Q.   And is that where Mr. Fried's        05:19:50
8  job duties and his role at LVI were           05:19:55
9  discussed?                                    05:19:57
10     A.   Yes.                                 05:19:58
11     Q.   And did Mr. Fried say anything       05:19:58
12 at this meeting?                              05:20:00
13     A.   Yes.  He made remarks advocating     05:20:01
14 the duties that he wished to have I            05:20:06
15 believe.                                      05:20:10
16     Q.   And what did he say at this          05:20:10
17 meeting?                                      05:20:11
18     A.   I believe he summarized his long     05:20:12
19 history with the company, his                 05:20:17
20 accomplishments, the company's               05:20:19
21 accomplishments, his value to the company,    05:20:20
22 and his desire to maintain the sets of        05:20:24
23 duties that he had laid out.                  05:20:31
24     Q.   Were the -- were those duties he     05:20:35

335

STATE

1  laid out were those the ones memorialized    05:20:39
2  in the list of duties I showed you?           05:20:41
3      A.   I don't recall that being passed     05:20:43
4  out as a handout or anything like that.  I    05:20:45
5  am not sure that it was that formal where     05:20:48
6  it was here is the due -- I think it was      05:20:50
7  just discussed in the context that           05:20:53
8  everybody knew what was there or they had     05:20:55
9  been previously provided.                     05:20:58
10     Q.   Now, at that point in time,          05:20:59
11 November 4, did you know what Mr. Fried       05:21:01
12 was doing at LVI?                             05:21:05
13     A.   In terms of his daily                05:21:07
14 activities?                                   05:21:12
15     Q.   Yes.                                 05:21:12
16     A.   I think after the October 19         05:21:13
17 meeting that we had, there was a bit of a     05:21:16
18 strain, and I don't know that he and I had    05:21:23
19 very many discussions after that.  I think    05:21:25
20 he went back to contemplate the discussion    05:21:29
21 that he had with me, and we may have had      05:21:32
22 -- I know we had some e-mail exchanges on     05:21:35
23 a few items, but, you know, again we were     05:21:39
24 still in the process of simply                05:21:42

336

STATE

1  transitioning a number of activities from    05:21:44
2  him to myself.                                05:21:46
3      Q.   So other than him transitioning      05:21:47
4  certain activities to you, did you -- did     05:21:49
5  you have any idea what he was doing at the    05:21:51
6  company?                                      05:21:52
7      A.   He -- yes, I mean generally I        05:21:54
8  know that he would have been involved with    05:21:56
9  any surety requests that would have --        05:21:58
10 have been coming in because he was in         05:22:01
11 Westport with that group.  I certainly        05:22:03
12 know he was involved with things that Greg    05:22:05
13 DiCarlo was doing because you saw the         05:22:07
14 e-mails associated with those activities.     05:22:10
15 You know, just generally that is what         05:22:16
16 I -- that is what I understood.               05:22:18
17     Q.   And do you know if he was doing      05:22:19
18 a good job with respect to whatever it was    05:22:21
19 he was doing?                                 05:22:23
20     A.   I didn't do any kind of              05:22:24
21 performance assessment.  I don't know.  I     05:22:26
22 can't speak to performance.                   05:22:28
23     Q.   Okay.  And how long did Mr.          05:22:29
24 Fried speak for at this meeting?              05:22:35

337

STATE

1      A.   He gave a -- an opening set of       05:22:36
2  remarks that I would guess was maybe         05:22:40
3  twenty minutes or so.                         05:22:43
4      Q.   And while he was giving his          05:22:44
5  remarks or immediately before, did he --     05:22:48
6      MR. DATOO:   Strike that.                 05:22:54
7      Q.   Were you present for when he         05:22:55
8  gave his remarks?                             05:22:58
9      A.   Yes.                                 05:22:59
10     Q.   And either prior to, immediately     05:22:59
11 prior to his remarks or during his           05:23:01
12 remarks, did he tell you to correct him if    05:23:04
13 he said anything wrong or use words to        05:23:07
14 that effect?                                  05:23:13
15     A.   I think there were -- I think        05:23:14
16 when he started out there was something to    05:23:16
17 the effect of well I don't -- well, it was    05:23:17
18 either started out or somewhere during it.    05:23:20
19 I don't know if he was directing the         05:23:24
20 comments just to me or to anyone, but, you    05:23:27
21 know, you can correct me if anything I say    05:23:30
22 here is incorrect.                            05:23:32
23     Q.   And did you?                         05:23:33
24     A.   I believe there -- I believe Mr.     05:23:34

**85  (Pages 334 to 337)**

338

```
 1             STATE
 2   Fried took exception to this comment that   05:23:40
 3   he says I made, which I dispute, about him   05:23:41
 4   being 70 years -- something about being 70   05:23:43
 5   years old or whatever, and I believe I      05:23:49
 6   took exception to the fact that that        05:23:51
 7   wasn't what I said. I had simply said       05:23:53
 8   something that he had said to me, but       05:23:55
 9   I -- I don't remember the specifics. I      05:23:57
10   know there was one exchange because I know  05:24:00
11   I used a four-letter word, and I don't      05:24:02
12   remember specifically -- I know I got       05:24:04
13   angry at one point.                         05:24:06
14       Q.  Which four letter word did you      05:24:08
15   use?                                        05:24:09
16       A.  I used the word fuck.               05:24:10
17       Q.  And was that to Mr. Fried?          05:24:11
18       A.  No.                                 05:24:13
19       Q.  And how -- can you -- how did       05:24:13
20   you use the word?                           05:24:16
21       A.  I think I -- I think I said         05:24:16
22   something -- well, I think I said that is   05:24:19
23   fucking wrong or something like that. I     05:24:22
24   know I -- I -- I know I became angry at     05:24:24
25   something that was said that I believed     05:24:27
```

339

```
 1   was attributed to me that was not true.     05:24:28
 2       Q.  Was that at the conclusion of       05:24:30
 3   Mr. Fried's remarks or was that during      05:24:32
 4   Mr. Fried's remarks?                        05:24:34
 5       A.  I don't think it was during the     05:24:38
 6   remarks. I think it was in -- in an         05:24:41
 7   ensuing discussion after that.              05:24:43
 8       Q.  And didn't Mr. Fried swear in       05:24:45
 9   his remarks?                                05:24:49
10       A.  I don't remember. There was         05:24:50
11   some pretty heated language between he and  05:24:54
12   Rajay and he and Jerry. I don't             05:24:57
13   remember -- I mean there was -- it was one  05:25:00
14   of the most unique meetings I have ever     05:25:04
15   been in.                                    05:25:06
16       Q.  Okay. And Mr. -- did Mr. Fried      05:25:06
17   tell the board the remark that you made to  05:25:12
18   him?                                        05:25:15
19       A.  I believe he said -- he made the    05:25:16
20   comment that I had said he was 70 and too   05:25:18
21   old to work or something to that effect,    05:25:21
22   which was absolutely false. It just         05:25:23
23   wasn't true.                                05:25:29
24       Q.  Well, did you make a remark to      05:25:30
```

340

```
 1             STATE
 2   him about his age?                          05:25:32
 3       A.  I made a remark to him about a      05:25:32
 4   remark he made to me. I didn't make a       05:25:34
 5   remark to him about his age.                05:25:36
 6       Q.  Did you bring up his -- I           05:25:38
 7   believe you testified earlier that you      05:25:40
 8   mentioned his age in your October 19        05:25:42
 9   meeting with him, correct?                  05:25:44
10       MS. SELTZER:  Objection. That           05:25:46
11   is not -- you're mischaracterizing. Why     05:25:47
12   don't you go over it again.                 05:25:51
13       A.  That's incorrect. What occurred     05:25:52
14   in our October 19 meeting is I made a       05:25:54
15   remark to Burt that said you said this to   05:25:56
16   me, not -- I didn't say to him you're 71    05:25:58
17   and too old. I didn't even have his age     05:26:02
18   correct. There is no way I could be         05:26:05
19   guessing his age. I repeated back           05:26:07
20   something I thought he had said to me, and  05:26:09
21   I repeated it wrong apparently. I said      05:26:11
22   71, and he laughed and said no. I'm 70.     05:26:15
23       Q.  Okay. Did Mr. Fried say he felt     05:26:17
24   he was being discriminated against at this  05:26:19
25   meeting?                                    05:26:22
```

341

```
 1             STATE
 2       A.  I think he eventually worked        05:26:22
 3   around to that as -- as where he was going  05:26:24
 4   with this. You know, if he wasn't going     05:26:28
 5   to get his duties in the agreement he       05:26:30
 6   believed he had with the company, then he   05:26:35
 7   believed he was being discriminated in      05:26:36
 8   some way.                                   05:26:38
 9       Q.  And did Mr. Fried say anything      05:26:39
10   else at this meeting?                       05:26:40
11       A.  There was a lot of back and         05:26:41
12   forth and discussion among everyone.        05:26:45
13   I -- there -- he didn't just make a speech  05:26:49
14   and then sit. There was a lot of            05:26:51
15   discussion about other items.               05:26:53
16       Q.  Was he being -- other items         05:26:55
17   regarding Mr. Fried's -- regarding Mr.      05:26:58
18   Fried or his role during this closed        05:27:00
19   session?                                    05:27:03
20       MS. SELTZER:  Objection to the          05:27:04
21   form.                                       05:27:04
22       A.  I am not -- can you --              05:27:05
23       Q.  You just said there was a lot of    05:27:07
24   back and forth regarding --                 05:27:09
25       A.  No, it was back and forth           05:27:10
```

**86 (Pages 338 to 341)**

342

```
           STATE
 1
 2   regarding what his duties would be      05:27:12
 3   relative to my duties and that type of  05:27:13
 4   thing.                                  05:27:15
 5       Q.   And while Mr. Fried was        05:27:15
 6   speaking, was the board engaging him with 05:27:17
 7   questions?                              05:27:19
 8       A.   I -- I think there were a few  05:27:19
 9   questions.  I -- for the most part it   05:27:22
10   was -- it was Burt speaking his mind,   05:27:25
11   and -- but I -- I don't recall if there 05:27:30
12   were specific interactions during that or 05:27:32
13   if there was engagement after this kind of 05:27:35
14   opening set of remarks.                 05:27:38
15       Q.   And after Mr. Fried concluded  05:27:40
16   his opening set of remarks, did you have 05:27:42
17   an opportunity to respond?              05:27:44
18       A.   I don't -- I think there were a 05:27:45
19   lot of people responding, and it was kind 05:27:47
20   of -- became chaotic.  I don't recall   05:27:49
21   anything specific.                      05:27:52
22       Q.   Did you say anything other than 05:27:54
23   swearing?                               05:27:57
24       A.   No.  I -- you know, that -- I  05:27:57
25   don't know that I said anything         05:28:03
```

343

```
           STATE
 1
 2   specifically.  I know that there were, you 05:28:05
 3   know -- at this point in time there was a 05:28:09
 4   lot of discussion between a -- Burt got  05:28:14
 5   into a heated argument with Rajay, and   05:28:17
 6   I -- there may have been curse words used. 05:28:21
 7   He got into an argument with Jerry.  I   05:28:27
 8   think Brian stepped in and said a few    05:28:28
 9   things.  I don't recall Rob saying       05:28:30
10   anything.  I think John Schnabel didn't  05:28:32
11   say anything.  Fiorucci and Buck, I think 05:28:36
12   Buck had left by this time, and I don't  05:28:40
13   recall -- well, and at one point I -- I   05:28:42
14   recall Burt calling out Fiorucci and     05:28:46
15   saying something to the effect, you know, 05:28:50
16   you know the surety is -- that I control  05:28:52
17   that relationship or something, and      05:28:55
18   Fiorucci didn't support that remark.     05:28:57
19       Fiorucci told me afterwards he       05:28:59
20   didn't believe that remark, that he was  05:29:02
21   actually extremely unhappy that that     05:29:04
22   remark was made, and so it was -- it was 05:29:08
23   chaotic.                                 05:29:11
24       Q.   And you mentioned that Mr. Fried 05:29:12
25   and Mr. Bagaria got into a heated        05:29:15
```

344

```
           STATE
 1
 2   argument.  What was that argument about? 05:29:18
 3       A.   I don't even remember.  I just  05:29:20
 4   remember it was -- it was one of those   05:29:22
 5   situations where you thought it could get 05:29:25
 6   physical.                               05:29:27
 7       Q.   Do you recall what was said?    05:29:28
 8       A.   No, but Rajay is not a very big 05:29:31
 9   guy, and so it was -- it was very -- it  05:29:34
10   was a very unusual meeting.              05:29:36
11       Q.   Rajay is a very young guy       05:29:38
12   though, isn't he?                       05:29:41
13       A.   He is a small guy.  I don't     05:29:41
14   know how old he is, but --              05:29:43
15       Q.   Okay.  And how about            05:29:46
16   Mr. Girardi?                            05:29:49
17       A.   Mr. Girardi?                    05:29:49
18       Q.   Yes.                           05:29:49
19       A.   He was sitting next to Mr.      05:29:51
20   Fried, and he made some comments, and then 05:29:54
21   there was a terse back and forth between 05:29:56
22   the two of them.                        05:29:58
23       Q.   Do you know what they discussed? 05:29:59
24       A.   I -- no.  I -- I don't have -- I 05:30:00
25   mean it was bizarre.                    05:30:04
```

