# Exhibit 12

2   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
3
    - - - - - - - - - - - - - - - - - - - -x
4
    BURTON T. FRIED,
5
                            Plaintiff,
6
                -against-
7                           10 Civ. 9308 (JSR)(JCF)

8   LVI SERVICES, INC.; LVI PARENT CORP.;
    CODE HENNESSY SIMMONS LLC d/b/a CHS
9   PRIVATE EQUITY V LP; APOLLO
    INVESTMENT CORP.; SCOTT E. STATE, in
10  his official and individual capacities;
    BRIAN SIMMONS, in his official and
11  individual capacities; RAJAY BAGARIA,
    in his official and individual
12  capacities; GERALD J. GIRARDI, in his
    official and individual capacities,
13
                            Defendants.
14
    - - - - - - - - - - - - - - - - - - - -x
15
                            May 20, 2011
16                          9:56 a.m.

17                  Videotaped deposition of

18  BURTON T. FRIED, taken by attorneys for

19  Defendants, pursuant to notice, held at the

20  offices of Sidley Austin LLP, 787 Seventh

21  Avenue, New York, New York, before Nicole

22  Cannistraci, a Shorthand Reporter and Notary

23  Public within and for the State of New York.

24     Pages 293 - 297 were marked "Highly Confidential"

25  and separately bound.


ELISA  DREIER
       REPORTING CORP.

950 Third Avenue         Telephone: 212-557-5558
New York, New York 10022   Fax: 212-557-0050
Email:production@courtreportingedrc.com

2

```
 1

 2   A p p e a r a n c e s :

 3

 4          THOMPSON WIGDOR & GILLY LLP
            Attorneys for Plaintiff
 5                85 Fifth Avenue
                  New York, New York 10003
 6
            BY:   DOUGLAS H. WIGDOR, ESQ.
 7

 8

            SIDLEY AUSTIN LLP
 9          Attorneys for Defendants LVI Services,
              Inc., LVI Parent Corp., Scott E.
10            State, Brian Simmons, Rajay Bagaria
              and Gerald J. Girardi
11                787 Seventh Avenue
                  New York, New York 10019
12
            BY:   JOANNE SELTZER, ESQ.
13                MICHAEL D. MANN, ESQ.

14

15   Also Present:

16          ILITCH PETERS - Videographer

17          GREGORY G. DiCARLO, ESQ.
            LVI Services
18

19

20

21

22

23

24

25
```

3

1

2                    S T I P U L A T I O N S

3                    IT IS HEREBY STIPULATED AND

4       AGREED, by and between the attorneys for the

5       respective parties hereto, that the sealing

6       and filing of the within deposition be

7       waived; that such deposition may be signed

8       and sworn to before any officer authorized

9       to administer an oath with the same force

10      and effect as if signed and sworn to before

11      a Justice of this Court.

12

13

14                   IT IS FURTHER STIPULATED AND

15      AGREED that all objections, except as to

16      form, are reserved to the time of trial.

17

18

19                   IT IS FURTHER STIPULATED AND

20      AGREED that the within examination and any

21      corrections thereto may be signed before any

22      Notary Public with the same force and effect

23      as if signed and sworn to before this Court.

24

25

1                    Burton T. Fried
2              THE VIDEOGRAPHER:   This is tape
3        number one of the videotaped deposition
4        of Mr. Burton T. Fried in the matter of
5        Burton T. Fried, plaintiff, against LVI
6        Services, Incorporated, et al.,
7        defendants, in the United States
8        District Court, Southern District of
9        New York, case number 10 Civ 9308
10       (JSR)(JCF).
11              This deposition is being held at
12       Sidley Austin, 787 Seventh Avenue, on
13       May 20th, 2011 at approximately
14       9:56 a.m.
15              My name is Ilitch Peters from the
16       firm of Elisa Dreier Reporting Services
17       and I'm the legal video specialist.   The
18       court reporter is Nicole Cannistraci, in
19       association with Elisa Dreier Reporting
20       Services located at 950 Third Avenue,
21       New York, New York.
22              For the record, will counsel
23       please introduce themselves.
24              MR. WIGDOR:   For the plaintiff,
25       Doug Wigdor, Thompson Wigdor & Gilly.

1                    Burton T. Fried

2              MS. SELTZER:  And Joanne Seltzer

3         from Sidley Austin, representing LVI

4         Services, Inc., LVI Parent Corp., Scott

5         State, Brian Simmons, Rajay Bagaria and

6         Gerald Girardi.

7              MR. MANN:  Michael Mann from

8         Sidley Austin, representing same

9         defendants.

10             MS. SELTZER:  And we have here

11        also Greg DiCarlo, who is the general

12        counsel for LVI Services, Inc.

13             THE VIDEOGRAPHER:  Now will the

14        court reporter please swear in the

15        witness.

16   B U R T O N   T.   F R I E D, having been first

17   duly sworn by Nicole Cannistraci, a Notary

18   Public of the State of New York, was examined

19   and testified as follows:

20   EXAMINATION

21   BY MS. SELTZER:

22             Q.    Good morning, Mr. Fried.

23             A.    Good morning.

24             Q.    Have you ever been deposed before?

25             A.    Yes.

1                      Burton T. Fried

2          Q.      How many times?

3          A.      Many in my 46-year career.

4          Q.      Less than ten, less than five?  Do

5    you have any approximate idea?

6          A.      It could be either side of ten.

7          Q.      So I'm going to assume that you

8    know the basic rules of taking a deposition but

9    I'll refresh a couple for you.

10                 I'm going to be asking you a

11   series of questions having to do with your

12   complaint with your employment at LVI, with your

13   separation.  If you don't understand my

14   questions, just ask me to rephrase them and I'll

15   be happy to do that for you.  If you answer the

16   question, I'm going to assume that you've

17   understood my question and that you're answering

18   it to the best of your abilities in the most

19   truthful way possible.

20                 Is that fair to agree to?

21         A.      Yes.

22         Q.      You can take a break any time that

23   you want to.  The only thing I would say, if

24   there is a question pending, that you wait until

25   you answer it and then you can take a break as

```
 1                    Burton T. Fried
 2   much -- and we are also going to be asked to
 3   take some breaks during the course of this
 4   deposition to change the tapes on the recording.
 5                    Are you currently taking any kind
 6   of medications or other substances that would
 7   impair your ability to tell the truth today or
 8   to remember?
 9        A.    No.
10        Q.    Have you met with your counsel
11   prior to this deposition?
12        A.    Yes.
13        Q.    How many times did you meet with
14   your counsel?
15             MR. WIGDOR:  About the deposition?
16             MS. SELTZER:  Yes.
17        A.    Once.
18        Q.    For approximately how many hours?
19        A.    Eight.
20        Q.    And by your counsel, did you meet
21   with Mr. Wigdor?
22        A.    Yes.
23        Q.    Did Mr. -- did you review any
24   documents in preparation for this deposition to
25   refresh your recollection?
```

8

```
 1                    Burton T. Fried
 2        A.    Yes.
 3        Q.    Okay.  Approximately how many
 4  documents did you review?
 5        A.    One hundred.
 6        Q.    Were they documents that were
 7  primarily e-mails or other kinds of electronic
 8  documents or --
 9        A.    Correspondence, e-mails.
10        Q.    Were all of these hundred or so
11  documents that you reviewed shown to you by your
12  counsel?
13        A.    Yes.
14        Q.    Did you look at any documents at
15  home, without your counsel being present?
16        A.    No.
17              MR. WIGDOR:  Just let her finish
18        the question before you give the answer,
19        okay?
20        Q.    Have you ever instituted a lawsuit
21  before, Mr. Fried?
22        A.    I don't understand the question.
23        Q.    Have you ever been a plaintiff in
24  a lawsuit before?
25        A.    Not that I recall.
```

1                        Burton T. Fried

2            Q.    Have you ever been party to a

3    lawsuit before?

4            A.    Yes.

5            Q.    What lawsuit?  How many lawsuits

6    have you been a party to?

7            A.    One that I could recall.

8            Q.    And what was the background to

9    that lawsuit?

10           A.    It was a claim by the union

11   Operating Engineers of Las Vegas, claiming that

12   its members were not paid assigned and paid

13   benefits on a project at the Stardust Hotel,

14   which was -- and LVI Services, or rather LVI

15   Services of Nevada, the local company, was sued,

16   as well as some of the officers of LVI Services,

17   and I was named as one of them.

18           Q.    And that's the only one you can

19   remember in which you were actually named as a

20   party?

21           A.    Yes.

22           Q.    Were you ever a witness in any

23   trials or arbitrations?

24           A.    I have no recollection of being a

25   witness in any of those proceedings.

1                    Burton T. Fried

2          Q.     Have you ever been involved in any

3    kinds of investigations, internal investigations

4    having to do with discrimination or harassment

5    while you were employed by LVI Services?

6          A.     Yes.

7          Q.     How many?

8          A.     Several.

9          Q.     Were any of the investigations

10   involving claims of age discrimination?

11         A.     No, not that I -- one.  I think

12   there is one.

13         Q.     Can you tell me a little bit about

14   that?

15         A.     I can't really say I was involved,

16   although I'm aware of it.  It involved a --

17   someone who was hired with his wife to work for

18   one of our companies, and for I think it was

19   less than a week, and when their employment was

20   severed, they made a claim that they were

21   severed because of age.

22         Q.     Did you make the decision to sever

23   them?

24         A.     No.

25         Q.     Was there an investigation done

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

11

```
 1                    Burton T. Fried
 2   into their claims?
 3           A.    I think it was handled by
 4   Mr. DiCarlo and probably insurance counsel.  I
 5   wasn't really involved in it other than just
 6   being aware of the nature of that suit.
 7           Q.    Do you have any idea how that suit
 8   was resolved?
 9           A.    No.
10           Q.    Did you ever -- were you ever
11   involved in any kind of depositions or any of
12   that kind of involvement in that lawsuit?
13           A.    Not involved at all, only aware of
14   the suit being on the litigation schedule and
15   the suit -- the nature of the suit may have been
16   described to me by Mr. DiCarlo.
17           Q.    Do you know approximately how long
18   ago that was?
19           A.    Within the last couple of years.
20           Q.    Do you remember the names of the
21   individuals?
22           A.    No.
23           Q.    Was that the only age
24   discrimination claim that you remember?
25           A.    That comes to mind, yes.
```

1                    Burton T. Fried

2          Q.     Have you personally ever been

3   accused of any kind of discrimination or

4   harassment?

5          A.     No.

6          Q.     You're an attorney; is that

7   correct, Mr. Fried?

8          A.     Yes.

9          Q.     Do you currently practice?

10         A.     No.

11         Q.     Are you still admitted to

12  practice?

13         A.     I retired from practicing law of

14  the State of New York.

15         Q.     Do you practice in any other

16  state?

17         A.     No.

18         Q.     Did you conduct a search for

19  documents in your computers at home to ensure

20  that there weren't any that were responsive to

21  this lawsuit?

22         A.     I don't use any computers at home.

23         Q.     So you don't have computers at

24  home?

25         A.     I have a laptop but it's not

```
 1                    Burton T. Fried
 2   functioning, so I haven't really used it.
 3           Q.     Do you have any computers in any
 4   other locations?
 5           A.     Yes.
 6           Q.     What location is that?
 7           A.     My office.
 8           Q.     Where is your office located?
 9           A.     In Westport, Connecticut.
10           Q.     Did you look in your Westport,
11   Connecticut computer to ensure that there were
12   no documents that might be responsive to this
13   lawsuit?
14           A.     Yes.
15           Q.     Did you find any?
16           A.     No.
17           Q.     Did you look through your files at
18   home to make sure there were no documents
19   responsive to this lawsuit?
20           A.     I did.
21           Q.     And have you produced to your
22   counsel everything that you have found?
23           A.     All of them.
24                  (An off-the-record discussion took
25           place.)
```

```
 1                    Burton T. Fried
 2              MS. SELTZER:  Could you mark this
 3         as Exhibit 1.
 4              (Amended complaint marked Fried
 5         Exhibit 1 for identification.)
 6              Q.    Mr. Fried, I have put in front of
 7    you the amended complaint in this matter.  If
 8    you want to just take a -- just a quick glance,
 9    I'm going to ask you -- during the course of
10    this deposition I'm going to ask you a number of
11    questions relating to this complaint.  So you
12    don't have to look at the entire thing now but
13    just familiarize yourself with the document.
14              A.    Okay.
15              Q.    Have you ever seen this complaint
16    before?
17              A.    Yes.
18              Q.    Did you review it before it was
19    filed in court?
20              A.    Yes.
21              Q.    Do you consider what's in this
22    complaint to be accurate, to your knowledge?
23              A.    Yes.
24              Q.    In your complaint you've made a
25    number of claims against LVI, both the parent
```

```
 1                    Burton T. Fried
 2   and LVI Services, including claims of age
 3   discrimination.
 4              What do you believe happened to
 5   you during your employment at LVI that was age
 6   discrimination or that was part of age
 7   discrimination?
 8         A.    I was stripped of my duties and
 9   told that I would be essentially terminated when
10   all that was complete, because of my age.
11         Q.    Any other actions that you believe
12   the company took with respect to you that had
13   something to do with age?
14         A.    The company, both LVI Services and
15   LVI Parent, supported those actions, did not
16   object to those actions.
17         Q.    Any other actions taken by the
18   company or companies?
19         A.    And in connection with that age
20   discrimination, retaliated against me.
21         Q.    We'll get to the retaliation in
22   one sec, let me just stick with age for a
23   second.
24              You claim that LVI stripped you of
25   your duties and ultimately terminated your
```

<pre>
 1                  Burton T. Fried
 2   employment because of your age?
 3        A.     Yes.
 4        Q.     What facts do you have that the
 5   actions happened because of your age?
 6        A.     At a meeting with Scott State, on
 7   November 4th, to -- at my request, to review the
 8   responsibilities that I would have going forward
 9   as chairman, I delivered a list of
10   responsibilities that I had been performing
11   as -- historically, as chairman, for many years.
12                  And at that meeting he advised me
13   that he was going to take away my responsibility
14   for strategic growth, which was the first item
15   and something that was contained in my
16   employment agreement.  And that he would
17   specifically replace me in the development of a
18   relationship with a New England -- with a Great
19   Britain-based company called Squibb Demolition,
20   a company that I met in London, and as a result
21   of meetings, entered into -- drafted, entered
22   into a teaming agreement, with the help of
23   counsel I engaged in Great Britain, and was
24   planning to meet with the principals and the
25   owners in New York for them to reciprocate for
</pre>

```
 1                    Burton T. Fried
 2   my meeting them in Great Britain, and in order
 3   to explore the actual development of a business
 4   relationship, including a project in the United
 5   States at an airport -- airplane facility of
 6   Boeing.
 7          Q.    Okay.
 8          A.     He told me it was unnecessary for
 9   me to attend, notwithstanding my historical
10   frame of reference in the development of this
11   relationship and my meeting and knowing the
12   people, and he would take it from that point.
13              He then said that with respect to
14   the -- all of my other duties and
15   responsibilities, he would assign that -- those
16   responsibilities to others, other managers, and
17   transition those duties to others.  He would
18   transition those duties to others and that
19   within the next 60 or 90 days, when I had
20   nothing further to do, he would then determine
21   my fate at LVI, which to me meant that he was
22   going to terminate my employment.
23              I asked him, "Scott, why would you
24   do this?"  His reply was, "Burt, you're 71 years
25   of age.  How long do you expect to work?"
```

```
 1                    Burton T. Fried
 2         Q.    Is there --
 3              MR. WIGDOR:  I don't think he's
 4         done.
 5              MS. SELTZER:  I'm sorry.
 6              MR. WIGDOR:  Yeah.
 7         A.    He then went on to say that "What
 8    if you're hit by a bus," and that the company
 9    has to plan for the future.
10              Clearly, I was in shock and I left
11    the meeting not knowing really what to do but
12    knowing full well that this was wrong, it had to
13    be an illegal act to say that he was taking away
14    my duties and ultimately going to terminate me
15    because of my age.  And returned to my office.
16         Q.    We'll talk more about that meeting
17    a little later in the deposition.
18              Any other facts that you have that
19    lead you to believe that your being stripped of
20    your duties and your being terminated had
21    something to do with your age, other than this
22    meeting with Mr. State?
23              MR. WIGDOR:  Does that question
24              include documents that he was unaware of
25              at the time but that he's now become
```

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

19

1                    Burton T. Fried

2          aware of through the course of discovery

3          in reviewing documents, or are you

4          asking him at the time?

5              MS. SELTZER:  That's correct.

6              MR. WIGDOR:  So the question is at

7          the time?

8              MS. SELTZER:  Yes.

9          Q.    Prior to your seeing everything in

10  this litigation, what were your -- what happened

11  to you that you believe -- not what happened to

12  you, but what facts do you have that lead you to

13  think that these things that happened to you

14  happened because of your age?  And you did just

15  mention a conversation you had with Scott.  Was

16  there any other type of fact that led you to

17  believe that this happened because of your age?

