1                    Burton T. Fried

2  who did that, in your opinion?

3          A.    He didn't do it in these two

4  instances.

5          Q.    Did he do it in any other

6  instances?

7          A.    I wouldn't know.  These are the

8  only ones that I was involved in.  There were no

9  instances in which I asked him to check with me

10  historical information.

11              For example, if -- if I was suing

12  someone for $1.6 million and an offer of

13  settlement was given to settle the case for

14  400,000, I would expect that he would -- and I

15  was handling the case and I knew the merits --

16  you're a lawyer so I can relate this to you --

17  and he would decide to settle a case for 400,

18  without knowing anything about the case or the

19  historical reference, you wouldn't think that

20  was an appropriate decision, would you?

21          Q.    Would you?

22          A.    Absolutely not, nor would any

23  other sensible and intelligent person.

24          Q.    Do you still -- when we first

25  started this section of the deposition, I asked

1                    Burton T. Fried

2    you if you experienced any problems in

3    transitioning your responsibilities with

4    Mr. State.  Wouldn't you consider this to be a

5    problem in transition?

6         A.    No.  Just alerting him at -- to

7    the sensitivity of doing something, which I'm

8    sure he knew he should have done and should do

9    going forward.

10        Q.    Did Mr. State ever get back to you

11   about this e-mail that you sent him?

12        A.    Well, I did have a discussion with

13   him about the CIO.

14        Q.    What was the discussion about?

15        A.    I explained to him everything I

16   just explained to you in the previous answer as

17   to what had occurred with the department, all of

18   the senior management supporting the hiring of a

19   CIO and the reason for the hiring of a CIO or at

20   least the search for one.

21        Q.    Right, and what was Mr. State's

22   response to you?

23        A.    He said that he was smarter than

24   any CIO and that he was an expert in computers

25   and he was an expert in selection and

```
 1                    Burton T. Fried
 2   transferring of software systems and, if
 3   necessary, he knew a consultant that could
 4   advise him.
 5          Q.    Do you know whether Mr. State was
 6   an expert in computers?
 7          A.    I had no idea.
 8          Q.    If he had been an expert in
 9   computers, would that have been a reasonable
10   point of view not to hire a CIO?
11          A.    No.
12          Q.    Why?
13          A.    Well, you know, you can be an
14   expert in computers but Mr. State was unaware of
15   the amount of time it would take, and devotion,
16   both in the review, investigation and
17   determination of what the available software is,
18   and once selected, the entire process of
19   transitioning one software into the other could
20   take up to a year where the failure rate of
21   interruption is more than 50 percent.
22                 I don't think that's the proper
23   amount of effort that a CEO should be directed
24   to, but really should be with someone else, over
25   his control and his direction, but certainly
```

```
 1                    Burton T. Fried
 2   shouldn't devote his time and effort to that.
 3        Q.    Did the CIO position -- was that
 4   suspended and never picked up again, to your
 5   knowledge?
 6        A.    I know it was suspended.  To my
 7   knowledge, it was suspended.  I don't know if it
 8   resumed.
 9             MS. SELTZER:  Can you mark this as
10             Exhibit 12, please.
11             (E-mail string, first one dated
12             October 13, 2010 marked Fried Exhibit 12
13             for identification.)
14        Q.    Were you -- after this
15   conversation that you had with Mr. State about
16   the CIO position being on hold, were you
17   beginning to understand that Mr. State was --
18   intended to run the business the way he wanted
19   to run it on his terms?
20        A.    I always believed he would run it
21   on his terms.  Nothing changed.
22        Q.    Exhibit Number 12 is an e-mail
23   from Burton Fried to Scott State dated
24   October 13th, 2010.  If you would just
25   familiarize yourself with this e-mail.
```

1                       Burton T. Fried

2          A.     Yes.

3          Q.     Who is Ted Southern?

4          A.     He is a national marketing person

5   focusing on the power industry.

6          Q.     And what was the Boeing

7   opportunity?

8          A.     It was an opportunity that Squibb

9   Demolition called me about from Great Britain,

10  in that they were prequalified to submit a bid

11  for the structural demolition and remediation of

12  a facility in the State of Washington.  LVI had

13  not received such an invitation.  Nevertheless,

14  Squibb said that they would like to discuss with

15  me the teaming of that project pursuant to a

16  teaming agreement that we had entered into.

17         Q.     Had Mr. Southern been involved in

18  any of these negotiations with Squibb?

19         A.     No.

20         Q.     These e-mails between Mr. Southern

21  and LES and Robert Simms, it looks like, from

22  Squibb, were these an indication that Mr. Ted

23  actually had had some involvement in this deal

24  requiring this conversation that you had with

25  Mr. State -- in this deal?

1                    Burton T. Fried

2          A.      Ted had no substantive involvement

3    in either the creation of the transaction, the

4    negotiation of the transaction, the negotiation

5    of the terms of the agreement that went back and

6    forth or the ultimate agreement of the parties

7    to the transaction.  I did that solely and

8    unilaterally.  I designated Ted as our point of

9    contact for communications with respect to if

10   they couldn't get me, get Ted and he'll get me.

11   Or any -- oh.

12              Specifically -- actually, I did

13   ask him to do something.  I asked him to develop

14   a prequalification book, joint prequalification

15   book, between Squibb and LVI that we could

16   jointly deliver in Great Britain or Europe and

17   as well as the United States.  And I asked Ted

18   to do that because he was in the marketing area

19   and that he could use the resources that --

20   people in the Westport office.  But asked him to

21   do that kind of detail rather than do the detail

22   himself or ask me to do the detail as CEO.

23              So to that extent, when I went to

24   Great Britain, I took John Leonard with me and I

25   took Ted with me, and so that they were familiar

1                     Burton T. Fried

2    with the people on the other side if in fact we

3    reached an agreement and there was a

4    follow-through then by Ted.

5              Q.    And what Mr. State is

6    communicating to you is that he wants to have a

7    meeting with him and Ted, correct, to explain

8    his take on the Vision versus Squibb situation;

9    is that right?

10                   This is the e-mail from Scott

11   dated 10/30/2010, so he's proposing that he go

12   forward with -- with Ted to look into this deal?

13             A.    Into what?  I don't quite

14   understand what you mean by --

15             Q.    It says here, "No meeting

16   scheduled.  I want a better idea on the agenda

17   before we burn a bunch of money" -- "of time and

18   money flying people to New York.  John and I are

19   also trying to get Ted to explain his take on

20   the Vision versus Squibb.  Planning a point call

21   from John and I to Squibb when he and I are in

22   the Denver office together."

23                   So he's basically, at least from

24   what I'm reading on this, going to be taking

25   your part in the ongoing negotiations with

```
1                    Burton T. Fried
2  Squibb; is that right?
3           A.    Well, yes.  And he didn't bring
4  that clearly to my attention until the 19th of
5  October, the following week.
6           Q.    What do you think he was saying
7  here?
8           A.    No, he was just getting involved
9  to understand it, but it was on the 19th that he
10 said he didn't want me at a meeting with Squibb
11 in New York and that he would be responsible for
12 acquisitions, and I said fine.
13                In this particular -- he had no
14 idea anything historical about Squibb.  He had
15 no idea who the people involved were, what the
16 entire thought process was in entering into the
17 transaction.  He even went off on thinking that
18 we were paying for their air travel coming in,
19 which was not the case.  And all of that fog of
20 what he thought could have been cleared up if he
21 had a simple conversation with me, again, with
22 respect to the historical reference of how this
23 transaction went and where it was as of this
24 date, and then he could proceed with
25 intelligence and knowledge.
```

1                    Burton T. Fried

2          Q.     Did you try to reach out to him?

3          A.     To whom?

4          Q.     To Scott, to describe these things

5    to him by telephone?

6          A.     No.  I didn't even know what he

7    was doing with -- I think I did speak to him

8    with respect to it.

9                 No, I wrote him an e-mail back and

10   I explained to him, and it was the first

11   instance I knew what his thoughts were and where

12   his head was, in that he was going to speak to

13   John when he got to Denver.  So I frankly never

14   had an experience working with a senior

15   executive in the manner in which he was

16   approaching the business, but certainly I felt

17   it was my duty, especially as a shareholder, to

18   explain to him that he ought to have the

19   historical reference before making a decision.

20         Q.     Couldn't John have given him the

21   historical reference?

22         A.     John didn't deal with Squibb in

23   the negotiations and all the other numerous

24   conversations with their representatives as I

25   did, nor did John have the conversation with

                        Burton T. Fried

1

2   Squibb with respect to their coming to visit us,

3   so he didn't know what arrangements were being

4   made or why they were coming to visit us.

5        Q.    You write in your response back to

6   Mr. State, "Very strange you seek advice from

7   Ted but none from me, but it's your decision."

8              Did it bother you that Mr. State

9   was seeking Ted's advice and not yours?

10       A.    You know, he was the final

11  decision-maker.  As I indicated, "it's your

12  decision," but it was strange that he wouldn't

13  come to me.  Since I was the architect of the

14  deal in handling it personally, as opposed to

15  Ted, that he wouldn't seek just my historical

16  reference to it before proceeding.

17             My sole interest was not Scott

18  State.  My sole interest was the success of LVI,

19  and that was my endeavor for 24 years.  To the

20  extent he was proceeding in a way that I thought

21  was not the best way, I was bringing it to his

22  attention but telling him, as I did in the

23  e-mail, "it's your decision."

24       Q.    Do you feel that your input as it

25  not being the right way was being ignored?

159

1                      Burton T. Fried

2          A.    I don't know.  He might have been

3     preoccupied because of his travel.  But, you

4     know, no different than the IT situation, we did

5     speak and I explained to him, he gave his -- his

6     point of view and I said, "Fine.  I only want

7     you to know the history, it's your decision."

8          Q.    Did you ever speak to Brian

9     Simmons about these issues that were arising

10    with respect to his not listening to your

11    advice?

12         A.    I didn't think it rose to the

13    level of speaking to Brian Simmons over a couple

14    of different issues while he's acclimating

15    himself to the company, no.  I didn't think it

16    was critical.  I didn't think it was ultra

17    important and I thought that it was just a

18    couple of items that he should talk to me about.

19    That's all.

20         Q.    Any other items that he didn't

21    talk to you about that you thought he should

22    have during this initial period of his

23    employment?

24         A.    Not that I can recall.

25         Q.    Did you suspect that the

                Elisa Dreier Reporting Corp. (212) 557-5558
                   950 Third Avenue, New York, NY 10022

                    Burton T. Fried

1  difficulties at this point in time that you were

2  having with Mr. State were due to your age?

3

4          A.    That was what?

5          Q.    Did you suspect that the time that

6  these issues were arising with Mr. State that

7  these issues were arising because of your age?

8          A.    No.

9          Q.    What did you think was happening?

10         A.    I did think he was just trying to

11  handle too much at one time and wasn't thinking

12  it through, and I was trying to give him some

13  guidance.

14         Q.    Was Mr. State getting guidance

15  from your management team?

16         A.    I'm sure they were giving him

17  guidance on issues that they were familiar with.

18         Q.    Did you ever speak to John Leonard

19  about your concerns that Mr. State wasn't paying

20  attention to your advice?

21         A.    I don't recall.  And certainly one

22  or two matters like this in the life of a CEO or

23  a chairman don't rise to the level of talking to

24  others, necessarily, complaining or anything

25  like that.  We have too much else to do.

1                    Burton T. Fried

2          Q.     How about Mr. Cutrone, did you

3   ever talk to him?

4          A.     I don't recall ever doing that,

5   but if it came up during a subject, we discussed

6   it for a couple of milliseconds, but it's not

7   something that we have the time to spend on.  We

8   were too busy trying to do business.

9          Q.     Was Mr. State ever under the

10  impression that you worked part-time as a

11  chairman?

12         A.     Who?

13         Q.     Mr. State?

14         A.     Was he under the impression?  He

15  may have mentioned it to me, or Simmons, I

16  think, may have said it to him or somebody at

17  Code Hennessy may have mentioned to him they

18  thought I was working part-time, but they knew

19  better than that.

20         Q.     Did Mr. State -- did Mr. State

21  ever take that up with you, to ask you whether

22  you worked part-time or full-time?

23         A.     I don't recall.  Again, it's such

24  a silly item.  Everybody in the company who had

25  any knowledge of operations in the business knew

1                    Burton T. Fried

2    I didn't work part-time.  You could ask, as you

3    pointed out, anybody in the field if Burt Fried

4    worked part-time.  On the contrary, I worked

5    seven days a week for this company.

6            Q.    Did Mr. State ever raise that with

7    you in your conversations with him, whether you

8    were a full-time or part-time employee?

9            A.    I don't know.  He may have made a

10   remark at one point about, "Gee, you know, don't

11   you work part-time?"  And my answer would have

12   been, "No, I've been working full part-time for

13   24 years."

14            Or a comment he made to me on

15   October 19th.  I said, "Scott, do you know how

16   much money I earn here?"  And he said, "Oh,

17   750."  And I said, "No, I earn 600."  I said,

18   "Why do you think I earn 750?"  He says, "Oh, I

19   think somebody -- I looked at some schedule or

20   something."  I said, "Well, when you took over

21   as CEO, I went back to 600.

22            "Oh, okay."

23            So I think it's just learning,

24   finding his way.  He's only been with the

25   company a couple of weeks, especially on this

```
 1                    Burton T. Fried
 2  e-mail of October 13th, he's with the company
 3  two weeks.
 4              MS. SELTZER:  Can you mark this,
 5         please.
 6              (E-mail dated October 14, 2010
 7         marked Fried Exhibit 13 for
 8         identification.)
 9              MS. SELTZER:  Let the record show
10         that Exhibit 13 is an e-mail from Burt
11         Fried to Scott State dated October 14th,
12         2010 and Bates stamped LVI 449 to 450.
13         Q.    Would you familiarize yourself
14  with this document.
15         A.    I'm familiar with it.
16         Q.    What prompted you to send this to
17  Mr. State?
18         A.    Well, I've always believed,
19  especially after working with Bob McNamara, that
20  the best way to have an effective meeting is to
21  outline an agenda and the issues that you'd like
22  to talk about rather than have a loose
23  conversation, and it's more efficient, more
24  effective and a better result.
25              So I called him and I asked for a
```

1                     Burton T. Fried

2   meeting, and he scheduled it for the 19th and I

3   told him that I would be sending him a list of

4   the agenda as well as the responsibilities that

5   I had performed historically so that we have

6   some basis upon which to have a discussion.  And

7   then he could decide what he would like me to do

8   and what not to do.

9          Q.    Was it your initiative to send

10  this or did he actually request you to put

11  together a list of what he thought -- you

12  thought your responsibilities should be under

13  his tenure?

14         A.    My initiative.

15         Q.    Was he responsive to receiving

16  this document?

17         A.    He didn't object.

18         Q.    If you look at the areas of

19  responsibility -- I know we had looked at what

20  you listed in the complaint and there's a few

21  more here than there were there -- were all of

22  these responsibilities responsibilities that you

23  had while you were working with Mr. McNamara or

24  are there some extra ones in here that you threw

25  in?

```
 1                   Burton T. Fried
 2              MR. WIGDOR:  Objection.
 3              You can answer.
 4        A.    Under Mr. McNamara I wasn't
 5   working on the Middle East, US and Latin America
 6   initiatives there.
 7        Q.    Were you reviewing all requests --
 8              MR. WIGDOR:  Were you done?
 9              MS. SELTZER:  I'm sorry.
10        A.    I'm still looking at the list.
11        Q.    Okay.
12        A.    With Mr. McNamara I assisted in
13   the negotiations on acquisitions.  I didn't do
14   it on my own.  Some of them he asked me to
15   follow through, others he handled.  That was the
16   basis of this comment about negotiating company
17   acquisitions.
18              And basically I handled all these
19   functions.
20        Q.    So had you -- during the time that
21   you were performing these functions under
22   Mr. McNamara, was Mr. DiCarlo employed by the
23   company?
24        A.    Yes.
25        Q.    Did he have any involvement at all
```

```
 1                    Burton T. Fried
 2   in the selection of outside counsel?
 3           A.    Yes.  We spoke to each other about
 4   it.
 5           Q.    Did you think that he was capable
 6   of performing that function?
 7           A.    We worked on it together, so
 8   certainly capable.  In fact, he, on matters
 9   would do research and make recommendations.
10           Q.    And do you think that he was
11   capable of managing senior level -- at a senior
12   level all LVI litigation and legal matters?
13           A.    Well, you know, as an attorney,
14   you know there are different levels of counsel.
15   He was a very talented attorney, but he didn't
16   have 46 years of experience, nor 24 years of
17   experience in construction law.
18                 So certainly while he is -- I
19   could say that he could handle it, he -- we
20   worked together and he used me as a resource for
21   making decisions inured to the benefit of LVI.
22                 And at no time during our working
23   relationship, which I considered excellent, did
24   he ever complain nor did I step on his toes.
25                 In fact, I confined myself to my
```

1                      Burton T. Fried

2   office and he used to come to me and sit and

3   we'd discuss matters.   I think that's an

4   intelligent and proper way, when you have legal

5   matters, rather than to look opposite at a wall

6   and look at a white wall, for somebody to bounce

7   things off of.

8                So we did -- pretty regularly he

9   would come in and we would discuss matters and

10   we would both agree on a course of action.

11        Q.    What did you mean by "monitor all

12   employee air travel"?

13        A.    We -- Shari, my daughter, one of

14   her responsibilities was to -- she initiated a

15   program with Garber Travel to use their software

16   so we could make -- have use of their software

17   for picking the cheapest travel available any

18   time somebody wanted to travel, rather than

19   calling a travel agency or an airline.   It came

20   up on a screen.   So he was -- she was in

21   charge -- assisting in the negotiation of

22   agreement, with charges and everything else that

23   Garber Travel did for us, and also in training

24   of travel coordinators throughout the nation.

25        Q.    What was your involvement in that?

```
1                        Burton T. Fried
2          A.      I'm going to get to that.
3          Q.      Okay.
4          A.      You have to understand the
5    background.
6                  MR. WIGDOR:  History, history.
7                  MS. SELTZER:  If we had three days
8            I would take all the history in the
9            world, I promise you.
10         A.      We may need three days.
11         Q.      I'm just trying to avoid having to
12   drag you back here again.
13         A.      If you want to know the answer, I
14   need to be complete.
15         Q.      By all means.
16         A.      She then -- it was a very detailed
17   system in which our travelers were prequalified,
18   our travelers were -- either worked through
19   travel coordinators for travel or, because if
20   they were frequent travelers, they could do so
21   at home, using the system.  But we needed a
22   check and balance on who was doing the
23   travelings because we spent 600, 700,000 a year
24   in travel.  So you had to know who was traveling
25   and why it was on company business --whether it
```

<pre>
 1                    Burton T. Fried
 2  was on company business.
 3                    So the way we did it was that we
 4  couldn't preapprove travel but we approved it
 5  the day after.  After the travel reservation was
 6  made and booked, Shari would get a travel form
 7  that was filled out by the employee or by a
 8  coordinator for the employee.  And there would
 9  be a name, it would be the reason for the
10  travel, where they were going to, what the
11  course of the travel was and so forth.
12                    I found that to be a very handy
13  and effective system of becoming aware of who
14  was going, what manager was going where and what
15  for.  And on occasion I found people going to
16  places like South America that they were not
17  authorized to do so.
18                    And so I learned this, by the way,
19  many years before I joined LVI, in learning that
20  the best way to determine what's going on in an
21  office or a business, in this case it was a
22  consulting engineering firm which I knew nothing
23  about, it was a small business and I wanted to
24  learn about it, I went into the office and I sat
25  at a desk and I asked for all mail to be brought
</pre>

Burton T. Fried

1    to me.  I read all incoming business mail.

2         Q.    Of other people?

4         A.    Of companies communicating with

5    this consulting engineering firm.

6         Q.    But I mean, e-mail --

7         A.    Business, not personal.

8         Q.    Letters that were addressed to

9    other people?

10        A.    No, to the company.

11        Q.    Okay.

12        A.    And I quickly learned what was

13   going on and how the business functioned.

14             Well, in this way with travel I

15   quickly learned that this was a -- an effective

16   way not only to be sure that it was -- the

17   protocol was being complied with, but where

18   everybody was going, what was happening out in

19   the United States, with 30 offices and maybe on

20   any given day, you know, 15 or 30 people

21   traveling.

22        Q.    Do you think this was an

23   appropriate role for the chairman of a company?

