# Exhibit 15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- x
BURTON T. FRIED,　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　Plaintiff,　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　　:　　10-CV-9308 (JSR)(JCF)
　　　v.　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　　:　　**DECLARATION OF**
LVI SERVICES, INC.; LVI PARENT CORP.; CODE　　:　　**BURTON T. FRIED**
HENNESSY SIMMONS LLC d/b/a CHS PRIVATE　　　　:
EQUITY V LP; APOLLO INVESTMENT CORP.;　　　　:
SCOTT E. STATE, in his official and individual　　:
capacities; BRIAN SIMMONS, in his official and　　:
individual capacities; RAJAY BAGARIA, in his　　:
official and individual capacities; GERALD J.　　:
GIRARDI, in his official and individual capacities,　:
　　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　Defendants.　　　　　　　　:
------------------------------------------------------------------- x

　　　　I, Burton T. Fried, pursuant to 28 U.S.C. §1746, declare and state as follows:

　　　　1.　　I am the Plaintiff in the above-captioned action. I am the former General Counsel, President and Chief Executive Officer, and Chairman of Defendant LVI Services, Inc. ("LVI"). I was admitted to practice law in the State of New York in 1964. I have personal knowledge of the facts set forth herein and submit this declaration in opposition to Defendants' motion for summary judgment.

　　　　2.　　I began working for LVI in 1986 and worked for the company until I was fired in November 2010. From approximately 1989 through November 2010, I was the President and CEO and/or Chairman of LVI.

　　　　3.　　While Robert McNamara was President and CEO of LVI from approximately July 2006 through approximately April/May 2010, I was Chairman of LVI. During this time, I worked on behalf of LVI and its subsidiaries in New York City and to the best of my recollection, my work included, but was not limited to, the following:

1

(a) A meeting in New York City with counsel to the City of New York to secure approval by the City of New York to a Vendex Listing sought by an LVI subsidiary. As a result of my efforts, the subsidiary secured a Vendex Listing and was able to bid on the Hudson Yards project in New York City, and was subsequently awarded the project.

(b) A meeting in New York City with Defendant Scott State to discuss entering into an agreement in which an LVI subsidiary would serve as the subcontractor on two large projects which Mr. State's client sought to bid involving the U.S. Department of Energy. As a result of my efforts at this meeting, the subsidiary entered into the agreement and two projects were bid by Mr. State's client with the subsidiary as the subcontractor.

(c) A meeting in New York City with Mr. McNamara and a company called DEMCO to discuss the role of an LVI subsidiary as a subcontractor of DEMCO in connection with a project involving the remediation and demolition of Yankee Stadium. The subsidiary became a subcontractor to DEMCO for the remediation and demolition of Yankee Stadium.

(d) A meeting in New York City with Mr. McNamara to discuss outstanding monies owed to an LVI subsidiary from DEMCO involving the remediation at Yankee Stadium. During that meeting, a payment schedule with DEMCO was negotiated for payment of arrears due and the terms for the performance of demolition at the site were agreed upon.

(e) A meeting in New York City with an attorney from Arent Fox LLP to discuss potential ERISA violations allegedly caused by the work performed by LVI's outside administrator.

(f) A meeting in New York City with an attorney from the office of the Inspector General of the New York City School Construction Authority to approve the pre-qualification of an LVI subsidiary to bid on projects involving New York City schools. As a result of my efforts, the pre-qualification was ultimately approved and the subsidiary was able to bid on these projects.

(g) Multiple meetings in New York City with representatives from the New York County District Attorney's Office and the U.S. Attorney for the Southern District of New York to assist them in the investigation of the events surrounding the bidding which led to a contract with another contractor for the performance of work at 130 Liberty Street, and the deaths of two fireman during the course of that work. An LVI subsidiary had bid that work, was awarded the contract, but withdrew from the project. After the deaths of the two firemen, the subsidiary was awarded a contract to complete the work.

(h) A meeting in New York City with the CEO of Charys Holding Company, Inc. to negotiate a payment schedule for approximately $12 million owed to LVI subsidiaries. As a result, a payment schedule was agreed upon at the meeting.

(i) A meeting in New York City with Asset Recovery Group, Inc. to negotiate a $5 million remediation contract for a project involving a Pratt & Whitney facility.

