# Exhibit 17

**ATTORNEY CLIENT PRIVILEGE**
**AIC MEMORANDUM**

| To: | Interested Parties |
|---|---|
| From: | Rajay Bagaria, Jerry Girardi, Teddy Reynolds |
| Cc: | Emil Buchman, Joseph Glatt |
| Date: | June 11, 2010 |
| Re: | **LVI Services, Inc.** |
| | **Proposed Restructuring Overview** |

### I – Situation Overview

In November 2005, AIC invested $43.0 million of senior subordinated notes and $2.5 million of equity to support the buyout of LVI Services, Inc. ("LVI" or the "Company") by Code Hennessy & Simmons ("CHS" or the "Sponsor"). LVI is a leading provider of building facility services including asbestos abatement, lead abatement, mold remediation, emergency disaster response, interior and structural demolition and other specialty contracting services to a broad range of commercial, industrial and institutional clients located throughout the United States. The Company operates through 25 regional branch locations nationwide with more than 3,000 employees, a large portion of which are hourly workers. While LVI experienced challenges almost immediately following our initial investment (discussed in more detail below), the Company was still able to generate $34-$35 million of EBITDA in both 2007 and 2008. However, the current economic downturn and its impact on the Company's core commercial end markets has materially impacted 2009 and YTD 2010 financial results. For the LTM period ended April 30, 2010, LVI generated revenue and EBITDA of $237.6 million and $18.7 million (7.9% margin), respectively.

Despite financial underperformance, the qualities that initially attracted us to invest in LVI are still largely intact. Over a two decade period, the Company has proven its ability to profitably grow both organically and through acquisitions. Furthermore, the Company's safety record is amongst the best in the industry, enabling it to obtain work on many high profile projects including the Pentagon, 9/11 clean-up, NASA Kennedy Space Center, 130 Liberty Street (Deutsche Bank building in lower Manhattan) and, a more recent award, Madison Square Garden. In its Emergency Response business segment, LVI is able to mobilize quickly and provide meaningful man-hours which it bills at attractive margins. For example, when hurricanes Katrina and Rita struck the Gulf in 2005, LVI nearly doubled its workforce to capitalize on the clean-up opportunity, which created over $70 million of incremental EBITDA over a two year time period. This business line contributes insignificant earnings in the LTM period, but provides a valuable option on the upside. We believe LVI also possesses high quality managers, which is particularly important in contract estimation. Regional branch management largely remains intact from the initial investment. With the addition of Bob McNamara as CEO, the Company increased its focus on improving its safety record which allowed LVI to diversify away from commercial construction / remediation projects and penetrate the energy, environmental and industrial industries. For all these reasons, we continue to believe the Company has reason to exist and that earnings will improve with economic growth.

Despite being a clear industry leader with a demonstrated track record, LVI has been a challenging investment for CHS since the initial LBO. When LVI was purchased in late 2005, the Company was benefitting from a massive amount of Katrina/Rita hurricane related clean-up work. By the end of 2005, LVI was billing $1 million of clean-up related revenue a day in Louisiana and Texas (at 30-35% margins), enabling it to produce $66 million of EBITDA that year. Based on the widespread destruction in the region, management projected clean-up related work to take months if not years to complete and forecasted 2006 and 2007 EBITDA of $104 million and $76 million, respectively. For a variety of

1

AIC 00000113

reasons, most notably anticipated FEMA clean-up related funds not being released and Louisiana political bureaucracy, this projected revenue and earnings growth never materialized for LVI.

The Company's capital structure and covenants from the initial 2005 LBO were predicated on a meaningful level of near term debt paydown from the projected hurricane clean up work. When this level of work did not materialize, the Company breached covenants in late 2006 and was forced to amend its debt agreements to provide for higher interest rates in exchange for covenant headroom. Since this time, the Company has performed relatively well and won high profile projects including the remediation and demolition of the Deutsche Bank building which allowed LVI to maintain earnings in 2008 despite the dramatic drop off in its core commercial end markets. However, beginning in 2009 the economic downturn has begun to more materially impact earnings and has not been able to be offset by other similarly large projects. As such, in late 2009 the Company commenced discussions with its lenders and other key constituent groups around a more comprehensive balance sheet restructuring.

Based on current LTM EBITDA of $18.7 million, which we view as near "trough" levels, the Company is levered 6.4x through $119 million of funded net senior debt, with our subordinated notes financing through 9.1x. Given the number of constituents that must be dealt with, the LVI restructuring is complex and further complicated by our inability to use bankruptcy as a resolution mechanism. One of our challenges has been dealing with a roughly $40 million working capital claim (amount under dispute) owed to the prior owners of the business (including current management) related to the receivables delivered on the closing date of the initial LBO for hurricane clean up work. As LVI began to underperform in 2006 and sought covenant relief, the Company's lenders restricted any further payments on this claim[1]. Additionally, there is an $8.5 million seller note issued to the prior owners of an existing subsidiary of LVI, the Mazzochis, related to the acquisition of the Mazzochi demolition business by LVI in 2007. This claim has a guarantee from the LVI operating company and as such, even though it is expressly subordinated to AIC's claim, makes an out-of-court restructuring even more difficult.

After months of intense discussions, and the untimely resignation of CEO Bob McNamara, it appears we are close to a broad restructuring solution which we highlight in greater detail in this memo. In summary, this restructuring involves a debt-to-equity conversion of AIC's existing $52 million subordinated debt position, a $25 million injection of new money ($15 million from CHS; $10 million from AIC) and the conversion of $15 million of senior debt to common equity from a large senior lender (Falcon Investments) who purchased the debt at distressed levels over the past year. The combination of these actions, along with other payments and amendments as outlined in this memo, provide for a restructured entity levered to 4.6x (through the senior debt) and creates the Company at 6.8x - 7.2x (depending on how we settle certain claims). The ownership structure of this restructured entity will be 37.5% CHS, 37.5% AIC and 25.0% Falcon (prior to dilution from management options).

In summary, we believe the new money investment is attractive in its own right and critical to obtaining any recovery on our mezzanine. The amount of ownership provided to AIC creates an opportunity to make $50-$60 million of proceeds in 3-4 years (assuming EBITDA reverts to $35-$40 million). Should EBITDA only rebound to $25 million, a level we would view as a reasonably conservative case, our recovery would still be $30 million, which is attractive compared to the alternatives.

---

[1] The initial working capital claim was for ~ $50 million. LVI paid $25 million of this claim up until the time it was restricted from paying any more by its lenders. With interest, the remaining $25 million portion of the claim has accreted to ~ $40 million.

2

AIC 00000114

## II – Restructuring Overview

### Sources and Uses

The table below details the sources and uses for the proposed LVI restructuring.  The restructuring for LVI importantly contemplates: $25 million of new cash equity ($15 million from CHS; $10 million from Apollo), $15 million of senior debt (to equity) conversion by Falcon, $52 million of subordinated debt conversion by Apollo, and the use of $17 million of balance sheet cash to repay the revolver and various other expenses.  The new equity will be used to repay senior debt through a dutch tender.  The charts below show the senior debt retired at par, however we expect to take out loans in the 85-90 context (the term loan is currently quoted in the low 70s though there has been little trading activity).

