# Exhibit 24

**T|W|G**

**Thompson Wigdor & Gilly LLP** ATTORNEYS AND COUNSELORS AT LAW

85 Fifth Avenue
New York, NY 10003
Tel 212.257.6800
Fax 212.257.6845
www.twglaw.com

**Douglas H. Wigdor**
dwigdor@twglaw.com

November 15, 2010

**CONFIDENTIAL COMMUNICATION
FOR SETTLEMENT PURPOSES ONLY**

<u>**VIA HAND DELIVERY**</u>

Mr. Scott E. State
President and Chief Executive Officer
LVI Services, Inc.
80 Broad Street
New York, NY 10004

    Re:    <u>Burton T. Fried</u>

Dear Mr. State:

We represent Burton T. Fried, the highly dedicated and long-standing Chairman and former Chief Executive Officer ("CEO") of LVI Services, Inc. ("LVI" or the "Company"), in connection with his employment with the Company. Specifically, Mr. Fried has retained our Firm in connection with recent attempts by the Company to unlawfully strip Mr. Fried of all his substantive job duties, including those services he has historically been performing as Chairman since 2006, and drastically reduce his role in the Company on account of his age and in breach of Mr. Fried's employment contract, the terms of which are memorialized in a November 16, 2005 contract with Mr. Fried (the "Contract").

As you are well aware, Mr. Fried is a long-tenured and exceedingly valuable employee of LVI, having served as the Company's CEO for two distinct periods totaling over 20 years. During Mr. Fried's tenure as CEO, he built LVI into the multi-million dollar company it is today and contributed immeasurably to the Company's years of success. Now, despite Mr. Fried's long track record of success and strong desire to continue as Chairman, the Company abruptly and unlawfully seeks to relegate Mr. Fried to the role of a mere figurehead on account of the fact he is seventy years of age. Because of his steadfast commitment to the Company and desire to remain with the Company that he has worked hard to build, this letter seeks to provide you with an opportunity to resolve this matter without commencing litigation against LVI.

Throughout his tenure with LVI, Mr. Fried has been indispensable to the Company's annual growth in both profits and revenue, presiding over the sale of the Company multiple times to

BF_066

**Thompson Wigdor & Gilly LLP** ATTORNEYS AND COUNSELORS AT LAW

Mr. Scott E. State                                    **CONFIDENTIAL COMMUNICATION**
11/15/2010                                            **FOR SETTLEMENT PURPOSES ONLY**
Page 2

new investors. As a result of Mr. Fried's efforts engineering these sales, LVI management has benefited greatly by reinvesting capital from these sales. The latest of these sales occurred on November 16, 2005, when Code Hennessy Simmons ("CHS") purchased a majority equity interest in LVI. On that same date, Mr. Fried entered into an employment contract with the Company where Mr. Fried agreed to remain as Company President and CEO until a replacement could be found. In recognition of Mr. Fried's expertise in the area and the respect he was formerly accorded, Mr. Fried was entrusted with the task of finding his own replacement. After Mr. Fried conducted interviews of all the candidates for the position and selected the finalists, both Mr. Fried and CHS agreed that Bob McNamara should replace Mr. Fried as CEO.

In June 2006, Mr. McNamara officially replaced Mr. Fried as CEO. In recognition of Mr. Fried's indispensability to the Company, Mr. McNamara conditioned his acceptance of the position on Mr. Fried continuing with the Company in the position of Chairman. Mr. Fried indeed stayed on as the Company's Chairman, accepting a pay cut to $600,000 a year and agreeing to work four days a week. That arrangement lasted only a week, however, as Mr. Fried quickly returned to full-time duty, albeit while continuing to honor his prior agreement to accept a reduced salary. Mr. Fried worked five days a week as the Chairman of LVI until Mr. McNamara resigned, effective April 2010. During that time, the Company's Earnings Before Interest, Taxes, Depreciation and Amortization fell from $65 million in Mr. Fried's last full year as CEO to only $20 million in 2009. Upon Mr. McNamara's resignation, the Company again looked to Mr. Fried's expertise and leadership by asking him to step in as interim CEO and conduct the search for his replacement. At that time, the Company increased Mr. Fried's salary to its former $750,000 level, with Brian Simmons, Managing Partner of CHS Capital LLC and member of the LVI Board of Directors, telling Mr. Fried in a May 12, 2010 email that "you are earning every penny of [your salary]."

