# Exhibit 33


1

1

2  UNITED STATES DISTRICT COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  No. 10 Civ. 9308(JSR)

5  ------------------------------------x

6  BURTON T. FRIED,

7                     Plaintiff,

8      - against -

9  LVI SERVICES, INC., LVI PARENT CORP., CODE

10  HENNESSY SIMMONS, LLC d/b/a CHS PRIVATE

11  EQUITY V LP; APOLLO INVESTMENT CORP.,

12  SCOTT E. STATE, in his official and

13  individual capacities; BRIAN SIMMONS, in

14  his official and individual capacities;

15  RAJAY BAGARIA, in his official and

16  individual capacities; GERALD J. GIRARDI,

17  in his official and individual capacities,

18                     Defendants.

19  ------------------------------------x

20                          May 25, 2011
                            11:10 a.m.

21

22

23

24

25

## Page 2

      VIDEOTAPE DEPOSITION of BRIAN SIMMONS, taken by the Plaintiff, pursuant to Notice, held at the offices of Thompson Wigdor & Gilly, LLP, 85 Fifth Avenue, New York, New York, before Debbie Zaromatidis, a Shorthand Reporter and Notary Public of the State of New York.

## Page 3

APPEARANCES:

THOMPSON WIGDOR & GILLY, LLP
Attorneys for Plaintiff
   85 Fifth Avenue
   New York, New York 10003
BY:  SHAFFIN A. DATOO, ESQ.
     MATTHEW GORMAN, ESQ.

SIDLEY AUSTIN, LLP
Attorneys for Defendants
   787 Seventh Avenue
   New York, New York 10019
BY:  JOANNE SELTZER, ESQ.

ALSO PRESENT:
BURTON FRIED
J.D. MARTINEZ, Videographer

## Page 4

STIPULATIONS

     IT IS HEREBY STIPULATED AND AGREED by and between the Attorneys for the respective parties hereto that filing and sealing be and the same are hereby waived.

     IT IS FURTHER STIPULATED AND AGREED that all objections except as to the form of the question, shall be reserved to the time of the trial.

     IT IS FURTHER STIPULATED AND AGREED that the within examination may be signed and sworn to before any notary public with the same force and effect as though signed and sworn to before this Court.

## Page 5

     THE VIDEOGRAPHER: We are on the record. My name is J.D. Martinez of Veritext New York. The date today is May 25, 2011, and the time is 11:10 a.m. This deposition is being held in the office of Thompson Wigdor & Gilly, LLP located at 85 Fifth Avenue, New York, New York. The caption of the case is Burton T. Fried versus LVI Services, Inc. et al. filed in the United States District Court, Southern District of New York.

     The name of the witness is Brian Simmons. At this time the attorneys will identify themselves and the parties they represent after which our court reporter, Debbie Zaromatidis, will swear in the witness, and we can proceed.

     MS. SELTZER: Joanne Seltzer with Sidley Austin representing all the defendants.

     MR. DATOO: Shaffin Datoo with Thompson Widgor & Gilly representing the plaintiff Burton T. Fried.

Page 6

```
 1
 2        BRIAN SIMMONS,
 3   having first been duly sworn by a Notary
 4   Public of the State of New York, was
 5   examined and testified as follows:
 6   EXAMINATION BY MR. DATOO:                      11:11:03
 7        Q.   Good morning, Mr. Simmons. As I      11:11:03
 8   mentioned to you earlier, my name is           11:11:05
 9   Shaffin Datoo. To my left is my colleague      11:11:07
10   Matthew Gorman, and to his left, as you        11:11:10
11   know, is Burt Fried.                           11:11:13
12        We are going to ask you some              11:11:15
13   questions today, and hopefully you can         11:11:17
14   answer all of them unless of course your       11:11:20
15   attorney directs you not to answer a           11:11:23
16   question. I am just going to start off by     11:11:26
17   asking you some preliminary questions.         11:11:28
18        Is your ability to tell the               11:11:29
19   truth in any way impaired today?               11:11:30
20        A.   No.                                  11:11:32
21        Q.   Do you understand that the           11:11:33
22   answers you are about to give are under        11:11:34
23   oath, and that you are subject to              11:11:35
24   penalties of perjury if you give an            11:11:37
25   untruthful answer?                             11:11:40
```

Page 7

```
 1                 SIMMONS
 2        A.   Yes.                                 11:11:41
 3        Q.   I am going to assume that if you     11:11:41
 4   answer a question, that you understood it.     11:11:43
 5   If you don't understand a question, let me     11:11:45
 6   know, and I will ask the question in a         11:11:47
 7   different way?                                 11:11:49
 8        A.   Thank you.                           11:11:49
 9        Q.   Please give verbal answers to my     11:11:50
10   questions. Don't shake your head or nod        11:11:52
11   it. The court reporter won't be able to        11:11:56
12   take that down. Also please let me finish      11:11:58
13   asking a question even though you may          11:12:01
14   already think you know where I am with it.     11:12:03
15   That is -- once again that is for the          11:12:09
16   court reporter.                                11:12:10
17        If you need a break, let me               11:12:11
18   know. The only condition is that you           11:12:14
19   answer the last question asked.                11:12:15
20        In connection with this lawsuit,          11:12:18
21   did you provide your attorney with all         11:12:20
22   responsive documents?                          11:12:22
23        A.   Yes.                                 11:12:23
24        Q.   And where did you look to find       11:12:24
25   these documents?                               11:12:27
```