345

```
           STATE
 1
 2       Q.   And what about Mr. Simmons?     05:30:06
 3       A.   I -- same sort of thing.  I     05:30:08
 4   think, you know, I made some comments,   05:30:12
 5   some rebuttal in effect to what -- what  05:30:15
 6   Burt had said, and -- and then there was 05:30:19
 7   some back and forth between them.        05:30:23
 8       Q.   Do you recall anything that was 05:30:24
 9   said between the outside investors and -- 05:30:30
10       A.   No.  I -- I assume they may     05:30:30
11   remember what was said, but I don't recall 05:30:32
12   specifically, you know -- it was -- there 05:30:36
13   was quite a fray going on, and I just sort 05:30:42
14   of stayed out of it while they -- there  05:30:44
15   was a much longer history with those folks 05:30:46
16   than with myself, and I just watched it. 05:30:49
17       Q.   And how long did this go on for 05:30:51
18   after Mr. Fried's opening remarks?       05:30:53
19       A.   Probably ten to fifteen minutes 05:30:55
20   and then they dismissed Mr. Fried and I  05:30:58
21   and had a closed session among just the  05:31:01
22   investors I believe.                    05:31:06
23       Q.   Do you know if Mr. Schanabel or 05:31:08
24   Mr. Buck were involved in that session?  05:31:12
25       A.   Mr. Buck I am fairly certain had 05:31:14
```

**87 (Pages 342 to 345)**

VERITEXT REPORTING COMPANY

212-267-6868                                     516-608-2400

346

```
 1            STATE
 2    left before the closed session began.    05:31:17
 3    Mr. Schnabel I -- I think he was still    05:31:19
 4    there, but I -- I wouldn't swear to that.    05:31:23
 5    I don't know.                05:31:25
 6        Q.   How about Mr. Fiorucci?    05:31:26
 7        A.   Mr. Fiorucci I believe was still    05:31:29
 8    there.                    05:31:31
 9        Q.   And --                05:31:31
10        A.   It was the outside directors,    05:31:33
11    and Burt and I were the inside directors.    05:31:36
12    So the outside directors --        05:31:38
13        Q.   Do you know what the outside    05:31:41
14    directors discussed when they excused    05:31:42
15    yourself and Mr. Fried?            05:31:45
16        A.   The stated purpose was for them    05:31:46
17    to discuss without he and I in the room    05:31:49
18    how things would be resolved or what was    05:31:51
19    going to happen going forward.        05:31:56
20        Q.   Why would they be making that    05:31:57
21    decision and not you?            05:31:58
22        A.   Because in my opinion, and    05:32:00
23    I -- and I -- well, at this point in time    05:32:03
24    I am not sure I even at this point in time    05:32:06
25    understood that Burt was actually an    05:32:10
```

347

```
 1            STATE
 2    employee of the company.  I viewed this    05:32:12
 3    whole dispute as relating to the board,    05:32:14
 4    and Burt was chairman of the board, and so    05:32:17
 5    I viewed it as a board issue.        05:32:22
 6        Q.   Did you ever ask at that meeting    05:32:24
 7    or any time prior to whether Mr. Fried was    05:32:25
 8    an employee?                05:32:27
 9        A.   I think I stated in this e-mail    05:32:28
10    here on November 1 that he is not an    05:32:29
11    employee.                05:32:32
12        Q.   So I am asking at that meeting    05:32:32
13    or prior to, did you ask anybody if he was    05:32:33
14    an employee?                05:32:36
15        A.   I -- I don't recall that I did.    05:32:37
16        Q.   And if you was an employee,    05:32:38
17    would that have made it easier for you    05:32:40
18    make a decision with respect to Mr. Fried?    05:32:44
19        A.   Well, if he worked for me        05:32:47
20    absolutely I could make a decision.  If he    05:32:48
21    didn't work for me, it seems odd I would    05:32:50
22    make an employment decision if someone is    05:32:53
23    not working for me.            05:32:54
24        Q.   And no one on the board pointed    05:32:55
25    out to you that he was an employee?    05:32:57
```

348

```
 1            STATE
 2        A.   I -- I will tell you I actually    05:32:59
 3    don't think they did.  I am not sure -- I    05:33:03
 4    am not sure everyone on the board even    05:33:05
 5    knew.                    05:33:07
 6        Q.   Okay.                05:33:08
 7        A.   I had very mixed messages over    05:33:08
 8    the last several months, and I don't    05:33:11
 9    know -- I don't know what people knew.    05:33:14
10    You would have to ask them.        05:33:16
11        Q.   Okay.  Do you know what happened    05:33:17
12    in this close session, what was discussed?    05:33:19
13        A.   No, I -- I didn't -- I don't    05:33:21
14    believe I ever got any specific feedback    05:33:24
15    of what was discussed.            05:33:26
16        Q.   Do you know if they came to some    05:33:27
17    sort of resolution?            05:33:29
18        A.   They invited us back in to    05:33:31
19    discuss deferring a decision, and I recall    05:33:34
20    I said we are not going to kick the can    05:33:39
21    down the road.  Let's make a decision, and    05:33:41
22    at that point in time I was fine        05:33:43
23    with whatever they decided.  If they had    05:33:46
24    decided that I needed to leave, I would    05:33:48
25    have been fine with that.            05:33:51
```

349

```
 1            STATE
 2        Q.   And did you and Mr. Fried go    05:33:52
 3    back in?                05:33:54
 4        A.   Yes, both of us.            05:33:54
 5        MR. DATOO:  I got one of these,    05:33:57
 6    so --                    05:33:59
 7        MS. SELTZER:  Okay.            05:33:59
 8        MR. DATOO:  We are going to    05:34:00
 9    take a break.                05:34:01
10        THE VIDEOGRAPHER:  We're going    05:34:04
11    off the record.  5:34 p.m., end of tape    05:34:05
12    number 5.                05:34:08
13        (Recess taken.)            05:40:18
14        THE VIDEOGRAPHER:  We're    05:40:18
15    returning to the record.  5:40 p.m.,    05:40:18
16    beginning of tape number 6.        05:40:21
17        Q.   Mr. State, you previously    05:40:22
18    testified -- previously testified that the    05:40:25
19    board members who were having a discussion    05:40:29
20    invited yourself and Mr. Fried back in,    05:40:31
21    correct?                05:40:34
22        A.   Correct.                05:40:35
23        Q.   And you testified that they said    05:40:36
24    they were going to defer their decision    05:40:37
25    regarding what to do with respect to Mr.    05:40:39
```

88  (Pages 346 to 349)

VERITEXT REPORTING COMPANY

212-267-6868                                        516-608-2400

350

```
 1            STATE
 2  Fried's role at LVI; is that correct?    05:40:43
 3       A.   I would say with respect to both   05:40:45
 4  of our roles at LVI.                 05:40:47
 5       Q.   And in response you said I --   05:40:49
 6       A.   I don't want -- I don't want to   05:40:51
 7  kick the can down the road.  If we are all   05:40:53
 8  here, let's make a decision.          05:40:55
 9       Q.   And what was their response?   05:40:57
10       A.   I don't think they actually came   05:40:58
11  to a conclusion, but I think they decided   05:41:01
12  that there were a number of action item.   05:41:03
13  I believe John Schnabel was going to talk   05:41:07
14  to some employees, and Burt -- that   05:41:11
15  happened I think later.  Burt requested   05:41:16
16  that John talk to some employees, but I   05:41:18
17  think there were decisions made to in a   05:41:20
18  fairly short amount of time consider what   05:41:22
19  the alternatives were in -- and get it to   05:41:27
20  a conclusion.                      05:41:31
21       Q.   Okay.  And did Mr. Fried say   05:41:32
22  anything when the board invited you or the   05:41:40
23  board members invited you and Mr. Fried   05:41:44
24  back in?                         05:41:47
25       A.   I don't -- yes, there   05:41:47
```

351

```
 1  were -- there were some further   05:41:54
 2  discussions.  When Mr. Fried and I were   05:41:56
 3  out in the hallway, I recall we were kind   05:41:57
 4  of standing in separate locations, and I   05:42:01
 5  approached him and -- and made clear to   05:42:03
 6  him that there was no way that I would   05:42:05
 7  have ever made disparaging remarks to him   05:42:08
 8  in any way.  He -- and he made a number of   05:42:12
 9  statements that I had marginalized him and   05:42:15
10  disparaged him, and I just said that is   05:42:19
11  not who I am.  That is not what I do,   05:42:22
12  and -- and I felt like he had accepted   05:42:25
13  that as the truth, and then I remember we   05:42:28
14  went back into the meeting, and it was   05:42:33
15  almost like we never had that discussion,   05:42:36
16  it was kind of back to a little bit   05:42:37
17  free for all again, and it sort of wrapped   05:42:39
18  up.                            05:42:42
19       Q.   What did he say in that meeting   05:42:42
20  when they invited you back in?        05:42:44
21       A.   I just remember there was   05:42:46
22  additional discussion about what his   05:42:50
23  duties would be and what the board's   05:42:52
24  direction was in terms of how they wanted   05:43:02
```

352

```
 1            STATE
 2  things to work going forward, and then at   05:43:02
 3  some point he closed his books and said I   05:43:03
 4  am -- I've got a meeting with my lawyers.   05:43:07
 5  You'll be hearing from me or something to   05:43:10
 6  that effect.                      05:43:12
 7       Q.   And what happened after that?   05:43:13
 8       A.   The meeting essentially broke   05:43:14
 9  up.  Everybody -- I think the meeting was   05:43:16
10  running late at that point, and everybody   05:43:18
11  scattered in different directions.    05:43:20
12       Q.   And before Mr. Fried left, what   05:43:22
13  specifically did he say?             05:43:25
14       MS. SELTZER:  Objection.  Other   05:43:27
15  than what he has already testified to?   05:43:29
16       MR. DATOO:  Yes.              05:43:31
17       A.   I don't recall anything   05:43:32
18  specific.                        05:43:34
19       Q.   And other than making the   05:43:34
20  comments about, you know, I don't   05:43:36
21  want -- or using words to that effect,   05:43:39
22  let's not kick the can down the road; we   05:43:41
23  are both here, did you say anything else?   05:43:44
24       A.   I don't recall.            05:43:45
25       Q.   Okay.  I hand you a document   05:43:48
```

353

```
 1            STATE
 2  that has been previously marked as   05:43:55
 3  Plaintiff's Exhibit 6.               05:43:56
 4       (Document handed to witness.)   05:43:57
 5       Q.   If you can just look at   05:43:59
 6  the -- scan the document from the last   05:44:01
 7  page going forward.  That might make it   05:44:02
 8  easier.                          05:44:04
 9       A.   From the last page going   05:44:05
10  forward?                         05:44:07
11       Q.   Yeah.                    05:44:07
12       (Pause.)                    05:44:08
13       Q.   Actually it might be easier if I   05:44:22
14  just asked you to review just the last   05:44:24
15  page.                           05:44:26
16       A.   Okay.                    05:44:26
17       Q.   And have you seen that e-mail   05:44:27
18  before?                          05:44:30
19       A.   I wrote that e-mail.         05:44:30
20       Q.   So yes?                   05:44:32
21       A.   Yes.                     05:44:35
22       Q.   Okay.  And according to that   05:44:35
23  e-mail, you had a call with Mr. Fiorucci,   05:44:38
24  Mr. Schnabel, and Mr. Leonard, correct?   05:44:42
25       A.   I believe I would say I had   05:44:45
```

89  (Pages 350 to 353)

354

```
 1           STATE
 2  calls from those three.  I -- you know, I   05:44:47
 3  would say I had long calls from them.    05:44:52
 4  Yes.                      05:44:54
 5     Q.   So you spoke to the three of    05:44:54
 6  them?                     05:44:56
 7     A.   Not together.  Individually I   05:44:56
 8  believe.                   05:44:58
 9     Q.   Okay.  And what did you discuss   05:44:58
10  with Mr. Fiorucci?             05:45:00
11     A.   I think we discussed generally   05:45:02
12  what the -- what had occurred at the    05:45:05
13  meeting and how bizarre it had seemed.   05:45:08
14     Q.   Anything else? Anything specific   05:45:12
15  to Mr. Fried?                05:45:16
16     A.   I don't know that there was a   05:45:17
17  lot specific to Mr. Fried.  I -- Fiorucci   05:45:19
18  I remember saying felt like he was -- he   05:45:26
19  had been betrayed that -- you know,    05:45:28
20  basically thrown under the bus I believe   05:45:32
21  were his words, and that -- that he had   05:45:34
22  tried to call Burt, and Burt hadn't    05:45:38
23  returned his calls, and, you know, he was   05:45:41
24  unhappy.                   05:45:43
25           Schnabel had a different view   05:45:44
```