18          A.    Yes.  I then contacted or

19  attempted to contact -- contact three

20  representatives of three corporations that had

21  become equity owners of the company.  They were

22  representatives who were also directors.

23          Q.    Who are these people?

24          A.    Rajay Bagaria, who represented

25  Apollo; Brian Simmons on behalf of Code

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

20

1                       Burton T. Fried

2  Hennessy; and John Schnabel on behalf of Falcon

3  Investments.

4           Q.    Did you reach them?

5           A.    Eventually, yes.

6           Q.    And I'm sorry, you were going to

7  say what facts lead you to think that you --

8           A.    I recanted to each of them the

9  events that took place which I just related to

10  you, and told them that -- that it clearly in my

11  mind was an unlawful act, discrimination against

12  me because of age.  And aside from the fact that

13  I couldn't understand the treatment based upon

14  my performance, historical performance and most

15  recent performance, leading to their investment

16  of the company.

17                Both -- Mr. Bagaria became very

18  agitated, obstreperous, and said that

19  notwithstanding my claims of discrimination,

20  that it was Mr. State's right to tell me

21  whatever he wanted to tell me and to handle my

22  situation as he saw fit.

23           Q.    Let me stop you before we talk

24  about those other two.

25                With Mr. Bagaria, was this an

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

```
 1                  Burton T. Fried
 2  in-person conversation or over the phone?
 3        A.    All telephone conversations.
 4        Q.    And approximately how much after
 5  your conversation with Mr. State did that
 6  happen?
 7        A.    He was the first person I was able
 8  to reach, shortly afterwards.
 9        Q.    Was it the same day?
10        A.    All occurred between October 20th
11  and the beginning of November, but certainly by
12  the end -- I think by the end of October, within
13  a week period or so.
14        Q.    Do you remember anything else
15  Mr. Bagaria said to you during the course of
16  that telephone conversation?
17        A.    No, other than he made his point
18  quite clear as to his support of Mr. State in
19  his actions.
20        Q.    How about Mr. Simmons, was that a
21  telephone conversation as well?
22        A.    He was the second person I
23  reached, and Mr. Simmons in that conversation
24  sort of waffled and said something about "We
25  have to plan for the future and we have to
```

1                     Burton T. Fried

2    support Scott State as new CEO, but I'll get

3    back to you after I talk to the other

4    directors."

5              Q.    Did he get back to you?

6              A.    He did, with an e-mail on

7    November 2nd.

8              Q.    We'll look at that e-mail together

9    in a little bit.

10              Anything else that you remember

11    Mr. Simmons saying in that telephone

12    conversation that you had shortly after your

13    meeting with Mr. State?

14              A.    I was left with the impression and

15    belief, based upon his statements, that he

16    supported these discriminatory acts that were

17    being perpetuated by Mr. State against me.

18              Q.    Did Mr. State make any kind of

19    statements to you about your age during the

20    course of that telephone conversation?

21              I'm sorry, Mr. Simmons, my

22    apologies.

23              A.    I repeated to him the comments

24    that were made by Mr. State.  And

25    notwithstanding that, he said that he has to

1                          Burton T. Fried

2    support -- I repeated the comments as well as

3    indicating that it was, in my mind,

4    inappropriate and probably illegal and certainly

5    discriminatory because of my age.

6          Q.      Just going back a second, did

7    Mr. Bagaria say anything that was age-related

8    during the course of that telephone

9    conversation?

10         A.      He supported the actions of

11   Mr. State after I described to him that it was

12   discriminatory and it seemed to be

13   discriminatory and illegal.

14         Q.      You said you had also a

15   conversation with Mr. Schnabel?

16         A.      Yes.

17         Q.      Am I pronouncing that correctly?

18         A.      Schnabel.

19         Q.      Why don't you tell me what you

20   remember about that telephone conversation?

21         A.      I related the same conversation to

22   him, and he was shocked.

23         Q.      What did he say that led you to

24   think that?

25         A.      He said that "I can't believe that

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

24

1                          Burton T. Fried

2  Scott State is taking that action and -- nor

3  that he's relating it to your age, and I oppose

4  that action under any grounds.  That Falcon made

5  the investment, recent investment into LVI based

6  upon your continuous employment and

7  participation in the business of LVI, and I will

8  contact the other parties and -- in an effort to

9  straighten this thing out."

10          Q.     Anything else that you remember

11  Mr. Schnabel saying to you?

12          A.     That was about it.

13          Q.     Did Mr. Schnabel make any comments

14  relating to your age during the course of that

15  telephone conversation?

16          A.     Other than finding the act of

17  discrimination because I was 71 years of age to

18  be repugnant and objectionable, no.

19          Q.     So we've spoken about your meeting

20  with Mr. State and then the subsequent -- any

21  other people, by the way, that you spoke to over

22  the telephone subsequent to the -- or in person,

23  subsequent to the meeting with Mr. State?

24          A.     Yes.

25          Q.     Who is that?

25

1                      Burton T. Fried

2           A.      Doug Wigdor.

3           Q.      Okay.   Anybody else other than

4    your counsel?

5           A.      Other than family, no.

6           Q.      Other than the meeting with

7    Mr. State and your conversation with these three

8    individuals after the meeting with Mr. State,

9    any other facts that lead you to think that what

10   happened to you at LVI was as a result of your

11   age?

12                  MR. WIGDOR:  Well, I think that

13              question doesn't accurately portray

14              his -- his testimony, because he also

15              said based on his prior performance.

16          Q.      Okay.   Anything -- any other facts

17   that you can remember?

18          A.      Yes.   I -- no mention was made of

19   any lack of performance, no criticism by anyone,

20   including those I spoke to by phone, related any

21   reason for the removal of responsibilities or

22   the planned termination by Mr. State.

23                  On the contrary, I had been

24   congratulated that very same month, earlier in

25   the month, by Mr. Simmons, as performing in an

26

1                     Burton T. Fried

2   exemplary manner during the company's most

3   difficult times, which was in the period of a

4   year that it took to restructure the equity and

5   debt of the company.

6                     And when the CEO left in May,

7   during this most critical time, he asked me and

8   I accepted the position of interim CEO, and he

9   related that the entire recapitalization and

10  restructuring and the survival of LVI could not

11  have taken place without my personal leadership.

12          Q.    I'm confused.  How is Mr. Simmons'

13  asking you to be an interim CEO and

14  congratulating you with respect to your

15  accomplishment an indication that anything

16  happened as a result of your age?

17          A.    I'm explaining to you there was no

18  reason given by anyone at any time, be it

19  Mr. State or each of the directors who invested

20  the company while I was interim CEO, and made

21  the commitment before even knowing Mr. State

22  existed, it was based upon my being CEO and I

23  was seeking a candidate and being more than

24  pleased with respect to my performance.

25                    After October 19th, I told you I

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

1                    Burton T. Fried

2   contacted Mr. Wigdor.  But I also received a

3   written communication from Mr. Simmons in the

4   beginning -- dated the beginning of November, in

5   which he related that he had discussed my

6   complaint with other members of the board.  He

7   didn't delineate, I don't think, who, but he

8   said "other members of the board," to my best

9   recollection.  And that they -- they supported

10  the termination of my employment from LVI

11  Services and suggested that I become a

12  consultant to LVI Parent Company and perform

13  matters selected by them of a legacy nature.

14                  That was followed by a board

15  meeting on November 4th in which Mr. Simmons

16  suggested that I express my opposition to the

17  treatment that I was being received.  And that

18  took place on November 4th at a meeting of the

19  board.

20        Q.    And we'll talk more about that as

21  we get further in terms of the details of that

22  meeting, but let me just step back a second.

23                  I understand that there was a

24  written communication from Mr. Simmons in which

25  he described a consultancy agreement that --

              Elisa Dreier Reporting Corp. (212) 557-5558
                 950 Third Avenue, New York, NY 10022

28

1                      Burton T. Fried

2    that would be offered to you.  How is that an

3    action that you believe was based on age?

4           A.    He knew the facts, that Mr. State

5    indicated that I was 71 years of age and how

6    long did I expect to work and "What if you get

7    hit by a bus," to me equating to "how long do

8    you expect to live."  And notwithstanding that

9    and that there was no other reason for taking

10   away my responsibilities that was given other

11   than my age, he still pursued and supported

12   Mr. State in that act of discrimination by

13   saying in his e-mail that he supported the

14   termination of my employment and the removal of

15   my health insurance and other benefits.

16          Q.    Any other facts that you can think

17   of at this point that lead you to believe that

18   the decisions that were taken by LVI had

19   something to do with your age?

20          A.    Any other facts that I was aware

21   of at that time?

22          Q.    That's correct?

23          A.    Not with respect to other e-mails

24   that I saw?

25          Q.    That's correct.

29

```
 1                    Burton T. Fried
 2          A.    My best recollection at the moment
 3    is those were the factors.
 4          Q.    Now, shifting a second to the
 5    individual defendants, you brought a number of
 6    claims against them that they participated in
 7    this discriminatory treatment, and we spoke
 8    about Mr. State briefly in terms of the comment
 9    that he made to you during the course of that
10    meeting.  Any other comments or actions by
11    Mr. State that you believe reflect age
12    discrimination against you?
13          A.    Yes.  He reaffirmed his ageist
14    remark to me at the board meeting on
15    November 4th.
16                I began my presentation by saying
17    to him specifically that I would be making
18    statements about remarks he made to me during an
19    October 19th meeting and that if he felt that
20    any of those statements were untrue, to please
21    stop me, interrupt me, and either deny or
22    correct them or say what you want if in fact
23    they are untrue.  And this was a statement that
24    I made before all of the members of the board,
25    that were 100 percent attendance, and Jeffrey
```

1                      Burton T. Fried

2    Smith, who was counsel to LVI Parent and a

3    partner in Sidley firm.

4                      Mr. State looked at me and nodded

5    his head, and I went into a presentation

6    concerning my service to LVI over a period of 24

7    years in its leadership and the most recent

8    events of the most difficult times of LVI in the

9    past year, which involved keeping thousands

10   employed without any credit line, which the bank

11   shut down, negotiating -- doing negotiations

12   with the lender, that was CIBC in New York,

13   keeping management intact, especially the

14   corporate staff in New York during this period

15   of time, notwithstanding rumors of the ultimate

16   demise of LVI because of its being in default of

17   indebtedness in an attempt to restructure.  And

18   described major projects that I was either

19   directly or indirectly involved of in New York,

20   that was the most premier projects, certainly in

21   New York City, if not the United States, during

22   the past year, which included the Deutsche Bank

23   building and being deeply involved daily, if not

24   weekly, in the progress of that project, the

25   most regulated project ever in the United States

1                    Burton T. Fried

2  because of its unfortunate history with the

3  death of a few firemen.

4                    Yankee Stadium project being

5  performed in a densely populated area, as well

6  as Deutsche Bank, and yet having -- getting the

7  community to support our actions and regulatory

8  authorities to support our -- and with an

9  incredible safety record as well as LMBC in the

10  Deutsche Bank project.

11                    And then ultimately, the most

12  recent project which I negotiated for LVI, which

13  was the remediation and selective structural

14  demolition project, the Deutsche Bank project,

15  which I negotiated a price with the help of

16  management, provided me the numbers, but the

17  actual contract I negotiated and the award I

18  negotiated with representatives of Cable Vision,

19  Madison Square Garden and Turner Corporation.

20  This was a $27 million contract to be performed

21  over a four-year period, which I'm sure is

22  currently being performed.

23                    And I described to them all these

24  events, including stepping in for Bob McNamara,

25  who left in May, and during these difficult

1                      Burton T. Fried

2    times holding 200 million in bonding and keeping

3    it effective notwithstanding the rumors going

4    around, as well as received by the surety about

5    our ultimate demise, which were rumors, but

6    certainly made everybody nervous, including

7    suppliers.  Having to keep the financial

8    stability of the company going, notwithstanding

9    not having resource to a credit line, and

10   therefore millions in payroll going out and

11   relying upon collection of receivables and

12   able -- before the closing able to amass

13   $17 million in cash in the bank.

14                      Performing these human tasks and

15   then to be told that because of my age and

16   related -- looking at Scott, the comment he

17   made, that within two weeks or three weeks of

18   his employment, that I was dead wood, that I was

19   useless, that I was old, that I was 71 years of

20   age and have no value to LVI, and that how long

21   did I expect to work, and by relating about

22   being hit by a bus, meaning -- "and we have to

23   plan for the future" -- that my longevity was of

24   short term.

25                      Scott State did not say a word

1                    Burton T. Fried

2   and -- to object to the credibility or the

3   candor or the accuracy of my remarks.

4                    Subsequently, when the meeting

5   proceeded after my remarks, none of the board

6   members who spoke objected to the remarks,

7   criticized the remarks.  They completely ignored

8   the remarks and rather told me that I had no

9   right to complain, I had no right to object, I

10  had no right to even discuss this matter, and

11  that it was the absolute unalterable right of

12  the corporation, the board of directors,

13  according to Bagaria and Scott State, to do

14  whatever he wished insofar as my continuity in

15  the corporation.

16          Q.    Are you done with your answer?

17          A.    For the moment.  There were

18  further discussions but that's all -- that's all

19  that I think relates to your question.

20          Q.    Before I get to these comments

21  that I want to talk a little more about, but

22  during the course of this meeting did Scott

23  State say or do anything that evidenced to you

24  age discrimination, or was it his not saying

25  something that you believe was discriminatory?

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

34

1                    Burton T. Fried

2          A.      His acquiescence to my remarks,

3    his failure to object, his failure to say that

4    it did not occur, his failure to change them, to

5    alter them and therefore reaffirmation.  He had

6    the opportunity at that point in time to correct

7    it, to withdraw it, to say it was a mistake, to

8    say that "It wasn't because of age, it was more

9    other reasons that I was taking away your

10   responsibility and planning to terminate you."

11   He chose to do nothing.

12          Q.      So he didn't say a word?

13          A.      Not a word.

14          Q.      You used a number of terms a

15   second ago and I want to just talk a little bit

16   about them.

17                  You used the term "dead wood."  Is

18   that a term that Scott State used with you?

19          A.      No.

20          Q.      Did anybody at LVI use that term

21   with you?

22          A.      Not that I recall.

23          Q.      Anybody on the board of directors?

24          A.      I don't recall.

25          Q.      You used the term "useless."  Was

35

1                         Burton T. Fried

2    that a term that Scott State used with you?

3              A.    No.   That was a term that I

4    interpreted from his remarks, that I was no

5    value because of my age.

6              Q.    And you said that you had no

7    value, the statement of your value to LVI.   Was

8    that also your interpretation of Mr. State's

9    comments or was that something that Mr. State

10   said to you?

11             A.    It's a result of his comments

12   prior to the board meeting, his reaffirmation at

13   the board meeting, and his actions after

14   October 19th, when he advised managers not to

15   speak to me anymore and directed them -- at

16   least one -- not to talk to me about any matter,

17   and another senior officer not to talk to me

18   about new matters, only legacy matters.   And to

19   me that interpreted that I could make no

20   contribution to the success of the company with

21   respect to the ongoing business.

22             Q.    Did Mr. State ever say to you,

23   "You're no value to LVI"?

24             A.    No.

25             Q.    Did anybody at LVI ever make that

36

1                    Burton T. Fried

2    statement to you?

3         A.    No.

4         Q.    Did anybody on the board of

5    directors make that statement to you?

6         A.    Not that I recall.

7         Q.    And other than Mr. State saying

8    you're 71 years old, how long do you want to

9    keep doing this -- I'm paraphrasing -- did

10   anyone else make reference to your being too old

11   to do the functions that you were performing at

12   LVI?

13              MR. WIGDOR:  I'm going to object

14         to the form of the question.  When you

15         say -- are you looking for specific --

16              MS. SELTZER:  Let me rephrase it.

17              MR. WIGDOR:  He testified a lot to

18         different actions.  Are you asking for a

19         specific comment?

20              MS. SELTZER:  That's correct.

21         Yes.

22              Let me rephrase it.  It probably

23         will be simpler.