24        A.    I found this to be so effective.

25   I can't expect you would know that before you

```
 1                    Burton T. Fried
 2   never operated a company, but as a --
 3            Q.    You don't know that, do you?
 4            A.    Well, I'm going to assume so.
 5                  MR. WIGDOR:  She has a little HR
 6            background, Burt, don't sell her short.
 7            A.    If you ran a company then you
 8   would know, that in our company our success was
 9   based on micromanagement, and I micromanaged.  I
10   wanted to know where everybody was, without them
11   speaking to me, it was a task that only took a
12   few minutes a day, to look at 15 travel forms to
13   see where everybody was going.  I didn't spend
14   an hour on it.  It was a few minutes.  I found
15   it very effective and rewarding as far as a
16   manager's use of time.
17                  Now, others might disagree.
18            Q.    Did Mr. State disagree that that
19   was an effective --
20            A.    Well, I --
21            Q.    Let me finish the question.
22                  -- that that was an effective use
23   of your time as chairman of the company?
24            A.    Mr. State never expressed to me
25   that he thought that it was not an effective use
```

```
 1                    Burton T. Fried
 2   of my time, but he did write an e-mail to --
 3   that I noticed in discovery, writing to
 4   Mr. Simmons, one of several e-mails that he
 5   wrote to Mr. Simmons about me, that --
 6   commenting that "Why do we have to pay -- we
 7   shouldn't be paying Fried $1 million a year for
 8   him to -- to review travel request forms and
 9   other bullshit administrative items."  It
10   clearly showed to me that, in answer to your
11   question, that he didn't think it was an
12   effective use of my time.  But he clearly had no
13   idea of what service I performed to the company
14   for the past 24 years, and clearly through the
15   last year, when I was both chairman and then
16   interim CEO.
17                    So his -- his understanding of the
18   business was critically faulty, and the
19   functioning of the business and what made it
20   successful.  But I didn't see that e-mail, by
21   the way, until recently.
22           Q.    If Mr. State had thought that this
23   was a function that was better handled by
24   Mr. Cutrone or by even your daughter on her own,
25   would you have found that to have been a bad
```

173

                        Burton T. Fried

1

2  business decision?

3        A.    I would have -- irrespective of my

4  feeling, I would have supported it.  I didn't

5  always agree with Bob McNamara and his

6  decisions, but as far as the world was

7  concerned, and first with Bob McNamara, he was

8  the ultimate decision-maker and I supported it.

9  As far as the rest of the world was concerned, I

10  never had a disagreement over a decision with

11  Bob McNamara.

12        Q.    And Mr. McNamara was in agreement

13  with you that you should be spending your time

14  monitoring where people were any one part of the

15  day in the country?

16        A.    Mr. McNamara had a great deal of

17  respect for my accomplishments in building a

18  company of this size, and so successfully in

19  remote locations, and being a leader in the

20  industry.  He never discussed with me minutia

21  such as that, as to my reviewing travel request

22  forms.

23        Q.    Before your meeting on the 19th

24  with Mr. State, did you have a telephone

25  conversation with him?  Do you recall that?

174

1                     Burton T. Fried

2          A.      One, one.

3          Q.      Do you remember -- were you in

4    Connecticut at the time, or were you in

5    New York?

6          A.      I was in Connecticut.

7          Q.      What was the purpose, why did you

8    decide to have a telephone conversation?

9          A.      It lasted a few minutes.  It was

10   to schedule a date for a meeting.

11         Q.      And what -- what was the purpose

12   of the meeting that you were scheduling?

13         A.      To go over my responsibilities.

14         Q.      Had he received that e-mail at the

15   time that you had this meeting?

16         A.      What e-mail?

17         Q.      The e-mail that this --

18   responsibilities is attached to.

19         A.      I sent it to him after our

20   conversation.

21         Q.      After the telephone?

22         A.      That's right.

23         Q.      What else do you remember him

24   saying in the course of that telephone

25   conversation?

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

175

1                      Burton T. Fried

2          A.     "Good-bye."

3          Q.     Did you say anything other than

4   that?

5          A.     "Good-bye."

6          Q.     Do you remember telling Scott in

7   that telephone conversation or remarking to

8   Scott, "I'm 70 years old; I don't want to do

9   this anymore"?

10         A.     Absolutely, unequivocally no.

11         Q.     Anything that might have been

12  similar to that in the conversation that you had

13  with Mr. State?

14         A.     Never happened.

15         Q.     Did you ever mention your age to

16  Mr. State in that conversation?

17         A.     It was simply let's meet on

18  October 19th and we set the time, and I said to

19  him I would send him an agenda and list of

20  responsibilities and he said fine.

21         Q.     Did you ever make a statement like

22  that, "I'm 70 years old; I don't want to do this

23  anymore," to Mr. State at any other time during

24  your employment with LVI?

25         A.     Absolutely no.

1                    Burton T. Fried

2         Q.    Anything in sum and substance that

3    was like that?

4         A.    Absolutely no.

5               In fact, Mr. State thought I was

6    71 and when he made a statement to me on the

7    19th, his remark was after I said, "Why are you

8    taking away all of my responsibilities," he said

9    to me, "Burt, you're 71 years of age, how long

10   do you expect to work?"  And my response to him

11   was, "Scott, I'm only 70 years of age."

12              We never had that -- that

13   conversation, and had we had the conversation,

14   he wouldn't say I was 71.

15              MS. SELTZER:  Could you mark this,

16        please, as Exhibit 14.

17              (Discussion items marked Fried

18        Exhibit 14 for identification.)

19        Q.    Did you meet with Mr. State on

20   October 19th?

21        A.    I did.

22        Q.    Did you meet with him in New York?

23        A.    Yes.

24        Q.    Was it in the offices of LVI?

25        A.    Yes.

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

```
 1                    Burton T. Fried
 2         Q.    Do you know what time the meeting
 3   began with him?
 4         A.    No.
 5         Q.    Do you remember how long it
 6   lasted?
 7         A.    Fifteen minutes.
 8         Q.    In total?
 9         A.    Yes.
10         Q.    Were you two the only people in
11   that meeting?
12         A.    Yes.
13         Q.    Was there -- was the meeting
14   inside Mr. State's office?
15              MR. WIGDOR:  This is F14, right?
16              MS. SELTZER:  Yes.
17              MR. WIGDOR:  Is this something you
18         produced to us or --
19              MS. SELTZER:  No, you produced it
20         yesterday.
21              MR. WIGDOR:  We produced it
22         yesterday without a Bates stamp number?
23              MS. SELTZER:  That's correct.
24         Q.    I'm sorry, the question was, was
25   it in Mr. State's office, there was nobody else
```

178

1                    Burton T. Fried

2   in the office.  Was it a closed-door meeting?

3        A.    Yes.

4        Q.    So nobody that you knew heard this

5   conversation?

6        A.    Not that I'm aware of.

7              THE VIDEOGRAPHER:  Excuse me,

8              Counsel, we need to go off the record a

9              second.

10             MR. WIGDOR:  Are we changing the

11             tape?

12             THE VIDEOGRAPHER:  The time is

13             2:35 p.m.  We're going off the record.

14                  (A recess was taken.)

15             THE VIDEOGRAPHER:  The time is

16             2:53 p.m., May 20th, 2011.  This is tape

17             number three in the videotaped

18             deposition of Mr. Burton T. Fried.

19   BY MS. SELTZER:

20        Q.    Looking at Exhibit No. 14 again,

21   Mr. Fried, is this a document that you prepared

22   in preparation for this meeting you had with

23   Mr. State?

24        A.    Yes.

25        Q.    And it was your intention to

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

1                    Burton T. Fried

2  discuss all these different topics during the

3  course of that meeting?

4         A.    Yes.

5         Q.    Had you discussed with Mr. State

6  any of these topics prior to this meeting?

7         A.    I don't recall.  I may have, I

8  don't recall.  I may have written e-mails about

9  the CIO and HR.  I don't know at that point

10 whether we had any resolution.

11               Like the CIO, he said he would be

12 checking it out.  So I was bringing it up to ask

13 him what the status was.

14               I guess I discussed earlier there

15 was a corporate lodging proposal, I was asking

16 what the status was.

17        Q.    Okay.  You don't have to go

18 through all of them.  I was just wondering if

19 these were all topics that had previously been

20 discussed.

21        A.    Not all, no.

22        Q.    So the meeting -- you said it

23 started in the morning?

24        A.    I didn't -- I don't recall, but

25 you have my calendar.

1                         Burton T. Fried

2           Q.      Okay.   Tell me what you remember

3    about the meeting in as much detail as you

4    remember.   I know we talked a little about it

5    before, but...

6           A.      The first item was the area of

7    responsibility, and so I handed him a copy of

8    the -- of that attached list.

9           Q.      That's the one that's attached

10   here, right?

11          A.      Yes.

12          Q.      So it's a little different from

13   the one that you had sent him; is that correct?

14          A.      Well, the date is different.   I

15   dated it the same day, but other than that, it

16   was pretty much the same.

17          Q.      There is a couple of more

18   responsibilities on it.

19          A.      Okay.   It could have been.

20          Q.      Anyway, go ahead.

21          A.      On reflection, I could have added

22   something and I've forgotten.   But in any event,

23   I handed him the list and I said, "Why don't we

24   go through this, and this is what I performed

25   under Bob McNamara, and why don't we determine

            Elisa Dreier Reporting Corp. (212) 557-5558
              950 Third Avenue, New York, NY 10022

1                    Burton T. Fried

2    what you want me to do in going forward so I

3    have some direction."

4                    And he said, "Well, the first

5    item, I'm going to take that over.  New business

6    initiatives."

7                    I said, "Fine."  I said, "Well,

8    what about the meeting that we're planning to

9    have with Squibb in New York?

10                   "Oh, I'll attend that meeting, you

11   don't have to go there.  But if I change my

12   mind, I'll let you know."

13        Q.    Okay.

14        A.    I said -- and I said, "Well, the

15   owner of Squibb Demolition is going to be there,

16   he couldn't make the meeting in Great Britain

17   because he was ill.  I would think he would

18   expect me to be there, so you might want to

19   consider that."

20                   He said, "No, I could take care of

21   that, but if I change my mind, I'll let you

22   know.  I said, "Fine.  You want to go to the

23   next item?"

24        Q.    Yeah.  Tell me what -- what his

25   response was.  I assume you went one-on-one.

182

1                        Burton T. Fried

2          A.       That's what I said.  I was giving

3    you my answer.

4          Q.       Okay.

5          A.       I said, "You want to go to the

6    next item."

7          Q.       Okay.  I thought you were talking

8    to me.  Go ahead.

9          A.       To State?

10         Q.       Yeah.

11         A.       And he said -- looked at the list

12   and he said.  "I'm going to be reassigning all

13   your responsibilities to other managers and I'm

14   going to do that in the next 60 to 90 days, and

15   when that's completed, I can let you know if

16   there is anything else for you to do."

17                  I didn't immediately respond

18   because I was in a state of shock.  And my only

19   response was, "Scott, why would you do that?"

20                  His response was, "Burt, you're 71

21   years of age, how long do you expect to work.

22   And what if you get hit by a truck" -- a bus,

23   rather -- "what if you get hit by a bus, and we

24   have to plan for the future."

25                  My response to that, since this

```
 1                    Burton T. Fried
 2   was the first time that there was any indication
 3   that -- of what his -- what he was going to do
 4   with my responsibilities -- so I said, "Scott,
 5   number one, I'm 70 years of age, not 71.  Number
 6   two, the things that I perform for the company
 7   is not -- there is no one here that performs
 8   that, there is no duplicity, and based upon my
 9   experience, I think I am performing it in a
10   manner in which I think can best serve the
11   interests of LVI Services.  I don't plan to be
12   hit by a bus; I'm in good health and I expect to
13   work for a long period of time.  I am healthy,
14   and by the way, there aren't many buses in
15   Westport, Connecticut."
16                    And his response was, "Well,
17   that's the way I'm going to proceed."
18                    I was in shock.  I -- frankly, I
19   had no warning, no indication, and I said to
20   him, "Well, is there anything you want me to
21   do?"  And he said, "Not that I can think of."
22   And I said, "Well, I'm in the midst of working
23   with Studley, who I retained to find corporate
24   office space, the lease expires next August, do
25   you want me to handle that?"  He said, "Oh,
```

184

1                        Burton T. Fried

2  yeah, you can continue handling that."

3              I said, "Fine."  And I said,

4  "There is a lender meeting on CIBC on the 2nd,

5  do you want me to be present with that?"  He

6  said, "No, we won't need you there."

7              And basically that was the end of

8  the meeting, which took place, I don't know, 15

9  minutes, 20 minutes, for that limited

10  discussion, and I left.

11          Q.    Before we talk about what happened

12  after the meeting, did you during the course of

13  that meeting talk about other employees of LVI

14  who were doing their work or who were not doing

15  their work?

16          A.    Not that I recall.

17          Q.    Do you recall talking with him

18  about the business development staff

19  specifically?

20          A.    Not that I recall.

21          Q.    Do you remember talking about

22  functions within the company that required

23  upgrading?

24          A.    Not that I recall.

25          Q.    Do you remember talking about Matt

185

                        Burton T. Fried

2   Dembin during the course of that meeting?

3          A.    Not that I recall.

4          Q.    So it's your testimony here that

5   the entire meeting was around the concept of

6   these responsibilities and where he was going to

7   allocate them?

8          A.    Yes.  I don't recall it and I

9   don't believe it happened, because he sought no

10  counsel of me on any matter since he joined us

11  on September 27th, and on the 19th he was

12  getting rid of my responsibilities and felt that

13  others should -- should be transitioned to other

14  managers.

15              So it wasn't shocking to me that

16  he wasn't seeking my advice on any of the

17  matters that you just mentioned.

18         Q.    The list -- this list, the

19  chairman areas of responsibilities, would you

20  not consider these day-to-day responsibilities?

21         A.    They are day-to-day

22  responsibilities that I perform, yes, not

23  operational responsibilities, more in a legal

24  nature.

25         Q.    So at the beginning of the

              Elisa Dreier Reporting Corp. (212) 557-5558
                950 Third Avenue, New York, NY 10022

1                    Burton T. Fried

2    deposition we were talking about the role of a

3    chairman.  I specifically asked you whether you

4    wanted the role of chairman to get away from the

5    day-to-day responsibilities of the firm.  Why

6    did you want to continue to be involved in these

7    highly specific day-to-day work?

8            A.    The day-to-day responsibilities of

9    a company of our nature has nothing to do with

10   the responsibilities that are on this list.

11   We're engaged in structural demolition,

12   remediation, emergency response and other

13   similar activities nationwide.  The day-to-day

14   responsibilities involves bidding, bid reviews,

15   marshaling of forces when awards are made,

16   discussions on projects and performance of

17   projects, discussions of -- of productivity,

18   change orders, discussions on collections.

19   They're operational day-to-day responsibilities

20   rather than the kinds of stuff that are on this

21   list, which are -- which are more of a corporate

22   office executive rather than a field, a

23   day-to-day operational.

24           Q.    So reviewing requests for bid bond

25   payments and performance bond requests, that's

1                    Burton T. Fried

2    not a day-to-day responsibility of a demolition

3    company?

4          A.    You're confusing my definition of

5    day-to-day with the task.   These functions you

6    do day to day but it bears no relationship to

7    the day-to-day responsibilities of a CEO in the

8    management of a self-performed abatement and

9    structural demolition company.

10               The activity of risk review is not

11   a -- what I consider a day-to-day responsibility

12   of a CEO.   That is more of an oversight after --

13   before a CEO approves an estimate and approves

14   the bidding and submission of a bid of a

15   project, he should have someone, if not himself,

16   but someone performing -- in the case of LVI, it

17   was the chairman under Bob McNamara --

18   overseeing or looking at the projects that were

19   being considered for bid, to determine the

20   difficulty factor, whether the schedule of

21   performance could be made, whether there was

22   sufficient labor force out there and whether the

23   contract terms were such that would expose us to

24   liability, whether there were contract terms

25   that had consequential damage, liquidated

188

1                    Burton T. Fried

2  damages, indemnification provisions that were

3  onerous.  Those were an overview, not the

4  day-to-day performance.

5                    That kind of advice is what I used

6  to give Bob McNamara even before the people made

7  the effort of putting a detailed estimate

8  together to tell them, boom, here's an e-mail.

9  And I never even notified Bob McNamara, because

10 it didn't get to his level, by telling him, "By

11 the way, did you consider the fact that we have

12 liquidator damages of 25,000 a day, have you

13 considered the fact that this schedule has to be

14 finished in -- it's a million dollars to be

15 finished in two weeks, have you considered the

16 fact that it doesn't appear to be a clearly

17 defined scope of work."

18       Q.    That sounds to me like the job of

19 a general counsel, to look at a contract and try

20 to determine whether there's any liabilities for

21 the company on that; isn't that the case?

22       A.    Not necessarily.  A general

23 counsel is familiar with legal until he becomes

24 familiar with the actual work that you

25 performed, the actual nature of the work.

1                    Burton T. Fried

2    General counsel wouldn't necessarily be familiar

3    with productivity of a labor force, availability

4    of a labor force, of whether we have a schedule,

5    a schedule, whether -- those kinds of decisions

6    are made with somebody who not only knows the

7    business but is also familiar with legal.

8              So I was a cross-section.  Now if

9    you want to question whether a counsel can do

10   that, yes.  Can a counsel do it as effectively

11   as I can, a counsel may say yes.  I say no, but

12   that -- you're questioning me as to who can do

13   it.  I can have a project manager do the same

14   thing, but he's not going to do it as

15   effectively as me.

16             Q.    I guess the better question is --

17             A.    So you're not questioning whether

18   I should -- I'm not questioning whether I should

19   do it or not.  This was presented by saying I

20   did it, and I did it at the request of Bob

21   McNamara.  If you're suggesting that I shouldn't

22   do it, then that was the prerogative of Scott

23   State to say, "Don't do it."

24             Q.    That's right, and you took that

25   prerogative, right?

1                      Burton T. Fried

2        A.      That would be his decision.

3        Q.      That's right.

4        A.      I was presenting to him what I

5   did.  Anyone can do any of these things.

6   Whether they could do it as well as I, I have my

7   opinion, other people have their opinion.

8                      But the bottom line is that we

9   were the most successful company in America in

10   what we did and the most profitable.  And it was

11   performing --

12        Q.      Mr. --

13        A.      I'm sorry, please don't interrupt

14   me.

15        Q.      Well, I understand --

16        A.      No, I don't want you to interrupt

17   me if I'm finishing -- if I'm answering your

18   question.

19        Q.      Well, then finish, because I have

20   a lot more questions for you.

21        A.      Yeah, but I want to answer your

22   question.

23        Q.      Answer.  Go ahead.

24        A.      The point is we were successful at

25   LVI in following a certain culture and

1                          Burton T. Fried

2    performing certain tasks.  If Mr. State wanted

3    to perform it, that was his prerogative.  I

4    wasn't telling him that I must perform these

5    tasks.  I'm telling him that historically I did

6    perform these tasks, "which do you want me to

7    perform and which do you not."  His response

8    was, "Because of your age, I'm firing you."

9    That's an act of age discrimination having

10   nothing to do with who's more qualified.

11                 In fact, he chose not to do these.

12   He ultimately determined that other people

13   throughout the company were to do these and he

14   in fact didn't make the selection.  He asked

15   other people to tell him who was qualified to do

16   these.

17                 So he was making a decision that

18   he wanted me out because of my age, having no

19   frame of reference to my qualifications of who

20   could best do it for LVI, but simply he didn't

21   want me to do it and he wanted me out because of

22   his age -- my age.

23        Q.    So Mr. State delegated those to

24   other people; is that correct?

25        A.    I'm told, and I have noticed in

1                     Burton T. Fried

2    other e-mails that he asked John Leonard, even

3    before he met with me, before he met with me,

4    who can handle these responsibilities.

5          Q.    Who under management?

6          A.    John Leonard then wrote him and

7    said who can handle it.

8          Q.    Right.  And was that not within

9    his province as CEO to do?

10         A.    Absolutely.

11         Q.    Why would it have anything to do

12   with age discrimination?

13         A.    Because he was -- told me he's

14   taking it away from me because of my age.

15         Q.    He didn't say that.  What did he

16   say?

17         A.    Well, you weren't there.

18              MR. WIGDOR:  Objection, objection,

19              argumentative.

20         Q.    Tell me -- tell me.

21              MR. WIGDOR:  He already said three

22              times what he said.

23         Q.    All right.  And from what I

24   understand, that's not what he said according to

25   your testimony of what his statement was.   I

1                    Burton T. Fried

2  mean, tell me again.  Maybe I misunderstood what

3  it is that he told you, but you said it three

4  times here, and that is not what you said that

5  he said to you.

6                    MR. WIGDOR:  Objection.

7         Q.     You said, "I'm 70 years old, how

8  much longer do you want to do this."  That

9  doesn't say, "You're old, I'm getting -- I'm,

10  you know, getting rid of you."