(j) A meeting in New York City to interview a candidate for a Regional Manager position within the LVI organization.

(k) A meeting in New York City to interview a candidate for a senior management position within the LVI organization.

(l) A meeting in New York City with New Mountain Capital, LLC, a private equity fund, to discuss its interest in purchasing LVI to accomplish a recapitalization and loan restructuring.

(m) A meeting in New York City with Apollo Investment Corporation to discuss issues in connection with the restructuring of LVI.

4. During the same time frame, I also, on almost a daily basis, called and/or emailed personnel at LVI's New York City office about LVI-related projects in New York City and/or about issues involving the operations of LVI at its New York City office including, but not limited to, accounts receivable, personnel and legal matters.

5. During the same time frame, I also worked on matters for several LVI-related projects in New York City. For example, I reviewed the contracts for projects involving Yankee Stadium, 130 Liberty Street, and was involved in the resolution of a jurisdictional dispute initiated by the Iron Workers union at the 130 Liberty Street project.

6. After Mr. McNamara resigned as President and CEO in May 2010, I assumed his former role and became interim President and CEO of LVI. From approximately May 2010 through approximately September 2010, I continued to work on behalf of LVI and its subsidiaries in New York City and to the best of my recollection, my work included, but was not limited to, the following:

(a) A meeting in New York City with Turner Construction Company ("Turner"), Madison Square Garden officials and their consultants in connection with a project involving the renovation of Madison Square Garden ("MSG Project") to discuss scope of work and contract issues.

(b) A meeting in New York City with Turner, MSG Project officials and their consultants to discuss pricing of the MSG Project.

(c) A meeting in New York City in connection with the MSG Project with Turner, MSG Project officials and their consultants to answer questions regarding the historical integrity and current business practices of LVI and its subsidiaries.

(d) A meeting in New York City with Turner in connection with the MSG Project to sign the contract for the project. As a result of my efforts, LVI and/or its subsidiaries employ up to approximately 700 workers in connection with the MSG Project.

(e) A meeting in New York City with attorneys from Sidley Austin LLP, and other parties with their attorney, regarding a dispute about the obligation of LVI to pay the balance of a purchase price for a company that an LVI subsidiary purchased.

(f) A meeting in New York City with Russell Reynolds Associates to discuss the search for a President and CEO for LVI.

(g) A meeting in New York City with American International Group to discuss with its insurance and surety executives the status of the recapitalization and loan restructuring, and current financial results of LVI.

(h) Multiple meetings in New York City with Avisco, Inc. to negotiate a strategic alliance between LVI and Avisco, Inc. in order to secure projects.

(i) A meeting in New York City with Helix Enterprises to negotiate a strategic alliance between LVI and Helix Enterprises in order to secure projects.

(j) A meeting in New York City with a consultant to discuss how LVI could secure projects in Haiti.

(k) A meeting in New York City with a New York based building owner to secure a multi-million dollar project for an LVI subsidiary. The subsidiary was subsequently awarded the project.

(l) Multiple meetings in New York City to interview candidates for the LVI President and CEO position.

(m) A meeting in New York City with an owner of an environmental management firm to discuss potential business opportunities for LVI.

4

(n)     A meeting in New York City with representatives of DEME to discuss a potential strategic alliance in order to secure projects.

(o)     A meeting in New York City with candidates for New York City based management positions within the LVI organization.

7. During the same time frame, I also, on almost a daily basis, continued to call and/or email personnel at LVI's New York City office about LVI-related projects in New York City and/or about issues involving the operations of LVI at its New York City office including, but not limited to, accounts receivable, personnel and legal matters. Moreover, I worked with Studley, a commercial real estate broker in New York City, by telephone and email in efforts to secure new office space for the New York City office of LVI. In addition, I had weekly conference calls with the on-site management of the 130 Liberty Street project to discuss project-related issues.

8. While Chairman, and interim President and CEO, I also met with representatives of Arch Surety in New York City on an annual basis.

9. Other than me, no other member of senior management was fired by LVI.

10. I was paid by the New York City office from its New York City controlled bank account.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 20, 2011

_____
BURTON T. FRIED