($ in millions)

| Sources | Amount | Uses | Amount |
|---|---|---|---|
| New Equity (net of 5% Equity Fee) | $25.0 | Paydown Revolver | $9.5 |
| Balance Sheet Cash | 17.0 | Reduction of Senior Term Loan - Cash Paydown | 25.0 |
| Conversion of Falcon Senior Debt Claim | 15.0 | Reduction of Senior Term Loan - Falcon Conversion | 15.0 |
| | | Payments to Key Management (W/Cap Claim Related) | 4.0 |
| | | Senior Debt Amendment Fee | 0.9 |
| | | Fees & Expenses (Legal, Financial Advisor, Etc.) | 2.6 |
| **Total Sources** | **$57.0** | **Total Uses** | **$57.0** |

### Existing and Pro Forma Capitalization

LVI's restructured balance sheet will have total debt reduced by approximately $100 million, thereby providing a permanent solution to its capital structure problems.  Cash-pay debt will be reduced to 4.6x, which implies a relatively healthy interest coverage ratio of 2.0x.  While we show the full amount of the Mazzochi claim – to be conservative – we expect this claim to be eliminated for some lesser amount for reasons discussed later in this memo.  Pro forma liquidity stands at $19 million, which combined with FCF is enough to support working capital as the business rebounds.

($ in millions)

| | Estimated at Closing | | | | Pro Forma for Restructuring | | |
|---|---|---|---|---|---|---|---|
| | At Closing | x LTM EBITDA (net) | x LTM EBITDA - CapEx (net) | Pro Forma Adjustments | Pro Forma | x LTM EBITDA (net) | x LTM EBITDA - CapEx (net) |
| Cash | $18.0 | | | ($17.0) | $1.0 | | |
| Revolver | $9.5 | | | (39.5) | $0.0 | | |
| Term Loan | 135.9 | | | (40.0) | 72.9 | | |
| Equipment Loans / Cap. Leases | 11.5 | | | | 11.5 | | |
| **Total Senior Debt** | **$156.9** | **6.4x** | **7.7x** | | **$87.4** | **4.6x** | **5.6x** |
| Apollo Sub. Debt | 51.6 | 9.1x | 11.1x | (51.6) | 0.0 | | |
| Mazzochi Seller Note | 8.5 | | | | 8.5 | | |
| **Total Debt** | **$197.0** | **9.6x** | **11.6x** | | **$95.9** | **5.1x** | **6.2x** |
| Accrued Working Capital Claim due to Sellers | 38.0 | | | (38.0) | 0.0 | | |
| Aggregate Contributed Equity to Date | 86.0 | | | (86.0) | 0.0 | | |
| New Contributed Equity | 0.0 | | | 40.0 | 40.0 | | |
| **Total Capitalization** | **$321.0** | **16.2x** | **19.7x** | | **$135.9** | **7.2x** | **8.8x** |

| | |
|---|---|
| LTM 4/30/10 EBITDA | $18.7 |
| LTM 4/30/10 CapEx | 3.3 |
| Estimated PF Interest Expense | 9.3 |

| Pro Forma Coverage Stats | | Pro Forma Available Liquidity | |
|---|---|---|---|
| EBITDA / Interest | 2.0x | Cash | $1.0 |
| EBITDA - CapEx / Interest | 1.7x | R/C Availability | 18.0 |
| | | **Total PF Liquidity** | **$19.0** |

3

Confidential

AIC 00000115

## Ownership

The following chart outlines the ownership split of LVI post-restructuring. Ownership is based on a recapitalized value of 6.8x - 7.2x depending on the final amount of the Mazzochi claim. At present, our notes finance from 6.4x to 9.1x (net leverage). Our view has been that we are the fulcrum but multiples are stretched particularly when factoring in the $7.5 million of payments required to compensate management for prior claims, the Mazzochi claim of up to $8.5 million, which while contractually junior is structurally senior and therefore cannot be flushed out-of-court, and other restructuring costs. Consistent with this thinking – and our desire not to provide the entire $25 million of new money required – we obtain modest value for our mezzanine conversion but our recovery is primarily driven by the new money investment. Given that we have had to take a significant haircut in order to facilitate an out-of-court consensual restructuring, we required that Falcon also convert its existing senior debt into equity at a 33% discount, which they argued strongly against. To illustrate the difference - while CHS's $15 million equity investment provides 37.5% ownership, Falcon's $15 million conversion only provides 25% ownership. This is what AIC achieves through its $10 million investment. We believe the ownership percentages below are fair and provide AIC a chance for a full recovery, which is discussed later in this memo.

| Owner | Amount | Common Consideration | Common Value | Pre-Mgmt Options | Post-Mgmt Options |
|---|---|---|---|---|---|
| AIC Mezz | 51.6 | 10% | 5.0 | 12.5% | 11.3% |
| AIC New Money | 10.0 | 100% | 10.0 | 25.0% | 22.5% |
| **AIC TOTAL** | **61.6** | | **15.0** | **37.5%** | **33.8%** |
| CHS New Common | 15.0 | 100% | 15.0 | 37.5% | 33.8% |
| Falcon | 15.0 | 67% | 10.0 | 25.0% | 22.5% |
| Mgmt Options | | | | 0.0% | 10.0% |
| **Total** | | | **40.0** | **100.0%** | **100.0%** |

## Board Composition

LVI's Board will consists of: Burt Fried, Chairman / former CEO, 2 seats for each Apollo and CHS, 1 seat for Falcon and 2 independent seats, which will be nominated by majority shareholders. We expect the independent seats to remain held by the existing directors who are Richard Ferrucci (owns an insurance brokerage firm, secured the Arch bonding relationship) and Robert Buck (Chairman/CEO of Beacon Roofing, a former CHS portfolio company). The shareholders agreement is fairly straightforward and provides for certain veto rights (which each owner maintains) and almost all major decisions to be made by majority vote.

| Owner | Board Seats |
|---|---|
| Apollo | 2 |
| CHS | 2 |
| Falcon | 1 |
| Independents | 2 |
| CEO | 1 |
| Burt Fried | 1 |
| | 9 |

4

AIC 00000116

### III – Key Constituents

Excluding Apollo and CHS, four primary constituent are critical to achieving the contemplated restructuring. These are:

1. Falcon Investments, who owns $37 million (or 23%) of the first lien
2. Management, who importantly are owed $8 million from the disputed "working capital" claim
3. Nick Mazzochi, who has an $8.5 million note (at an opco, but subordinated to AIC's mezzanine)
4. The senior lenders – we need 100% to vote in favor given maturity extension

Below is a more detailed discussion of where we stand with each key constituent.

#### 1. Falcon Investments

Falcon Investments was formed as a private equity fund in 2000 by Sandeep Alva and William Kennedy who worked previously together in the mezzanine group of John Hancock Life Insurance Company. Falcon is currently investing its third fund, has $1 billion of assets under management, is based in New York and targets $10-$75 million sub debt and equity investments. Throughout the LVI process, Falcon has been very difficult to deal with and oftentimes unreasonable. Rafael Fogel is the partner responsible for the investment. Prior to joining Falcon, "Rafe" was a high yield manager at SunAmerica Investments.