Mr. Fried continued his invaluable service to the Company throughout his term as interim CEO by leading the Company through the period of negotiation of a recapitalization and restructuring to eliminate $100 million in debt. After the restructuring and recapitalization closed, CHS specifically applauded Mr. Fried's work during that process and informed Mr. Fried that the Company survived only because of his leadership during the negotiation period. The positive sentiment expressed by CHS and Mr. Simmons dissipated in mere months as the Company, and you, as its new CEO, in addition to individual directors, came to believe that Mr. Fried's age necessitated removal of all his day-to-day responsibilities.

As he had done in the previous search for a CEO, Mr. Fried spearheaded the efforts earlier this year to find someone to take over for him on a permanent basis. After he interviewed about ten candidates, Mr. Fried provided your resume to Russell Reynolds, the firm retained by LVI as the recruiter for the CEO position, as well as Brian Simmons. From there, your resume was passed on to Apollo and Falcon, the two private equity firms poised to come on as equity partners with CHS. As a result of Mr. Fried's introductions, you became the first choice to fill the CEO position. Mr. Fried's efforts on your behalf did not stop after putting your name forward as an

**Thompson Wigdor & Gilly LLP** ATTORNEYS AND COUNSELORS AT LAW

Mr. Scott E. State                     **CONFIDENTIAL COMMUNICATION**
11/15/2010                             **FOR SETTLEMENT PURPOSES ONLY**
Page 3

interested candidate. Indeed, both you and the Company sought Mr. Fried's advice during the contract negotiation process as CHS became concerned that you would not accept the position due to your worries that Mr. Fried would play too big of a role in the Company. Mr. Fried allayed the concerns of both you and CHS, convincing you that you would operate as CEO and that Mr. Fried would support you fully in the role of Chairman. Due to Mr. Fried's tireless efforts, you accepted the position as CEO and began work on or about October 1, 2010.

On October 19, 2010, just shortly after you commenced employment with LVI, Mr. Fried met with you to present you with a list of the responsibilities Mr. Fried had as Chairman under Mr. McNamara. Instead of discussing these responsibilities with Mr. Fried, you informed him that his duties would be transitioned to other LVI managers and that, effective immediately, he would cease working on various projects that he had been effectively managing prior to your hiring. After Mr. Fried sought a reason for this drastic and unnecessary step, you told Mr. Fried, "You are 71 years old. How long do you expect to continue working?" Mr. Fried immediately left the meeting due to this shocking and obviously discriminatory conduct. Although Mr. Fried hoped that this discriminatory animus was not shared by others at LVI and gave you every opportunity to repudiate your discriminatory comment, the discriminatory and demeaning treatment of Mr. Fried has continued to this day. To Mr. Fried's disappointment, you took further action to humiliate Mr. Fried and minimize his role at the Company by directing senior managers not to call Mr. Fried and to route all inquiries to Mr. Fried through you.

While you may have been the only one to outwardly express your belief that Mr. Fried's age necessitates removal of all his job duties, others at LVI obviously harbor the same animus. For instance, an email from Mr. Simmons to Mr. Fried on November 2, 2010 expressed his opinion that Mr. Fried should be phased out of the Company due to his age. Indeed, at the same time that Mr. Simmons commended Mr. Fried for selecting you as CEO, he told Mr. Fried that all of his responsibilities should be distributed to other LVI managers. Mr. Simmons concludes his email by revealing his true motivations behind reducing Mr. Fried's responsibilities, telling him that "while the team has relied on you for advice and counsel for many years, they must now take on true ownership of daily challenges, be asked to produce results on their own, and be evaluated based upon the outcome." Mr. Simmons clearly shares your belief that Mr. Fried's age necessitates pushing him to the background and giving away his responsibilities to younger employees.

Most recently, at a closed session of the LVI Board of Directors, Mr. Fried gave an impassioned speech detailing his years of outstanding service to the Company and expressing his desire to continue as LVI Chairman with substantive responsibilities. As a courtesy, Mr. Fried again gave you a chance to repudiate your discriminatory comment, yet, you did not take the olive branch offered by Mr. Fried. Instead, you squandered this chance to begin the process of rectifying the situation by refusing to deny that you had indeed told Mr. Fried that his age required his constructive ouster from the Company.