Page 8

```
 1                 SIMMONS
 2        A.   I looked in my e-mail files at       11:12:27
 3   work, and I instructed various people at       11:12:32
 4   my firm to look through the firm's files       11:12:35
 5   on our investment in LVI.                      11:12:38
 6        Q.   Do you have a personal e-mail        11:12:41
 7   account?                                       11:12:43
 8        A.   I do not.                            11:12:44
 9        Q.   Do you keep any work-related         11:12:45
10   documents at home?                             11:12:48
11        A.   I do not.                            11:12:49
12        Q.   Have you ever been sued before?      11:12:50
13        A.   My firm has been sued. I am not      11:12:52
14   sure if I was named personally in any of       11:12:58
15   those suits or not.                            11:13:00
16        Q.   And other than this lawsuit, has     11:13:01
17   anyone ever accused you of discrimination      11:13:03
18   before?                                        11:13:06
19        A.   No.                                  11:13:06
20        Q.   Have you ever given any sworn        11:13:06
21   testimony before?                              11:13:12
22        A.   Yes.                                 11:13:12
23        Q.   How many times?                      11:13:13
24        A.   Once.                                11:13:14
25        Q.   And in what type of proceeding       11:13:16
```

Page 9

```
 1                 SIMMONS
 2   was that?                                      11:13:20
 3        A.   It was a deposition.                 11:13:20
 4        Q.   And do you know in what type of      11:13:21
 5   case that was?                                 11:13:23
 6        A.   I don't.                             11:13:24
 7        Q.   Okay. Do you know how long ago       11:13:26
 8   you were deposed?                              11:13:29
 9        A.   Approximately twenty years.          11:13:30
10        Q.   Okay. Have you ever been             11:13:32
11   deposed in connection with an employment      11:13:34
12   discrimination case?                           11:13:35
13        A.   No.                                  11:13:37
14        Q.   Did you do anything to prepare       11:13:37
15   for this deposition?                           11:13:40
16        A.   I met with my attorney.              11:13:41
17        Q.   How many times?                      11:13:44
18        A.   Once.                                11:13:47
19        Q.   And for how long?                    11:13:48
20        A.   Approximately two hours.             11:13:49
21        Q.   And did you read Mr. Fried's         11:13:52
22   deposition transcript?                         11:13:56
23        A.   I did not.                           11:13:57
24        Q.   Did you read any excerpts or         11:13:58
25   summaries of his deposition transcript?        11:14:00
```

```
                                   10
 1              SIMMONS
 2     A.   I did not.              11:14:03
 3     Q.   Mr. Simmons, how old are you?   11:14:04
 4     A.   Fifty-one.              11:14:06
 5     Q.   And what is your date of birth?   11:14:06
 6     A.   April 24.               11:14:08
 7     Q.   What year?              11:14:10
 8     A.   1960.                   11:14:11
 9     Q.   And do you know the plaintiff in   11:14:16
10   this lawsuit, Mr. Burt Fried?        11:14:18
11     A.   Yes.                    11:14:20
12     Q.   How so?                 11:14:21
13     A.   He is the former chairman of the   11:14:21
14   board of LVI.                    11:14:27
15     Q.   And do you know how old Mr.   11:14:30
16   Fried is?                        11:14:32
17     A.   I do not.               11:14:32
18     Q.   Okay. How old do you think he   11:14:35
19   is?                              11:14:37
20     A.   Approximately 70.       11:14:37
21     Q.   How long have you known Mr.   11:14:39
22   Fried?                           11:14:42
23     A.   Approximately five and a half   11:14:42
24   years.                           11:14:45
25     Q.   What LVI entity employed Mr.   11:14:46

                                   11
 1              SIMMONS
 2   Fried in 2010?                   11:14:53
 3     A.   I don't know.           11:14:55
 4     Q.   Do you know who Mr. Fried worked   11:14:56
 5   for in 2010?                     11:15:02
 6          MS. SELTZER: Objection. Asked   11:15:06
 7   and answered. You can answer it.   11:15:07
 8     A.   I don't know.           11:15:09
 9     Q.   Do you know if he worked for LVI   11:15:10
10   Parent Corp.?                    11:15:12
11     A.   I don't know.           11:15:13
12     Q.   Do you know if he worked for LVI   11:15:14
13   Services?                        11:15:17
14     A.   I don't know.           11:15:17
15     Q.   Do you know what his job title   11:15:18
16   was?                             11:15:20
17          MS. SELTZER: I am sorry.   11:15:22
18   Which portion of 2010 are you talking   11:15:23
19   about?                           11:15:25
20          MR. DATOO: I'm sorry. Sorry.   11:15:26
21     Q.   In November 2010, do you know   11:15:28
22   what his job title was?          11:15:29
23     A.   November 2010 I believe is the   11:15:31
24   month he resigned from various potions at   11:15:40
25   various LVI entities.            11:15:43

                                   12
 1              SIMMONS
 2     Q.   Was he --               11:15:45
 3     A.   So it is -- so I don't know what   11:15:46
 4   his job title was in November.   11:15:48
 5     Q.   Was he -- did he resign or was   11:15:50
 6   he fired?                        11:15:51
 7     A.   He resigned from some positions,   11:15:52
 8   and he was terminated from some positions.   11:16:00
 9     Q.   Do you know what position he   11:16:02
10   resigned from?                   11:16:03
11     A.   I do not.               11:16:04
12     Q.   Do you know what positions he   11:16:06
13   was fired from?                  11:16:07
14     A.   I do not.               11:16:08
15     Q.   Are you currently employed?   11:16:08
16     A.   Yes.                    11:16:10
17     Q.   Full time?              11:16:10
18     A.   Yes.                    11:16:12
19     Q.   Where do you work?      11:16:12
20     A.   CHS Capital.            11:16:13
21     Q.   And what does CHS do?   11:16:15
22     A.   CHS is a private equity fund   11:16:17
23   manager.                         11:16:20
24     Q.   How long have you worked there?   11:16:22
25     A.   Approximately twenty-three   11:16:24

                                   13
 1              SIMMONS
 2   years.                           11:16:26
 3     Q.   And what is your current job   11:16:26
 4   title?                           11:16:29
 5     A.   Managing partner.       11:16:29
 6     Q.   And how long have you held that   11:16:30
 7   title?                           11:16:32
 8     A.   Approximately a year.   11:16:32
 9     Q.   And what was your previous job   11:16:37
10   title?                           11:16:40
11     A.   Partner.                11:16:40
12     Q.   How long did you hold that title   11:16:41
13   for?                             11:16:43
14     A.   Approximately twenty-one years.   11:16:44
15     Q.   And what are your job duties,   11:16:48
16   your current job duties?         11:16:50
17     A.   I am responsible for numerous   11:16:51
18   aspects of managing our firm. I serve as   11:16:56
19   one of the partners on an investment team.   11:17:02
20   I serve on our management committee, and I   11:17:05
21   serve on our investment committee.   11:17:08
22     Q.   What does LVI Parent Corp. do?   11:17:10
23     A.   I don't know.           11:17:15
24     Q.   Do you know who owns LVI Parent?   11:17:17
25     A.   No.                     11:17:21
```