355

```
 1           STATE
 2  simply because he had a long relationship   05:45:50
 3  with Burt, some success on other things.   05:45:52
 4  They worked together on other things, and   05:45:54
 5  he was looking for an amicable solution,   05:45:57
 6  and John Leonard I -- I just -- I know he   05:46:01
 7  called specifically because he had been   05:46:06
 8  asked to leave the meeting, and I think he   05:46:08
 9  wanted to know if things had gotten    05:46:11
10  resolved.  I don't recall specifically   05:46:12
11  anything else that -- that he had to say.   05:46:14
12  I just -- I recall Fiorucci and Schnabel   05:46:19
13  taking kind of a position that -- I think   05:46:22
14  everybody expected that I might just say   05:46:26
15  screw this and just walk and -- and just   05:46:29
16  say I've had enough of this.  It was in   05:46:32
17  everyone's words the most unbelievable   05:46:35
18  meeting they had ever been in.       05:46:37
19     Q.   Now, with respect to Mr.      05:46:39
20  Fiorucci, did he tell you why he felt he   05:46:40
21  was thrown under the bus?          05:46:43
22     A.   Yes.  Burt had taken a position   05:46:44
23  that -- that the relationship with the   05:46:46
24  surety was his relationship, and that   05:46:49
25  without him involved in the company that   05:46:52
```

356

```
 1           STATE
 2  would go away, which was completely bogus,   05:46:54
 3  and Fiorucci made the point that he had   05:47:01
 4  brought the surety to the company.  He   05:47:02
 5  dealt with the surety every day.  It was   05:47:03
 6  his relationship, and that having it    05:47:06
 7  characterized as -- by Burt that it was,   05:47:10
 8  you know, Burt who controlled that    05:47:14
 9  marginalized him to the point that he felt   05:47:16
10  that it was just a complete untruth    05:47:22
11  and --                    05:47:25
12     Q.   Had --               05:47:25
13     A.   -- and he was very unhappy about   05:47:26
14  it.                      05:47:28
15     Q.   Mr. Fiorucci was a broker for   05:47:28
16  Arch?                     05:47:31
17     A.   No.  Mr. Fiorucci is our surety   05:47:32
18  agent.                    05:47:34
19     Q.   Okay.                 05:47:35
20     A.   And a board member.         05:47:35
21     Q.   How long was the conversation   05:47:37
22  with Mr. Fiorucci?             05:47:38
23     A.   Five, ten minutes.  I don't   05:47:40
24  know.                     05:47:42
25     Q.   And was that a one-on-one call?   05:47:42
```

357

```
 1           STATE
 2     A.   Yes.                 05:47:44
 3     Q.   And Mr. Schnabel, how long was   05:47:46
 4  that conversation?             05:47:48
 5     A.   Probably the same, ten minutes.   05:47:49
 6     Q.   And was that a one-on-one call?   05:47:52
 7     A.   I am sure it would have been.   05:47:57
 8     Q.   And with Mr. Leonard, how long   05:47:58
 9  was that conversation?           05:48:00
10     A.   No idea.               05:48:01
11     Q.   And was that a one-on-one call?   05:48:02
12     A.   I -- yes, I would assume it was.   05:48:05
13     Q.   And with respect to all three of   05:48:08
14  them, did you document your conversations   05:48:09
15  with them?                  05:48:11
16     A.   No, I believe November 5 -- I am   05:48:12
17  trying to remember.  I think I went from   05:48:15
18  that board meeting -- I was traveling.  I   05:48:17
19  know I would have been somewhere -- I   05:48:22
20  think I was on the west coast the next day   05:48:24
21  or something.  So I was probably in a car   05:48:29
22  talking to them.              05:48:31
23     Q.   So your answer is no?        05:48:32
24     A.   No.                  05:48:33
25     Q.   If you flip to the next page.   05:48:34
```

VERITEXT REPORTING COMPANY

212-267-6868                                      516-608-2400

358

```
 1              STATE
 2     A.  Forward?                    05:48:35
 3     Q.  Yes, the next page forward.  05:48:36
 4     A.  Okay.                       05:48:38
 5     Q.  If you scan the stream of   05:48:39
 6  e-mails, some which you are not copied on  05:48:46
 7  or a recipient or a sender of.    05:48:51
 8     A.  Okay.                       05:48:53
 9     Q.  It appears that there was a  05:48:55
10  conference call with Mr. Girardi, with  05:48:57
11  Mr. Bagaria, Mr. Simmons, and maybe Mr.  05:48:59
12  Hogan and you.                    05:49:02
13     MS. SELTZER:  Objection.  I   05:49:04
14  don't know where you are reading that.  05:49:06
15     MR. DATOO:  If you start at the  05:49:11
16  bottom of page 2, Mr. Simmons writes:  05:49:12
17  "Maybe we can have a short conference call  05:49:17
18  on Monday or Tuesday," and Mr. State  05:49:19
19  writes, "Sure.  That sounds fine."  05:49:21
20     MS. SELTZER:  I got you.        05:49:25
21     Q.  Okay.  Do you see that?     05:49:27
22     A.  Okay.  Where --            05:49:27
23     Q.  I starts from the second page,  05:49:30
24  the very bottom.                   05:49:31
25     A.  Right.  So let's --         05:49:32
```

359

```
 1              STATE
 2     Q.  Just working your way up.    05:49:33
 3     A.  Okay.                       05:49:35
 4     Q.  I just want to -- my question is  05:49:36
 5  according to this document it appears that  05:49:37
 6  a conference call took place between Mr.  05:49:39
 7  Girardi, Mr. Bagaria, Mr. Simmons,  05:49:46
 8  yourself, and maybe Mr. Hogan.     05:49:49
 9     A.  Okay.  I -- I don't know.  I  05:49:51
10  don't know if I was involved in that  05:49:55
11  conversation or not.               05:49:57
12     Q.  Okay.  Do you see where --  05:49:58
13     A.  I see where -- I understand what  05:50:02
14  you are saying.  I just don't recall if I  05:50:03
15  was involved in a conversation with that  05:50:05
16  group of people or not.            05:50:07
17     Q.  Do you -- do you recall having a  05:50:10
18  conversation with these people, you know,  05:50:11
19  a few days after you spoke with Mr.  05:50:18
20  Schnabel, Mr. Leonard, and Mr. Fiorucci?  05:50:20
21     A.  All on the same -- on a call  05:50:24
22  together?                          05:50:34
23     Q.  Yes.                       05:50:34
24     A.  I -- I don't recall that we had  05:50:34
25  such a call.                       05:50:34
```

360

```
 1              STATE
 2     Q.  Do you recall if you had a    05:50:34
 3  conversation with all of them separately  05:50:34
 4  or in various groups?              05:50:35
 5     A.  I -- I recall that most if not  05:50:38
 6  all of the board members other than Bob  05:50:40
 7  Buck called me subsequent to the meeting I  05:50:43
 8  think just to say hang in there.  We  05:50:48
 9  are -- you know, this is going to be over  05:50:52
10  at some point, and we will all move on and  05:50:54
11  whatever happens happens and don't jump  05:50:56
12  ship.  That was kind of the message.  05:51:00
13     MR. DATOO:  This is 36.  Right.  05:51:01
14     (Plaintiff's Exhibit 36 marked  05:51:18
15  for identification.)               05:51:19
16     (Document handed to witness.)  05:51:20
17     Q.  Mr. State, you have in front you  05:51:21
18  a document marked Plaintiff's Exhibit 36.  05:51:23
19     Please review the document and  05:51:25
20  let me know if you've seen it before.  05:51:26
21     A.  Yes.                       05:51:27
22     Q.  Okay.  Who is David Hicks?  05:51:28
23     A.  He is a -- an employee that we  05:51:31
24  brought on board around -- around the  05:51:33
25  first of the year I believe.       05:51:39
```

361

```
 1              STATE
 2     Q.  Do you know what MWH Global is?  05:51:41
 3     A.  It is the company he was working  05:51:47
 4  for at the time.                   05:51:49
 5     Q.  What kind of company is that?  05:51:50
 6     A.  That is an engineer consulting  05:51:51
 7  firm.                              05:51:53
 8     Q.  In the e-mail -- sorry.  Have  05:51:53
 9  you seen this e-mail before? I don't know  05:52:07
10  if I asked you that.               05:52:09
11     A.  I wrote this e-mail.  Yes.  05:52:09
12     Q.  You wrote: "Generally as     05:52:11
13  expected a full endorsement by the board  05:52:12
14  of my agenda."                     05:52:15
15     A.  Right.                      05:52:17
16     Q.  What was your -- what did you  05:52:17
17  mean by the word "agenda"?          05:52:19
18     A.  There was -- I don't know -- a  05:52:21
19  40- or 50-page presentation, Power Point  05:52:25
20  presentation that was made that had my  05:52:27
21  agenda for growth essentially, and that  05:52:30
22  was why the meeting lasted four hours.  We  05:52:34
23  spent a lot of time on where I had  05:52:37
24  envisioned taking the company, which  05:52:40
25  markets I wanted to go to, that type of  05:52:44
```

91  (Pages 358 to 361)

362

```
1          STATE
2    thing.                          05:52:46
3       Q.   In the next sentence you wrote,  05:52:46
4    "In a battle with founder about his need  05:52:48
5    to retire, but board gets it and is   05:52:50
6    working to exit him with some respect."  05:52:52
7       A.   Right.                   05:52:55
8       Q.   When you use the word "founder",  05:52:56
9    are you referring to Mr. Fried?     05:52:58
10      A.   Yes.                      05:53:00
11      Q.   What did you mean by a battle  05:53:00
12   with founder about his need to retire,  05:53:02
13   but --                           05:53:06
14      A.   That the board was in a battle  05:53:07
15   with -- with Mr. Fried.            05:53:08
16      Q.   And what did you mean by the  05:53:12
17   words "his need to retire"?         05:53:13
18      A.   I -- I think what I am referring  05:53:15
19   to there is that there was a census that  05:53:17
20   Burt had made, and this was Brian's words  05:53:20
21   I guess, that Burt had made an indication  05:53:23
22   in '05, '06 that he intended to retire.  05:53:26
23   The board actually thought he was a part  05:53:30
24   time -- had part-time involvement in the  05:53:33
25   company ,and then it came to light in this  05:53:35
```

363

```
1          STATE
2    board meeting that Burt indicated he was  05:53:38
3    working -- he had always worked full time.  05:53:41
4    I think there was a lot of surprise in the  05:53:44
5    board meeting at the involvement    05:53:46
6    that -- that Burt indicated he had had  05:53:48
7    with the company, and so there was a lot  05:53:50
8    -- I mean the discussion at the board  05:53:52
9    meeting was specifically about Burt stated  05:53:54
10   -- according to Brian Burt stated interest  05:53:58
11   or intent to retire, and, you know, we  05:54:00
12   were in a battle about that.        05:54:04
13      Q.   So at that meeting,         05:54:05
14   did -- November 4 meeting --        05:54:10
15      A.   That is -- yes, the board  05:54:11
16   meeting.                         05:54:13
17      Q.   Did you -- were you still under  05:54:13
18   the impression that Mr. Fried wanted to  05:54:15
19   retire?                          05:54:16
20      A.   Was I under the impression? I am  05:54:17
21   not sure what I concluded.  The meeting  05:54:24
22   was so bizarre.  It -- I concluded that it  05:54:26
23   seemed to be Burt's interest to have a  05:54:30
24   fight.  I didn't really understand what  05:54:33
25   his objective was at that point.  I don't  05:54:36
```

364

```
1          STATE
2    know what his objective is today.  I think  05:54:39
3    he may have been happy to retire if he got  05:54:42
4    the right package going out.  I just don't  05:54:44
5    know. I --                       05:54:47
6       Q.   This --                   05:54:47
7       A.   It is just speculative.  I don't  05:54:48
8    have any idea.                    05:54:51
9       Q.   But at this point you still  05:54:52
10   didn't ask or did you ask Mr. Fried if he  05:54:54
11   wanted to retire at this point?     05:54:57
12      A.   Nobody was asking Mr. Fried  05:54:59
13   anything at this point.             05:55:01
14      Q.   Okay.  Why were you discussing  05:55:02
15   LVI matters with Mr. Hicks?         05:55:09
16      A.   Because Mr. Hicks was a     05:55:10
17   prospective new hire for the company, and  05:55:13
18   I didn't want to get into the business  05:55:16
19   of -- of getting him involved in the  05:55:18
20   company.  He knew that -- that there was a  05:55:19
21   lot of unrest in the company.  He wanted  05:55:21
22   to make sure that if he was going to leave  05:55:23
23   his job and come to LVI, he -- he would  05:55:25
24   work during -- he is a former employee of  05:55:29
25   mine from a past relationship -- that I  05:55:31
```