24         Q.    During the course of your

25   employment with LVI, did anyone ever say to you,

1                    Burton T. Fried
2    "Burt, you're too old to do this job"?
3           A.    I think that if anyone made a
4    comment it was somebody with whom I had a
5    relationship and did it in jest, insofar as how
6    hard I worked.
7           Q.    So is the answer no?
8           A.    The answer is just what I gave
9    you.
10          Q.    Maybe I'd better rephrase it a
11   third time.
12                Did anyone at LVI ever state to
13   you or intimate to you -- state to you, make a
14   statement to you, that you were too old to
15   perform the functions of chairman or interim
16   CEO, president?
17          A.    No.
18          Q.    And when Mr. State purportedly
19   said to you, "You could be hit by a bus," how
20   does that in your mind connect to your age?
21          A.    It was at the end of the statement
22   of my age, how long do I expect to work, "you're
23   71 years of age."  I replied, "I'm 70, not 71."
24   And he said, "Well, what if you get hit by a
25   bus?"  That equated to me -- I said, "I live in

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

1                      Burton T. Fried
2    Westport, there aren't many buses in Westport,"
3    but understood that his meaning was that -- I
4    mean, anybody can get hit by a bus.  He was
5    talking about what if in fact I died suddenly,
6    an accident, a sudden event.  The company had to
7    go on.  And that was followed by the statement,
8    "We have to plan for the future."
9          Q.     So you just said a second ago --
10               MR. WIGDOR:  Are you done?
11               MS. SELTZER:  I'm sorry.
12         Q.     Were you pausing or are you
13   finished with your answer?
14         A.     No, I was pausing.
15         Q.     Then continue.
16         A.     "You have to plan, we have to plan
17   for the future, and that's why I'm going to
18   assign your responsibilities to others and in
19   30 -- 60 to 90 days you won't have anything else
20   to do and we can decide what to do with you."
21         Q.     So if Mr. State had not made the
22   statement about your being 71 years old and had
23   just said, "You could get hit by a bus
24   tomorrow," would that reflect any kind of ageist
25   sentiment to you?

               Elisa Dreier Reporting Corp. (212) 557-5558
                 950 Third Avenue, New York, NY 10022

1                    Burton T. Fried

2          A.    Yes.

3          Q.    Why?

4          A.    For the reasons I gave you.

5          Q.    Can anyone of any age be hit by a

6  bus?

7          A.    Yes, but he was making specific

8  reference to me in connection with my age,

9  together with a comment "We have to plan for the

10  future," so that if there was a sudden event

11  like death, disability, illness, more prevalent

12  with someone who's 70 or 71 years of age, that

13  might be a problem for the company.

14         Q.    He didn't say those things,

15  though; is that correct?

16         A.    Well, you asked me what it meant

17  and I'm giving you the answer.

18         Q.    So you're equating being hit by a

19  bus as an event that happens more predominantly

20  to older people?

21         A.    No, but the effect of being 71

22  years of age and with a short longevity or being

23  hit by a bus, meaning -- not being hit by a bus

24  but having some event because of -- directly

25  related to age being more likely to happen with

```
 1                    Burton T. Fried
 2    someone 71 years old, be it a heart attack,
 3    serious injury or serious sickness or disability
 4    that we have, and then related it to "We have to
 5    plan for the future."
 6                    MR. WIGDOR:  This is going to be
 7             in your summary judgment motion and
 8             you're going to lay it out, but I just
 9             want to be clear on the record that he's
10             already testified to all
11             performance-related issues and things.
12             Are you looking for specific age
13             comments?
14                    MS. SELTZER:  That's correct.  I
15             think that's what I said.
16                    MR. WIGDOR:  I don't think that's
17             what you said, but okay.
18                    MS. SELTZER:  I think it's really
19             important to keep these speaking
20             objections down.  I mean, I agree if you
21             think there is something improper in
22             my -- in my question to Mr. Fried, you
23             can certainly object that way, but I
24             don't think it's proper for you to
25             recharacterize what it is I'm saying.
```

41

1              Burton T. Fried
2         MR. WIGDOR:  Well, it's also
3    improper for you to ask a question that
4    misinterprets and mischaracterizes his
5    prior testimony, so let's read back the
6    question that was asked.
7         MS. SELTZER:  Let's do that.
8              (The last question was read back
9    by the court reporter.)
10        MR. WIGDOR:  That's the reason why
11   I objected, that it reflects any sort of
12   age sentiment.  That could be anything
13   that he already testified to.
14        MS. SELTZER:  Let me cut you off
15   and let's --
16        MR. WIGDOR:  You have to be
17   clearer in your question.
18        MS. SELTZER:  Let's cut this off,
19   because otherwise we are going to be
20   doing this for a really long time, and
21   let me just rephrase it for you and see
22   if it's better.
23        Q.    Other than this comment that he
24 made to you during this meeting, was there
25 anything else that Mr. State said to you that

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

42

1                      Burton T. Fried

2   you believed to have been a comment with respect

3   to your age?

4                      MR. WIGDOR:  And I object to the

5              form of the question.

6              A.    Not that I can recall.

7              Q.    Let's turn our attention to

8   Mr. Simmons.

9                    During the course of your

10  employment with LVI, did Mr. Simmons ever make a

11  comment to you that you believed to have been a

12  reflection of his discriminating against you on

13  account of your age?

14                     MR. WIGDOR:  Objection to the form

15             of the question.

16             A.    Not until after my conversation

17  with Mr. Simmons concerning the age remark and

18  cause of action because of my age being made by

19  Mr. State.

20             Q.    What did Mr. Simmons say to you

21  that --

22             A.    He had to support the actions

23  of -- of Mr. State and did not attempt to -- and

24  in effect supported -- by his statements to me,

25  supported the position of Mr. State that I was

1                    Burton T. Fried

2   too old and how long would I continue to work,

3   and by saying to me, "We have to plan for the

4   future."

5                    I had grown the company for 24

6   years to be the most successful company in its

7   field of specialty and the largest in my last

8   year of CEO.  I achieved the highest earnings,

9   more than $60 million, and the highest revenue.

10  I created a brand name, LVI.  And I was

11  congratulated by Mr. Simmons on not only I --

12  permitting him to achieve a restructuring of the

13  company and the survival of LVI and his

14  investment just weeks before, as well as telling

15  me that the closing could never have taken place

16  without me, as well as telling me that the hire

17  of Mr. State could not have taken, and

18  congratulating me, and could not have taken

19  place without me, and now was telling me that he

20  supported the comments of Mr. State that I was

21  too old.

22          Q.    Did he say that?

23          A.    Yes.

24          Q.    Did Mr. Simmons state that he

25  supported the statement -- the ageist statement

1                      Burton T. Fried

2      that Scott State made to you?

3            A.      Yes.

4            Q.      When did he say that?

5            A.      In the conversation he said, "We

6      have to plan for the future."

7            Q.      How is that supporting the

8      statement?

9            A.      After repeating to him the comment

10     that I was too old to continue, and he was

11     taking away -- my responsibilities would

12     terminate, he gave a reason, an explanation for

13     that comment by saying that the company has to

14     plan for the future, notwithstanding my efforts

15     and notwithstanding his comments of my successes

16     with the company in the previous year.

17           Q.      Is it possible that Mr. Simmons

18     was giving an explanation, perhaps, for the

19     things that were happening to you, like the

20     giving away of your responsibilities to

21     management, as opposed to the comment that

22     Mr. State made?

23                   MR. WIGDOR:  Objection.

24           A.      I don't understand the question.

25           Q.      Well, you just stated that

45

1                    Burton T. Fried

2   Mr. Simmons saying, "We have to move on" or "we

3   have to plan for the future" was his support of

4   the ageist statement that Scott State made; is

5   that correct?

6         A.    Yes.

7         Q.    Couldn't it be that Mr. Simmons

8   was actually saying that he was supporting

9   Mr. State's actions in moving some of your

10  responsibilities to management as opposed to the

11  statement?

12               MR. WIGDOR:   Objection.

13               Go ahead.

14        A.    He was supporting the ageist

15  remark and the actions he was taking because of

16  the ageist remark by saying, "We have to plan

17  for the future."  Planning for the future,

18  because of the ageist remark, is inalterably

19  connected and merged.

20               In my statement to him, it wasn't

21  two separate conversations.  It was one complete

22  dialogue in which he supported by saying, "We

23  have to plan for the future."  He didn't say, "I

24  don't consider you too old but we have to assign

25  duties for other reasons."  His simple comment

46

1                    Burton T. Fried

2   was, after I made that one statement about age

3   and assignment of duties, "We have to plan for

4   the future."

5          Q.    Okay.  Other than Mr. Simmons,

6   according to you, supporting Mr. State's

7   statements to you, did Mr. Simmons take any

8   other action against you that you believe was

9   based on your age?

10         A.    Yes.

11         Q.    What is that?

12         A.    At the board meeting he was very

13  vocal in supporting the position of Mr. State

14  and the actions Mr. State was taking, and at no

15  time did he recant or -- or deny or say that he

16  disagreed with the reasons for Mr. State's

17  actions.  And his concluding remarks in which I

18  were present, because there was a part that I

19  wasn't present, in which I was present, was that

20  he would discuss it with the board but as far as

21  he was concerned, whatever Scott State wanted,

22  he supported for the reasons that Scott State

23  gave.

24         Q.    So I'll ask you my question one

25  more time.

1                     Burton T. Fried

2            Other than his support of Scott

3   State and the statement and these actions that

4   Mr. State wanted to take against you, is there

5   anything else that Mr. Simmons did to you that

6   you believe to be discrimination on the basis of

7   age?

8            MR. WIGDOR:  Objection.

9       A.    Yes.

10      Q.    What is that?

11      A.    On November 16th, I think it was,

12  I could be off a day, but November 16th he sent

13  me a letter.

14      Q.    I think I know the letter, the

15  consultancy letter we spoke about a second ago?

16      A.    No, a letter in which he

17  terminated my employment on behalf of the board.

18      Q.    Okay.

19      A.    My employment with LVI Services, I

20  think, and wrote the letter on Code Hennessy

21  stationery and -- and then offered, after

22  termination of my employment, for me to become

23  employed as a consultant for another company,

24  LVI Acquisition, as a consultant.

25           MR. WIGDOR:  Are you done with the

48

```
 1                    Burton T. Fried
 2          answer?
 3                    THE WITNESS:  Yes.
 4                    MR. WIGDOR:  I would like to take
 5          a break.  We have been going for about
 6          an hour, so --
 7                    MS. SELTZER:  Fine.
 8                    THE VIDEOGRAPHER:  The time is
 9          10:55 a.m.  We're going off the record.
10                    (An off-the-record discussion took
11          place.)
12                    (A recess was taken.)
13                    THE VIDEOGRAPHER:  The time is
14          11:01 a.m. and we're back on the record.
15  BY MS. SELTZER:
16           Q.   Before the break we were talking
17  about Mr. Simmons and the actions that you
18  believe that he took against you as a result of
19  your age, and you talked about his support of
20  Mr. State's decisions with respect to you, and
21  you spoke about this November 16th letter which
22  he sent to you indicating your termination of
23  your employment and the consultancy agreement.
24                    Is that an accurate representation
25  so far?
```

```
 1                    Burton T. Fried
 2         A.    Yes.
 3         Q.    Anything else Mr. Simmons did that
 4  you believe were based on age discrimination?
 5         A.    Yes.
 6         Q.    Okay.
 7         A.    He sent me a letter, as a member
 8  of the board of LVI Parent, terminating my
 9  employment of LVI Services, Inc.  It was not the
10  board of LVI Services, Inc. that terminated my
11  employment but the board of LVI Parent.  I did
12  not have any employment relationship for the
13  services that I was performing for LVI Services
14  with LVI Parent.  I thought that was a -- an
15  illegal act in furtherance of their
16  discriminatory conduct and to take that -- those
17  actions without even caring about the corporate
18  protocol and requirements of law and exceeding
19  the authority that he had.
20              So individually and as a member of
21  LVI Parent, with the other board members, they
22  were terminating my employment that I had the
23  agreement with another corporation.
24              Further, he then attached to his
25  letter of termination an offer of employment as
```

50

```
 1                    Burton T. Fried
 2   a consultant, terminable at 30 days' notice.
 3   And yet requiring me, in order to become a
 4   consultant, to waive my age discrimination
 5   claims.  And I thought this was an act of
 6   discrimination.
 7          Q.    Waiving the claims, asking you to
 8   waive the claims?
 9          A.    Asking me to waive the claim.  I
10   also considered that to be an acknowledgment
11   that I had an age discrimination claim.
12          Q.    You had raised a claim by that
13   point, had you not?
14          A.    Yes.  And now he was asking me to
15   waive it.
16              I felt that if there was -- he
17   certainly gave merit to my claim, that's why he
18   was asking for a waiver, or else he wouldn't ask
19   for a waiver.  He was acknowledging the claim
20   and in my mind the authenticity of the claim.
21          Q.    In your mind?
22          A.    Yeah, in my -- it was in my mind
23   as a lawyer for 46 years that you don't ask
24   somebody to waive something if there is no merit
25   to it.  And it was condition of my employment as
```

51

```
 1                   Burton T. Fried
 2   a consultant to LVI Parent.
 3            Q.     Anything else that Mr. Simmons
 4   did, other than this letter and his support of
 5   Mr. State?
 6                   MR. WIGDOR:  I'm just going to
 7            keep on objecting.  Why don't you just
 8            ask anything else, because his prior
 9            testimony speaks for itself.
10                   MS. SELTZER:  Okay, that's fine.
11                   MR. WIGDOR:  You keep on trying to
12            recharacterize his testimony.
13            Q.     Anything else that Mr. Simmons did
14   with respect to your employment that you believe
15   to be based in age discrimination?
16            A.     Yes.  I subsequently discovered
17   that he was planning --
18            Q.     Did you discover that as a course
19   of your discovery in this case?
20            A.     Yes.
21                   Can I finish my answer?
22            Q.     Sure, go ahead.
23            A.     I discovered that he was planning
24   to -- and conspiring with Mr. State to cause my
25   retirement prior to the time that Mr. State was
```

1                    Burton T. Fried
2    even hired and while he was being considered for
3    hire.  And that other correspondence indicated
4    that that plan of Mr. Simmons and Mr. Hogan and
5    the other board members was being effectuated
6    with the ultimate meeting that took place with
7    Mr. State on October 19th.  And in furtherance
8    of their ends, they -- he gave me the impression
9    that this complaint was being considered and he
10   was going to discuss it with the board, when I'm
11   certain that he had already planned to terminate
12   me, force me into retirement or whatever you
13   want to call it.  And that's why he included in
14   the offer of consultancy that -- not only asking
15   me or requiring me to waive my claim but
16   required me to agree not to compete with the
17   company for a period of 12 months without
18   compensation, when the current agreement in
19   effect that I had with the company required me
20   to be paid for noncompetition.  And that also
21   was another act of discrimination in furtherance
22   of his purposes to terminate my employment
23   unlawfully.
24             Q.   What document did you see that led
25   you to believe that there was a plan to retire

53

1                    Burton T. Fried

2    you prior to Mr. State's being hired, is what I

3    think you testified to.

4           A.    E-mail traffic between

5    Messrs. Simmons, Hogan and State.

6           Q.    What did they -- if you can just

7    remember what the traffic was about, or what

8    they said to each other in this e-mail?

9           A.    Examining agreements, be it the

10   shareholders agreement that had been recently

11   signed, and other discussion about the fact that

12   they should get rid of me and retire me

13   before -- suggesting before State comes aboard.

14          Q.    Was that --

15          A.    Well, retirement is equivalent to

16   termination, especially if you don't want to

17   retire.  And I had no intention for retiring.

18   On the contrary, for many, many years I have

19   voiced dozens and dozens of times that I

20   intended to die in my chair.  So there was never

21   any question in anybody's mind of my intention

22   to continue to serve LVI.

23          Q.    Is that -- does that document

24   actually talk about getting rid of you or --

25          A.    Yes.  It's implicit in the

54

```
 1                    Burton T. Fried
 2    document.  I don't remember the exact words.
 3         Q.    Okay.
 4         A.    But the whole effect of the
 5    document is how do we get rid of Fried, how do
 6    we retire him.
 7         Q.    Is the word "retirement" used in
 8    the document?
 9         A.    Yes.
10         Q.    Okay.  Anything else that
11    Mr. Simmons did that made you name him in this
12    lawsuit?
13         A.    Not that I can recall at the
14    moment.
15         Q.    Let's turn to Mr. Bagaria.
16              In addition to his support of
17    Mr. State's decisions with respect to your
18    employment and his participation in that board
19    meeting, is there anything else that Mr. Bagaria
20    did that you believe to be an action against you
21    because of your age?
22         A.    Yes.
23              MR. WIGDOR:  Objection.  Again,
24              I'm going to just object and just -- the
25              record speaks for itself as to what this
```

1                    Burton T. Fried

2          witness has testified with respect to

3          Mr. Bagaria, not the way this -- the way

4          counsel is phrasing the question.

5               MS. SELTZER:  Objection taken.  He

6          can answer the question.

7               MR. WIGDOR:  I just want to make

8          sure the question is clear, because I

9          know the question is going to appear in

10         some motion down the line.  I just want

11         to make sure when the judge reads the

12         motion he understands that there is

13         prior testimony before this question,

14         which mischaracterizes the evidence.

15         Q.    You can answer the question if you

16    remember what it is.

17         A.    I -- I remember -- I related to

18    you the conversation that I had with Mr. Bagaria

19    after October 19th.

20         Q.    Okay.

21         A.    In his support for the actions of

22    Mr. State.  I hope I don't have to repeat this.

23         Q.    No, anything more.  You don't need

24    to repeat anything that you've said already.