11        A.     Counselor, you're paraphrasing

12  what I said.  You're not stating accurately what

13  he said and the record speaks for itself.  And

14  the repetition of that, without objection by

15  every single member of the board on telephone

16  and in front of him, without objection, without

17  denial, without denial by Mr. State that "That's

18  not what I said" -- you're saying he didn't say

19  it.  I'm saying he said it, and I repeated that

20  in front of him before a large boardroom, in

21  front of Jeffrey Smith, who was there as

22  secretary so maybe he has the notes, saying that

23  that's what he said to me, and he didn't say --

24  he didn't deny it.

25                    So you can deny what he said but

                Elisa Dreier Reporting Corp. (212) 557-5558
                   950 Third Avenue, New York, NY 10022

194

1                    Burton T. Fried

2    nobody has, to this date, but you.

3         Q.    Tell me again one more time the

4    sentence he said to you.  I just want to make

5    sure we have it 100 percent clear on the record.

6         A.    After he told me that he's

7    reassigning all the responsibilities, my

8    responsibilities to others, and within 60 to 90

9    days he'll determine what, if anything else, I

10   have to do, there is for me to do, and related

11   the conversation about "We have to plan for the

12   future and what if you get hit by a bus," I

13   asked him, "Why are you doing this?"  His answer

14   was, "Burt, you're 71 years of age, how much

15   longer do you expect to work?"

16        Q.    That was the sum of the statement?

17        A.    Quote-unquote.

18        Q.    Okay.  Let's talk a little bit

19   about those telephone conversations you say that

20   you had subsequent to this meeting.  You say the

21   first one, I believe, was with Mr. Simmons?

22        A.    No.  The first one was calling

23   counsel for advice.

24        Q.    Okay.  Barring that one, what was

25   the first one that we can talk about?

            Elisa Dreier Reporting Corp. (212) 557-5558
               950 Third Avenue, New York, NY 10022

```
 1                  Burton T. Fried

 2        A.    Mr. Bagaria.

 3        Q.    So the first person you thought to

 4   call was Mr. Bagaria?

 5        A.    Yes.

 6        Q.    Okay.  And how long was the

 7   telephone conversation?

 8        A.    I don't remember, 10-15 minutes.

 9        Q.    And did you speak with him about

10   the background of what the conversation was

11   between you and Mr. State, the areas of

12   responsibility?

13        A.    I didn't detail the

14   responsibilities but I described the nature of

15   the meeting.

16        Q.    And did you describe to him

17   Scott's intent to transfer those

18   responsibilities to other people?

19        A.    Yes.

20        Q.    Did you explain to him the comment

21   that you've just told me?

22        A.    Yes.

23        Q.    And what was Mr. Bagaria's

24   reaction?

25        A.    "Scott State is the CEO and I
```

                         Burton T. Fried

1    support whatever he does."

2        Q.    Did you tell Mr. Bagaria that you

3    believed that statement was in violation of age

4    discrimination statutes?

5        A.    I said there was something illegal

6    about that insofar as using age as a reason for

7    the assignment.

8        Q.    What did Mr. Bagaria say to that?

9        A.    He said, "I continue to support

10   Scott State in whatever he does."

11       Q.    Did you say anything else to

12   Mr. Bagaria?

13       A.    Not that I recall.

14       Q.    And the second conversation was

15   with whom?

16       A.    With Brian Simmons.

17       Q.    And how much after the

18   conversation with Mr. Bagaria did you speak to

19   Mr. Simmons?

20       A.    It might have been a day or two.

21       Q.    And what did you tell

22   Mr. Bagaria -- I mean Mr. Simmons, sorry.

23       A.    I related the same conversation

24   that I had related to Mr. Bagaria.

        Elisa Dreier Reporting Corp. (212) 557-5558
           950 Third Avenue, New York, NY 10022

1                    Burton T. Fried

2         Q.     Word for word?

3         A.     Absolutely.

4         Q.     So you told him about the

5    responsibilities, you told him about Mr. State's

6    response to those, about the statement that

7    Mr. State made?

8         A.     Yes.

9         Q.     And that you felt that this was in

10   some way discriminatory on the basis of age?

11        A.     Yes.

12        Q.     And what was Mr. Simmons' response

13   to you?

14        A.     At first he said -- he sounded as

15   if he was surprised and he'll somehow figure out

16   a solution to this, but then he said, "You know,

17   Scott State is the CEO and we have to support

18   whatever he wants to do."

19        Q.     Did you say anything to him back

20   when he said that?

21        A.     No.  He said to me that he would

22   speak to other directors and get back to me.

23        Q.     Did you ask him to forward your

24   list of chairman responsibilities to the rest of

25   the board?

1                    Burton T. Fried

2          A.    Yes.

3          Q.    Did you ask him to address this

4    issue at the board of directors meeting on

5    November 4th?

6          A.    No.  I said to him I would forward

7    him the list.  He asked is it okay to send it to

8    the other directors.  I said absolutely.

9          Q.    Anything else that you remember

10   about the conversation with Mr. Simmons?

11         A.    No.

12         Q.    Was there anybody, by the way, in

13   the room with you when you were making these

14   telephone conversations that we're going to talk

15   about?

16         A.    Intentionally not.

17         Q.    Anybody within earshot?

18         A.    Could be, but I mean, I wasn't in

19   a soundproof room but I didn't have anyone there

20   as a witness as to what I was telling to anyone,

21   because at the moment there was no final

22   decision in this matter and, you know, stuff

23   like this goes out like wild fire and causes

24   distraction and unrest, and there was no reason

25   for that.

1                         Burton T. Fried

2           Q.      And was this in your office in

3    Westport?

4           A.      Yes.

5           Q.      Were all these calls on the same

6    day?

7           A.      No.

8           Q.      Anything else that you remember

9    about the communication with Simmons?

10          A.      Not necessarily.  I mean, he could

11   have been calling me back.  I mean, you know, it

12   wasn't as if I called him -- in fact, it was a

13   case that I called him and he wasn't there and

14   he did call me back.  So, you know, not

15   necessarily the call I made to him and he picked

16   up the phone, but that was essentially what

17   occurred.

18                  And then it was a few days later

19   that I got a call or John Schnabel sent me an

20   e-mail and asked me to call him.  I don't recall

21   which way it went.

22          Q.      Did Mr. Schnabel ask you to call

23   him or did you ask Mr. Schnabel to call you, do

24   you remember?

25          A.      I spoke to him.  He wasn't there

Burton T. Fried

1    the first time that I reached out to him and

2    left a message.

3

4          Q.     What do you remember about your

5    conversation with Mr. Schnabel?

6          A.     It was identical.

7          Q.     Same exact thing?

8          A.     Same exact thing.

9          Q.     What was Mr. Schnabel's reaction?

10         A.     Shock.

11         Q.     Tell me, how do you express shock

12   over the telephone?

13         A.     He expressed that's unbelievable.

14   In so many words, these people are a bunch of

15   idiots.  I don't know if he used the word

16   "idiots," but something similar.

17                "The whole purpose of making this

18   investment, a critical element in my making this

19   investment, was your continuity in the

20   management of the business and your presence.

21   I'm going to straighten this out.  I oppose this

22   and I'll get back to you."

23         Q.     And then you may have testified to

24   this already, but refresh my recollection, did

25   he get back to you?

                      Burton T. Fried

1

2        A.    He -- I don't know that he did.   I

3   think the next time I saw him might have been at

4   a -- next time I saw him was probably at the

5   board meeting.  I may have even not been able to

6   reach him and might have sent him an e-mail

7   describing what happened and what I wanted to

8   talk to him about, but he was the last one.   He

9   might have been the first one I called because I

10  couldn't understand how he could support that,

11  since before he made the decision to make the

12  investment to buy debt of the company he called

13  me and said I was the last item on his due

14  diligence and wanted to get my opinion.  And we

15  had a longstanding relationship of success, so I

16  couldn't understand how he would be involved in

17  that.

18       Q.    Did you send him an e-mail that

19  you know of?

20       A.    I don't remember.

21       Q.    Did you find it in any of your

22  e-mails at home?

23       A.    I haven't yet seen it, but I'm not

24  certain.

25             But in any event, the next contact

```
 1                    Burton T. Fried
 2   I received, it was from Brian Simmons.
 3            Q.    Okay.  This was still before the
 4   board of directors meeting?
 5            A.    Yeah.
 6            Q.    Okay.  What was that contact?
 7            A.    He sent me an e-mail saying he had
 8   spoken to the board members and it was best for
 9   the company that I be terminated, best for the
10   company, best for the company that I be
11   terminated and that "We would offer you a
12   consulting agreement but you'll no longer be an
13   employee of Services and you'll be a consultant
14   for LVI Parent."
15            Q.    I'm sorry?
16            A.    LVI Parent.  "You'll be a
17   consultant," and that we should discuss it at a
18   board meeting that was to take place in a couple
19   of days.
20            Q.    Anything else Mr. Simmons said to
21   you in that phone conversation?
22            A.    That was in an e-mail.
23            Q.    Okay.  Did you follow up with a
24   phone conversation?
25            A.    No.
```

```
1                   Burton T. Fried
2              MS. SELTZER:  Can you mark this,
3         please.
4              (E-mail string, first one dated
5         November 3, 2010, marked Fried Exhibit
6         15 for identification.)
7              MS. SELTZER:  Let the record
8         reflect that Exhibit 15 is an e-mail
9         from Brian Simmons to Burton Fried,
10        November 3rd, 2010, LVI 1375 to 77.
11             Q.    Do you remember this e-mail?
12             A.    Yes.
13             Q.    Is that e-mail that begins in the
14   second half of the first page and bridges into
15   the second page the e-mail that you were
16   referring to?
17             A.    Yes.
18             Q.    And this came on November 2nd,
19   2010.  Does that clarify for when you might have
20   had the telephone conversation with Mr. Simmons?
21             A.    I had the conversation preceding
22   November 2nd.
23             Q.    So somewhere between November 2nd
24   and the meeting of October 19th?
25             A.    Yeah.
```

204

                        Burton T. Fried

1

2        Q.      Do you have any record of that

3    conversation?  Did you write it on your

4    calendar, did you put it in your Outlook?

5        A.      No.

6        Q.      Did you have any record of any of

7    the conversations that you had with Mr. Bagaria

8    or Mr. Schnabel?

9        A.      I didn't maintain the telephone

10   log.

11       Q.      When you spoke to Mr. Simmons, did

12   you call him in his office?

13       A.      I would only call him in his

14   office and leave him a message if he wasn't

15   there.

16       Q.      And Mr. Bagaria, did you call him

17   over at the Apollo offices?

18       A.      Absolutely, that's where he

19   worked.

20       Q.      And Mr. Schnabel?

21       A.      At his office at Falcon.

22       Q.      Now, in this e-mail Mr. Simmons

23   says to you at the tail end of that e-mail,

24   "Please give me a call if you want to discuss

25   and let me know if you desire a closed board

              Elisa Dreier Reporting Corp. (212) 557-5558
                 950 Third Avenue, New York, NY 10022

                          Burton T. Fried

1
2    session on November 4th."

3                    Do you see that it's in the second

4    page, the last sentence in Mr. Simmons' e-mail?

5         A.    Yeah.

6         Q.    And you respond, "Brian, I'm

7    prepared to discuss this matter at tomorrow's

8    board meeting."

9         A.    Yes.

10        Q.    You didn't want to talk to

11   Mr. Simmons before the board meeting about this?

12        A.    No.

13        Q.    Why?

14        A.    There's no point.

15        Q.    Why?

16        A.    He already knew the facts and then

17   sent me an e-mail with a bunch of nonsense as

18   the reason for taking his action, and I saw no

19   point in discussing his nonsense.

20        Q.    Can you tell me which part of

21   Mr. Simmons' e-mail is nonsense to you?

22        A.    "Your list is much more expansive

23   than what I envisioned for your duties as

24   chairman after we hired a new CEO."

25        Q.    How is that nonsense?

Burton T. Fried

1

2      A.      Because these are all the duties I

3   performed under Bob McNamara for four years at

4   his -- with his support.

5      Q.      Did Mr. Simmons know the duties

6   that you were performing under Mr. McNamara?

7      A.      Sure.  It was discussed at the --

8   at board meetings the things I was doing, not

9   necessarily that I was looking at travel

10   requests, but he knew I was involved in the

11   litigation aspect of the company.  He knew I was

12   involved in the preparation of teaming

13   agreements.  Major items he knew I was involved

14   in.  Now he's telling me it's much more

15   expansive.  I never -- he never discussed my

16   duties with me.

17      Q.      Is it possible he didn't know what

18   your duties were?

19      A.      Oh, he knew.  He used to

20   congratulate me for a great job.  He used to ask

21   me to help in difficult situations, like

22   supporting your firm in the Mazoki matter in

23   which the Mazokis were seeking $8 million, when

24   I discovered that he was acting as an informer

25   for the FBI.

Burton T. Fried

Q. Did you ever send a list like the one that you gave to Mr. State to Mr. Simmons prior to Mr. State becoming CEO?

A. No.

Q. Had there ever been a discussion in the board of directors about the proper role of the chairman?

A. No.

Q. Had you ever spoken at all about the types of responsibilities that you were doing under Mr. McNamara?

A. Yes, at board meetings. There were board meetings four times a year over a period of five years. Mr. Simmons was there amongst God knows how many other directors, with Code Hennessy and outside directors. I used to report on a variety of activities that I was engaged in. They used to ask me for a report.

Q. Were the activities that you would present to the board more having to do with projects as opposed to things like selecting outside counsel and negotiating acquisitions and monitoring air travel? Was it more the achievements that you had done as -- during the

1                    Burton T. Fried

2    period of time?

3             A.    They involved matters of

4    significance and importance to the board.   They

5    didn't deal with minutia.   Reviewing travel

6    request forms was my three-minute-a-day task

7    that I determined was important.   They wouldn't

8    be interested whether I did it or not.   And for

9    that matter, I don't know if Bob McNamara was

10   interested.

11             But matters of importance like the

12   Mazoki matter and working with counsel who you

13   had in your office earlier, major matters like

14   defense of employment liability cases that I

15   reported on, they were familiar with that.   They

16   were familiar with Squibb Demolition and my

17   negotiation and execution of a teaming

18   agreement.   I mean, I can go on and on.

19             Q.   No, I know.   But the issue is, is

20   it possible that Mr. Simmons had absolutely no

21   idea that these were the responsibilities that

22   you were -- that you were having under

23   Mr. McNamara?

24             A.   No.

25             Q.   What else do you find of

1                    Burton T. Fried

2    Mr. Simmons' e-mail that's nonsense?

3           A.      "The outline you provided for

4    chairman's duties" -- starting with that

5    sentence -- "does not seem consistent with

6    sentiments you have expressed to me over several

7    years regarding your intent when we hired Bob

8    and now Scott to be CEO."  Nonsense.

9           Q.      Why is that nonsense?

10          A.      He is just congratulating me for

11   taking over the interim CEO position and saying

12   that I'm worth every penny at $750,000 and

13   knowing what my responsibilities I did as

14   chairman, and now paying me more and saying,

15   "You're worth every penny," knowing he was

16   paying me 600,000 a year, did he think I was

17   looking at travel request forms for 600,000 a

18   year?  Or did he know that I collected

19   $8 million that he thought was unrecoverable

20   from clients of LVI that we performed work for

21   at Katrina, and was congratulating me that an

22   unbelievable job in collecting that money and

23   now I was in pursuit of the remaining

24   $2 million.

25                  He knew exactly all the major

1                         Burton T. Fried
2    events I was handling or else he wouldn't have
3    asked me to become interim CEO.  He knew my
4    capabilities, he knew the work I was doing, he
5    knew the successes that I had effected, and then
6    at the end, when this deal was finally going
7    through, congratulated me for doing an exemplary
8    job as interim CEO because the closing could
9    never have taken place but for my efforts.
10            Q.    Did Mr. Simmons believe that you
11   were in earnest when you said that you wanted to
12   let go of the day-to-day responsibilities and
13   just focus on strategic projects?
14            A.    I don't understand the question.
15            Q.    At the beginning of the deposition
16   we were talking about, when I showed you the
17   purchase -- the acquisition memorandum and it
18   showed that your intention was to move away from
19   the day-to-day responsibilities and assume more
20   of a strategic role in the organization, is it
21   possible that Mr. Simmons did not see this list
22   of responsibilities as strategic at all but more
23   as the day-to-day runnings that could be
24   delegated to the managers of a company and
25   should be delegated to the managers of a

1                     Burton T. Fried

2    company?

3          A.    He'd be lying if he said that.

4          Q.    Did Mr. State ever say that he

5    thought these were responsibilities that should

6    be delegated to people who are managers of the

7    company?

8          A.    No.  He said they should be

9    delegated because I was 71 years of age and how

10   long did I expect to work and what if I get hit

11   by a bus and they have to plan for the future.

12   That's the reason he was giving it away.

13         Q.    During the course of your

14   conversation with him on October 19th, did he

15   give you any explanation as to why, for example,

16   he wanted to take on the development

17   implementation of the new business initiatives?

18         A.    Yeah.  He felt that would be a

19   responsibility that he wanted to perform, and I

20   said fine.

21         Q.    And how about transferring some of

22   the outside counsel responsibilities and the

23   litigation responsibilities to Mr. DiCarlo, who

24   is the general counsel of the company?  Did he

25   explain why he wanted to do that?

212

1                     Burton T. Fried

2          A.     He didn't say that to me.

3          Q.     What did he say?

4          A.     He didn't say that he wanted to

5   assign that to Mr. DiCarlo.  He said he wanted

6   to assign it to other managers.

7          Q.     Did he say why he wanted to assign

8   it to other managers?

9          A.     Because of my age, I was 71 years

10  of age and how long did I have to live.

11         Q.     Is that the direct response he

12  gave you in terms -- in response to why he

13  wanted to transfer these responsibilities?

14         A.     That is my interpretation of a

15  remark of "What if you get hit by a bus, we have

16  to plan for the future."

17         Q.     It's your interpretation of the

18  remark.

19         A.     My interpretation.

20              MR. WIGDOR:  Objection.  There is

21              no question.  That's what you call

22              echoing the witness.

23              (E-mail dated October 28, 2010

24              marked Fried Exhibit 16 for

25              identification.)

1                    Burton T. Fried

2          MS. SELTZER:  Let the record show

3       that Exhibit 16 is an e-mail from Burton

4       Fried to Brian Simmons, Rajay Bagaria

5       and John Schnabel, dated October 28th,

6       2010.

7          Q.    Do you recall this e-mail?

8          A.    I do, and it states what I said to

9  you earlier in my testimony without the benefit

10  of recollection of this e-mail.

11          Q.    Tell me your purpose in sending

12  this e-mail to Mr. Simmons, Bagaria and

13  Mr. Schnabel.

14          A.    My preparation of the list

15  attached as responsibilities of the chairman was

16  not prepared for litigation.  It was prepared

17  for discussion with a new CEO at LVI.  I wanted

18  those who received this to understand the

19  protocol that was used with Bob McNamara in that

20  these responsibilities, many of which were

21  performed before Bob McNamara had the

22  opportunity to be involved in the review of a

23  project and was in the nature of risk

24  assessment, which is -- I felt that I was

25  particularly qualified to perform, as did Bob

1                    Burton T. Fried

2    McNamara, and that it was the best way to

3    maximize the time of the CEO and keep us clear

4    of legal problems.

5          Q.    Is it possible that Mr. State

6    didn't care what you did under Mr. McNamara?

7          A.    It was his prerogative.

8          Q.    Is it possible he wanted to decide

9    on his own what your role should be at LVI?

10          A.    I gave him the opportunity on

11   October 19th.

12          Q.    Is it possible that he felt it was

13   necessary to pass these responsibilities to

14   managers of LVI so they could grow into their

15   roles?

16          A.    It was his prerogative to do it,

17   but not because of my age.

18          Q.    Is it possible that that was the

19   motivation behind his wanting to shift your

20   responsibility to other people and it had

21   absolutely nothing to do with age, but it had to

22   do with his wanting to transition his

23   responsibilities the way he had already

24   discussed with you that he would like to do?

25               MR. WIGDOR:  Objection.

```
 1                    Burton T. Fried
 2               You can answer.
 3        A.     It had to do only with age, and
 4  other e-mails exchanged with Simmons and Hogan
 5  prior to this meeting now support that.
 6        Q.     Is it possible that part of
 7  Mr. State's motivation in transferring your
 8  responsibilities to other people was to allow
 9  his managers to do the jobs, the day-to-day
10  running of the company that you had been
11  performing?
12               MR. WIGDOR:  Objection.
13        A.     I did not perform the day-to-day
14  running of the company.
15        Q.     Is it possible that he wanted them
16  to perform the roles that you have here as
17  chairman areas of responsibility?
18               MR. WIGDOR:  Objection.
19        A.     He clearly wanted me to do it, but
20  he -- the reason he was assigning it to them
21  because he felt that I was dead wood.
22        Q.     Did he say that?
23        A.     Yes.
24        Q.     He said the term "dead wood"?
25        A.     In my -- what I heard him say was
```

1                    Burton T. Fried

2  equivalent to "dead wood" -- "how long do you

3  have to live."