Falcon is highly familiar with LVI, having held a minority position in the Company under the previous ownership (Blue Point). Through secondary purchases, Falcon today holds $37 million of the first lien which constitutes 32% of the term loan (but its vote is only 23% when including the revolver). Reaching a deal with Falcon was therefore a first step and took extensive discussions over months. The deal with Falcon, which has it converting $15 million, will leave them owning 19% of the senior facility post restructuring. This assumes Falcon does not tender any of its position in the dutch auction.

While most aspects of our deal with Falcon have been negotiated, we are concerned that Falcon may seek to revisit its economics if a deal with the senior lenders materially changes or the settlement with Mazzochi takes a turn for the worse. At present, this does not seem like it will be the case.

#### 2. Management / Working Capital Claim

The acquisition consideration for LVI contained a deferred payment, which would be made upon cash receipt of certain accounts receivable. The Company made $25 million of the estimated $50 million of payments in connection with this working capital adjustment, but as the business underperformed (and creditors prohibited further cash distributions), LVI reached an agreement with the previous owners to defer payment indefinitely. That amount has since accrued to almost $40 million and sits at LVI Acquisition Corp, a holding company.

We've included a schedule of the amounts owed to different constituents under the working capital adjustment on the next page. Blue Point (seller of LVI to CHS) is the largest holder with $22.8 million exposure. To date, we have not had any discussions about this claim with Blue Point. Though structurally and contractually junior to the new equity, this claim is disclosed in LVI's audited financials and therefore attracts attention with sureties. To clean it up, we would be prepared to offer a small amount of out-of-the-money warrants struck at a value after which CHS and Apollo achieve a full recovery. The claim with management is more difficult as it extends throughout the organization and encompasses all key employees including branch managers. Management, and in particular Burt Fried, has expressed a strong desire to be able to obtain this value over time.

5

AIC 00000117

We cannot provide compensation to one party of a claim and not the others. However, we do not want to risk jeopardizing employee morale or risk defections over this issue. As such, we plan to make a $4 million payment to the management at closing in connection with achieving a successful restructuring. Management will be able to obtain an additional $4 million (paid equally over 2 years) if it can grow EBITDA to certain agreed upon targets – these earn-outs would be permitted "restricted payments" under the credit agreement. We believe we are close to a deal with management however tax considerations still need to be vetted.

| Summary | |
|---|---|
| Blue Point | $ 22,834,193.71 |
| DuPont/Wilton/Sürchting | 2,779,230.65 |
| Falcon | 4,410,517.92 |
| Ed Pleasants | 217,504.97 |
| Mgmt Employees – current | 8,869,313.24 |
| Mgmt Employees - former (*) | 883,857.54 |
| | $ 39,994,618.03 |

### 3. Mazzochi Claim

In 2007, LVI acquired Mazzochi Wrecking, Inc. a NJ based provider of structural demolition services (fifth largest in the U.S.). The acquisition consideration consisted of approximately $12 million of cash, $5.4 million of assumed debt and $10 million in deferred consideration in the form of a note that sits at LVI Mazzochi Wrecking, a subsidiary of LVI Services, the borrower. The obligation is at an operating company and therefore is structurally senior to the term loans and mezzanine. It is also guaranteed by LVI Services and therefore derives credit support from all the other operating companies. However, the note is expressly subordinated to debt at LVI Services and therefore would be treated as a junior claim in bankruptcy. The note amount is approximately $8.5 million.

Prior to its sale to LVI, Mazzochi was engaged in an FBI undercover investigation aimed at rooting out a corrupt Newark city official. Effectively the official was awarding business to Mazzochi in exchange for Mazzochi subcontracting with firms that would provide the official with compensation. We've been told that Mazzochi came under FBI investigation after having conspired with the official (a criminal offense). In exchange for leniency, Mazzochi agreed to cooperate. However in the process of setting up the official, he won several jobs that effectively inflated earnings. No disclosure was made of this during the sale process, which is a clear breach of certain representations and warranties in the purchase agreement. The investigation was made public only recently and LVI is seeking to cancel the remaining note.

Mazzochi believes he is entitled to the full amount of the claim. Even if he ultimately agrees to the breach, there is a question of how to quantify the damages. We have some thoughts but in short believe this could take some time to resolve, particularly if Mazzochi chooses to litigate versus settle. The Company has a strong position and will attack all consideration paid to Mazzochi. The next step however is for LVI and Mazzochi's lawyers to see if they can make any progress on a settlement. Given how long this will likely take to resolve, we plan to close with the $8.5 million liability remaining on the balance sheet.

### 4. The Senior Lenders

There are effectively two groups of senior lenders – one with revolver commitments and the other with funded term loan exposure. There is little crossover holdings which has been problematic because each group has a different motivation. The revolver lenders currently have $25.5 million outstanding in the form of funded loans and letters of credit under a $45 million committed facility. This group recognizes the need to continue extending revolver availability, but their goal is to reduce exposure to the maximum

6

AIC 00000118

extent possible. Complicating matters, Dymas/Cerberus is the second largest holder under the revolver with $17.5 million. Dymas has been outspoken about their intent to limit future exposure and can hold-up the deal. Other revolver lenders including M&T and CIBC appear more commercially minded. Despite these dynamics, we are actually very close to agreement.

The term loan is held by 13 institutions with Falcon holding the largest amount at 23% and Highland the second largest holder at 10%. Confirmed through our own checkings, outside of these two groups, all investors in the first lien seem highly motivated to complete a restructuring as quickly as possible and the deal we have proposed is attractive to them. The following chart contains a summary of key terms. At this point, we have had several rounds of comments with the first lien, and while a handful of points remain outstanding (capex covenant, additional covenant in the future, minor economic adjustments), we believe we can arrive at a deal materially similar to what is outlined below. To note, the primary risk to a deal with the first lien is that a 100% vote is required given the maturity extension. This gives smaller holders significant hold-up value. Bankruptcy is not a good option to flush these accounts, as we believe it will impede LVI's ability to obtain bonding and compete for new business. We provide an option for these accounts to sell their loan through the dutch tender and would use this pressure to drive consensus.