**Thompson Wigdor & Gilly LLP** ATTORNEYS AND COUNSELORS AT LAW

Mr. Scott E. State  
11/15/2010  
Page 4

**CONFIDENTIAL COMMUNICATION**  
**FOR SETTLEMENT PURPOSES ONLY**

Although Mr. Fried has devoted a substantial portion of his life to LVI, the Company now evinces a total lack of respect for Mr. Fried's years of steadfast and exemplary service. At his present age, Mr. Fried has shown no signs of slowing down and has expressed only an unwavering commitment to staying with the Company in more than the "advisory" capacity LVI now envisions him in. In spite of Mr. Fried's vitality, the Company seeks merely to exploit Mr. Fried's relationship with Richard Ferrucci and Arch Surety ("Arch" or the "Surety") in order to ensure that the $200 million surety line remains open to LVI. Now, the Company attempts to have it both ways by distributing all of Mr. Fried's substantive responsibilities to younger employees but still leaving Mr. Fried at LVI with the ceremonial title of Chairman in order to take advantage of his ten year relationship with the Surety. Mr. Fried will not lend his name and reputation to any effort to represent to the Surety that he is anything less than a vibrant and active executive involved in approval of projects before a bond request is made to Arch; nor, will Mr. Fried stand by idly as LVI promotes his active participation in the Company in its press releases while behind the scenes the Company seeks only to relieve him of any meaningful role.

As the Company is no doubt aware, stripping Mr. Fried of his responsibilities, including those additionally assigned duties and responsibilities he has performed since Mr. McNamara joined the Company in June 2006, would also be in breach of the Contract he signed with LVI on November 16, 2005. As per the terms of this agreement, Mr. Fried is entitled to maintain the position of Chairman, with "primary responsibility for strategic growth." Contrary to this promise, the Company now seeks to make Mr. Fried merely your "on call resource" and to give you full discretion to decide "if there are areas of the business or specific situations where [you] want[] [Mr. Fried's] direct involvement." Providing you with such unlimited discretion is directly contrary to Mr. Fried's employment agreement, a point realized by Mr. Simmons as he tells Mr. Fried in his November 2 email that he wishes "to replace [his] existing employment arrangement with a consulting agreement." Mr. Simmons clearly realizes the illegality of the proposed changes in Mr. Fried's employment and is unsubtly attempting to make an end run around the clearly defined parameters of Mr. Fried's employment contract.

Based on our knowledge of LVI's callous and discriminatory conduct to date, it is abundantly clear that the Company is pursuing a course of conduct which constitutes unlawful age discrimination and violates Mr. Fried's employment contract. Although Mr. Fried's devotion to the Company is unwavering and he would prefer to remain with LVI in his present, undiminished capacity, he remains committed to pursuing any and all legal remedies in order to ensure that he is fully made whole as a result of the Company's illegal and discriminatory action. As noted above, I am writing to provide the Company with the opportunity to avoid a costly legal action that will result in substantial liability for LVI. To this end, I ask that you contact me to discuss the possible resolution of this matter as soon as possible, but by no later than November 22, 2010.

Finally, I trust that you will treat this letter with the appropriate degree of discretion so that Mr. Fried's professional relationships are not harmed in any way by disclosure of his decision to seek

BF_069

**Thompson Wigdor & Gilly LLP** ATTORNEYS AND COUNSELORS AT LAW

Mr. Scott E. State  **CONFIDENTIAL COMMUNICATION**
11/15/2010  **FOR SETTLEMENT PURPOSES ONLY**
Page 5

legal representation. In addition, I remind you of your legal obligation to preserve all documents that may be relevant to this matter, including but not limited to all relevant emails, voicemails, telephone recordings, video surveillance recordings, and other communications that may be relevant to this matter. If you have not done so already, please take immediate steps to preserve any material related to this matter, whether in electronic or paper form, including immediately implementing the following:

- Hold in abeyance any existing document retention and/or destruction policies or practices, or any other actions that would result in the deletion of any material;

- Stop the automatic deletion of emails and other electronic data;

- Stop the recycling or reuse of computer backup tapes;

- Secure and preserve all recorded telephone conversations and email correspondence of yourself and other decision-makers responsible for the circumstances of my client's employment;

- Maintain all electronic data in reasonably accessible form, including ceasing any automatic archiving to backup tapes; and

- Secure and preserve all computer or electronic hardware, including all hard drives, laptops, PDA's, Blackberry's or any other similar equipment and devices.

I await your response.

Sincerely,

*[signature]*
Douglas H. Wigdor

BF_070