### Page 18

SIMMONS

| | | |
|---|---|---|
| 1 | | |
| 2 | A. Or in New York at LVI's office. | 11:21:32 |
| 3 | Q. When were you first appointed to | 11:21:35 |
| 4 | the board of directors? | 11:21:36 |
| 5 | A. November of 2005. | 11:21:38 |
| 6 | Q. And how many seats does CHS have | 11:21:40 |
| 7 | on the board of directors? | 11:21:43 |
| 8 | A. Two. | 11:21:45 |
| 9 | Q. And do you occupy one of those | 11:21:45 |
| 10 | seats? | 11:21:50 |
| 11 | A. Yes, I do. | 11:21:50 |
| 12 | Q. And who occupies the other seat? | 11:21:51 |
| 13 | A. Rob Hogan. | 11:21:53 |
| 14 | Q. And what types of decisions does | 11:21:54 |
| 15 | the board make? | 11:22:01 |
| 16 | A. The board approves an annual | 11:22:10 |
| 17 | budget. The board approves acquisitions. | 11:22:13 |
| 18 | The board approves other requests | 11:22:16 |
| 19 | presented by the chief executive officer. | 11:22:19 |
| 20 | Q. And what types of requests are | 11:22:22 |
| 21 | those? | 11:22:24 |
| 22 | A. Requests for capital spending, | 11:22:24 |
| 23 | requests to entering into long-term | 11:22:29 |
| 24 | contracts. | 11:22:32 |
| 25 | Q. How about closing offices? | 11:22:34 |

### Page 19

SIMMONS

| | | |
|---|---|---|
| 1 | | |
| 2 | A. No. | 11:22:36 |
| 3 | Q. And does the board make any | 11:22:38 |
| 4 | personnel decisions? | 11:22:41 |
| 5 | A. Other than hiring a chief | 11:22:43 |
| 6 | executive officer, no. | 11:22:47 |
| 7 | Q. Now, since you've been on the | 11:22:48 |
| 8 | board, were you given any | 11:22:55 |
| 9 | anti-discrimination training? | 11:22:56 |
| 10 | A. No. | 11:22:58 |
| 11 | MS. SELTZER: Objection. | 11:23:00 |
| 12 | Through the board or through his -- | 11:23:01 |
| 13 | MR. DATOO: Through the board. | 11:23:03 |
| 14 | A. No. | 11:23:05 |
| 15 | Q. Okay. Now, the entity whose | 11:23:05 |
| 16 | board you sit on, the LVI entity whose | 11:23:10 |
| 17 | board you sit on, does that entity have a | 11:23:14 |
| 18 | handbook? | 11:23:16 |
| 19 | A. I don't know. | 11:23:16 |
| 20 | Q. Does that entity whose board you | 11:23:17 |
| 21 | sit on have an equal employment | 11:23:19 |
| 22 | opportunity policy? | 11:23:22 |
| 23 | A. I imagine so. | 11:23:23 |
| 24 | Q. Why? | 11:23:29 |
| 25 | MS. SELTZER: Objection, but | 11:23:30 |