365

```
1          STATE
2    was going to be there.             05:55:33
3       Q.   How did he know that there was  05:55:34
4    unrest in the company?             05:55:35
5       A.   I had had a conversation with  05:55:36
6    him.  He is a friend.  He is a personal  05:55:38
7    friend.                          05:55:40
8       Q.   And what I -- maybe I didn't  05:55:40
9    follow you, but when you wrote "his need  05:55:45
10   to retire" -- "in a battle with founder  05:55:51
11   about his need to retire," were    05:55:57
12   you the -- when you said battle I believe  05:56:01
13   you testified that you referred to the  05:56:03
14   board?                           05:56:06
15      A.   That is the board.          05:56:06
16      Q.   Does that include you?      05:56:07
17      A.   Yes and no.  I think it really  05:56:08
18   includes the outside investors of the  05:56:10
19   company.  It is -- this all got down to  05:56:12
20   what they wanted to do, whether there was  05:56:15
21   a relationship that we both stayed or one  05:56:19
22   or the other of us wasn't going to be  05:56:22
23   there.                           05:56:24
24      Q.   So it was either --         05:56:24
25          MR. DATOO:  Strike that.     05:56:28
```

92  (Pages 362 to 365)

**366**

1            STATE
2       Q.   So the -- was the battle between   05:56:29
3    the board and Mr. Fried about him retiring   05:56:31
4    or not?                              05:56:35
5       A.   I think the battle was with the   05:56:38
6    board and Mr. Fried about the -- what they   05:56:40
7    believed, at least what Brian Simmons   05:56:44
8    believed was Burt's stated objective that   05:56:48
9    he intended to retire and that he had   05:56:51
10   somehow changed his mind after the fact.   05:56:53
11      Q.   So at this board meeting, no   05:56:55
12   one -- did anyone mention the word retire?   05:56:58
13      A.   I think it was mentioned, yes.   05:57:01
14      Q.   Who -- who do you think   05:57:02
15   mentioned it?                        05:57:04
16      A.   I think Brian Simmons said,   05:57:04
17   Burt, we have had these discussions since   05:57:06
18   2005 when we brought MacNamara in, and,   05:57:08
19   you know, you indicated you had wanted to   05:57:11
20   retire.                              05:57:13
21      Q.   And what did Mr. Fried say in   05:57:14
22   response?                           05:57:15
23      A.   I -- I -- it was -- I don't   05:57:16
24   know.  I mean I just -- I know there   05:57:19
25   was -- Brian was not one to mince words or   05:57:21

**367**

1            STATE
2    walk away from a dispute, and I think he   05:57:24
3    put it out there and said here is what I   05:57:27
4    understood.                          05:57:29
5       Q.   And do you recall what Mr. Fried   05:57:29
6    said in response?                    05:57:31
7       A.   I don't recall what he said.   05:57:32
8       Q.   Handing you a document that has   05:57:33
9    been marked previously as Plaintiff's   05:57:48
10   Exhibit 8, can you take a look at the   05:57:50
11   document and let me know if you have even   05:57:55
12   it before.                           05:57:56
13          (Document handed to witness.)   05:57:56
14          (Pause.)                     05:58:00
15      A.   Yes.                        05:58:00
16      Q.   And do you recall when the first   05:58:00
17   time it that was you saw this document?   05:58:02
18      A.   I saw this document -- let's   05:58:05
19   see.  When -- well, it would have been   05:58:11
20   November 16.                         05:58:15
21      Q.   Now, prior to November 16, did   05:58:21
22   you have a discussion -- I guess after the   05:58:24
23   board meeting and prior to November 16,   05:58:29
24   did you have a discussion with any of the   05:58:31
25   board members about the resolution that   05:58:33

**368**

1            STATE
2    they reached at the board meeting where   05:58:38
3    Mr. Schnabel would reach out to Mr. Fried?   05:58:40
4       A.   Yes.  There was I think some   05:58:45
5    kind of endorsement that Schnabel   05:58:55
6    would -- would reach out to Burt, look for   05:58:57
7    some resolution.  As I recall, there was a   05:59:00
8    discussion that occurred, and then Burt   05:59:03
9    had requested that Schnabel talk to some   05:59:06
10   employees of the company and find out if   05:59:10
11   he was overbearing, which I am not sure   05:59:12
12   exactly what that meant, and somebody came   05:59:15
13   to me, Simmons or Schnabel and said, hey,   05:59:21
14   we would like to talk to some employees,   05:59:25
15   and I believe they talked to John Leonard   05:59:28
16   and probably DiCarlo I think, and I -- and   05:59:33
17   I agreed.  Yes, talk to them.  Find out   05:59:37
18   what their opinion is.  That is fine.  I   05:59:40
19   asked that Rob Hogan sit in on the calls   05:59:42
20   just to make sure that we had two people   05:59:48
21   listening, so that we -- we heard   05:59:51
22   everything that was said, and that   05:59:53
23   was -- that was the end of it.  Schnabel I   05:59:55
24   believe made those calls.  I don't recall   05:59:57
25   any -- I didn't receive any feedback from   05:59:59

**369**

1            STATE
2    those that I recall.  He may have given   06:00:04
3    feedback to other members of the board or   06:00:06
4    the other investors, and that is kind of   06:00:08
5    the extent of it.  I remember having a   06:00:12
6    discussion with John Schnabel one   06:00:14
7    afternoon probably in that time frame   06:00:20
8    you're speaking about.  I remember he   06:00:22
9    called me, and I am talking to him for a   06:00:24
10   bit about, you know, him looking for   06:00:26
11   a -- an amicable resolution but not being   06:00:29
12   real confident that -- that there was such   06:00:33
13   an opportunity.                      06:00:35
14      Q.   Did you have a conversation with   06:00:36
15   Mr. Schnabel about his conversation with   06:00:38
16   Mr. Fried?                           06:00:44
17      A.   I think I had a conversation   06:00:45
18   subsequent to his conversation with Mr.   06:00:49
19   Fried, but I don't know if I had a   06:00:51
20   conversation with him about that.   06:00:52
21      Q.   Well, focusing on the   06:00:55
22   conversation you had subsequent to Mr.   06:00:58
23   Schnable's conversation about Mr. Fried,   06:01:00
24   what did Mr. Schnabel tell you about his   06:01:02
25   conversation with Mr. Fried?   06:01:04

**93  (Pages 366 to 369)**

370

STATE

1
2    A.  I don't think he told me a lot,   06:01:05
3  and I -- frankly I don't have curiosity   06:01:08
4  for that type of thing.  I -- I wanted the   06:01:12
5  process to be worked through that   06:01:15
6  everybody felt was transparent and above   06:01:16
7  board, and, like I said, if it ended up me   06:01:18
8  being wrong, send me home.  I was   06:01:21
9  perfectly fine with that.   06:01:25
10    Q.  Did Mr. Schnabel send you any   06:01:26
11  e-mails about his conversation with Mr.   06:01:29
12  Fried?   06:01:31
13    A.  I don't believe so.   06:01:32
14    Q.  If I can just direct your   06:01:37
15  attention to Plaintiff's Exhibit 8, when   06:01:39
16  you received this letter did you discuss   06:01:43
17  it with anybody?   06:01:47
18       MS. SELTZER:  If there was any   06:01:49
19  discussions that you had with either   06:01:52
20  internal or outside counsel, you are not   06:01:53
21  to testify about them.   06:01:56
22       THE WITNESS:  Okay.   06:01:57
23       MR. DATOO:  He can testify if   06:01:58
24  he had any discussions with counsel, just   06:02:00
25  not what he discussed.   06:02:02

371

STATE

1
2       MS. SELTZER:  That is what I   06:02:03
3  meant.  Yes.   06:02:03
4    A.  I -- as I recall, I received   06:02:05
5  this, and this -- this letter came into   06:02:07
6  the New York office, and I recall an   06:02:09
7  exchange back and forth that my assistant   06:02:14
8  in New York indicated a letter had come in   06:02:17
9  for me, and I think I asked her who it was   06:02:19
10  from, and she said who it was from,   06:02:24
11  and --   06:02:27
12    Q.  Mr. State, I don't mean to cut   06:02:28
13  you off.   06:02:30
14    A.  Yes.   06:02:30
15    Q.  I just want to try to get   06:02:31
16  everyone out of here, but after you   06:02:32
17  received this letter did you have any   06:02:34
18  conversations about it?   06:02:35
19    A.  I am trying to piece it together   06:02:36
20  in my mind for you.   06:02:37
21    Q.  Okay.   06:02:39
22    A.  So I know there was a back and   06:02:39
23  forth, and then eventually that was -- I   06:02:41
24  think this was delivered on the 15th,   06:02:44
25  which you could probably attest to.  It is   06:02:47

372

STATE

1
2  dated the 15th.  On the 16th I spoke to   06:02:49
3  Paul Cutrone, and I was traveling, and he   06:02:52
4  said there is this letter from a firm, and   06:02:56
5  I said go ahead and open it because it was   06:03:00
6  addressed as confidential -- yes,   06:03:02
7  confidential.  And so I got it on the   06:03:05
8  16th, and I believe I forwarded it to   06:03:09
9  Simmons and Bagaria, and I -- it seems   06:03:12
10  like I had a conversation from an airport.   06:03:15
11  I think it was San Francisco with one or   06:03:19
12  both of those gentlemen that I received   06:03:22
13  this letter, and I was forwarding it to   06:03:24
14  them.   06:03:26
15    Q.  And what did you discuss with   06:03:26
16  these gentlemen?   06:03:30
17    A.  I -- I don't -- I think they   06:03:31
18  just said we got this letter, and, you   06:03:36
19  know, we will have to see what to do with   06:03:38
20  it.  I don't recall even reading this   06:03:40
21  letter until I was able to open it,   06:03:42
22  download it and review it.   06:03:45
23    Q.  Did you have multiple   06:03:46
24  conversations with Bagaria or Simmons?   06:03:48
25    A.  I don't think so.  It was -- it   06:03:54

373

STATE

1
2  would have been primarily with Simmons.   06:03:58
3  Simmons had been directed I believe by the   06:04:00
4  group to kind of represent Apollo and Code   06:04:04
5  in this.   06:04:08
6    Q.  And did you say that you had   06:04:08
7  this conversation on the 16th of November?   06:04:10
8    A.  Yes, I believe it was on the   06:04:13
9  16th.  If you notice I -- I got this at 3   06:04:15
10  in the afternoon, which would have been on   06:04:20
11  the west coast time, and -- or I sent   06:04:22
12  it at 3 in the afternoon, so it would have   06:04:26
13  been late afternoon, and -- and then a   06:04:29
14  discussion would have taken place I am   06:04:33
15  sure after that.   06:04:34
16    Q.  Okay.  Now, did there come a   06:04:35
17  time when Mr. Fried was notified that he   06:04:37
18  was being terminated as an employee?   06:04:40
19    A.  Yes, I believe so.   06:04:42
20    Q.  Do you recall when that was?   06:04:46
21    A.  No.   06:04:48
22    Q.  Handing you a document that has   06:04:50
23  been previously marked as Plaintiff's   06:05:04
24  Exhibit 11, take a look at the document   06:05:04
25  and let me know if you've seen it before.   06:05:08

**94  (Pages 370 to 373)**

VERITEXT REPORTING COMPANY

212-267-6868                                          516-608-2400

374

```
 1              STATE
 2      (Document handed to witness.)    06:05:08
 3      (Pause.)                         06:05:11
 4      A.  I -- I am familiar with the text  06:05:19
 5  of this.  I think I may have seen a draft.  06:05:21
 6  I don't know if I saw that letter.   06:05:23
 7      Q.  Okay.  Do you know when this  06:05:25
 8  letter was sent to Mr. Fried?        06:05:26
 9      A.  I am assuming the 16th of     06:05:28
10  November, but I'm not certain about that.  06:05:31
11      Q.  And do you know if this was   06:05:32
12  before or after you had that conversation  06:05:34
13  with Mr. Bagaria or Mr. Simmons?     06:05:36
14      A.  I -- I believe this letter was  06:05:41
15  drafted on the 14th or 15th.  I couldn't  06:05:43
16  know when it went out on the 16th.  I -- it  06:05:48
17  didn't send it, so I don't know.     06:05:50
18      Q.  And when was it decided that Mr.  06:05:52
19  Fried's employment would terminate?  06:05:54
20      A.  You have to ask Simmons.      06:05:56
21  I -- that was not a decision I was   06:06:02
22  directly involved with.              06:06:04
23      Q.  You didn't make the decision to  06:06:05
24  terminate Mr. Freed?                 06:06:07
25      A.  No.                          06:06:08
```