25         A.    He was very vocal at the board of

56

```
 1                    Burton T. Fried
 2   director closed session.  And unlike
 3   Mr. State -- sorry, unlike Mr. Simmons in saying
 4   that it was the authority of Mr. State to
 5   determine what my duties were or were not and
 6   how long I would be with the company, it was
 7   Mr. Bagaria's position that -- he vocalized in
 8   front of that entire room that it wasn't any CEO
 9   that had the authority to change my duties or to
10   terminate me, it was the authority of the board,
11   LVI Parent.
12                    And I found that to be
13   discriminatory in that LVI Parent was not my
14   employer but was acting as my employer.  And he
15   was so anxious to terminate me because of my
16   age, and notwithstanding counsel being in the
17   room, was now voicing the fact that it was LVI
18   Parent that would take that action.  And in
19   fact, it did.  With the letter of Mr. Simmons,
20   on behalf of the board of LVI Parent, they were
21   terminating my employment with LVI Services.
22                    So this was a group who in concert
23   determined one way or the other, and without
24   apology, were going to terminate my employment
25   because of age, notwithstanding my comments and
```

1                       Burton T. Fried

2    objections, and then were going to retaliate

3    against me and -- by termination, and then

4    retaliate against my daughter by terminating her

5    employment within weeks thereafter.

6          Q.    Okay.   We'll get to that.

7                Anything else Mr. Bagaria did,

8    other than what happened at that meeting on

9    November 4th and anything else that you

10   testified to, anything more that you want to add

11   in terms of what Mr. Bagaria might have done to

12   you with respect to your age?

13         A.    There are -- there is

14   correspondence, e-mails that I have not yet

15   reviewed, that were being produced as of

16   yesterday by your office.   I have not had a

17   chance to review it and I don't know if

18   everything has been produced that was requested,

19   so that there may be other actions in writing

20   that I'm not aware of.

21         Q.    Anything that you remember now?

22         A.    As I know now, based on what I've

23   seen, I don't recall anything else.

24         Q.    And with Mr. Girardi, what actions

25   do you believe he took that were based on your

58

1                    Burton T. Fried

2  age?

3         A.     He was the other person at the

4  board meeting of February 4th --

5         Q.     November 4th?

6         A.     I'm sorry, I'm sorry,

7  November 4th.

8                -- that became very vocal in

9  supporting the comments made by his colleague,

10  Mr. Bagaria, on behalf of Apollo and as a board

11  member of LVI Parent, in supporting the

12  discrimination that was being brought upon me,

13  by saying that he as a board member supports the

14  actions of Mr. State and I had no say, and was

15  particularly offensive in his remarks.  Because

16  I remember saying to him, probably too politely,

17  "Please don't talk to me that way."  At which

18  point he didn't say anything further and moved

19  to the other side of the room, away from me.

20         Q.     What had Mr. Girardi said to you

21  that prompted that comment from you?

22         A.     It was offensive remarks

23  concerning the fact that I had no rights and it

24  was -- it was like Mr. Bagaria said, the rights

25  of the board to determine, and Mr. State was a

1                      Burton T. Fried

2    member of the board, to determine my future and

3    I had no right to object, irrespective of my

4    performance and my career at LVI.

5            Q.     Was that the offensive comment

6    that Mr. Girardi made?

7            A.     I believe it was more offensive

8    than that, but I can't recall it at the moment.

9            Q.     You don't remember the specific

10   words to be offensive?

11           A.     Not at this -- but it certainly

12   was offensive for me to make that remark.

13           Q.     Any other actions taken by

14   Mr. Girardi, other than what you testified to,

15   that reflect age discrimination?

16           A.     I believe there were other actions

17   in that Mr. Simmons indicated in his letter to

18   me of November 16th that the board had

19   determined that I should be terminated, but I

20   can't tell you what the vote was of the board,

21   whether Mr. Girardi supported that or what

22   comments he made, because I -- although a board

23   member, I wasn't permitted in the boardroom.

24                  And the minutes of the board

25   clearly and intentionally failed to reflect any

60

1                    Burton T. Fried

2   of the -- and I guess to hide the conversations

3   that took place at the board meeting concerning

4   my termination and age discrimination, because

5   the minutes of November 4th, as my best

6   recollection, are devoid of any reference to

7   one-hour session on the subject of my -- acts of

8   discrimination against me and the termination of

9   my employment and the reasons for it, as well as

10  the conversation.  It would seem that the

11  termination for age discrimination, a claim of

12  age discrimination being presented to the board

13  of LVI Parent and discussed for an hour, would

14  be set forth, as well as if there was any vote

15  on my termination.

16          Q.    Did Mr. Girardi write the minutes?

17          A.    No.  Normally Mr. Smith writes the

18  minutes, Jeffrey Smith.

19          Q.    So if we go back to what

20  Mr. Girardi did that you felt was

21  discriminatory?

22          A.    Well, I'm saying to you I don't

23  know what the comments of Mr. Girardi were in my

24  absence, and for that matter I don't know about

25  every other board member -- what discriminatory

61

1                    Burton T. Fried

2   acts they've taken during the course of

3   discussion about -- leading to the -- I assume a

4   vote, which is not reported, on the vote for my

5   termination.

6        Q.    That's why I'm focusing on the

7   things that you do know.  And that's what I'm

8   asking you about, not the things that you don't

9   know, obviously.

10             MR. WIGDOR:  Objection.

11        Q.    So is there any other action taken

12  by Mr. Girardi that you can think of, and that

13  you know of sitting here today, that you think

14  reflect age discrimination against you that you

15  haven't testified to already?

16        A.    Mr. Simmons said that the board

17  had voted to terminate my employment.  I believe

18  that's an act of discrimination in that

19  Mr. Girardi is a member of the board and he

20  voiced his support of that.  So I assume that he

21  voted in favor of that.

22        Q.    Is Mr. Schnabel a member of the

23  board?

24        A.    Yes.

25        Q.    Did Mr. Schnabel support your

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

62

1                    Burton T. Fried
2    termination?
3          A.    He voiced to me he opposed it.   I
4    was not at the board meeting.
5                Again, it's not reported, but at
6    all times both before the board meeting and
7    after the board meeting, he verbally, when I
8    spoke to him, indicated the support for my
9    continuation of employment, my importance at the
10   company and his efforts to see that that was
11   avoided.
12         Q.    Did Mr. Schnabel make any comments
13   during the November 14th meeting in support of
14   your position?
15         A.    He was silent during my presence.
16         Q.    Like Mr. State?
17         A.    Like Mr. State.
18         Q.    Do you have any idea, sitting here
19   today, how Mr. Schnabel voted with respect to
20   the termination of your employment and the
21   offering of your consultancy agreement?
22         A.    No.
23         Q.    If you believed today that
24   Mr. Schnabel supported Mr. State's actions
25   against you, would you have named him in your

63

1                     Burton T. Fried

2    complaint?

3                     MR. WIGDOR:  Objection.

4         A.     Yes.

5         Q.     Any other reason why you didn't

6    name Mr. Schnabel in your complaint?

7                     MR. WIGDOR:  Objection.  Calls for

8              privileged communications.

9         Q.     Other than what you've discussed

10   with your counsel, is there any other reason why

11   you didn't name Mr. Schnabel?

12        A.     I only named people who I knew

13   supported it, my termination, because of age.

14   And I did not name the board members who did not

15   evidence support of that during the course of

16   the meeting on -- or in telephone conversations.

17        Q.     Did Mr. Simmons ever tell you that

18   the decision was unanimous?

19        A.     No.

20        Q.     Did anyone ever tell you that?

21        A.     No.

22        Q.     What year did you join LVI,

23   Mr. Fried?

24        A.     July 1986.

25        Q.     And what was your title at that

64

1                    Burton T. Fried

2   time?

3          A.     General counsel.  And I have --

4   maybe I've been called president, but I didn't

5   perform as such.

6          Q.     Okay.  So your first position with

7   LVI was as general counsel?

8          A.     Yes.

9          Q.     And what was your position

10  subsequent to that title?

11         A.     A few years later I became

12  president and CEO.

13         Q.     So that would have been around

14  1988, '89?

15         A.     Yes.  '89, I believe.

16         Q.     And -- go ahead.

17         A.     Yeah, correct.

18         Q.     And how long did you hold that

19  position?

20         A.     I held that position for 17 years.

21         Q.     When did you start working out of

22  the Westport office?

23         A.     September of 2003.

24         Q.     And what was the reason for your

25  moving to the Westport office?

1                      Burton T. Fried

2           A.      I could be more effective in the

3     management of the company through less travel

4     and more effective in the development of and

5     oversight, really, of the New York corporate

6     office and the development of the business in

7     New York and making plans for the fact that at

8     my request we were about to be engaged in the

9     recruitment of the CEO, new CEO, at which point

10    I would become chairman.

11          Q.      Why did you think that being in

12    Connecticut would make you more effective with

13    respect to oversight of what was happening in

14    New York?

15          A.      I no longer had to travel three

16    hours a day, and I showed up for work usually

17    around seven o'clock in the morning, and rather

18    than traveling and first arriving at the office

19    sometime later.

20          Q.      Do you live in Westport?

21          A.      Yes.

22          Q.      Was a consideration for your

23    moving to a Westport office convenience to you

24    with respect to your commute to work?

25          A.      Yes.

66

1                    Burton T. Fried

2          Q.     Did you have an office in

3    New York?

4          A.     Yes.

5          Q.     Where was that located?

6          A.     Eighty Broad Street.

7          Q.     And with respect to a normal week,

8    how many days did you work in New York as

9    opposed to the days that you worked in Westport,

10   Connecticut?

11              MR. WIGDOR:  You're talking about

12              physically or what he was doing?

13              MS. SELTZER:  No, physically.

14         A.     I worked in the New York office

15   maybe two, three days a week and Connecticut

16   two, three days a week.  It depended upon

17   business matters as to where I worked, but I

18   also, in addition -- even if I wasn't physically

19   in the New York office, I was having meetings in

20   New York City on securing work and other legal

21   matters and business matters.  So I wasn't

22   limiting it -- if I worked in Connecticut three

23   days, it wouldn't necessarily mean I was only

24   two days in New York.  I could have been there

25   longer than that.

1                    Burton T. Fried

2           Q.     So it's your testimony that you

3    split your week fairly evenly between New York

4    and Westport?

5           A.     Yeah, and that was also a concern

6    of Code Hennessy later on, that I -- that I make

7    sure that I'm, you know, in Connecticut --

8    rather, in New York.  They were concerned about

9    the corporate staff and my presence.

10          Q.     In Connecticut or in New York?

11          A.     In New York, later.

12          Q.     This splitting of the week between

13   Connecticut and New York, was that pretty much

14   for the entire period of time after you moved to

15   the Westport office?

16          A.     In what period of time are you

17   talking about?

18          Q.     That's fair enough.

19                 After Scott State took the job as

20   CEO/president of the company, did you also split

21   your weeks in between the New York and

22   Connecticut offices?

23          A.     No.  I visited the New York office

24   but it wasn't on a prescribed -- where necessary

25   I came into the New York office for meetings.

1                   Burton T. Fried

2   But understand, my longevity at the New York

3   office -- rather, with LVI, was rather limited

4   after Mr. State was hired at the end of

5   November.  So -- strike that.  At the end of

6   October.  He came aboard the end of September

7   and my employment was terminated weeks later,

8   so...

9           Q.    So during the time that

10  Mr. Scott -- Mr. Scott -- Mr. State was

11  president and CEO of LVI, how many times do you

12  think that you came to New York for a meeting or

13  for any reason whatsoever?

14          A.    Many times.

15          Q.    Are "many" more than ten?

16          A.    Could be.  I -- I wasn't just in

17  the office.  I also attended meetings.  We had

18  other matters in New York.

19                I don't remember, but -- if it was

20  during that period of time, but I met at your

21  office here with your partner on a litigated

22  matter, in meetings with the Mazokis concerning

23  the defense of a claim for $8 million balance of

24  purchase price.  I don't know if it was after

25  Mr. State came on or before, but there were

69

1                    Burton T. Fried

2    matters in which I visited New York from

3    Connecticut, which I didn't physically enter the

4    New York office.

5          Q.    How many times do you think during

6    the period of time that Scott State was

7    president and CEO of LVI Services did you find

8    yourself using your New York office at 80 Broad

9    Street?

10         A.    Physically?

11         Q.    Yes.

12         A.    Several.

13         Q.    Less than five?

14         A.    I don't remember.

15         Q.    When your employment was

16   terminated, your position was chairman; is that

17   correct?

18         A.    Yeah.

19         Q.    Was that chairman of the LVI

20   Parent board of directors or chairman of LVI

21   Services?

22         A.    They terminated me as chairman or

23   employee or officer of LVI Services.

24         Q.    So you believed you were the

25   chairman of LVI Services, not of the board of

1                          Burton T. Fried

2    directors of LVI Parent?

3           A.    I was also chairman of the board

4    of LVI Parent, but LVI Parent was a board

5    designation as opposed to an officer

6    designation.

7           Q.    So your officer designation was as

8    chairman of LVI Services?

9           A.    Yes.

10          Q.    When did Mr. McNamara come on

11   board?

12          A.    It was -- it was, I believe --

13   well, it was definitely in '06 and it could have

14   been May of '06.

15          Q.    During the time before

16   Mr. McNamara came on board, who was responsible

17   for determining your compensation?

18          A.    It was set forth in an agreement

19   dated November 16th with LVI Services.

20          Q.    Was there anyone who was

21   responsible for recommending you for salary

22   increases?

23          A.    I would present it to the board of

24   LVI Services, that meaning bonuses, for example.

25   I didn't think my salary changed, but certainly

1                    Burton T. Fried

2  bonuses.

3          Q.    So the board of LVI Services was

4  responsible for effectuating bonuses?

5          A.    Yes.

6          Q.    Did the board of LVI Services

7  during that period of time have the authority to

8  evaluate your performance?

9          A.    It did.  And that -- on that

10  board, by the way, I -- as well as -- it was LVI

11  Services and -- and they also used LVI

12  Acquisition.  But form over substance, it was

13  really Mr. Simmons who made that evaluation

14  before Mr. McNamara came on board.

15          Q.    In 2005, there was a sale of LVI

16  to CHS; is that correct?

17          A.    Yes.

18          Q.    Do you know what circumstances

19  brought that about?

20          A.    Yes.

21          Q.    Would you tell me what they are?

22          A.    Yes.  It was -- I think we should

23  stop after this question because I believe there

24  is only five minutes left.

25          Q.    Oh, I didn't even notice it.

72

```
1                     Burton T. Fried
2    Thank you.
3          A.     But I'll -- I'll finish the
4    question.
5          Q.     Finish this question and we'll
6    change the tape.
7          A.     It might take three minutes.
8                 The -- the owner of the -- of the
9    -- of the equity LVI Services was a private
10   equity fund called Blue Point Capital that
11   purchased the equity in '02.  And their part --
12   the managing directors approached me and
13   suggested that the market was right to sell the
14   company and would I support the sale of the
15   company.  And I said that they were the majority
16   equity owners, although I and other managers own
17   stock, it was really their decision since they
18   had the biggest interest, and I would support
19   whatever they wanted.  They said they thought it
20   might be a good idea at least to try and see
21   what happened.
22                 So a sale of the company was then
23   orchestrated with information and books and
24   solicitations, and there were two finalists for
25   the purchase of the company, from basically Blue
```

73

```
 1                    Burton T. Fried
 2   Point and management, which was Code Hennessy,
 3   and another company called Arias in California
 4   that was owned by Tony Ressler, who is the
 5   brother-in-law of the owner of Apollo.
 6          Q.    And CHS wound up being the company
 7   that bought; is that correct?
 8          A.    Correct.
 9          Q.    Did you receive --
10                MS. SELTZER:   Let's change the
11          tape.
12                THE VIDEOGRAPHER:   The time is
13          11:32 a.m., May 20th, 2011.   This
14          completes tape number one in the
15          videotaped deposition of Mr. Burton T.
16          Fried.
17                (An off-the-record discussion took
18          place.)
19                THE VIDEOGRAPHER:   The time is
20          11:36 a.m., May 20th, 2011.   This is
21          tape number two in the videotaped
22          deposition of Mr. Burton T. Fried.
23   BY MS. SELTZER:
24          Q.    Mr. Fried, at the time of the sale
25   of LVI to CHS, what was your title?
```

1                    Burton T. Fried

2        A.      President and CEO.

3                MS. SELTZER:  Could you mark this

4        as Exhibit 2, please.

5                (Investment memo marked Fried

6        Exhibit 2 for identification.)

7        Q.      Exhibit 2 is a document entitled

8   "Investment Memo," Bates stamped number CHS1 to

9   11.

10               Have you ever seen this document

11   before, Mr. Fried?

12       A.      I don't recall seeing it, no.

13       Q.      If you turn to page number 3 of

14   this document, it's also called CHS3 on the

15   lower right-hand corner, if you look at the

16   second bullet point from the bottom that begins

17   with "Enhance the strong management team," could

18   you just read that paragraph to yourself?

19       A.      Yes.

20       Q.      This paragraph talks about "The

21   current CEO, Burton Fried, will then transition

22   into an active chairman role focusing on growth

23   initiatives."