4          Q.    And he said neither of those

5  things directly, did he?

6                    MR. WIGDOR:  Objection.  We've

7          been through it five times.

8                    MS. SELTZER:  Exactly, so that's

9          why I want to make sure.

10                   MR. WIGDOR:  I think it's for a

11         fact finder to interpret what he said.

12         You have one thing what he said, we have

13         another thing what he said, and that's

14         why we have juries.

15                   MS. SELTZER:  No.  This is exactly

16         the point.

17         Q.    Did Mr. State ever use the term

18  "dead wood"?

19                   MR. WIGDOR:  No, he's already said

20         no.

21         A.    I said no.

22                   MS. SELTZER:  Exactly.

23         Q.    I mean, I understand your

24  interpretation.  I just want to know factually

25  what he said to you.

1                  Burton T. Fried

2            MR. WIGDOR:  It's his

3       interpretation.  It's also a reasonable

4       interpretation.

5            MS. SELTZER:  And we're not here

6       to talk legal theories.

7            MR. WIGDOR:  You keep asking the

8       same question four times.

9            MS. SELTZER:  I have to ask the

10      same question because he keeps bringing

11      it up as something that was actually

12      said when it's his interpretation, but

13      let's not waste --

14            MR. WIGDOR:  It is an age

15      discrimination case last I checked, and

16      it's important, when somebody makes a

17      comment about age --

18      Q.   Mr. Fried --

19            MR. WIGDOR:  -- to know what the

20      interpretation is.

21      Q.   Mr. Fried, let's talk a little bit

22  about your use of age comments.  You have made a

23  statement a while back that you did use your age

24  sometimes as a source of humor or joking with

25  other people; is that correct?

```
 1                    Burton T. Fried

 2        A.    Yes, yes.

 3              MS. SELTZER:  Can you give me

 4        Exhibit 29?

 5              (E-mail dated June 30th, 2005

 6        marked Fried Exhibit 17 for

 7        identification.)

 8              MS. SELTZER:  Let the record show

 9        that Exhibit 17 is an e-mail from Burton

10        Fried to Mike Lane, dated June 30th,

11        2005, Bates stamped LVI 1898.

12        Q.    Do you remember this e-mail,

13   Mr. Fried?

14        A.    No.

15        Q.    Do you know who Mike Lane is?

16        A.    Yes.

17        Q.    Who is he?

18        A.    On the date of this e-mail it was

19   pre-Katrina and he was co-chief operating

20   officer.

21        Q.    So he was a member of LVI

22   management?

23        A.    Not just management.  He was -- he

24   reported directly to me.

25        Q.    Do you know how old Mr. Lane is?
```

1                    Burton T. Fried

2          A.    Actually, he reported directly to

3    Bob McNamara at this point but we had a very

4    close relationship.

5          Q.    Do you know how old Mr. Lane is?

6          A.    He was probably at that time in

7    his late 40's, just like Mr. State now is about

8    47.  I think he was about that age.

9          Q.    So about the same age as

10   Mr. State?

11         A.    He was that age then as Mr. State

12   is currently.

13         Q.    And he says to you, writes to you,

14   "You're up early this morning.  A man of your

15   age needs his sleep."

16               Do you consider that to be a

17   comment about your age?

18         A.    No.  It was a joke.

19         Q.    And you responded back to him,

20   "With you on vacation how can an old man like me

21   sleep?"

22               That was a joke?

23         A.    We had a very close relationship.

24   We worked together for years.  We went through

25   thick and thin together and we used to extend a

1                      Burton T. Fried

2    lot of levity between each other.

3          Q.    Is there any possible way that

4    Mr. State's comment to you was tongue-in-cheek?

5          A.    No.

6          Q.    Why?

7          A.    He was serious, and he was serious

8    when he made this statement to me and he didn't

9    retract it and nor did anyone after that, any of

10   the three board members retract it, nor did he

11   retract it on the February 4th board meeting,

12   and he had every opportunity to say, "I didn't

13   mean it that way, it was a tongue-in-cheek."

14   And all the board members that I mentioned got

15   up and never retracted it or criticized it.   And

16   outside the boardroom, when I was with State

17   alone, he never retracted it and never

18   apologized, never said it was a mistake, never

19   said anything of the nature, and so it was never

20   a tongue-in-cheek.

21                (E-mail string, first one dated

22                June 23, 2006, marked Fried Exhibit 18

23                for identification.)

24                MS. SELTZER:   Let the record show

25                that Exhibit 18 is an e-mail from Burton

221

Burton T. Fried

1            Fried to Brian Simmons dated June 23rd,

2            2006, Bates stamped LVI 1928 through 31.

3        Q.    Look at the attachment, Mr. Fried.

4   I want to ask you a question about that.

5        A.    Yes.

6        Q.    Did you approve the press release

7   that went out?

8        A.    Yes.

9        Q.    What is the reason for including

10  your age on this press release, and

11  Mr. McNamara's age?

12       A.    That would have been a public

13  relations firm.

14       Q.    Did they explain to you why they

15  wanted to put your ages in a press release?

16       A.    I never asked them.

17       Q.    Did it bother you that they put

18  your age in the press release?

19       A.    I have nothing to be embarrassed

20  about.  I'm a senior citizen.

21       Q.    If you look at the e-mail itself,

22  Mr. Simmons writes to you on June 23rd, 2006, he

23  says, "Use as you wish.  FYI, I didn't realize

24  you were only 66.  I thought it was 67.  Had I

222

1                    Burton T. Fried

2   known, we would not have allowed you to retire."

3                    And you respond, "I may look 67

4   but I'm really a young 66."

5                    Did you know Mr. Simmons for years

6   and years and had a close relationship with him?

7          A.    I had known Mr. Simmons for about

8   a year.

9          Q.    Did you have the kind of

10  relationship you had with Mr. Lane, where you

11  wouldn't have taken offense at his using your

12  age in this --

13         A.    In the context of which he was

14  making this comment, which is referring to a

15  press release and referring to Bob McNamara

16  taking over the day-to-day responsibilities and

17  his reference to my retiring being no longer

18  CEO, it was a joke.  You have to have a sense of

19  humor when somebody says that in the context of

20  which it was mentioned.

21         Q.    Did you believe that Mr. Simmons

22  was implying here that if you were 67, you

23  should have -- if you were 66, you wouldn't have

24  been retired, but 67 you would have?

25         A.    I couldn't read his mind.

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

223

1                    Burton T. Fried

2          Q.    Did you think this was an ageist

3    comment from Mr. Simmons?

4          A.    It might have been, but I

5    didn't -- I wasn't offended.

6          Q.    And yet you were offended by

7    Mr. State's comment, which is somewhat similar

8    to this action?

9                MR. WIGDOR:  Objection.  Come on.

10            You want to ask a real question?

11                MS. SELTZER:  Yeah, that is a real

12            question.

13         Q.    You were offended by Mr. State's

14   comment?

15                MR. WIGDOR:  That's not what you

16            asked.  You interject.  It's an opinion.

17                MS. SELTZER:  Which is similar to

18            this, because he's talking about --

19                MR. WIGDOR:  Why don't you reask

20            the question.  What's the question?

21                MS. SELTZER:  I don't need to.

22                Reread it back.

23                MR. WIGDOR:  Well, the

24            second-to-last question you are

25            withdrawing and you're going to stick

```
1                   Burton T. Fried
2          with the last question?
3               MS. SELTZER:  No, I'm going to
4          stick with the last question.
5               MR. WIGDOR:  The last question is
6          okay because you rephrased it.
7               MS. SELTZER:  Okay.
8               MR. WIGDOR:  Can you read back the
9          last question, second-to-last question,
10         just so I make sure -- it was the
11         second-to-last question I had a problem.
12              (Record read.)
13              MR. WIGDOR:  Yeah.  I'm objecting
14         to the form of the question.
15         Q.    You can still answer.
16              MR. WIGDOR:  If you can answer
17         that question.
18         A.    It was not the same remark.  It
19    was not in the same context and it was in
20    relation to taking away all my duties, and so,
21    yes, I was offended.
22         Q.    Did you think Mr. Simmons here was
23    implying that at 67 you ought to retire?
24         A.    No, but he was making an ageist
25    remark that I let go by.
```

1                         Burton T. Fried

2          Q.      Did you report this ageist remark

3    to anybody?

4          A.      I didn't feel offended, as I said

5    to you, so I didn't, I didn't report it to

6    anyone.  It had no impact on me.  It related to

7    my taking over as chairman duties, and I think

8    it was more of a compliment because he was

9    indicating that maybe I should have stayed on as

10   CEO and now I had the duties of chairman.

11              I think he had a great deal of

12   respect for my duties at the time, and my

13   accomplishments.  He had just bought the

14   company.  He was basing his purchase based upon

15   my accomplishments.  So I don't think he was

16   making a derogatory remark at the time.

17         Q.      Was there an HR director or

18   manager at this time?

19         A.      We had one for a period of time, a

20   very short period of time.  We never really had

21   one.

22         Q.      Do you have one now?

23         A.      No, unless Mr. State decided to

24   hire one.

25         Q.      And so you didn't think that this

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

```
 1                    Burton T. Fried

 2   was serious enough to take to the attention of

 3   anybody in the company?

 4         A.    No.  I wasn't injured.

 5         Q.    Does an ageist remark have to

 6   injure in order to be ageist?

 7               MR. WIGDOR:  Objection.

 8         A.    You're the attorney, Counselor.

 9   Don't ask me for a legal opinion.

10         Q.    You're an attorney, too,

11   Mr. Fried.

12         A.    But you're an employment

13   specialist.

14         Q.    Okay.  Let's not -- the time that

15   you sent -- that Mr. Simmons circulated your

16   chairman responsibilities to the board, did

17   anything -- between that point in time and the

18   time of the board meeting on November 4th, were

19   there any further conversations that you had

20   with anyone who was, you know, in LVI or the

21   board of directors about the upcoming board

22   meeting?

23         A.    At some point in time, and I

24   really can't tell you when.  The only other time

25   that I met a managing director of Falcon that
```

227

1                     Burton T. Fried

2   relates to this matter was at a -- at a dinner

3   relating to the closing.  He came to see me at

4   the dinner, before it started, to -- just to say

5   hello and to tell me that John Schnabel couldn't

6   attend because it was weather conditions and his

7   flight was delayed.  And just wanted to tell me

8   that this would all be straightened out and that

9   they -- they absolutely were opposed to what was

10  going on and not to be concerned about it.

11          Q.    I'm sorry, who was this again that

12  said this to you?

13          A.    Ray Fogel.

14          Q.    What was Mr. Fogel's position?

15          A.    He was a managing director of

16  Falcon and one of the active participants in the

17  negotiations for the restructuring of this

18  transaction on behalf of Falcon.

19          Q.    What did you think Mr. Fogel was

20  referring to when he was talking about things

21  working their way out?

22          A.    In that -- about stripping my

23  duties and terminating my employment.

24          Q.    Did he give you any indication of

25  how he had found out about this?

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

```
 1                    Burton T. Fried
 2          A.    I assumed he did from John
 3   Schnabel.  They're partners.
 4          Q.    Did he tell you about any
 5   conversations that he had with Mr. Schnabel?
 6          A.    Other than that he felt confident
 7   that John Schnabel would take care of it.
 8          Q.    Did you tell Mr. Fogel anything
 9   further about your conversation with Mr. State
10   on October 19th?
11          A.    No.
12          Q.    Did you tell him about Mr. State's
13   comment to you?
14          A.    No.  He was already aware of what
15   was going on.
16          Q.    Did he tell you he was aware of
17   the comment?
18          A.    He told me he was aware of the
19   problem that has arisen and that John Schnabel
20   would take care of it.
21          Q.    And by "problem" you're assuming
22   he meant the ageist remark?
23          A.    That's the only thing he was
24   talking about, was the ageist remark and the
25   removal of my duties and the act of age
```

229

1                    Burton T. Fried

2  discrimination.

3          Q.    So he could have been referring to

4  any one of those things, correct?

5          A.    He was referring to all of them.

6          Q.    How do you know that?

7          A.    Because you had to be there to

8  understand it.

9          Q.    And he said "problem," right?

10         A.    Yeah.

11         Q.    Let's talk about the meeting with

12 the board of directors on November 4th.

13         A.    Again?

14         Q.    Yup, again.

15               Was this a regularly scheduled

16 board meeting?

17         A.    Yes.  It was the first board

18 meeting.

19         Q.    Of the year?

20         A.    No, of LVI Parent.

21         Q.    So this was the first time that

22 Mr. Bagaria and Mr. Girardi were voting members

23 of the board?

24         A.    Yes.

25         Q.    Who attended that meeting, if you

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

1                    Burton T. Fried

2    remember?

3         A.      All of the directors.

4         Q.      And who would that have been at

5    that time?

6         A.      Mr. Simmons, Mr. State,

7    Mr. Bagaria, Mr. Girardi, Mr. Farucci,

8    Mr. Schnabel, Mr. Buck and myself, and other

9    people like the secretary of the meeting,

10   Jeffrey Smith, and some of the representatives

11   of Code Hennessy I think were there, and Paul

12   Cutrone and John Leonard.  I think that does it.

13        Q.      Were there various items that were

14   discussed prior to your presentation at the end

15   of the meeting?

16        A.      Yes.

17        Q.      Do you know how long the meeting

18   was held for?

19        A.      It had gone on for maybe an hour

20   and a half, two hours.

21        Q.      Did you present on anything other

22   than your responsibilities and duties at the end

23   of the board meeting?

24        A.      I may have been asked a question

25   about some matter, but I don't recall.

1                    Burton T. Fried

2          Q.     Were -- was the -- when you state

3     that the -- your statement was during part of

4     the closed board meeting, what do you mean by

5     that?

6          A.     Well, at the end of the agenda of

7     business items, those that were not board

8     members were asked to leave, with the exception

9     of Jeffrey Smith.  Although all board members

10    were asked do leave, Jeffrey Smith remained as

11    secretary because it was still a meeting of the

12    board, and that was at my request because I felt

13    it would be inflammatory to have John Leonard

14    and Cutrone there to listen to this dialogue,

15    when in fact it could have been or I had hoped

16    it would be resolved and there was no reason for

17    that to then be repeated out among the managers

18    and so forth.  And Simmons asked me if I wanted

19    it closed and I said I preferred it because of

20    that reason and he said fine.

21         Q.     What was your purpose in the

22    statement that you made to the board of

23    directors?  What did you intend to do with that

24    statement?

25         A.     If his actions had the approval of

232

1                    Burton T. Fried

2    the board.

3          Q.     So you wanted to find out if his

4    actions had the approval of the board?

5          A.     I wanted to find out if it had the

6    actions, I wanted them to be aware of what was

7    going on and whether they supported it.

8                 They had just invested tens of

9    millions of dollars into the company.  I had

10   been with the company for 24 years, I had been

11   with it in this past year, I had rescued it,

12   helped rescue it in the past six months so they

13   could do a restructuring and make the

14   investment.  It was my obligation to present to

15   them these facts and for them to determine if in

16   fact they supported the actions of Scott State.

17         Q.     Which members of the board of

18   directors were in this closed meeting?

19         A.     All.

20         Q.     So that would have been

21   Mr. Bagaria, Mr. Girardi, Mr. Schnabel,

22   Mr. Simmons?

23         A.     Yes.

24         Q.     You, Mr. State were there?

25         A.     Yes, Mr. Farucci, Mr. Buck.

233

Burton T. Fried

2          Q.     Had you, by the way, reached out

3     to Mr. Farucci or Mr. Buck after the meeting but

4     before the board of directors -- after your

5     meeting with Scott State but before the board of

6     directors meeting on November 14?

7          A.     I don't remember speaking to

8     Mr. Buck.  I don't think I did.

9                 I may have spoken to Mr. Farucci.

10    I don't recall that I did, frankly.  I think I

11    limited it to those people.  I don't -- I don't

12    think I spoke -- I had spoken to Mr. Farucci

13    about other matters.  I don't think in this

14    period of time I spoke to him about this matter.

15         Q.     By the way, other than the members

16    of the board of directors, did you call any

17    members of LVI management with respect to the

18    comment made by Mr. State?

19         A.     I don't believe I did, and the

20    only person that I know I did speak to was John

21    Leonard, and I believe that was after the board

22    meeting.

23         Q.     I just want to focus on before the

24    board meeting.

25         A.     I'm trying to focus on it and then

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

234

```
 1                    Burton T. Fried
 2   eliminate him from someone who I spoke to before
 3   the board meeting.  I don't believe I did.
 4           Q.    So you didn't speak to Paul
 5   Cutrone about it?
 6           A.    No.
 7           Q.    You didn't speak to your general
 8   counsel about it?
 9           A.    I don't believe I did.
10           Q.    Any reason why you didn't approach
11   anyone within the company with respect to an
12   ageist comment that was made to you by the CEO?
13           A.    I believed that he was unstable.
14           Q.    Who was unstable?
15           A.    Scott State, and it would serve no
16   purpose for me to let other members of
17   management know what was going on and what he
18   was doing within a couple of weeks in his
19   current state, after just taking over the CEO
20   position, and if it could be resolved quietly
21   and without any further complaint by me, it was
22   best for LVI that it be put to bed by the board
23   meeting, which was a short period of time after
24   my conversation with him.
25           Q.    What led you to think Mr. State
```

1                  Burton T. Fried

2  was unstable?

3          A.    I don't believe that any new

4  executive CEO, within weeks of coming aboard,

5  would make an ageist remark to a -- an executive

6  who had been the founder of the company and had

7  built it to a preeminent position and along the

8  way sold it three times to private equity funds

9  who enjoyed the benefits and applauded my

10  efforts, and then would not only seek to take

11  away my responsibilities and terminate me, but

12  use an ageist remark.

13                A senior executive who is

14  experienced doesn't do things like that, and I

15  couldn't figure out why he did it.  And clearly

16  my interest, since I invested a million dollars

17  into the company and I was owed $1.6 million,

18  was to get this resolved so the company goes on,

19  in a most difficult period of time in the worst

20  economy it was working on since the depression.

21                So I had no personal vendetta or

22  interest to make more of this than it was, in

23  the hope that it could be resolved.

24          Q.    If you were to separate the

25  transfer of your responsibilities from the

        Elisa Dreier Reporting Corp. (212) 557-5558
            950 Third Avenue, New York, NY 10022

1                       Burton T. Fried

2    remark that he made, did you think that his

3    decision to transfer your responsibilities to

4    other members of management to be an unstable

5    act?

6                    MR. WIGDOR:   Objection.

7          A.     It's not something an intelligent

8    CEO, an experienced CEO, would do two weeks

9    after he came aboard without going over item by

10   item to determine and evaluate the value added

11   that the executive -- or the lack of value that

12   an executive was contributing to each and every

13   single item on the list, as opposed to making an

14   ageist remark and saying, "How long do you have

15   to work."

16         Q.     Let me ask you again, because from

17   what I'm hearing from you, we obviously don't

18   agree with the decision, but you did make a

19   statement that you thought him to be unstable.

20                Is that -- is his opting to

21   transfer your job responsibilities to another

22   member of his management, do you consider that

23   an unstable act of a person who just becomes a

24   CEO of a company?

25         A.     I think it's his prerogative but I

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

1                       Burton T. Fried

2    think it's after careful review and

3    consideration of the individual items of

4    performance that I had on the list.

5                No one -- Scott State, who was

6    then 47 years old, not Brian Simmons, who was

7    then probably around 50, nothing, not Rajay

8    Bagaria, who was 34, not Girardi, who was

9    probably around 50, none of them, I believe,

10   would have performed such a -- none of them,

11   other than what State was doing, would have gone

12   about in -- being in a similar situation, gone

13   about in performing that.