One other item to note, we are contemplating LVI paying a $400,000 per year management fee. Apollo's share of this would be $150,000.

| Term | Current Credit Agreement | Company Proposal (6/7) |
|---|---|---|
| Revolving Credit Commitment | $45MM | • $38MM as of the Closing Date; with a reduction to $35MM anytime LTM does not exceed $17MM |
| Maturity | • Revolver: November 16, 2010<br>• Term Loan: November 16, 2011 | • Revolver: September 30, 2013<br>• Term Loan: March 31, 2014 |
| Amortization | • Quarterly amortization of $350K through 12/31/10; balloon payments for subsequent quarters | • Quarterly amortization payments of $150K beginning on March 30, 2011 |
| Term Loan Call Protection | • N/A | • Year 1 - 102; Year 2 - 101 (if paydown is made with proceeds from a debt or equity issuance) |
| Covenants | • Min FCCR (currently at 1.15x); total leverage (currently at 5.00x w/step-down to 4.90x at 9/30/2010); CapEx not to exceed $7.5MM | • Min FCCR of 1.00x thru 12/31/2011, 1.15x thereafter; CapEx set at the greater of 120% of projections and $7.5MM |
| Pricing | • Based on a leverage grid, currently at P + 4.00% (not including default interest) | • LIBOR + 7.50% if Total Leverage > 3.25x<br>• LIBOR + 4.75% if Total Leverage ≤ 3.25x<br>• 1.75% LIBOR Floor |
| Sponsor Guaranty | • No longer in effect | • Subject to the conversion of not less than $15 million of Term Loans to equity on the Closing Date, among other things, no guaranty of the Sponsor of Revolving Loans and Letter of Credit Usage shall be required. |
| Management Fees | • Up to $1MM per year, payable in cash | • Up to $400k per year, payable in cash (so long as FCCR ≥ 1.00x, otherwise shall accrue) |
| Excess Cash Flow Sweep | • 75% of excess cash flow | • 75% of excess cash flow |
| Other | • N/A | • Payment of an amendment fee to lenders of 0.75% on the pro forma facility<br>• Payment to certain members of the management team of $4MM at closing, with the opportunity to earn two additional payments of $2MM each<br>• Ability to conduct a reverse Dutch auction for a period of no longer than fifteen (15) days after close<br>• Conversion of $15MM of term loans into equity<br>• Equity contribution of at least $25MM<br>• Potential consideration given to holders of the Working Capital Adjustment in the form of warrants for common equity |

7

AIC 00000119

## IV – Company and Financial Overview

LVI is the nation's largest environmental remediation, demolition and facility services provider and the only national provider of turnkey remediation and demolition services in the U.S. LVI serves facility owners and construction firms in large and growing end markets including energy, power and industrial, infrastructure, government and institutional – along with its core retail and commercial end markets. The Company leverages its national footprint comprised of 25 regional offices to deliver asbestos abatement, soft and structural demolition, mold remediation, decontamination and decommissioning, fireproofing and on-demand emergency response services to customers across the country. In 2009, LVI completed work on over 4,000 projects with an average contract size of $66,000.

Along with its bonding capacity (discussed in more detail later in this memo), a key differentiator for LVI is its world-class safety record – which sets it apart from its peers and provides the Company with the opportunity to access a broader range of industrial and other non-commercial customers, including government (federal, state and municipal), leading power utility providers and major oil and gas companies. During 2009, LVI experienced a recordable incident rate of 1.2 cases per 100 full time workers compared to the industry average of 5.1 cases. Furthermore, LVI had a lost time injury rate of 0.2 cases per 100 full time workers as compared to the industry average of 2.7 cases. These safety metrics have been improving over the past several years – driven by a heightened safety focus implemented under prior CEO Bob McNamara. Within the construction services sector, safety metrics are critical to maintain particularly as it relates to workers comp insurance, bonding and public projects.




LVI groups its service offerings into 3 business segments: Remediation, Demolition, and Emergency Response. Each of these three segments are discussed in greater detail in the following pages.

Remediation Segment (45% of 2010E Revenue)
LVI's remediation segment primarily consists of jobs related to the remediation of asbestos, lead and mold as well as specialized services including fireproofing and infection control. LVI has an extensive history of successful abatement projects, with almost 18,000 asbestos abatement projects completed since 2000 and over 50 million recorded man hours related to asbestos and mold removal in the past 20 years. The Company is capable of performing remediation tasks in either non- or partially-occupied buildings and caters to a wide variety of clients, including government buildings, schools, hospitals, hotels, industrial facilities and more. LVI has a proven track record with exceptionally low incident rates and employs the most up-to-date abatement solutions with quality standards exceeding national and industry standards. According to *Engineering News-Record*, LVI is the largest asbestos abatement contractor in the U.S. at almost four times the size of its closest competitor.

8

Confidential

As illustrated below, LVI's Remediation segment has been severely negatively impacted by the recent economic downturn, with total segment revenue for 2010 projected at $125-$130 million (roughly equal to 2002 total remediation revenue and down from a peak of $245 million in 2008). It should be noted that the true downturn over the past two years and the impact on the Remediation segment has been somewhat masked by the large 130 Liberty Street abatement project (Deutsche Bank building in lower Manhattan), which contributed $54 million of remediation revenue in 2008 and $37 million in 2009. Excluding this one project, "adjusted" revenue for the Remediation segment declined by 15% and 28% in 2008 and 2009, respectively, and is projected to decline by another 8% in 2010. In management's forecast as illustrated in the following pages, total Remediation segment revenue is projected to return to 2003-2005 levels by 2012-2014 due to expected improvement in the core commercial environment.

| Remediation Segment ($ in millions) | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | INITIAL BANK PLAN 2010 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **REVENUE** | | | | | | | | | | | |
| ACM | $112.6 | $97.0 | $110.8 | $122.7 | $126.3 | $138.4 | $159.8 | $182.2 | $201.1 | $145.4 | $91.1 |
| Lead | 6.1 | 7.4 | 5.2 | 4.2 | 4.2 | 6.3 | 10.0 | 11.5 | 8.4 | 4.3 | 6.6 |
| Mold/Hazmat | 0.3 | 4.5 | 8.8 | 18.1 | 23.8 | 20.2 | 19.4 | 13.7 | 12.1 | 8.3 | 12.8 |
| FP | 4.6 | 5.0 | 6.4 | 6.5 | 9.7 | 12.1 | 13.3 | 16.5 | 23.0 | 16.1 | 15.1 |
| **Total Remediation** | $123.6 | $113.9 | $131.2 | $151.5 | $164.0 | $177.0 | $202.5 | $223.9 | $244.6 | $174.1 | $125.6 |
| *% Growth* | -- | *-7.8%* | *15.2%* | *15.5%* | *8.3%* | *7.9%* | *14.4%* | *10.6%* | *9.2%* | *-28.8%* | *-27.9%* |
| | | | | | | | | | | | |
| **DIRECT GROSS PROFIT** | | | | | | | | | | | |
| ACM | $30.5 | $26.1 | $28.4 | $32.0 | $29.4 | $30.8 | $41.3 | $43.6 | $45.6 | $32.2 | $23.1 |
| *% Margin* | *27.1%* | *26.9%* | *25.6%* | *26.1%* | *23.3%* | *22.3%* | *25.8%* | *23.9%* | *22.7%* | *22.1%* | *25.4%* |
| Lead | 1.8 | 1.6 | 1.3 | 1.3 | 1.3 | 1.9 | 3.0 | 3.4 | 2.7 | 1.3 | 1.7 |
| *% Margin* | *29.5%* | *21.6%* | *25.0%* | *31.0%* | *31.0%* | *30.2%* | *30.0%* | *29.6%* | *32.1%* | *30.2%* | *25.8%* |
| Mold/Hazmat | 0.1 | 1.6 | 3.3 | 7.2 | (1.3) | 8.1 | 6.3 | 4.1 | 4.0 | 2.9 | 3.6 |
| *% Margin* | *33.3%* | *35.6%* | *37.5%* | *39.6%* | *-5.5%* | *40.1%* | *32.5%* | *29.9%* | *33.1%* | *34.9%* | *28.1%* |
| FP | 1.3 | 1.3 | 1.5 | 1.4 | 2.3 | 2.9 | 3.1 | 3.8 | 6.0 | 3.4 | 4.1 |
| *% Margin* | *28.3%* | *26.0%* | *23.4%* | *21.5%* | *23.7%* | *24.0%* | *23.3%* | *23.0%* | *26.1%* | *21.1%* | *27.2%* |
| **Total Remediation** | $33.7 | $30.6 | $34.5 | $41.9 | $31.7 | $43.7 | $53.7 | $54.9 | $58.3 | $39.8 | $32.5 |
| *% Margin* | *27.3%* | *26.9%* | *26.3%* | *27.6%* | *19.3%* | *24.7%* | *26.5%* | *24.5%* | *23.8%* | *22.9%* | *25.9%* |