### Page 20

SIMMONS

| | | |
|---|---|---|
| 1 | | |
| 2 | you can answer. | 11:23:31 |
| 3 | A. I believe all companies have | 11:23:31 |
| 4 | EEOC policies. | 11:23:33 |
| 5 | Q. Okay. Does the entity whose | 11:23:34 |
| 6 | board you sit on have an | 11:23:36 |
| 7 | anti-discrimination policy? | 11:23:38 |
| 8 | A. I am sorry. Repeat the | 11:23:39 |
| 9 | question, please. | 11:23:44 |
| 10 | Q. Does the entity whose board you | 11:23:44 |
| 11 | sit on have an anti-discrimination policy? | 11:23:46 |
| 12 | A. Sure. Yes. | 11:23:48 |
| 13 | Q. And does the entity whose board | 11:23:50 |
| 14 | you sit on have an anti-retaliation | 11:23:53 |
| 15 | policy? | 11:23:56 |
| 16 | A. I don't know. | 11:23:56 |
| 17 | Q. What is LVI Acquisition Corp.? | 11:23:59 |
| 18 | A. I am not sure. | 11:24:06 |
| 19 | Q. How many employees does LVI | 11:24:17 |
| 20 | have? | 11:24:21 |
| 21 | A. I don't know. | 11:24:21 |
| 22 | Q. Does the entity of the board you | 11:24:25 |
| 23 | sit on have any employees? | 11:24:41 |
| 24 | A. I don't know. | 11:24:43 |
| 25 | Q. Does the entity whose board you | 11:24:46 |

### Page 21

SIMMONS

| | | |
|---|---|---|
| 1 | | |
| 2 | sit on have any officers? | 11:24:50 |
| 3 | A. I am not -- I don't know. | 11:24:51 |
| 4 | Q. Who is Jeffrey Smith? | 11:25:01 |
| 5 | A. Jeffrey Smith is an attorney | 11:25:02 |
| 6 | with Sidley Austin. | 11:25:07 |
| 7 | Q. Does he serve on the board of | 11:25:09 |
| 8 | directors for the entity whose board you | 11:25:11 |
| 9 | sit on? | 11:25:13 |
| 10 | A. No. | 11:25:13 |
| 11 | Q. Does he -- is he a secretary to | 11:25:14 |
| 12 | the board of directors for the entity you | 11:25:16 |
| 13 | sit on? | 11:25:18 |
| 14 | A. No. | 11:25:19 |
| 15 | MS. SELTZER: If -- if I might | 11:25:19 |
| 16 | make a suggestion, if you phrase your | 11:25:32 |
| 17 | questions between LVI Services he might be | 11:25:35 |
| 18 | able to give you better answers. | 11:25:38 |
| 19 | A. I can't distinguish between the | 11:25:39 |
| 20 | LVI entities. LVI to me is LVI. Period. | 11:25:41 |
| 21 | MR. DATOO: Let's go off the | 11:25:46 |
| 22 | record. | 11:25:47 |
| 23 | THE VIDEOGRAPHER: Off the | 11:25:50 |
| 24 | record. The time is 11:25 a.m. | 11:25:51 |
| 25 | (Discussion held off the | 11:26:37 |