375

```
 1              STATE
 2      Q.  You're sure?                  06:06:08
 3      MS. SELTZER:  Objection. Asked   06:06:11
 4  and answered.                        06:06:12
 5      A.  Not to my recollection.      06:06:13
 6  The -- the decision to terminate him I  06:06:14
 7  am -- I am fairly certain was made by the  06:06:16
 8  board.                               06:06:19
 9      Q.  If Mr. Bagaria and Mr. Girardi  06:06:19
10  testified under oath that you made the  06:06:24
11  decision, would they be lying?       06:06:26
12      MS. SELTZER:  Objection.         06:06:28
13  I -- I think you might be            06:06:31
14  mischaracterizing, but either way -- 06:06:33
15      MR. DATOO:  I think --           06:06:35
16      MS. SELTZER:  Would that make a  06:06:36
17  difference in your testimony?        06:06:37
18      A.  Look, I don't -- I wasn't here.  06:06:38
19  I don't know what their testimony was.  06:06:42
20  They may believe that I made that    06:06:44
21  decision, but this letter and that   06:06:46
22  decision was not something I -- I -- I  06:06:54
23  didn't write this letter, and I didn't  06:06:56
24  make that decision.                  06:06:57
25      Q.  So is it your testimony that the  06:06:58
```

376

```
 1              STATE
 2  board made the decision?             06:07:00
 3      A.  It is my testimony that the   06:07:01
 4  board concluded that is what the company  06:07:03
 5  would do.                            06:07:05
 6      Q.  And were you part of the board  06:07:06
 7  when that decision was made or did you  06:07:08
 8  participate in that decision as a board  06:07:10
 9  member when you refer to the board?  06:07:11
10      A.  I don't remember specifically  06:07:13
11  like a telephonic board meeting or   06:07:19
12  anything like that where that decision was  06:07:21
13  made.  I -- I don't recall exactly how  06:07:23
14  that decision came about.            06:07:25
15      Q.  So did the board just make this  06:07:27
16  decision without your input?         06:07:29
17      A.  I think they had -- they took  06:07:31
18  everybody's input on the board including  06:07:33
19  Fiorucci and Buck.                   06:07:35
20      Q.  Did they take your input?     06:07:36
21      A.  I believe they would have taken  06:07:38
22  my input, yes.                       06:07:39
23      Q.  And what was your input?      06:07:41
24      A.  I would have supported that   06:07:43
25  decision.                            06:07:43
```

377

```
 1              STATE
 2      Q.  Okay.  Did you recommend that  06:07:44
 3  Mr. Fried be terminated?             06:07:46
 4      A.  No, I don't believe I did.    06:07:47
 5      Q.  Who raised the possibility of  06:07:49
 6  terminating Mr. Fried?               06:07:51
 7      A.  I -- believe it was Mr. Simmons.  06:07:52
 8      Q.  Okay.  And everyone supported  06:07:54
 9  that decision on the board?          06:07:56
10      A.  I believe so.                06:07:58
11      Q.  Do you know if anyone objected?  06:07:58
12      A.  I don't recall -- like I said, I  06:08:00
13  don't recall an actual meeting that  06:08:04
14  occurred.  I know there was no meeting in  06:08:06
15  person, and I don't recall a telephonic  06:08:08
16  meeting where it would have           06:08:11
17  been -- everybody would have been polled.  06:08:13
18  The only one I am -- I am uncertain about  06:08:16
19  is John Schnabel, but I think he      06:08:18
20  ultimately did say that is what should  06:08:19
21  happen.                              06:08:22
22      Q.  Handing you a document that has  06:08:22
23  been previously marked as Plaintiff's  06:08:32
24  Exhibit 12, can you take a look at the  06:08:36
25  document -- not that document.  The one in  06:08:42
```

378

```
1              STATE
2    front of you, Exhibit 12.            06:08:47
3         (Document handed to witness.)   06:08:48
4    A.   Yes, I am -- this --            06:08:48
5    Q.   Let me know if you have seen it 06:08:50
6    before.                             06:08:51
7    A.   I've -- I've seen at least     06:08:53
8    drafts of this document.  I don't recall 06:08:57
9    if I saw the final document or not. 06:08:59
10   Q.   Now, is this the consulting    06:09:02
11   agreement that was offered to Mr. Fried? 06:09:13
12   A.   I believe this is.             06:09:21
13   Q.   And whether Mr. Fried accepted 06:09:23
14   or rejected this consulting agreement, his 06:09:23
15   status as an employee was -- he was still 06:09:25
16   terminated as an employee of LVI,   06:09:30
17   he?                                 06:09:33
18   A.   I believe so because it looks to 06:09:33
19   me like this -- this may have been sent 06:09:35
20   with this.  They -- they were probably 06:09:38
21   sent together.                      06:09:41
22   Q.   Okay.                          06:09:42
23   A.   They -- this letter from Brian 06:09:42
24   Simmons and the consulting agreement. 06:09:46
25   Q.   So is it -- is               06:09:48
```

379

```
1              STATE
2    it regardless -- I am just going to ask 06:09:51
3    you the question again because I don't 06:09:56
4    know if you answered it or not.     06:09:57
5    A.   Okay.                          06:09:59
6    Q.   Regardless of whether Mr. Fried 06:09:59
7    accepted or rejected the consulting 06:10:01
8    agreement, his status -- he was still 06:10:03
9    terminated as an employee of LVI Services, 06:10:05
10   correct?                            06:10:08
11   A.   I believe that is true.        06:10:08
12   Q.   And earlier in your testimony we 06:10:10
13   touched upon a consulting agreement.  Is 06:10:11
14   this the agreement that you were -- that 06:10:14
15   you had in mind when we were talking about 06:10:16
16   it?                                 06:10:18
17   A.   I believe this is the agreement 06:10:18
18   that -- that you referred to earlier. 06:10:20
19   Q.   Is this the agreement that you 06:10:22
20   referred to that was quite generous I 06:10:23
21   believe?                            06:10:25
22   A.   I -- I believe it is, yes.     06:10:26
23   Q.   Okay.  And what do you feel is 06:10:28
24   generous about this agreement?      06:10:30
25   A.   Well, as I recall, there was   06:10:31
```

380

```
1              STATE
2    a -- there is a base retainer of 150,000 06:10:34
3    dollars a year, and then there was a fee 06:10:37
4    for every hour that Mr. Fried would work, 06:10:41
5    and -- maybe you could point me to the 06:10:46
6    provision that has that.  I am not seeing 06:10:48
7    it.                                 06:10:50
8    Q.   Third paragraph.               06:10:51
9    A.   250 dollars an hour, and -- I  06:10:52
10   think the thought process, as I understood 06:10:56
11   it, was that if -- if there were a need 06:10:58
12   for Mr. Fried's services in areas that the 06:11:01
13   company would retain value, he could 06:11:05
14   frankly make more than he was making 06:11:10
15   previously with the company.        06:11:12
16   Q.   Now, is there a guarantee of a 06:11:13
17   minimum number of hours that Mr. Fried 06:11:16
18   would work based on the terms of this 06:11:18
19   agreement?                          06:11:20
20   A.   I don't believe so.            06:11:21
21   Q.   Okay.  And is the full 150,000 06:11:22
22   dollar per year retainer guaranteed? 06:11:26
23   A.   I don't know.                  06:11:29
24   Q.   Why don't you read the third   06:11:29
25   paragraph.  See if you can answer that 06:11:33
```

381

```
1              STATE
2    question.                           06:11:36
3         (Pause.)                       06:11:39
4    MS. SELTZER:  I would just           06:11:46
5    object on the grounds that obviously the 06:11:48
6    document speaks for itself, so --   06:11:50
7    MR. DATOO:  Okay.                    06:11:52
8    A.   The -- the agreement could be  06:11:53
9    terminated on or before February 28, 2011. 06:11:56
10   After that I am not sure if the agreement 06:12:00
11   could be terminated or not.         06:12:04
12   Q.   Well, if -- if the agreement was 06:12:06
13   terminated on or before February 28, 06:12:10
14   2011 --                             06:12:14
15   A.   Right.                         06:12:14
16   Q.   -- how much was Mr. Fried      06:12:15
17   entitled to?                        06:12:17
18   A.   He would receive the first     06:12:18
19   advance under the retainer of 37,500. 06:12:19
20   Q.   And that is all he was         06:12:22
21   guaranteed under this agreement?    06:12:24
22   A.   I believe that is all he was   06:12:26
23   guaranteed under this agreement that was 06:12:28
24   offered.                            06:12:29
25   Q.   And if he signed this agreement 06:12:32
```

**96  (Pages 378 to 381)**

382

```
            STATE
1
2   he would also have to waive his right to      06:12:33
3   sue for age discrimination, correct?          06:12:35
4       A.   I don't know that --                 06:12:38
5       Q.   Second page, II.                      06:12:39
6       A.   I -- I -- I am not a lawyer.  I       06:12:43
7   don't -- I understand that it says "age        06:12:47
8   discrimination and employment act," but        06:12:49
9   I -- I will take your word for it that          06:12:52
10  that is what he would have to do.               06:12:55
11      Q.   And if I can direct your               06:12:57
12  attention to the second paragraph on the        06:12:58
13  first page.                                     06:13:04
14      A.   The second paragraph on the            06:13:04
15  first page.                                     06:13:04
16      Q.   On the first page.                     06:13:05
17      A.   Yes.                                   06:13:06
18      Q.   The last sentence.  Does               06:13:07
19  that -- does that sentence mean that            06:13:10
20  either Mr. Fried or LVI could terminate         06:13:13
21  this agreement at any time upon 30 days         06:13:15
22  notice?                                         06:13:18
23      A.   Yes.                                   06:13:18
24      Q.   Do you still think this is a           06:13:19
25  generous agreement?                             06:13:21
```

383

```
            STATE
1
2       MS. SELTZER:   Objection.              06:13:23
3       A.   Yes.  Yes.                        06:13:24
4       Q.   Why?                              06:13:27
5       A.   Because if -- if we had entered   06:13:28
6   into this agreement I -- you're making an   06:13:32
7   presumption that it was the company's       06:13:34
8   objective to get Burt to sign this and to   06:13:37
9   terminate him the next day, which -- to     06:13:39
10  terminate this agreement the next day with  06:13:42
11  30 day's notice, which was not the intent   06:13:44
12  at all.  I would have been very happy with  06:13:47
13  this agreement.  I think Burt could have    06:13:49
14  brought a great deal of value to the        06:13:51
15  company under this agreement, and I          06:13:52
16  believe he would be working under this      06:13:54
17  agreement today supporting the various      06:13:56
18  opportunities that the company has.  You    06:14:01
19  are simply drawing a conclusion that this   06:14:05
20  was just a means to get Burt to sign away   06:14:07
21  certain rights and then cut him lose 30     06:14:09
22  days later.                                 06:14:13
23      Q.   Who drafted this agreement?       06:14:14
24      A.   This agreement was probably       06:14:15
25  drafted by outside counsel.  I don't know.  06:14:17
```

384

```
            STATE
1
2   I didn't have anything to do with drafting  06:14:19
3   it.                                         06:14:21
4       Q.   Do you know why it was drafted     06:14:21
5   in such a way where it would only           06:14:24
6   guarantee Mr. Fried 37.5?                   06:14:24
7       A.   No.  I --                          06:14:26
8       Q.   Okay.                              06:14:27
9       A.   It is not atypical to pay          06:14:28
10  consultants on a quarterly basis, and I     06:14:30
11  might also say that I don't recall Burt     06:14:33
12  ever making a counterproposal asking for    06:14:35
13  any of those terms to be removed.           06:14:38
14      Q.   Okay.  Now, going back to what I   06:14:39
15  was discussing earlier that the -- about    06:14:43
16  the decision to terminate Mr. Fried, and    06:14:46
17  you testified earlier that you believed it  06:14:48
18  was Mr. Simmons that made the               06:14:50
19  recommendation.                             06:14:51
20      MS. SELTZER:   Objection.  I am         06:14:52
21  not sure.                                   06:14:54
22      A.   I --                               06:14:55
23      MS. SELTZER:   I --                     06:14:56
24      A.   I believe -- I don't know.  I      06:14:58
25  believe that is likely what happened.  I    06:15:00
```

385

```
            STATE
1
2   am not a hundred percent sure of that.      06:15:02
3       Q.   Do you know if the decision to     06:15:03
4   terminate or the discussion surrounding     06:15:05
5   any decision to terminate Mr. Fried was     06:15:09
6   memorialized in writing?                    06:15:11
7       A.   I do not know.                     06:15:13
8       Q.   Do you think that was all done     06:15:16
9   over the phone?                             06:15:19
10      A.   I -- I am unsure.  I don't know.   06:15:20
11      Q.   When you provided your input       06:15:25
12  into the decision -- I believe you          06:15:27
13  testified that you supported it -- did you  06:15:28
14  do that over the phone?                     06:15:30
15      A.   I -- I think I said I would        06:15:32
16  support the decision.  I don't recall like  06:15:34
17  I said -- I indicated I don't recall a      06:15:36
18  conversation where there was any type of    06:15:40
19  roll call or any process like that.  I      06:15:42
20  said I would support -- I would or did      06:15:44
21  depending on how it happened support the    06:15:47
22  decision.  I don't recall specifically      06:15:49
23  stating that.                               06:15:52
24      Q.   Do you recall who you said that    06:15:53
25  to or had that conversation with?           06:15:55
```