24               Do you see that?

25       A.      Yes.

75

```
 1                    Burton T. Fried
 2         Q.      Was that your decision to
 3    transition into a chairman role or was it the
 4    decision of CHS or any entity involved in the
 5    purchase of the company?
 6         A.      It was my decision.
 7         Q.      Why did you decide that you wanted
 8    transitioning to an active chairman role?
 9         A.      We had achieved revenues
10    approaching 300 million.  I felt that the
11    company had the capability of continuing its
12    profitable growth and achieving revenues with
13    profits of a billion.
14                    At that point in time we were
15    dominating -- the dominant force in the nation
16    in the performance of our services.  We had a
17    brand name.  We had 25-plus offices.  We were
18    probably the largest of our kind in the planet.
19    And I believed the company needed the management
20    skill sets to take us to a billion and I didn't
21    know that I had that capability.  And I then
22    recommended to Blue Point that we conduct a
23    search.  And they asked me to retain a
24    recruiter.  They supported the effort to retain
25    a recruiter.
```

```
 1                    Burton T. Fried
 2         Q.    Can I stop you one second?  We'll
 3   talk about the recruitment from this point.
 4   Right now let's just focus back a second to your
 5   decision, if it was your decision, to take the
 6   role of chairman.
 7               And I think you just testified
 8   that you did that because you believed that the
 9   skill sets needed to take the company to the
10   next step in terms of profitability were maybe
11   skill sets that you didn't have.  Am I --
12         A.    Yes.  I felt there had to be a
13   manager out there that could contribute the
14   skill sets to take us, you know, to triple our
15   earnings and to manage the company effectively.
16         Q.    It also says here, "This
17   transition was planned and announced prior to
18   initiating the sales process."
19               Was your moving into a position of
20   chairman from the position of CEO a condition of
21   CHS's hire -- purchase of LVI?
22         A.    A condition?
23         Q.    Yes.
24         A.    No.  We -- we began the
25   recruitment process before I ever knew the name
```

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

1                    Burton T. Fried
2   Code Hennessy, and retained the recruiter even
3   before I heard the name Code Hennessey, and
4   suspended this recruitment process even before I
5   ever heard the name Code Hennessey, because we
6   now decided to move forward with a possible sale
7   of the company and I felt that it would be
8   useless to identify a candidate and select one
9   when we couldn't introduce the new owner for
10  whom he would work.  So we suspended that
11  process.
12          Q.    So at the time that Code Hennessey
13  bought LVI, they knew that you had intended to
14  step from the position of CEO to the position of
15  chairman and to hire a CEO to take your place in
16  that position; is that correct?
17          A.    There was no intention.  They knew
18  I would.  And that was the plan before and they
19  bought the company with that understanding.
20          Q.    Was there ever a chairman before
21  you in that position?
22          A.    No.  I was the most senior officer
23  for the period of time from 19 -- certainly
24  performing the function from 1989 through this
25  date, which was 2005.

78

```
 1                    Burton T. Fried
 2         Q.      What was your understanding of the
 3    term "active chairman role"?
 4         A.      I would participate in executive
 5    decisions.
 6         Q.      What types of executive decisions
 7    did you believe were a proper prominence for an
 8    active chairman of the board?
 9         A.      Well, it wasn't what I thought.
10    It was what the board thought and senior
11    management supported, that role.  That was
12    initially just defined for the purposes of a
13    document of strategic growth, which is
14    acquisitions, organic growth or acquisitions.
15    But my forte and contribution historically had
16    been in the legal area and risk assessment and
17    in the negotiation of major contracts and in
18    claims -- the development of claims and
19    negotiation and approval of claims.  Now I'm
20    talking about claims in the multimillion dollars
21    claims, project claims.
22                    And so without defining it on
23    November 16th, when the letter agreement was
24    signed as to my role, I sort of morphed into
25    that role in support of the actions of the CEO,
```

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

1                    Burton T. Fried

2  with his consent and clearly with the

3  understanding and consent of the board of both

4  LVI Services and LVI Acquisition, the then

5  parent of LVI Services.

6                    And was requested by the board,

7  which includ Mr. Simmons, Mr. Hogan,

8  Mr. Hennessy from CHS, to actively pursue a

9  variety of matters on behalf of the company,

10 including collection of approximately

11 $10 million of receivables that were owed as a

12 result of Hurricane Katrina.

13        Q.    We'll get to the responsibilities

14 under Mr. McNamara in a second.  I just want to

15 focus back to your understanding of the role of

16 active chairman at the time that this company

17 was sold to CHS.

18        A.    Okay.

19        Q.    And you mentioned a second ago

20 that you believed -- was it your understanding

21 that the strategic initiatives that you were

22 going to be asked to do were determined by the

23 board of directors and the CEO that would be

24 taking your position?

25        A.    I don't think the board of

80

1                    Burton T. Fried
2    directors ever got involved in the operations of
3    the business.  They were there simply to listen
4    quarterly, if that frequent, to results of
5    operations and the plans for the future and to
6    make recommendations to management of what steps
7    to take and who to use and how to get there.
8          Q.    So who would you believe would
9    have been responsible for determining the types
10   of growth initiatives that you would be focused
11   on as chairman of LVI?
12         A.    That would be the CEO, and that
13   would be with the support of the board.
14         Q.    Did you view the chairman role as
15   an opportunity to remove yourself from the
16   day-to-day management of the firm?
17         A.    Yes.
18         Q.    Why did you want to remove
19   yourself from the day-to-day management?
20         A.    Simply because the CEO role, by
21   its title, as chief executive officer, should
22   have the day-to-day and final decision in the
23   operations of the business.  And the chairman
24   should be a person who supports the actions of
25   the CEO and in any way that the CEO seeks that

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

81

1                     Burton T. Fried

2   advice and counsel.

3          Q.     Did you play a role in recruiting

4   the new CEO, the very first CEO after you --

5   after the sale or during the sale of CHS -- of

6   LVI to CHS?

7          A.     We commenced -- we started up

8   again the recruitment process under the original

9   retainer agreement that we had signed with

10  Heidrick & Struggles, and only this time it was

11  like Blue Point.  Mr. Simmons, on behalf of Code

12  Hennessy, asked that I select the candidate,

13  find the candidate, select the candidate and

14  present the candidate for the approval of Code

15  Hennessey.

16         Q.     So am I to understand that you

17  were in charge of the recruiting process for the

18  CEO position?

19         A.     I was the sole person who -- who

20  was engaged to -- with that task and worked with

21  Hunter --

22         Q.     Was Mr. McNamara the only person

23  that presented as a CEO candidate?

24         A.     No.  There were others, but for --

25  for consideration and review, but it was

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

1                        Burton T. Fried

2    Mr. McNamara that was head and shoulders above

3    all the other candidates.

4              Q.    Do you remember when Mr. McNamara

5    actually started employment?

6              A.    In about May of '06.

7              Q.    How would you characterize your

8    relationship with Mr. McNamara?

9              A.    We had an excellent working

10   relationship.

11             Q.    What did you think that excellent

12   working relationship was based on?

13             A.    Respect, honor, integrity,

14   dignity, candor, honesty and performance and

15   communication.

16             Q.    And that goes both ways?

17             A.    Absolutely, unequivocally.

18             MS. SELTZER:   Could you mark this

19        as Number 3.

20             (Letter dated November 16, 2005

21        marked Fried Exhibit 3 for

22        identification.)

23             MS. SELTZER:   Let the record

24        reflect that Exhibit Number 3 is a

25        document which has Bates stamp BF01 to

83

```
 1                     Burton T. Fried

 2          BF03.

 3          Q.     Do you recognize this document,

 4   Mr. Fried?

 5          A.     I don't have it.

 6          Q.     Oh, I'm sorry.

 7                 Now do you recognize it?

 8          A.     Yes.

 9          Q.     Was this the agreement that you

10   were referring to before?

11          A.     Yes.

12          Q.     And on page BF03, is that your

13   signature on the bottom?

14          A.     It is.

15          Q.     Was it your understanding that

16   this contract -- let me strike that.

17                 Do you know the concept of at will

18   employment, Mr. Fried?

19          A.     Yes.

20          Q.     Was this contract -- did this

21   contract leave you the freedom to leave whenever

22   you wanted and give LVI the ability to terminate

23   you whenever they wanted?

24          A.     It gave me the freedom of not

25   having a specific term of employment, and that
```

                          Burton T. Fried

1

2    went both ways with respect to both of us.

3    There was no specific term.  There's no

4    termination provision.  So it would appear that

5    we each had a right to terminate the agreement.

6          Q.    And could you have had -- could

7    you have negotiated a term employment agreement

8    if you wanted to?

9          A.    I don't know, I don't remember.

10         Q.    Did you ask for one?

11         A.    I don't recall.

12         Q.    Did you feel that you needed some

13   kind of guarantee to stay with the company?

14         A.    There is no term agreement, so it

15   appears that I didn't need any, feel I needed

16   any guarantees.

17               This is -- in a way, this was

18   similar to the terms of employment that I held

19   every other employee and officer and senior

20   manager accountable to, that as long as you

21   perform, you have no worry about being

22   terminated.  That resulted in all of my senior

23   managers with a longevity of 20 to 24 years in

24   the employment of LVI without a term agreement.

25   So I held myself to the same standard as

85

1                    Burton T. Fried

2    everyone else.

3                    "Perform and I'm not going to put

4    handcuffs on you if you choose to leave, but you

5    certainly are someone that we want to have with

6    the company."  And it was evidenced by the fact

7    that many of the people at LVI, many of the

8    senior managers, and it was disclosed in the

9    documents that were handed to Code Hennessey,

10   had an incredible longevity of senior managers

11   with -- many of whom only saw one masthead, LVI

12   Services, in their entire career and one

13   signature on the bottom of the check, which was

14   mine.  Lasting -- many of them, I think it was

15   the average of 18 to -- 18 years, at least for

16   the term through '05, from '86, '87, '88.

17        Q.    So it's your testimony that LVI

18   put a premium on experience with respect to the

19   people that they chose for their management

20   positions?

21        A.    We took care of our people and we

22   made them feel part of the family, and we

23   rewarded managers with incentives and paid them

24   for their performance and made sure that they

25   were taken care of.

```
 1                    Burton T. Fried
 2                    And that applies not only to the
 3   most senior managers, middle managers, lower
 4   middle managers, salary personnel and as well as
 5   hourly workers, because I was the first in the
 6   nation for -- in our field to provide medical
 7   insurance to hourly workers, who were sometimes
 8   earning as low as ten dollars an hour, but
 9   providing them the similar medical benefits that
10   was afforded to the most senior people, with
11   CIGNA medical insurance and hospitalization as
12   well as other benefits.  These were focused on
13   open shop workers that had no union representing
14   them, because that's --
15           Q.   I appreciate that --
16           A.   If I can just finish my answer.
17           Q.   Mr. Fried --
18           A.   No?
19           Q.   -- here is the problem.  We have
20   seven hours to get this accomplished, and I
21   appreciate everything you're telling me about
22   your accomplishments with the firm, but right
23   now we really need to focus on your claims in
24   this case.  So if I interrupt you, it's not
25   because I disrespect what you're saying or that
```

```
 1                    Burton T. Fried
 2  I don't want to hear what you're saying.  I'm
 3  just trying to streamline this so that we can
 4  get done everything we can get done today.
 5            A.    Okay, I'll do my best.
 6                  MR. WIGDOR:  Can you just read
 7            back the question?  Thanks.
 8                  (The last question was read back
 9            by the court reporter.)
10                  MR. WIGDOR:  Okay.
11            Q.    And I think you answered that.
12            A.    Yes.
13            Q.    While you were chairman, during
14  Mr. McNamara's tenure while you were chairman,
15  did you have any employees reporting directly to
16  you?
17            A.    If you want to use an
18  organizational chart, there was dotted line
19  responsibility to me by many senior officers,
20  with certainly a solid line responsibility to
21  Mr. McNamara and -- but I believe that I worked
22  very closely, and I don't know if you want to
23  call it dotted line or straight line, with then
24  in-house counsel that I brought aboard in the
25  Connecticut office, which was Mr. DiCarlo, with
```

88

```
 1                  Burton T. Fried
 2   whom I worked closely, as opposed to
 3   Mr. McNamara.
 4          Q.    Did Mr. DiCarlo report to you?
 5          A.    I never used the word "report to"
 6   at LVI.  I always used the term "worked with."
 7                In addition to that, I worked with
 8   a staff of marketing people at the Westport
 9   office that were hired to support marketing
10   efforts, national accounts, and I worked with
11   them.  I don't know that they directly reported
12   to me but I worked with them.  And as well as I
13   worked with my daughter at the Westport office
14   that was in charge of, as you know, bonding,
15   insurance, travel, et cetera, nationwide.
16          Q.    If you look at the complaint that
17   was the first exhibit that I showed you, and you
18   turn to page number 9 of that exhibit and look
19   at paragraph 34 of the complaint --
20          A.    Yes.
21          Q.    -- you want to read it over one
22   sec and I'll ask you some questions about it?
23          A.    Yes, I'm familiar with it.
24          Q.    Is this an accurate representation
25   of the day-to-day duties that you had with
```

89

1                    Burton T. Fried

2    respect to Mr. McNamara's tenure?

3         A.    Yes, yes.

4         Q.    Did Mr. McNamara give you these

5    responsibilities?

6         A.    No.   We discussed them and he

7    assigned them to me.

8         Q.    Were there any responsibilities

9    that you wanted that Mr. McNamara thought you

10   shouldn't have?

11        A.    We ultimately agreed on the duties

12   I would be assigned and I always supported his

13   decision.

14             MR. WIGDOR:   Take a break?

15             MS. SELTZER:   Sure.

16             THE VIDEOGRAPHER:   The time is

17        11:59 a.m.   We're going off the record.

18             (An off-the-record discussion took

19        place.) are

20             (A recess was taken.)

21             THE VIDEOGRAPHER:   The time is

22        12:05 p.m.   We're back on the record.

23   BY MS. SELTZER:

24        Q.    During the time that Mr. McNamara

25   was president and CEO, did he ever express any

              Elisa Dreier Reporting Corp. (212) 557-5558
                 950 Third Avenue, New York, NY 10022

90

1                    Burton T. Fried

2    dissatisfaction with your role as chairman?

3        A.    No.

4        Q.    Did you ever have any arguments

5    with Mr. McNamara with respect to your role

6    vis-a-vis his?

7        A.    No.

8             MS. SELTZER:  Would you mark

9             this -- what are we up to, 4?

10            (Executive securities agreement

11            marked Fried Exhibit 4 for

12            identification.)

13        Q.    Stepping back a second to the

14    responsibilities that were listed in your

15    complaint that were the day-to-day

16    responsibilities that you had under

17    Mr. McNamara, did you expect that those

18    responsibilities would be retained by you with

19    successive CEOs and presidents to LVI?

20        A.    Yes.

21        Q.    What led you to believe that?

22        A.    Conversation with Mr. State, at

23    the request of Mr. Simmons, to influence

24    Mr. State in accepting the position with LVI.

25        Q.    We'll talk about that conversation

91

1                    Burton T. Fried

2  in a bit.

3           A.     Good.

4           Q.     If you look at Exhibit 4, Exhibit

5  4 is an executive securities agreement Bates

6  stamped BF172 --

7           A.     I'm sorry.  I didn't shut this

8  off.

9           Q.     That sounds like one of those

10 old-fashioned telephones.  I like that sound.

11          A.     It's just an old-fashioned ring.

12          Q.     172.

13          A.     Let me just shut it off.  I didn't

14 realize.  Okay.

15          Q.     Bates stamped 1 -- BF172 to BF193.

16 Do you recognize this document, Mr. Fried?

17          A.     Yes.

18          Q.     This appears to be an agreement

19 between you, LVI Acquisition Corp. and CHS; is

20 that correct?

21          A.     Yes.

22          Q.     What was the purpose of this

23 agreement, if you remember?  Why did you enter

24 into this agreement?

25          A.     This is an agreement, really, with

92

1                     Burton T. Fried

2   LVI Acquisition and it's in connection with my

3   purchase of a million dollars worth of stock in

4   LVI Acquisition, at the request of Mr. Simmons,

5   so that I would have a significant equity stake

6   in the company as chairman.

7          Q.    Why did you think Mr. Simmons

8   wanted you to have a substantial equity stake in

9   the company?

10         A.    Well, he started off by asking me

11  for $3 million; we agreed upon a million.  And

12  that's to assure my focus and longevity with the

13  company and performance for years to come, since

14  he was making a substantial investment at the

15  time of the transaction.

16         Q.    If you turn to page 10 of this

17  agreement, there is a paragraph marked C, small

18  c, entitled "Non-Competition, Non-Solicitation

19  and Non-Disparagement."

20               Do you see that?

21         A.    Sure.

22         Q.    I think you spoke a little bit

23  briefly about or at least mentioned it at that

24  time.