14               And their support of State was a

15   cause of consternation for me and cause of

16   suffering ever since it occurred.  And I think

17   about it, frankly, every single day, the very

18   issue that you're raising as to how can somebody

19   who is stable do something like that.  And I

20   haven't, since November 4th, figured out, or

21   October 9th -- 19th, figured out how someone in

22   his position, that we just hired, who came to me

23   and asked me to put his name in, who I worked

24   with most recently on two -- trying to secure

25   two $20 million projects, and I secured the

238

```
 1                    Burton T. Fried
 2  bonds for him, could turn around, without
 3  comment, within a couple of weeks and not only
 4  perform that, say that he's doing that, but
 5  doing it because of my age.
 6                    You know what?  I have suffered
 7  terribly since then, both personally and
 8  professionally, but the worst of it, I think, is
 9  not my damage, which I think is permanent and
10  irrevocable, I will always have the scars of
11  what he's done and the effect that's out in the
12  community with my family and friends, but what I
13  have tried to analyze countless mornings, at two
14  and three in the morning when I'm up and I can't
15  sleep thinking about this, is why would a person
16  who's stable ever do something like this.  And I
17  have not come up with a solution.
18           Q.    You mentioned a second ago that
19  you didn't think that any of the individuals,
20  the other board members, would have made a
21  decision like that.  How do you know that?
22           A.    I don't think anybody stable
23  would, and I have to assume they're stable.
24           Q.    So you don't think -- so you think
25  in order for a CEO to transfer responsibilities
```

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

```
 1                    Burton T. Fried
 2   from one manager, from one person to other
 3   people, is an unstable act?
 4              MR. WIGDOR:  Objection, objection.
 5              You want to hear the entire testimony
 6              again?  That's not what he said.
 7              MS. SELTZER:  No, I'm just asking.
 8         A.    You're taking my comment in
 9   piecemeal to suit your own purposes.
10   Fortunately -- fortunately, the jury will hear
11   my entire answer.
12         Q.    So tell me why you believe that --
13   and once again putting aside the statement, just
14   focusing on the action, which is the transfer of
15   these responsibilities from you to other members
16   of management, do you think that that is out of
17   the realm of a CEO's job duties --
18         A.    No.
19         Q.    -- to transfer others --
20         A.    No, not out of his job duties.
21   Taking it as a whole, his entire statement to
22   me, together with the ageist remark, after three
23   weeks on the job, talking to an executive who
24   has been with the company for 24 years and built
25   it to where it is, including the wars of the
```

1                    Burton T. Fried

2   last six months, knowing what -- that there is

3   no other company in the nation like ours and it

4   happened under my leadership, and there isn't

5   any question -- nobody throughout this entire

6   period of time questioned my leadership or my

7   accomplishments or my results as a result of

8   being president, CEO, then chairman, then

9   interim CEO and then chairman again.  Nobody

10  questioned or criticized one single act on my

11  part, one single event, one single performance.

12  Nobody, no board of director, nobody at the

13  board of directors meeting, nothing before the

14  meeting, nothing after the meeting, nothing in

15  any correspondence as to why this even was

16  happening and why I was being terminated.

17  Nobody criticized or gave any other explanation

18  for the termination of -- because of

19  non-performance.

20                    The only thing that remained and

21  the only thing that was repeated over and over

22  and over and over again was the connection of

23  the ageist remark with respect to the

24  reassignment of my duties.

25                    So, Counselor, if you want to

241

1                    Burton T. Fried

2   separate, you may, the assignment of duties.   Is

3   that a proper purview of a CEO, absolutely.   But

4   taken in the context of the situation, I don't

5   believe that's a stable act.

6          Q.     You just mentioned a second ago

7   non-performance.   Do you think that anything

8   happened with respect to the transfer of these

9   responsibilities had anything to do with your

10  ability to perform?

11                 MR. WIGDOR:   Objection.

12         Q.     Do you think that Mr. State --

13         A.     I don't understand your question.

14         Q.     Let me rephrase it.

15                 Do you believe that Mr. State

16  believed that you were incapable of performing

17  these responsibilities?

18         A.     I don't know what he thought.   He

19  never expressed anything to me and never

20  discussed any single issue other than taking

21  over the acquisition responsibility.

22                 THE VIDEOGRAPHER:   The time is

23         4:05 p.m.   We're going off the record.

24                 (An off-the-record discussion took

25         place.)

242

```
 1                    Burton T. Fried
 2              (A recess was taken.)
 3              THE VIDEOGRAPHER:  The time is
 4         4:15 p.m., May 20th, 2011.  This is tape
 5         number four in the videotaped deposition
 6         of Mr. Burton T. Fried.
 7  BY MS. SELTZER:
 8         Q.    Just a couple of more questions
 9  about the board meeting.
10              Did Mr. State make any statements
11  prior to your making a statement?
12         A.    No.
13         Q.    Did anybody make a statement prior
14  to your making a statement in that closed-door
15  meeting?
16         A.    Mr. Simmons might have introduced
17  the subject.
18         Q.    Do you remember what Mr. Simmons
19  said?
20         A.    No.
21         Q.    And nobody else said anything
22  prior to your beginning to speak?
23         A.    No.
24         Q.    Do you know approximately how long
25  your speech was?
```

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

243

1                    Burton T. Fried

2          A.    No.   I have no idea.   Certainly

3    within a half an hour.

4          Q.    And did people talk while you were

5    talking?  Did they interrupt or did they make

6    comments during the course of your speech?

7          A.    Complete silence.

8          Q.    After you were concluded with your

9    speech, did anybody say anything?

10         A.    Yes.

11         Q.    What do you remember?

12         A.    There were comments, first

13   Mr. Bagaria and then Mr. -- let's see,

14   Mr. Girardi, then Mr. Simmons, then Mr. Farucci,

15   in between there might have been a statement by

16   Mr. Hogan, and that was it.

17         Q.    We'll get to these in one second,

18   but let me ask you one question more about your

19   statement.

20               Did you ever make any statement

21   during the course of your speech that you were

22   going to contact the sureties to ruin the

23   relationship with the sureties and LVI Services?

24         A.    Can you repeat the question,

25   please.

Elisa Dreier Reporting Corp. (212) 557-5558
         950 Third Avenue, New York, NY 10022

244

1                    Burton T. Fried

2          Q.    Sure.   During the course of your

3    speech, did you make any statement that you were

4    going to contact the sureties to make sure they

5    wouldn't do business with LVI anymore or that

6    would ruin the relationship between the sureties

7    and LVI?

8          A.    No.

9          Q.    Anything in sum and substance like

10   that?

11         A.    No.

12         Q.    Any mention of the sureties at

13   all?

14         A.    Yes.

15         Q.    Tell me what you remember saying

16   about the sureties.

17         A.    I mentioned that I enjoyed and

18   maintained the relationship with the surety for

19   the past ten years, which was, I believe, a

20   significant reason for the maintenance of a

21   $200 million line of credit with LVI.   And that

22   I had no interest to be a figurehead, as

23   proposed, of a company.

24         Q.    Is that the only thing you

25   remember saying about the surety?

245

```
 1                   Burton T. Fried
 2              MR. WIGDOR:  I don't think he was
 3         done.
 4              MS. SELTZER:  I'm sorry, there was
 5         a pause.
 6              MR. WIGDOR:  If you just look, you
 7         can see he's still speaking.  You've
 8         done it a number of time.
 9              But just continue.  You're looking
10         down, that's why.
11         Q.   Go ahead.
12         A.   I had -- I'm sorry, I lost my
13    train of thought.
14              MR. WIGDOR:  You were going
15         through the conversation about the
16         surety.
17         A.   I indicated that the 200 million
18    line was critical to the success of the
19    business.  It had been maintained with Arch,
20    A-r-c-h, and that the relationship with Arch is
21    a period of ten years with whom I had that
22    relationship, Arch and its predecessor, and that
23    I had no interest in being a figurehead, simply
24    to act in a way to give them a false impression
25    that I was involved in the risk management of
```

```
 1                    Burton T. Fried
 2  the business, which was a critical factor for
 3  them, and that I would absolutely, of necessity,
 4  have to tell them so as not to commit fraud,
 5  that if in fact they proceeded in taking away
 6  those responsibilities, to advise them that I
 7  was no longer handling that responsibility.
 8         Q.    Which responsibility is that?
 9         A.    Risk management that's listed in
10  the responsibilities listing that's in the
11  exhibit.
12         Q.    Did you believe that by telling
13  Arch that, that would have prompted them to back
14  away from LVI in terms of doing business?
15         A.    Not necessarily, no.  And in fact,
16  they asked Richard Farucci that question and his
17  response was I -- "You have to understand that
18  Burt Fried is the grandfather -- is considered
19  the grandfather of the industry and there
20  certainly has to be a reaction from the surety
21  to that, but that I feel confident that I could
22  hold everything in place."
23         Q.    Did you feel that using --
24  Mr. Farucci using the term "grandfather of the
25  industry" to be an ageist comment?
```

1                      Burton T. Fried

2          A.    No.  I have been involved in the

3   business for 24 years, from the time that the

4   industry really began.  It began something prior

5   to that, but regulation really in '86, and I

6   consider that to be a statement -- I never heard

7   anybody say that before but I wasn't offended.

8   And that it was Mr. Hogan --

9          Q.    Before -- I'm sorry, I just want

10  to put that in context.

11               So Mr. Farucci's comment about you

12  being the grandfather of the industry was the

13  comment that he made after your speech?  Is that

14  what he said?

15         A.    In response to a question from

16  Mr. Simmons whether it would affect the surety

17  relationship.

18         Q.    And this was after your speech?

19         A.    Yes.

20         Q.    Was Mr. Simmons saying that

21  because you had made some statement that you

22  were going to tell them that you were no longer

23  handling the risk?

24         A.    I said it was my obligation, so as

25  they were not misled and defrauded, to tell

1                    Burton T. Fried

2    them, and that was his comment.

3                    And then Mr. Hogan made one

4    comment, and he said, "I'm sure when that

5    occurred" -- this was his statement.  "I'm sure

6    when that occurred, Mr. Fried would introduce

7    Mr. State as the person who would be

8    responsible, a new CEO," because while Mr. State

9    visited offices, he never had yet thought it

10   important enough to visit the surety.  And I

11   said, "By all means, I would be happy to

12   introduce Mr. State."  Not happy, but I would --

13   I think I said I would introduce Mr. State as

14   the new CEO.

15             Q.    Do you remember what Mr. Bagaria's

16   comments were after your speech?

17             A.    Highly offensive.

18             Q.    What did he say?

19             A.    He made comments that were so

20   offensive and he did it where -- while sitting

21   as close to me as -- as Mr. Wigdor is, that I

22   turned to him and said, "Please don't talk to me

23   that way."

24             Q.    What did he say?

25             A.    I don't remember what he said as

Burton T. Fried

much as I remember him getting out of his seat
and walking to the other side of the room.

Q.   So you don't remember what this
very offensive thing he said was?

A.   It was along the lines of being
supportive of my removal, the elimination of my
duties, I had no right to comment or complain or
object to the ageist remark or to anything that
they were doing.  It was up to the board of
directors to determine my responsibilities and
if the board decided to strip me of my
responsibilities, that was final.  And some
other crude remarks, all of which I really can't
remember, except I remember it was so offensive
that I asked him not to talk to me that way.

Q.   Did he use obscenities or what do
you mean by "crude"?

A.   No, not obscenities.  Just very
critical remarks about who do I think I am.

Q.   You said a second ago that
Mr. Bagaria said -- correct me if I
misunderstood you -- that Mr. Bagaria said that
you had no right to complain about the
discriminatory remark.  Did he say that?

```
 1                    Burton T. Fried
 2          A.     No.  I said that was Girardi.
 3          Q.     Okay.  So did Mr. Bagaria say
 4    anything to you with respect to the
 5    discriminatory remark?
 6          A.     No.
 7          Q.     Okay.
 8          A.     And actually, I don't think
 9    Mr. Girardi directly specifically referred to
10    the discriminatory remarks, although said I had
11    no right to object to anything that was said to
12    me by Mr. State.  And clearly that meant to me
13    the discriminatory remarks.  But he didn't use
14    the word "discriminatory remarks."
15          Q.     So neither Mr. Bagaria nor
16    Mr. Girardi said you had no right to complain
17    about the discriminatory remark; is that
18    correct?
19          A.     No.  Their only comment was they
20    had the right to do whatever they wanted to do,
21    and they made those statements with the
22    knowledge that an act of discrimination was
23    being effected upon me.
24          Q.     Did anybody comment on the comment
25    that you related to them?
```

1                    Burton T. Fried

2        A.      Not a word.

3        Q.      Did Mr. -- what did Mr. Simmons

4   say after the speech was over?

5        A.      He said that it was the decision

6   of Mr. State to determine what my duties were,

7   so I clearly was a little confused because they

8   weren't all consistent.  It was either the

9   board -- some saying the board, the others

10  saying Mr. State.

11                He, too, didn't make any reference

12  to the discriminatory remarks other than to say

13  it was up to Mr. State and it was his duties and

14  responsibilities, he would support that, and

15  that the board would meet and then let me know

16  what their decision was.

17       Q.      Did -- you said that Mr. Schnabel

18  didn't say anything; is that correct?

19       A.      No.  Nor did Mr. Buck.

20       Q.      Nor did Mr. State?

21       A.      Nor Mr. State, nor Jeffrey Smith.

22       Q.      Anybody else say anything after

23  your speech that you remember?

24       A.      No.  Mr. Simmons then said that

25  the meeting therefore is ended.

252

```
 1                    Burton T. Fried
 2          Q.      Did you at some point during the
 3   course of the meeting step out of the conference
 4   room with Mr. State?
 5          A.      Yes.
 6          Q.      Was that after your speech?
 7          A.      Yes.
 8          Q.      Do you remember why you were asked
 9   to step outside?
10          A.      Mr. Simmons said that the board
11   wanted to discuss this alone.  In camera?
12          Q.      I don't know if that's used in a
13   board meeting.  Possibly.
14                  Tell me, about how long were you
15   and Scott outside of the conference room?
16          A.      10-15 minutes.
17          Q.      Did you speak at all?
18          A.      It seems everything is 10-15
19   minutes.
20                  He came over to me and said,
21   "Burt, I just want to tell you that I never told
22   anyone not to speak to you," and because during
23   the presentation I made reference to the fact
24   that I was told by two officers that they were
25   not to speak to me, one at all, the other one
```

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

253

```
 1                      Burton T. Fried
 2   about new matters.
 3                 My reply was, "Then you ought to
 4   speak to two of your most senior officers who
 5   volunteered that to me."
 6          Q.    Who were the two?
 7          A.    John Leonard and Paul Cutrone.
 8          Q.    Did Mr. State say anything back to
 9   you after you said that?
10          A.    No, nor did he deny or apologize
11   for the ageist remarks.
12          Q.    Did you say anything to him about
13   the ageist remarks when you were out there?
14          A.    I had no further conversation
15   about it.
16          Q.    So that was it?
17          A.    That was it.
18          Q.    What did Mr. Leonard tell you
19   about Mr. Scott -- Mr. State telling you?
20          A.    That I was not to -- he was not to
21   talk to me at all, and that and if there were
22   any items he felt necessary to talk to me, he
23   was to speak to Mr. State and Mr. State would
24   then speak to me and get an answer.
25          Q.    When did Mr. Leonard say Mr. State
```

```
1                   Burton T. Fried
2   said that to him?
3          A.      Prior to the board meeting.
4          Q.      Did Mr. Leonard tell you that he
5   commented on that?
6          A.      That was the end of the
7   discussion.
8          Q.      How about Mr. Cutrone, what did
9   Mr. Cutrone tell you?
10         A.      He volunteered -- they were
11  volunteering this in response to my inquiry as
12  to why they were not calling me on the phone,
13  and the same question of Paul Cutrone.  He
14  answered, "I was told by Scott not to talk to
15  you about any new matters but that it was okay
16  to talk to you about legacy matters."
17         Q.      Did you ever go back to Scott and
18  ask him why he had instructed Mr. Leonard and
19  Mr. Cutrone not to talk to you about certain
20  topics?
21         A.      I had not spoken to Scott between
22  October 18th and the board meeting except for
23  some conversations that we may have had
24  concerning the matters that were expressed in
25  the e-mails.  But, no, I never -- I never had
```

255

```
 1                    Burton T. Fried
 2  any conversation.  Clearly his course of conduct
 3  and his objective and his goal was very clear.
 4         Q.    Were you, during the period
 5  between the meeting with Scott, which was
 6  October 18th or 19th --
 7         A.    19th.
 8         Q.    -- 19th, and the time of the board
 9  meeting, were you the whole time in your
10  Westport office as opposed to New York?
11         A.    I was in New York.
12               MR. WIGDOR:  Objection.
13               You can answer the question.
14         A.    I was in New York.  I think I
15  attended meetings on business matters but,
16  clearly, yes.
17         Q.    So you were in the offices in
18  New York?
19         A.    Not necessarily the office.  I
20  could have been in the office, I could have been
21  at meetings in New York on LVI matters.  I mean,
22  we had active projects going on of which I was
23  concerned about and -- and including Madison
24  Square Garden, which I was personally involved.
25         Q.    So you were --
```

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

1                    Burton T. Fried

2            A.       You have to understand something,

3     that I -- New York itself, New York City itself,

4     generally New York State, but clearly New York

5     City, LVI was the largest employer of -- of

6     labor from the union in New York City and

7     probably the largest employer of labor of this

8     specialty, New York City and New York State, of

9     any other contractor.  If not the largest at any

10    point in time, close to the largest.  And we had

11    big projects and we performed the most

12    high-profile projects.

13            So my involvement was -- whether I

14    was in the office, as you pointed out -- asked

15    me -- in the office at 80 Broad, and I was many

16    times, or I was at clients' offices or on --

17    on -- related to the business matters.  I mean,

18    we had heavy involvement with a big structural

19    demolition company performing work there, like

20    Hudson Yards or these other projects.  And so my

21    contact in New York was significant.

22            Q.       So at the time that the --

23    between -- after the meeting with Scott State on

24    October 19th, were you working on some major

25    projects yourself?  Were you involved in

1                      Burton T. Fried

2    projects?

3         A.    I was involved in matters that

4    affected projects, that, you know, we were

5    trying to beat a deadline for the Deutsche Bank

6    project because there was liquidated damages.

7               I was working on a claim against

8    the -- in getting information on a claim that --

9    a possible claim against the Crane Company for

10   the number of days that we were down due to

11   mechanical failures.

12        Q.    Any other projects that you were

13   working on?

14        A.    We had a problem, I don't know if

15   it's before or after that date, was clearly

16   within that period of time, we had a big problem

17   with an incident in Madison Square Garden.

18        Q.    Any other projects?

19        A.    That was the $27 million project.

20        Q.    I'm just trying to find out what

21   else you were working on during that period of

22   time.

23        A.    So I don't have a current

24   recollection on what days I was there, what

25   matters I -- we had the Mazoki matter at which I

1                        Burton T. Fried

2    was at your offices here in this building, and

3    not only personal presence but telephone calls

4    relating to the business, not only in New York

5    but the nation, but clearly a lot in New York

6    that was going on.

7              Q.    Did Mr. State ever tell you to

8    stop working on those projects?

9              A.    No.

10             Q.    So you actually were continuing to

11   do work as chairman during this period of time?

12             A.    To the extent that I received any

13   inquiries from branches, I did, yes.

14             Q.    Would you consider these projects

15   to be strategic projects?

16             A.    Strategic?  Yeah, they are very

17   important projects, sure.

18             Q.    So these were a province of what

19   you had said that you would be doing as chairman

20   of the board of LVI; is that correct?

21             A.    It was ill-defined.  No, it was

22   strategic growth.  Not strategic.  He took away

23   strategic growth.  Those were projects that I --

24   that he referred to as bullshit work.

25             Q.    This was bullshit work?

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

1                    Burton T. Fried

2          A.    Oh, yeah.  He has an e-mail

3    claiming I'm getting a million dollars a year.

4    In looking at the list, I was only performing

5    review of travel requests and bullshit

6    administrative duties.

7          Q.    And he was referring to these

8    projects, the MSG incident --

9          A.    Well, he said that was the only

10   things I was doing.

11         Q.    -- the Deutsche Bank project, the

12   Mazoki litigation?  These were the bullshit

13   projects?

14         A.    Well, we're going to find out,

15   aren't we, when we take his deposition.

16         Q.    Well, why don't you answer my

17   question?

18         A.    I can't read his mind.  That's all

19   he said I was doing for LVI.

20         Q.    Did you believe that that's what

21   he was referring to when he said "these bullshit

22   projects," that he was referring to these, you

23   know, initiatives that you were involved with?

24         A.    It was part of his effort to

25   embarrass, demean, demoralize and take away my

260

1                    Burton T. Fried

2   self-respect.

3            Q.      He didn't pass any of these

4   projects to anyone else, did he?  Did he put

5   anyone else on the Mazoki litigation?

6            A.      I don't know what he did.  He

7   never spoke to me.

8            Q.      You continued to work on the

9   Mazoki --

10           A.      Only if I was called on.

11           Q.      And as far as the Deutsche Bank

12  project, did you continue to work on that?

13           A.      Only to the extent I was called on

14  with inquiries.  But the main direct people who

15  I worked with were told not to talk to me.

16  Eventually that filtered down to the people on

17  projects that I was involved in.

18           Q.      So that would have been

19  Mr. Leonard and Mr. Cutrone?

20           A.      That filtered from them down to

21  regional managers, branch managers.  And that

22  was part of his campaign and part of the damages

23  that he brought upon me.

24           MS. SELTZER:  Could you mark this,

25           please.