| Remediation Segment (Excluding 130 Liberty St. Project) ($ in millions) | 2007 | 2008 | 2009 | INITIAL BANK PLAN 2010 |
|---|---|---|---|---|
| Total Remediation Revenue | $223.9 | $244.6 | $174.1 | $125.6 |
| Less: 130 Liberty ACM Revenue | 0.0 | (54.3) | (37.4) | 0.0 |
| **"Adjusted" Remediation Revenue** | $223.9 | $190.3 | $136.7 | $125.6 |
| *% Growth* | | *-15.0%* | *-28.2%* | *-8.1%* |

9

Confidential

AIC 00000121

Demolition Segment (47% of 2010E Revenue)

Through its Demolition segment, LVI executes both structural and non-structural demolition projects, ranging from selective interior / exterior demolition to large-scale building implosions. In addition, LVI's total turnkey demolition services provide a key competitive advantage as the Company can also perform any required remediation services in advance of demolition (as they did for the 130 Liberty Street Deutsche Bank project and are doing for the Madison Square Garden project). The Company has performed major demolition projects for industrial manufacturing and chemical plants, power plants, retail and commercial facilities, resorts and movie sets and prides itself on its reputation for world class performance, safety and efficiency.

LVI has been expanding its Demolition focus over the past 5+ years as it sought to add a key complimentary product offering to its core abatement and remediation services. The Company accomplished this primarily through acquisitions, including the 2007 acquisition of Mazzochi Wrecking, the premier provider of surgical demolition services in the New York / New Jersey metro area. As such, over the past 10 years LVI has grown its annual demolition related revenue from $15-$20 million to over $100 million.

Demolition Segment

| ($ in millions) | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | INITIAL BANK PLAN 2010 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **REVENUE** | | | | | | | | | | | |
| Demolition | $27.3 | $26.4 | $14.9 | $19.0 | $44.5 | $81.4 | $99.9 | $129.5 | $108.5 | $76.4 | $131.5 |
| % Growth | -- | -3.3% | -43.6% | 27.5% | 134.7% | 82.5% | 22.7% | 29.6% | -16.2% | -29.5% | 72.0% |
| **DIRECT GROSS PROFIT** | | | | | | | | | | | |
| Demolition | 3.1 | 3.5 | 2.9 | 3.3 | 9.1 | 14.7 | 21.2 | 26.7 | 24.1 | 18.9 | 31.1 |
| % Margin | 11.4% | 13.3% | 19.5% | 17.4% | 20.4% | 18.1% | 21.2% | 20.6% | 22.3% | 24.7% | 23.7% |

A primary driver of recent and projected demolition revenue growth relates to LVI's increased focus on and successful penetration of industrial, oil & gas and power utility projects. A major area of upside for the Company relates to these areas – primarily the projected deconstruction and decommission of older coal-fired power plants in the U.S., an initiative well documented and driven by EPA and other air emission regulations being implemented by the current Obama administration. Related to this, LVI recently signed a five year strategic alliance contract with NRG Energy, one of the nation's largest power generators. Under this agreement, LVI will serve as NRG's preferred provider of environmental services and demolition work at its power-generating facilities nationwide. In the very near term, LVI expects to receive a release of a $10.4 million project for NRG's El Segundo, CA plant related to this initiative, and other facility awards are expected to follow in the near to intermediate term. The total revenue opportunity related to NRG alone is projected by management to be $40-$60 million. Besides NRG, LVI has also been in discussions with other large utility companies for similar such work and management believes they are well positioned to secure projects from utilities such as Progress Energy, Duke Energy and AEP. Management estimates that each power plant job is a $5-$20 million revenue opportunity.

10

AIC 00000122

Emergency Response Segment (8% of 2010E Revenue)

The Company's Emergency Response segment now operates under the NorthStar brand. NorthStar offers professional emergency response and recovery services to customers facing damage and disruption left in the wake of any size disaster. NorthStar leverages LVI's national network of 25 regional offices and more than 3,000 employees to rapidly dispatch teams ready to assist customers in restoring their business safely, cost effectively and on schedule. The self-performing and cross-trained labor force has decades of unmatched experience with all types of industries and challenges and works with the best equipment and technology.

With over 900 million square feet contracted under MSAs, NorthStar is a preferred provider to approximately 50 large customers with holders of significant real estate portfolios, such as retailers and hospitality companies (e.g. Target, Holiday Inn). In addition to the day-to-day non-emergency work (leaks, water damage due to faulty sprinklers, etc.), the MSAs create significant upside opportunity for NorthStar in the event of hurricanes or other significant catastrophes and has allowed LVI to compete with large disaster recovery firms across the nation. For example, the Company generated over $150 million of aggregate clean-up related revenue related to 2004-2005 hurricanes, and more recently is expected to earn $5-$15 million of revenue from the recent flooding in Nashville and Rhode Island. LVI currently has people working in the Gulf on the BP oil spill, and believes this could be material to near-term earnings.

| Emergency Response Segment | | | | | | | | | | | INITIAL BANK PLAN |
|---|---|---|---|---|---|---|---|---|---|---|---|
| (5 in millions) | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
| **REVENUE** | | | | | | | | | | | |
| Emergency Response | 0.3 | 11.4 | 2.1 | 1.0 | 54.9 | 121.2 | 22.8 | 8.1 | 23.6 | 14.8 | 22.8 |
| % Growth | -- | 3700.0% | -81.6% | -52.4% | 5390.0% | 120.8% | -81.2% | -64.5% | 191.4% | -37.1% | 53.6% |
| **DIRECT GROSS PROFIT** | | | | | | | | | | | |
| Emergency Response | 0.1 | 3.7 | 0.9 | 0.0 | 27.7 | 55.0 | 8.3 | 3.2 | 7.7 | 5.4 | 7.2 |
| % Margin | 33.3% | 32.5% | 42.9% | 4.0% | 50.5% | 45.4% | 36.4% | 39.5% | 32.6% | 36.4% | 31.6% |

In Management's forecast, Emergency Response is projected to contribute $15-$20 million of annual revenue – primarily driven by non-emergency, recurring clean up work under its nationwide MSAs. A major disaster such as a hurricane (or the BP oil cleanup) represents upside to management's projections, but not something we are underwriting for purposes of evaluating the proposed new money investment in LVI. To note, LVI currently has 35 workers involved with the oil spill clean-up and many more on standby. In general it charges $24 per worker/hour and achieves a 30% contribution margin. The clean-up will eventually involve substantial amounts of additional labor. We estimate that if LVI can ultimately have 500 workers involved with the clean up, clean-up work will provide $13 million of revenue (over six months) and $4 million of profit. This provides some idea of the potential upside.