6 (Pages 18 to 21)

```
                                    62
 1              SIMMONS
 2      A.   Do I recall when?          12:08:12
 3      Q.   When.                      12:08:14
 4      A.   No, I don't recall exactly when. 12:08:15
 5      Q.   Do you know if it was in '06, 12:08:16
 6   '07, '08, '09, '10?                12:08:19
 7      A.   I just don't remember. I am 12:08:22
 8   sorry.                             12:08:24
 9      Q.   Now, did Mr. State want to speak 12:08:24
10   to Mr. Fried before accepting an offer 12:08:28
11   from LVI?                          12:08:30
12      A.   Yes.                       12:08:32
13      Q.   Why?                       12:08:32
14      A.   He was concerned about his 12:08:33
15   ability to conduct the job of chief 12:08:34
16   executive officer without interference 12:08:39
17   with Mr. Fried.                    12:08:41
18      Q.   Why would he be concerned? 12:08:42
19      A.   I don't know why.          12:08:44
20      Q.   And did Mr. Fried speak to Mr. 12:08:49
21   State?                             12:08:53
22      A.   Yes, I believe so.         12:08:53
23      Q.   And do you know what they  12:08:54
24   discussed?                         12:08:55
25      A.   I believe they discussed the 12:08:56
```

```
                                    63
 1              SIMMONS
 2   autonomy that Mr. State would have to  12:08:59
 3   organize the affairs of the company in the 12:09:02
 4   way in which he saw fit.           12:09:04
 5      Q.   And do you know how that   12:09:09
 6   conversation went?                 12:09:10
 7      A.   I believe Mr. Fried assured Mr. 12:09:10
 8   State that he would have free rein to run 12:09:12
 9   the company any way he wanted, and that 12:09:15
10   Mr. Fried would remain at the company only 12:09:17
11   as long as Mr. State desired.      12:09:19
12      Q.   And how do you know that they 12:09:21
13   had this discussion?               12:09:24
14      A.   Mr. Fried told me.         12:09:25
15      Q.   After Mr. State started working 12:09:29
16   for LVI, did Mr. Fried's job title change? 12:09:36
17      A.   Yes.                       12:09:40
18      Q.   To what?                   12:09:41
19      A.   To -- back to chairman of the 12:09:43
20   board.                             12:09:46
21      Q.   And what were his job duties 12:09:46
22   after his title changed?           12:09:50
23      A.   I don't know.              12:09:51
24      Q.   Do you know if they were any 12:09:52
25   different from when -- from what his job 12:09:55
```

```
                                    64
 1              SIMMONS
 2   duties were as chairman?           12:09:57
 3          MS. SELTZER: Just as a     12:09:59
 4   clarification, you're talking about his 12:10:00
 5   duties as chairman of the board of the 12:10:02
 6   directors?                         12:10:06
 7          MR. DATOO: His duties as   12:10:07
 8   chairman.                          12:10:08
 9          MS. SELTZER: Okay.         12:10:10
10      A.   Chairman of the board of  12:10:11
11   directors.                         12:10:12
12      Q.   As chairman, that is what I am 12:10:12
13   asking. Do you know what his job duties 12:10:13
14   were as chairman?                  12:10:15
15      A.   Is there a distinction between 12:10:16
16   chairman and chairman of the board of 12:10:19
17   directors?                         12:10:20
18      Q.   There is.                  12:10:21
19      A.   Can you explain that to me, 12:10:21
20   please?                            12:10:23
21      Q.   Sure. Why don't we go off the 12:10:24
22   record because this is not going to be a 12:10:26
23   question answer, so --             12:10:27
24          THE VIDEOGRAPHER: Going off 12:10:29
25   the record. 12:10 p.m.             12:10:29
```

```
                                    65
 1              SIMMONS
 2          (Discussion held off the   12:11:00
 3   record.)                           12:11:00
 4          THE VIDEOGRAPHER: We are   12:11:01
 5   returning to the record. 12:11 p.m. 12:11:07
 6      Q.   Was Mr. Fried an employee of 12:11:10
 7   LVI?                               12:11:13
 8      A.   At what time?              12:11:13
 9      Q.   At any time.               12:11:22
10      A.   At any time. Yes, Mr. Fried was 12:11:23
11   an employee of at least one LVI entity. 12:11:25
12      Q.   And of that LVI entity that he 12:11:28
13   was an employee of, what was his job 12:11:30
14   title?                             12:11:32
15      A.   I don't know.              12:11:32
16      Q.   And was he also the chairman of 12:11:33
17   the board of directors?            12:11:36
18      A.   I --                       12:11:37
19          MS. SELTZER: I object to the 12:11:41
20   form.                              12:11:42
21      A.   At what point in time?     12:11:42
22      Q.   At any point in time.      12:11:44
23      A.   Yes, Mr. Fried served as   12:11:45
24   chairman of the board of directors 12:11:47
25   and -- and to my knowledge that was his 12:11:49
```

                                    17 (Pages 62 to 65)

### Page 74

SIMMONS

2 performance at board meetings? 12:31:05
3 A. I don't remember the exact 12:31:07
4 number. I imagine I observed something 12:31:09
5 negative at every board meeting. 12:31:11
6 Q. And what was that? 12:31:13
7 A. Mr. Fried can be a challenging 12:31:15
8 individual to work with in situations 12:31:20
9 where opinions counter to his are proposed 12:31:22
10 and discussed and considered, and I 12:31:28
11 observed that challenging behavior on 12:31:31
12 numerous occasions. 12:31:33
13 Q. And did you speak to Mr. Fried 12:31:35
14 about that? 12:31:37
15 A. I may have. I don't remember. 12:31:37
16 Q. And did you put that in writing, 12:31:39
17 your observations? 12:31:45
18 A. I may have. I don't remember. 12:31:46
19 Q. Did you ever put in writing your 12:31:48
20 observations regarding Mr. Fried's work 12:31:50
21 performance? 12:31:52
22     MS. SELTZER: Objection. 12:31:53
23 A. I may have. I don't remember. 12:31:54
24 Q. And if you would have, would you 12:31:55
25 have provided that -- those documents to 12:31:57

### Page 75

SIMMONS

2 your counsel? 12:31:59
3 A. No. Well, in connection with 12:31:59
4 this lawsuit, sure. If I have them, they 12:32:03
5 have them. 12:32:07
6 Q. Okay. Did you attend a meeting 12:32:07
7 on October 19, 2010 between Mr. State and 12:32:16
8 Mr. Fried? 12:32:20
9 A. I don't believe so. 12:32:21
10 Q. Do you know if they met that 12:32:25
11 day? 12:32:27
12 A. I don't know. 12:32:27
13 Q. Do you know if Mr. State made 12:32:28
14 any comments regarding Mr. Fried's age? 12:32:29
15 A. I have no idea. 12:32:32
16 Q. Did Mr. Fried ever tell you that 12:32:34
17 Mr. State made a comment about his age? 12:32:36
18 A. Yes. 12:32:39
19 Q. When? 12:32:39
20 A. At the board meeting. 12:32:40
21 Q. And -- 12:32:42
22 A. The final board meeting at which 12:32:43
23 Mr. Fried -- that Mr. Fried attended. 12:32:45
24 Q. And what did Mr. Fried tell you? 12:32:47
25 A. He didn't tell me anything. He 12:32:49