97  (Pages 382 to 385)

VERITEXT REPORTING COMPANY

212-267-6868                              516-608-2400

386

```
 1              STATE
 2      A.   It would have been one or all of   06:15:57
 3   the members of the board.             06:16:01
 4      Q.   Okay.  Do you know if there was   06:16:02
 5   a vote taken to terminate Mr. Fried?    06:16:04
 6      A.   I do not know.               06:16:08
 7      Q.   Should there have been a vote   06:16:09
 8   taken?                              06:16:12
 9         MS. SELTZER:   Objection.       06:16:13
10      A.   You would have to read the      06:16:16
11   corporate governance documents.  I am not   06:16:16
12   sure this would be controlled under -- I   06:16:19
13   don't think you need a board resolution.   06:16:24
14   I don't know.                       06:16:26
15      Q.   Going back to Plaintiff's       06:16:26
16   Exhibit 11.                        06:16:28
17      A.   Yes.                        06:16:30
18      Q.   I believe you testified that you   06:16:30
19   saw a draft of this letter a few days    06:16:33
20   before; is that correct?             06:16:38
21      A.   Yes.  I believe I -- there were   06:16:39
22   drafts.  There was a draft that was      06:16:41
23   circulated.                        06:16:45
24      Q.   Did you approve any of the      06:16:46
25   drafts for Plaintiff's Exhibit 11?      06:16:49
```

387

```
 1              STATE
 2      A.   I don't believe I had any input   06:16:52
 3   into it, no.                       06:16:54
 4      Q.   Did you review a draft of       06:16:54
 5   Plaintiff's Exhibit 11?             06:16:56
 6      A.   I know I -- I believe I received   06:16:58
 7   a draft, and the reason I say that is    06:17:00
 8   because I don't recall seeing it on     06:17:06
 9   letterhead.  I may have, but -- did I see   06:17:08
10   it?  Yes.  Did I review and comment?  I   06:17:12
11   would say I probably reviewed it.  I don't   06:17:15
12   know that I commented on it though.     06:17:18
13      Q.   Okay.  When you reviewed a draft   06:17:20
14   of Plaintiff's Exhibit 11, can you -- is   06:17:22
15   that when you learned that Mr. Fried was   06:17:27
16   an employee of LVI Services?          06:17:29
17      A.   I don't know.  I -- I seem to     06:17:30
18   recall a document we looked at where on   06:17:35
19   November 1 it was clear I did believe he   06:17:39
20   was on employee.  By this point -- I think   06:17:43
21   by the time we had gone through the board   06:17:46
22   meeting and some of those gyrations it was   06:17:48
23   apparent or someone advised me that he    06:17:53
24   was.                               06:17:56
25      Q.   So at that point why was the     06:17:57
```

388

```
 1              STATE
 2   board still involved in determining Mr.   06:17:59
 3   Fried's role with the company and not you?   06:18:01
 4      A.   Because he didn't work for me.    06:18:03
 5   He worked for the board.             06:18:05
 6      Q.   Well, didn't it say in a draft   06:18:06
 7   of Plaintiff's Exhibit 11 that Mr. Fried   06:18:08
 8   was employed by LVI Services, Inc.?      06:18:11
 9      A.   It certainly says that, but he   06:18:14
10   did not work for me.                06:18:15
11      Q.   Well, you were the CEO of the    06:18:17
12   company?                           06:18:20
13      A.   Correct.                    06:18:21
14      Q.   And is there anyone higher than   06:18:22
15   you in LVI Services, Inc.?           06:18:23
16      A.   Isn't that bizarre?  Isn't that   06:18:27
17   incredibly bizarre?  Yes.            06:18:29
18      Q.   And --                      06:18:32
19      A.   You explain it to me.  I can't   06:18:33
20   explain it.  I have no idea.  I have never   06:18:35
21   seen anything like it in my life.       06:18:37
22      Q.   You don't know if there is an   06:18:39
23   employee higher than the CEO in LVI      06:18:40
24   Services?                          06:18:42
25      A.   I didn't think there was, but   06:18:42
```

389

```
 1              STATE
 2   you tell me.  Was there?             06:18:44
 3      Q.   Well, it is not my deposition.    06:18:45
 4      A.   Okay.  But I --              06:18:48
 5      Q.   You're being deposed.          06:18:49
 6      A.   I -- I for the life of me to     06:18:51
 7   this day do not understand that employment   06:18:56
 8   relationship.  It is mysterious to me.    06:18:57
 9      Q.   Did you -- did you ask anyone if   06:19:00
10   you could terminate Mr. Fried if he was an   06:19:04
11   employee of LVI Services?            06:19:06
12      A.   If I could?                 06:19:07
13      Q.   Yes.                        06:19:08
14      A.   No, I don't recall ever        06:19:08
15   asking -- I don't believe up until around   06:19:10
16   this time that he was an employee.      06:19:13
17      Q.   Okay.  Why was Mr. Fried        06:19:14
18   terminated?                        06:19:22
19      A.   I believe a decision was made by   06:19:23
20   the board that the duties and           06:19:26
21   responsibilities that were -- could be    06:19:30
22   served by others in the company, and that   06:19:34
23   in the best interests of the business we   06:19:37
24   wished to pursue a strategy where he would   06:19:40
25   service the company as a consultant.     06:19:43
```

98  (Pages 386 to 389)

VERITEXT REPORTING COMPANY

212-267-6868                                    516-608-2400

390

```
              STATE
 1
 2      Q.   Was he terminated because he        06:19:45
 3   interfered with the business or meddled in   06:19:47
 4   the business?                                06:19:49
 5      A.   I -- I don't know that there is      06:19:50
 6   any specific instance that -- that you       06:19:52
 7   would say that was the case.                 06:19:56
 8          (Plaintiff's Exhibit 37 marked        06:20:21
 9   for identification.)                         06:20:22
10          (Document handed to witness.)         06:20:22
11      Q.   Mr. State, I am handing you a        06:20:23
12   document that is being marked as             06:20:25
13   Plaintiff's Exhibit 37.                      06:20:27
14      A.   Holly crap.                          06:20:28
15      Q.   I known.  I know.  I am only         06:20:29
16   giving you what I have got.                  06:20:32
17          MS. SELTZER:  Was that 37?            06:20:34
18          MR. DATOO:  37.                       06:20:35
19      Q.   Can you please review the            06:20:36
20   document and let me know if you have seen    06:20:37
21   it before?                                   06:20:39
22      A.   I will let you know if I can         06:20:39
23   read it.                                     06:20:40
24      Q.   I didn't do this on purpose.         06:20:41
25      A.   Okay.                                06:20:54
```

391

```
              STATE
 1
 2      Q.   Have you seen this document          06:20:55
 3   before?                                      06:20:56
 4      A.   Yes.                                 06:20:57
 5      Q.   Who or what is Dixon Eaton?          06:21:00
 6      A.   It was a public relations firm       06:21:02
 7   that the company had used.                   06:21:04
 8      Q.   And who is Amy McGahan?              06:21:06
 9      A.   She was the account                  06:21:09
10   representative.                              06:21:10
11      Q.   Why did you tell her that Mr.        06:21:10
12   Fried resigned?                              06:21:14
13      A.   Because he did.                      06:21:14
14      Q.   What did he resign?                  06:21:16
15      A.   He resigned all of his board        06:21:17
16   appointments effective some date certain.    06:21:19
17   I forgot what it was.                        06:21:25
18      Q.   Wasn't he also fired by the          06:21:27
19   company?                                     06:21:28
20      A.   He was terminated, and he            06:21:29
21   resigned as to his board assignments.        06:21:31
22      Q.   Why didn't you tell her that he      06:21:35
23   was terminated as well?                      06:21:36
24      A.   Did I have to?                       06:21:38
25      Q.   Well, I am the one asking            06:21:39
```

392

```
              STATE
 1
 2   questions today.                             06:21:42
 3      A.   Sure.  Okay.                          06:21:43
 4      Q.   Why didn't you tell her that he      06:21:44
 5   was fired?                                   06:21:45
 6      A.   I didn't think it was any of her     06:21:46
 7   business.  Did I want to put the word on     06:21:48
 8   street that Burt had been terminated?  I     06:21:50
 9   didn't feel like that was the kind of        06:21:52
10   thing that did anything for Burt.            06:21:54
11      Q.   Were you doing it for his good?      06:21:56
12      A.   I would say yes.                     06:21:57
13      Q.   Okay.  Are you familiar with an      06:21:59
14   employee -- a former employee named Sheri    06:22:17
15   Dembin?                                      06:22:20
16      A.   Yes.                                 06:22:20
17      Q.   How so?                              06:22:21
18      A.   I know she was employed in the       06:22:22
19   Westport office.  I know that she is         06:22:25
20   Burt's daughter, and I never met her, and    06:22:30
21   I spoke to her half a dozen times over the   06:22:33
22   phone.                                       06:22:37
23      Q.   When did you learn that she was      06:22:38
24   Mr. Fried's daughter?                        06:22:40
25      A.   I don't know.  It wasn't -- I        06:22:41
```

393

```
              STATE
 1
 2   know it wasn't prior to joining the          06:22:43
 3   company, and I -- I don't recall when I      06:22:44
 4   learned that she was Burt's daughter, and    06:22:48
 5   Matt Dembin was his former son-in-law.  It   06:22:51
 6   was likely some time in October.             06:22:54
 7      Q.   Okay.  And do you know how long      06:22:57
 8   Ms. Dembin worked for LVI?                   06:22:59
 9      A.   I -- I do not.                       06:23:02
10      Q.   Do you know what office she          06:23:04
11   worked in?                                   06:23:06
12      A.   She worked in the Westport          06:23:07
13   office.                                      06:23:08
14      Q.   And do you know what her job         06:23:09
15   title was?                                   06:23:11
16      A.   I do not.                            06:23:12
17      Q.   Do you know what her job duties      06:23:13
18   were?                                        06:23:16
19      A.   I -- I know I believe what some      06:23:16
20   of her -- I believe she was involved in      06:23:20
21   travel coordination I know was one of her    06:23:22
22   duties.  I don't know specifically what      06:23:25
23   else she would have done.  I think she had   06:23:29
24   some involvement in the bonding activities   06:23:32
25   as well.                                     06:23:34
```

99  (Pages 390 to 393)

VERITEXT REPORTING COMPANY

212-267-6868                                    516-608-2400

## 394

STATE

```
1            STATE
2    Q.   Do you know what kind of        06:23:35
3   involvement?                           06:23:36
4    A.   I -- it is my understanding it  06:23:36
5   was administrative in nature.          06:23:40
6    Q.   Do you know if she was -- if she 06:23:41
7   reviewed and processed insurance requests 06:23:44
8   from branch offices?                   06:23:46
9    A.   I don't know that.               06:23:47
10   Q.   Do you know if she was          06:23:50
11  responsible for reviewing bid and bond 06:23:52
12  requests before the requests were sent to 06:23:55
13  Arch?                                  06:23:57
14   A.   I thought that was one of Burt's 06:23:58
15  duties.  Can you read that again?      06:24:01
16   Q.   I am not asking you to go back   06:24:19
17  to the documents.  I am just asking you 06:24:19
18  you what you know.                     06:24:19
19   A.   I don't know.                    06:24:19
20   Q.   Okay.  Do you have any knowledge 06:24:19
21  about the quality of her work performance? 06:24:19
22   A.   No.                              06:24:19
23   Q.   Do you know how long she was     06:24:19
24  performing her insurance and bonding   06:24:20
25  related duties?                        06:24:23
```

## 395

STATE

```
1            STATE
2    A.   No.                              06:24:24
3    Q.   Did you consider her job duties  06:24:26
4   as noncritical administrative duties?  06:24:31
5    A.   I -- I have testified I don't    06:24:34
6   even know specifically whether she had 06:24:38
7   certain of these duties, so I -- I really 06:24:41
8   can't answer that.                     06:24:44
9    Q.   Now, did there come a time when  06:24:44
10  Ms. Dembin was terminated?             06:24:48
11   A.   Yes.  As part of the reduction   06:24:52
12  in force with Westport and the business 06:24:52
13  development functions and a number of  06:24:54
14  other administrative positions in New York 06:24:56
15  and across the country, she -- she was 06:24:59
16  terminated.                            06:25:01
17   Q.   How many people were terminated  06:25:02
18  in connection with that layoff?        06:25:05
19   A.   I would say ten to               06:25:06
20  fifteen -- fifteen maybe.  I don't know 06:25:10
21  the exact number.                      06:25:13
22   Q.   Okay.  And who made the decision 06:25:14
23  to terminate these people?             06:25:18
24   A.   I did.                           06:25:20
25   Q.   Did anyone assist you in your    06:25:20
```