25         A.    Yes.

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

1                    Burton T. Fried

2          Q.     On the next page we have section E

3     that's called "Certain Severance Benefits."  Do

4     you see that section?  And it indicates that if

5     you terminate from the company, the company

6     would provide you with 18 months of salary and

7     health insurance at -- basically at its

8     discretion; is that correct?

9          A.     Yes, yes.

10         Q.     And the Non-Compete section of

11    subparagraph C, which is little i, is it your

12    testimony that the enforcement of the

13    non-compete provision of this agreement was

14    based on your receiving the 18 months of salary

15    and health insurance?

16         A.     Yes.

17         Q.     With respect to subsection little

18    i, which looks to be the Solicitation of

19    Customers, Suppliers, Contractors,

20    Subcontractors and Other Business Relations,

21    that wasn't contingent on your receiving 18

22    months of salary, was it?

23         A.     I'm sorry?  Little i?  Where is

24    that?

25         Q.     There are two little i.

94

1                    Burton T. Fried

2          A.    On the previous page?

3          Q.    Yup, page 10.

4          A.    Page 10.

5                MR. WIGDOR:  What's your question?

6          Sorry, say it again?

7          Q.    Well, was it your understanding

8     that the Non-Solicitation section of this

9     restrictive covenant had continued despite

10    whether they gave you the 18 months or not; is

11    that correct?

12         A.    Correct, yes.

13               MR. WIGDOR:  I'm going to object.

14         Thank you.

15         Q.    And the three little i's,

16    Non-Solicitation of Business Associates, that

17    also would continue in full force regardless of

18    whether they gave you the 18 months or not; is

19    that correct?

20               MR. WIGDOR:  Objection.

21         A.    Yes.  I'm not addressing the legal

22    effectiveness of this document.

23         Q.    I'm not asking you to.  I'm just

24    asking your understanding of what the

25    document --

          Elisa Dreier Reporting Corp. (212) 557-5558
              950 Third Avenue, New York, NY 10022

1                    Burton T. Fried

2          A.    My understanding is correct, it

3    would not be dependent upon the payment.

4          Q.    And little 5, this disparagement,

5    that you don't -- that you're not going to make

6    disparaging, derogatory or other negative

7    statements about the company, that also

8    continued in full force and effect regardless of

9    whether they paid you the 18 months or not; is

10   that correct?

11         A.    Yes.

12         Q.    So the only provision here that

13   was contingent on your receiving the 18 months

14   of salary and benefits was the non-competition?

15         A.    Yes.

16               MR. WIGDOR:   Objection.

17         Q.    And that non-competition provision

18   was waived by the company; is that correct?

19         A.    Yes.

20         Q.    Mr. Fried, have you breached any

21   of those provisions?

22         A.    No.

23         Q.    In or around September of 2010,

24   there was another restructuring that was

25   contemplated; is that correct?

```
 1                  Burton T. Fried
 2        A.    I don't understand the question.
 3        Q.    Well, maybe I'll give you the
 4   document.  That's probably a fairer way to do
 5   it.
 6              MS. SELTZER:  If we can mark this
 7         as 5.
 8              (Written consent of the board of
 9         directors of LVI Services, Inc. marked
10         Fried Exhibit 5 for identification.)
11              MS. SELTZER:  Let the record show
12         that Exhibit 5 is a document entitled
13         "Written Consent of the Board of
14         Directors of LVI Services," Bates
15         stamped BF83 to 89.
16        Q.    Are you familiar with this
17   document, Mr. Fried?
18        A.    Yes, I am.
19        Q.    Was there a restructuring that
20   happened on or around September-October of 2010
21   that is the subject of this agreement?
22        A.    There was only one restructuring
23   that took place in 2010.
24        Q.    Right, one was the sale.
25        A.    Okay.  And part of that
```

97

1                    Burton T. Fried

2  restructuring was evidenced by what was related

3  in this document.

4           Q.    And at that point in time, Apollo

5  agreed to convert their debt obligation to

6  shares of common stock; is that correct?

7           A.    Yes.

8           Q.    And CHS agreed to contribute an

9  additional 15 million in cash, is that -- in

10  exchange for shares of common stock?  It's the

11  last "whereas" on the front page.

12           A.    Fifteen.

13                 (An off-the-record discussion took

14           place.)

15           Q.    Did CHS agree to contribute

16  $15 million in cash?

17           A.    Yes.

18           Q.    Did this restructuring create

19  something called the "LVI management cash

20  incentive plan"?  Are you familiar with that

21  term?

22           A.    It resulted in the negotiation of

23  that.

24           Q.    Was that something that you

25  negotiated?

98

```
 1                      Burton T. Fried
 2            A.      Solely.
 3            Q.      What was the purpose of your
 4   negotiating that provision?
 5            A.      Management of LVI Services,
 6   consisting of about 30 managers, were -- was --
 7   they were entitled to receive the remaining
 8   payment in connection with their sale of stock
 9   to Code Hennessy as a result of the transaction
10   that took place in November '05.
11            Q.      So there would be a series of
12   awards that would be given to members of
13   management of LVI; is that correct?
14            A.      I haven't finished my answer.
15            Q.      I'm sorry.
16            A.      Code Hennessy and Apollo had
17   structured a transaction for restructuring of
18   the company, debt and loans, that would
19   effectively make the remaining obligation to
20   management worthless because it was an
21   obligation of LVI Acquisition, and LVI Parent
22   was where they were putting in the funds and
23   issuing stock, and it was therefore leaving LVI
24   Acquisition without funds and a dilution of
25   equity.
```

```
 1                    Burton T. Fried

 2                    I was the management

 3    representative on behalf of management

 4    shareholders, and Apollo and Code Hennessy

 5    indicated that this transaction would result in

 6    the complete elimination of that obligation to

 7    management shareholders and that nothing would

 8    be paid.  And I then negotiated with Apollo and

 9    Code Hennessy for management shareholders to

10    receive 8 million of the 10 million that was

11    owed in two tranches, the first of 4 million at

12    the closing of the restructuring transaction and

13    the second tranche of 4 million based upon the

14    receipt -- based upon the achievement of certain

15    earnings.

16                    And the instrument that was

17    created to substitute for that other obligation

18    of LVI Acquisition was created and called the

19    document you just made reference to.

20          Q.     The LVI management cash incentive

21    plan?

22          A.     Yes.

23          Q.     And of that 4 million in that

24    first tranche that we're speaking about, you

25    received approximately 1.6 million of that; is
```

1                    Burton T. Fried

2   that correct?

3          A.    Yes.

4          Q.    And the rest was distributed to

5   other members of the management?

6          A.    Yes.

7          Q.    And then you had two subsequent

8   tranches that would come -- that would vest in

9   '11 and '12, 2011 and 2012; is that correct?

10         A.    Yes, and if those earnings were

11  not achieved, I believe it would be deferred.

12         Q.    And those tranches, with respect

13  to you, were approximately $795,000 each; is

14  that correct?

15         A.    Correct.

16         Q.    Did you receive your 2011 tranche

17  yet?

18         A.    No.

19         Q.    When is that expected to be paid?

20         A.    It has to be the achievement of

21  earnings.

22         Q.    Which would be when?

23         A.    At the end of 2011 and 2012.

24               MS. SELTZER:   Make this number 6.

25               (Participation award notice marked

101

```
 1                    Burton T. Fried
 2           Fried Exhibit 6 for identification.)
 3           Q.    Exhibit No. 6 is a document
 4   entitled "LVI Services, Inc. Participation Award
 5   Notice," Bates stamped LVI 380 to 381.
 6                 Do you recognize this document,
 7   Mr. Fried?
 8           A.    Yes.
 9           Q.    With respect to these awards --
10           A.    Yes.
11           Q.    -- was there a provision in these
12   award letters that you had to be employed on the
13   day that the awards were distributed in order to
14   receive them?
15           A.    I don't recall.
16           Q.    I'll show something that might
17   refresh your recollection.
18                 MR. WIGDOR:  You're talking about
19                 in Fried 5, or --
20                 MS. SELTZER:  No.  We were on 6,
21                 but now I'm going to show him a
22                 different document that might help
23                 Mr. Fried remember that, if you would
24                 mark this as 7.
25                 (E-mail dated December 16, 2010
```

```
 1                    Burton T. Fried
 2         marked Fried Exhibit 7 for
 3         identification.)
 4              MS. SELTZER:  Let the record
 5         reflect that Exhibit No. 7 is an e-mail
 6         from Paul Cutrone to Burton Fried, LVI
 7         401, and attachments continuing to 411.
 8         Q.    Do you remember this e-mail,
 9  Mr. Fried?
10         A.    Yes.
11         Q.    And the LVI management cash
12  incentive plan contains on page 7 and 8 a bit
13  called "Participation Award Notice," if you
14  would just take a look at that.
15         A.    That's okay.
16         Q.    The second page states that in
17  order to receive a portion of the bonus amount,
18  you must be employed by the Company Group --
19              MR. WIGDOR:  I'm sorry, where are
20         you looking?
21              MS. SELTZER:  Page 8.
22              MR. WIGDOR:  This is Fried 7,
23         right.
24              MS. SELTZER:  Fried 7.
25              MR. WIGDOR:  Page 8.
```

```
 1                    Burton T. Fried
 2                 MS. SELTZER:  Yeah, the last page.
 3             Third to the top paragraph, "In order to
 4             receive a portion," do you see that?
 5                 MR. WIGDOR:  Yes.
 6             Q.    That "In order to receive a
 7   portion of the bonus amount you must be employed
 8   by the Company Group and not have provided
 9   notice of such individual's intention to
10   terminate as of immediately prior to the payment
11   of any such bonus."
12                 Can you read that?
13             A.    Now I need to see it.
14             Q.    It's the last page, the very last
15   page of the document.  Three full paragraphs
16   from the bottom.  So it begins, "In order to."
17   Do you see that?
18             A.    Yes.
19             Q.    Could you just read that to
20   yourself?
21             A.    Okay, yes, I see it.
22             Q.    Does this refresh your
23   recollection as to whether you needed to be
24   employed at the time the award was being given
25   in order to receive it, a management person
```

104

```
 1                    Burton T. Fried

 2  receiving this?

 3              MR. WIGDOR:  Are you talking about

 4         him specifically?

 5              MS. SELTZER:  No, I'm talking

 6         about a management person, people who

 7         participated in this plan.

 8              MR. WIGDOR:  Objection.

 9         A.    I negotiated the terms and

10  notwithstanding, this was not executed and

11  processed and delivered until after the

12  termination of my employment, December 16th.

13         Q.    If you turn back to number 6 that

14  we were looking at before, which was your award

15  letter.

16         A.    Yeah.

17         Q.    If you turn to the second page,

18  and it says, "As previously discussed between

19  you and the company, the continued employment

20  provisions set forth in section fourth of the

21  bonus plan are not applicable to your award."

22              Do you see that?

23         A.    You need to let me finish my

24  answer.

25         Q.    I'm sorry, I didn't realize that
```

105

1                      Burton T. Fried

2   you hadn't.  Go ahead.

3            A.    I hadn't finished and I think it

4   will answer your question.

5            Q.    Okay.

6            A.    I had negotiated on behalf of all

7   managers the terms under which they would

8   receive this money.  It was their entitlement

9   whether or not they were employed by the

10  company, because it was a -- notwithstanding

11  what it was being called, it was the balance of

12  the purchase price, irrespective of their

13  continued employment.

14                At the time this was negotiated, I

15  made a point of indicating that I wanted to be

16  assured that notwithstanding termination of my

17  employment or resignation, that since pointed

18  out earlier I didn't have a term agreement, that

19  I received this payment.  I believe I also

20  negotiated that -- that the other management --

21  different terms than indicated here with respect

22  to the other managers, and I noted in

23  correspondence with Paul Cutrone that there were

24  terms different with respect to other managers

25  other than that which I negotiated.

1                    Burton T. Fried

2              That might not be relevant to your

3      question but I just wanted you to know that,

4      that I had no part in the negotiation, ultimate

5      agreement that was sent to other managers, but

6      clearly the one with respect to me, I made a

7      point of having that inserted into the

8      agreement, and that was a change that Sidley

9      made because of the understanding,

10     notwithstanding what they presented to me, that

11     postscript.

12         Q.    So what I'm understanding is that

13     you negotiated this particular provision for

14     yourself in this?

15              MR. WIGDOR:   This particular

16              provision in what?

17              MS. SELTZER:   The one we're

18              talking about.

19              MR. WIGDOR:   The record is not

20              going to know what you're pointing to.

21         Q.    The provision you didn't need to

22     be employed on the dates those two awards were

23     going to be paid?

24         A.    Yes.

25              MR. WIGDOR:   And you're pointing

1                    Burton T. Fried

2           to Fried Exhibit --

3                    MS. SELTZER:  We're on 6.

4                    MR. WIGDOR:  6, okay.

5          A.    Yes.

6          Q.    Did you request this because you

7    envisioned not being employed with LVI in 2011

8    or 2012?

9          A.    No.

10         Q.    Did Mr. McNamara eventually resign

11   from LVI?

12         A.    Yes.

13         Q.    Did he resign or was he

14   terminated?

15         A.    He resigned.

16         Q.    Do you know the reasons for his

17   resignation?

18         A.    He secured employment with another

19   company.

20         Q.    Did you know he was looking for

21   other work?

22         A.    I know that he was receiving

23   offers and he was unhappy with Code Hennessy.

24         Q.    What made him unhappy with Code

25   Hennessy?

1                    Burton T. Fried

2          A.     Failure of Code Hennessy to live

3   up to their obligations to him and the company

4   insofar as growth acquisitions, and he decided

5   to leave.

6          Q.     So did he believe there weren't

7   enough growth acquisitions?

8          A.     He felt that -- I believe, I can't

9   read the man's mind, but I believe, and he

10  evidenced -- he expressed that acquisitions --

11  opportunities that he presented to the board

12  were not embraced, and recommendations -- other

13  recommendations he was making to the equity

14  owner with respect to the financial structure of

15  the company were not acted on, and later proved

16  that his advice should have been taken.

17         Q.     When Mr. McNamara resigned, you

18  stepped in as interim president and CEO; is that

19  correct?

20         A.     I was requested by Brian Simmons

21  of the board.

22         Q.     So Mr. Simmons asked you to step

23  in; is that correct?

24         A.     Personally.

25         Q.     Is that something you wanted to

```
 1                    Burton T. Fried
 2  do?
 3          A.    I've served LVI and I -- they had
 4  a need, and it wasn't a position that I wanted,
 5  but was by necessity.  There was no one else
 6  that could handle the position, especially in
 7  the trying times of restructuring and the
 8  economy.
 9          Q.    When you were working as chairman,
10  were you working full-time?
11          A.    Yes.
12          Q.    Was there ever an agreement that
13  you would be working part-time while you were
14  working as chairman?
15          A.    No.  After Mr. McNamara took over,
16  he discussed with me a reduction in my
17  compensation in connection with now that I was
18  no longer CEO but chairman.  And I agreed to a
19  reduction of 20 percent, down to 600,000,
20  provided that the amount of time that I had to
21  devote was no more than 20 percent less than a
22  full week, which was four days.
23          Q.    I don't mean to interrupt you, but
24  is it your testimony then that you did go to a
25  more part-time schedule, less than a full-time
```

1                    Burton T. Fried

2     schedule?

3          A.     For one week.

4          Q.     For one week?

5          A.     And then I went back to a

6     full-time schedule at the same compensation that

7     I agreed to, which was the reduced amount.

8          Q.     Why did you go back to full-time?

9          A.     My services were necessary.

10         Q.     Did Mr. McNamara ask you to go

11    back full-time?

12         A.     No.

13         Q.     Did the board?

14         A.     No.   The demands of the business

15    required it, and as everyone in the company

16    knew, including people at the Westport office, I

17    worked from 7 in the morning straight until 5 or

18    5:30, sometimes 6.

19         Q.     When Mr. McNamara resigned, did

20    you ever think about taking over the role of CEO

21    again?

22         A.     No.

23         Q.     Why?

24         A.     I felt the company had the need to

25    have somebody in there that could grow the

1                    Burton T. Fried

2    company.

3         Q.    So is the reasoning that you

4    decided not to step back in full time is the

5    same reasoning which you originally thought a

6    CEO was needed; is that correct?

7         A.    I was working full time.  I didn't

8    want to take over the CEO role for the same

9    reason we searched and found Mr. McNamara.  And

10   that was for the growth of the company to be far

11   larger and a more dominant force in the

12   marketplace.

13        Q.    Did the board have to approve your

14   assuming the interim role of CEO?

15        A.    The board did.

16        Q.    The board did?

17        A.    Yes.

18        Q.    And did the board agree to giving

19   you an increase in your salary when you became

20   the interim head and the CEO?

21        A.    Yes.  I asked that of Mr. Simmons,

22   who then confirmed it to me in writing.