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

261

```
1                    Burton T. Fried

2                    (E-mail dated November 16, 2010

3            marked Fried Exhibit 19 for

4            identification.)

5                    MS. SELTZER:   Let the record show

6            that Exhibit 19 is an e-mail from Brian

7            Simmons to Burton Fried, dated

8            November 16th, 2010, Bates stamped BF8

9            through 12 and BF153.

10           Q.      Do you recognize this?

11           A.      Yes.

12           Q.      If you would just turn first to

13    the last page, which is the letter dated

14    November 16, 2010 and signed by Brian Simmons on

15    behalf of the board of directors of LVI Parent

16    Corporation, if you look at the fourth paragraph

17    down, it talks about some of the projects that

18    you would be working on as a consultant,

19    including the Kessler Federal Credit Union

20    litigation, the litigation on the estate of

21    Daniel Sitomer, and Dwayne Morris LLP

22    litigation.

23                   Were these litigations that you

24    were currently working on?

25           A.      Well, I can't say it was just me.
```

262

1                     Burton T. Fried

2   This was also being worked on by Mr. DiCarlo.

3           Q.     But these were projects that you

4   were -- litigations that you were working on

5   that you were involved with prior to this being

6   sent to you?

7           A.     There was only some of them.

8           Q.     Okay.

9           A.     Mr. Simmons wasn't aware of all of

10  them or else he would have listed others with

11  higher value that I was intimately involved in.

12          Q.     But these were -- these were

13  ongoing litigations?

14          A.     Yes.

15          Q.     And then he says, "In addition you

16  would be asked to provide assistance and support

17  from time to time on various projects as

18  requested by Scott State."

19          A.     Yes.

20          Q.     Did you find these

21  responsibilities to be outside of your scope of

22  experience?

23          A.     No.

24          Q.     Did you find them objectionable in

25  some way?

```
 1                    Burton T. Fried
 2        A.    No.
 3        Q.    Why did you decide not to take the
 4   consulting agreement?
 5        A.    Because it contained a
 6   discriminatory provision.
 7        Q.    Do you mean release?
 8        A.    Release.  And a release of
 9   liability of my rights under the Civil Rights
10   Act, and it contains a provision for
11   non-competition for 12 months without payment,
12   and the conditions under which these items -- in
13   exchange for these items there was an offer to
14   pay me 375 per quarter, and it could be
15   terminated at any time after the inception, and
16   if so, under the terms of the agreement, my only
17   rights was to keep the 375 and then I would be
18   bound to the other provisions, in effect giving
19   up my right under the Civil Rights Act for
20   37,500, and be precluded from competing for 12
21   months, when currently, as you pointed out under
22   the other provision, executive securities
23   agreement, I would have to be paid up to 18
24   months if in fact they enforced it, and that was
25   at the rate of 600,000 a year.
```

264

```
 1                   Burton T. Fried
 2        Q.     Did you respond to Mr. Simmons
 3   with respect to this proposal or was it at that
 4   point Mr. Wigdor negotiating for you?
 5        A.     No.  At that point it wasn't
 6   worthy of a response.
 7        Q.     So you choose not to respond to
 8   it?
 9        A.     Correct.
10        Q.     Did you turn it down?  You just
11   didn't answer?
12        A.     I didn't acknowledge it within the
13   time period that...
14        Q.     Did you understand at this time if
15   you didn't take this consultancy, that your
16   employment would be terminated as of
17   November 30th?
18             MR. WIGDOR:  Objection.  The
19             letter speaks for itself.
20             MS. SELTZER:  Yeah.  I'm just
21             asking if he understood it.
22             MR. WIGDOR:  No, no, no, you
23             misinterpreted what the letter says.
24             The letter terminates his employment.
25             Okay?
```

```
 1                    Burton T. Fried
 2              MS. SELTZER:  Right.
 3         Q.    Did you understand that if you
 4  didn't accept --
 5              MR. WIGDOR:  That's not what he --
 6         my objection is that you're insinuating
 7         that a consulting agreement is --
 8              MS. SELTZER:  My objection is that
 9         you're making speaking objections on the
10         record.
11              MR. WIGDOR:  No.  You're asking a
12         misleading question because a consulting
13         agreement -- a consulting agreement --
14              I was in the middle of speaking
15         when I was interrupted.
16              MS. SELTZER:  You're not supposed
17         to be speaking, this is my deposition.
18              MR. WIGDOR:  Well, a consulting
19         agreement does not extend his
20         employment.  This very clearly
21         terminated his employment.  No matter
22         what happened, his employment was
23         terminated.
24              MS. SELTZER:  Fine.  Then let's
25         talk -- let me rephrase it.
```

 1                    Burton T. Fried

 2          Q.    Did you understand that your

 3   employment would be terminated on November 30th

 4   and that if you didn't accept the consultancy

 5   agreement, that you would have no further

 6   relationship with LVI Services?

 7          A.    And I also understood that this

 8   was in response to a letter that was sent by my

 9   counsel on my behalf asserting the fact that I

10   have been subjected to an act of age

11   discrimination, and the response to that was the

12   termination of my employment as employee of LVI

13   after 24 years.

14          Q.    When did your counsel send a

15   letter?

16          A.    On the 15th of November.

17          Q.    And this was sent to you on the

18   16th of November?

19          A.    That's correct.  Therefore, there

20   are two acts of discrimination.

21          Q.    Let me stop you.

22                So you believe that -- it's your

23   belief that this letter and this agreement were

24   drafted in the one day between your attorney's

25   letter and -- in one day?

```
 1                    Burton T. Fried
 2              MR. WIGDOR:  I don't think that's
 3         his testimony, because he was just about
 4         to explain other reasons for
 5         termination.
 6         Q.    Go ahead, then explain.
 7         A.    The -- the letter -- I mean, I am
 8   sorry but, you know, I have difficulty being
 9   asked a question and then you interrupt me
10   before I can finish the --
11         Q.    I didn't interrupt you, I just
12   asked you the question.
13              MR. WIGDOR:  Yeah, you did.
14         A.    You did and now I don't even
15   remember the question.
16              MS. SELTZER:  Maybe we'll read it
17         back.
18              (Record read.)
19              MR. WIGDOR:  So that was the
20         question?
21              MS. SELTZER:  I'm sorry.
22              MR. WIGDOR:  Just ask a question.
23              MS. SELTZER:  Then I ask my
24         question -- it's your -- let me go back
25         to that question then, because I don't
```

```
 1                    Burton T. Fried

 2          know if you answered it.

 3          Q.    So you believe that this agreement

 4   and this letter were both drafted after the time

 5   that your counsel sent a letter to Mr. State; is

 6   that your testimony?

 7          A.    No.

 8          Q.    Okay.  Why don't you tell me

 9   what --

10          A.    My testimony is my letter dated or

11   my e-mail dated November 2nd, Mr. Simmons said

12   that the company would terminate my employment

13   and then offer me a consulting agreement.  This

14   document could have been drafted at any time

15   after November 2nd.  It was delivered to me the

16   day after my attorney delivered to LVI a letter

17   complaining of an act of discrimination.

18               This letter is retaliation in more

19   than one aspect.  Number one, it's retaliation

20   of a complaint of discrimination and asking that

21   it be resolved and settled, and the retaliation

22   is the termination of my employment.  The second

23   act of retaliation is asking me to waive my

24   rights under the Civil Rights Act.

25          Q.    Under the Age Discrimination
```

269

1                     Burton T. Fried

2      Employment Act?

3          A.     That's right.

4              MR. WIGDOR:  Well, Civil Rights

5          Act was referred to in the New York

6          City --

7              MS. SELTZER:  I'm clarifying.

8              MR. WIGDOR:  But it was

9          gratuitous.  Why would you have to

10         clarify?  What was your point?

11             MS. SELTZER:  Why don't we just

12         stop the comments.

13             MR. WIGDOR:  What was your point?

14         What was your point?

15             MS. SELTZER:  I was clarifying for

16         him that it's also the ADEA, is what

17         he's got here.

18             MR. WIGDOR:  Okay.  So just ask a

19         question.

20             MS. SELTZER:  Fine.  And stop

21         interrupting and we can get done with

22         this by 7:30.

23             MR. WIGDOR:  If you would stop

24         interrupting the witness in his answers

25         and providing gratuitous information, we

270

```
 1                    Burton T. Fried

 2           would.

 3                    So go.

 4           Q.    Mr. Simmons had mentioned the

 5    concept of a consultancy agreement on

 6    November 2nd, as you said, right?

 7           A.    In an e-mail.

 8           Q.    So the letter that was sent by

 9    Mr. Wigdor on the 15th, your testimony isn't

10    that they -- that letter was in retaliation

11    because Mr. Simmons had already spoken about

12    those terms back on November 1st -- 2nd, right?

13                    MR. WIGDOR:  Objection.

14                    You can answer.

15           A.    He suggested that that was what

16    the board wanted to do, but he did not do it

17    until the day after a complaint by my attorney

18    of age discrimination was delivered.

19           Q.    You resigned from the board of

20    directors on November 30th, 2010; is that

21    correct?

22           A.    Yes.

23           Q.    Why did you resign?

24           A.    That was the last day of my

25    employment with LVI Services.  And my election
```

1                    Burton T. Fried

2   to the other boards and responsibilities on

3   other boards of both LVI Services, LVI Parent

4   and -- and other subsidiary boards was only

5   because of my employment at LVI Services.  So I

6   sought to extinguish that legal connection.

7          Q.     Could you have stayed on the board

8   of LVI Parent and not been an employee of LVI

9   Services?

10         A.     It's possible, I guess.

11         Q.     Did you want to do that?

12         A.     I chose not to have responsibility

13  being on that board when my employment was

14  terminated.

15         Q.     What parts of the LVI business

16  were housed in the Westport office?

17         A.     Very important aspects of the

18  business.

19         Q.     Okay.  Tell me what they were.

20         A.     My services were performed there.

21  Services of Greg DiCarlo, which provided legal

22  services to all offices throughout the nation

23  and corporate.  His other counsel, who also

24  provided legal services in support of

25  Mr. DiCarlo, paralegal who supported their

1                        Burton T. Fried

2      services, three marketing coordinators that

3      provided a complete A to Z marketing support

4      services for all offices throughout the nation

5      and national marketing effort for all marketing

6      people, total maybe 20-25 people, as well as the

7      office requests and also completion of

8      prequalification materials and presentations.

9      And newsletters that went out quarterly.

10              Q.    Can I just interrupt one second,

11     just to clarify?

12                    I'm not interested, really, in the

13     functions, meaning what they did.  Just tell me

14     what groups or what departments were housed at

15     the Westport office.  You told me the legal

16     department and the marketing coordinators.  What

17     other functions were -- were --

18              A.    I'm trying to tell you what the

19     functions were.  First you say departments, then

20     you say departments.

21              Q.    Then why don't we say groups.

22     What other groups were housed there?

23              A.    I'm finished explaining it -- and

24     then also the receptionist.

25              Q.    Okay.

```
 1                    Burton T. Fried
 2          A.      And also Shari Dembin, my
 3   daughter, who performed bonding, surety bonding,
 4   insurance certificates, travel, management
 5   meetings, special events and special projects.
 6          Q.      Anybody -- any other groups housed
 7   in the Westport office?
 8          A.      Not at that time.
 9          Q.      When did you first find out that
10   the Westport office was being closed?
11          A.      When I received a communication
12   from Mr. State -- Mr. Simmons, rather.
13          Q.      Do you remember what was on that
14   communication?
15          A.      It was a communication, I guess,
16   it could have been the November 2nd
17   communication.
18                  THE VIDEOGRAPHER:  The time is
19          4:52 p.m.  We are going off the record.
20                  (An off-the-record discussion took
21          place.)
22                  (A recess was taken.)
23                  THE VIDEOGRAPHER:  The time is
24          4:57 p.m.  We're back on the record.
25   BY MS. SELTZER:
```

1                    Burton T. Fried

2          Q.     I think we were talking about the

3   closing of the Westport office, and forgive me

4   if I asked you this before but when did you

5   first learn that the Westport office was going

6   to be closed?

7          A.     I believe it was in a

8   communication from Brian Simmons to me which

9   alluded to the fact they planned to close the

10  Westport office.

11         Q.     You said that communication was

12  somewhere in November?

13         A.     I believe it was the letter they

14  sent me two days before the board meeting, or

15  the e-mail.

16         Q.     Do you know why the Westport

17  office was closed?

18         A.     No.

19         Q.     Did anybody tell you why the

20  Westport office was closed?

21         A.     No.

22         Q.     Do you know who decided that the

23  Westport office should be closed?

24         A.     No.

25         Q.     Do you know when that decision was

1                    Burton T. Fried

2   taken?

3          A.    No.

4          Q.    Is it your belief that the office

5   was closed because you complained about

6   discrimination?

7          A.    I believe that it was a factor

8   in -- in closing the office and dismissing my

9   daughter and using the closing of the Westport

10  office as an excuse for the retaliation against

11  her because of the acts of my complaints of age

12  discrimination.

13         Q.    Was your daughter -- your daughter

14  was selected for the reduction of force; is that

15  correct?

16              MR. WIGDOR:  Objection.

17         Q.    Your daughter was selected for

18  termination?

19         A.    I don't know what that means

20  except that I know that her employment was

21  terminated on January 6th.

22         Q.    Was she the only employee

23  selected?

24         A.    There were four other employees

25  that were terminated.

276

                    Burton T. Fried

1

2        Q.      Are you aware of the fact that

3    there were eleven employees terminated during

4    the course of that reduction in force?

5                MR. WIGDOR:   Objection.

6        A.      There were four other employees

7    terminated from the Westport office.

8        Q.      But were you aware that there were

9    other employees terminated in other parts of the

10   organization?

11       A.      You know, termination of -- no, I

12   wasn't aware of it.

13       Q.      Okay.  Were you aware that Matt

14   Dembin was terminated as part of that reduction

15   of force?

16       A.      I know that he was terminated but

17   I didn't know that he was terminated in

18   connection with the closing of the Westport

19   office.

20       Q.      Do you ever recall discussing your

21   daughter with Mr. State?

22       A.      No.

23       Q.      Are you -- would you even know

24   that Mr. State knew that Ms. Dembin was your

25   daughter?

1                    Burton T. Fried

2          A.     Oh, yes.

3          Q.     How would he know that?

4          A.     I'm sure it came up in

5   conversations.

6          Q.     Conversations with who?

7          A.     With me.

8          Q.     So do you remember discussing your

9   daughter with Mr. State?

10         A.     If you would ask me a specific

11  instance and when, I don't remember, but clearly

12  he would know it.  He knew that my son-in-law

13  was Matt Dembin.  If it came up -- it may have

14  come up in conversations with me over a period

15  of time that I've known him, especially in the

16  months preceding his hiring at LVI, his visit to

17  the LVI Westport office, where my daughter was

18  at the time of his visit.  He may have been

19  introduced to her at the time and also being

20  told by other senior officers of LVI.

21         Q.     But you, yourself, don't have a

22  specific instance that you remember telling him?

23         A.     I know I told him.  I can't tell

24  you when.

25         Q.     Do you know if anyone was hired to

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

278

1                    Burton T. Fried

2    replace your daughter?

3                    MR. WIGDOR:   Objection.

4         A.    No.

5         Q.    Were there -- did your daughter

6    ever complain to you about any instances of

7    retaliation against her prior to her

8    termination?

9         A.    Yes.

10        Q.    What did she explain to you?

11        A.    She complained that Scott was not

12   speaking to her concerning her duties.  She

13   didn't know, now that I was leaving the company,

14   who she should be forwarding material to that I

15   was receiving from her historically.  And

16   although he asked her to set up a meeting with

17   the travel agent, he and -- she asked if she

18   should attend the meeting, he said he would get

19   back and never got back.  And then when he got

20   back, he assumed -- on the day of the meeting,

21   he assumed and believed he told her to attend,

22   but realized he didn't and said he would handle

23   it.

24        Q.    So he asked her to attend and she

25   wasn't available?

```
 1                     Burton T. Fried
 2            A.     He never asked her to attend.  He
 3    assumed he did and realized he never did.
 4            Q.     Was she not available to attend?
 5            A.     She was always available to
 6    attend.
 7            Q.     So why didn't she attend?
 8            A.     She was never asked to.  I said it
 9    three times.
10            Q.     I'm sorry, I misunderstood you.  I
11    thought what you had said was he thought he
12    asked her and it turned out that he didn't.
13            A.     Correct, so she didn't attend.
14            Q.     So -- so he never went back and
15    said to her, "Oh, I meant to invite you"?
16            A.     Well, he couldn't because it was
17    the day of the meeting.
18            Q.     Any other instances of retaliation
19    that your daughter communicated to you?
20                   MR. WIGDOR:  Prior to her
21                   termination?
22                   MS. SELTZER:  That's correct.
23            A.     Prior to her termination, no,
24    other than her termination.
25            Q.     Do you believe that your complaint
```

                        Burton T. Fried

1   of discrimination had anything to do with the

2   termination of the ten other employees during

3   that same period?

4       A.      I can't hear you.

5       Q.      I said do you believe that your

6   complaint of discrimination had anything to do

7   with the terminations of the ten -- of the

8   eleven other employees at the same time?

9       A.      I can't answer you.  I can't read

10  his mind.

11      Q.      Okay.

12      A.      And he didn't confer with me.

13              MS. SELTZER:  Mark this one.

14              (E-mail dated January 10, 2011

15              marked Fried Exhibit 20 for

16              identification.)

17              MS. SELTZER:  Let the record show

18              that Exhibit 20 is an e-mail from Shari

19              Dembin to Burt Fried at his Hotmail

20              account.  The subject line is "Travel

21              Form."  It's Bates stamped LVI 3291 to

22              92.

23      Q.      Do you remember this e-mail,

24  Mr. Fried?

281

1                    Burton T. Fried

2          A.     This is the first time I'm seeing

3     it.

4          Q.     Do you check your Hotmail account?

5          A.     Not often, and many items somehow

6     get into junk mail, et cetera, but I'm familiar

7     with the attachment.

8          Q.     Did you ask Ms. Dembin to send you

9     the attachment?

10         A.     No.  She had described to me what

11    it contained and I never realized she sent it to

12    me.

13         Q.     What did Ms. Dembin tell you about

14    the attachment?

15         A.     It was a travel request by Scott

16    State, who was traveling between Denver and

17    New York, and next to the request form for

18    "approved by" -- to her it was amusing -- he put

19    the word "None, I am the CEO."  She thought it

20    was very amusing and told me on the phone about

21    it and I thought it was amusing as well.

22         Q.     Did Ms. Dembin send you any other

23    company documents after you left LVI?

24         A.     No.  And in fact, I never really

25    saw this one.

1                     Burton T. Fried

2          Q.     Well, it obviously, though, was

3    sent; is that correct?

4          A.     I never saw this one.  That's my

5    answer.

6          Q.     I understand, but it's attached to

7    something that went into your Gmail account or

8    your Hotmail?

9          A.     Is that a question?

10         Q.     I'm asking you, do you have an

11   account at bfried26@hotmail.com?

12         A.     I do, but I've never seen this.

13         Q.     Okay.  Are there any other

14   documents that Ms. Dembin sent you that belong

15   to LVI?

16         A.     No.

17         Q.     Did you believe that it was proper

18   for Ms. Dembin to send you an e-mail that was

19   obviously a document that belonged to LVI?

20         A.     It's -- it's -- my function in

21   reviewing travel requests is a lot more

22   important than her sending this, and you

23   belittled my looking at travel requests.

24         Q.     That's not my question.  You want

25   me to have it read to you again?

```
 1                    Burton T. Fried
 2          A.      You've indicated to me, in your
 3   opinion, looking at travel requests is an
 4   administerial act not worthy of a chairman.  So
 5   why do you attach such importance to this as a
 6   business document?
 7          Q.      Were you performing that function
 8   on January 10th, 2011?
 9          A.      No.  I never saw this.  So you'd
10   have to ask her as to whether -- whether she
11   thought that it was a violation of anything in
12   sending it to me.  Don't ask me.
13          Q.      So you think there was a
14   legitimate business purpose to sending this
15   company document to you after you had been
16   terminated?
17          A.      It was done sheerly by amusement,
18   because normally what you have in there is the
19   person, name of the person who approved it, and
20   if you're a senior officer and you don't need
21   anybody else's approval, you put your name in.
22   But he's putting in something, "I am the CEO,"
23   as if he's standing on the top of a mountain
24   with a big badge and braids on his shoulders, "I
25   am the CEO."  I thought it was amusing, too.
```

1                    Burton T. Fried

2          Q.     Did he -- did she ever send you

3    any other documents that belonged to LVI?

4          A.     No.

5          Q.     Did you -- strike that.

6                 When is the last time you've gone

7    into your Hotmail account?