11

## V – Bonding Discussion

LVI must post bonds for all public projects, which represents about 25% of LVI's total business (private projects rarely require bonds). The following chart shows the amounts of bonds issued over the past four years and the amount outstanding as of 3/31/2010. As shown, the average bond is $700,000 and the related work is generally completed within a few months – as such, this is generally low risk business for sureties. LVI does however obtain bonds for larger projects (e.g., the work at 130 Liberty required a $14 million bond).

| YEAR ISSUED | TOTAL BONDS ISSUED | OUTSTANDING BONDS AS OF 3/31/2010 | # OF BONDS ISSUED | AVG. VALUE OF BONDS ISSUED |
|---|---|---|---|---|
| 2010 | $    4,649,573 | $    2,236,721 | 17 | 273,504 |
| 2009 | 44,488,145 | 17,777,838 | 85 | 523,390 |
| 2008 | 96,255,598 | 22,931,326 | 84 | 1,145,900 |
| 2007 | 86,123,075 | 4,544,179 | 122 | 705,927 |
| 2006 | 69,254,390 | 35,577 | 122 | 567,659 |
| TOTALS | $  300,770,780 | $   47,525,640 | 430 | $       699,467 |

A bond is issued by a surety to effectively protect taxpayer dollars. To use an example, when LVI is awarded a project for $10 million, Arch (LVI's primary bonding provider) provides the municipality with a $10 million "performance and payment" bond in their favor. This ensures that if anything were to happen to LVI, the surety would step-in to complete the work. While this rarely occurs, the surety in this situation would hire other contractors to finish the job. Knowing that LVI has built in a 20% margin, the surety has some room to find contractors that might be more expensive. The way bonding exposure is tracked then (shown in the chart above) is based on the remaining value of the contract (as progress is made, bonding exposure is reduced).

LVI today uses primarily Arch Capital (ticker: ACGL) and AIG (Chartis) for surety bonds. Though there is no written contract to this effect, which in practicality would not have much meaning as each bond are not drawn like a revolver but based on the merits of each project, Arch has generally allocated $200 million of exposure to LVI. While LVI never needs this much in bonding, the size is an important differentiator in the market (show of strength). Arch has been working with LVI for 7-8 years; the relationship was sourced and still managed by Richard Ferrucci, who sits on LVI's board (and owns and insurance brokerage company). AIG has been working with LVI for 20 years; because their commitment to the surety business has wavered, LVI prefers to do more business with Arch.

Surety economics are seemingly low – Arch makes approximately 1% on outstanding bonds –this is because the risk and capital requirements are low. A surety has never lost money with LVI in its operating history. What sureties like to see from companies like LVI are a consistent track record in completing projects profitability, ideally the work is related to shorter-term projects and the contractor must have balance sheet strength. Arch wants comfort that LVI can withstand losses from an occasional unprofitable contract or the economic downturn. When LVI was acquired by CHS, Arch had concern over the amount of leverage and asked that LVI post a $10 million letter of credit in its favor. That LC still is in place today (we would hope to have this credit support removed following the close of this transaction, which would free up revolver capacity). Part of the impetus to get a deal done soon is that Arch has not yet received LVI's audit (we can't deliver with a clean opinion) and accordingly has expressed concern about the situation. They are aware of the financial restructuring taking place and are acting patiently. It's not in their interest to do anything that would precipitate a downturn, but if this situation persists Arch's underwriting will likely change to narrow exposure and over time we will likely lose them.

12

We have reviewed public information on Arch and believe they are in solid financial shape, well capitalized and committed to the surety business.  Notably, Arch recently hired a senior person from Liberty Mutual to head the surety business and in press releases described this as a growth business.  LVI is arranging for us to speak to Arch directly next week. Given the importance of bonding and dependency on Arch, upon closing we intend source additional providers as quickly as possible. Because LVI deals with hazardous materials, obtaining bonding is not as straightforward as it might be for a general contractor.  However management has begun discussions with Safeco (owned by Liberty Mutual) and believes it can obtain a line once the financial restructuring has taken place.

## VI – CEO Search

In March 2010, in the midst of restructuring, Bob McNamara resigned to take become CEO of the Americas for Bovis Lend Lease. This is a big position and hopefully he will be helpful to LVI in this capacity.  Fortunately, Burt Fried, Chairman and former CEO, was able to step-in as interim CEO and provide time for an orderly transition.  CHS has taken the lead on the CEO search and, along with Burt Fried, has narrowed the list to four potential candidates through Heidrick & Struggles.   We will meet with these candidates in the coming weeks. Our feeling though is that we will be able to recruit a talented CEO once the restructuring is completed.  At present though, we are fortunate to have Burt Fried as interim CEO who has done a good job stabilizing the situation.

| Name/Title/Company | Prior Experience/Education | Compensation |
|---|---|---|
| Adrian W. Jackman | | Base: $300K |
| *Executive Vice President – International* | 1980 – MA– Cambridge University | Bonus: 100% |
| *Operations* | | |
| EMCOR Group, Inc. | 1977 – BA – Cambridge University | |
| Daniel K. Mazany | | Base: $325K |
| *SVP Principal in Charge Healthcare Group* | 1987 – MBA – University of New Haven | Bonus: 50% |
| Bovis Land Lease | | |
| John L. Hopkins | | Base: $550K |
| *Group Executive, Fluor Environmental &* | 1980 – BBA –University of Texas | Bonus: 100% |
| *Nuclear Operating Company* | | |
| Jim Bollweg | | Base: $400K |
| *President CBI Services, Inc.* | 1974 – BS – Western Michigan University | Bonus: 40% |

13

AIC 00000125

## VII – Consolidated Historical Financial Summary and Management Projections

The chart below summarizes LVI's 2007-2009 historical financial performance as well as management's 5-year forecast. Remediation segment revenue is projected to improve (and return to 2003-2005 levels) due to economic improvement and a return to normalcy in commercial end markets. Demolition related revenue is projected to increase given the Company's recent penetration and focus on industrial, oil & gas and utility end markets and related decommissioning / deconstruction work. As of April 2010, the Company has a $105 million backlog – a significant majority of which relates to demolition work and including $27 million for the recently awarded abatement / demolition project for Madison Square Garden. Backlog trends have been improving and management feels confident that the Company has stabilized. To note, we have engaged a market consulting firm (FMI) to interview customers and competitors and provide a better sense of where we are in the cycle. We expect to have this report in the coming days.

The projected FCF below assumes $3.75 million of earnout/other payments in each of 2011 and 2012 relating to payouts to management (relating to their pre-restructuring working capital claims - $2 million assumed paid in 2011 and $2 million assumed paid in 2012) and Mazzocchi-related payments (model assumes $1.75 million each in both 2011 and 2012). For conservatism, we show credit stats assuming the $8.5 million Mazzocchi seller note remains on LVI's balance sheet as debt.