### Page 76

SIMMONS

2 told the board in a -- in the middle of a 12:32:50
3 long tirade regarding the injustices being 12:32:55
4 done to him that he was well aware 12:32:59
5 of -- of the legal ramifications of age 12:33:08
6 discrimination, and he threatened Mr. 12:33:11
7 State and the board with a proceeding 12:33:15
8 regarding alleged age discrimination. 12:33:17
9 Q. Did he tell you what comment 12:33:20
10 Mr. State made to him about his age? 12:33:22
11 A. I don't believe so. 12:33:27
12 Q. Did he tell you about any 12:33:28
13 comment Mr. State made to him about his 12:33:29
14 age? 12:33:31
15 A. I don't believe so. He simply 12:33:32
16 stated that comments had been made. 12:33:36
17 Q. But he didn't -- to your 12:33:37
18 knowledge, he didn't tell you what comment 12:33:38
19 was made? 12:33:40
20 A. If he did, I don't remember. 12:33:40
21 Q. Did you investigate Mr. Fried's 12:33:42
22 allegations of age discrimination? 12:33:46
23 A. What do you mean by 12:33:48
24 "investigate"? 12:33:51
25 Q. Did you look into his 12:33:51

### Page 77

SIMMONS

2 allegations of age discrimination? 12:33:52
3 A. Other than the discussion -- I 12:33:54
4 guess no is the answer. No. 12:34:03
5 Q. Did the board? 12:34:06
6 A. No. 12:34:07
7 Q. Why not? 12:34:07
8 A. We didn't deem them to have 12:34:08
9 enough validity to investigate. 12:34:14
10 Q. Okay. Now, did there come a 12:34:16
11 time when Mr. Fried's job duties -- when 12:34:34
12 Mr. State started transitioning Mr. 12:34:37
13 Fried's job duties to other people? 12:34:40
14 A. I'm not certain. 12:34:41
15 Q. Did there come a time when Mr. 12:34:42
16 Fried e-mailed you a list of his job 12:34:44
17 duties? 12:34:46
18 A. Whose job duties? 12:34:47
19 Q. His job duties? 12:34:48
20 A. No. 12:34:50
21 Q. Did there come a time when Mr. 12:34:51
22 Fried e-mailed you a list of his job 12:34:53
23 duties? 12:34:56
24     MS. SELTZER: Mr. Fried's job 12:34:57
25 duties? 12:34:59

20 (Pages 74 to 77)

### Page 130

```
                    SIMMONS
 2      Q.  -- did you send another letter     02:29:43
 3   to Burt?                                  02:29:44
 4      A.  I don't remember.                  02:29:45
 5      Q.  Okay.                              02:29:47
 6      A.  At this point it became pretty     02:29:51
 7   clear that Burt had chartered a course    02:29:54
 8   that was highly unlikely to result in an  02:29:56
 9   acceptable resolution of this dispute,    02:29:58
10   management dispute between himself and Mr. 02:30:02
11   State.                                    02:30:04
12      Q.  Now, did there come a time when    02:30:04
13   Mr. Fried was fired?                      02:30:06
14      A.  Well, Mr. Fried was asked to       02:30:07
15   assume the position of chairman of the    02:30:11
16   board with a defined list of              02:30:15
17   responsibilities and a compensation       02:30:18
18   arrangement that would have enabled him to 02:30:21
19   earn the same level of compensation he had 02:30:24
20   previously been paid assuming he worked   02:30:28
21   the same number of hours, and he was told 02:30:30
22   that if he did not accept that position   02:30:33
23   then he would be terminated.              02:30:36
24      Q.  So did there come a time when he   02:30:38
25   was fired?                                02:30:40
```

### Page 131

```
                    SIMMONS
 2      A.  Burt did not accept the position   02:30:40
 3   as chairman of the board, and ultimately  02:30:42
 4   he was terminated.                        02:30:45
 5      Q.  Do you know when he was fired?     02:30:46
 6      A.  I don't know the exact date.       02:30:47
 7          (Document handed to witness.)      02:31:05
 8      Q.  Handing you a document that has    02:31:05
 9   been previously marked as Plaintiff's 11. 02:31:07
10      A.  Right.                             02:31:09
11      Q.  Take a look at that document and   02:31:09
12   let me know if you have seen it before.   02:31:11
13      A.  I have seen it before.             02:31:12
14      Q.  Did you author this document?      02:31:14
15          MS. SELTZER:  Objection.           02:31:16
16      Q.  Did you draft this document?       02:31:18
17          MS. SELTZER:  Author?              02:31:20
18          MR. DATOO:  Yes.                   02:31:20
19          MS. SELTZER:  Sorry.               02:31:21
20      A.  Yes.                               02:31:24
21      Q.  Okay.  Can I direct your           02:31:25
22   attention to the second full paragraph in 02:31:28
23   this letter?  It says, "Effective         02:31:30
24   11/30/10, your employment with LVI        02:31:36
25   Services, Inc. will terminate."           02:31:39
```