## 396

STATE

```
1    decision making?                      06:25:23
2    A.   To a certain extent, yes.        06:25:24
3    Q.   Who?                             06:25:27
4    A.   About 30 people in the company.  06:25:28
5    Q.   Okay.  Who at the executive      06:25:33
6   level?                                 06:25:39
7    A.   Every one of them.               06:25:39
8    Q.   And how did they help you in     06:25:42
9   general?                               06:25:43
10   A.   I -- when I realized probably    06:25:44
11  within a couple of weeks after coming to 06:25:49
12  the company that things could get      06:25:51
13  difficult, I looked at the cost structure 06:25:54
14  of the business, and, as I indicated   06:25:58
15  before, the prior success in business  06:25:59
16  development, and so I put together a   06:26:02
17  letter.  I worked with John Leonard, and 06:26:07
18  we went out to every branch manager, which 06:26:09
19  would typically be considered an executive 06:26:13
20  of the company, and a number of the    06:26:15
21  administrative executives, and I asked our 06:26:17
22  people which of these employees were   06:26:21
23  positive contributors to their success, 06:26:26
24  and based on those results I made      06:26:30
```

## 397

STATE

```
1    decisions who we kept and who we didn't 06:26:32
2    keep.                                 06:26:35
3    Q.   And was that done in writing?    06:26:35
4    A.   Yes, that went out -- I don't    06:26:37
5   know the date.  It ultimately went out.  I 06:26:39
6   believe it went out from John Leonard to 06:26:41
7   the operations folks because they all  06:26:43
8   worked for him.  And -- and then we    06:26:45
9   solicited -- I believe we got input back 06:26:48
10  from -- from everyone.                 06:26:51
11   Q.   And was Ms. Dembin identified by 06:26:52
12  one of the branch managers?            06:26:55
13   A.   As?                              06:26:56
14   Q.   As not being a value or being    06:26:57
15  expendable.                            06:27:00
16   A.   No, the -- the process that I am 06:27:01
17  describing was specific to business    06:27:06
18  development, and Ms. Dembin was not    06:27:07
19  involved with business development.  Her 06:27:10
20  ex-husband, Mr. Dembin was, and he was 06:27:13
21  unfortunately one of the people on that 06:27:16
22  list that didn't make it.              06:27:19
23   Q.   So why was Ms. Dembin selected   06:27:20
24  for layoff?                            06:27:23
```

100  (Pages 394 to 397)

**398**

STATE

1
2      A.   Because it was a function        06:27:24
3   that -- what she was doing, and I spoke    06:27:25
4   with Joseph Annarumma, who had been her    06:27:27
5   boss for a number of the years that she    06:27:30
6   worked in the company, and I asked him,    06:27:34
7   you know, if there were essential job      06:27:36
8   functions being performed in support of    06:27:38
9   the company in Westport other than the     06:27:42
10  legal area because I knew we didn't have   06:27:45
11  any other lawyers, and at that time        06:27:47
12  Ms. Dembin had received notice from John   06:27:50
13  Leonard that she worked for him, and he    06:27:53
14  said, yeah, I -- I can do these duties     06:27:55
15  myself, and so it was like all the other   06:27:58
16  administrative reductions we did. It was   06:28:02
17  an efficiency decision. We were --         06:28:08
18      Q.   And when was that decision made   06:28:08
19  to terminate -- to include Ms. Dembin in   06:28:09
20  the lay off?                               06:28:12
21      A.   I -- it was all done early on.    06:28:13
22  I -- I don't know. It was probably early   06:28:20
23  November. I -- I -- I would have to look   06:28:27
24  at when we went out and began that         06:28:31
25  process. I know we had a regional          06:28:36

**399**

STATE

1
2   manager's meeting in Denver. I don't       06:28:38
3   remember what the date was, but it         06:28:40
4   was -- it was all discussed at that time   06:28:42
5   in early November.                         06:28:44
6      Q.   Do you know when it was            06:28:46
7   finalized that Ms. Dembin would be part of  06:28:47
8   this layoff?                               06:28:49
9      A.   The -- the final, final list was   06:28:50
10  not really concluded until about a day     06:28:54
11  before, but she had been on the list since  06:28:58
12  day one. There was one individual that we  06:29:00
13  were uncertain, and it became apparent     06:29:05
14  that there weren't any office managers     06:29:07
15  that were willing to support that          06:29:09
16  individual remaining with the company, and  06:29:12
17  so we finalized the list. I recall I       06:29:14
18  drafted the memo, and then we had to       06:29:17
19  redraft it because we add one person to    06:29:19
20  the RIF.                                   06:29:21
21      Q.   And when you say early November,  06:29:22
22  can you give me a more specific date?      06:29:24
23      A.   I -- I know it was around the     06:29:29
24  time we had our first regional managers    06:29:31
25  meeting, which would be the three senior   06:29:35

**400**

STATE

1
2   managers that -- that run all the          06:29:37
3   operations, and we were making decisions   06:29:38
4   on how to reduce our cost. We were in a    06:29:40
5   budgeting process. So all of this was      06:29:45
6   part and parcel to budgeting for the       06:29:47
7   coming year, which would have been done in  06:29:50
8   early November.                            06:29:52
9      Q.   Was this before or after the      06:29:53
10  board meeting?                             06:29:54
11      A.   I don't -- I don't recall. I     06:29:55
12  don't remember when that regional managers  06:29:59
13  meeting took place. It was around that     06:30:01
14  time. It was probably within a -- plus or  06:30:03
15  minus a week I would guess.                06:30:06
16      Q.   Do you have any -- are there any  06:30:08
17  documents that would demonstrate when you  06:30:10
18  had this regional managers meeting?        06:30:13
19      A.   I believe I can figure it out.   06:30:15
20  I don't know that I have any documents.    06:30:16
21  It wasn't -- it was -- it was John         06:30:18
22  Leonard's meeting that I participated in,  06:30:20
23  and I laid out what our strategy going     06:30:23
24  forward was going to be. So I was          06:30:25
25  essentially an invited participant, but I  06:30:27

**401**

STATE

1
2   am sure John Leonard would have            06:30:29
3   information as to when that was.           06:30:31
4      Q.   How can you -- you mentioned you  06:30:33
5   could figure it out. How can you figure    06:30:34
6   it out?                                    06:30:36
7      A.   By asking him to go back and      06:30:36
8   tell me when that meeting took place.      06:30:38
9      Q.   And you are saying Mr. Leonard    06:30:40
10  knows this?                                06:30:42
11      A.   I am saying he could figure it   06:30:42
12  out. I am not saying he knows it right     06:30:43
13  now.                                       06:30:45
14      MR. DATOO:   Joanne, I would          06:30:45
15  like to request any documents evidencing   06:30:47
16  when this regional meeting took place.     06:30:49
17      MS. SELTZER:   Why don't you          06:30:52
18  write it down, and we will take it under   06:30:53
19  advisement.                               06:30:55
20      MR. DATOO:   Okay.                    06:30:55
21      Q.   Now, did you speak directly to   06:30:56
22  Mr. Annarumma about Ms. Dembin?           06:30:59
23      A.   Yes, I believe -- I believe I    06:31:03
24  did.                                       06:31:05
25      Q.   Did you -- is there a document   06:31:05

101  (Pages 398 to 401)

**402**

STATE

1
2  evidencing that conversation?                06:31:09
3      A.   I -- I don't know.              06:31:10
4      Q.   And did you speak to Mr.         06:31:14
5  Annarumma about all of the employees who  06:31:17
6  reported to him?                           06:31:21
7      A.   Yes, there was another employee   06:31:22
8  in the New York office that was terminated 06:31:24
9  as well.                                   06:31:25
10     Q.   Okay.  And how many people from   06:31:26
11 the Connecticut office were               06:31:28
12 terminated -- the Westport office were     06:31:33
13 terminated?                                06:31:34
14     A.   Well, there was Ms. Dembin and    06:31:36
15 then the administrative person Robin       06:31:37
16 Keller.  I remember her name now, and then 06:31:40
17 three people that supported the business   06:31:42
18 development function.  I believe that is   06:31:44
19 it.                                        06:31:50
20     Q.   And who did the admin person      06:31:50
21 support?                                   06:31:54
22     A.   I don't know.  I am not           06:31:54
23 certain.                                   06:31:57
24     Q.   And were other -- who were the    06:31:57
25 other people that were included layoffs,   06:32:01

**403**

STATE

1
2  their positions?                           06:32:05
3      A.   They were marketing support       06:32:06
4  folks.                                     06:32:08
5      Q.   And where were they located?      06:32:08
6      A.   It -- you mean -- you're talking  06:32:09
7  about people outside of Westport?          06:32:12
8      Q.   Yes.                              06:32:13
9      A.   Oh, there were senior business    06:32:13
10 development people, one in North Carolina, 06:32:16
11 one in Boston.  Matt Dembin was New York   06:32:18
12 metro area, and -- I know I gave you the   06:32:28
13 four --                                    06:32:44
14     Q.   There is a fourth person?         06:32:44
15     A.   Yes, and I am drawing a blank at  06:32:45
16 the moment who that even was.              06:32:47
17     Q.   Did the three people that were    06:32:49
18 laid off in the Westport office, the       06:32:51
19 marketing people, did they support these   06:32:55
20 business development people?               06:32:57
21     A.   Largely they supported them,      06:32:58
22 yes.                                       06:33:01
23     Q.   Okay.  And I forgot if I asked    06:33:01
24 you this, but did the admin person in      06:33:04
25 Westport support the marketing people?     06:33:06

**404**

STATE

1
2      A.   I -- I don't know.              06:33:09
3      Q.   Okay.  Why was the admin person  06:33:10
4  terminated?                                06:33:14
5      A.   I believe, as I recall, at the   06:33:14
6  regional managers meeting we looked at the 06:33:19
7  reduced footprint we were after, and it    06:33:22
8  was decided that that position would be    06:33:24
9  one that we could do without.              06:33:26
10     Q.   And so just the three lawyers     06:33:28
11 were left in Westport?                      06:33:30
12     A.   Right.                            06:33:31
13     Q.   And at the regional managers      06:33:32
14 meeting, is that when the people were      06:33:38
15 first selected for inclusion in the        06:33:40
16 layoff?                                     06:33:45
17     A.   I don't think so.  I think I had  06:33:45
18 already probably in counsel with John      06:33:46
19 Leonard gone through and said here is      06:33:51
20 what -- we had agreed on.  Here is what we 06:33:54
21 think and then the regional managers       06:33:57
22 meeting was to discuss any operational     06:34:00
23 impact that that would create.  You know,  06:34:02
24 if we are going to radically change the    06:34:06
25 way we do business development and remove  06:34:08

**405**

STATE

1
2  these groups and these support functions   06:34:10
3  and these administrative functions, how    06:34:13
4  will we conduct our business efficiently   06:34:16
5  and effectively with these reduced costs   06:34:19
6  and cost structure.                        06:34:23
7      Q.   Of the four employees that        06:34:24
8  worked at LVI, did you ask the             06:34:26
9  supervisors --                             06:34:30
10          MR. DATOO:   Strike that.         06:34:31
11     Q.   Did you specifically ask          06:34:32
12 Annarumma about all of his employees who   06:34:34
13 could be included in the layoff?           06:34:37
14     A.   We asked the senior management    06:34:39
15 team to identify any and all employees     06:34:41
16 that we might be able to take a reduction  06:34:44
17 with in order to reduce the overhead costs 06:34:48
18 of the company, and it wasn't an exercise  06:34:51
19 that the group seemed to be unfamiliar     06:34:53
20 with.  As I look at it, it looked like the 06:34:55
21 company had taken out 5 or 6 million       06:34:58
22 dollars dollars of overhead in the prior   06:35:01
23 two or three years.  So this was -- it was 06:35:03
24 a pretty orderly process.  It was not      06:35:06
25 something that hadn't been done before.    06:35:08

102  (Pages 402 to 405)

406

```
 1          STATE
 2      Q.  And were there more than -- you      06:35:10
 3  said in the layoff approximately ten to      06:35:16
 4  fifteen people were terminated.              06:35:18
 5      A.  Right.                               06:35:20
 6      Q.  Were more people than the ten to     06:35:21
 7  fifteen identified by the -- by              06:35:23
 8  management?                                  06:35:28
 9      A.  I don't recall if there were         06:35:29
10  others that were on the list or off the      06:35:35
11  list.  I mean it was a -- it was a pretty    06:35:41
12  orderly process where it was determined      06:35:41
13  who would -- who would stay and who would    06:35:45
14  go from the get go.                          06:35:47
15      Q.  And can you describe how this        06:35:48
16  process worked?                              06:35:53
17      A.  The --                               06:35:54
18      Q.  The process for selecting the        06:35:58
19  people to be included in the layoff?         06:35:59
20      A.  We were looking to reduce the        06:36:01
21  overhead costs to the company, call it       06:36:05
22  roughly 2 million dollars a year, and 2      06:36:07
23  million dollars a year would be --           06:36:09
24  depending on salary with travel and fringe   06:36:11
25  and all of that you are looking at on the    06:36:15
```