23        Q.    Did Mr. Simmons discuss with you

24   his reasoning for wanting you to become interim

25   president and CEO?

```
 1                   Burton T. Fried

 2        A.    Yes.

 3        Q.    What did he say that you remember?

 4        A.    I was the only qualified person to

 5   continue the stable path of the company, retain

 6   management, motivate management, continue

 7   profitable operations, and as the face of the

 8   company with respect to the surety relationships

 9   and other relationships, and understanding that

10   as part of my duties I would conduct a search

11   for a permanent CEO.

12        Q.    Did Mr. Simmons say that he felt

13   that you were the only person who would be able

14   to function in this interim capacity until a new

15   CEO was found?

16        A.    Yes.

17        Q.    How old were you at the time,

18   Mr. Fried?

19        A.    That occurred in May of '10.  I

20   was 70 years old.

21        Q.    At that time did Mr. Simmons

22   express any kind of reservation of you assuming

23   that role because of your age?

24        A.    Not on an interim basis.  He was

25   without options at the time.  A search would
```

113

1                    Burton T. Fried

2   take, you know, a considerable period of time

3   and the ship would be rudderless, so it was a

4   matter of necessity.

5          Q.    Did you take control of searching

6   for a new CEO?

7          A.    Yes.

8          Q.    Did anybody else take control with

9   you or was it solely you?

10         A.    Solely me.

11         Q.    Did Mr. Simmons participate at all

12  in the recruitment?

13         A.    No.

14         Q.    Did you retain a search firm?

15         A.    Mr. Simmons recommended one, which

16  was Russell Reynolds.

17         Q.    Did you agree with that

18  recommendation?

19         A.    No.

20         Q.    Why?

21         A.    I felt they didn't have the

22  specialist that was necessary to produce a

23  candidate or candidates with the proper

24  qualifications.

25         Q.    Did you then move forward with

        Elisa Dreier Reporting Corp. (212) 557-5558
            950 Third Avenue, New York, NY 10022

114

1                        Burton T. Fried

2    Russell Reynolds?

3            A.     I did, because he insisted that he

4    was confident the person that would handle the

5    recruitment would be as -- would be able to

6    perform the function.

7            Q.     What was the name of that person,

8    if you remember?

9            A.     Marcus Brauer.

10           Q.     What was your role with respect to

11   this recruitment?

12           A.     To work with Marcus in the

13   development of a profile for the candidate, the

14   qualities and requirements of the position, to

15   review all resumes that were proposed by

16   Mr. Brauer and to determine if in fact I would

17   interview them.  And then go through the

18   interviewing process and then ultimately making

19   a recommendation of one or more candidates to

20   Mr. Simmons and the board for their selection

21   and approval.

22           Q.     There were three candidates that

23   seemed to have come to the finish line, a

24   gentleman by the name of Dan Massoni, a

25   gentleman named Jim Robertson and a third

```
 1                    Burton T. Fried
 2   gentleman which is Mr. State; is that correct?
 3   Is that how you remember it?
 4         A.    No.
 5         Q.    Who do you remember being the
 6   final candidates for this position?
 7         A.    The final candidate and the one
 8   that was offered the position was the first
 9   choice and the most qualified of all these
10   candidates.
11         Q.    Who was?
12         A.    I have forgotten his name, but he
13   had --
14         Q.    John Hopkins?
15         A.    Huh?
16         Q.    Was it John Hopkins?
17         A.    Yeah.  And he was with, at the
18   time, Flaw, and -- one of five -- of the five
19   top executives, company that was doing
20   $15 billion, public company.
21         Q.    I thought you said 50.
22               Was Mr. Hopkins your first choice?
23         A.    Yes.
24         Q.    Was he Mr. Simmons' first choice?
25         A.    Frankly, I -- I think he was.  It
```

Burton T. Fried

1  was earlier -- it was the only one I presented,

2  frankly, to Mr. Simmons.  And Mr. Hopkins then

3  did some research and withdrew.

4  

5          Q.    Why did he withdraw?

6          A.    I can only tell you what I

7  believe, not what the fact is, so I prefer not

8  to say.

9          Q.    Did Mr. Hopkins have any

10  conversations with you about why he was

11  withdrawing from the position?

12          A.    No.

13          Q.    Did he have any conversations with

14  Mr. Simmons about it?

15          A.    I don't know.

16          Q.    Did Mr. Simmons ever speak to you

17  about it, about any conversations with Mr.

18  Hopkins?

19          A.    I don't recall.

20          Q.    Was Mr. State also being

21  interviewed at the same time Mr. Hopkins was?

22          A.    No.  He was not a candidate for

23  this position, nor was he an individual that was

24  discovered by Russell Reynolds, nor was he a

25  person with whom Code Hennessy, Apollo or Falcon

1                    Burton T. Fried

2  ever heard of before.

3          Q.     In fact, you knew Mr. State, is

4  that correct, prior to this search?

5          A.     I had known Mr. State and he was

6  sort of introduced to be considered for the

7  position by one or more managers of LVI.

8          Q.     When did you meet Mr. State?

9          A.     I met him in around '99 or 2000.

10         Q.     And what was the circumstances

11 around which you met Mr. State?

12         A.     We were in bankruptcy court for a

13 competitor of LVI.

14         Q.     What was your understanding of

15 Mr. State's reputation at the time that you met

16 him and subsequent to that?

17         A.     I didn't really know Mr. State

18 prior to my first meeting with him.

19         Q.     Did you recommend to Mr. State

20 that he should apply for the position of CEO at

21 LVI?

22         A.     I suggested that after being

23 requested to do that by other managers.

24         Q.     What other managers?

25         A.     I don't -- I believe it was

1                    Burton T. Fried

2    Mr. Leonard and Mr. Messisco.

3         Q.    Did you agree with their

4    assessment that he would be a good candidate for

5    the position?

6         A.    I knew that he would not be the

7    candidate that -- like Mr. Hopkins.  He didn't

8    have the management expertise or knowledge of a

9    Mr. Hopkins or a Mr. McNamara.  But what he did

10   have was the capability, based upon his

11   representation, that he could bring substantial

12   business to the company in the power sector,

13   specifically Energy Solutions, which he claimed

14   to have a strong relationship with.  And I felt

15   that what we needed at the time was to get

16   somebody in that could add 50 or $100 million in

17   business to the company and provided he would

18   not change the culture.  And I had him, as well

19   as the other candidates at that time,

20   interviewed by the COO, the CFO and the regional

21   managers so that they could give me their

22   opinion, because there was no one leading

23   candidate among the three in my mind.  And they

24   selected Mr. State.

25        Q.    What do you mean by changing the

1                    Burton T. Fried

2    culture?

3           A.    The company had a culture that was

4    developed in 24 years of business and that was

5    the structure of the company, the manner in

6    which we did business, our safety focus of being

7    world class, honesty, integrity, communication,

8    working as a team and working as a family.  And

9    performance, meaning we are based upon incentive

10   bonuses.  We take care of our people based upon

11   performance and incentive bonus so that their

12   performance is directly related.  Their

13   incentive bonus is annually or directly related

14   to their own performance and success.

15              And we also -- the culture was our

16   business segments, which included commercial

17   area, the industrial area as well as other

18   sectors, and the manner in which we sought

19   business through regional, local branch

20   marketing people and three or four national

21   marketing people, and the support of those

22   national people with talented marketing people

23   who prepared these presentations and prequels,

24   et cetera, based in the Westport office.

25              That was a culture to success.

120

1                     Burton T. Fried

2    That was how we grew.  That's how we developed

3    NorthStar, which is an emergency response

4    company that we started from scratch and grew

5    successfully with high margins.  That's how

6    people at LVI didn't walk across the street for

7    five cents more an hour or $25,000 more a year.

8           Q.    Did you think that Mr. State was

9    going to change the culture or not going to?

10          A.    He assured me that he would not

11   change the culture.

12          Q.    When did he do that?

13          A.    In conversation with him.

14          Q.    During the interview process?

15          A.    No, in my telephone conversation

16   with him to encourage him, at Simmons' request,

17   to join the company.

18          Q.    Do you remember interviewing

19   Mr. State?

20          A.    No.  Actually, I knew Scott

21   State -- I knew enough about him and what his

22   history was, and simply proposed him to Russell

23   Reynolds, who interviewed him.  I believe

24   Mr. Simmons interviewed him and then I arranged

25   for, I think, others to interview him, like

121

```
 1                    Burton T. Fried
 2   Falcon and Apollo and then the senior managers
 3   of the company.
 4             Q.    Did you have some reservations
 5   with respect to Mr. State's management
 6   experience?
 7             A.    He wasn't in the profile that I
 8   was hoping to secure, but clearly it appeared
 9   that he had certainly the same or similar
10   experience or as much experience as the other
11   two candidates.  So I had no objection and in
12   fact supported his hiring upon the
13   recommendation of the senior managers.
14             Q.    So would you say that Mr. State
15   was your and the management's choice for the
16   position?
17             A.    He was as a result of my adopting
18   the recommendation of the senior managers.  He
19   wasn't the choice of Mr. Simmons but then he
20   became his choice.
21             Q.    Did you have any conversations
22   with Mr. Simmons or any other CHS person about
23   the possibility of Scott State being hired?
24             A.    It was simply we were proposing --
25   I proposed him as the choice of management and
```

1                          Burton T. Fried

2     they went through the interview process, as I

3     mentioned, with the three equity owners and then

4     I had the senior managers and they came back and

5     said, "Okay, we'll go along with what senior

6     managers want."

7              Q.     Was there ever consideration given

8     to offering Mr. State the position of chairman

9     and CEO?

10             A.     I think there was one e-mail that

11    Simmons wrote about that and asked me if he

12    should take over as chairman and CEO or

13    something like that.   And I didn't understand

14    where that was coming at, where that was coming

15    from, but I think I indicated, you know, he

16    could do whatever he wants.   He -- he makes the

17    decisions.

18             MS. SELTZER:   Can you mark this,

19             please, as number 8.

20             (E-mail dated September 3, 2010

21             marked Fried Exhibit 8 for

22             identification.)

23             MS. SELTZER:   Let the record show

24             that Exhibit 8 is an e-mail from Burton

25             Fried to John Leonard and Paul Cutrone,

123

1                    Burton T. Fried

2              dated September 3rd, 2010 and Bates

3              stamped 741.

4         Q.    Do you remember this e-mail?

5         A.    Yes.

6         Q.    In this e-mail, you mentioned that

7    Brian asked whether Scott should be elected as

8    chairman and CEO, and you respond that you would

9    stay until asked to leave but thought that Scott

10   should have a few months with you until he

11   became comfortable with the position.

12        A.    Yes.

13        Q.    Is that the position of chairman

14   that you were talking about there?

15        A.    Yes.

16        Q.    Did you only intend to stay a few

17   months?

18        A.    No.

19        Q.    Why did you write that?

20        A.    I served, as I said earlier,

21   without term and that I was entitled to stay as

22   long as I performed, and I could be terminated,

23   certainly, if in fact -- since, as you pointed

24   out, it was an "at will."  But as it turned out,

25   I was terminated because of age discrimination,

124

```
 1                    Burton T. Fried
 2   not because of any other business reason.
 3          Q.     Did you expect that it would take
 4   a few months for Scott to hit the ground running
 5   with respect to the chairman position?
 6          A.     I didn't think he could take on my
 7   responsibilities effectively, but that didn't
 8   mean that I didn't disagree.  I've disagreed
 9   with others and people who make the ultimate
10   decision run with it.  I only give my opinion.
11          Q.     Which responsibilities that you
12   had did you believe he would not be able to do?
13          A.     Most of those that I listed, that
14   were listed in the complaint.
15                 THE VIDEOGRAPHER:  The time is
16          12:49 p.m.  We're going off the record.
17                 (An off-the-record discussion took
18          place.)
19                 (Lunch recess:  12:49 p.m.)
20
21
22
23
24
25
```

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

1                     Burton T. Fried

2                  AFTERNOON SESSION

3                      1:33 p.m.

4              THE VIDEOGRAPHER:   The time is

5        1:33 p.m.   We're back on the record.

6   B U R T O N    T.    F R I E D ,   having been

7   previously duly sworn, was examined and

8   testified further as follows:

9   CONTINUED EXAMINATION

10  BY MS. SELTZER:

11        Q.     Welcome back, Mr. Fried.

12        A.     Thank you.

13        Q.     If we can resume with Exhibit 8

14  again, we were halfway through that.

15              You write in this e-mail to

16  Mr. Cutrone and Mr. Leonard that "Apparently CHS

17  still can't wait to get rid of me."

18        A.     Yeah.

19        Q.     Why did you think CHS was trying

20  to get rid of you?

21        A.     It was a thread of the manner in

22  which they did business during Mr. McNamara's

23  tenure and, you know, they -- it was just a

24  sense that age was a factor.   But there was

25  nothing they said to me directly.

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

1                  Burton T. Fried

2          Q.     So when you wrote this, did you

3    believe that CHS was trying to get rid of you

4    because of your age?

5          A.     I have from time to time in the

6    past seemed to be directed that way during

7    Mr. McNamara's tenure, and although he never

8    said that to me, I just always had a sense with

9    respect to discussions or meetings on certain

10   matters.  It was just that comment when they

11   said, "when we elect Scott chairman," I just

12   picked it up that here it comes again.

13         Q.     So you felt their recommendation

14   that Scott be elected chairman as well as CEO

15   was based on the fact that you're older?

16              MR. WIGDOR:  Objection.

17         A.     I don't think they're recommending

18   anything.  I think it was a loose comment.  It

19   went no further than a one-sentence -- and I

20   don't even remember it being said to me,

21   frankly, but apparently it was and that's why I

22   commented on it.

23         Q.     Did Mr. State -- prior to his

24   hire, did Mr. State ever ask you for an

25   assurance that he would have the authority to

```
 1                    Burton T. Fried
 2    run the company the way he wanted to run it?
 3            A.    Yes.
 4            Q.    When was that?
 5            A.    Well, it was -- clearly it was
 6    brought to my attention by Brian Simmons that he
 7    was concerned that he would be -- about being
 8    the final word insofar as decisions.
 9            Q.    How did -- so the conversation was
10    between you and Mr. Simmons as opposed to you
11    and Mr. State?
12            A.    It was initially with me and
13    Simmons.
14            Q.    Do you remember around when that
15    conversation happened?
16            A.    Yes, in September.
17            Q.    And before Mr. State actually
18    accepted the position?
19            A.    Yes.
20            Q.    What did Mr. Simmons say to you
21    and what did you say to him in that conversation
22    that you remember?
23            A.    He said that Scott wanted to speak
24    to me and be assured that he would be the final
25    decision-maker on executive decisions.
```

                        Burton T. Fried

1

2          Q.     Did Mr. Simmons express to you

3   that Mr. Scott -- Mr. State was concerned that

4   you would interfere with his ability to run the

5   company?

6          A.     No.

7          Q.     So the only concern that

8   Mr. Simmons voiced to you was that Scott was

9   afraid that he would not be the final decision

10  maker?

11         A.     Yeah, and I guess he was concerned

12  about interference, but that's all he said, that

13  he was the final decision-maker.

14         Q.     Did Mr. Simmons ask you to speak

15  to Mr. State?

16         A.     Yes.

17         Q.     Did you speak to Mr. State?

18         A.     I did.

19         Q.     Was it a telephone call or a

20  face-to-face?

21         A.     Telephone call.

22         Q.     And how much after this

23  conversation with Mr. Simmons was this telephone

24  call with Mr. State?

25         A.     Shortly.

129

1                    Burton T. Fried

2          Q.     Can you tell me everything that

3    you said to Mr. State and everything that

4    Mr. State said to you during the course of that

5    conversation?

6          A.     I -- he indicated to me that he

7    wanted to withdraw from consideration and I

8    asked him why, and he said he wasn't pleased

9    with the constantly changing positions by Code

10   Hennessy in connection with his negotiation of

11   the terms of his employment.  And that he didn't

12   like the way Code Hennessy negotiates.

13              I said to him that he didn't have

14   to be concerned about that going forward, once

15   he resolved the issues, because there were other

16   partners involved in the case of Apollo and

17   Falcon.  And I had no reason to believe that

18   they wouldn't do anything but the right thing as

19   far as negotiations and I'm sure whatever issues

20   he has could be resolved simply.

21              He said, "Well, I never get a

22   chance to speak to Simmons, only with Hogan."

23   And I said, "Well, I can arrange for Simmons to

24   speak with you."

25              Then I said, "I understand you're

```
 1                    Burton T. Fried
 2   concerned about your being the final decision
 3   maker."  He said "yes" and I said, "Well, I want
 4   to assure you that you are the CEO or would be
 5   the CEO, I would be the chairman, you would be
 6   the final decision-maker on all matters as CEO.
 7   And you don't have to believe me.  Call Bob
 8   McNamara, because for a period of four years Bob
 9   was CEO and you know Bob, and he could tell you
10   on a phone conversation with you and he of how
11   we worked together and whether he was the final
12   decision maker."  His response was, "I believe
13   you, I trust you, I don't have to call Bob."
14          Q.    Did -- is that all you remember
15   about the conversation?
16          A.    Yes.
17          Q.    Did Mr. State raise any issues
18   having to do with his concerns that you were
19   going to get in his way in being able to run the
20   company the way he wanted to run it?
21          A.    Absolutely, unequivocally no.
22                MS. SELTZER:  Can you mark this as
23          number -- what are we up to, 9?
24                (E-mail string, first one dated
25          September 21, 2010 marked Fried Exhibit
```

1                    Burton T. Fried

2          nine for identification.)