8          A.     Yesterday.

9          Q.     Did you search your Hotmail

10   account to make sure there were no responsive

11   documents in there?

12         A.     Yes.

13         Q.     You didn't see this document in

14   there?

15         A.     No.

16         Q.     Did you check your -- your junk

17   mail to see if there were any responsive

18   documents?

19         A.     Not yesterday, but I have.  From

20   time to time I check.  I have not seen any.

21         Q.     Have you checked it with respect

22   to this litigation, the junk mail folder?

23         A.     I check junk mail and if it's

24   anything appropriate I look at it, but it didn't

25   seem to be anything appropriate.

1                    Burton T. Fried

2          Q.    So you have checked it to make

3    sure there was nothing responsive in it?

4          A.    There's nothing there.

5          Q.    I asked you if you checked that,

6    there was nothing there?

7          A.    I checked.  There is nothing

8    there.

9                (Plaintiff's Rule 26(a) initial

10               disclosures marked Fried Exhibit 21 for

11               identification.)

12         Q.    Would you take a look at the

13   document?

14         A.    What specifically?

15         Q.    Just give an overall look.

16               MR. WIGDOR:  No, no --

17               MS. SELTZER:  I just want him to

18               take a look at it.  Usually we get

19               complaints if we don't let them look at

20               it.

21               MR. WIGDOR:  I know, but you know

22               what?  I'm not trying to stall like a

23               lot of plaintiff's attorneys might have

24               their witnesses look at documents.  He

25               knows what it is.  Just ask questions.

```
 1                   Burton T. Fried

 2        Q.      Have you seen this document

 3   before?

 4        A.      Yes.

 5        Q.      Have you had a chance -- did you

 6   review it before it was filed in this action?

 7        A.      Yes.

 8        Q.      Could you turn to page 11?

 9        A.      Yes.

10        Q.      On page 11 you have a listing of

11   various damages that you believe you've suffered

12   as a result of the actions or inactions of the

13   defendants?

14        A.      Yes.

15        Q.      I'd like to discuss some of these

16   with you.

17                You've listed that you believe you

18   deserve to collect $12 million in front pay

19   through your expected retirement, and this isn't

20   including benefits and et cetera.

21                How did you calculate $12 million?

22        A.      First of all, it's -- it's not

23   including benefits, bonus salary increases or

24   interest.  I think I'm entitled to more than

25   $12 million.
```

1                    Burton T. Fried

2          Q.     Why don't you just tell me how you

3    calculated the 12 million?

4                    MR. WIGDOR:   I'm going to object

5          but let him answer.

6          A.     This is an error, really, because

7    this is based on 600,000 a year for twenty

8    years, and that comes to $12 million but it

9    should be pointed out it doesn't include -- it's

10   an error and misleading because it doesn't

11   include bonus of about 400,000 a year, which is

12   another $8 million, salary increases, interest

13   and all the lost benefits, health insurance that

14   they canceled on me.

15         Q.     And this figure is based on your

16   working twenty years, from this point?

17         A.     Sure.   So the figure I think is

18   more appropriate is north of $20 million.

19         Q.     What do you consider -- you have

20   the next level of damages as called

21   consequential damages.   Do you see that, to the

22   tune of $1.6 million?

23         A.     Yes.

24         Q.     What is consequential damages?

25         A.     I'm owed, as you pointed out

```
 1                     Burton T. Fried
 2    before, $1.6 million in incentive bonus and I
 3    agreed to the terms under that incentive bonus
 4    based upon what I believe was continued
 5    employment with the company, or else I would
 6    have demanded that $1.6 million be paid at the
 7    closing.
 8            Q.     Okay.  So --
 9            A.     If I can finish my answer, please.
10            Q.     I'm sorry, I thought you were.
11            A.     But they perpetuated an act of
12    discrimination on me and a breach I consider of
13    fairness as far as my continued employment,
14    having nothing to do with my performance, and
15    therefore have removed me from participation in
16    the operation of the business which I can
17    believe I would contribute significantly to the
18    achievement of the goals in order for me to be
19    paid $1.6 million.
20            The acts of -- of discrimination,
21    as you know, go way back, as I've testified, to
22    October 19th and repeated by conversations I've
23    had with directors, and then again and on -- and
24    then by a letter I've gotten, or an e-mail
25    rather, from Simmons on November 2nd, and then
```

1                    Burton T. Fried

2  by a board meeting on November 4th, and then the

3  retaliation that I suffered took place on the

4  16th as a result of those acts of discrimination

5  and to punish me for making a charge of

6  discrimination.

7                    So the retaliation took place by

8  the termination of my employment, by asking me

9  to waive my ADA right or my rights under the

10  Civil Rights Act, New York City, et cetera, and

11  also the retaliation of -- of this provision of

12  termination of my daughter on -- on the 8th or

13  6th.

14                    So this 1.6 consequential is

15  another act, damage that I've incurred as a

16  result of their violation of my rights.

17          Q.    Are you done?

18          A.    Yes.

19          Q.    I hadn't wanted you to go back to

20  the discrimination retaliatory acts.  All I was

21  trying to figure out is what the basis for these

22  consequential damages were.  So is it your

23  testimony this is an amount you would have

24  earned in bonus, in success bonus, had you

25  continued to be employed with the company?

1                      Burton T. Fried

2           A.      The success -- it's not a success

3    bonus.

4           Q.      What kind of bonus?

5           A.      It's an entitlement.   They called

6    it a bonus.   We were paying ordinary income on

7    this even though we should be paying capital

8    gains tax on the purchase price.   So we agreed

9    to take less.   We succumbed to their request.

10   We agreed to pay ordinary income taxes and then

11   they made part of it contingent.

12                  And I had no problem with that

13   provided that I was going to be there in charge

14   of the debt, in the sense participating in the

15   success of the company, and what they did, their

16   plan was to get me to agree to that format of --

17   of contingent payment while they were planning

18   to get rid of me as a result of the retaliation

19   for the act of discrimination, and therefore

20   that results in the consequential damage.

21          Q.      Is there a document that reflects

22   this agreement to forgo this payment or forgo

23   the tax consequence?   This is new to me.   What

24   bonus was this that you're talking about?

25          A.      We discussed this already.   You

291

1                    Burton T. Fried

2   showed me a document.

3            Q.    So the award is that?

4            A.    Yeah.   That really is a

5   nomenclature problem that they wanted to use to

6   show it for tax purposes so they can take a

7   deduction and us to pay income taxes rather than

8   for us to have capital gains treatment and they

9   wouldn't have a deduction.   So it was financial

10  engineering on their part, but even with that

11  and accepting it, I am now -- my 1.6 million is

12  in severe jeopardy.

13           Q.    This is the award we talked about

14  that has the three different tranches, right?

15           A.    Yeah.

16           Q.    You were paid the first tranche

17  and the two still haven't been paid; is that

18  correct?

19           A.    Right.

20           Q.    Is it your belief you're not going

21  to get paid those tranches?

22           A.    I believe that's in serious

23  jeopardy and I have no faith or confidence,

24  but --

25           Q.    Okay.

1                    Burton T. Fried

2          A.     -- but we're now in May, halfway

3     through 2011.  I guess by the time of trial

4     we'll know whether the tranche is going to be

5     met or not and I have every reason to believe

6     that it will not.

7          Q.     You have a right to your beliefs.

8          A.     But I hope it is because I'd be

9     very happy to receive the money.

10         Q.     You have a certain number of

11    damages listed for compensatory damages and one

12    of them is for emotional distress in the amount

13    of $1.5 million.

14         A.     Yes.

15         Q.     How did you arrive at this amount?

16              MR. WIGDOR:  Objection.  First of

17              all, it's no less than 1.5.  So what we

18              will request at trial might be a lot

19              higher than that.  But it was done by

20              counsel, so next question.

21         A.     And I don't agree with a minimum

22    or a 1.5.  I think it should be substantially

23    higher.

24              (Continued in highly confidential

25              section.)

1                     Burton T. Fried

2   BY MS. SELTZER:

3          Q.     Did you do that on your own or did

4   you bring in some outside help for that?

5          A.     I did it with consultation of your

6   law firm, Jeffrey Smith, with consultation with

7   Brian Simmons and with consultation of

8   employment counsel at Jackson Lewis and a

9   partner of Boston, Joan Ackerstein, and another

10  partner in that office whose name I forgot.

11         Q.     What was the outcome of the

12  investigation?

13         A.     The allegations were false and

14  fraudulent.

15         Q.     What happened to the person who

16  was -- I'm assuming it's a woman?

17         A.     Yeah.

18         Q.     What happened to the woman who --

19  who alleged sexual harassment against

20  Mr. McNamara?

21         A.     She left our employ.

22         Q.     Was she fired?

23         A.     She was laid off.

24         Q.     Was she laid off because of the

25  complaint?

299

1                     Burton T. Fried

2          A.    No.

3          Q.    What happened to Mr. McNamara?

4          A.    He continued in the service of the

5     company until at some point in time he resigned

6     and joined another company.

7          Q.    Was it found that Mr. McNamara was

8     having a sexual relationship with this woman?

9          A.    I don't really know.  I do know

10    that she admitted in writing that after being

11    paid a settlement amount of 75,000, which

12    included her attorneys' fees, she admitted that

13    it was all false, and I considered suing her for

14    the return of the money and decided against it,

15    figuring that she was a sick person.

16         Q.    So the case settled, the

17    allegation was settled?

18         A.    It was settled and with an

19    admission of -- of a false accusation.

20         Q.    So she admitted that she never had

21    a sexual relationship with Mr. McNamara?

22         A.    She admitted that she was never

23    sexually harassed.

24         Q.    Did Mr. McNamara ever admit to

25    having had a sexual relationship with this

```
 1                    Burton T. Fried

 2  woman?

 3           A.     I don't recall.

 4           Q.     Under your compensatory damages,

 5  you have harm for career progression in the

 6  amount of not less than $500,000.  What do you

 7  mean by "career progression"?

 8           A.     I'm now 71 years of age.  I've

 9  been terminated from an employer that I held

10  this position of chairman and presidency prior

11  to that, and with a stigma of being fired and

12  trying to explain why I'm no longer associated

13  with the company and trying to be truthful.

14                  And to be truthful, I have to

15  explain that I am the subject of age

16  discrimination and people somehow question

17  whether -- and can't avoid the question of

18  whether that's the real reason for my

19  termination and -- and wonder whether -- whether

20  I'm litigious in employment matters, coupled

21  with the fact that I'm 71 years of age in this

22  economy is quite difficult.  And that relates to

23  the harming career progression.

24           Q.     What about, how was your

25  reputation damaged to -- in the amount of not
```

```
 1                    Burton T. Fried
 2   less than $1.5 million?
 3          A.      Having a surety bond line of 200
 4   million with no collateral or de minimis
 5   collateral or -- except when Code Hennessy took
 6   over a letter of credit because of the high
 7   leverage, is unheard of in the industry.  That
 8   was secured as a result of my reputation for
 9   honesty, integrity and success in the running of
10   a business, living up to my promises and being
11   very candid and working very hard and being very
12   fair with all of the employees of the company.
13                  I now have a stigma of being
14   fired.  It has completely destroyed my
15   reputation of -- and frankly, an example of the
16   reputation is our securing the $27 million
17   Madison Square Garden job even though we were
18   not low bidder, and I was told by
19   representatives of Cable Vision that the only
20   reason that we received the job was because of
21   our reputation and my reputation for honesty and
22   integrity, because the recommendation for us
23   getting the job came from the integrity monitor
24   that knows us very well.
25                  I no longer have that same
```

1                    Burton T. Fried

2    reputation.

3          Q.     How do you know that?

4          A.     Well, I -- I have made human

5    efforts to secure work, and these people I've

6    dealt with for years, and I don't get return

7    phone calls.  So --

8          Q.     Go ahead.

9          A.     That's okay.

10          Q.     Has anybody ever said to you, you

11    know, "We're not going to hire you or we're not

12    going to give you a contract because we believe

13    you to be -- to have been terminated from your

14    prior employment"?

15          A.     No.

16          Q.     Has anyone ever -- has anyone ever

17    raised the issue of you being terminated, a

18    potential employer or a potential person that

19    you'd be doing business with?

20          A.     Everyone wants to know why I'm no

21    longer with LVI.  It is unnatural.  I've been

22    with them for so many years and I'm only

23    truthful, so I explain.

24          Q.     And you explain --

25          A.     That I have a lawsuit pending that

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

1                    Burton T. Fried

2    relates to age discrimination, and that's

3    usually the end of the conversation.

4         Q.    Is it necessary -- why do you find

5    it necessary to tell them you have a lawsuit

6    pending?

7         A.    Because that's the fact in

8    explaining that I'm not there, and if I left and

9    I was subjected to age discrimination, why

10   wouldn't I seek recovery for it.  Then there

11   would be a question of whether I really had an

12   age discrimination claim.

13        Q.    Did you ever consider just saying

14   that you left the company?

15        A.    It wouldn't be truthful.  It would

16   be like saying I resigned, and that would be a

17   lie and that would be deceit and that's not my

18   reputation.

19        Q.    Have you ever been hospitalized as

20   a result of any of the manifestations of your

21   emotional distress damages?

22        A.    No.

23        Q.    During the period since the

24   termination of your employment with LVI, have

25   there been any other contributing factors to

1                    Burton T. Fried

2   your emotional distress, such as family issues,

3   financial problems, drug problems, anything?

4          A.    Yes.  I feel permanently scarred

5   as a result of the termination of my daughter,

6   who has an act of retaliation for my complaints

7   of discrimination, and she's a single mother of

8   two young children, 4 and a half and 7, and

9   there was absolutely, in my mind, absolutely no

10  reason for her termination, after 15 years of

11  service and the only person qualified to handle

12  all of the responsibilities and with the

13  experience of handling those responsibilities

14  for a very modest compensation.  She was not a

15  big wager in there.  It was modest compensation.

16                  It had nothing to do with the

17  closing of the Westport office.  Legal

18  department is still surviving and still working

19  for the company notwithstanding the expiration

20  of the Westport lease and they'll be moved to

21  another location.  She was never offered the

22  opportunity to move to New York and work there,

23  never offered the opportunity to work in

24  Milford, never offered the opportunity to stay

25  on until the office closed and then to determine

1                      Burton T. Fried

2  where she would work.  She was singled out.

3           Q.     Other than the legal department,

4  were any of the other individuals who were let

5  go at the Westport office given an additional

6  relocation or another job?

7           A.     No.  But their responsibilities

8  were eliminated because national marketing

9  people, who they primary supported, were

10 diminished or were let go and the

11 responsibilities that the national market people

12 were given to the regional offices.  So there

13 was a correlation between them being let go,

14 national marketing.  Even though I wouldn't

15 necessarily agree with that decision and time

16 will tell whether that was the right one, I

17 think all these decisions time will tell whether

18 it was the right one, but -- but there is a

19 correlation between letting go of national

20 marketing people and these marketing

21 coordinators, absolutely no correlation for or

22 reason to let her go, as experienced she was and

23 singled out.  While as you mentioned, other

24 people may have been let go on or about the same

25 time, I'm sure there is new hires out there and

                         Burton T. Fried

 1
 2  new consultants.

 3          Q.    In the Westport office?

 4          A.    No, in the nation.   There weren't

 5  11 people let go in the Westport office.   You

 6  mentioned 11 people were let go.

 7          Q.    Actually, 12 with Ms. Dembin.

 8          A.    Nationwide, but yeah, there is

 9  higher -- we'll find out ultimately what the

10  census is and who was hired, and consultants or

11  otherwise, because there was marketing people --

12  marketing person let go but another marketing

13  people -- person hired in Denver, and I'm sure

14  there are other people hired.   I mean, it's a

15  natural thing, but not to single out an

16  experienced, long-term employee who happened to

17  be my daughter.

18          And so that injury I have is --

19  and the injury she has, and I have that injury

20  because they picked on someone helpless at the

21  same time he knew that he was getting rid of her

22  husband.   He's just absolutely disgusting.

23          Q.    I thought you said she was a

24  single mom.

25          A.    Her former husband upon which she

1                    Burton T. Fried

2   receives support.  Her children receive support.

3   It is an absolutely disgusting act, and I guess

4   at some point in time we'll find justice.

5           Q.     Is your daughter working right

6   now?

7           A.     For me.

8           Q.     What is she earning?

9           A.     Excuse me?

10          Q.     What is she earning from you?

11                 MR. WIGDOR:  Do you think that's

12          relevant to his action?

13                 MS. SELTZER:  Yes.

14                 MR. WIGDOR:  How?

15                 MS. SELTZER:  I don't think that

16          we're arguing relevance and you're not

17          allowed to object on relevance.

18                 MR. WIGDOR:  Then I'm going to

19          object on harassing the witness.  Why is

20          his daughter's salary relevant to this

21          case?  Just give me a proffer.

22                 MS. SELTZER:  Because if there is

23          a cost to his business on his daughter's

24          salary, I would like to know that for

25          the mitigation of his damages.

```
 1                    Burton T. Fried
 2           MR. WIGDOR:  Why don't you ask him
 3      how much he's making?
 4           MS. SELTZER:  I'm going to get to
 5      that.
 6           MR. WIGDOR:  So that's all you
 7      need to know.
 8           How much are you making?
 9           THE WITNESS:  How much?
10           MS. SELTZER:  Are you asking the
11      questions now?
12    _____DIR
13           MR. WIGDOR:  You don't need to
14      answer the question about what your
15      daughter is making.
16           THE WITNESS:  I don't need to
17      answer it.
18           MR. WIGDOR:  She can ask her that
19      when she takes her deposition.
20           MS. SELTZER:  Are you instructing
21      him not to answer that question?
22           MR. WIGDOR:  I am.  Yup.  And it's
23      also quarter to 6.  How much more time
24      are you going to need?
25           MS. SELTZER:  At least an hour and
```

```
 1                    Burton T. Fried
 2        a half.
 3             MR. WIGDOR:  Well, your seven
 4        hours is up at 6 o'clock.
 5             MS. SELTZER:  If we are going to
 6        play this game, we'll get the Court on
 7        the line right now, because this has
 8        been taking a while, you agreed to the
 9        fact that we were going to squeeze it
10        all in one day.  If you want to make it
11        less time, I can bring him back another
12        time.
13             MR. WIGDOR:  No, we are going to
14        do the seven hours.
15             MS. SELTZER:  No, we're going to
16        do more than the seven hours.
17             MR. WIGDOR:  We'll see what
18        happens at seven hours.
19   BY MS. SELTZER:
20        Q.    You also have some costs for your
21   attorneys' fees; is that correct?
22        A.    Yes.
23             MR. WIGDOR:  You don't need to
24        answer the next question.  Go.
25             MS. SELTZER:  He is allowed to ask
```

1                    Burton T. Fried

2          what your fee arrangement is.

3                    MR. WIGDOR:  No, no, no.  Next

4          question.

5                    MS. SELTZER:  Are you instructing

6          him not to answer?

7    _____RUL

8                    MR. WIGDOR:  I'm instructing him

9          not to answer, yes.  When he wins the

10         case and we make our fee application,

11         then can you find out what our

12         arrangement is.

13                   MS. SELTZER:  Okay.

14                   MR. WIGDOR:  Okay?

15         Q.     Is Thompson Wigdor the only

16    attorney you've seen with respect to these

17    claims?

18         A.     Yes.

19         Q.     Are there any other attorneys

20    involved in this other than Thompson Wigdor &

21    Gilly?

22         A.     I'm sorry.

23         Q.     Are there any other law firms

24    involved in this claim other than Thompson

25    Wigdor & Gilly?

1                        Burton T. Fried

2            A.      Not that I'm aware of.

3            Q.      You were terminated on

4    November 30th, 2010.  Can you tell me if you've

5    gone on any interviews for other jobs?

6            A.      I have not -- not for employment.

7    I've sent out resumes.

8            Q.      How many, approximately?

9            A.      Four recruiters.

10           Q.      Who were the recruiters?

11           A.      I don't remember the last one,

12   but -- or the third one, but going backwards,

13   Lucas Group, Russell Reynolds and Heidrick &

14   Struggles.

15           Q.      Did they send you on any

16   interviews?

17           A.      No.

18           Q.      None of them?

19           A.      No.

20           Q.      Did you discuss a possible deal

21   with -- is it P-A-L or PAL Environmental?

22           A.      Yes.

23           Q.      What type of business concept were

24   you discussing with PAL Environmental?

25           A.      Management consulting.

1                    Burton T. Fried

2          Q.     Who did you speak to at PAL

3    Environmental with respect to this business that

4    you were entering into with them?

5          A.     I was proposing a business

6    transaction and that was with Sal DeLorenzo.

7    He's the owner.

8          Q.     How were Brian Messisco and Mike

9    Lane involved in that deal?

10         A.     They brought in Bristol

11   Environmental, Ernie DeCaro, and they were

12   interested in, considering -- or our

13   conversation related to the joint effort of PAL

14   and Bristol Environmental in joining forces

15   under a team year agreement to expand their

16   markets in the northeast.