SUMMARY HISTORICAL AND PROJECTED FINANCIALS

| ($ in millions) | 2007A | 2008A | 2009A | 2010E | 2011E | 2012E | 2013E | 2014E |
|---|---|---|---|---|---|---|---|---|
| **Revenue Build** | | | | | | | | |
| Remediation | $223.8 | $244.6 | $174.1 | $127.5 | $139.8 | $148.8 | $171.2 | $186.8 |
| Demolition | 129.5 | 108.5 | 76.4 | 126.6 | 144.7 | 159.1 | 175.0 | 192.5 |
| Emergency Response | 8.2 | 23.6 | 14.8 | 14.1 | 15.6 | 17.1 | 18.8 | 20.7 |
| **Total Revenue** | **$361.5** | **$376.7** | **$265.3** | **$268.2** | **$300.1** | **$325.0** | **$365.0** | **$400.0** |
| *% Growth* | *10.9%* | *4.2%* | *-29.6%* | *1.1%* | *11.9%* | *8.3%* | *12.3%* | *9.6%* |
| | | | | | | | | |
| Gross Profit (incl. D&A) | 71.7 | 75.4 | 54.5 | 59.8 | 66.0 | 71.5 | 80.3 | 88.0 |
| *% Margin* | *19.8%* | *20.0%* | *20.5%* | *22.3%* | *22.0%* | *22.0%* | *22.0%* | *22.0%* |
| | | | | | | | | |
| SG&A | 51.6 | 50.6 | 44.4 | 44.6 | 45.9 | 48.4 | 52.4 | 55.4 |
| *% of Total Revenue* | *14.3%* | *13.4%* | *16.7%* | *16.6%* | *15.3%* | *14.9%* | *14.4%* | *13.9%* |
| | | | | | | | | |
| **Adj. EBITDA** | **$34.3** | **$35.1** | **$20.4** | **$24.0** | **$26.1** | **$28.5** | **$33.8** | **$38.1** |
| *% Margin* | *9.5%* | *9.3%* | *7.7%* | *8.9%* | *8.7%* | *8.8%* | *9.3%* | *9.5%* |
| | | | | | | | | |
| CapEx | 4.4 | 4.2 | 4.1 | 4.1 | 3.8 | 5.8 | 4.6 | 5.0 |
| *% of Total Revenue* | | | | | | | | |
| | | | | | | | | |
| **Note - Total Backlog** | **$138.5** | **$120.1** | **$89.3** | | | | | |

PROJECTED FCF AND CREDIT STATS (PF FOR RESTRUCTURING)

| | 6 mos. 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|
| **Free Cash Flow** | | | | | |
| EBITDA | $15.5 | $26.1 | $28.5 | $33.8 | $38.1 |
| Earnout / Other Payments | 0.0 | (3.8) | (3.8) | 0.0 | 0.0 |
| Maintenance CapEx | (2.9) | (3.8) | (4.1) | (4.6) | (5.0) |
| Operating Lease Buyout | 0.0 | 0.0 | (1.8) | 0.0 | 0.0 |
| Taxes | (2.9) | (4.8) | (6.7) | (8.8) | (10.8) |
| Change in Working Capital | (0.3) | (1.3) | (3.7) | (5.4) | (5.2) |
| **Subtotal - FCF** | **$9.5** | **$12.6** | **$8.6** | **$15.0** | **$17.1** |
| Management Fee | (0.2) | (0.4) | (0.4) | (0.4) | (0.4) |
| Cap. Lease Payments | (1.4) | (2.7) | (2.8) | (2.6) | (1.6) |
| Cash Interest | (4.6) | (7.4) | (6.6) | (6.4) | (6.2) |
| **FCF for Debt Repayment** | **$3.3** | **$2.1** | **($1.2)** | **$5.7** | **$9.0** |
| | | | | | |
| Net Senior Debt | $81.3 | $76.5 | $74.9 | $66.7 | $56.2 |
| Net Senior Debt / EBITDA | 3.4x | 2.9x | 2.6x | 2.0x | 1.5x |
| | | | | | |
| Net Total Debt | $89.8 | $85.0 | $83.4 | $75.2 | $64.7 |
| Net Total Debt / EBITDA | 3.7x | 3.3x | 2.9x | 2.2x | 1.7x |

14

AIC 00000126

**Quarterly Analysis and 2010 "Likely Case" Projection**

Management believes that they have good momentum heading into H2 2010 -- including a $105 million backlog as of April 30th which should drive near term earnings – and is reluctant to revise downward the 2010 EBITDA estimate of $24 million (although they acknowledge this will be difficult to achieve). This H2 forecast projects Q3 and Q4 revenue of $80 million and $75 million, respectively.  Given our discussions with management of the assumptions contained in these quarterly forecasts, we believe a $10 million revenue reduction in each of these two remaining quarters is warranted for a more "base case" estimate – particularly given the underperformance vs. plan thus far in 2010 (our adjustment is effectively a run-rate of the underperformance).  At approximately 20% gross margin and SG&A relatively fixed at $11 million a quarter, this $20 million cumulative revenue reduction through year end equates to a $4 million reduction to 2010 EBITDA.  At $20 million of earnings, total leverage at year end (including the Mazzochi note) is estimated at 4.5x vs. management's plan of 3.7x and down from 5.1x estimated at closing.  If we are successful in eliminating the Mazzochi note, total leverage would be approximately 4x.

It's important to note that LVI experiences some seasonality (primarily due to weather) with H2 stronger than H1.  The business therefore faces relatively favorable comps in the back half of the year.  We would be disappointed if we did not see EBITDA growth from June levels.

**Quarterly EBITDA Analysis**

|  | Q1 | Q2 | Q3 | Q4 | Total |
|---|---|---|---|---|---|
| 2008A | 4.3 | 9.5 | 11.1 | 10.2 | $35.1 |
| 2009A | .5.5 | 6.0 | 4.1 | 4.8 | $20.4 |
| 2010E | 3.7 | 4.8 | 8.2 | 7.4 | $24.0 |
| **Mgmt Case 2010 LTM EBITDA** | **$18.6** | **$17.4** | **$21.5** | **$24.0** | |
| Projected Leverage at Year End | | | | 3.7x | |
| **AIC Base Case Assumptions** | | | | | |
| Revenue "Risk" to 2010 Quarterly Periods | | $0.0 | $10.0 | $10.0 | |
| EBITDA Impact (1) | | 0.0 | 2.0 | 2.0 | |
| **AIC Base Case 2010 LTM EBITDA** | **$18.6** | **$17.4** | **$19.5** | **$20.0** | |
| Projected Leverage at Year End | | | | 4.5x | |

(1) Assumes 20% Gross Margin business; SG&A assumed relatively fixed (as per management guidance).

15.

Confidential

AIC 00000127

## VIII – Recovery Analysis

For purposes of projecting returns / recoveries to the various constituents, we have assumed an exit in 3 years (June 2013). The tables below illustrate returns assuming 3 different LTM EBITDA assumptions at exit ($25 million, $30 million, and $35 million) and furthermore assume an exit multiple of 6.5-7.0x. As a reminder, LVI generated EBITDA of $34-$35 million in both 2007 and 2008, and upside certainly exists for EBITDA meaningfully greater than $35 million in 3 years. However, for underwriting purposes we have focused on the three cases illustrated below. Additionally, for conservatism we again assume that the Mazzochi seller note remains an $8.5 million debt obligation of LVI.