### Page 132

```
                    SIMMONS
 2          Do you see that?                   02:31:43
 3      A.  I do.                              02:31:44
 4      Q.  Does that refresh your             02:31:45
 5   recollection as to whether Mr. Fried      02:31:45
 6   was -- on when Mr. Fried was terminated?  02:31:48
 7      A.  It appears he was terminated       02:31:50
 8   effective 11/30.                          02:31:52
 9      Q.  Okay.  And was that termination    02:31:54
10   contingent upon him accepting any sort of 02:31:56
11   arrangement, alternative working          02:31:59
12   arrangement?                              02:32:01
13          MS. SELTZER:  Objection to the     02:32:02
14   form.                                     02:32:03
15      A.  I'm not sure I understand the      02:32:04
16   question.                                 02:32:05
17      Q.  You testified earlier that if      02:32:05
18   Mr. Fried did not accept a consulting     02:32:07
19   arrangement, he would be terminated; is   02:32:09
20   that correct?                             02:32:11
21          MS. SELTZER:  He did not say       02:32:12
22   that.                                     02:32:13
23          THE WITNESS:  Could you read       02:32:13
24   that back to me, please.                  02:32:14
25          (Record read.)                     02:34:10
```

### Page 133

```
                    SIMMONS
 2      Q.  Okay.  So if Mr. Fried -- was      02:34:10
 3   Mr. Fried terminated regardless of whether 02:34:20
 4   he accepted or didn't accept a position?  02:34:23
 5          MS. SELTZER:  Objection to the     02:34:27
 6   form, but you can answer.                 02:34:28
 7      A.  Yes.  So I think we need to        02:34:29
 8   expand a little on my earlier answer.     02:34:32
 9   What this letter does is what we intended 02:34:35
10   it to do, which is to make Mr. Fried the  02:34:37
11   non-executive chairman of LVI with        02:34:40
12   prescribed responsibilities and a mutually 02:34:43
13   agreed upon compensation arrangement.  In 02:34:46
14   order to make Mr. Fried a non-executive   02:34:49
15   chairman, his employment by definition had 02:34:53
16   to be terminated.  By definition a        02:34:55
17   non-executive chairman is not an employee, 02:34:57
18   and we addressed the compensation and     02:35:00
19   other benefit aspects of his relationship 02:35:03
20   with LVI outside of a relationship with   02:35:07
21   the company as an employee.  So that was  02:35:10
22   the purpose of this letter.               02:35:12
23      Q.  So his status as an employee of    02:35:14
24   LVI was terminated?                       02:35:19
25      A.  That is correct.                   02:35:22
```

**Page 158**

SIMMONS

2  A.  No.  02:58:15
3  Q.  Do you know which office she  02:58:15
4  worked out of?  02:58:17
5  A.  I have been told she worked in  02:58:17
6  the company's Westport office.  02:58:19
7  Q.  Do you have any personal  02:58:21
8  knowledge about the quality of her work?  02:58:25
9  A.  None whatsoever.  02:58:27
10 Q.  Do you have any knowledge about  02:58:28
11 the quality of her work?  02:58:29
12 A.  None whatsoever.  02:58:30
13 Q.  Now, did there come a time when  02:58:31
14 Ms. Dembin was terminated?  02:58:34
15 A.  I believe so.  02:58:37
16 Q.  Do you know when that was?  02:58:38
17 A.  I don't know.  02:58:40
18 Q.  Do you know why she was  02:58:41
19 terminated?  02:58:42
20 A.  I believe she was terminated as  02:58:43
21 part of a general reduction in force that  02:58:45
22 affected a range of employees.  02:58:47
23 Q.  Sorry. What was the last part?  02:58:49
24 A.  A general reduction in force  02:58:52
25 that affected a group of employees.  02:58:54

**Page 159**

SIMMONS

2  Q.  And was that group of employees  02:58:56
3  limited only to the Westport office?  02:58:57
4  A.  I don't believe so.  02:58:59
5  Q.  Was it a company-wide reduction  02:59:02
6  in force?  02:59:04
7  A.  It -- I believe it affected  02:59:04
8  multiple offices of the company and --  02:59:06
9  Q.  Do you know which office?  02:59:09
10 A.  I don't know which offices.  02:59:10
11 Q.  Do you know what people?  02:59:11
12 A.  I don't know.  02:59:12
13 Q.  Do you know how many people?  02:59:13
14 A.  No, I know -- I don't know.  02:59:14
15 Q.  Were you involved in the  02:59:17
16 decision -- in the reduction in force  02:59:18
17 decision?  02:59:22
18 A.  No, I was not.  02:59:23
19 Q.  Was the board consulted on  02:59:24
20 the -- in the decision?  02:59:26
21 A.  No.  02:59:28
22 Q.  Does Mr. State have discretion  02:59:28
23 to open and close offices?  02:59:30
24 A.  Absolutely.  02:59:32
25 Q.  Does he have discretion to hire  02:59:33