407

```
 1          STATE
 2  order of fifteen people.  We looked at the   06:36:18
 3  business development staff.  We took all      06:36:20
 4  of those people and -- the fourth one it     06:36:23
 5  -- it was in Pennsylvania, Rob Lafever is    06:36:29
 6  his name.  We took them -- we took that to   06:36:32
 7  all the branch managers and asked them       06:36:35
 8  where they were obtaining value and then     06:36:37
 9  based on that made the decisions who         06:36:40
10  stayed and who goes.                         06:36:42
11      Q.  And when was that?                   06:36:42
12      A.  That is the process that John        06:36:44
13  Leonard ran with -- with his folks.          06:36:46
14  I -- I would guess November, early           06:36:50
15  December, that time frame by the time we     06:36:53
16  got that out.  We had gone through a good    06:36:55
17  first pass of the budgeting process, and     06:36:59
18  it was apparent that from the operation      06:37:01
19  side of the business we weren't going to     06:37:05
20  generate the kind of income that we were     06:37:07
21  going to need, and so we had to take costs   06:37:09
22  out of the overhead structure of the         06:37:11
23  company to make what was going to be an      06:37:13
24  acceptable plan for the investors.           06:37:15
25      Q.  Maybe it is getting late for me,     06:37:17
```

408

```
 1          STATE
 2  but --                                       06:37:20
 3      MS. SELTZER:  For all of us.             06:37:21
 4      Q.  For all of us.  When was             06:37:23
 5  Ms. Dembin -- when was Ms. Dembin            06:37:25
 6  identified as a person that potentially      06:37:29
 7  could be included in the lay off?            06:37:33
 8      A.  I would say late October, early      06:37:35
 9  November, somewhere in that time frame.      06:37:37
10      Q.  So prior to you sending an           06:37:39
11  e-mail, your one-month review e-mail where   06:37:41
12  you mentioned --                             06:37:46
13      A.  It was prior to that.  I -- I        06:37:47
14  mentioned that in there, that we are         06:37:49
15  looking at that.  I -- I don't know if I     06:37:51
16  mentioned the overall scale of what we       06:37:55
17  were going to try to reduce the overhead     06:37:57
18  by.  Yes, it was -- it was concluded at      06:37:59
19  that time that that was a major component    06:38:02
20  of where we were going have to go and get    06:38:05
21  some cost structure out of the company.      06:38:08
22      MR. DATOO:  Joanne, we will put          06:38:10
23  this in writing, but to the extent there     06:38:12
24  are any documents regarding the layoff,      06:38:14
25  the selection process, any initial lists     06:38:16
```

409

```
 1          STATE
 2  that were developed, we are -- we are        06:38:18
 3  going to request that from you.              06:38:20
 4      MS. SELTZER:  Put it in writing          06:38:21
 5  and we will take it under advisement.        06:38:23
 6      MR. DATOO:  Okay.                        06:38:25
 7      Q.  Now, did you make the ultimate       06:38:28
 8  decision on who was going to be              06:38:29
 9  terminated?                                  06:38:32
10      A.  Yes.                                 06:38:32
11      Q.  And what did you base your           06:38:33
12  decision on?                                 06:38:34
13      A.  I based it on the                    06:38:35
14  recommendations of the entire senior        06:38:38
15  management team.                             06:38:40
16      Q.  And who was on the senior            06:38:41
17  management team?                             06:38:43
18      A.  The seven individuals that I         06:38:44
19  have mentioned before.  We can go through    06:38:48
20  all the names again.                         06:38:50
21      Q.  It is okay.  I got the names.        06:38:51
22      A.  Okay.  Primarily the -- the          06:38:53
23  parties involved were on the corporate      06:38:56
24  side of things, Joseph Annarumma.  We took   06:39:02
25  an employee out of -- I think we took a      06:39:05
```

103  (Pages 406 to 409)

**410**

STATE

1
2  health and safety employee that wasn't a      06:39:14
3  performer out in Texas, so that health and    06:39:14
4  safety senior management would have been       06:39:14
5  involved. Mark Canessa would have been         06:39:15
6  involved because he worked a lot with the      06:39:18
7  sales and marketing folks, and, you know,      06:39:20
8  any senior manager that had employees that     06:39:22
9  worked for them had a say, and I -- I          06:39:24
10 wanted to know if they supported it or had     06:39:27
11 good reason not to support what -- what we     06:39:29
12 needed to do.                                  06:39:33
13     Q.   Now, after Ms. Dembin was            06:39:33
14 terminated, do you know who assumed her        06:39:39
15 job duties?                                    06:39:41
16     A.   They were absorbed by Joseph         06:39:42
17 Annarumma, her -- her supervisor.             06:39:45
18     Q.   And is Mr. Annarumma actually        06:39:48
19 performing her job duties?                     06:39:50
20     A.   He and a secretary in New York       06:39:52
21 are.                                           06:39:53
22     Q.   Are they dividing her job            06:39:53
23 duties?                                        06:39:55
24     A.   No, they -- I think the job          06:39:55
25 duties are largely performed by the            06:39:57

**411**

STATE

1
2  secretary and supervised by Joseph, but        06:40:01
3  he's had direct involvement. I -- I am         06:40:04
4  not intimately familiar with what he is        06:40:07
5  doing other than I -- I know that we have      06:40:09
6  not had a lost step there at all.             06:40:15
7      Q.   Now, is it -- do you think it is     06:40:18
8  appropriate for a secretary to be              06:40:19
9  reviewing and processing insurance            06:40:20
10 requests?                                      06:40:22
11     A.   Yes.                                  06:40:22
12     Q.   How about reviewing bid and bond     06:40:23
13 requests?                                      06:40:26
14     A.   Yes.                                  06:40:27
15     Q.   With Mr. Annarumma's                  06:40:27
16 supervision?                                   06:40:34
17     A.   Mr. Annarumma, and if it is a        06:40:34
18 bid and bond request, there is really two     06:40:37
19 levels of review. One is an                    06:40:39
20 administrative level, making sure all the      06:40:42
21 information is there, and the other is a       06:40:44
22 review that is -- that is being done by a     06:40:46
23 paralegal that works for Mr. DiCarlo.         06:40:49
24     Q.   Do you know why Ms. Dembin was       06:40:51
25 identified for termination prior to the       06:40:57

**412**

STATE

1
2  layoff?                                        06:41:01
3      MS. SELTZER:  Objection to the            06:41:02
4  form.                                          06:41:03
5      A.   I am not sure I understand           06:41:03
6  the --                                         06:41:06
7      Q.   Do you know why -- why did           06:41:06
8  you -- why was Ms. Dembin included in the     06:41:08
9  layoff?                                        06:41:12
10     MS. SELTZER:  Objection. Asked            06:41:12
11 and answered.                                  06:41:14
12     A.   Why?                                  06:41:14
13     Q.   Yes.                                  06:41:16
14     A.   Because the duties that she was      06:41:17
15 performing were easily performed by a          06:41:19
16 number of other people we had including        06:41:23
17 her supervisor.                                06:41:26
18     Q.   And do you know how long she was     06:41:27
19 performing those duties for?                   06:41:28
20     A.   No.                                   06:41:30
21     Q.   Okay. Do you have any idea why       06:41:31
22 she wasn't identified as someone who could    06:41:36
23 be terminated if her job duties could have    06:41:38
24 been absorbed by others?                       06:41:41
25     MS. SELTZER:  Objection to the            06:41:42

**413**

STATE

1
2  form.                                          06:41:43
3      A.   I'm not following you.               06:41:44
4      MS. SELTZER:  You mean prior to           06:41:45
5  this?                                          06:41:46
6      MR. DATOO:  Yes, prior.                   06:41:47
7      MS. SELTZER:  If she hadn't               06:41:48
8  been picked?                                   06:41:50
9      MR. DATOO:  Yes, exactly.                 06:41:50
10     A.   I don't know. I am not sure          06:41:51
11 when the last round of layoffs had            06:41:53
12 occurred in the company. It was before my     06:41:55
13 time.                                          06:41:57
14     MR. DATOO:  Okay. Let's mark              06:41:58
15 this part confidential.                        06:42:03
16     A.   Okay.                                 06:42:03
17     (The following portion of the             06:42:05
18 transcript has been designated as             06:42:05
19 confidential and is bound separately.)         06:42:05
20
21
22
23
24
25

**104  (Pages 410 to 413)**

**418**

```
 1              STATE
 2         MR. DATOO:  Okay.  Can we just    06:44:40
 3    take a quick break?  I want to see if    06:44:41
 4    there is anything left.              06:44:43
 5         THE VIDEOGRAPHER:  We're going    06:44:44
 6    off the record.  6:44 p.m.          06:44:45
 7         (Recess taken.)               06:44:49
 8         THE VIDEOGRAPHER:  We're         06:48:51
 9    returning to the record.  6:48 p.m.     06:48:51
10      Q.  Mr. State, who put or placed      06:48:54
11    Ms. Dembin on the list for those to be    06:48:58
12    laid off?                        06:49:02
13      A.  I am not certain.  It probably    06:49:03
14    was Joseph or John, but I am not certain.   06:49:12
15      Q.  John Leonard?                06:49:14
16      A.  Yes.                      06:49:15
17         (Continued on next page.)      06:49:15
18
19
20
21
22
23
24
25
```

**419**

```
 1              STATE
 2         MR. DATOO:  Okay.  Thank you      06:49:16
 3    very much.  I have no further questions.    06:49:19
 4         THE VIDEOGRAPHER:  We're going    06:49:20
 5    off the record.  6:49 p.m.  End of today's   06:49:21
 6    questioning.                     06:49:27
 7         (Time noted:  6:49 p.m.)        06:49:28
 8
 9
10
11
12
13
14              SCOTT STATE
15
16    Subscribed and sworn to before me
17    this      day of          , 2011
18
19                           .
20
21
22
23
24
25
```

**420**

```
 1
 2         C E R T I F I C A T I O N
 3
 4
 5
 6       I, DEBBIE ZAROMATIDIS, a Shorthand
 7    Reporter and a Notary Public, do hereby
 8    certify that the foregoing witness, SCOTT
 9    STATE, was duly sworn on the date
10    indicated, and that the foregoing is a
11    true and accurate transcription of my
12    stenographic notes.
13       I further certify that I am not
14    employed by nor related to any party to
15    this action.
16
17
18
19
20
21
22
23         DEBBIE ZAROMATIDIS
24
25
```

**421**

```
 1
 2         E X H I B I T S
 3
 4    PLAINTIFF'S
 5    EXHIBIT      DESCRIPTION            PAGE
 6    22     Press release            92
 7    23     Offer letter            152
 8    24     E-mail                171
 9    25     E-mail                175
10    26     E-mail                180
11    27     E-mail                184
12    28     E-mail                203
13    29     E-mail                210
14    30     List of job duties       215
15    31     List of job duties       227
16    32     E-mail                266
17    33     E-mail                293
18    34     Agenda               302
19    35     E-mail                316
20    36     E-mail                360
21    37     E-mail                390
22    38     (Exhibit skipped)
23    39     Draft press release      145
24
25
```

**105  (Pages 418 to 421)**

422

1
2               LITIGATION SUPPORT INDEX
3
4       REQUEST FOR PRODUCTION OF DOCUMENTS
5       Page    Line    Page    Line
6       324      5      401      15
7       409      3
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

ERRATA SHEET
VERITEXT/NEW YORK REPORTING, LLC

CASE NAME: Fried, Burton T. v. LVI Services, Inc., et al.
DATE OF DEPOSITION: May 26, 2011
WITNESSES' NAME: Scott State

PAGE  LINE (S)   CHANGE        REASON
___|_____|_____|_____
___|_____|_____|_____
___|_____|_____|_____
___|_____|_____|_____
___|_____|_____|_____
___|_____|_____|_____
___|_____|_____|_____
___|_____|_____|_____
___|_____|_____|_____
___|_____|_____|_____
___|_____|_____|_____
___|_____|_____|_____
___|_____|_____|_____
___|_____|_____|_____
___|_____|_____|_____

_____
         Scott State
SUBSCRIBED AND SWORN TO BEFORE ME
THIS _____ DAY OF _____, 20__.

_____
(NOTARY PUBLIC)          MY COMMISSION EXPIRES:

VERITEXT REPORTING COMPANY

212-267-6868                                        516-608-2400