3              MS. SELTZER:   Let the record show

4          that Exhibit No. 9 is an e-mail from

5          Brian Simmons to Burton Fried dated

6          September 21st, 2010 and Bates stamped

7          LVI 2465.

8          Q.    Let me know when you've had a

9    chance to review this, Mr. Fried.

10         A.    Yes.

11         Q.    Is this reflective of the

12   conversation that you had with Mr. Simmons?

13             The first e-mail on the bottom

14   which is dated September 21st of 2010 indicates

15   that -- Mr. Simmons asking you to speak -- that

16   Scott telling you that Scott wants to discuss

17   your ongoing role at LVI.  He states that he

18   wants to be assured that he'll have the

19   authority to align his team, manage the

20   business, et cetera.

21             Do you remember that being the

22   topic of Mr. Simmons' conversation with you?

23         A.    No.  It was something similar but

24   not exact.  He just wanted to be certain that I

25   assured him that he was the final

1                    Burton T. Fried

2    decision-maker.

3         Q.      And you respond back to

4    Mr. Simmons that before Mr. McNamara accepted

5    the LVI CEO position, his only question of you

6    was how long you would continue at LVI.  And you

7    responded a day, up to a year, subject to your

8    pleasure.

9                 What did you mean by that comment?

10        A.      As long as he wants.

11        Q.      So you would stay either a day or

12   up to a year?

13        A.      I would stay.  Always my intention

14   was to stay for an extended duration, but I

15   wanted to give him the comfort that he was the

16   final decision-maker and I would stay as long as

17   he wanted, and therefore his reply was until I

18   leave.

19        Q.      Had Mr. McNamara decided to

20   terminate you the day after he became the CEO,

21   would that have been in accordance with your

22   understanding of your promises to him?

23        A.      Provided -- yes, provided it was

24   not the subject of age discrimination.

25        Q.      You then write -- you write that

```
1                    Burton T. Fried
2    you would repeat your offer to Scott, that you
3    would be prepared to remain at LVI until he, the
4    board or you decide it's time to leave, "an
5    offer he can't refuse."
6                    Did you make that offer to
7    Mr. State?
8         A.    No.
9         Q.    Why?
10        A.    It never came up.  He was
11   satisfied he would be the final decision-maker
12   and we never had to go any further.
13        Q.    So you never reassured Mr. State
14   that you'd be willing to leave whenever he, the
15   board or you decided it was time?
16        A.    No.
17        Q.    Did you tell Mr. State that he was
18   in charge and you would give him the room that
19   he needs to manage the company?
20        A.    Oh, yeah.
21        Q.    So the only thing that's written
22   on this e-mail that you didn't get a chance to
23   tell Mr. State was the fact that you would stay
24   there as long as he wanted you to?
25        A.    Correct.
```

134

1                    Burton T. Fried

2              MS. SELTZER:  That's number 10.

3              (E-mail string, first one dated

4         September 22, 2010 marked Fried Exhibit

5         10 for identification.)

6              MS. SELTZER:  Exhibit 10 is an

7         e-mail from Paul Cutrone to John Leonard

8         with a copy to Burton Fried, dated

9         September 22nd, 2010, LVI 865 and 866.

10        Q.    Do you recognize this e-mail,

11   Mr. Fried?

12        A.    Yeah.

13        Q.    Could you turn to the second page

14   of this document, to your e-mail to Mr. Leonard

15   dated September 21st, 2010.

16              You write to Mr. Leonard and to

17   Mr. Cutrone, "Scott accepted the offer.

18   According to Brian, Scott wants to speak to me

19   tomorrow."  And then you go on to say, "Scott

20   wants to speak to me tomorrow to be assured that

21   I will not get in his way to manage the

22   business, align his team and be in charge.

23   'If'" -- in quotation marks -- "that is the

24   reason for Scott's call to me tomorrow, will

25   tell him that I will remain at LVI until he, the

135

```
1                    Burton T. Fried
2    board or I decide it's time to leave.  Hard to
3    believe he would have that conversation with me.
4    It would be a sign of insecurity."
5                    Why did you put the "if" in little
6    quotation marks?
7            A.    I had no reason to believe that in
8    or about this time that an executive taking on a
9    company of our size, the CEO, would be concerned
10   about the final decision-maker, and at the same
11   time, based upon my experience with Code
12   Hennessy, I didn't necessarily believe
13   100 percent, you know, all the time, that what
14   they were telling me was an accurate reflection
15   of concern.  I questioned it on the part of
16   Scott.  So I was saying if in fact he really
17   believes that, then fine, that would be my
18   response.
19           Q.    Did you believe that Brian Simmons
20   was not telling you the truth about what
21   Mr. State was concerned about?
22           A.    It may have been a
23   characterization and that was his conclusion.
24   Maybe that was what he deduced was a concern,
25   but he was, you know, thoroughly sold on Scott
```

                    Burton T. Fried

and he was now attempting to clear all the

barriers that he thought existed.

           So I didn't know if that was the

most important thing, and as it turns out it

wasn't, because I simply responded as to how it

would go and I asked him to verify it with

somebody who I worked with for four years, and

he chose not to and said, "I trust you."  So it

clearly wasn't the issue of significance to

Scott State.

      Q.    So you -- once again, you state

here again that you were going to tell him that

you were going to remain at LVI "until he, the

board or I decide it's time to leave," and you

never got a chance to give that message because

it never came up; is that your testimony?

      A.    After I mentioned that, I told him

to speak -- speak to -- to Bob McNamara.  He

said, "I don't have to, I trust you."  And that

was the end of the subject.

      Q.    Were you prepared to give him that

message?

      A.    Yeah.

      Q.    So you were prepared to tell him

1                      Burton T. Fried

2    that you would remain at LVI until either he,

3    the board or you decided that it was --

4            A.    I had no term in my contract and

5    provided that it was not an act of termination

6    in connection with a violation of law, like age

7    discrimination, I would be subject to

8    termination.

9            Q.    At this time the concept of age

10   discrimination with respect to Mr. State wasn't

11   in the cards, was it?

12           A.    No, but I was confident that that

13   event would never happen because of 24 years of

14   service and all the congratulations and

15   everything I received in the last year and

16   because it was I who proposed State and

17   supported his -- his selection.

18                So it was not even a remote

19   possibility in my mind that I would be asked --

20   I would be terminated by Mr. State, except now

21   clearly for a violation of something, so that's

22   why I said, "Any time you want, it's okay."  It

23   was always on condition on the fact that there

24   is a legal course for my termination, being I'm

25   an employee at will.

138

1                        Burton T. Fried

2          Q.    So you were prepared to make this

3    statement but you didn't believe Scott would

4    ever take you up on it?

5          A.    Correct, correct.  I mean, he

6    valued my contribution up until he became a

7    candidate for employment.  And if you ask the

8    question, I'll give you the answer why.

9          Q.    Before I ask you that question --

10         A.    I'm trying to be as brief as

11   possible.

12         Q.    Good.

13               At this point in time on the 21st

14   of September you said Scott had accepted the

15   offer of employment, right?

16         A.    Okay.

17         Q.    So at this point in time -- did

18   you believe at this point in time that Scott was

19   harboring any kind of discriminatory feeling

20   towards you?

21         A.    I didn't learn that until later.

22         Q.    But you believed that he did at

23   this point in time?

24         A.    No, I didn't.  I didn't.

25               MR. WIGDOR:  At the time?

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

1                    Burton T. Fried

2              MS. SELTZER:   At the time.

3         A.     At the time I had no reason to

4    believe it.

5         Q.     Just to recap what you said a

6    second ago, you were prepared to make this offer

7    to him, but you didn't anticipate that he would

8    take you up on it?

9         A.     Not at all.

10        Q.     Did you anticipate that the board

11   would take you up on it?

12        A.     Not at all.

13        Q.     Even after you said in the e-mail

14   before that CHS was trying to get rid of you?

15        A.     It was, you know, tongue-in-cheek

16   remark.

17        Q.     Why did you believe if he had this

18   conversation with you it would be a sign of

19   insecurity?

20        A.     If in fact that was a concern,

21   it's a sign of insecurity because a leader, a

22   CEO of a significant company with thousands of

23   employees, would never be concerned.  His psyche

24   as a leader is never being concerned there is

25   somebody else who's going to interfere with his

```
 1                    Burton T. Fried
 2   work and with his direction.
 3                    I was never concerned in 24 years.
 4   I couldn't believe -- Bob McNamara was never
 5   concerned about that.  I couldn't believe that
 6   Scott was concerned in view of the fact that
 7   more than eight years before he ran a company of
 8   some substance.
 9            Q.    So in your mind what would a
10   leader do if they felt there was somebody
11   interfering with their work?
12            A.    He would either attempt to resolve
13   it or he would take whatever action was
14   necessary, if in fact it impeded and the board
15   agreed with the fact that he was being impeded
16   and they supported his position.
17            Q.    And at that point would it be
18   justifiable for a CEO to terminate the
19   employment of the person they believed was
20   interfering with his ability to do the work?
21            A.    I don't believe that an employee,
22   a CEO alone would terminate the employment of a
23   chairman, especially one that's been with the
24   company for 24 years and has performed as I've
25   described before, and I won't repeat it.
```

```
 1                    Burton T. Fried

 2              So I think that anyone, be it a

 3    CEO or a board supporting that decision without

 4    having a reason for the termination, be it

 5    performance or interference, is obviously

 6    terminating for some other reason, and in this

 7    case there was another reason.

 8         Q.    Did you believe that you

 9    interfered with Mr. State's ability to run the

10    company?

11         A.    I never spoke to Mr. State from

12    the time he was employed until the time I met

13    him on October 19th, except for one conversation

14    setting up a meeting for October 19th, and

15    having no other substantive conversation with

16    him other than scheduling a meeting.

17         Q.    Did you have any substantive

18    e-mails with him regarding issues?

19         A.    Negative.  No.  I had e-mails to

20    him after October 19th, attempting to work after

21    he froze me out and mentioning matters,

22    et cetera, but between the 27th, when he came

23    aboard, and the 19th that I met him, he was

24    constantly traveling to offices and never picked

25    up the phone to call me or discuss anything with
```

142

1                     Burton T. Fried

2  me, so I certainly couldn't be interfering with

3  him.

4          Q.    Did you ever represent to the

5  board that you would step aside if you were

6  asked to do so?

7          A.    The board never asked me that.  On

8  the contrary, from the first day in '05 when

9  they -- when Code Hennessy took over, all the

10  way through and including the October 19th

11  meeting with Scott State in 2010, for a period

12  of five years I had nothing but the support and

13  congratulations on accomplishments over my

14  results in every aspect, in every matter which I

15  handled and produced results, nothing but

16  congratulations.  And to support that, I

17  received significant bonuses annually, and that

18  had to be done with the approval of the board.

19          Q.    Did Mr. Simmons ever tell you that

20  the restructuring would not happen if Scott

21  State didn't accept employment with LVI?

22          A.    I don't remember him saying that.

23  We had other candidates, so that was silly

24  simply because the lenders -- from the lenders'

25  point of view, never met Scott State, probably

1                        Burton T. Fried

2    never heard his name.  From the -- from -- from

3    the point of view of Falcon and Apollo and

4    Simmons, they never knew of Scott State when

5    they committed to go ahead with and were working

6    on the restructuring for a year.  It was only at

7    that last breath before the closing, a month or

8    two before, that they even met Scott State.  So

9    it was -- and that's while I was -- when

10   McNamara was CEO and then the other half of the

11   time when I was interim CEO.

12          Q.    So is your response to that that

13   you don't remember Mr. Simmons saying that to

14   you?

15          A.    I don't recall him ever saying

16   that to me.

17                In fact, another reason was

18   Mr. Simmons indicated that he wanted another

19   candidate and his first choice was not Scott

20   State, as I mentioned earlier.  And then only

21   after the management, the people I mentioned,

22   supported his election and then I said I support

23   it as well, did he change.

24          Q.    When did Mr. State begin his

25   employment?

144

1                    Burton T. Fried

2          A.     On or about September 27th.

3    That's what I was told.

4          Q.     Did you experience any problem in

5    transitioning your responsibilities to

6    Mr. State?

7          A.     Absolutely not.  I never had.

8    Mr. State called me.  So he took over the

9    leadership.  He made direct contact with the

10   COO.  He dealt with the CFO.  That was a

11   transition and we never even discussed it

12   because it was the CFO and the CEO dealt with

13   him.  He was traveling around the country,

14   meeting regional managers, branch managers,

15   marketing people.  I never called anybody to

16   say, "Don't talk to Scott State."

17         Q.     Did you -- were you -- were you

18   concerned that Mr. State had not sought your

19   counsel in those first couple of weeks he was

20   employed, when he was meeting all these people?

21         A.     No, I wasn't concerned.  I figured

22   that he wanted to get the feel of the -- lay of

23   the land, and I thought it was admirable that he

24   is going out to meet the people who made the

25   money.

```
 1                    Burton T. Fried
 2              My only concern was I wanted to
 3    get up and running and I wanted to know what my
 4    responsibilities were and that's why I got in
 5    touch with him and asked for a meeting and sent
 6    him the list of responsibilities for -- that I
 7    work for under McNamara.
 8              MS. SELTZER:  Can you mark this
 9         one as Exhibit 11.
10              (E-mail string, first one dated
11         October 3, 2010 marked Fried Exhibit 11
12         for identification.)
13              MS. SELTZER:  Let the record show
14         that Exhibit 11 is an e-mail from Rob
15         Hogan to Brian Simmons dated
16         October 3rd, 2010, Bates stamped LVI 672
17         to 73.
18         Q.    And the first e-mail you're not
19    either cc'd on or sent to, but you are in the
20    one that starts in the second half of 672.
21              Do you see that e-mail that's
22    dated October 3rd, 2010?
23         A.    Yes.
24         Q.    Why don't you read that over and
25    tell me --
```

1                    Burton T. Fried

2         A.    I read that.

3         Q.    Okay.  Tell me what was happening

4    with the CIO position?

5         A.    I had as interim CEO been very

6    unhappy with the performance of the IT

7    department.  Paul Cutrone, CFO, was unhappy.

8    The COO was unhappy.  The branch managers were

9    unhappy.  The regional managers were unhappy.

10   The field was unhappy.  Everybody was unhappy

11   with the performance of the IT department.  Yet,

12   Paul was concerned, though he really didn't move

13   forward, he was concerned that if we made a

14   change in the manager of the IT department,

15   which most familiar with the system, it might

16   cause a disruption in the functioning of what we

17   relied upon.  A very important part of our

18   business was reliance upon the IT department and

19   uninterrupted service and access.

20               So I then explored instead of --

21   and with the consent of both senior officers, be

22   it Cutrone and Leonard, that we explore hiring a

23   CIO who would be overseeing that department, and

24   therefore we wouldn't make any change in the

25   department, and we could also use the CIO

1                    Burton T. Fried

2    because with experience, because we were now

3    considering changing the software program that

4    we were using and we had to go out through a

5    selection process of evaluating other software

6    and whether to perform the functions and what

7    would be engaged and what kind of interruption

8    in the transitioning of the software from one

9    software to another --

10           Q.    What did Mr. State do with respect

11   to this -- this search for the CIO?

12           A.    He decided he wanted to evaluate

13   it first, before it went any further.

14           Q.    Did you have a problem with that?

15           A.    I gave him my thoughts that it was

16   important, and in a historical reference that it

17   was important and why it was important, somewhat

18   more detail than I've just given you, but

19   basically the same comment, and his response was

20   that he's smarter than any CIO and he's an

21   expert in computers and he doesn't need any CIO

22   and he has his own consultants to advise him.

23           Q.    You write here, "Believe it

24   appropriate that you receive my views on all CEO

25   transitional issues, including an HR and CIO

1                     Burton T. Fried

2    position, before you reach a decision to suspend

3    recruitment efforts that I initiated."

4                     Did you really believe it was

5    appropriate he run these types of decisions

6    through you before making a decision?

7              A.    You're misreading it.

8              Q.    How am I misreading it?

9              A.    He didn't have to run it through

10   me.  He was getting my historical frame of

11   reference before reaching the decision and he is

12   the ultimate decision maker.

13             Q.    Why would he need to get your

14   views?

15             A.    He didn't need to do it.  It was

16   my recommendation.

17             Q.    Why was it your recommendation?

18             A.    Any intelligent CEO who takes over

19   a position, and has a ready source of historical

20   reference for the history of the running of any

21   department or the needs of senior executives,

22   first communicates and determines the basis of

23   the needs or the decisions that had occurred

24   before he came aboard.

25             Q.    Was Mr. State one of those people