17         Q.     Were Brian Messisco and Mike Lane

18   employed by LVI?

19         A.     They were former employees.

20         Q.     So they're no longer employed by

21   LVI?

22         A.     No.  Brian Messisco -- Mike Lane

23   was the former COO and Mike Lane -- rather,

24   Brian Messisco was a former national business

25   development manager.

```
 1                    Burton T. Fried

 2          Q.     And their employment with LVI

 3     terminated before yours, to your knowledge?

 4          A.     Mike Lane was.  I don't remember

 5     about Brian.

 6          Q.     How about Brian Messisco?

 7          A.     I don't recall.

 8          Q.     Did you ever approach Robert

 9     McNamara for a position?

10          A.     Yes.

11          Q.     When was that?

12          A.     He knows about what occurred and

13     I've seen him within the last few weeks.

14          Q.     What company does he work for now?

15          A.     He is the CEO of -- of Lend Lease

16     Americas, which is -- includes Latin America,

17     North America and Canada, or US and Canada.

18          Q.     Did LVI do business with Lend

19     Lease during your employment?

20          A.     No.  They did business with one of

21     their New York companies.

22          Q.     Do you remember which one?

23          A.     Yeah.  Bovis.

24          Q.     Did you approach Mr. McNamara or

25     did he approach you?
```

1                    Burton T. Fried

2        A.     No, I approached him.

3        Q.     When LVI was doing business with

4   Bovis, was that with Mr. McNamara as well?

5        A.     Excuse me?

6        Q.     I know that was fast.

7               When LVI was doing business with a

8   subsidiary called Bovis, was that also through

9   Mr. McNamara?  Was the contact --

10       A.     They were doing business with

11  Bovis before McNamara joined them.

12       Q.     Subsequently, did Mr. McNamara get

13  involved with that?

14       A.     Yes.

15       Q.     And you entered into a contract

16  with Road Safe Traffic Systems; is that correct?

17       A.     Yes, yes.

18       Q.     How did you come to learn about

19  this opportunity?

20       A.     I had been on their board of

21  directors for several years.

22       Q.     And what kind of services are you

23  providing for Road Safe?

24       A.     Business management consulting

25  services.

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

1                    Burton T. Fried

2          Q.     Are you on staff or consultancy or

3    how --

4          A.     I'm a consultant.

5          Q.     What is your compensation?

6          A.     I receive $6,000 a week.

7          Q.     Is that based on hours worked or

8    is that a flat amount you get every week?

9          A.     It's assuming that I'm working for

10   them about two days a week.

11         Q.     Okay.  Have you been working for

12   them consistently or off and on?

13         A.     Pretty much consistently.

14         Q.     To date, how much have you earned

15   from your work at Road Safe?

16         A.     I can best tell you that the work

17   from Road Safe and the work from Nuprecon, which

18   is the other consultancy agreement, I'm earning

19   approximately $15,000 a month.  I've earned

20   roughly -- between February and April roughly

21   15,000 a month, and my expenses for those three

22   months are 15,000 a month without my drawing out

23   a single nickel of income.

24         Q.     Is Nuprecon the same as NCM

25   Contracting Group?

1                    Burton T. Fried

2         A.    Yes, it is.

3         Q.    And what kind of work are you

4    doing for them?

5         A.    I'm giving them, again, management

6    consulting on their attempt to consolidate

7    three -- three businesses that are located in

8    Maryland, Seattle, Washington primarily, and

9    California.  And they're also interested in

10   expanding their operations, their penetration,

11   business penetration.

12        Q.    Who is your contact there?

13        A.    John Hennessey.

14        Q.    Was Mr. Hennessey -- did

15   Mr. Hennessey ever do business with LVI during

16   your tenure?

17        A.    No, no.

18        Q.    Who is the business contact of

19   Road Safe there?

20        A.    That would be at Falcon, Eric

21   Rogoff.

22              MS. SELTZER:  We have to change

23        the tape.

24              THE VIDEOGRAPHER:  The time is

25        5:49 p.m., May 20th, 2011.  This

              Elisa Dreier Reporting Corp. (212) 557-5558
                950 Third Avenue, New York, NY 10022

317

```
 1                    Burton T. Fried
 2          completes tape number four of the
 3          videotaped deposition of Mr. Burton T.
 4          Fried.
 5                 (A recess was taken.)
 6                 THE VIDEOGRAPHER:  The time is
 7          5:55 p.m., May 20th, 2011.  This is tape
 8          number five in the videotaped deposition
 9          of Mr. Burton T. Fried.
10   BY MS. SELTZER:
11          Q.    When did you launch BTF Strategic
12   Services?
13          A.    On or about February 1st.
14          Q.    Is it an LLC, a corporation?  What
15   kind of form is it?
16          A.    LLC.
17          Q.    And which state is it registered
18   to do business in?
19          A.    Connecticut.
20          Q.    Have you filed any kind of tax
21   returns for the business?
22          A.    No, other than payroll tax
23   returns.
24          Q.    What is the nature of the
25   business?
```

```
 1                    Burton T. Fried
 2         A.    Management consulting.
 3         Q.    Do you have any offices?
 4         A.    Yes.
 5         Q.    Do you lease office space?
 6         A.    Yes.
 7         Q.    Is it a furnished office, did you
 8   have to furnish it yourself?
 9         A.    Furnished.
10         Q.    Do you lease your business
11   equipment?
12         A.    I purchased phones, I purchased
13   the computers, I lease a copier.
14         Q.    In bold strokes, what have been
15   the costs in setting up that business to you?
16         A.    I put in $51,000 to set up the
17   business for working capital.
18         Q.    Any other capital of your own that
19   you've invested in that?
20         A.    No.
21         Q.    Do you have any other investors
22   that are involved in that business?
23         A.    No.
24         Q.    And other than Ms. Dembin, do you
25   have any other employees that work for the
```

1                    Burton T. Fried

2    company?

3         A.     No.

4         Q.     What is Ms. Dembin's function for

5    you?

6         A.     Administrative assistant.

7         Q.     And just basically doing

8    administrative responsibilities for you?

9         A.     Answering phones, copying, filing.

10        Q.     Does she work full-time for you?

11        A.     Yes.

12        Q.     Do you have benefits as part of

13   BTF Strategic Services?

14        A.     I pay for health insurance.

15        Q.     And you don't have any business

16   partners in this business, right?

17        A.     No.

18        Q.     So far how many clients have you

19   had in that business?

20        A.     Two.

21        Q.     Is that the two that we've

22   discussed, Road Safe and NCM?

23        A.     Yes, yes.

24        Q.     Is there any other stream of

25   revenue that's coming in for that business,

1                    Burton T. Fried

2  other than these two clients?

3          A.    No.

4          Q.    Do you draw a salary from --

5          A.    No.

6          Q.    Do you have a car that's charged

7  to the company?

8          A.    No.

9          Q.    Have you earned any other form of

10 compensation other than what you've earned

11 through BTF Strategic Services?

12         A.    No.

13         Q.    Have you collected unemployment?

14         A.    No.  I mean, I'm now on Social

15 Security.

16         Q.    Do you own another business with

17 your son?

18         A.    No.

19         Q.    Do you have a financial interest

20 in any other businesses?

21         A.    No.

22         Q.    Do you serve as a member of the

23 board of directors for any other companies?

24         A.    Yes.

25         Q.    Who do you serve for?

321

```
 1                    Burton T. Fried
 2          A.     Road Safe and Packers Sanitation.
 3          Q.     Do you receive any compensation
 4   for your participation on the board of Road
 5   Safe?  In addition to the contract, obviously.
 6          A.     Yes.
 7          Q.     What do you earn?
 8          A.     It's -- I think it's 6250 a
 9   quarter.
10          Q.     $6,250?
11          A.     Yeah, a quarter.
12          Q.     What about with Packers Sanitation
13   Systems?
14          A.     That is -- I think it's something
15   like -- I'm not exactly certain, somewhere
16   around 5,000 a meeting, which is -- oh, no, no.
17   It might be around 6,000 a meeting.  That's
18   ending now because their company is being sold.
19          Q.     When did it begin?
20          A.     Years ago.
21          Q.     So you were on this board even
22   when you were employed with --
23          A.     Yeah, same -- as well as Road
24   Safe.
25          Q.     And Road Safe, you're still on the
```

```
 1                    Burton T. Fried
 2    board, right?
 3              A.    Yes.
 4              Q.    And those are the only two
 5    companies that you sit on the board of?
 6              A.    Yes.
 7              MS. SELTZER:  This might be the
 8              last one, thank goodness.
 9              (Plaintiff's objections and
10              responses to defendant LVI Services,
11              Inc. first set of interrogatories marked
12              Fried Exhibit 22 for identification.)
13              MS. SELTZER:  Exhibit 22 is
14              plaintiff's objections and responses to
15              defendant LVI Services, Inc.'s first set
16              of interrogatories.
17              Q.    Do you recognize this document?
18              A.    Yes.
19              Q.    Is that your verification on the
20    last page of this document?
21              A.    Yes.
22              Q.    You reviewed the answers to this
23    document, found them to be correct?
24              A.    Yes.
25              Q.    In response to interrogatory
```

323

1                    Burton T. Fried

2    number nine, which was the -- page 9 -- bear

3    with me one second.

4                    The interrogatory asks to identify

5    employees, former employees, blah, blah, blah,

6    whom you contacted for purposes of seeking

7    employment?

8              A.    Yes.

9              Q.    And you list a number of people.

10                   When did you contact John Schnabel

11   to seek employment?

12             A.    I think at all times during the

13   period of -- of these events, the subject of

14   this action, he has indicated to me that he

15   will -- Falcon will have opportunities for me.

16             Q.    Have there been any opportunities

17   that have come from Falcon at this point?

18             A.    No.

19             Q.    Are there any prospective ones

20   that you're waiting for them to come to

21   fruition?

22             A.    No.

23             Q.    If you look at interrogatory

24   number four, it asks you to identify individuals

25   whom you or your representatives contacted,

1                    Burton T. Fried

2    interviewed or communicated with about this

3    matter.  Do you see that?

4            A.    Yes.

5            Q.    When did you -- now, when you list

6    Scott State in this --

7            A.    Yes.

8            Q.     -- are you -- are you stating

9    that you communicated with him during your

10   employment about this matter?

11           A.    Yes.

12           Q.    Did you communicate with him at

13   all since your employment about this matter?

14           A.    No.

15           Q.    Is that the same with Mr. Simmons?

16           A.    Yes.

17           Q.    Same with Bagaria?

18           A.    Yes.

19           Q.    And Mr. Girardi?

20           A.    Yes.

21           Q.    How about Mr. Leonard, have you

22   spoken with him after your employment ended?

23           A.    Yes.

24           Q.    Okay.  When did you speak with

25   Mr. Leonard?

```
 1                    Burton T. Fried
 2         A.    Months ago.
 3         Q.    Can you just give me an overview
 4  of what the conversation was about?
 5         A.    Yeah.  He had spoken with me
 6  sometime in December and -- and said that, you
 7  know, he would be in touch with me after --
 8  before the new year, and we never spoke, and so
 9  this must have been January or February.  I had
10  heard that he was in an accident, skiing
11  accident or snow boarding accident, and so I
12  called him and asked him how he was and he
13  related he had some serious injuries to his legs
14  and that he expected to have some operations.
15         Q.    Did you talk about the case at
16  all?
17         A.    I don't know so much about my
18  case, but I complained to him that I don't know
19  how he permitted retaliation against Shari.
20         Q.    What did he say?
21         A.    And he didn't respond.
22         Q.    Anything else about the case or
23  Ms. Dembin's case that you discussed with him?
24         A.    I don't recall, except to say that
25  he didn't call me anymore and he didn't call my
```

```
 1                    Burton T. Fried
 2   daughter anymore.
 3          Q.    Did you talk with Mr. Leonard at
 4   all about your deposition or his deposition in
 5   this matter?
 6          A.    No.
 7          Q.    As far as Mr. Cutrone is
 8   concerned, have you spoken to him since the
 9   termination of your employment?
10          A.    No.
11          Q.    How about Mr. Annarumma?
12          A.    No.
13          Q.    Mr. Farucci?
14          A.    No.
15          Q.    Mr. Hogan?
16          A.    No.
17          Q.    Mr. Buck?
18          A.    No.
19          Q.    You said you have spoken to
20   Mr. Schnabel; is that correct?
21          A.    I spoke to him on or about the
22   time of these events, but I have not spoken to
23   him since.
24          Q.    How about Mr. Sucrom?
25          A.    I think we exchanged e-mails
```

1                      Burton T. Fried

2     concerning COBRA, but I -- no.  I don't believe

3     I've spoken to him, just exchange of e-mails

4     concerning health insurance, COBRA.

5             Q.     Nothing having to do with the

6     case?

7             A.     No.

8             Q.     How about Mr. DiCarlo, have you

9     spoken to him -- except today, of course --

10    since the termination of your employment?

11            A.     Yes.

12            Q.     When did you speak with

13    Mr. DiCarlo?

14            A.     At the federal mediation.

15            Q.     Other than that?

16            A.     No.

17            Q.     Let's see.  If you turn to

18    interrogatory number six, the interrogatory asks

19    you to identify persons who you contend made

20    admissions against interest on behalf of

21    defendants.

22                   Do you know what that term means,

23    Mr. Fried?

24            A.     Yes.

25            Q.     Can you tell me what admissions

```
 1                    Burton T. Fried
 2   against interest Mr. State made?
 3           A.    His admission against interest was
 4   his --
 5                MR. WIGDOR:  I mean, could we
 6           short circuit the whole thing and ask
 7           him if there is anything other than he's
 8           already testified --
 9                MS. SELTZER:  Okay.
10                MR. WIGDOR:  -- that would be
11           admission against interest for
12           interrogatory number six.
13                MS. SELTZER:  No.  Let me just ask
14           him one by one, if you don't mind.
15                MR. WIGDOR:  Okay.
16           Q.    Other than what you testified to,
17   are there any other admissions by Scott State
18   that you believe to be against interest?
19           A.    No.
20           Q.    Other than what we've spoken about
21   with Mr. Simmons, is there any admissions
22   against interest that he has made?
23           A.    No.
24           Q.    Mr. Bagaria?
25           A.    No.
```

```
 1                    Burton T. Fried
 2        Q.    Mr. Girardi?
 3        A.    No.
 4        Q.    Mr. Farucci?
 5        A.    No.
 6        Q.    And Mr. Schnabel?
 7        A.    No.
 8              I believe that there are, if
 9   that's considered admission against interest,
10   e-mails that preceded my October -- October 19th
11   meeting with him, which I was not aware of, and
12   nor copied, which makes reference to termination
13   because of age, and those are in documents you
14   have produced to my counsel.
15        Q.    Termination because of age, you
16   said?
17        A.    Yes.
18        Q.    And I'm sorry, was this about
19   Mr. Schnabel or --
20        A.    No, Mr. State, I'm saying, and
21   Mr. Simmons and Mr. Hogan.
22        Q.    Anything else from Mr. Schnabel
23   other than what we've already spoken about?
24        A.    No.
25        Q.    Other than what we've already
```

1                    Burton T. Fried

2    spoken about, are there any other comments made

3    by any management-level people at LVI or by

4    anybody on the board of directors that you

5    believe to be ageist?

6          A.    Not that I recall.

7          Q.    And other than what we've spoken

8    about, are there any actions that were ever

9    taken by anyone at LVI or on the board of

10   directors that you consider to be

11   discriminatory?

12         A.    Not that I recall.

13         Q.    And other than what we've already

14   spoken about, are there any other actions that

15   you have -- taken by LVI or the board of

16   directors that you consider to be retaliatory?

17         A.    Not that I recall.

18             MS. SELTZER:  All right, if you

19             give me five minutes, I'm just going to

20             regroup and then hopefully we'll be

21             done.

22             MR. WIGDOR:  Okay.

23             THE VIDEOGRAPHER:  The time is

24             6:11 p.m.  We're going off the record.

25                 (A recess was taken.)

1                    Burton T. Fried

2              THE VIDEOGRAPHER:   The time is

3         6:19 p.m.   We are back on the record.

4    BY MS. SELTZER:

5         Q.    We spoke about three telephone

6    conversations that you had that occurred in

7    between the meeting with Mr. State on

8    October 19th and the November 14th board of

9    directors meeting?

10              A.    November 4.

11              Q.    I'm sorry.

12              A.    I thought it was November --

13              Q.    Four?

14              A.    Yeah.

15              Q.    There was one to Mr. Bagaria and

16   one to Mr. Simmons and one to Mr. Schnabel, I

17   believe; is that correct?

18              A.    Yes.

19              Q.    Do you know which phone you used

20   to make those calls?

21              A.    I think I used my office phone.

22              Q.    In Westport?

23              A.    Yes.

24              Q.    Do you keep a desk calendar?

25              A.    No.

332

                        Burton T. Fried

1

2        Q.      Do you keep a paper calendar of

3   any kind?

4        A.      No.

5        Q.      How do you keep track of your

6   appointments?

7        A.      I use the Lotus Notes calendar,

8   but that's not exclusive.  I'm not religious

9   that way, I'm old-fashioned.  So I don't always

10  record where I am or what I'm doing.

11       Q.      So you have no other way of

12  keeping track of your appointments other than

13  Lotus Notes?

14       A.      That and I have it just in my

15  head.

16       Q.      How do you normally travel to New

17  York from Westport?

18       A.      Usually by train.

19       Q.      During the time that you were

20  employed by LVI, did you put in your train

21  tickets on your expense reports?

22       A.      Never.

23       Q.      How did you pay for your train

24  tickets?

25       A.      Personally.

333

                          Burton T. Fried

1
2          Q.      I mean did you pay cash, did you

3     pay with credit card?

4          A.      Credit cards.

5     _____REQ

6               MS. SELTZER:  We're going to ask

7          for the production of Mr. Fried's --

8               MR. WIGDOR:  Yeah, I get where

9          you're going.  We'll wait until the

10         deposition is over.

11              MS. SELTZER:  So you know on the

12         record.

13              MR. WIGDOR:  You give me a letter,

14         I can check the phone records.  I can

15         maybe check the credit card records.

16         We'll talk about it.

17              MS. SELTZER:  Yeah.  Sounds good.

18         Q.      And when you come to the New York

19    office, how do you gain entry into the building?

20         A.      How do I what?

21         Q.      How do you gain entry into the

22    building?

23         A.      Into the building?  They have a

24    security pass.

25         Q.      Do you have a key fob or some kind

1                    Burton T. Fried

2  of --

3          A.     Key fob, I used to have it.

4          Q.     And you turned that in when you

5  terminated?

6          A.     Yeah.  And coming into New York, I

7  also on occasion drive.  So it isn't exclusive

8  by train.

9          Q.     Do you usually park in a garage?

10         A.     Yes.

11         Q.     Do you usually charge that or pay

12 in cash?

13         A.     I usually pay in cash.

14         Q.     Do you ever put that into your

15 expense reports?

16         A.     Not religiously, no.  I'm poor in

17 doing that.

18                MS. SELTZER:  That's all I have of

19         the witness.

20                THE VIDEOGRAPHER:  The time is

21         6:23 p.m., May 20th, 2011.  This

22         completes the videotaped deposition of

23         Mr. Burton T. Fried.

24                (Time noted:  6:23 p.m.)

25

1                     Burton T. Fried

2                   ACKNOWLEDGMENT

3          I, BURTON T. FRIED, hereby certify that

4    I have read the transcript of my testimony taken

5    under oath in my deposition of May 20, 2011,

6    that the transcript is a true, complete and

7    correct record of my testimony, and that the

8    answers on the record as given by me are true

9    and correct.

10

11          ———————————————————————————————
                          BURTON T. FRIED
12

13       Subscribed and sworn to before me

14       this_____ day of _____, 2011.

15       _____, Notary Public

16

17

18

19

20

21

22

23

24

25

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

```
 1                    Burton T. Fried
 2                    CERTIFICATE
 3   STATE OF NEW YORK      )
 4                          )   Ss.
 5   COUNTY OF QUEENS       )
 6              I, NICOLE CANNISTRACI, a Shorthand
 7   Reporter and Notary Public within and for the
 8   State of New York, do hereby certify:
 9              That I reported the proceedings in the
10   within entitled matter, and that the within
11   transcript is a true record of such proceedings.
12              I further certify that I am not
13   related to any of the parties to this action by
14   blood or marriage, and that I am in no way
15   interested in the outcome of this matter.
16              IN WITNESS WHEREOF, I have hereunto
17   set my hand this 20th day of May, 2011.
18                    Nicole Cannistraci
19                    NICOLE CANNISTRACI
20
21
22
23
24
25
```