To bookend reasonable outcomes – we believe an exit EBITDA of $25 million represents a conservative case and $35 million of EBITDA represents a reasonable growth case. At a 6.5x exit multiple on $25 million of EBITDA, the new money generates a 1.9x MOIC and a 3-year IRR of 23.6%. Given the equity stake received from our mezzanine conversion, total proceeds to AIC would be $28 million under this scenario. In a $35 million and 7x exit, the new money generates an MOIC of 3.7x and a 3-year IRR of 55.2%. Total proceeds to AIC in this scenario is $56 million.

To note, for purposes of the Falcon IRR shown below we assume their contribution is valued at $15 million (face amount of senior term loan being converted). In reality, their cost basis for their term loan investment is closer to 50 cents on the dollar and their internal IRRs would be much greater (and a reason they were ultimately willing to convert at a higher valuation than the new money investment proposed by CHS and AIC).

### Assumed 3-year Exit with LTM EBITDA of $25 million

| Exit Multiple of 6.5x | | Exit Multiple of 7.0x | |
|---|---|---|---|
| | AIC $25mm Case | | AIC $25mm Case |
| | 6.5x | | 7.0x |
| *($ in millions)* | 3-Year Exit | *($ in millions)* | 3-Year Exit |
| **Apollo** | | **Apollo** | |
| Mezz Conversion Equity | $9.4 | Mezz Conversion Equity | $10.9 |
| New Money Equity | 18.9 | New Money Equity | 21.7 |
| Subtotal | $28.3 | Subtotal | $32.6 |
| **CHS** | | **CHS** | |
| New Money Equity | 28.3 | New Money Equity | 32.6 |
| Subtotal | $28.3 | Subtotal | $32.6 |
| MOIC on New Money | 1.9x | MOIC on New Money | 2.2x |
| 3-Year IRR on New Money | 23.6% | 3-Year IRR on New Money | 29.4% |
| **Falcon** | | **Falcon** | |
| Common Equity from Conversion | 18.9 | Common Equity from Conversion | 21.7 |
| Subtotal | $18.9 | Subtotal | $21.7 |
| Falcon 3-Year IRR | 8.0% | Falcon 3-Year IRR | 13.1% |
| **Mgmt Options** | $4.0 | **Mgmt Options** | $5.2 |

Confidential

AIC 00000128

Assumed 3-year Exit with LTM EBITDA of $30 million

| Exit Multiple of 6.5x | | Exit Multiple of 7.0x | |
|---|---|---|---|
| | AIC $30mm Case | | AIC $30mm Case |
| | 6.5x | | 7.0x |
| ($ in millions) | 3-Year Exit | ($ in millions) | 3-Year Exit |
| **Apollo** | | **Apollo** | |
| Mezz Conversion Equity | $13.1 | Mezz Conversion Equity | $14.8 |
| New Money Equity | 26.2 | New Money Equity | 29.6 |
| Subtotal | $39.3 | Subtotal | $44.4 |
| | | | |
| **CHS** | | **CHS** | |
| New Money Equity | 39.3 | New Money Equity | 44.4 |
| Subtotal | $39.3 | Subtotal | $44.4 |
| MOIC on New Money | 2.6x | MOIC on New Money | 3.0x |
| 3-Year IRR on New Money | 37.8% | 3-Year IRR on New Money | 43.5% |
| | | | |
| **Falcon** | | **Falcon** | |
| Common Equity from Conversion | 26.2 | Common Equity from Conversion | 29.6 |
| Subtotal | $26.2 | Subtotal | $29.6 |
| Falcon 3-Year IRR | 20.4% | Falcon 3-Year IRR | 25.4% |
| | | | |
| Mgmt Options | $7.2 | Mgmt Options | $8.7 |

Assumed 3-year Exit with LTM EBITDA of $35 million

| Exit Multiple of 6.5x | | Exit Multiple of 7.0x | |
|---|---|---|---|
| | AIC $35mm Case | | AIC $35mm Case |
| | 6.5x | | 7.0x |
| ($ in millions) | 3-Year Exit | ($ in millions) | 3-Year Exit |
| **Apollo** | | **Apollo** | |
| Mezz Conversion Equity | $16.8 | Mezz Conversion Equity | $18.7 |
| New Money Equity | 33.5 | New Money Equity | 37.5 |
| Subtotal | $50.3 | Subtotal | $56.2 |
| | | | |
| **CHS** | | **CHS** | |
| New Money Equity | 50.3 | New Money Equity | 56.2 |
| Subtotal | $50.3 | Subtotal | $56.2 |
| MOIC on New Money | 3.4x | MOIC on New Money | 3.7x |
| 3-Year IRR on New Money | 49.6% | 3-Year IRR on New Money | 55.2% |
| | | | |
| **Falcon** | | **Falcon** | |
| Common Equity from Conversion | 33.5 | Common Equity from Conversion | 37.5 |
| Subtotal | $33.5 | Subtotal | $37.5 |
| Falcon 3-Year IRR | 30.7% | Falcon 3-Year IRR | 35.6% |
| | | | |
| Mgmt Options | $10.5 | Mgmt Options | $12.2 |

## IX– Summary Remarks

This is a challenging situation given the number of constituents involved, pressure we are experiencing with Arch (given LVI's inability to deliver a clean audit) and lack of visibility on the cycle. If we can't reach a capital structure solution in the near-term the business will likely come under significant pressure. We are hopeful that the FMI report, which we expect to receive in the coming days, will confirm what we are seeing and hearing from management – that the business has flat-lined, its industry positioning remains strong and the market outlook is improved.

17

AIC 00000129

The restructuring we've taken a lead in developing requires unanimous support and therefore almost by definition cannot be ideal for any group. Ultimately, we believe a $10 million investment is warranted because it's in connection with implementing a permanent solution and provides AIC with a good shot at recouping a meaningful amount, if not all, of our total investment. The valuation we are investing at is reasonable, the debt load manageable and the new money economics are potentially 3-4x.

LVI has a long operating history and through this downturn we are effectively at revenue levels experienced 10 years ago. But today, LVI is a more diverse and professional business than it was then and has major opportunities in the energy market that it previously could not pursue (lacked relationships/expertise). As such, we expect it to recover to higher levels in the coming years. As this occurs, we will likely have opportunities to refinance the debt at less expensive rates. Improved performance will also enable an exit, which we believe might occur with a large strategic seeking a U.S. footprint or a niche remediation company with a solid reputation and track record. It could also occur with a private equity group, which could grow LVI both organically and through acquisitions – effectively the strategy LVI has been pursuing for two decades. The market is still highly fragmented and will consolidate over time.

This memo was intended to provide an overview of the situation and new money investment. We will keep the team posted on the restructuring process, performance and key findings from the FMI report. Please call any of us with questions.

18

Confidential                                                                         AIC 00000130