**Page 160**

SIMMONS

2  and fire?  02:59:35
3  A.  Absolutely.  02:59:36
4  Q.  Why did the board -- why was the  02:59:37
5  board involved in the decision to  02:59:40
6  terminate Mr. Fried?  02:59:41
7  A.  Because Mr. Fried works for the  02:59:42
8  board.  02:59:44
9  Q.  Wasn't he also an employee at  02:59:45
10 LVI?  02:59:46
11 A.  Mr. Fried reported to the board  02:59:47
12 of directors, so it is exactly that group  02:59:53
13 of people that were responsible for the  02:59:58
14 terms of his employees, and it was that  02:59:59
15 group of people that were able to make a  03:00:01
16 decision as to his ongoing role at the  03:00:02
17 company.  03:00:05
18 Q.  He didn't report to Scott State?  03:00:05
19 A.  No. He certainly didn't think  03:00:07
20 he reported to Scott State. Scott State  03:00:08
21 certainly didn't think he reported to  03:00:10
22 Scott State.  03:00:12
23 Q.  Who made the decision to close  03:00:12
24 the Westport office?  03:00:18
25 A.  I believe Scott -- Scott State.  03:00:19

**Page 161**

SIMMONS

2  Q.  Who made the decision to select  03:00:21
3  which employees to be laid off?  03:00:24
4  A.  With respect to the Westport  03:00:26
5  office?  03:00:30
6  Q.  In connection with this general  03:00:31
7  reduction in force that affected --  03:00:32
8  A.  Mr. State. And he may have  03:00:35
9  received input from other managers at the  03:00:37
10 company. I'm not certain.  03:00:38
11 Q.  But the board had nothing to do  03:00:40
12 with this?  03:00:41
13 A.  The board had nothing to do with  03:00:41
14 it.  03:00:43
15 Q.  Okay. Were you involved in any  03:00:43
16 communications whether it be verbal or  03:00:49
17 written regarding a reduction in force?  03:00:53
18 A.  I believe there were some  03:00:55
19 e-mails that outlined the potential  03:00:57
20 expense savings associated with a variety  03:01:00
21 of actions, and I believe I have seen some  03:01:03
22 of those e-mails.  03:01:04
23 Q.  Do you know when the decision  03:01:05
24 was made to reduce the force?  03:01:07
25 A.  I don't know.  03:01:08

VERITEXT REPORTING COMPANY

212-267-6868                                         516-608-2400

### Page 179

```
 1              SIMMONS
 2   various members of his executive            03:27:52
 3   management team.                            03:27:54
 4       Q.   So if these responsibilities       03:27:55
 5   were delegated to Mr. Fried by the CEO,     03:27:56
 6   would that be acceptable?                   03:27:59
 7       A.   Yes, that would be acceptable to   03:28:00
 8   me.                                         03:28:02
 9       Q.   Okay.  And do you know if these    03:28:03
10   were the duties that were delegated Mr.     03:28:08
11   Fried while he was -- while Mr. McNamara    03:28:10
12   was CEO?                                    03:28:14
13       A.   I don't --                         03:28:15
14           MS. SELTZER:  I object.  Asked      03:28:17
15   and answered about 1200 times.              03:28:18
16           MR. DATOO:  Let's go for 1201       03:28:20
17   then.                                       03:28:21
18           MS. SELTZER:  Let's go for          03:28:22
19   1201.                                       03:28:24
20       A.   I don't know.                      03:28:24
21       Q.   Can I direct your attention to     03:28:31
22   the stack of exhibits in front of you that  03:28:32
23   is marked as Plaintiff's Exhibit 16.  I     03:28:35
24   you just want to draw your attention to     03:28:44
25   the e-mail you sent to Mr. Fried where you  03:28:46
```

### Page 180

```
 1              SIMMONS
 2   wrote:  "You were earning every penny of    03:28:49
 3   it."                                        03:28:55
 4       Do you see that?                        03:28:56
 5       A.   Yes.                               03:28:57
 6       Q.   Is that a true statement?          03:28:58
 7           MS. SELTZER:  Objection.  Asked     03:29:02
 8   and answered.                               03:29:03
 9       A.   Yes.                               03:29:03
10       Q.   Okay.                              03:29:04
11           MR. DATOO:  Okay.  Thank you        03:29:08
12   very much.                                  03:29:12
13           THE WITNESS:  Thank you.            03:29:14
14           MR. DATOO:  No further              03:29:15
15   questions.                                  03:29:15
16       (Continued on next page.)               03:29:15
```

### Page 181

```
 1              SIMMONS
 2           THE VIDEOGRAPHER:  We're going      03:29:16
 3   off the record.  3:29 p.m. End of today's   03:29:16
 4   questioning.                                03:29:20
 5       (Time noted: 3:29 p.m.)                 03:29:22




12            BRIAN SIMMONS

14   Subscribed and sworn to before me
15   this     day of         , 2011
```

### Page 182

```
 2            CERTIFICATION


 6       I, DEBBIE ZAROMATIDIS, a Shorthand
 7   Reporter and a Notary Public, do hereby
 8   certify that the foregoing witness, BRIAN
 9   SIMMONS, was duly sworn on the date
10   indicated, and that the foregoing is a
11   true and accurate transcription of my
12   stenographic notes.
13       I further certify that I am not
14   employed by nor related to any party to
15   this action.




23            DEBBIE ZAROMATIDIS
```